COLEMAN & BALOGH LLP
ETHAN A. BALOGH, No. 172224
235 Montgomery Street, Suite 1070
San Francisco, CA 94104
Telephone: 415.391.0440
Facsimile: 415.373.3901
eab@colemanbalogh.com

Attorneys for Arrestee
DONALD KOLLMAR

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF DON KOLLMAR | Case No. 4:19-70677 MAG<br><br>ARRESTEE DON KOLLMAR'S MEMORANDUM OF LAW IN SUPPORT OF RELEASE<br><br>Before the Honorable Kandis A. Westmore<br>United States Magistrate Judge |

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS .................................................................................... 1

ARGUMENT ....................................................................................................... 6

   A. THE COURT SHOULD RELEASE MR. KOLLMAR PURSUANT TO THE
   FOURTH AMENDMENT .............................................................................. 6

   B. THE GOVERNMENT HAS NOT (AND TO ARRESTEE'S KNOWLEDGE,
   CANNOT) IDENTIFY ANY FEDERAL OFFENSE THAT WOULD SUBJECT HIM
   TO PROSECUTION IN THE UNITED STATES HAD THE ALLEGED CONDUCT
   BEEN COMMITTED IN ITS TERRITORIAL JURISDICTION. .................................. 9

   C. THERE EXIST SPECIAL CIRCUMSTANCES SUPPORTING DONALD
   KOLLMAR'S ADMISSION TO BAIL. ............................................................ 12

CONCLUSION .................................................................................................. 15

I

# TABLE OF AUTHORITIES

**Cases**

*Caltagirone v. Grant*, 629 F.3d 739 (2d Cir. 1980)............................................................7

*Extradition of Campillo Valles*, 36 F. Supp. 2d 1228 (S.D. Cal. 1998)..............................6

*In re Lane*, 135 U.S. 443 (1890) ........................................................................................2

*Matter of Extradition of Sidali*, 868 F. Supp. 656 (D.N.J. 1994) ................................12

*Matter of Requested Extradition of Kirby*, 106 F.3d 855 (9th Cir. 1996)....................13

*Orhorhaghe v. INS*, 38 F.3d 488 (9th Cir. 1994) ...............................................................6

*Parretti v. United States*,  122 F.3d 758 (9th Cir. 1997).............................................6, 8, 9, 12

*People v. Osband,* 13 Cal. 4th 622 (1996) .........................................................................2

*R. v. MAURANTONIO,* 2 C.C.C.115, 2 C.R.N.S.375 (Ont.C.A. 1968) .......................5

*Sahagian v. United States*, 864 F.2d 509 (7th Cir. 1988) ................................................8

*Salerno v. United States*, 878 F.2d 317 (9th Cir. 1989)...........................................12, 13

*Singh v. Holder*, 638 F.3d 1196 (9th Cir. 2011) ............................................................12

*Theron v. United States*, 832 F.2d 492 (9th Cir. 1987)...................................................10

*United States v. Dorsey*, 677 F.3d 944 (9th Cir. 2012)...................................................13

*United States v. Gomez-Mendez*, 486 F.3d 599 (9th Cir. 2007) .......................................2

*United States v. Rodriguez-Gomez*, 506 F.3d 738 (9th Cir. 2007) ..................................2

*United States v. Taitz*, 130 F.R.D. 442  (S.D. Cal. 1990) ...............................................13

*United States v. Wathne*, 2008 WL 4344112 (N.D. Cal. Sept. 22, 2008)......................11

*United States v. Wells*, 519 U.S. 482 (1997)...................................................................10

*United States v. Williams*, 480 F.Supp. 482 (D. Mass.)....................................................7

II

**Statutes**

18 U.S.C. § 2243 ........................................................................................ 11

Crim. Code Canada § 143 ........................................................................ 2, 4

Crim. Code Canada § 146 ........................................................................ 2, 4

Crim. Code Canada § 149 ........................................................................ 1, 4

III

## PRELIMINARY STATEMENT

Arrestee Donald Kollmar, by and through undersigned counsel, here by responds to the Government's Memorandum of Law in Opposition to Bail.  ECF 4.

This extradition case involves serious allegations of sexual activity with a minor purportedly committed by Donald Kollmar more than 40 years ago.  In cases with inflammatory allegations, it is often difficult to avoid an emotional view of the case.  But it is precisely in those types of cases where the gravest of injustices can occur.  When a reasoned view of the facts and law is undertaken, it becomes clear that the presentation offered by the Government to support extradition falls short of establishing probable cause.  Indeed, Canada's apparent failure to conduct basic investigation over the course of the last four decades, an unexplained and extraordinary delay that itself may serve as a bar to extradition, is cause for significant concern.

Even putting aside that Mr. Kollmar, a citizen of the United States, is innocent, and that serious questions exist regarding the propriety of any impending (but not yet received) extradition request, the question at bar now is whether he should be detained pending receipt and adjudication of any such request.  For the reasons set forth below, the answer is he should not be, and he should be released on his own recognizance, or at least admitted to bail.

## STATEMENT OF FACTS

The Government arrested Mr. Kollmar on May 3, 2019, pursuant to a criminal complaint seeking his provisional arrest pending a formal request for extradition by the Canadian Government.  *See* ECF 1 at 2 (¶ 3); ECF 6.  The Complaint identifies three alleged crimes as established by the Criminal Code of Canada ("CCC"): "one count of Indecent Assault on a Female, in violation of CCC § 149 ('Count 1'); one count of Rape, in violation of CCC §

////

1

143(b)(iii) ('Count 2'); and one count of Rape of A Female, in violation of CCC § 146(2) ('Count 3')."  ECF 1 ¶ 6.

To support these allegations, the Complaint asserts that 44 years ago, in 1975, the Arrestee touched the genitals of a minor (hereafter "B.B"), aged 12 or 13, and digitally penetrated her.  *Id.* ¶ 7(c).  The Complaint also alleges that 42 years ago, on Mother's Day weekend 1977, the Arrestee "placed part of his penis inside B.B.'s vagina" when she was aged 14.  *Id.* ¶ 7(d).

The Complaint does *not* allege that this conduct was accomplished by force or violence, or the threat of force of violence.  *See generally* ECF 1.  Rather, the Complaint recites that during this time period, B.B. and her family belonged to a religious group named "Students of Light" and that "she felt that she was 'chosen by God to be with [the Arrestee]."  *Id.* §§ 7(a) & 7(e).  The Complaint additionally asserts that Kollmar had told her "that he intended to marry her when she turned (16)[,]" and as a result, "B.B. felt that it was her 'responsibility' and 'honour to be with him, and married to him."  *Id.*  In other words, the account presented in the Complaint establishes consent, and thus sounds in rape by false pretenses (Counts One and Two), and statutory rape (Count Three), as opposed to common law rape, *viz.*. forcible rape. [1]

////

---

[1] The crime of "rape" refers to the common law crime of engaging in sexual activity with another by violence and against the will of the other party.  *See In re Lane,* 135 U.S. 443, 448 (1890).  The Complaint does not make out a claim of rape.  *See* ECF 1.  Rather, Count Three attempts to make out a claim of statutory rape.  *See United States v. Rodriguez-Gomez,* 506 F.3d 738, 741 (9th Cir. 2007) ("'Statutory rape' is commonly understood to be the offense of unlawful sexual intercourse with a minor." (quoting *People v. Osband,* 13 Cal.4th 622, 55 Cal.Rptr.2d 26, 919 P.2d 640, 712 (1996)); *United States v. Gomez-Mendez,* 486 F.3d 599, 603 (9th Cir. 2007) ("The term 'statutory rape' is ordinarily, contemporarily, and commonly understood to mean the unlawful sexual intercourse with a minor under the age of consent specified by state statute.")

According to the account presented in the Complaint, the Arrestee didn't marry B.B., so "[w]hen she was sixteen (16) years old, B.B. reported [the Arrestee's behavior" to her parents; after consulting an attorney, they decided not to lodge a formal complaint. *Id.* ¶ 7(f). (The content of that report to the parents is unknown at this time.)

Twenty years after these alleged events, the Complaint alleges that in 1997, B.B. made a "statement to Canadian authorities[,]" and that statement resulted in an initial arrest warrant. *Id.* ¶ 7(e).[2] Twenty years after that, in July 2017, the Complaint alleges that Canadian law enforcement "observed a photograph of a man named Don Kollmar" on the internet, and "B.B. identified the individual in the photograph as that of the man who had sexually assaulted her as a child." *Id.* ¶ 7(f)[*]. (The Complaint does not present facts to establish that the person she identified is, in fact, the Arrestee.)

As noted, the account presented in the Complaint sounds in rape by false pretenses, and rape defined by statute (statutory rape) as opposed to common law rape. The allegations identified in the Complaint bear this out.

////

---

[2] This statement is difficult to understand. As reflected in paragraph 6 of the Complaint, an arrest warrant arises from the swearing of an Information before a Justice of the Peace, which in this case, is alleged to have occurred on November 28, 2018, *viz.*, more than 40 years after the alleged events. *See id.*, ¶ 6. If there was a 1997 arrest warrant, where is it, and where is the Information presenting any alleged crimes at that time? The Complaint is silent on these points. So too, the arrestee has visited Canada at least 20 times since 1997 because his sister and brother-in-law reside in Ontario. Had a warrant been active for this 22 year period, one would have expected the Canadian authorities to have arrested Mr. Kollmar on one of his many border crossings.

In addition, it appears that the Complaint intended to label this subparagraph as 7(g), because following subparagraphs 7(e) and 7(f), the Complaint then labels the next two subparagraphs 7(e) and 7(f) for the second time. Going forward, we will mark the second iterations of subparagraphs 7(e) and 7(f) with a superscript asterisk ([*]) to identify them as the second of the two identically-labeled subparagraphs.

3

As stated, Count One alleges that on some unknown date between 1974 and 1977, the Arrestee committed "Indecent Assault on a Female," in violation of CCC § 149.  During those four years, that code section proscribed as follows:

149.

(1)  Every one who indecently assaults a female person is guilty of an indictable offence and is liable to imprisonment for five years and to be whipped.

(2)  An accused who is charged with an offence under subsection (1) may be convicted if the evidence establishes that the accused did anything to the female person with her consent that, but for her consent, would have been an indecent assault, if her consent was obtained by false and fraudulent representations as to the nature and quality of the act. 1953-54, c. 51, s. 141.

Count Two alleges that on some unknown date between 1974 and 1977, the Arrestee committed rape, in violation of CCC § 143(b)(iii).  During those four years, that section of the Canadian criminal code proscribed as follows:

143.

A male person commits rape when he has sexual intercourse with a female person who is not his wife, (a) without her consent, or (b) with her consent if the consent (i) is extorted by threats or fear of bodily harm, (ii) is obtained by personating her husband, or (iii) is obtained by false and fraudulent representations as to the nature and quality of the act.  1953-54, c. 51, s. 135.

And Count Three alleges that on some unknown date between 1974 and 1977, the Arrestee committed rape of a female, in violation of CCC § 146(2).  During those four years, that section of the Canadian criminal code proscribed as follows:

146.

(1)  Every male person who has sexual intercourse with a female person who (a) is not his wife, and (b) is under the age of fourteen years, whether or not he believes that she is fourteen years of age or more, is guilty of an indictable offence and is liable to imprisonment for life and to be whipped.

4

(2) Every male person who has sexual intercourse with a female person who (a) is not his wife, (b) is of previously chaste character, and (c) is fourteen years of age or more and is under the age of sixteen years, whether or not he believes that she is sixteen years of age or more, is guilty of an indictable offence and is liable to imprisonment for five years.

(3) Where an accused is charged with an offence under subsection (2), the court may find the accused not guilty if it is of opinion that the evidence does not show that, as between the accused and the female person, the accused is more to blame than the female person. 1953-54, c. 51, s. 138; 1959, c. 41, s. 9.

In other words, Counts One and Two hinge on both the accuracy of the alleged sexual conduct, and the question of whether the Arrestee secured B.B.'s consent based on "false and fraudulent representations as to the nature and quality of the act." The Complaint provides no such allegations. *See also R. v. MAURANTONIO,* [1968] 2 C.C.C.115, 2 C.R.N.S.375 (Ont.C.A.) (holding that in determining the question of obtaining consent by false and fraudulent representations the phrase 'nature and quality of the act' should be interpreted to encompass the surrounding circumstances which give meaning to the particular physical activity in question; and accordingly where the complainants consented to a medical examination by the accused who had falsely held himself out to be a doctor, they were subjected to something entirely different from that to which they had consented).

Count Three hinges on the sufficiency of evidence proving (1) sexual intercourse, *viz.*, the accuracy of the allegation that in 1977, the Arrestee "placed part of his penis inside of her vagina," (2) the question of whether B.B. was "previously of chaste character," and (3) her age in May 1977. The Complaint provides no allegations to support the second element of this alleged violation.

////

5

In addition, the Government had not identified which, if any, federal statute proscribed the alleged conduct at the time of the events. As shall be shown below, Mr. Kollmar contends that no such statutes exist and the Government will not be able to establish dual criminality.

**ARGUMENT**

**A.    THE COURT SHOULD RELEASE MR. KOLLMAR PURSUANT TO THE FOURTH AMENDMENT.**

The Court should enter an Order directing the immediate release of Donald Kollmar pursuant to the Fourth Amendment. The Ninth Circuit grappled with the issue of whether a foreign fugitive who was "provisionally" arrested in the United States based upon allegations made in a foreign warrant were entitled to an independent determination of probable cause. *Parretti v. United States*, 122 F.3d 758 (9th Cir. 1997), *opinion withdrawn and appeal dismissed on other grounds*, 143 F.3d 508 (9th Cir. 1998 (en banc).[3] (Of course, and quite important, Mr. Kollmar is a natural born United States citizen.) *Parretti* held that sections of a treaty and 18 U.S.C. § 3184 which permit "provisional arrest" without independent judicial determination of probable cause violate the Fourth Amendment. 122 F.3d at 773.

So too, the Second Circuit has raised "grave questions concerning the constitutional propriety" of issuing an arrest warrant solely on the basis of the existence of a foreign arrest

---

[3] Mr. Kollmar recognizes that an *en banc* panel of the Ninth Circuit withdrew the three-judge panel's opinion in *Parretti*. The *en banc* panel, however, did not disagree with the merits of the issues addressed by the three-judge panel. Rather, the *en banc* panel declined to reach the merits and instead dismissed the appeal under the fugitive disentitlement doctrine. *Parretti*, 143 F.3d at 510-11. Thus, although the three-judge panel opinion in *Parretti* was vacated and therefore is no longer binding precedent, it nonetheless stands as very persuasive authority for courts in the Ninth Circuit. *See Orhorhaghe v. INS*, 38 F.3d 488, 493 n.4 (9th Cir. 1994) (relying on prior Ninth Circuit opinion that was vacated as moot and explaining that the opinion was "still persuasive authority"). Indeed, the three-judge "panel's majority opinions . . . still accurately set forth the law." *Parretti*, 143 F.3d at 512 (Reinhardt, J., dissenting). And, Magistrate Judge Stiven has applied *Parretti* even after the opinion was vacated. *See Extradition of Campillo Valles*, 36 F. Supp. 2d 1228, 1231 (S.D. Cal. 1998).

warrant. *Caltagirone v. Grant*, 629 F.3d 739, 758 (2d Cir. 1980); *see also United States v. Williams*, 480 F.Supp. 482, 485 (D. Mass.) (expressing doubt as to the constitutionality of 30-day provisional detention bases solely on information that the fugitive had been charged with an extraditable crime), *rev'd on other grounds*, 611 F.2d 914 (1st Cir. 1979).

But *Caltagirone* then avoided the constitutional question by interpreting the treaty at issue there (with Italy) as requiring a full evidentiary showing of probable cause to believe that an extraditable crime had been committed, and then holding that the warrant for "provisional arrest," which was based solely on the existence of the Italian arrest warrant, violated the treaty because it was issued without probable cause. *Caltagirone*, 629 F.2d at 742, 747.

The language in the Italian treaty that the Second Circuit interpreted as requiring probable cause for a provisional arrest warrant was as follows:

> In case of urgency a Contracting Party may apply for the provisional arrest of the person sought pending the presentation of the request for extradition through the diplomatic channel.... The application shall contain a description of the person sought, an indication of intention to request the extradition of the person sought and a statement of the existence of a warrant of arrest ... against that person, *and such further information, if any, as would be necessary to justify the issue of a warrant of arrest had the offense been committed ... in the territory of the requested Party* "

*Caltagirone,* 629 F.2d at 744 n. 9 (quoting Treaty of Extradition, Jan. 18, 1973, U.S.–Italy, 26 U.S.T. 493) (emphasis added). In other words, the Italian treaty provided for the issuance of a warrant for "provisional arrest" only upon a showing of both the existence of an arrest warrant *and* "such further information as would be necessary to justify the issue of the warrant of arrest had the offense been committed" in the United States. *Id.* at 745. The Second Circuit interpreted this "further information" language as requiring a showing of probable cause in addition to the existence of an arrest warrant issued by the requesting state. *Id.* at 744 ("Had the offense [the

7

fugitive was charged with] been committed in the United States, a showing of probable cause would have been necessary to justify the issuance of an arrest warrant.").

The language of Article 11 the Treaty with Canada applicable to this case is identical in the material parts:

> In case of urgency a Contracting Party may apply for the provisional arrest of the person sought pending the presentation of the request for extradition through the diplomatic channel.  Such application shall contain a description of the person sought, an indication of intention to request the extradition of the person sought and a statement of the existence of a warrant of arrest or a judgment of conviction against that person, *and such further information, if any, as would be necessary to justify the issue of a warrant of arrest had the offense been committed, or the person sought been convicted, in the territory of the requested State*.

*See* Ex. A (emphasis added).

Like the Second Circuit, the Seventh Circuit, in *Sahagian v. United States*, 864 F.3d 509, 511 (7th Cir. 1988), interpreted the same language in the treaty with Spain as requiring, in addition to the existence of the Spanish warrant, and additional showing of probable cause to support the issuance of a warrant for provisional arrest in the United States.

This Court should find the Second and Seventh Circuits' interpretations of the same language found in the Treaty with Canada persuasive, and should follow those cases and independently assess the Government's probable cause showing now.

And for similar reasons expressed in *Parretti*, the domestic warrant underlying Mr. Kollmar's "provisional arrest" was issued without probable cause, and thus detention without bail violates due process, absent a showing that the Arrestee poses a flight risk (which is not the case here).  122 F.3d at 773-76.  Like here, the information contained in the Complaint "was issued solely on the basis of the allegations of fact contained in the [foreign] arrest warrant[.]"  *Id*. at 773.  In rejecting the Government's showing, the Court noted—as applicable here—that "[i]n

8

applying for the warrant to arrest [the fugitive], all the government presented were the [foreign] magistrate's allegations of fact." *Id.*, at 774.  So too, "[t]he government presented no affidavits, deposition testimony, or other competent evidence that could have provided [the reviewing court] with a substantial basis for concluding that probable cause existed." *Id.* (quotations and citation omitted).

"In sum, [the fugitive] is correct that the government's probable cause showing consisted of nothing more than naked allegations." *Id*. at 775.  Such "allegations without supporting affidavits or other competent evidence provide no basis to believe that [the fugitive] committed an extraditable crime." *Id*.

Moreover, even *if* the Court could consider the Complaint as providing more than naked allegations—and it shouldn't under *Parretti*'s detailed refutation of the sufficiency of such allegations—Mr. Kollmar would still be entitled to bail because the Government presented no evidence that (1) he committed the alleged acts by making "false and fraudulent representations as to the nature and quality of the act[,]" which a required element of Counts One and Two, or (2) B.B. was a virgin at the time of the 1977 events, which is a necessary element of Count Three. In other words, even accepting the Complaint as true, it still falls short of establishing probable cause.

**B.**   **THE GOVERNMENT HAS NOT (AND TO ARRESTEE'S KNOWLEDGE, CANNOT) IDENTIFY ANY FEDERAL OFFENSE THAT WOULD SUBJECT HIM TO PROSECUTION IN THE UNITED STATES HAD THE ALLEGED CONDUCT BEEN COMMITTED IN ITS TERRITORIAL JURISDICTION.**

At the last calling of the case, the Government suggested that to satisfy dual criminality, as required to support a request for extradition, the Court should look to that laws of any of the 50 states when making its assessment.  The Government is incorrect.

////

9

True enough, when Canada and the United States entered their extradition treaty, it defined extraditable offenses differently.   Therein, in Article 2, the parties directed that persons subject to extradition were those who had committed "any of the offenses listed in the Schedule annexed to this Treaty," and that Schedule included rape and indent assault.  *See* Ex. A, Art. 2 & Schedule.[4]  Thus, at that time, the Government may have argued a broader interpretation for extraditable offenses.[5]

But as the Government recognizes, the parties amended the Extradition Treaty in 1988, which the Senate ratified in 1990.  *See* ECF 1 ¶ 2.  That amendment deleted Article 2, and replaced it, in the relevant part, with the following:

> Extradition shall be granted for conduct which constitutes an offense punishable by the laws of both Contracting Parties by imprisonment or other form of detention for a term exceeding one year or any greater punishment.

*See* Ex. B.  Because the contracting parties are the United States and Canada, only "offense[s] punishable by the laws of both [the United States and Canada]" are covered by the treaties.  State law does not apply to this case by the agreement of the United States and Canada.[6]

---

[4] *But see* n.1 *supra*.

[5] But even then, that argument would likely have failed because "rape" refers to common law rape, which is defined as sexual intercourse obtained by force and against the will of another. There are no such allegations in this case.  *See* n.1, *supra*.

[6] In *Theron v. United States*, 832 F.2d 492, 496 (9th Cir. 1987), *cert. denied*, 486 U.S. 1059 (1988), *abrogated on other grounds*, *United States v. Wells*, 519 U.S. 482, 486 n.3 (1997), the Court addressed whether to use federal law or state law when addressing extraditability.  That treaty included a provision that proscribed extradition if "exemption from prosecution or punishment has been acquired by lapse of time, according to the laws of the High Contracting Party applying to or applied to."  832 F.2d at 498.  "[B]ecause the United States is the contracting party to the treat[y], [and] not the individual states, *Theron* held that the magistrate court must look to *federal* law for the rule of decision when assessing the laws of the "Contracting Part[ies.]"

10

So too, as of this writing, the Government has never identified any law, much less federal law, that proscribed the Arrestee's alleged conduct. The first two counts cited in the Complaint require as an element proof that the complainant's consent "was obtained by false or fraudulent representations as to the nature and quality of the act." But there is no federal analogue to rape by false statements, and there certainly was none in 1977. Thus, Mr. Kollmar may not be extradited on Count One or Two.[7]

With respect to Count Three—the CCC § 146 charge—there was no federal analogue in 1974-1977. Rather, federal law did not proscribe sexual activity with persons between the ages of 12 and 16 until 1986. *See* 18 U.S.C. § 2243. And even if that law could apply to the Arrestee despite that fact that the alleged conduct did not violate *any* federal law when committed, section 2243 still cannot establish dual criminality for another reason: section 2243 provides for a "reasonable mistake of age defense," *i.e.*, that the complainant "had attained the age of 16 years[,]" 18 U.S.C. § 2243(c)(1), while CCC § 146(2) expressly proscribes that defense and establishes a strict liability offense in all cases.

In sum, because the Government cannot establish that the alleged conduct—in 1977, engaging in sexual activity with a minor aged 14 years—constitutes an offense that may be punished by the laws of the United States, it has not presented any extraditable offense, and the Arrestee should be released.

---

[7] Because extradition may only be granted when the Arrestee's "conduct … constitutes an offense punishable by the laws of both Contracting Parties[,]" the Court must evaluate the alleged conduct, *viz.*, engaging in consensual sexual activity with B.B. in 1975 and 1977. That conduct does not "constitute[] an offense punishable by the laws of [the United States]." *See also United States v. Wathne*, 2008 WL 4344112 (N.D. Cal. Sept. 22, 2008) (Walker, J.) ("this court concludes that the dual criminality requirement of the extradition treaty under Indian law requires that the offense charged be punishable in both countries at the time of the conduct that constitutes the offense.")

## C.   THERE EXIST SPECIAL CIRCUMSTANCES SUPPORTING DONALD KOLLMAR'S ADMISSION TO BAIL.

As the Government correctly notes, "any assessment of extraditability is a substantive question that is to be decided at the extradition hearing itself."  ECF 4 at 10:24-25.  Thus, Mr. Kollmar must identify "special circumstances" to justify bail.  *Salerno v. United States*, 878 F.2d 317 (9th Cir. 1989).[8]

While the Government contends that an assessment of extraditability "is not relevant to a fugitive's bail status[.]"  ECF 4 at 10:25-27 (*citing Matter of Extradition of Sidali*, 868 F. Supp. 656 (D.N.J. 1994), the Ninth Circuit had held the opposite: "special circumstances" supporting bail "include the raising of substantial claims which the appellant has a high probability of success, … and unusual delay in the appeal process."  *Salerno*, 878 F.2d at 317.[9]  The Government's failure to date to identify any federal statute that would even subject Mr. Kollmar to extradition thus supports bail thus supports the Arrestee's application for bail.

So too, given the legal issues already presented, Mr. Kollmar respectfully contends that the litigation over his extraditability, including appeals by either party, are likely to be protracted.  Indeed, this case presents extraordinary circumstances that implicate due process and ex post facto principles: the arrest of an individual 42 years after the alleged conduct. [10]

---

[8] Mr. Kollmar maintains that the special circumstances test is unconstitutional, *see Parretti*, 122 F.3d at 781-787 (Reinhardt, J., concurring), and preserves the issue.

[9] While the Government argues that "some courts have incorrectly held that the probability of a fugitive's success against extradition or against the foreign charges underlying the extradition treaty qualify as a special circumstance[,]" ECF 4 at 10:18-19, Mr. Kollmar respectfully contends that this Court is bound to follow the Ninth Circuit's rule, not the Government's contention that its rule is "incorrect."

[10] *See also Singh v. Holder*, 638 F.3d 1196, 1203-05 (9th Cir. 2011) (due process requires the government to bear the burden of proving, by clear and convincing evidence, that an alien appealing his deportation order is a risk of flight or a danger to the community in order to deny

12

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Third, the Government's failure to present evidence to support probable cause for his arrest, as required by *Caltagirone* and *Sahagian*, present an additional special circumstance in support of admitting Mr. Kollmar to bail.  (While the Government may note that this Court is not bound by this Second and Seventh Circuit authority, it's important to observe that the Ninth Circuit "will not lightly create a circuit split" and "start[s] off inclined to follow the consistent decisions of the" other circuits.  *United States v. Dorsey*, 677 F.3d 944, 957 (9th Cir. 2012).  Mr. Kollmar respectfully contends that this Court should adopt a similar prudential approach here.)

Fourth, the extraordinary delay of more than 40 years in seeking Mr. Kollmar's arrest, including the unexplained delay for 20 of them, presents a special circumstance supporting admission to bail.  *See Salerno*, 878 F.2d at 317; *Matter of Requested Extradition of Kirby*, 106 F.3d 855 (9th Cir. 1996) (affirming district court's order of release on bail where court relied upon "delay prior to the bail hearings, and the highly probable lengthy delays thereafter as a result of the [potential] extradition proceedings themselves and the appeals therefrom.")  So too, the extraordinary fact pattern of this case presents a special circumstance under the "uniqueness" standard, recognized by the Ninth Circuit in *Kirby*, 106 F.3d at 864.

Fifth, Mr. Kollmar's good moral conduct and lack of criminal history, *see* ECF 4 at 9:2-6 (citing *United States v. Taitz*, 130 F.R.D. 442, 445  (S.D. Cal. 1990) ("Taitz has no prior record and is not charged with a crime of violence.  There is no allegation that he is a danger to any community on the basis of violence or continuing criminal conduct"), provide additional special

---

him bail.  The Ninth Circuit explained that "[f]or detainees like Singh, who face years of detention before resolution of their removability, the individual interest at stake is without doubt 'particularly important and more substantial than mere loss of money,' and therefore a heightened standard of proof is warranted."  *Id.* at 1204 (citation omitted).  At a minimum, Mr. Kollmar's substantial liberty should be honored by admitting him to bail.

circumstances supporting release on conditions.  *See also* Declaration of FBI Deputy Associate

Director (Ret.) Richard Kollmar ("R. Kollmar Decl.).

Sixth, the availability of bail in Canada, *see Taitz*, 130 F.R.D. at 446, presents yet another

special circumstance supporting release on conditions.[11]  Indeed,

> [t]he diplomatic necessity for denying bail does not exist in this
> case. … [T]he rationale for denying bail is that the United States
> will suffer consequences in foreign affairs if one subject to
> extradition absconds while on release. The State Department has
> recognized that in general, the practice of the district courts is to
> release persons provisionally arrested and facing extradition on
> bail in the absence of risk of flight. *United States v. Messina,* 566
> F.Supp. 740, 742 (E.D.N.Y.1983).

---

[11]The current Canadian Extradition Act can be found at: https://laws-
lois.justice.gc.ca/eng/acts/e-23.01/page-1.html#h-212737.  In sum, ordinary bail provisions from
the Canadian Criminal Code apply to all persons arrested on Extradition Warrants except in
cases arising from the International Criminal Court:

**Section 18**

(1) The judge before whom a person is brought following arrest
under section 13 or 16 shall

(a) if the person has been arrested on the request of the
International Criminal Court, order the detention in custody of the
person unless

(i) the person shows cause, in accordance with subsection 522(2)
of the *Criminal Code*, that their detention in custody is not
justified, and

(ii) the judge is satisfied that, given the gravity of the alleged
offence, there are urgent and exceptional circumstances that justify
release — with or without conditions — and that the person will
appear as required; or

(b) in any other case, order the release, with or without conditions,
or detention in custody of the person.

14

*Taitz* also noted that because the Government's treaty partner there—South Africa—permitted bail in extradition cases (like Canada does), then:

> there can be no diplomatic concern by South Africa if a United States court releases on bail a person who is facing extradition to South Africa where bail is available in South Africa for persons facing extradition to the United States.

130 F.R.D. at 446.  The same reasoning applies to this case.

## CONCLUSION

As demonstrated by the attached declaration of FBI Deputy Associate Director Richard Kollmar (Ret.) and by the presence in Court of Mr. Kollmar's proposed sureties—Kirkland & Ellis LLP partners Christopher Kirkham and Samantha Good—and as should be included in the bail report: Donald Kollmar is not a flight risk, and will abide all conditions of release imposed by the Court.  The ancient allegations presented in the Complaint raise a host of issues at the outset, and considering counsel's newness to this nascent proceeding, we respectfully contend that other significant legal issues regarding the propriety and legality of extradition are likely to arise.

On these facts, the Court should either release Mr. Kollmar on his own recognizance based on the lack of probable cause, or should admit him to bail based on the unlikelihood of flight, and the special circumstances presented.

Respectfully submitted,

DATED: May 10, 2019                COLEMAN & BALOGH LLP

*/s/ E A Balogh*
ETHAN A. BALOGH
235 Montgomery Street, Suite 1070
San Francisco, CA 94104

Attorneys for Arrestee
DONALD KOLLMAR

15

# EXHIBIT A

Canada International Extradition Treaty with the United States

December 3, 1971, Date-Signed

March 22, 1976, Date-In-Force

STATUS:
Treaty signed at Washington on December 3, 1971.  An agreement amending the treaty effected by exchange of notes signed at Washington on June 28 and July 9, 1974.  Ratification of the treaty, as amended, advised by the Senate of the United States of America on December 1, 1975.  It was Ratified by the President of the United States of America on December 12, 1975.  It was Ratified by Canada on February 2, 1976. Ratifications exchanged at Ottawa on March 22, 1976.  It was Proclaimed by the President of the United States of America May 6, 1976 and Entered into force March 22, 1976.


TREATY ON EXTRADITION BETWEEN THE UNITED STATES OF AMERICA AND CANADA

TRAITE D'EXTRADITION ENTRE LES ETATS-UNIS D'AMERIQUE ET LE CANADA

TEXT:

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

A PROCLAMATION

CONSIDERING THAT:

The Treaty on Extradition between the United States of America and Canada was signed at Washington on December 3, 1971, as amended by an exchange of notes on June 28 and July 9, 1974, the original of which Treaty, as amended, is hereto annexed;

The Senate of the United States of America by its resolution of December 1, 1975, two-thirds of the Senators present concurring therein, gave its advice and consent to ratification of the Treaty, as amended;

The Treaty was ratified by the President of the United States of America on December 12, 1975, in pursuance of the advice and consent of the Senate, and has been duly ratified on the part of Canada; The respective instruments of ratification were exchanged at Ottawa on March 22, 1976;

It is provided in Article 18 of the Treaty that the Treaty shall enter into force upon the exchange of ratifications;

Now, THEREFORE, I, Gerald R. Ford, President of the United States of America, proclaim and make public the Treaty, as amended, to the end that it shall be observed and fulfilled with good faith on and after March 22, 1976, by the United States of America and by the citizens of the United States of America and all other persons subject to the jurisdiction thereof.

IN TESTIMONY WHEREOF, I have signed this proclamation and caused the Seal of the United States of America to be affixed.

DONE at the city of Washington this sixth day of May in the year of our Lord one thousand nine hundred seventy-six and of the Independence of the United States of America the two hundredth.

The United States of America and Canada, desiring to make more effective the cooperation of the two countries in the repression of crime by making provision for the reciprocal extradition of offenders, agree as follows:

ARTICLE 1

Each Contracting Party agrees to extradite to the other, in the circumstances and subject to the conditions described in this Treaty, persons found in its territory who have been charged with, or convicted of, any of the offenses covered by Article 2 of this Treaty committed within the territory of the other, or outside thereof under the conditions specified in Article 3(3) of this Treaty.

ARTICLE 2

(1) Persons shall be delivered up according to the provisions of this Treaty for any of the offenses listed in the Schedule annexed to this Treaty, which is an integral part of this Treaty, provided these offenses are punishable by the laws of both Contracting Parties by a term of imprisonment exceeding one year.

(2) Extradition shall also be granted for attempts to commit, or conspiracy to commit or being a party to any of the offenses listed in the annexed Schedule.

(3) Extradition shall also be granted for any offense against a federal law of the United States in which one of the offenses listed in the annexed

Schedule, or made extraditable by paragraph (2) of this Article, is a substantial element, even if transporting, transportation, the use of the mails or interstate facilities are also elements of the specific offense.

ARTICLE 3

(1) For the purpose of this Treaty the territory of a Contracting Party shall include all territory under the jurisdiction of that Contracting Party, including air space and territorial waters and vessels and aircraft registered in that Contracting Party or aircraft leased without crew to a lessee who has his principal place of business, or, if the lessee has no such place of business, his permanent residence in, that Contracting Party if any such aircraft is in flight, or if any such vessel is on the high seas when the offense is committed. For the purposes of this Treaty an aircraft shall be considered in flight from the moment when power is applied for the purpose of the take-off until the moment when the landing run ends.

(2) In a case when offense 23 of the annexed Schedule is committed on board an aircraft at any time from the moment when all its external doors are closed following embarkation until the moment when any such door is opened for disembarkation, such offense and any other offense covered by Article 2 committed against passengers or crew of that aircraft in connection with such offense shall be considered to have been committed within the territory of a Contracting Party if the aircraft was registered in that Contracting Party, if the aircraft landed in the territory of that Contracting Party with the alleged offender still on board, or if the aircraft was leased without crew to a lessee who has his principal place of business, or, if the lessee has no such place of business, his permanent residence in that Contracting Party.

(3) When the offense for which extradition has been requested has been committed outside the territory of the requesting State, the executive or other appropriate authority of the requested State shall have the power to grant the extradition if the laws of the requested State provide for jurisdiction over such an offense committed in similar circumstances.

ARTICLE 4

(1) Extradition shall not be granted in any of the following circumstances:

(i) When the person whose surrender is sought is being proceeded against, or has been tried and discharged or punished in the territory of the requested State for the offense for which his extradition is requested.

(ii) When the prosecution for the offense has become barred by lapse of time according to the laws of the requesting State.

(iii) When the offense in respect of which extradition is requested is of a political character, or the person whose extradition is requested proves that the extradition request has been made for the purpose of trying or punishing him for an offense of the above-mentioned character. If any question arises as to whether a case comes within the provisions of this subparagraph, the authorities of the Government on which the requisition is made shall decide.

(2) The provisions of subparagraph (iii) of paragraph (1) of this Article shall not be applicable to the following:

(i) A kidnapping, murder or other assault against the life or physical integrity of a person to whom a Contracting Party has the duty according to international law to give special protection, or any attempt to commit such an offense with respect to any such person.

(ii) When offense 23 of the annexed Schedule, or an attempt to commit, or a conspiracy to commit, or being a party to the commission of that offense, has been committed on board an aircraft engaged in commercial services carrying passengers.

ARTICLE 5

If a request for extradition is made under this Treaty for a person who at the time of such request, or at the time of the commission of the offense for which extradition is sought, is under the age of eighteen years and is considered by the requested State to be one of its residents, the requested State, upon a determination that extradition would disrupt the social readjustment and rehabilitation of that person, may recommend to the requesting State that the request for extradition be withdrawn, specifying the reasons therefor.

ARTICLE 6

When the offense for which extradition is requested is punishable by death under the laws of the requesting State and the laws of the requested State do not permit such punishment for that offense, extradition may be refused unless the requesting State provides such assurances as the requested State considers sufficient that the death penalty shall not be imposed, or, if imposed, shall not be executed.

ARTICLE 7

When the person whose extradition is requested is being proceeded against or is serving a sentence in the territory of the requested State for

an offense other than that for which extradition has been requested, his surrender may be deferred until the conclusion of the proceedings and the full execution of any punishment he may be or may have been awarded.

ARTICLE 8

The determination that extradition should or should not be granted shall be made in accordance with the law of the requested State and the person whose extradition is sought shall have the right to use all remedies and recourses provided by such law.

ARTICLE 9

(1) The request for extradition shall be made through the diplomatic channel.

(2) The request shall be accompanied by a description of the person sought, a statement of the facts of the case, the text of the laws of the requesting State describing the offense and prescribing the punishment for the offense, and a statement of the law relating to the limitation of the legal proceedings.

(3) When the request relates to a person who has not yet been convicted, it must also be accompanied by a warrant of arrest issued by a judge or other judicial officer of the requesting State and by such evidence as, according to the laws of the requested State, would justify his arrest and committal for trial if the offense had been committed there, including evidence proving the person requested is the person to whom the warrant of arrest refers.

(4) When the request relates to a person already convicted, it must be accompanied by the judgment of conviction and sentence passed against him in the territory of the requesting State, by a statement showing how much of the sentence has not been served, and by evidence proving that the person requested is the person to whom the sentence refers.

ARTICLE 10

(1) Extradition shall be granted only if the evidence be found sufficient, according to the laws of the place where the person sought shall be found, either to justify his committal for trial if the offense of which he is accused had been committed in its territory or to prove that he is the identical person convicted by the courts of the requesting State.

(2) The documentary evidence in support of a request for extradition or copies of these documents shall be admitted in evidence in the

examination of the request for extradition when, in the case of a request emanating from Canada, they are authenticated by an officer of the Department of Justice of Canada and are certified by the principal diplomatic or consular officer of the United States in Canada, or when, in the case of a request emanating from the United States, they are authenticated by an officer of the Department of State of the United States and are certified by the principal diplomatic or consular officer of Canada in the United States.

ARTICLE 11

(1) In case of urgency a Contracting Party may apply for the provisional arrest of the person sought pending the presentation of the request for extradition through the diplomatic channel. Such application shall contain a description of the person sought, an indication of intention to request the extradition of the person sought and a statement of the existence of a warrant of arrest or a judgment of conviction against that person, and such further information, if any, as would be necessary to justify the issue of a warrant of arrest had the offense been committed, or the person sought been convicted, in the territory of the requested State.

(2) On receipt of such an application the requested State shall take the necessary steps to secure the arrest of the person claimed.

(3) A person arrested shall be set at liberty upon the expiration of forty-five days from the date of his arrest pursuant to such application if a request for his extradition accompanied by the documents specified in Article 9 shall not have been received. This stipulation shall not prevent the institution of proceedings with a view to extraditing the person sought if the request is subsequently received.

ARTICLE 12

(1) A person extradited under the present Treaty shall not be detained, tried or punished in the territory of the requesting State for an offense other than that for which extradition has been granted nor be extradited by that State to a third State unless:

(i) He has left the territory of the requesting State after his extradition and has voluntarily returned to it;

(ii) He has not left the territory of the requesting State within thirty days after being free to do so; or

(iii) The requested State has consented to his detention, trial, punishment for an offense other than that for which extradition was granted or to his

extradition to a third State, provided such other offense is covered by Article 2.

(2) The foregoing shall not apply to offenses committed after the extradition.

ARTICLE 13

(1) A requested State upon receiving two or more requests for the extradition of the same person either for the same offense, or for different offenses, shall determine to which of the requesting States it will extradite the person sought.

(2) Among the matters which the requested State may take into consideration are the possibility of a later extradition between the requesting States, the seriousness of each offense, the place where the offense was committed, the dates upon which the requests were received and the provisions of any extradition agreements between the requested State and the other requesting State or States.

ARTICLE 14

(1) The requested State shall promptly communicate to the requesting State through the diplomatic channel the decision on the request for extradition.

(2) If a warrant or order for the extradition of a person sought has been issued by the competent authority and he is not removed from the territory of the requested State within such time as may be prescribed by the laws of that State, he may be set at liberty and the requested State may subsequently refuse to extradite that person for the same offense.

ARTICLE 15

(1) To the extent permitted under the law of the requested State and subject to the rights of third parties, which shall be duly respected, all articles acquired as a result of the offense or which may be required as evidence shall, if found, be surrendered to the requesting State if extradition is granted.

(2) Subject to the qualifications of paragraph (1) of this Article, the above-mentioned articles shall be returned to the requesting State even if the extradition, having been agreed to, cannot be carried out owing to the death or escape of the person sought.

ARTICLE 16

(1) The right to transport through the territory of one of the Contracting Parties a person surrendered to the other Contracting Party by a third State shall be granted on request made through the diplomatic channel, provided that conditions are present which would warrant extradition of such person by the State of transit and reasons of public order are not opposed to the transit.

(2) The Party to which the person has been extradited shall reimburse the Party through whose territory such person is transported for any expenses incurred by the latter in connection with such transportation.

ARTICLE 17

(1) Expenses related to the transportation of the person sought to the requesting State shall be paid by the requesting State. The appropriate legal officers of the State in which the extradition proceedings take place shall, by all legal means within their power, assist the requesting State before the respective judges and magistrates.

(2) No pecuniary claim, arising out of the arrest, detention, examination and surrender of persons sought under the terms of this Treaty, shall be made by the requested State against the requesting State.

ARTICLE 18

(1) This Treaty shall be ratified and the instruments of ratification shall be exchanged at Ottawa as soon as possible.

(2) This Treaty shall terminate and replace any extradition agreements and provisions on extradition in any other agreement in force between the United States and Canada; except that the crimes listed in such agreements and committed prior to entry into force of this Treaty shall be subject to extradition pursuant to the provisions of such agreements.

(3) This Treaty shall enter into force upon the exchange of ratifications. It may be terminated by either Contracting Party giving notice of termination to the other Contracting Party at any time and the termination shall be effective six months after the date of receipt of such notice.

IN WITNESS WHEREOF the undersigned, being duly authorized thereto by their respective Governments, have signed this Treaty.

DONE in duplicate, in the English and French languages, each language version being equally authentic, at Washington this third day of December, one thousand nine hundred seventy one.

Les Etats-Unis d'Amerique et le Canada, desireux de renforcer la cooperation existant entre les deux pays pour la repression du crime en instituant des dispositions en vue de l'extradition reciproque des delinquants, sont convenus de ce qui suit:

ARTICLE 1

Chaque Partie contractante s'engage a livrer a l'autre Partie, dans les circonstances et sous reserve des conditions indiquees au present Traite, les individus trouves sur son territoire qui ont ete accuses ou declares coupables d'une des infractions couvertes par l'Article 2 du present Traite commise sur le territoire de l'autre ou, aux conditions specifiees au paragraphe 3) de l'Article 3 du present Traite, hors de ce territoire.

ARTICLE 2

1) Les individus seront livres conformement aux dispositions du present Traite pour l'une quelconque des infractions enumerees a l'Annexe jointe audit Traite, et qui en est partie integrante, a condition que ces infractions soient punissables, en vertu des lois des deux Parties contractantes, d'une peine d'emprisonnement de plus d'un an.

2) Sera egalement extrade tout individu qui aura tente de commettre l'une des infractions enumerees a l'Annexe du present Traite, aura complote en vue de la commettre ou y aura ete partie.

3) L'extradition sera egalement accordee pour toute infraction a une loi federale des Etats-Unis dont une des infractions enumerees a l'Annexe ci-jointe ou justifiant l'extradition en vertu du paragraphe 2) du present Article constitue un element important, meme si le transport ou l'utilisation de la poste ou des moyens de communication entre Etats sont egalement des elements de cette infraction particuliere.

ARTICLE 3

1) Aux fins du present Traite, le territoire d'une Partie contractante comprend tout le territoire auquel s'etend la competence de celle-ci, y compris l'espace aerien et les eaux territoriales ainsi que les navires et aeronefs immatricules dans le territoire de cette Partie contractante ou les aeronefs loues sans equipage a une personne qui a le siege principal de son exploitation ou, a defaut, sa residence permanente sur le territoire de ladite Partie contractante, si un tel aeronef est en vol ou si un tel navire se trouve en haute mer lorsque l'infraction est commise. Aux fins du present Traite, un aeronef est considere comme etant en vol depuis le moment ou la force motrice est employee pour decoller jusqu'au moment ou

l'atterrissage a pris fin.

2) Si l'infraction 23 de l'Annexe ci-jointe est commise a bord d'un aeronef entre le moment ou, l'embarquement etant termine, toutes ses portes exterieures sont fermees et le moment ou l'une de ces portes est ouverte en vue du debarquement, cette infraction ainsi que toute autre infraction couverte par l'Article 2 qui est commise contre les passagers ou l'equipage de cet aeronef a l'occasion de cette infraction sont considerees comme ayant ete commises sur le territoire d'une Partie contractante si l'aeronef etait immatricule dans le territoire de celle-ci, s'il a atterri dans ledit territoire alors que l'auteur presume de l'infraction se trouvait a bord ou s'il a ete loue sans equipage a une personne qui a le siege principal de son exploitation ou, a defaut, sa residence permanente dans le territoire de ladite Partie contractante.

3) Lorsque l'infraction pour laquelle l'extradition a ete demandee a ete commise hors du territoire de l'Etat requerant, l'executif ou toute autre autorite competente de l'Etat requis a le pouvoir d'accorder l'extradition si les lois de l'Etat requis donnent competence pour une telle infraction commise dans des circonstances similaires.

ARTICLE 4

1) L'extradition n'est accordee dans aucun des cas suivants:

i) Lorsque l'individu dont l'extradition est demandee ou bien fait l'objet de poursuites ou bien a ete juge et acquitte ou puni, sur le territoire de l'Etat requis, pour l'infraction motivant la demande d'extradition.

ii) Lorsque la poursuite relative a l'infraction est frappee de prescription selon les lois de l'Etat requerant.

iii) Lorsque l'infraction motivant la demande d'extradition revet un caractere politique ou que l'individu dont l'extradition est demandee prouve que la demande d'extradition vise a le mettre en jugement ou a le punir pour une infraction revetant un caractere politique. Si la question se pose de savoir si une affaire tombe sous le coup des dispositions du present alinea, il appartient aux autorites gouvernementales de l'Etat auquel la demande est presentee d'en decider.

2) Les dispositions de l'alinea iii) du paragraphe 1) du present Article ne s'appliquent pas a ce qui suit:

i) L'enlevement ou le meurtre d'un individu auquel une Partie contractante est tenue, selon le droit international, d'accorder une protection speciale ou toutes autres voies de fait visant a lui enlever la vie ou a nuire a sa

sante physique, ou toute tentative de perpetration d'une telle infraction a l'egard d'un tel individu.

ii) Lorsqu'un individu commet l'infraction 23 de l'Annexe ci-jointe a bord d'un aeronef en service commercial faisant le transport de passagers, ou, a bord d'un tel aeronef, tente de commettre ou complote en vue de commettre cette infraction ou y est partie.

ARTICLE 5

Si une demande d'extradition faite en vertu du present Traite vise un individu qui, au moment de cette demande ou au moment de la commission de l'infraction pour laquelle l'extradition est demandee, est age de moins de dix-huit ans et considere par l'Etat requis comme etant l'un de ses residents, l'Etat requis peut, s'il est etabli que l'extradition empecherait le reclassement social et la rehabilitation de cet individu, recommander a l'Etat requerant de retirer sa demande d'extradition, en specifiant les raisons sur lesquelles il se fonde.

ARTICLE 6

Lorsque l'infraction motivant la demande d'extradition est punissable de la peine de mort en vertu des lois de l'Etat requerant et que les lois de l'Etat requis n'autorisent pas cette peine pour une telle infraction, l'extradition peut etre refusee a moins que l'Etat requerant ne garantisse a l'Etat requis, d'une maniere jugee suffisante par ce dernier, que la peine de mort ne sera pas infligee ou, si elle l'est, ne sera pas appliquee.

ARTICLE 7

Lorsque l'individu dont l'extradition est demandee fait l'objet de poursuites ou subit une peine sur le territoire de l'Etat requis pour une infraction autre que celle pour laquelle l'extradition a ete demandee, sa remise peut etre differee jusqu'a l'issue des procedures et jusqu'a ce qu'il ait purge toute peine qui pourra ou a pu lui etre infligee.

ARTICLE 8

La decision d'accorder ou de refuser l'extradition doit etre prise conformement a la loi de l'Etat requis et l'individu dont l'extradition est demandee aura droit a tous les recours prevus par ladite loi.

ARTICLE 9

1) La demande d'extradition doit se faire par la voie diplomatique.

2) La demande doit etre accompagnee du signalement de l'individu recherche, d'un enonce des faits, du texte des dispositions des lois de l'Etat requerant decrivant l'infraction et stipulant la peine a infliger a cet egard ainsi que d'un enonce de la loi relative a la prescription en matiere de procedures judiciaires.

3) Lorsque la demande vise un individu qui n'a pas encore ete declare coupable, elle doit en outre etre accompagnee d'un mandat d'arret emis par un juge ou une autre autorite judiciaire de l'Etat requerant et de tout element de preuve qui, selon les lois de l'Etat requis, justifierait l'arrestation et la mise en jugement dudit individu si l'infraction y avait ete commise, notamment la preuve que l'individu dont on demande l'extradition est bien celui qui est vise par le mandat d'arret.

4) Lorsque la demande vise un individu deja declare coupable, elle doit etre accompagnee du jugement de culpabilite et de la sentence prononces contre lui dans le territoire de l'Etat requerant, d'une declaration indiquant quelle partie de la peine reste a purger et de la preuve que l'individu dont l'extradition est demandee est bien celui qui doit purger la peine.

ARTICLE 10

1) L'extradition ne doit etre accordee que si la preuve est jugee suffisante, selon les lois du lieu ou l'individu recherche est trouve, soit pour justifier une mise en jugement si l'infraction dont il est accuse avait ete commise sur le territoire dont ce lieu fait partie, soit pour etablir qu'il est bien l'individu condamne par les tribunaux de l'Etat requerant.

2) Les preuves documentaires a l'appui d'une demande d'extradition, qu'il s'agisse d'originaux ou de copies, doivent etre admises en preuve lors de l'examen de la demande d'extradition lorsque, dans le cas d'une demande emanant du Canada, elles sont legalisees par un fonctionnaire du Ministere de la Justice du Canada et certifiees par le principal agent diplomatique ou consulaire des Etats-Unis au Canada, ou que, dans le cas d'une demande emanant des Etats-Unis, elles sont legalisees par un fonctionnaire du Departement d'Etat des Etats-Unis et certifiees par le principal agent diplomatique ou consulaire du Canada aux Etats-Unis.

ARTICLE 11

1) En cas d'urgence, une Partie contractante peut demander l'arrestation provisoire de l'individu recherche en attendant la presentation de la demande d'extradition par la voie diplomatique. La demande d'arrestation doit donner le signalement de l'individu recherche, indiquer qu'on se propose de demander l'extradition de cet individu, indiquer si un mandat d'arret a ete emis contre lui ou s'il a ete declare coupable aux termes d'un

jugement et fournir, le cas echeant, les autres renseignements qui seraient necessaires pour justifier l'emission d'un mandat d'arret si l'infraction avait ete commise dans le territoire de l'Etat requis ou si l'individu recherche y avait ete condamne.

2) Des reception d'une telle demande, l'Etat requis prend les mesures necessaires pour assurer l'arrestation de l'individu reclame.

3) Un individu arrete doit etre mis en liberte a l'expiration d'un delai de quarante-cinq jours de la date de son arrestation en vertu de cette demande si une demande d'extradition, accompagnee des documents specifies a l'Article 9, n'a pas alors ete recue a son egard. Cette stipulation n'empeche pas d'engager des procedures en vue de l'extradition de l'individu recherche si la demande d'extradition est recue par la suite.

ARTICLE 12

1) Un individu extrade en vertu du present Traite ne doit etre ni detenu, ni juge, ni puni sur le territoire de l'Etat requerant pour une infraction autre que celle ayant motive l'extradition et ne peut non plus etre livre par ledit Etat a un Etat tiers, sauf:

i) S'il a quitte le territoire de l'Etat requerant apres son extradition et y est revenu volontairement;

ii) S'il n'a pas quitte le territoire de l'Etat requerant dans un delai de trente jours apres etre devenu libre de le faire; ou

iii) Si l'Etat requis a consenti soit a ce qu'il soit detenu, juge et puni pour une infraction autre que celle ayant motive son extradition, soit a ce qu'il soit livre a un Etat tiers, a condition que cette autre infraction soit couverte par l'Article 2.

2) Les dispositions qui precedent ne s'appliquent pas aux infractions commises apres l'extradition.

ARTICLE 13

1) Lorsque l'extradition d'un individu est demandee par deux Etats ou plus, soit pour la meme infraction, soit pour des infractions differentes, l'Etat requis doit determiner vers lequel des Etats requerants il extradera l'individu recherche.

2) L'Etat requis peut notamment prendre en consideration les facteurs suivants: la possibilite d'une extradition ulterieure entre les Etats requerants, la gravite de chaque infraction, le lieu ou l'infraction a ete

commise, les dates auxquelles les demandes ont ete recues et les dispositions des accords d'extradition conclus entre l'Etat requis et le ou les autres Etats requerants.

ARTICLE 14

1) L'Etat requis doit rapidement communiquer a l'Etat requerant, par la voie diplomatique, la decision prise sur la demande d'extradition.

2) Si un mandat ou un ordre d'extradition d'un individu recherche a ete emis par l'autorite competente et que l'individu n'est pas renvoye du territoire de l'Etat requis dans le delai qui peut etre prescrit par les lois de cet Etat, il peut etre libere et l'Etat requis peut, par la suite, refuser de l'extrader pour la meme infraction.

ARTICLE 15

1) Dans la mesure ou le permettent les lois de l'Etat requis et sous reserve des droits des tiers, qui doivent etre dument respectes, tous les objets obtenus par suite de l'infraction ou qui peuvent etre requis a titre de preuve doivent, s'ils sont trouves, etre remis a l'Etat requerant si l'extradition est accordee.

2) Sous reserve des conditions du paragraphe 1) du present Article, les objets ci-dessus mentionnes doivent etre restitues a l'Etat requerant meme si l'extradition, ayant ete accordee, ne peut etre effectuee en raison de la mort ou de l'evasion de l'individu recherche.

ARTICLE 16

1) Le droit de transporter sur le territoire d'une des Parties contractantes un individu qui est livre a l'autre Partie contractante par un Etat tiers sera accorde sur demande faite par la voie diplomatique, pourvu que soient reunies les conditions qui justifieraient l'extradition de cet individu par l'Etat de transit et que des raisons d'ordre public ne s'opposent pas a son passage.

2) La Partie vers laquelle l'individu a ete extrade doit rembourser a la Partie sur le territoire de laquelle il est transporte tous les frais encourus par cette derniere a l'occasion de ce transport.

ARTICLE 17

1) Les frais relatifs au transport de l'individu recherche vers l'Etat requerant doivent etre couverts par ce dernier. Les officiers de justice competents de l'Etat dans lequel se deroulent les procedures d'extradition

doivent, par tous les moyens juridiques dont ils disposent, aider l'Etat requerant devant les juges et magistrats respectifs.

2) Aucune reclamation d'ordre pecuniaire, decoulant de l'arrestation, de la detention, de l'interrogatoire et de la remise d'individus recherches aux termes du present Traite, ne doit etre presentee par l'Etat requis contre l'Etat requerant.

ARTICLE 18

1) Le present Traite sera ratifie et les instruments de ratification seront echanges a Ottawa le plus tot possible.

2) Le present Traite terminera et remplacera tous accords d'extradition en vigueur entre les Etats-Unis et le Canada et toutes dispositions relatives a l'extradition contenues dans tout autre accord en vigueur entre eux; toutefois, les infractions enumerees dans ces accords et commises avant l'entree en vigueur du present Traite seront passibles d'extradition en application des dispositions de ces accords.

3) Le present Traite entrera en vigueur le jour de l'echange des ratifications. Il pourra etre denonce a tout moment par l'une des Parties contractantes sur notification a l'autre Partie de son intention d'y mettre fin et, dans ce cas, le Traite cessera d'etre en vigueur six mois apres la date de reception de cette notification.

EN FOI DE QUOI les soussignes, dument autorises par leurs Gouvernements respectifs, ont signe le present Traite.

FAIT en double exemplaire, dans les langues anglaise et francaise, les deux textes faisant egalement foi, a Washington ce troisieme jour de decembre mil neuf cent soixante et onze.

# EXHIBIT B

Canada International Extradition Treaty-First Protocol with the United States

January 11, 1988, Date-Signed

November 26, 1991, Date-In-Force

Protocol was read the first time, and together with the accompanying papers, referred to the Committee on Foreign Relations and ordered to be printed for the use of the Senate.

MESSAGE FROM THE PRESIDENT OF THE UNITED STATES

101ST CONGRESS

2d Session

SENATE

LETTER OF TRANSMITTAL

THE WHITE HOUSE, April 24, 1990.

To the Senate of the United States:

With a view to receiving the advice and consent of the Senate to ratification, I transmit herewith the Protocol signed at Ottawa on January 11, 1988, amending the Treaty on **Extradition** Between the United States of America and **Canada,** signed at Washington on December 3, 1971, as amended by an exchange of notes on June 28 and July 9, 1974. I transmit also, for the information of the Senate, the report of the Department of State with respect to the protocol.

The protocol amends the **Extradition** Treaty Between the United States and **Canada,** signed at Washington on December 3, 1971, as amended by an exchange of notes on June 28 and July 9, 1974. It represents an important step in improving law enforcement cooperation and combatting terrorism by excluding from the scope of the political offense exception serious offenses typically committed by terrorists; e.g., murder, manslaughter, kidnapping, use of an explosive device capable of endangering life or causing grievous bodily harm, and attempt or conspiracy to commit the foregoing offenses.

The protocol also will help to improve implementation of the current **extradition** treaty in several other respects. Most significant, the protocol substitutes a dual criminality clause for the current list of extraditable offenses, so that, inter alia, parental child abduction and certain additional narcotics offenses will be covered by the new treaty.

I recommend that the Senate give early and favorable consideration to the protocol and give its advice and consent to ratification.

GEORGE BUSH.

LETTER OF SUBMITTAL

DEPARTMENT OF STATE, Washington, April 10, 1990.

The PRESIDENT,
The White House.

THE PRESIDENT: I have the honor to submit to you the Protocol amending the 1971 **Extradition** Treaty Between the United States of America and **Canada** signed at Ottawa January 11, 1988. I recommend that the Protocol be transmitted to the Senate for advice and consent to ratification.

The Protocol supplements and amends the **Extradition** Treaty Between the United States and **Canada,** signed at Washington on December 3, 1971, as amended by an exchange of notes on June 28 and July 9. The Protocol would exclude specified crimes of violence, typically committed by terrorists, from the scope of the political offense exception to **extradition.** It therefore represents an important step toward improving law enforcement cooperation and countering the threat of international terrorism and other crimes of violence. In addition, the Protocol will help improve the implementation of the current Treaty in several other respects. Most significantly, the Protocol substitutes a dual criminality clause for the current list of extraditable offenses, so that, inter alia, parental child abduction and certain additional narcotics offenses will be covered.

Article 2 of the 1971 **Extradition** Treaty, as amended, which incorporates a Schedule of extraditable offenses, has been replaced in its entirety. Pursuant to the current **Extradition** Treaty, only crimes that are listed in the Schedule are considered extraditable offenses. As amended by Article I of the Protocol, Article 2 of the 1971 Treaty, as amended, adopts a dual criminality approach, which emphasizes **extradition** based on underlying criminal conduct rather than for a particular offense. A dual criminality clause permits **extradition** for any crime that is punishable in both countries by imprisonment or other detention for at least one year. Inclusion of a dual criminality clause, therefore, obviates the need to renegotiate or supplement the Treaty as offenses, such as computer-related crimes or money laundering, become punishable under the laws of both states.

Article I of the Protocol replaces Article 2 of the 1971 Treaty and provides that an offense is extraditable notwithstanding that conduct such as interstate transportation or use of the mails or of other facilities affecting interstate or foreign commerce, required for the purpose of establishing jurisdiction, forms part of the offense in the United States. This provision will allow the United States to request **extradition** for offenses including interstate and foreign travel or transportation in aid of racketeering enterprises even though the Canadian laws do not include analogous jurisdictional elements for similar underlying criminal behavior. The new provision also stipulates that offenses that relate to taxation or revenue or that are of a "purely fiscal character" will be extraditable offenses.

Article II of the Protocol is a technical amendment, deleting the Schedule of extraditable

offenses annexed to the 1971 Treaty, as amended, and incorporated by reference in Article 2.

Article III of the Protocol deletes Article 3 of the 1971 Treaty, in which a particularized definition of "territory," which was necessary at that time to cover certain types of hijacking offenses, is no longer necessary, as both the United States and **Canada** are parties to the Hague Convention for the Suppression of Unlawful Seizure of Aircraft, done at The Hague December 16, 1970, and entered into force October 14, 1971, (Hijacking Convention) and the Montreal Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation, done at Montreal September 23, 1971, and entered into force January 26, 1973, (Sabotage Convention).

Article 3(3) of the 1971 Treaty is amended to give the Executive or other appropriate Authority the discretion to extradite fugitives when the requesting state has jurisdiction over an offense in a situation where the laws of the requested state would not provide for jurisdiction in similar circumstances.

Article IV of the Protocol replaces Article 4 of the 1971 Treaty, and effectively limits the scope of the political offense exception. It specifies certain crimes which shall not be regarded as political offenses, including murder, manslaughter, malicious assault, kidnapping, specified explosives offenses, and conspiracy or attempt to commit any of the foregoing offenses.

In addition, Article IV of the Protocol includes a provision that excludes from the reach of the political offense exception any offense for which both the United States and **Canada** have an international treaty obligation to extradite the person or submit his case for prosecution; e.g., aircraft hijacking pursuant to the Hijacking Convention; aircraft sabotage pursuant to the Sabotage Convention;  crimes against internationally protected persons, including diplomats, under the Convention on the Prevention and Punishment of Crimes against Internationally Protected Persons, including Diplomatic Agents, done at New York December 14, 1973 and hostage taking pursuant to the International Convention against the Taking of Hostages, done at New York on December 17, 1979. This exception will also extend to crimes similarly defined in future multilateral treaties.

Article V of the Protocol replaces Article 7 of the 1971 **Extradition** Treaty, which allows the Requested State to defer surrender of a fugitive being proceeded against or serving a sentence in its territory until the conclusion of the proceedings and the full execution of any punishment. Under the Protocol, the Requested State has the discretion to choose to extradite to the Requesting State a fugitive who is serving a prison sentence in the Requested State before the expiration of his sentence. This alternative of temporary surrender is routinely included in our modern **extradition** treaties.

Article VI of the Protocol replaces Article 11(3) of the current Treaty to extend the period of provisional arrest in the Requested State from forty-five days to sixty days, which is the time period most commonly provided under U.S. **extradition** treaties. The extension will allow prosecutors greater latitude in assembling **extradition** packages and in making necessary adjustments or additions to the documents.

Article VII of the Protocol amends the 1971 Treaty by adding a provision that establishes that, in

cases where both states have jurisdiction to prosecute for an offense, the Executive Authority of the Requested State will consult with the Executive Authority of the Requesting State and make a decision whether to extradite the fugitive, or whether to submit the case to its competent authorities for the purpose of prosecution, after considering all relevant factors.

Article VIII of the Protocol provides that its provisions shall apply to any offense committed, any request made or any person found extraditable before or after the entry into force of the Protocol, but shall not apply to an offense committed before the Protocol enters into force if the offense in question was not an offense under the laws of both Contracting Parties at the time of its commission.

Article IX of the Protocol sets forth the procedures for ratification and entry into force.

I enclose, for the information of the Senate, an exchange of letters, dated January 11, 1988, which restates that the transborder abduction of persons found in **Canada** to the United States of America by civilian agents of bail bonding companies, so-called "bounty hunters," is an extraditable offense under the 1971 **Extradition** Treaty.

The Department of Justice joins the Department of State in favoring transmission of this Protocol to the Senate at the earliest possible date.

Respectfully submitted,

JAMES W. BAKER III.

Enclosure: As stated.

THE SECRETARY OF STATE,

Washington, January 11, 1988.

Hon. JOE CLARK, P.C., M.P.,
Secretary of State for External [ILLEGIBLE WORD] of **Canada,** Ottawa.

DEAR MR. MINISTER: I refer to the Protocol Amending the Treaty on **Extradition** between the United States and **Canada** we signed today and have the honor to address to you the following.

The United States and **Canada** recognize that the transborder abduction of persons found in **Canada** to the United States of America by civilian agents of bail bonding companies, so-called "bounty hunters", is an extraditable offense under the United States-**Canada Extradition** Treaty.

Where a person has been charged with or convicted of such an offense in **Canada** and is found within the jurisdiction of the United States, the United States agrees, upon request, to commence **extradition** proceedings against such a person pursuant to the Treaty in order that the person may be returned to **Canada.**

The United States will use its best efforts to honor Canadian requests for testimony, information, or other assistance pertaining to such abductions.

**Canada** and the United States agree to cooperate to deter such transborder abductions. To assist in achieving that purpose, the United States will continue to exert its best efforts to inform those engaged in business as bail bondsmen or bounty hunters and other interested parties of the positions set forth in this exchange of letters.

**Canada** and the United States agree to consult promptly concerning any case of transborder abduction involving bounty hunters which might arise in the future. The purpose of such consultations shall be to address matters relating to any such case, including any request by the Government of **Canada** for the return of the person so abducted. In the event of return, the Governments agree to cooperate to have the abducted person escorted to **Canada** and taken into custody at the border, pursuant to a request for provisional arrest, pending the outcome of **extradition** proceedings. For the purpose of these consultations, the principal law enforcement contact for the United States will be the Director of the Office of International Affairs of the Criminal Division of the Department of Justice.

I have the honor to propose that this letter and your reply constitute an understanding between our two Governments which is not intended to create or otherwise alter legal obligations for either Government nor to create or otherwise alter any rights or privileges for private parties.

Sincerely yours,

GEORGE P. SHULTZ.

OTTAWA, January 11, 1988.

Hon. GEORGE P. SHULTZ,
Secretary of State of the United States of America.

DEAR MR. SECRETARY: I have the honour to acknowledge receipt of your letter of today's date concerning transborder abduction of persons found in **Canada** to the United States of America by civilian agents of bail bonding companies, so-called "bounty hunters". I accept your proposal that your letter and this reply constitute an Understanding between our two Governments which is not intended to create or otherwise alter legal obligations for either Government nor to create or otherwise alter any rights or privileges for private parties.

Yours sincerely,

JOE CLARK.

PROTOCOL AMENDING THE TREATY ON **EXTRADITION** BETWEEN THE UNITED STATES OF AMERICA AND **CANADA** SIGNED AT WASHINGTON ON DECEMBER 3, 1971, AS AMENDED BY AN EXCHANGE OF NOTES ON JUNE 28 AND JULY 9, 1974

The Government of the United States of America and the Government of **Canada;**

Desiring to make more effective the **Extradition** Treaty between the Contracting Parties, signed at Washington on December 3, 1971, as amended by the agreement effected by an Exchange of Notes on June 28 and July 9, 1974 (hereinafter referred to as "the **Extradition** Treaty");

Have agreed as follows:

ARTICLE I

Article 2 of the **Extradition** Treaty is deleted and replaced by the following:

"ARTICLE 2

"(1) **Extradition** shall be granted for conduct which constitutes an offense punishable by the laws of both Contracting Parties by imprisonment or other form of detention for a term exceeding one year or any greater punishment.

"(2) An offense is extraditable notwithstanding

"(i) that conduct such as interstate transportation or use of the mails or of other facilities affecting interstate or foreign commerce, required for the purpose of establishing jurisdiction, forms part of the offense in the United States, or

"(ii) that it relates to taxation or revenue or is one of a purely fiscal character."

ARTICLE II

The SCHEDULE to the **Extradition** Treaty, as amended, is deleted.

ARTICLE III

Paragraph (2) of Article 3 of the **Extradition** Treaty is deleted. Paragraph (3) of Article 3 of the **Extradition** Treaty is amended to read as follows:

"(2) When the offense for which **extradition** is requested was committed outside the territory of the requesting State, the executive or other appropriate authority of the requested State shall grant **extradition** if the laws of the requested State provide for jurisdiction over such an offense committed in similar circumstances. If the laws in the requested State do not so provide, the executive authority in the requested State may, in its discretion, grant **extradition.**"

ARTICLE IV

Paragraph (2) of Article 4 of the **Extradition** Treaty, as amended, is deleted and replaced by the following:

"(2) For the purpose of this Treaty, the following offenses shall be deemed not to be offenses within subparagraph (iii) of paragraph 1 of this Article:


"(i) An offense for which each Contracting Party has the obligation pursuant to a multilateral international agreement to extradite the person sought or to submit the case to its competent authorities for the purpose of prosecution;

"(ii) Murder, manslaughter or other culpable homicide, malicious wounding or inflicting grievous bodily harm;

"(iii) An offense involving kidnapping, abduction, or any form of unlawful detention, including taking a hostage;

"(iv) An offense involving the placing or use of explosives, incendiaries or destructive devices or substances capable of endangering life or of causing grievous bodily harm or substantial property damage; and

"(v) An attempt or conspiracy to commit, or counselling the commission of, any of the foregoing offenses, or aiding or abetting a person who commits or attempts to commit such offenses."


ARTICLE V

Article 7 of the **Extradition** Treaty is deleted and replaced by the following:

"ARTICLE 7

"When the person sought is being proceeded against or is serving a sentence in the requested State for an offense other than that for which **extradition** is requested, the requested State may surrender the person sought or postpone surrender until the conclusion of the proceedings or the service of the whole or any part of the sentence imposed."

ARTICLE VI

Paragraph (3) of Article 11 of the **Extradition** Treaty is deleted and replaced by the following:

"(3) A person arrested shall be set at liberty upon the expiration of sixty days from the date of arrest pursuant to such application if a request for **extradition** and the documents specified in Article 9 have not been received. This stipulation shall not prevent the institution of proceedings with a view to extraditing the person sought if the request and documents are subsequently received."

ARTICLE VII

The **Extradition** Treaty is amended by adding the following after Article 17:

"ARTICLE 17 BIS

"If both contracting Parties have jurisdiction to prosecute the person for the offense for which **extradition** is sought, the executive authority of the requested State, after consulting with the executive authority of the requesting State, shall decide whether to extradite the person or to submit the case to its competent authorities for the purpose of prosecution. In making its decision, the requested State shall consider all relevant factors, including but not limited to:

"(i) the place where the act was committed or intended to be committed or the injury occurred or was intended to occur;

"(ii) the respective interests of the Contracting Parties;

"(iii) the nationality of the victim or the intended victim; and

"(iv) the availability and location of the evidence."

ARTICLE VIII

Notwithstanding paragraph (2) of Article 18 of the **Extradition** Treaty, this Protocol shall apply in all cases where the request for **extradition** is made after its entry into force regardless of whether the offense was committed before or after that date.

ARTICLE IX

(1) This Protocol shall be subject to ratification in accordance with the applicable procedures of the Government of the United States and the Government of **Canada** and instruments of ratification shall be exchanged as soon as possible.

(2) The Protocol shall enter into force upon the exchange of instruments of ratification.

IN WITNESS WHEREOF, the undersigned, being duly authorized thereto by their respective Governments, have signed this Protocol.

DONE in duplicate at Ottawa, this 11th day of January 1988, in the English and French languages, the two texts being equally authentic.

For the Government of the United States of America.

GEORGE P. SHULTZ.

For the Government of **Canada.**

JOE CLARK.