1  COLEMAN & BALOGH LLP
2  ETHAN A. BALOGH, No. 172224
   235 Montgomery Street, Suite 1070
3  San Francisco, CA 94104
   Telephone: 415.391.0440
4  Facsimile: 415.373.3901
   eab@colemanbalogh.com
5
6  Attorneys for Arrestee
   DONALD KOLLMAR
7
                    UNITED STATES DISTRICT COURT
8
                 NORTHERN DISTRICT OF CALIFORNIA
9
                          OAKLAND DIVISION
10
11
   IN THE MATTER OF THE EXTRADITION       Case No. 4:19-70677 MAG
12
   OF DON KOLLMAR                          DECLARATION OF SETH WEINSTEIN
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## DECLARATION OF SETH WEINSTEIN

I, Seth Weinstein, declare under penalty of perjury as follows:

1. I make this declaration on personal knowledge, and if called as a witness, could testify competently to the facts presented in this declaration.

2. I am partner at Greenspan Humphrey Weinstein in Toronto with an advocacy practice focused on criminal trials, extradition, mutual legal assistance and regulatory offences. I am also a Director of the Ontario Criminal Lawyers Association ("CLA"), and for the seven years prior to becoming a director, I was the co-editor of the CLA publication, *For The Defence*. For past two years, I have been named in The Best Lawyers in Canada in the practice area of criminal defence. I also serve as an Adjunct Professor at Osgoode Hall Law School, one of the most competitive law schools in Canada. I am also a frequent presenter at continuing legal education programs.

3. I have particular expertise in extradition and mutual legal assistance cases, and have served as counsel in some of the leading cases in those areas. I am also Co-author of "Prosecuting and Defending Extradition Cases: A Practitioner's Handbook" (2017, Emond).

4. At the request of Mr. Kollmar's counsel, who had previously retained my law partner, David Humphrey, with respect to advising on this matter, I provide this declaration on the question of Canadian bail practices in the extradition context.

## Bail in Canadian Extradition Proceedings

5. A person arrested in Canada for extradition, whether they are a resident or not, has the right not to be denied bail without just cause. The *Extradition Act* adopts the provisions governing domestic bail hearings such that a person can only be detained if one or more of the following three grounds have been established:

    (i)       Detention is necessary to ensure his/her attendance in court ("the primary

1

ground");

(ii)    Detention is necessary for the protection or safety of the public ("the secondary ground"); and

(ii)    Detention is necessary to maintain confidence in the administration of justice ("the tertiary ground").

6.  While the criteria for bail pending extradition mirror those that apply in domestic proceedings, some variances do exist in the extradition context.  One of these differences relates to the application of the primary ground and, in particular, how the risk of flight is examined.  In particular, courts have held that Canada's treaty obligations and its commitment to international comity dictate that the risk of an accused absconding must be examined more cautiously at an extradition bail hearing.

7.  The most effective way to address any primary ground concerns is to structure a release plan that satisfies the court that an accused will remain in Canada, attend court as required and surrender into custody when required.  This could include cash deposits and the approval of sureties who can properly supervise the person sought on release and provide financial pledges. These sureties should be family members or other relatives and/or friends who have strong ties to Canada and who have the ability and authority to discharge the duties of a surety.  It would be expected that the person sought would reside with sureties or someone approved by the surety who can supervise the person while out of custody.

8.  Applications for bail must be brought at each stage of the extradition process and are often granted even after they are committed for extradition.

9.  In my experience, bail is routinely granted to Canadian citizens in extradition cases as well as on appeal when the person sought had bail pending their committal hearing and there are arguable issues to advance on appeal or in submissions to the Minister of Justice.  In fact, bail in

2

extradition cases is often granted on consent, *i.e.*, with the agreement of the prosecutor; and, as a result, those cases do not result in judgments available for citation. I can also attest that I have reviewed Arrestee Don Kollmar's Memorandum in Support of Release, filed May 10, 2019, and the recitation on page 14 with respect to the availability of bail in extradition cases in Canada is accurate.

### Examples of Cases Where Bail Granted Pending Extradition

10. Even non-residents may obtain bail in extradition cases. For example, in *United States v. Meng*, 2018 BCSC 2255, a case where a non-resident was released following a contested bail hearing. In support of her detention, the requesting state had argued in that case that the person sought in that case had an incentive to flee due to the potentially lengthy incarceration she would face in the United States if she were extradited and convicted there. Further, that the person sought did not have a significant connection with the jurisdiction, and that she has substantial financial resources that make the imposition of bail conditions, including substantial sureties, ineffective in ensuring her court attendance. The Court rejected that argument and released the person sought on bail. In doing so, the court held:

> While no bail order can ever function as an absolute guarantee that a detainee will not abscond, I am satisfied that on the particular facts of this case, including the fact that Ms. Meng is a well-educated businesswoman, who has no criminal record, and of whom several people have attested to her good character, the risk of her non-attendance in court can be reduced to an acceptable level by imposing the bail conditions proposed by her counsel, with bail set at a total amount of $10 million, with a $7 million cash deposit, and with five or more sureties in an aggregate total amount of $3 million.

11. In *United States of America v. Hillis*, 2018 ONSC 5360, the person sought, a Canadian citizen, was released pending his extradition hearing for allegations involving the sexual assault of three young girls in Minnesota.

12. Below, I present several judgments that followed contested bail hearings to illustrate

3

that bail is often granted pending extradition from Canada, even in contested cases:

**United States of America v. Ruggeberg, 2005 BCSC 113 (CanLII)**

13. This was a case from British Columbia where the person was being sought for his extradition for allegations that he had raped a woman at gunpoint in Texas approximately 25 years earlier. He had initially been denied bail but was released when he presented a better release plan to the court.

**United States of America v. Rockwell, 2013 ABCA 444**

14. A judgement from the Alberta Court of Appeal where the person sought was wanted in the United States for child pornography offences. He was a dual citizen who was released on bail as he appealed his committal order.

**Republic of France v. Diab, 2009 CanLII 26600**

15. In this case, the accused's extradition was being sought for four counts of murder and 40 counts of attempted murder arising from allegations that he was responsible for the bombing of a synagogue in Paris in 1980. He was a Canadian citizen, who lived a very transient lifestyle with roots in many countries. The Court released him on bail pending his extradition hearing. After being committed for extradition, he was released again as he appealed to the Court of Appeal for Ontario.

**Republic of France v. Wang, 2014 BCSC 2689**

16. The person sought in this case was wanted in France on charges of money laundering and conspiracy to launder the proceeds of crime. Although he was not ordinarily a resident of Canada, he was released on bail even in the face of a strong case in support of his extradition.

4

*United States of America v. Ellington* **2018 BCSC 1962**

17. The person sought was released on bail pending his extradition for allegations of trafficking drugs and where he faced a mandatory minimum ten year sentence.

*United States of America v. Virdi* **2016 BCCA 315**

18. The accused's extradition was being sought for the imposition of sentence. He had signed a plea agreement in Washington State but then fled prior to the imposition of sentence. Bail in this case was granted pending the person's application to seek leave to appeal his committal order to the Supreme Court of Canada.

*United States of America v. McGowan* **2017 CanLII 94952 (Ont. C.A.)**

19. The person sought was released on bail pending his appeal and pending his extradition hearing in circumstances where he was charged with drug trafficking in Illinois.

*United States of America v. Deland and Singh*, **2017 QCCS 3379 (CanLII)**

20. The accused were charged in New York State with weapons trafficking and firearm exportation offences and were released on bail in Quebec pending their extradition. In doing so, the judge rejected the prosecutor's argument that the accused were flight risks because they were facing serious sentences: "the Court cannot agree that the risk of flight is serious….that reasoning would render bail exceptional in the extradition process[.]" Put another way, the Court did not find bail as exceptional in these circumstances.

21. Attached hereto are each of the cases I have discussed herein.

I state the foregoing is true and correct under penalty of perjury of the laws of the United States of America.

DATED: May 16, 2019

_____

SETH WEINSTEIN

5

# ATTACHMENT

# IN THE SUPREME COURT OF BRITISH COLUMBIA

Citation:      *United States v. Meng,*
               2018 BCSC 2255

Date: 20181211
Docket: 27761-1
Registry: Vancouver

2018 BCSC 2255 (CanLII)

**In the Matter of the *Extradition Act,***
**S.C. 1999, c. 18 as amended**

**And**

**In the Matter of**
**The Attorney General of Canada on behalf of**
**the United States of America**

Requesting State

**And**

**Wanzhou Meng, also known as "Cathy Meng" and "Sabrina Meng"**

Person Sought

Before: The Honourable Mr. Justice Ehrcke

## Oral Reasons for Judgment

Counsel for the Attorney General of Canada
on behalf of the Requesting State:

K.L. Swift
J.M.L. Gibb-Carsley

Counsel for the Person Sought:

D.J. Martin
T.J. Duncan

Place and Date of Hearing:

Vancouver, B.C.
December 5, 7, 10, 11, 2018

Place and Date of Judgment:

Vancouver, B.C.
December 11, 2018

2018 BCSC 2255 (CanLII)

## INTRODUCTION

[1]     THE COURT:  Forty-six-year-old Wanzhou Meng, who is also known by the names Cathy Meng and Sabrina Meng, was born in Chengu, China, and currently resides in Shenzhen, China. She is a Chinese citizen and does not hold citizenship in any other country. For the past 25 years, she has worked for Huawei Technologies Co. Ltd. ("Huawei"), China's largest telecommunications company. She currently holds the position of CFO and Deputy Chairwoman of the Board of Huawei.

[2]     On December 1, 2018, Ms. Meng was travelling from Hong Kong, apparently on her way to Mexico and then other destinations. Her flight arrangements involved a stopover in Vancouver. Before she could board her connecting flight, she was arrested at Vancouver Airport and is currently incarcerated at the Alouette Correctional Centre for women.

[3]     The arrest was based on a Provisional Arrest Warrant issued on November 30, 2018, pursuant to a request made by the United States of America (the "Requesting State") in accordance with the *Treaty on Extradition between the Government of Canada and the Government of the United States of America* (the "*Treaty*").

[4]     Ms. Meng now applies for judicial interim release under s. 18 of the *Extradition Act*, S.C. 1999, c. 18 (the "*Act*"). The Requesting State opposes her release and seeks an order for her detention.

## GENERAL NATURE OF THE REQUESTING STATE'S ALLEGATIONS

[5]     As set out above, Ms. Meng was arrested on a Provisional Arrest Warrant. Accordingly, the Requesting State has not yet filed a Certified Record of the Case, which would provide a more detailed account of the allegations against Ms. Meng and the evidence said to exist in support of those allegations for the purpose of an extradition request.

[6]     Pursuant to Article 11 of the *Treaty*, the Requesting State has a fixed period of time from the date of the arrest within which to submit a full request for Ms. Meng's extradition, along with the Record of the Case upon which they will be relying.

[7]     What we have at this point is a Summary of Facts produced by the Requesting State in support of their request for the Provisional Arrest Warrant. This was attached to the Affidavit of Cst. Yep that was marked as Exhibit 2 on this bail hearing. We also have a letter dated December 3, 2018, from United States Attorney, Eastern District of New York, which was marked as Exhibit 1.

[8]     According to those materials, a judge of the Eastern District of New York issued a warrant in the United States on August 22, 2018 for the arrest of Ms. Meng to stand trial on U.S. charges. The Requesting State alleges that starting in 2009, Ms. Meng and others conspired to make representations to numerous multinational financial institutions inducing them to continue to provide banking services to Huawei, despite the fact they were operating in countries subject to United States sanctions.

[9]     More specifically, it is alleged that Huawei operated Skycom Tech Co. Ltd. ("Skycom") as an unofficial subsidiary to conduct business in Iran, while concealing Skycom's link to Huawei. It is alleged that Meng and other Huawei representatives repeatedly lied about the nature of the relationship between Huawei and Skycom in order to obtain banking services from multinational financial institutions.

[10]    It is alleged that "the financial institutions at issue . . . maintained policies by which they would not onboard Iran-based clients or process Iran-related transactions through the United States, so as to avoid exposure to U.S. civil and criminal liability."

[11]    It is alleged that because of the misrepresentations, the "victim banking institutions were induced into carrying out transactions that they otherwise would not have completed", potentially exposing them to the risk of fines and forfeiture for violating U.S. sanctions laws.

2018 BCSC 2255 (CanLII)

2018 BCSC 2255 (CanLII)

[12]    The allegations appear to centre around Ms. Meng's participation in a PowerPoint presentation in August or September 2013 that allegedly contained false or misleading representations regarding Huawei's ownership and control of Skycom and Huawei's compliance with applicable U.S. laws.

[13]    I am told by counsel for Ms. Meng that the allegations of false or misleading representations are denied, and a request for her extradition will be vigorously opposed.

## THE POSITION OF MS. MENG

[14]    Ms. Meng has filed an affidavit in support of her application for judicial interim release. That affidavit discloses, as set out above, that Ms. Meng is a 46-year-old citizen of China. She does not hold any other citizenship. She has a Hong Kong passport and a Chinese passport. She lives in Shenzhen, China.

[15]    Ms. Meng is married to Xiaozong Liu, and they have a 10-year-old daughter who also resides in Shenzhen. Ms. Meng has three sons from previous marriages, one of whom is currently attending school in the United States.

[16]    Ms. Meng holds a Master's Degree, and she is currently the CFO and Deputy Chairwoman of the Board of Huawei, a company she has worked at since 1993.

[17]    Ms. Meng at one time was a permanent resident of Canada, although she has since relinquished that status. In 2009, she and her husband purchased a home at 4005 28th Avenue West in Vancouver, and between 2009 and 2012, two of her children attended school in Vancouver. Since 2010, her in-laws have typically stayed at the Vancouver home for multiple months in the summer, and Ms. Meng has tried to spend at least two to three weeks in Vancouver every summer. In 2016, Ms. Meng and her husband purchased another home in Vancouver at 1603 Matthews Street. That home is currently under renovation, with the intention that it will be for their family's use. The combined assessed value of the two homes is approximately $21.9 million, but they are subject to mortgages amounting to approximately $7.5 million.

[18]     Ms. Meng has no criminal record in China or elsewhere. She has various health problems, including hypertension. She had surgery for thyroid cancer in 2011, and more recently in May 2018 for issues related to sleep apnea.

[19]     The facts set out in Ms. Meng's affidavit are supported by affidavits from other individuals, including her husband. Letters of reference have also been filed attesting to her good character, and opining that she would not violate any court order. The letter by Sha Ye, who is a senior fellow at Fudan University in Shanghai, includes this comment:

> I am really saddened to hear the news that Ms. Meng has been detained in Vancouver over the past weekend. I have spoken to Ms. Meng's family. Ms. Meng firmly believes that the Canadian and US legal system will produce a just result that will prove her innocence. Ms. Meng has spent her entire career working for Huawei. She has gained an impeccable reputation over these years. This is her lifelong work! If she is bailed, she will not risk damaging her personal reputation and career, as well as the business of Huawei, by going back to China without proper legal approval. She will stay in Canada to see justice getting served.

[20]     Another letter has been provided by a neighbour who lives on 28th Avenue in Vancouver, who writes:

> I offer this letter as a testament to Wanzhou Meng. As her neighbour, I first met Sabrina about 8 years ago when she and her husband first purchased the house next door. The home has been largely used as a summer retreat for extended family including children and grandparents. Sabrina's visits were typically brief but understandably due to her involvement in business affairs internationally. Conversations with her gave one the impression of a quiet and modest individual who considered her family and children a priority. On this basis, as well as the obvious support of her tightly knit family, I believe that Sabrina would not jeopardize the well being and future status of her children (her son attends school in the US.)
>
> I believe that Sabrina would not violate a court order.

[21]     Those comments are consistent with the words of Ms. Meng herself, who deposed at paragraph 10 of her affidavit:

> 10.     If this Honourable Court grants me judicial interim release, I will abide by any condition imposed. I will surrender both of my passports. I can reside at my home at 4005 28th Street [sic], Vancouver. I understand that my husband and daughter, and my extended family members would come to Vancouver and reside with me as permitted by Canada's immigration laws.

2018 BCSC 2255 (CanLII)

My husband and I are willing to pledge the equity in either or both of our homes as security, or to make a cash deposit should the Court require us to do so. I will scrupulously abide by any curfew or reporting requirement imposed upon me. My father founded Huawei and I would never do anything that would cause the company reputational damage. I believe that breaching my bail conditions would cause such damage. I maintain that I am innocent of the allegations that have been levelled at me. I wish to remain in Vancouver to contest my extradition and I will contest the allegations at trial in the U.S. if I am ultimately surrendered.

## THE POSITION OF THE REQUESTING STATE

[22]    Counsel on behalf of the Requesting State points out that s. 19 of the *Extradition Act* incorporates Part XVI of the *Criminal Code* with respect to judicial interim release, and in particular, incorporates by reference the primary, secondary, and tertiary grounds for detention set out in s. 515(10) of the *Criminal Code*. That section provides:

> 515 (10) For the purposes of this section, the detention of an accused in custody is justified only on one or more of the following grounds:
>
>> (a) where the detention is necessary to ensure his or her attendance in court in order to be dealt with according to law;
>>
>> (b) where the detention is necessary for the protection or safety of the public, including any victim of or witness to the offence, or any person under the age of 18 years, having regard to all the circumstances including any substantial likelihood that the accused will, if released from custody, commit a criminal offence or interfere with the administration of justice; and
>>
>> (c) if the detention is necessary to maintain confidence in the administration of justice, having regard to all the circumstances, including
>>
>>> (i) the apparent strength of the prosecution's case,
>>>
>>> (ii) the gravity of the offence,
>>>
>>> (iii) the circumstances surrounding the commission of the offence, including whether a firearm was used, and
>>>
>>> (iv) the fact that the accused is liable, on conviction, for a potentially lengthy term of imprisonment or, in the case of an offence that involves, or whose subject-matter is, a firearm, a minimum punishment of imprisonment for a term of three years or more.

[23]    In the circumstances of the present case, counsel on behalf of the Requesting State submits that the sole issue is whether Ms. Meng's detention is justified on the

2018 BCSC 2255 (CanLII)

2018 BCSC 2255 (CanLII)

primary ground referred to in s. 515(10)(a), namely whether her detention is required to ensure her attendance in court. Counsel on behalf of the Requesting State makes no submission on the secondary or tertiary grounds set out in clauses (b) and (c) of s. 515(10). That is, counsel on behalf of the Requesting State does not take the position that Ms. Meng needs to be detained for the protection or safety of the public, or to prevent her from committing an offence, or to prevent her from interfering with the administration of justice, or to maintain public confidence in the administration of justice. The only issue is whether Ms. Meng needs to be detained in order to ensure that she attends court.

[24]     Counsel on behalf of the Requesting State submits that, pursuant to s. 515(6)(b) of the *Criminal Code*, Ms. Meng is subject to a reverse onus owing to the fact that she is not ordinarily resident in Canada, and accordingly, Ms. Meng must show cause why her detention in custody is not justified. Counsel on behalf of the Requesting State submits that Ms. Meng has not met that onus, and says that she has an incentive to flee due to the potentially lengthy incarceration she would face in the United States if she were extradited and convicted there. The submission is that Ms. Meng does not have a significant connection with this jurisdiction, and that she has substantial financial resources that make the imposition of bail conditions, including substantial sureties, ineffective in ensuring her court attendance.

[25]     As counsel on behalf of the Requesting State wrote:

> Ms. Meng has significant financial resources which would enable her to flee Canada should she choose to do so. She is a senior executive at one of the world's largest telecommunications companies and the daughter of its founder. Her father has an approximate net worth of U.S. $3.2 billion. Ms. Meng is a Chinese national. China has no extradition agreement with the U.S. Should Ms. Meng want, she has the means to flee and remain outside Canada and the United States indefinitely. As held by the Court in *United States of America v. Baratov*, 2017 ONSC 2212, "if you have infinite sources, the value of the pledge diminishes.": para. 40.

[26]    Counsel on behalf of the Requesting State relies on the comments of Wood J.A. at para. 5 of *U.S.A. v. Ross* (5 July 1993), Vancouver CA017111 (B.C.C.A.):

> [15]    But the courts in this Country have long recognized that a correct approach to extradition proceedings is characterized by good faith in honouring Canada's international obligations; see: *Schmidt v. The Queen*, [1987] 1 S.C.R. 500. In my view, adherence to that principle requires a court considering a bail application such as this to limit the assumption of the risk of non-appearance more severely than might otherwise be acceptable in the case of domestic proceedings.

[27]    The decision in *Ross* was referred to with approval by Low J.A. in *U.S.A. v. Edwards*, 2010 BCCA 149 at para. 18:

> [18]    This application for interim release must be considered in light of the need to honour Canada's international treaty obligations. Therefore, the court must look at the risk of non-appearance even more cautiously than might be the case in domestic proceedings:  see the decision of Wood, J.A. in *United States of America v. Ross*, CA017111, July 5, 1993.

[28]    To similar effect are the comments of MacKenzie A.C.J., as she then was, at paragraph 17 of *U.S.A. v. Espinosa* (19 November 2010), Vancouver 25574 (B.C.S.C.).

[29]    Counsel on behalf of the Requesting State submits that the present case bears similarities to *U.S.A. v. Su Bin* (23 July 2014), Vancouver 26595 (B.C.S.C.). In that case, Cullen A.C.J., as he then was, ordered the detention of a Chinese national who had been arrested on a provisional warrant in relation to allegations that he had accessed the computer networks of defence contractors in the United States and committed theft of data relating to military aircraft and weapons systems.

## **ANALYSIS**

[30]    The Requesting State relies on a number of factors to support the proposition that Ms. Meng has not satisfied her onus of showing that her detention is not necessary to secure her attendance in court. These factors include the submission that Ms. Meng has no meaningful connection with Vancouver, that the wealth of her family would make it easy for her to flee the jurisdiction, and that her ordinary life is

2018 BCSC 2255 (CanLII)

in China, a country with no extradition treaty with either Canada or the United States. In addition, the Requesting State submits that since the allegations against Ms. Meng are in the nature of fraud, her averments that she would not flee should be given little credence.

[31]    Two other matters have been raised that deserve mention.

[32]    First, there was an allegation that Ms. Meng possessed multiple passports. That concern, in my view, has been put to rest by the Affidavit No. 3 of Xiaozong Liu, explaining that there are only two currently valid passports, one issued by the People's Republic of China, and the other by Hong Kong. The other passports that have been alluded to were issued as replacement passports for valid reasons that are explained in that affidavit. Ms. Meng and her counsel have assured the Court that if she is released, all her passports will be surrendered to the appropriate authorities.

[33]    The second matter is the allegation contained in the letter from the United States Attorney Eastern District of New York, that Ms. Meng has demonstrated an intention to evade apprehension in the United States by reason of the fact that she has not travelled there since March 2017. According to the author of that letter, the reason for that lack of travel to the United States is that in April 2017, Huawei became aware of a U.S. criminal investigation when Huawei's U.S. subsidiaries were served with a grand jury subpoena.

[34]    I put very little weight on the suggested inference that Ms. Meng's failure to travel to the United States since March 2017 is evidence of an intent to evade apprehension there. That inference is entirely speculative and without any reliable foundation. Residents of countries other than the United States, including Ms. Meng, may have myriad good reasons for choosing not to travel to the United States during the past two years.

[35]    As mentioned above, counsel on behalf of the Requesting State referred to *U.S.A. v. Su Bin* as a case that bore some similarity to the present case. There, after

2018 BCSC 2255 (CanLII)

referring to a number of factors, including the fact that the person sought was a Chinese national and that China had no extradition treaty with either the United States or Canada, Mr. Justice Cullen wrote at paras. 59 to 60:

> [59]     In my view, those factors, taken in combination, raise a significant risk that Mr. Su, if released, will abscond rather than face the prospect of extradition to the United States to face these charges.

> [60]     I am not satisfied that what he has proposed by way of bail terms is sufficient to offset that risk, given the absence of any evidence of the nature or extent of his offshore assets and resources, and the fact that he is only able to offer his wife as a surety.

Mr. Justice Cullen went on to say at para. 64:

> [64]     Each case is to be decided on its own facts, of course . . .

[36]     The question before me, then, is whether, on the particular facts of this case, I can be satisfied that what Ms. Meng has proposed by way of bail terms is sufficient to offset the risk of flight. Indeed, that is the sole question, given that counsel on behalf of the Requesting State is relying only on the primary ground of s. 515(10) and not on the secondary or tertiary grounds.

[37]     The fact is that Ms. Meng has proposed something quite different from what was proposed by Su Bin.

[38]     On these proceedings, two witnesses were called to testify about the security services they could provide to monitor Ms. Meng's compliance with the terms of any bail order that might be made.

[39]     Scot Filer is a former member of the RCMP. He retired from that force in 2007 after 30 years of service. He is now the Chief Executive Officer of Lions Gate Risk Management Group, a firm that he founded in 2008, which provides risk management and surveillance services. His proposal for the services his firm could provide is set out in a written document that has been marked as Exhibit 12 in these proceedings. He offers two options, with Option 2 being preferred because it offers the highest level of security.

2018 BCSC 2255 (CanLII)

2018 BCSC 2255 (CanLII)

[40]     As set out in Exhibit 12, Option 2 provides for continuous observation at any time when Ms. Meng would be outside of her residence, and it is described in this way:

> Option Two: Minimally intrusive that allows for continuous observation
>
> Resources required per eight-hour shift: One Security Driver, one Security Officer, one Security Vehicle, Technical devices.
>
> This option consists of a security driver, a security officer, and a security vehicle. The advantages of this option are that while still being minimally intrusive and less overt, it still provides continuous observation of Ms. Meng while at the residence and out in the community. The driver remains with the vehicle at the pick up and drop off location, while the security officer accompanies Ms. Meng into whatever location she attends. The security officer remains in close proximity of Ms. Meng while still allowing her to conduct business and have private conversations. This option also utilizes secure software and hardware that tracks the movement of the operators while on duty. The device allows for constant two-way communications via secure text, and accurate GPS tracking. The device does not track Ms. Meng, which minimizes the intrusion of her Charter Rights. The device works in conjunction with a GPS tracking bracelet.
>
> Option Two provides continuous monitoring of Ms. Meng while in residence due to the fact that there are two operators. One operator remains at the front of the residence with the security vehicle, and the second operator remains at the back of the residence depending on the layout.

[41]     I should add that this proposal has been modified, because Scot Filer testified that in this case there would be two security officers rather than one.

[42]     A map of the proposed travel restriction area has been marked as Exhibit 13, and includes most of Vancouver and Richmond, with the exception of the area around YVR Airport, and also parts of North and West Vancouver.

[43]     The other witness called was Stephen Tan, the founding partner and Director of Operations of Recovery Science Corporation, which can provide monitoring of a subject through the use of a GPS ankle bracelet that communicates tracking information to the company through the Rogers Communications network. Their proposal is outlined in a document that has been marked as Exhibit 14.

[44]     A summary of the bail conditions that have been proposed by counsel for Ms. Meng is set out in Exhibit 11 and reads as follows:

Proposed bail conditions:

The Applicant will enter a recognizance in the amount of 15 million dollars of which the sum of 1 million dollars will be deposited by way of cash or other form of cash like instruments satisfactory to the Registry of this Honourable Court, and 14 million dollars of which will be tendered by pledging two residences owned by Xiaozong Liu, who is the husband [of] the Applicant. The residences are located at 1603 Matthews Avenue, Vancouver, BC, V6J 2T1 and 4005 28th Avenue West, Vancouver, V65 1S7.

And that the Applicant:

1.      Report to a bail supervisor at the Vancouver West Community Corrections Office at 202 - 1855 Burrard Street, Vancouver, British Columbia within 48 hours of her release and thereafter weekly, or as otherwise directed by a bail supervisor:

2.      Remain in British Columbia;

3.      Keep the peace and be of good behaviour;

4.      Reside at 4005 28 Avenue West, Vancouver British Columbia, and not change her address without prior approval of the court;

5.      Be in her place of residence between the hours of 11:00 pm and 6:00 am unless she has prior written permission of her bail supervisor or the court to be absent or in the event of a medical emergency;

6.      To surrender any and all passports and travel documents in her name to the Royal Canadian Mounted Police forthwith and agree not to apply for any passport or travel document anywhere in the world;

7.      Arrange for a surety in the amount of $1,000.00 be provided for by Lions Gate Risk Management Group ("Lions Gate"), which has as its address for business #334, 5148 - 48th Avenue, in the City of Delta, Province of British Columbia, together with a signatory as surety by Scot Filer, Chief Executive Officer, with said firm who will on a 24-hour per day basis ensure that all conditions of the Applicant's judicial interim release are complied with;

8.      Shall comply with the directions of Lions Gate employees, including by allowing them access onto and into the residence as required, and by allowing Lions Gate's use of secure tracking software and hardware to facilitate situational awareness of the Applicant's movement both at the residence and while in the community. Lions Gate employees will accompany the Applicant when she leaves the residence;

9.      Shall be subject to GPS monitoring by Recovery Services Corporation ("RSC"). This will include: a) entering into RSC's participant agreement and complying with its terms, b) wearing a GPS ankle bracelet at all times, c) permitting RSC to install supplementary equipment and to inspect, replace and maintain equipment as it deems necessary, d) complying with RSC leave notification and battery charging requirements. e) cooperating fully with RSC staff, and f) installing ankle bracelet prior to leaving the facility where the Applicant is detained;

2018 BCSC 2255 (CanLII)

2018 BCSC 2255 (CanLII)

> 10.   At all times, while not at the residence, carry a copy of the
>       recognizance and present it to police officers upon request;
>
> 11.   Surrender herself into custody if so required by the Supreme Court of
>       British Columbia;
>
> 12.   Consent to the attendance of a Royal Canadian Mounted Police
>       officer or any other peace officer without notice to her premises to
>       determine whether or not she is in compliance with her conditions of
>       release.

[45]   In addition, counsel for Ms. Meng said that she would agree to pay all the costs and expenses of the services provided by Lions Gate and Recovery Services.

[46]   During submissions, I raised the issue of Xiaozong Liu's immigration status in Canada, and whether that posed an impediment to him acting as a surety. I have been informed that he is currently in Canada on a visitor's visa which will expire in six months, but could very likely be renewed.

[47]   There appears to be some uncertainty over the ability of a non-resident to act as a surety. In Ewaschuk, *Criminal Pleadings and Practice in Canada*, the authors state at paragraph 6:1120(h) that:

> The following are not acceptable as sureties . . . a non-resident of the
> province.

[48]   *R. v. Martin No. 2* (1980), 57 C.C.C. (2d) 31 (Ont. C.A.) is cited as authority. Upon reading that case, however, it does not appear to be authority for that proposition, but rather for the different point that a surety must have property within the province. In the present case, of course, Mr. Liu does have property within British Columbia.

[49]   Counsel referred me to the decision of the Ontario Court of Appeal in *R. v. Wilson*, 2017 ONCA 229, where we are told at para. 10 that Mr. Wilson had been released on extradition bail with a number of sureties, one of whom was in Canada on a visitor's visa. The judge in that case wrote:

> If Rosemary Wilson were being proposed as the sole surety in this matter, I
> would perhaps give more weight to the concerns raised by the respondent
> with respect to her suitability as a surety. However, pursuant to the plan of
> release, she is only one of four proposed sureties.

[50]     In British Columbia, we have the decision of Maisonville J. in *United States v. Le,* 2010 BCSC 1653, where, although this point was not directly in issue, the learned judge reproduced at para. 42 of her reasons a portion of the document used by our Court Registry in screening proposed sureties. The document contains a portion entitled "Important Information for Surety Applicants," which includes the following advice:

> A surety must be a resident of British Columbia and at least 19 years old.

[51]     In light of this uncertainty over the suitability of Mr. Liu to act as a surety because of his status as a visitor to Canada, four more individuals have come forward as proposed sureties. Each has filed an affidavit attesting to the fact that they are residents of Vancouver who know Ms. Meng personally and are willing to act as sureties for her. Those affidavits have been marked as Exhibits 16 through 19 in these proceedings. The total amount that they are willing to pledge as security for her release is $3 million.

[52]     Counsel for Ms. Meng has told me that she and her husband could post $7.5 million as a cash deposit in lieu of the originally-proposed $14 million pledge of their real property in Vancouver.

[53]     While no bail order can ever function as an absolute guarantee that a detainee will not abscond, I am satisfied that on the particular facts of this case, including the fact that Ms. Meng is a well-educated businesswoman, who has no criminal record, and of whom several people have attested to her good character, the risk of her non-attendance in court can be reduced to an acceptable level by imposing the bail conditions proposed by her counsel, with bail set at a total amount of $10 million, with a $7 million cash deposit, and with five or more sureties in an aggregate total amount of $3 million.

## **CONCLUSION**

[54]     I order that Ms. Meng may be released from custody upon her entering into a recognizance in the amount of $10 million, including a cash deposit of $7 million and

2018 BCSC 2255 (CanLII)

with five or more sureties in the total aggregate amount of $3 million, with one of those sureties being Scot Filer in the amount of $1,000, and the other sureties being acceptable to the Justice of the Peace, and upon the following conditions:

a)     You must keep the peace and be of good behaviour;

b)     You must report to a bail supervisor at the Vancouver West Community Corrections office at 202, 1855 Burrard Street, Vancouver, British Columbia, within 48 hours of your release and thereafter weekly or as otherwise directed by your bail supervisor;

c)     You must provide your bail supervisor with all telephone and cellular numbers which you regularly use and you must be able to be contacted by either telephone or cellular numbers to confirm compliance with the conditions of your release;

d)     You must remain in the Province of British Columbia;

e)     You must reside at 4005 28th Avenue West, Vancouver, British Columbia (the "Residence"), and not change that Residence without the prior written approval of the court;

f)     You must remain inside your Residence between the hours of 11:00 p.m. and 6:00 a.m., unless you have prior written permission of your bail supervisor or the court to be absent, or in the event of a medical emergency;

g)     You must remain within that portion of the geographical area of the Lower Mainland of Vancouver that is defined in the proposed travel restrictions that was marked as Exhibit 13;

h)     You must surrender any and all passports and travel documents in your name to the Royal Canadian Mounted Police forthwith and agree not to apply for any passport or travel document anywhere in the world;

2018 BCSC 2255 (CanLII)

2018 BCSC 2255 (CanLII)

i)      You must agree to have your surety, Scot Filer, and his company, Lions Gate Risk Management Group ("Lions Gate"), provide 24-hour-per-day, seven-days-per-week supervision and surveillance to ensure that all conditions of your judicial interim release are complied with;

j)      You must comply with the directions of Lions Gate employees, including by allowing them access onto and into the Residence as required and by allowing Lions Gate's use of secure tracking software and hardware to facilitate situational awareness of your movement, both at the Residence and while in the community, and to have Lions Gate employees accompany you whenever you leave the Residence;

k)      You must agree that whenever you leave the Residence, Lions Gate is authorized to take you into custody in the event that you breach any of your bail conditions, in accordance with their power at common law and pursuant to the relevant provisions of the *Criminal Code of Canada*, until such time that you can be transferred to the custody of the Royal Canadian Mounted Police or any other peace officer;

l)      You must agree to be subject to GPS monitoring by Recovery Services Corporation ("RSC") which will include:

  i.      entering into RSC's participant agreement and complying with its terms;

  ii.      wearing a GPS ankle bracelet at all times;

  iii.      permitting RSC to install supplementary equipment and to inspect, replace, and maintain equipment as it deems necessary;

  iv.      complying with RSC leave notification and battery charging requirements;

v.      cooperating fully with RSC staff; and

vi.     installing the ankle bracelet prior to leaving the facility where you are detained;

m)   You must agree to pay for all the costs associated with the services of both Lions Gate and RSC in connection with this order;

n)   You must at all times while not at your Residence carry a copy of the recognizance and present it to police officers upon request;

o)   You must consent to the attendance of a Royal Canadian Mounted Police officer or any other peace officer, without notice, to the Residence to determine whether or not you are in compliance with the conditions of your release;

p)   You must attend court as and when required and surrender yourself into custody if so required by the Supreme Court of British Columbia.


The Honourable Mr. Justice W.F. Ehrcke

2018 BCSC 2255 (CanLII)

**CITATION:** USA v. Hillis, 2018 ONSC 5360
**COURT FILE NO.:** CR-18-0055-BR
**DATE:** 2018-09-12

## SUPERIOR COURT OF JUSTICE - ONTARIO

**RE:**        The Attorney General of Canada on behalf of the United States of America, Respondent

                v.

                Brady John Hillis, Applicant

**HEARD:**     September 12, 2018

**BEFORE:**   Fitzpatrick J.

**COUNSEL:**  *B. Friesen*, for the Respondent AG Canada

             *D. Gunn*, for the Applicant Brady John Hillis

### Endorsement On Application for Judicial Interim Release Pursuant to Section 18(1) of the Extradition Act S.C. 1999 c. 18

### WARNING
**A NON-PUBLICATION ORDER HAS BEEN MADE IN THIS PROCEEDING UNDER S. 517 OF THE *CRIMINAL CODE OF CANADA* which will continue until the surrender or discontinuation of the Extradition Hearing to be held in this matter and further A NON-PUBLICATION ORDER HAS BEEN MADE IN THIS PROCEEDING UNDER S. 26 OF THE EXTRADITION ACT S.C. 1999 c. 18**

[1]      The Applicant, Brady John Hillis is facing a hearing leading to possible extradition to the United States of America.  He is accused of committing three separate acts of sexual interference against three different minor children at a resort property on the territory of the Bois Forte Band of Chippewa on or about June 22, 2018.  He is facing several charges under the United States Federal Criminal Law.  The precise particulars of those charges, for example what sections of the United States Federal Criminal Law are engaged is not known to the parties before this Court.

United States v. Hillis
Court File No. CR-18-0055

Case 4:19-mj-70677-MAG    Document 24    Filed 05/16/19    Page 26 of 138
Endorsement on Bail Application
Fitzpatrick J.

- 2 -

[2]     On August 23, 2018, the Minister of Justice for Canada authorized the Attorney General for Canada to seek an order for committal for Mr. Hillis in order that he may be extradited to the United States. Accordingly the Attorney General sought and obtained a warrant for the arrest of Mr. Hillis pursuant to section 16 of the *Extradition Act* SC 1999 c. 18 (the "Act"). Mr. Hillis seeks his release from custody pending his extradition hearing pursuant to section 18 of the Act. By virtue of section 19 of the Act, the provisions of Part XVI of the *Criminal Code of Canada* (the "Code") are engaged on this application. The Attorney General for Canada on behalf of the United States (the "USA") opposes release on the primary and tertiary grounds. This is a reverse onus bail hearing. Mr. Hillis is required to show cause why his detention is not justified pending the completion of the extradition process.

## Evidence of the USA

[3]     Further to the USA's request to extradite Mr. Hillis, an Assistant U.S. Attorney in the District of Minnesota provided a "Record of the Case for the Prosecution" (the "ROC") to the Department of Justice on or about August 16, 2018. The ROC contained summaries of the expected evidence of 16 witnesses. Three witnesses were minor female children who claim they were inappropriately touched by Mr. Hillis. These children are referred to in the ROC as Jane Doe 1, 2 and 3 respectively. The expected testimony summary of four other witness who are related to Jane Doe 1's is provided in the ROC. The expected testimony summary of three other witnesses who are related to Jane Doe 2 is provided in the ROC. The ROC contains the expected testimony summary of two witnesses unrelated to the complainant children who observed Mr. Hillis' movements on June 22, 2018.

United States v. Hillis            Document 24      Filed 05/16/19      Page 27 of 138
Court File No. CR-18-0055                                                 Endorsement On Bail Application
                                                                                    Fitzpatrick J.

- 3 -

--------------------------------------------------------------------------------

[4]     The ROC also contains the expected testimony summary of three persons employed by the resort in security type positions.   One in particular summarizes video security camera evidence allegedly of Mr. Hillis which purports to show his entering the resort property and then interacting with Jane Doe 1, 2 and 3 on June 22, 2018.   Also provided in the ROC are expected testimony summaries of two American peace officers, one employed by Bureau of Indian Affairs on the Bois Forte Indian Reservation and one employed by the FBI.

[5]     A summary of the allegations made regarding Jane Doe 1 ("JD1") is as follows.   JD1 is nine years old.   JD1 and her two brothers, aged 11 and 10,  were in the video arcade at the resort at around 8 pm.   They were playing a particular game, when they were approached by a man, whom JD1 later identified as Mr. Hillis.   He knelt down beside the children and began to engage them in conversation.   The children ran out of money to play the games.   JD1 was standing by herself near a machine when Mr. Hillis came over to her.   She says he offered to give her money if she "let him touch her bum".   At the same time he ran his left hand up against her right leg. He then touched her buttock over top of her knee-length dress.   JD1 and her two brothers ran out of the arcade.   JD1 told her parents what happened.   JD1's mother went to the front desk to call the police.   JD1's father went with her to the pool area of the resort.   JD1's father confronted Mr. Hillis regarding his daughter's allegations.   Mr. Hillis denied he did anything wrong.

[6]     The ROC contains a summary of video security camera surveillance tape of the arcade that night.   The head of resort security claims there is video evidence showing Mr. Hillis in the vicinity of the three children showing an initial interaction between himself and JD1 as described by JD1.   The security officer claims the video evidence then shows Mr. Hillis touching JD1's leg and buttocks with his left hand.

United States v. Hillis Case 9:19-mj-70677-MAG   Document 24   Filed 05/16/19   Page 28 of 138
Court File No. CR-18-0055                                        Endorsement On Bail Application
                                                                        Fitzpatrick J.

- 4 -

------------------------------------------------------------------------------------------------

[7]     The ROC contains the expected testimony of an adult who is unrelated to JD1, who claims she saw Mr. Hillis in the arcade and in close proximity to three minor children.

[8]     Jane Doe 2 ("JD2") is seven years old.   At about 8:30 pm on June 22, 2018 she was swimming in the resort pool with some of her siblings.   She was wearing a two piece swimsuit. She went over to swim in the kiddie pool by herself.   Mr. Hillis came over to sit on the edge of the pool with his feet in the water.   He got up to get a towel to sit on.   He went back to the edge of the pool and sat on the towel.   Mr. Hillis asked JD2 to come over to him.   He asked JD2 her name.   He continued to talk to her while he put his arm under the water and slid his hand under the leg portion of her swim suit bottom.   JD2 claims he touched her "private part" with his fingers.   She felt scared and weird.   JD2 claims she tried to move away but Mr. Hillis pulled her back.   He then put his hand under her swimsuit top and touched her chest.   JD2 pushed away and went into the big pool.

[9]     JD2 told her sister what happened and pointed to Mr. Hillis as the man who did it.   A cousin of JD2 took her to the front desk to report the incident.   The head of security indicates there is surveillance tape showing Mr. Hillis sitting beside JD2 in the kiddie pool.   The video shows the two interacting for about one minute.   Then JD2 is shown jumping back in to the big pool.

[10]     Jane Doe 3 was twelve years old on June 22, 2018.   At about 8:40 pm she was swimming in the big pool at the resort with her friend.   She noticed a male swimming close to her.   She decided to race her friend to the other end of the pool.   As she dove underwater she felt a hand touch her buttocks.   She surfaced and asked her friend if she did it.   She said she did not.   She heard the male person who had been swimming close to them make a moaning sound.   JD3 told

her mother later about this. JD3 saw Mr. Hillis later in the resort but he was surrounded by security guards. Neither JD3 nor her mother told law enforcement about this incident on June 22, 2018.

[11]  The head of security will testify that there is video showing Mr. Hillis reaching out with his left hand to touch the buttock of a female child as she swims by him in the pool. Immediately after that, JD1 and her father can be seen coming in to the pool area and confronting Mr. Hillis.

**Plan for Release**

[12]  Mr. Hillis is 29 years old. He has been an OPP officer for three years. He is currently stationed in Kenora. He reported the allegations to his superiors on June 25, 2018. He was placed on administrative leave. He was asked and did report to the OPP station every day thereafter until his arrest on September 5, 2018.

[13]  Mr. Hillis has no criminal record. He is married. He and his wife do not have any children. Mr. Hillis grew up in London, Ontario. He proposes to live with his parents in London pending resolution of the extradition matter. He makes the following specific proposals:

a.  Obtain two sureties in the amount of $10,000 and $50,000;

b.  To reside with his mother, Margaret Hillis, and father, William Hillis, at 91 Metcalfe Crescent, in London, Ontario;

c.  To not move without permission of the court;

d.  To remain within the province of Ontario;

e.  To abide by a curfew that this Honourable Court sees fit;

United States v. Hillis
Court File No. CR-18-0055

Case 4:18-mj-70677-MAG   Document 24   Filed 05/16/19   Page 30 of 138
Endorsement On Bail Application
Fitzpatrick J.

- 6 -

f.  To not contact any named complainants involved in the allegations;

g.  To not have contact with any child under the age of 18, unless in the presence of a sober adult who is aware of these allegations;

h.  To not attend any public park or public swimming area where persons under the age of 16 are present or can reasonably be expected to be present, or a daycare centre, school ground, playground, or community centre;

i.  To not seek, obtain, or continue any employment or become a volunteer in a capacity that involves being in a position of trust or authority towards persons under the age of 16 years;

j.  To not possess or consume any alcohol, drugs, including marijuana upon its legalization, or prescriptions drugs for which he does not have a prescription;

k.  To deposit his passport with law enforcement prior to his release and to not obtain a new passport;

l.  To personally report to a police station as often as this Honourable Court deems fit; and,

m.  Any other conditions this Honourable Court deems necessary.

[14]   Mr. Hillis recognizes there will be a need for a kind of interim condition which would govern his movement from Kenora to London if he was to be granted bail.  He proposes to remain in the presence of his sureties to be driven back to London on or before Monday September 17, 2018.  He as well will agree to report as required to the RCMP detachment in London located at 451 Talbot Street beginning on September 17, 2018.  He will also surrender his OPP uniform to the Kenora detachment immediately if granted bail.

## The Law and the Positions of the Parties on the Three Grounds for Detention

[15]   It was agreed by the parties that the charges facing Mr. Hillis in the United States are analogous to charges of sexual interference contrary to section 151 of the Code. The justification for detention is found in the provisions of s. 515(10) of the *Criminal Code* and include the

primary grounds, which are to ensure his attendance in court; the secondary grounds, which are a consideration of the protection or safety of the public, including any substantial likelihood that he would commit further criminal offences or interfere with the administration of justice; and the tertiary grounds, which are to maintain confidence in the administration of justice.

## Primary Grounds

[16]     In assessing the primary grounds, the courts have established the following factors as being relevant:

- Whether the accused has previously committed an offence of being unlawfully at large or breaching an undertaking or recognizance;

- Is the accused a Canadian citizen;

- Does the accused have significant roots in the community, including assets, family, employment/schooling;

- Does the accused have an articulable connection to a foreign jurisdiction;

- Does the accused have a passport;

- Is there any evidence that the accused contemplated flight;

- Does the accused's criminal record or character suggest routine disregard for court orders;

- Is there a real incentive for the accused to flee given the nature of the crime charged, the strength of the prosecution's case, and the length of sentence that could be imposed; and

- Is the proposed release plan one which would reduce the risk of non-attendance for trial within tolerable limits?

[17]     The USA argues Mr. Hillis is a flight risk. They point to the possible significant sentence he is facing should he be convicted, at least according to the letter from the Assistant United States Attorney who has requested Mr. Hillis' extradition.  USA refers to the decision of Bellamy J. in USA v. Ben Huu Dinh (2007) unreported where the Justice found that possible

--------------------------------------------------------------------------------

consequences of conviction are relevant to assessing risk of flight of an applicant for interim judicial release.

[18]    Mr. Hillis submits he is not a flight risk.  He has no connections to any other place other than Ontario.  His sureties, all of whom reside in Southern Ontario, travelled to Kenora to attend this hearing.  They have sufficient assets to support the proposed deposits.  They are well aware of the nature of the allegations facing him.

[19]    Counsel for Mr. Hillis notes the speed at which Mr. Hillis voluntarily reported the incidents which have led to the charges being laid in the United States.   He reported them immediately after his return to Canada.  He was ordered to report to the police station every day which he has done.  He is prepared to surrender his passport.  His only trips outside of Canada in the past two years have been to the United States.   As a peace officer he is well aware of his obligations to attend court.

**Secondary Ground**

[20]    The secondary ground is set out at section 515(10)(b) of the *Criminal Code*. It is directed at the issue of the safety of the public in general and witnesses in particular. The secondary ground does not consider whether the accused might commit a further offence or interfere with the administration of justice; there must be evidence to show that it is substantially likely that the accused would do so.   The USA does not oppose bail on the secondary ground.  I find therefore that Mr. Hillis' plan is sufficient to protect the public from him committing a further offence or interfering with the administration of justice.

-------------------------------------------------------------------------------------------------

## Tertiary Ground

[21]   Section 515(10)(c) of the *Criminal Code* provides that detention is justified if the detention is necessary to maintain confidence in the administration of justice, having regard to all the circumstances, including:

    i.    The apparent strength of the prosecution's case;

    ii.    The gravity of the offence;

    iii.    The circumstances surrounding the commission of the offence, including whether a firearm was used; and

    iv.    The fact that the accused is liable, on conviction, for a potentially lengthy term of imprisonment or, in the case of an offence that involves, or whose subject-matter is, a firearm, a minimum punishment of imprisonment for a term of three years or more.

[22]   The test is whether detention is necessary to maintain confidence in the administration of justice, having regard to the four factors listed above and whether, in light of all the circumstances, a reasonable member of the community would conclude that detention was both necessary and appropriate. No one factor standing alone will be sufficient to justify detention on this ground. It is the combined effect of all the factors that may lead to the conclusion that detention on this ground is justified.

[23]   In the recent Supreme Court of Canada case of *R. v. St-Cloud*, 2015 SCC 27, [2015] 2 S.C.R. 328, the Court noted at para. 59 that one of the factors to be considered in a release hearing is any defence raised by the accused and that the judge presiding at the release hearing should, to the extent possible, consider the Crown's position, both the strengths and weaknesses, as well as any defences that the defence may suggest. The court at paras. 68-71 made the following comments regarding the tertiary grounds:

United States v. Huis
Court File No. CR-18-0055

Case 4:19-mj-70677-MAG   Document 24   Filed 05/16/19   Page 34 of 138
Endorsement On Bail Application
Fitzpatrick J.

- 10 -

--------------------------------------------------------------------------------

68     Section 515(10)(c) could not be worded more clearly: it refers to "all the circumstances, including...." In my opinion, Parliament would have worded this provision differently (although I will not comment on the validity of such a wording) if it had intended a detention order to be automatic where the four listed circumstances weigh in favour of such an order. In fact, Parliament intended the opposite. As the Chief Justice stated in Hall, a justice dealing with an application for detention based on s. 515(10)(c) must consider all the relevant circumstances, but must focus particularly on the factors Parliament has specified: para. 41. The automatic detention argument also seems to be inconsistent with the following statement by the Chief Justice, at para. 41:

> At the end of the day, the judge can only deny bail if satisfied that in view of these factors and related circumstances, a reasonable member of the community would be satisfied that denial is necessary to maintain confidence in the administration of justice.

69     Moreover, the automatic detention argument disregards the fact that the test to be met under s. 515(10)(c) is whether the detention of the accused is necessary to maintain confidence in the administration of justice. The four listed circumstances are simply the main factors to be balanced by the justice, together with any other relevant factors, in determining whether, in the case before him or her, detention is necessary in order to achieve the purpose of maintaining confidence in the administration of justice in the country. This is the provision's purpose. Although the justice must consider all the circumstances of the case and engage in a balancing exercise, this is the ultimate question the justice must answer, and it must therefore guide him or her in making a determination. The argument that detention must automatically be ordered if the review of the four circumstances favours that result is incompatible with the balancing exercise required by s. 515(10)(c) and with the purpose of that exercise.

70     Finally, it is important not to overlook the fact that, in Canadian law, the release of accused persons is the cardinal rule and detention, the exception: Morales, at p. 728. To automatically order detention would be contrary to the "basic entitlement to be granted reasonable bail unless there is just cause to do otherwise" that is guaranteed in s. 11(e) of the *Charter*: Pearson, at p. 691. This entitlement rests in turn on the cornerstone of Canadian criminal law, namely the presumption of innocence that is guaranteed by s. 11(d) of the *Charter* (*Hall*, at para. 13). These fundamental rights require the justice to ensure that interim detention is truly justified having regard to all the relevant circumstances of the case.

71     Although I will not set out an exhaustive list of the circumstances relevant to the analysis required by s. 515(10)(c) Cr.C., I think it will be helpful to give a few examples. Section 515(10)(c)(iii) refers to the "circumstances surrounding the commission of the offence". I would add that the personal circumstances of the accused (age, criminal record, physical or mental condition, membership in a criminal organization, etc.) may also be relevant. The justice might also consider the status of the victim and the impact on society of a crime committed against that

person. In some cases, he or she might also take account of the fact that the trial of
the accused will be held at a much later date.

[24]    The USA argues that denial of bail is necessary to maintain confidence in the
administration of justice.  As a peace officer, Mr. Hillis cannot be seen as receiving preferential
treatment.  The USA notes that a consideration of the strength of the prosecution's case in this
matter goes to the strength of the case to extradite Mr. Hillis as opposed to the strength of the
case he will face in the United States.  However the USA did submit that the presence of video
evidence validating the complaints of these youthful complainants would be of importance to
any reasonable members of the public assessment of a decision not to detain Mr. Hillis pending
the completion of the extradition process.  Any time a person who has been entrusted with
upholding and enforcing the law are themselves accused of breaking it, the USA submits
heightens the concern that interim judicial release may bring the justice system into disrepute.

[25]    The defence argues that Mr. Hillis should be released.  He has faced up to the allegations
by reporting immediately to his supervisors.  He has a reasonable plan.

[26]    Mr. Hillis has not been provided with the exact charges he is facing in the United States.
Relying on the request for extradition letter provided by the USA, and the reference to a potential
30 year minimum sentence, counsel searched the United States Federal Criminal law to find
examples of charges involving sexual assaults against minors that carry such a minimum.  He
could only locate one such reference.  It was contained in Title 18-Crimes and Criminal
Procedure ss 2241 c which reads:

(c)  WITH CHILDREN—Whoever crosses a State line with intent to engage in a sexual act with a
person who has not attained the age of 12 years, or in the special maritime and territorial
jurisdiction of the United States or in a Federal prison, or in any prison, institution, or facility in
which persons are held in custody by direction of or pursuant to a contract or agreement with the
head of any Federal department or agency, knowingly engages in a sexual act with another

--------------------------------------------------------------------------------

person who has not attained the age of 12 years, or knowingly engages in a sexual act under the circumstances described in subsections (a) and (b) with another person who has attained the age of 12 years but has not attained the age of 16 years (and is at least 4 years younger than the person so engaging) or attempts to do so, shall be fined under this title and imprisoned for not less than 30 years or for life. If the defendant has previously been convicted of another Federal offense under this subsection, or of a State offense that would have been an offense under either such provision had the offense occurred in a Federal prison, unless the death penalty is imposed, the defendant shall be sentenced to life in prison.

[27]   Mr. Hillis notes the requirement in that offence for the prosecution to prove the crossing of a state line with intent to engage in a sexual act with a minor. Mr. Hillis submits the evidence in the ROC shows no such intent. This is very important, when contrasted with the request for committal provided by the Minister which outlines that the comparable offence in Canada is one of sexual interference contrary to s. 151.

[28]   Mr. Hillis submits his interim release would not undermine confidence in the administration of justice and he has satisfied the tertiary ground.

## Decision

[29]   Considering all the circumstances of this case to date, the submissions of counsel, and the overarching principles of the presumption of innocence I am convinced that Mr. Hillis has satisfied me on this hearing that his detention is no longer justified pending the completion of the extradition hearing.

[30]   In my view, Mr. Hillis' plan for release is very strong. I am confident he will attend court as required. I do not find on the evidence before me that he is a flight risk. I accept Mr. Hillis' submission that he has no connections to any other jurisdiction. His conduct of dutifully reporting every day to his detachment since late June gives me confidence that he accepts the

United States v. Hillis                    Endorsement On Bail Application
Court File No. CR-18-0055                                      Fitzpatrick J.

- 13 -

---

severity of what he is facing and is nevertheless prepared to abide by conditions and comply with his proposed plan. In this case I do not find that the fact he is now facing extradition is sufficient to convince me that this increases his risk of flight.

[31]    On the primary ground, I find Mr. Hillis's continued detention is not justified to ensure that he will attend court in order to be dealt with according to law.

## The Secondary Grounds

As noted above, I am satisfied that Mr. Hillis' detention would not be jusitfied on this ground.

## The Tertiary Grounds

[32]    Since the decision of the Supreme Court in *R v. St-Cloud*, it is clear that this ground is not to be considered sparingly or interpreted narrowly. It is not a residual ground. It is to be independently assessed and not considered only if the other two grounds are not satisfied.

[33]    It requires the court to expressly deal with the four enumerated circumstances and then consider any other relevant circumstances.

### *The Strength of the Crown's Case*

[34]    I accept that this is to be assessed as the strength of the case for extradition. In that context our court will consider the evidence through the lens of the analogous Canadian offence of sexual interference. Mr. Hillis concedes that there is sufficient evidence in the ROC of the elements of that offence for a reasonable instructed jury to reach a verdict of guilty on the Canadian charge of sexual interference, which is the standard for committal to trial (see USA v Ferras [2006] 2 S.C.R. 77 at paras 46 and 68). The Crown therefore has a strong case on that standard.

*The Gravity of the Offence*

[35]   It is not disputed Mr. Hillis is facing a serious charge as it involves an allegation of abuse, in public of vulnerable children.

*The Circumstances Surrounding the Offence*

[36]   I agree with the submissions of the USA that the allegations in this matter are disturbing if not bizarre.  Three separate touching incidents, in public spaces, against 3 very young children all occurring in a very short time frame are brazen and would be very concerning to the public. The fact that Mr. Hillis is a peace officer is also of some concern.  However, the fact that no charges were initially laid, and that Mr. Hillis was driven off reserve and dumped at the side of a road, also raises questions as to the gravity of the offence and the manner in which it is perceived in the place it is alleged to have occurred.

*Possible Result of Conviction*

[37]   This aspect of the matter gives me some considerable concern.  I really have no idea what exactly Mr. Hillis will be facing should he be extradited.  I agree with his submission that there is no evidence before the court at this time about the critical intent aspect of the particular American law, that Mr. Hillis might be charged under.  Although Mr. Hillis' does bear the onus in this matter, the fact that the Minister has categorized the offences at issue to being sexual interference, in our law a finding of guilt would result in a mandatory minimum reformatory sentence.  This is significant but not anything close to the alleged thirty year sentence which was relied upon in the affidavit evidence submitted by the USA in this matter.  I find that because I

cannot determine precisely what result Mr. Hillis will be facing if extradited, this is a factor that militates in favour of his release, given the facts of this case.

### Other Circumstances

[38]   I consider Mr. Hillis' plan for release as relevant under this particular aspect of consideration of the tertiary grounds.  In this regard I am persuaded by the reasons for decision given by Trotter J. (as he then was) in the decision *R v. Dang* 2015 ONSC 4254.  This decision considered the application of the decision of the Supreme Court in *St-Cloud*.  At  paragraph 58 Trotter J. states:

> 58  *An accused person's release plan may be relevant to whether public confidence in the administration of justice is capable of being maintained: see R v. B.(A.) (2006), 204 C.C.C. (3d) 490 (Ont. S.C.J.), at p. 501. This is explicitly recognized in the newly enacted amendment (S.C. 2012, c. 1) to s. 29(2)(c) of the YCJA. A reasonable and knowledgeable member of the community may take a different view of a case in which an accused person charged with a violent offence is released into the community with virtually no supervision, compared to a situation where a strict plan has been put in place to monitor the accused. The plan goes to the core of s. 515(10)(b), but it may also impact on the application of s. 515(10)(c). The bail decision does not involve a stark choice between absolute freedom on one hand, and detention on the other. Realistically, it is a choice between release on conditions and detention. I see nothing wrong with this reality being reflected in s. 515(10)(c).*

[39]   In my view, Mr. Hillis' plan requires him to be on strict conditions.  It strikes an appropriate balance between the public's continuing right to be protected, the administration of

United States v. Hillis
Court File No. CR-18-0055

Case 4:19-mj-70677-MAG   Document 24   Filed 05/16/19   Page 40 of 138
Endorsement On Bail Application
Fitzpatrick J.

- 16 -

justice to be respected by adherence to its process and the confidence that Mr. Hillis will participate in the extradition process such that Canada may honour her obligations to her extradition partner the USA.  I am also keenly aware of Mr. Hillis' constitutional right to seek bail. I am keenly aware that, in Canadian law, the release of accused persons is the cardinal rule and detention, the exception.

[40]     As such, I find that confidence in the administration of justice will be maintained by providing interim judicial release on conditions proposed by Mr. Hillis, including those amendments to the conditions as proposed by the USA during its argument in the alternative.

[41]     Accordingly Mr. Hillis is to be released on the following conditions:

a.   Margaret Helen Hillis shall be surety without deposit in the amount of $50,000;

b.   Kirsten Mellisa Hillis shall be surety without deposit in the amount of $10,000.00;

c.   William Willamson Hillis shall be a surety for Mr. Hillis in the amount of $1,000.00 without deposit;

d.   From September 12, 2018 at 4 pm. until 9 am on September 17, 2018 Brady John Hillis shall remain in the presence of at least one of Margaret Helen Hillis, William Williamson Hillis or Kirsten Mellisa Hillis.  He shall make arrangements to travel by car from Kenora Ontario to London Ontario during that period.  So long as he is in the presence of at least one of these named sureties he may travel at whatever time is convenient;

e.   On or after September 17, 2018 Mr. Hillis shall reside with his mother, Margaret Hillis, and father, William Hillis, at 91 Metcalfe Crescent, in London, Ontario;

f.   Following September 17, 2018 Mr. Hillis shall not move without permission of the court or consent of the Attorney General of Canada;

g.   He shall remain within the province of Ontario;

h.   He shall remain at the residence at 91 Metcalfe Crescent, 7 days a week from the hours of 11 pm until 6 am except in the case of medical emergencies;

United States 4:18-mj-70677-MAG   Document 24   Filed 05/16/19   Page 41 of 138
Endorsement On Bail Application
Court File No. CR-18-0055
Fitzpatrick J.

- 17 -

i.   At all other times if away from the residence at 91 Metcalfe Crescent he shall be in the presence of at least one of his sureties;

j.   He shall see to it that a landline telephone is installed at 91 Metcalfe Crescent and as soon as practicable and must be installed in any event on or before October 31, 2018 and shall answer that landline during the curfew hours of 11 pm to 6 am and will provide the landline telephone number forthwith upon receipt;

k.   To come to the door at 91 Metcalfe Crescent during curfew hours if the RCMP conducts a curfew check;

l.   To submit to any searches by police of any vehicles you are found in;

m.  On or after September 24, 2018  Mr. Hillis shall report every Monday at a time to be determined by the RCMP at their offices located at 451 Talbot Street in London Ontario;

n.   To return his OPP uniform and any other official articles identifying Mr. Hillis as a peace officer to the Kenora detachment of the OPP on or before September 14, 2018;

o.   To ensure Margaret Hillis, William Hillis and Kirsten Hillis execute any surety documents required of them by the Attorney General for Canada;

p.   To not contact any complainants, Jane Doe 1, Jane Doe 2 and Jane Doe 3 named in the ROC;

q.   To not contact any of the other witnesses named in the ROC except through counsel;

r.   To not have contact with any child under the age of 18, unless in the presence of a sober adult who is aware of these allegations;

s.   To not attend any public park or public swimming area where persons under the age of 16 are present or can reasonably be expected to be present, or a daycare centre, school ground, playground, or community centre;

t.   To not seek, obtain, or continue any employment or become a volunteer in a capacity that involves being in a position of trust or authority towards persons under the age of 16 years;

u.   To not possess or consume any alcohol, drugs, including marijuana upon its legalization, or prescriptions drugs for which Mr. Hillis does not have a prescription;

---

v.  To forthwith deposit his passport, Visa's or any documents allowing travel outside of Canada with the RCMP or the counsel for the Attorney General for Canada prior to his release from custody on September 12, 2018 and to not obtain a new passport;

w.  Not to possess any firearm, ammunition or explosive substances or any weapon as defined by the Criminal Code;

x.  Keep the peace and be of good behaviour.

_____

The Hon. Mr. Justice F.B. Fitzpatrick

**DATE:**       September 12, 2018

<u>**CITATION**</u>: R v. Tuesday, 2018 ONSC 5360
**COURT FILE NO.:** CR-18-55-BR
**DATE:** 2018-09-12

## SUPERIOR COURT OF JUSTICE - ONTARIO

| | |
|---|---|
| **RE:** | The Attorney General of Canada on Behalf of the United States of America |
| | **v.** |
| | Brady John Hillis |
| **HEARD:** | September 12, 2018 |
| **COUNSEL:** | *B. Friesen*, for the Attorney General of Canada, Respondent |
| | *D. Gunn*, for the Applicant |

---

### ENDORSEMENT ON BAIL APPLICATION

---

**WARNING**
**A NON-PUBLICATION ORDER HAS BEEN**
**MADE IN THIS PROCEEDING**
**UNDER S. 517 OF THE CRIMINAL CODE OF**
**CANADA**

Fitzpatrick J.

**DATE:** September 12, 2018

# IN THE SUPREME COURT OF BRITISH COLUMBIA

Citation:     ***United States of America v. Ruggeberg,***
              2005 BCSC 113

Date: 20050128
Docket: 23164
Registry: Vancouver

**IN THE MATTER OF THE *EXTRADITION ACT***

**And**

**IN THE MATTER OF**

**United States of America**

**And**

**Erwin Ruggeberg**

Before: The Honourable Mr. Justice Burnyeat

## Reasons for Judgment

| | |
|---|---|
| Counsel for Mr. Ruggeberg | R.S. Anderson |
| Counsel for the Attorney General of Canada on behalf of the United States of America | R.G. McMeans |
| Date and Place of Hearing: | January 7 and 14, 2005 Vancouver, B.C. |

2005 BCSC 113 (CanLII)

*United States of America v. Ruggeberg*                    *Page 2*

[1]   Pursuant to s. 18(2) of the ***Extradition Act***, R.S.C.,
1999, c. 18, Mr. Ruggeberg seeks to review the Detention Order
made on November 25, 2004 [2005] BCSC 111, when I concluded on
a balance of probabilities that the detention of Mr. Ruggeberg
was necessary to ensure his attendance in Court in order to be
dealt with according to law as was required on the primary
grounds set out under s. 515(10) of the ***Criminal Code***.

[2]   The Detention Order was made at the conclusion of an
application for release made by Mr. Ruggeberg following his
arrest on a provisional arrest warrant issued under the
***Extradition Act*** wherein it was alleged that Mr. Ruggeberg had
raped a woman at gunpoint and had threatened her with death
while in Austin, Texas in 1981.

[3]   Since the date of the bail application by Mr. Ruggeberg,
the Government of the United States of America has provided
the Government of Canada with a Record of the Case which
contains a detailed summary of the evidence against Mr.
Ruggeberg.  Without assuming that there will ultimately be an
extradition, the Record merely adds to the conclusion
previously reached that a strong case has been made out by the
requesting State.  The Minister of Justice of Canada has
issued an Authority to Proceed authorizing the Attorney

2005 BCSC 113 (CanLII)

General of Canada to seek an order for the committal of Mr. Ruggeberg pursuant to s. 29 of the *Extradition Act*.

[4]   Under s. 18(2) of the *Extradition Act*, a decision respecting judicial interim release may be reviewed and, upon review, the decision can be confirmed, varied or substituted. Under s. 19 of the *Extradition Act*, Part XVI of the *Criminal Code* is incorporated.

**WHO CAN REVIEW AN ORDER OF DETENTION?**

[5]   In *Federal Republic of Germany v. Schreiber* (2000), 147 C.C.C. (3d) 404 (Ont. S.C.), an extradition judge made an order for the release of Mr. Schreiber.  Mr. Schreiber later applied to vary one of the terms of his release.  The judge who had made the original order had retired and the issue to be determined was whether a judge of the Superior Court could exercise jurisdiction under s. 18(2) of the *Extradition Act* to vary the terms of the bail order or whether only a Judge of the Court of Appeal would vary the terms of the bail order. The Court held that the language of s. 18(2) is permissive and therefore provided concurrent jurisdiction for either a judge of the Superior Court or a judge of the Court of Appeal to conduct a bail review where extradition was sought for offences other than those offences enumerated under s. 469 of the *Criminal Code*.

2005 BCSC 113 (CanLII)

[6]   The decision in **Schreiber** was applied by Dohm A.C.J. in **United States of America v. Gilliland** (unreported decision) November 14, 2003 (Vancouver Registry No. 22590).  Dohm A.C.J. concluded that he had jurisdiction to hear an application to vary one of the terms of release and that the applicant was not required to have his application heard by the Court of Appeal.

[7]   In **The United States of America v. Pannell** [2005] O.J. (Q.L.) No. 10 (Ont. C.A.), Mr. Pannell had applied for judicial interim release which was denied.  He then applied before the same judge for a review of the detention order citing a "material change in circumstances".  When the review application was dismissed, Mr. Pannell appealed to the Court of Appeal who dealt with the matter without commenting that it was inappropriate for the review of the original decision to be heard by the same judge of the lower court.

[8]   On the basis of the authorities of **Schreiber**, **Gilliland**, and **Pannell**, *supra*, I am satisfied that I have jurisdiction to hear this application of Mr. Ruggeberg that he be released from custody if certain conditions are met.

## WHAT MUST BE SHOWN BEFORE THE MERITS OF THE APPLICATION CAN BE CONSIDERED?

[9]  A review of whether there should now be an order releasing Mr. Ruggeberg from custody is not a hearing *de novo*. Mr. Ruggeberg must either present new evidence amounting to "a material change in circumstance" of such a magnitude that the order under review can no longer stand or to demonstrate a serious error of law or a fact.

[10]  In *The Law of Bail in Canada*, 2nd ed. (Toronto: Carswell, 1999), the learned author states that a "Review" application is a "hybrid" approach:

> The nature of the hybrid approach to bail reviews is cogently expressed in *R. v. Bradley and Bickerdike (1977)* ... [38 C.C.C. (2d) 273 (Que. S.C.)] in which Greenberg J. stated:
>
> > The undersigned is of the opinion that a revision is a proceeding of a hybrid nature. It is basically in the nature of an appeal but, because of the provisions of s. 457.6(8) [now s. 521(8)], it also has some of the qualities of a *de novo* hearing. However, unless convincing new evidence is received at the revision hearing which was not heard by the magistrate, which is not the situation in the present case, the Superior Court judge in revision should not substitute his own discretion for that of the magistrate unless he comes to the conclusion that the magistrate either exceeded his jurisdiction or made an error in law or a serious error in his appreciation of the facts.
>
> As its name suggests, the hybrid model combines the features of a *de novo* hearing and an appeal on the

2005 BCSC 113 (CanLII)

> record.  The applicant must either present new
> evidence (on which a fresh exercise of discretion
> may be made) or demonstrate an error of law in the
> proceedings below.  This model has proven to be the
> most popular of all three.
>
> As with errors of law, not any new evidence will
> suffice insofar as "showing cause" is concerned.
> The applicant must demonstrate a change in
> circumstances that is of such magnitude that the
> order of the lower court can no longer stand.  This
> may involve a change in respect of a matter that
> affected the onus at the original hearing, such as
> the existence of an outstanding charge.  The change
> may also relate to the personal circumstances of the
> applicant or general matters touching upon the
> alleged offences.  (at pp. 308-9)

[11] In *United States of America v. Chan* (2000), 144 C.C.C.

(3d) 93 (Ont. C.A.), Sharpe J.A. on behalf of the Court found

that the standard of review contemplated by s. 18(2) of the

*Extradition Act* is analogous to that applicable to the review

of judicial interim release or detention orders.  Accordingly,

the applicant on a bail review bears the onus of demonstrating

an error in law or serious error in the appreciation of the

facts.  Alternatively, a material change in circumstances must

be shown.

[12] As is the case where a reviewable error is alleged, it is

incumbent upon Mr. Ruggeberg to establish that there has been

a material change in circumstances warranting a review:

*United States of America v. Ivanov*, [2003] N.J. (Q.L.) No. 47

(Nfld. S.C.) at para. 11, application for stay dismissed

(2003), 172 C.C.C. (3d) 551 (Nfld. C.A.).

[13] In ***Ivanhov, supra***, Cameron J.A. on an application to stay

an order pending review of the order stated:

> As to the test to be applied in determining if a
> stay should be ordered there is no real difference
> between the parties.  The test is that enunciated by
> the Supreme Court of Canada in *RJR-MacDonald Inc. v.*
> *Canada (Attorney General)*, [1994] 1 S.C.R. 311. When
> examining the first part of the test, I return to my
> role under s. 18(2) of the *Extradition Act*.
> Yesterday during discussion with counsel I alluded
> to the fact that there exists a difference in view
> in this Country as to the approach which should be
> taken to review. In *R. v. Fleming* (1999), 141 C.C.C.
> (3d) 391 (Nfld. C.A.), I discussed this and the
> difference in approach between a review under s. 680
> and one under s. 520 or 521.  Having decided that
> this is a review akin to a s. 680 review, then in
> determining whether the first part of the test is
> met, I must do so in light of the limited nature of
> the review described in *R. v. Parsons* (1994), 118
> Nfld. & P.E.I.R. 353, 30 C.R. (4th) 189 (Nfld.
> C.A.), as "in essence an appeal from a discretionary
> order" (para. 8).  In the absence of new evidence
> based on a change of circumstances, which I do not
> understand to be the case, the standard against
> which the decision of Mercer J. must be tested is,
> did he exceed jurisdiction or make an error in law
> or serious error in appreciation of the facts.

(at pp. 557-8)

## HAS MR. RUGGEBERG MET THE ONUS OF SHOWING EITHER AN ERROR IN LAW, A SERIOUS ERROR IN THE APPRECIATION OF THE FACTS, OR A MATERIAL CHANGE IN CIRCUMSTANCES?

[14] Mr. Ruggeberg does not submit that an error in law was

made.  However, Mr. Ruggeberg does suggest that there was a

serious error in the appreciation of the facts.  Mr. Ruggeberg

was released on a bond in the amount of $25,000.00 in December

1981 and, when he failed to appear, an arrest warrant was

issued.   Mr. Ruggeberg was released on a $200,000.00 bond with cash deposit in 1985 and, when he failed to appear, a new arrest warrant was issued.

[15] In my November 25, 2004 Ruling, I stated: "Twice Mr. Ruggeberg elected to fail to attend so that bail of $25,000.00 and $200,000.00 was forfeited to the detriment of those relatives and friends who put up their own assets because they believed Mr. Ruggeberg was of good character and was trustworthy at that time."

[16] It is now apparent that cash amounting to 10% of those amounts was forfeited and not the full $225,000.00.  Despite the error, I am satisfied that the decision as to whether Mr. Ruggeberg should be released would not have been changed.  I am also satisfied that this error could not be described as a "serious error".  Rather, it was an error which would not have affected the general concern that Mr. Ruggeberg might well be prepared to put his own interests ahead of the interests of those relatives and friends who had put their trust in him by arranging for bail on two occasions.

[17] The question which then arises is whether there has been a material change of circumstances such that a fresh exercise of discretion should be made.  I have concluded that Mr.

Ruggeberg has met the onus of showing that there has been a
material change in circumstances.

## **WHAT ARE THE MATERIALS CHANGES IN CIRCUMSTANCE?**

[18] Mr. Ruggeberg had arranged for what I described as an
"impressive array of letters" testifying to the trust and
affection which friends, relatives and business associates had
for him and the stability which is now present in his life.
Despite that, I was concerned that the writers might not be
aware of what was alleged in Texas and might not be aware of
what might be considered by the Court in an application for
interim release.  On the basis of the new letters that have
been provided, I can now be satisfied that friends, relative
and business associates are aware of the charges in Texas and
I remain satisfied that they are confident that, if Mr.
Ruggeberg is granted bail, there will be no likelihood that he
will fail to appear in further proceedings.

[19] Denny Marie Rapanos is a personal friend of the brother
of Mr. Ruggeberg and states that he knows many of the members
of the Ruggeberg family.  Mr. Rapanos is a Canadian citizen
and resident in British Columbia for 45 years.  He is prepared
to act as a surety for Mr. Ruggeberg and states:

> I make this offer due to my friendship in support of
> the Ruggeberg family.  I have not been promised
> anything in return for agreeing to act as a surety

and no-one has agreed to indemnify me for any claim
that might arise against me in connection with
agreeing to act as a surety.

[20] The learned author in *The Law of Bail in Canada* states

that the nature of the relationship between the surety and the

accused is an important consideration in determining who

should be permitted to act as a surety:

> Factors such as how long the surety has known the
> accused, whether they are related, how frequently
> they see each other and how close they live to one
> another (indeed, whether they live together) should
> give some indication of how well a surety can be
> expected to supervise an accused and take action if
> the accused fails to live up to the conditions of
> his/her release.  A proposed surety who barely knows
> the accused or who has little contact with the
> accused will not be in a position to effectively
> supervise the accused. (at p. 293)

[21] The Attorney General of Canada on behalf of the United

States of America relies upon this passage to suggest that Mr.

Rapanos is not a suitable surety.  I do not accept that

submission.  First, Mr. Rapanos has not been asked to

supervise Mr. Ruggeberg.  Second, counsel was not able to cite

any authorities for the proposition that a person who is

prepared to be a surety and who is prepared to allow his or

her property to stand behind the surety must be a relative, a

close business associate, or a good friend of the person to be

released on an interim basis.  In fact, it may be that the

Court should give more weight to a "stranger" being prepared

to act as a surety as there may be other reasons why a

2005 BCSC 113 (CanLII)

proposed surety close to the person to be released might be
prepared to act as a surety whereas a stranger has nothing to
gain and much to lose if the person being released does not
subsequently appear.

[22] The materials on file allow me to conclude that Mr.
Rapanos has equity of between $143,000 and $250,000 in the
property which will be offered to the Court for the $50,000
surety of Mr. Rapanos.  Unlike the previous application before
me where it was proposed that the surety be resident in a
different Province and that Mr. Ruggeberg not be in British
Columbia, I am satisfied that the willingness of a long-time
British Columbia resident to vouch for the continuing
appearance of Mr. Ruggeberg contributes to there being a
material change in circumstance.

[23] Previously, the sureties proposed were the son and
daughter-in-law of Karin Ruggeberg who is the older sister of
Mr. Ruggeberg.  All three of those individuals reside in
Toronto and the son and daughter-in-law were prepared to be
named as sureties and post their condominium apartment to
ensure the attendance of Mr. Ruggeberg in these proceedings.
I was satisfied that the nephew and the wife of the nephew of
Mr. Ruggeberg were not "sufficient sureties" as they were not
residents of British Columbia: *R. v. Morenstein* (1977), 40

C.C.C. (2d) 131 (Ont. C.A.) and *R. v. Martin* (No. 2) (1980),
57 C.C.C. (3d) 31 (Ont. C.A.).  That concern has now been
eliminated.  Based on his connection with the Ruggeberg
family, his long-time residency in British Columbia, and that
the property in support of the surety will be in British
Columbia, I find that Mr. Rapanos is a "sufficient surety".

[24] The advice before me was that Mr. Ruggeberg could board a
flight to Mexico despite not having a current passport.  I am
now satisfied that other documents available to Mr. Ruggeberg
could be used to allow him to board a flight.  However, I am
satisfied that the deposit of those documents by Mr.
Ruggeberg, his wife, and his daughter combined with
injunctions against various airlines and voluntary steps taken
by various airlines will make virtually impossible the
possibility of Mr. Ruggeberg, his wife, and/or daughter
leaving Vancouver by air.

[25] To the extent that they are available, Mr. Ruggeberg,
Mrs. Laura Ruggeberg, and Raquel Ruggeberg will deposit with
the Court any valid passports, any expired passports,
originals of their Birth Certificates, driver's licences,
photo identification, any Matricula Consular, Certificates of
Baptism, Voter's Certificates, and available undertakings
addressed to the Mexican Consulate in Canada agreeing not to

apply for a Matricula Consular, replacement passports or Certificates of Nationality.

[26] In this latter regard, the Consul General of Mexico in Vancouver states that the Consulate General of Mexico in Vancouver may issue a Matricula Consular to a Mexican national for travel from Canada to Mexico without a passport or birth certificate and that the Matricula Consular is: "... an identification card that is often used in place of a driver's licence and allows a Mexican national to travel into Mexico solely on this document and may issue a Consular Registration to a Mexican national for travel from Vancouver to Mexico without a passport or birth certificate".

[27] The Consul General states that Mr. Ruggeberg has not been issued either document and, because Mr. Ruggeberg has provided the Consulate General of Mexico in Vancouver with a written waiver of his right to obtain such documents, the Consulate General of Mexico in Vancouver will not issue a Matricula Consular, a Consular Registration or a new passport as long as the Extradition Proceedings against Mr. Ruggeberg continue to take place in Canada.  The Consul General also states: "If Mr. Ruggeberg were to take steps to remove the waiver of his right to these documents, I will immediately notify the Courts of such action.  I am satisfied that these further measures

2005 BCSC 113 (CanLII)

contribute to my conclusion that there has been a material change in circumstances.

[28] $200,000 has been raised through family and friends. Additionally, Mr. and Ms. Ruggeberg are also prepared to go into the college fund set aside for their children to the extent of $30,000.  This trust that family and friends have in Mr. Ruggeberg remains a strong indication that Mr. Ruggeberg will appear as schedule in these proceedings.  Unlike the situation in Texas, all these funds will be lost if Mr. Ruggeberg fails to appear.

[29] While not reflected in the November 25, 2004 Ruling, I had been advised that electronic monitoring of the presence of Mr. Ruggeberg was not available in British Columbia.  I am now advised that this is not the case and that Mr. Ruggeberg can be electronically monitored so that his unexplained or unapproved absence from his Vancouver address will be immediately known.  I am satisfied that this further contributes to my conclusion that there has been a material change in circumstances.

[30] It was originally proposed that Mr. Ruggeberg would travelling from British Columbia to Ontario, would be electronically monitored in Ontario, and would be supervised by his older sister who resides in Ontario.  I had a number of

2005 BCSC 113 (CanLII)

concerns regarding what was proposed.  I no longer have
concerns about what is proposed.   A business associate has
purchased a two-bedroom condominium on Keefer Street in
Vancouver for $280,000.00.  Laura Ruggeberg and their daughter
have moved from Mexico to Vancouver and will reside with Mr.
Ruggeberg at the Keefer Street address.

[31] Laura Ruggeberg and Raquel Ruggeberg have applied for a
Temporary Residence Permits so that they can stay in Canada to
provide support to Mr. Ruggeberg and so that Raquel Ruggeberg
can continue her education as a foreign student.  In this
latter regard, Raquel Ruggeberg began attending classes at a
local Secondary School in Vancouver on January 4, 2005.

[32] The Keefer Street residence is wheelchair accessible and
has facilities which will assist in the physiotherapy required
by Mr. Ruggeberg.  I am also satisfied that the experience of
Laura Ruggeberg will assist in his physiotherapy.  The fact
that Mr. Ruggeberg will be confined to the Keefer Street
address unless his absence is with the approval of his bail
supervisor, and unless accompanied by his wife and the fact
that his wife and daughter will now reside in Vancouver allows
me to conclude that a fresh exercise of discretion should be
made.

2005 BCSC 113 (CanLII)

[33] Their daughter is now enrolled in school in Vancouver.  I am satisfied that Laura Ruggeberg has committed to stay in Vancouver until the extradition proceedings are brought to a conclusion.  I am satisfied that I can place sufficient restrictions on the mobility of Laura and Raquel Ruggeberg such that their continued presence in Vancouver can be guaranteed.  I think it unlikely that Mr. Ruggeberg would exit from Vancouver without them.  I am satisfied that what is now proposed as to where Mr. Ruggeberg will be while waiting further proceedings and the commitment of his wife and daughter to be in Vancouver contributes to my conclusion that there has been a material change in circumstances.

[34] I am satisfied that the combined effect of the lack of mobility of Mr. Ruggeberg as a result of his injuries, the electronic monitoring which will be in place, the virtual certainty that Mr. Ruggeberg, Laura Ruggeberg and Raquel Ruggeberg will not be in a position to leave British Columbia by air transport, and the commitment of Laura Ruggeberg to stay in British Columbia until the extradition proceedings are complete introduces a significant supervision component to the virtual house arrest of Mr. Ruggeberg.

[35] On application by Mr. Ruggeberg for an injunction, an injunction will go against various airlines prohibiting those

airlines from allowing Mr. Ruggeberg, Laura Ruggeberg and

Raquel Ruggeberg to board any flights within Canada.  Two

other carriers, Air Canada and Japan Airlines International

Company, Ltd. have advised through their counsel that they

will, upon the request of Mr. Anderson and the Court, place

the names of Mr. Ruggeberg, Laura Ruggeberg and Raquel

Ruggeberg on their "No Fly List".  I am also satisfied that

being able to put these safeguards in place further allows me

to conclude that there has been a material change in

circumstance.

[36] I am satisfied that Mr. Ruggeberg has met the onus of

showing that there has been a material change in circumstances

and that he has shown cause why his continued detention in

custody is not justified.  I am satisfied that Mr. Ruggeberg

has met the onus of establishing that his further detention is

not necessary to ensure his attendance in court in order to be

dealt with according to law.

[37] Section 515(4) of the ***Criminal Code*** permits me to direct

as conditions that Mr. Ruggeberg will do the following:

> (a)  report at times to be stated in the order to a peace
>
>       officer or other person designated in the order;

2005 BCSC 113 (CanLII)

(b)   remain within a territorial jurisdiction specified in the order;

(c)   notify the peace officer or other person designated under paragraph (a) of any change in his address or his employment or occupation;

(d)   comply with such other reasonable conditions specified in the order as the justice considers desirable.

**ORDER**

[38] Mr. Ruggeberg will be released on the following conditions once those conditions have been fulfilled:

(a)   Upon his release from custody on Judicial Interim Release, Mr. Ruggeberg will report by telephone to Canada Border Services, Pacific Regional Enforcement Centre (604-666-8769) every Tuesday between the hours of 8:00 a.m. and 4:00 p.m.;

(b)   Upon his release, Mr. Ruggeberg will immediately attend at Bail Supervision at 275 Cordova Street accompanied by a member of the Law Society of British Columbia, counsel will remain with Mr. Ruggeberg until he is fitted with the Electronic Monitoring Device, counsel and Mr. Ruggeberg will then go immediately to the Keefer Street address,

and counsel will remain with Mr. Ruggeberg until the receiving device is installed at that address and the Bail Supervisor has informed counsel that the Electronic Monitoring System is operational;

(c)   A surety in the amount of $50,000 will be made available by Denny Marie Rapanos relating to a Recognizance of Bail to be entered into by Erwin Ruggeberg and there will be an order pursuant to s. 284 of the **Land Title Act**, 1996, c. 250 to be prohibit any dealings with the property in New Westminster having a civic address of 358 Simpson Street and a legal description of Lot 42 of the North Half Lot 19 and of the South Half Lot 20 Suburban Block 3 Plan 2620 in order to prohibit any dealings with the property offered by Mr. Rapanos;

(d)   There will be cash surety of $200,000;

(e)   The presence of Mr. Ruggeberg at the Keefer Street address will be electronically monitored and he will not leave that address unless accompanied by his wife, unless his absence is with the approval of his bail supervisor and only for the purposes of attending for Court hearings or medical, physiotherapy, or psychological appointments;

[39] Mr. Ruggeberg will deposit with the Court and to the extent that it is applicable, Laura Ruggeberg and Raquel Ruggeberg will deposit with the Court the following:

> (i)     valid passports;
>
> (ii)    expired passports;
>
> (iii)   original Birth Certificates;
>
> (iv)    driver's licences;
>
> (v)     any photo identification;
>
> (vi)    any Matricula Consular;
>
> (vii)   an undertaking addressed to the Mexican Consulate in Canada agreeing not to apply for a Matricula Consular, a replacement passport or a Certificate of Nationality;
>
> (viii)  Voter's certificates;
>
> (ix)    Certificates of Baptism.

[40] Once Mr. Ruggeberg is residing at the Keefer Street address, the following shall notify the bail supervisor of the following:

2005 BCSC 113 (CanLII)

2005 BCSC 113 (CanLII)

    (a)   Dr. Klarke, his general practitioner; Dr. Eaves, his psychologist; any other medical advisor to whom Mr. Ruggeberg is referred by Dr. Klarke and any physiotherapist chosen by Mr. Ruggeberg shall advise the bail supervisor of Mr. Ruggeberg at least 48 hours in advance of the date, time, duration and location of any appointments scheduled by them and immediately if Mr. Ruggeberg is more than 10 minutes late for any of those appointments;

    (b)   the principal or vice-principal of the school where Raquel Ruggeberg will be attending will advise the bail supervisor of Mr. Ruggeberg of any absences from school without school approval of Raquel Ruggeberg by 10:00 a.m. on any regular school day if Raquel Ruggeberg is not present in school;

[41] Laura Ruggeberg and/or Raquel Ruggeberg will be at liberty to apply to me to be released from the conditions imposed on them.

[42] Erwin Ruggeberg also known as Erwin A. Ruggeberg, also known as Edwin A. Ruggeberg, also known as Erwin Artur Ruggeberg, also known as Erwin Artur Ruggeberg Barber, Laura Ruggeberg and Raquel Ruggeberg will be enjoined from

travelling outside the boundaries of the Municipality of
Vancouver.

[43] The following airlines will be enjoined from receiving
Erwin Ruggeberg, Laura Ruggeberg or Raquel Ruggeberg as
passengers on any flights within or from Canada: Zoom Airlines
Limited, Kalitta Air LLC, Kelowna Flightcraft Air Charter
Ltd., I.M.P. Group Limited, carrying on business as Execair,
Jetsgo Corporation and Excel Airlines Limited.

"G.D. Burnyeat, J."
The Honourable Mr. Justice G.D. Burnyeat

# In the Court of Appeal of Alberta

**Citation: United States v Rockwell, 2013 ABCA 444**

**Date:** 20131220
**Docket:** 1303-0298-A
**Registry:** Edmonton

2013 ABCA 444 (CanLII)

Between:

### The Attorney General of Canada on Behalf of
### the United States of America

Respondent

- and -

### Kevin Rockwell

Applicant

_____

**Reasons for Decision of**
**The Honourable Madam Justice Barbara Lea Veldhuis**

_____

Application for Judicial Interim Release

---

**Reasons for Decision of**
**The Honourable Madam Justice Barbara Lea Veldhuis**

---

[1]     The applicant seeks an order for judicial interim release pending a decision of the Minister of Justice for his surrender to the United States, pursuant to s 20(b) of the *Extradition Act*, SC 1999, c 18.

**Facts**

[2]     The applicant is a dual citizen of Canada and the United States. He has been committed for extradition to the United States to face charges relating to transportation of child pornography (this is the United States offence equivalent to distribution of child pornography contrary to s 163.1(3) of the *Criminal Code*). It is alleged that the applicant sent pornographic images depicting the sexual exploitation of infants and toddlers to a Special Agent of the US Department of Homeland Security.

[3]     The applicant was arrested pursuant to an extradition warrant on May 28, 2013. On June 7, 2013, a Court of Queen's Bench judge granted him bail pursuant to ss 18 and 19 of the *Extradition Act*, upon him entering into a recognizance in the amount of $2,000 cash and several conditions. On December 3, 2013, the applicant consented to committal, conceding that the prerequisites to a committal order were made out. He has been in custody at the Edmonton Remand Centre since that date.

[4]     The applicant intends to make submissions to the Minister of Justice, arguing against his surrender to the United States. His counsel advised that discussions are ongoing with counsel in the United States and that materials will be filed with the Minister in Canada in early January 2014, so as to move expeditiously.

**Analysis**

[5]     Section 20(b) of the *Extradition Act* provides that the test for judicial interim release pending appeal in s 679 of the *Criminal Code,* RSC 1985, c C-46 applies to applications such as this. To succeed, the applicant must establish:

>  (a)     that his proposed submissions to the Minister are not frivolous;
>
>  (b)     that he will surrender himself to authorities as required; and
>
>  (c)     that his detention is not necessary in the public interest.

[6]     At the hearing, counsel for the Attorney General essentially conceded the first and second elements of this test. She agreed that the applicant's submissions are not frivolous and thus, the applicant has satisfied the first element of the test. Counsel for the Attorney General also acknowledged that the applicant agreed to surrender himself into custody, that he does not have a prior criminal record and that there are no concerns with failure to attend or with previous attempts to flee the jurisdiction. Counsel, however, emphasized that there is a heightened obligation to limit the risk of non-appearance in the extradition context.

2013 ABCA 444 (CanLII)

[7]     Thus, the primary point of contention is whether the applicant's detention is necessary in the public interest. The applicant argued that his detention is not necessary to protect the public and pointed to the following factors in support of his position: he was previously out on bail for six months without a breach, he does not have a prior criminal record, and he has complied with all the conditions of the prior bail order, some of which were quite onerous. Counsel for the Attorney General pointed to the seriousness of the offence and argued that there is a public interest in preventing the continuation of this offence and protecting the public from the risk of harm.

[8]     I am satisfied that the applicant has met the test for judicial interim release. As conceded by counsel for the Attorney General, the applicant's submissions to the Minister are not frivolous and he has agreed to surrender himself. I note that the applicant has complied with all the conditions of his release to date, consented to the committal order, and surrendered himself in court without delay. Indeed, a "track record" of compliance while on release is a relevant consideration: *United States of America v Batista-Cervantes*, 2013 ABCA 348, [2013] AJ No 1081 (QL) at para 8.

[9]     Third, while the alleged offences are serious, the protection of the public can be addressed through strict conditions. I note, in particular, the applicant's voluntary surrender on committal and his compliance with prior conditions. His passport was seized at the time of his arrest, he does not have any other travel documents, and he expects to return to his prior work arrangements. Any notion of his fleeing the jurisdiction would seriously impair any sympathy the Minister may have for his case. Further, the applicant's counsel has advised that the applicant is prepared to comply with stringent conditions, particularly with regard to accessing the internet and granting access to the authorities to enter his residence on a 24-hour per day basis to perform random checks to ensure that he is not breaching any conditions.

**Conclusion**

[10]     Judicial interim release is justified in these circumstances The applicant will be released upon him entering into a recognizance in the amount of $3,000 cash with deposit on the following terms and conditions:

(a)     Keep the peace and be of good behavior;

(b)     Appear before the court as required. Within 48 hours of notice being given to counsel of the Minister's impending decision, the applicant will surrender himself into custody and remain in custody to receive the Minister's decision.

(c)     Report to a probation supervisor in Edmonton in person within 24 hours of release, and thereafter once per week in person, subject to his work schedule. If his current work schedule continues, he will be required to report in person to his probation supervisor before leaving to northern Alberta for work and upon his return to Edmonton. He shall provide his work schedule to the probation officer on a regular basis;

(d)     Provide his employer with a copy of his release conditions forthwith;

2013 ABCA 444 (CanLII)

(e)     If the applicant is in possession of any passport or travel documents, he shall surrender them and will not apply for a new passport or travel documents;

(f)     Reside at a residence approved in writing by his probation supervisor and will not change his residence without prior written permission from his probation supervisor;

(g)     Provide access to his residence on a 24-hour per day basis to any Peace Officer who seeks entry in order to view the interior of the residence and to do all the necessary things in order to confirm his compliance with any of the conditions of this recognizance;

(h)     Refrain from possessing, using, or having in his possession any electronic device capable of accessing the internet including, but not limited to computers, modems, blackberries, cell phones, webcams, smart phones or video game consoles;

(i)     Refrain from possessing or using a cellular phone or other device, electronic or otherwise, capable of taking photos or videos;

(j)     Refrain from accessing the internet at any time;

(k)     Have no contact, direct or indirect, with any person under the age of 16;

(l)     Refrain from attending any place where it is known that children under age 16 will frequent including, but not limited to, schools, playgrounds, recreational centres, swimming pools and parks;

(m)     Provide the name of his employer and a name and phone number of a contact person at his employer's location to his probation supervisor; and

(n)     Carry a copy of the recognizance at all times and present it to any Peace Officer upon request.

Application heard on December 18, 2013

Reasons filed at Edmonton, Alberta
this 20th day of December, 2013

_____

Veldhuis J.A.

2013 ABCA 444 (CanLII)

**Appearances:**

S. Dej
      for the Respondent

D.F. Bullerwell
      for the Applicant

2009 CanLII 26600 (ON SC)

Court File No. 12838

## ONTARIO SUPERIOR COURT OF JUSTICE

B E T W E E N :

REGINA

V

HASSAN DIAB

\*\*\*\*\*\*\*\*\*\*

R E A S O N S   F O R   D E C I S I O N

RENDERED BY THE HONOURABLE MR. JUSTICE MARANGER
on March 31, 2009 at OTTAWA, Ontario

\*\*\*\*\*\*\*\*\*\*

APPEARANCES:

Mr. C. Lefrancois,
Ms. S. Schriek,                                    Counsel for the Federal Crown

Mr. D. Bayne,                                      Counsel for the accused

**********

2009 CanLII 26600 (ON SC)

(i)

Table of Contents

SUPERIOR COURT OF JUSTICE

2009 CanLII 26600 (ON SC)

| WITNESSES | Exam. In-Chief | Cr.-Exam. | Re-Exam. |
|---|---|---|---|

\*\*\*\*\*\*\*\*\*\*

E X H I B I T S

| EXHIBIT NUMBER | ENTERED ON PAGE |
|---|---|

\*\*\*\*\*\*\*\*\*\*

Transcript Ordered:        April 1, 2009

Transcript Completed:       April 2, 2009

Ordering Party Notified:      ...................

1
R. V Hassan Diab

2009 CanLII 26600 (ON SC)

<u>March 31, 2009</u>

D E C I S I O N

MARANGER, J.: (Orally)

     This is an application for judicial interim release by Hassan Diab.  Mr. Diab faces extradition to the Republic of France to be tried on four counts of murder, 40 counts of attempted murder and charges relating to the destruction of property.  The offences arise from the allegation that he is responsible for the bombing of a synagogue on Copernic Street in Paris, France on the 3rd day of October, 1980.

     Mr. Diab was arrested on November 13th, 2008.  He has been in custody ever since.  By virtue of S. 18 and 19 of the <u>Extradition Act</u>, the provisions of the <u>Criminal Code of Canada</u> respecting bail apply to this case.  The severity of the charges make this a reverse onus bail hearing in that the Applicant must demonstrate that his detention is not justified in the circumstances.

     The Prosecution has argued for detention pending the completion of the extradition proceedings and relies upon all three grounds set out at S. 515(10)(a), (b) and c) of the <u>Criminal Code of Canada</u> which provides:

    "(10) For the purposes of this section, the detention of accused in custody is justified only on one or more of the following grounds:

(a)    where the detention is necessary to ensure his or her attendance in court in order to be dealt with according to law;

(b)    where the detention is necessary for protection or safety of the public, including any victim of or witness to the offence, having regard to all the circumstances including any substantial likelihood that the accused will, if released from custody, commit a criminal offence or interfere with the administration of justice; and

c)    if the detention is necessary to maintain confidence in the administration of justice, having regard to all the circumstances, including

2

Decision - Maranger, J.

2009 CanLII 26600 (ON SC)

(i)    the apparent strength of the prosecution's
case,
(ii)    the gravity of the offence,
(iii)the circumstances surrounding
the commission of the offence, including
whether a firearm was used, and
(iv)    the fact that the accused is liable, on
conviction, for a potentially lengthy term of
imprisonment...."

I propose to deal with the secondary ground, or S.
515(10)(b) first, as it is the least problematic in my view.
Although raised by the Prosecution I do not consider it a concern
that could justify detention.  The accused person is a 55-year-old
Canadian citizen with no criminal record.  In fact, with no record of
ever being charged with anything in his life until these allegations
surfaced.  He holds a PhD in sociology and has a record of
teaching at universities all over the world, including the University
of Ottawa and Carleton University.  The allegations are extremely
serious, however they occurred over 28 years ago and there's
nothing in the record of the case, in the 10 months of surveillance
conducted by the police in this country, or in the behaviour of this
man in the last 28 years that would suggest that he is a
substantial risk of committing a criminal offence or interfering with
the administration of justice if he were to be released.

The Primary Ground - S. 515(10)(a)

The evidence discloses that Hassan Diab is an individual
who has travelled extensively in his lifetime and who has in fact
lived in numerous countries, including the US, Kuwait, the United
Arab Emirates, Lebanon and Canada in the last 12 years.  It would
appear for the most part that the nations where he has resided

3

Decision - Maranger, J.

2009 CanLII 26600 (ON SC)

have coincided with teaching positions at universities.

The Crown has also highlighted what appears to be a somewhat transient lifestyle.  It is fair to say that Mr. Diab has had a number of marriages and common-law relationships over the years which demonstrate that he is not a person drawn to long-term commitment.  More importantly, for the purposes of what I must decide, he is not a person who has specific long-term roots or family ties in this country.

The Applicant is a Canadian citizen and has resided in the City of Ottawa since 2006.  He has had contract teaching positions at both of our city's universities, more so at Carleton than at the University of Ottawa.  He has what has been described as an on-again off-again relationship with Doctor Rania Tfaily and has for the most part lived with her since being in Ottawa.

Mr. Diab has family connections to other countries, most importantly Lebanon, a nation that does not have an Extradition Treaty with France.  The concern here, to put it bluntly, is that if Mr. Diab could somehow make his way back to Lebanon or any other non-treaty nation, he could forever avoid the prospect of extradition and, as a consequence, French justice.

The proposition being advanced is that his world-wide connections, possible ties to terrorist groups, travel savvyness and possible ability to obtain travel documents legitimately or illegitimately make him a serious flight risk.  This risk, it was suggested, is exacerbated by the very serious charges this man faces and the consequence of a lifetime behind bars if he ever were to be convicted.

Counsel for the Applicant points out that there is no record at all to suggest that he will not show up for court.  Furthermore, it

4

Decision - Maranger, J.

2009 CanLII 26600 (ON SC)

was said on behalf of Mr. Diab that the best way to predict future behaviour is to look to the past in that this accused was aware through newspaper articles and a journalist's questioning that he was a suspect in this bombing and that France was looking at him for extradition to answer these allegations.  It has been suggested that Mr. Diab was in fact possessed with this knowledge as early as October 2007 and that he could have easily fled the country at that time.  There is some truth in this observation.

In my view, the primary ground, the risk of flight so as not to have to face the allegations is a real concern in this matter. The issue here lies more with determining whether the Applicant has advanced evidence of a plan of release that adequately responds to the Court's concerns respecting this particular ground of detention.

The Tertiary Ground - S. 515(10)c

The determination of whether detention is necessary to maintain confidence in the administration of justice requires an examination of all of the circumstances with the obligation to focus on four specific factors in order to objectively gauge the impact a release could or would have on the public's confidence in our administration of justice.

In upholding the constitutional validity of this provision, Chief Justice McLachlin in speaking for the majority in R. v. Hall 167 CCC (3d) 449, explained the purpose of the section and the scope of the investigation in the following terms at paragraphs 40 and 41:

> "Section 515(10)c) sets out specific factors which delineate a narrow set of circumstances under which bail can be denied on the basis of maintaining confidence in the

5

Decision – Maranger, J.

2009 CanLII 26600 (ON SC)

administration of justice.  As discussed earlier, situations may arise where, despite the fact the accused is not likely to abscond or commit further crimes while awaiting trial, his presence in the community will call into question the public's confidence in the administration of justice.  Whether such a situation has arisen is judged by all the circumstances, but in particular the four factors that Parliament has set out in S. 515(10)c) – the apparent strength of the prosecution's case, the gravity of the nature of the offence, the circumstances surrounding its commission and the potential for lengthy imprisonment."

In paragraph 41:

"This, then, is Parliament's purpose: to maintain public confidence in the bail system and the justice system as a whole.  The question is whether the means it has chosen go further than necessary to achieve that purpose.  In my view, they do not.  Parliament has hedged this provision for bail with important safeguards.  The judge must be satisfied that detention is not only advisable but <u>necessary</u>.  The judge must, moreover, be satisfied that detention is necessary not just to any goal, but <u>to maintain confidence in the administration of justice</u>.  Most importantly, the judge makes this appraisal objectively through the lens of the four factors Parliament has specified.  The judge cannot conjure up his own reasons for denying bail; while the judge must look at all the circumstances, he must focus particularly on the factors Parliament has specified.  At the end of the day, the judge can only deny bail if satisfied that in view of these factors and related circumstances, a reasonable member of the community would be satisfied that denial is necessary to maintain confidence in the administration of justice."

In <u>R. V Mordue</u> (2006) 223 CCC (3d), the Ontario Court of Appeal described circumstances where a judge might feel compelled to detain an individual on this specific ground.  At paragraphs 31 and 32 of that decision the court said:
"       No one factor is determinative.  The four factors should be analysed together, not separately.  Consideration

6

Decision - Maranger, J.

2009 CanLII 26600 (ON SC)

of their combined effect in the context of all the circumstances enables the court to determine whether it is necessary to deny bail in order to maintain public confidence in the administration of justice.

Section 515(10)c) is designed so that a consideration of all the circumstances with special regard to the four key factors will result in a determination that maintains the public's confidence in the administration of justice.  For example, where each of the four factors is assessed as having maximum force, a determination that refusal of bail is necessary to maintain public confidence in the administration of justice is entirely to be expected."

The four factors to be considered are the strength of the Crown's case, the gravity of the offence, the circumstances surrounding its commission and the potential for a lengthy term of imprisonment.  In this case two of the four factors are easily dealt with in that they are clearly at their maximum force.  Firstly, the gravity of the offence.  This was the murder of four completely innocent people and the attempted murder of 40 others, it was an act of terrorism, it was a hate crime.  In terms of gauging public perception, this factor is easily at the furthest end of the spectrum.  Similarly, in terms of the potential for a lengthy term of imprisonment if convicted, no doubt in this case a conviction would result in a term of imprisonment for life.

The issues of the strength of the Crown's case and the circumstances surrounding the commission of the offence require deeper analysis.

The strength of the Crown's case is measured in terms of the prospect of Mr. Diab being extradited to France.  The test for extradition is that there must be evidence upon which a properly instructed jury, acting reasonably, could return a verdict of guilty.  In the United States of America v Ferras 209 CCC (3d), the

*7*

Decision - Maranger, J.

2009 CanLII 26600 (ON SC)

Supreme Court of Canada has recently provided guidance to the courts in relationship to what is expected generally and specifically in terms of conducting and determining an extradition.  Chief Justice McLachlin indicated the following at paragraphs 26, 46 and 47 of that decision.

> "I conclude that the principles of fundamental justice applicable to an extradition hearing require that the person sought for extradition must receive a meaningful judicial determination of whether the case for extradition prescribed by S. 29(1) of the Extradition Act has been established - that is, whether there is sufficient evidence to permit a properly instructed jury to convict.  This requires an independent judicial phase, an independent and impartial judge and a judicial decision based on an assessment of the evidence and the law."

At 46:

> "Section 29(1)'s direction to an extradition judge to determine whether there is admissible evidence that would "justify committal" requires a judge to assess whether admissible evidence shows the justice or rightness in committing a person for extradition.  It is not enough for evidence to merely exist on each element of the crime.  The evidence must be demonstrably able to be used by a reasonable, properly instructed jury to reach a verdict of guilty.  If the evidence is incapable of demonstrating this sufficiency for committal, then it cannot "justify committal".  The evidence need not convince an extradition judge that a person sought is guilty of the alleged crimes.  That assessment remains for the trial court in the foreign state.  However, it must establish a case that could go to trial in Canada.  This may require the extradition judge to engage in limited weighing of the evidence to determine, not ultimate guilt, but sufficiency of evidence for committal to trial."

At 47:

> "Section 29(1) of the Extradition Act, as discussed, requires the extradition judge to be satisfied that the evidence would

8

Decision - Maranger, J.

2009 CanLII 26600 (ON SC)

justify committal for trial in Canada, had the offence occurred here.  Canadian courts in recent decades have adopted the practice of leaving a case or defence to the jury where there is any evidence to support it, and have discouraged trial judges from weighing the evidence and refusing to put a matter to the jury on the basis that the evidence is not sufficiently reliable or persuasive: see Arcuri ... This may explain the conclusion in Shephard that the extradition judge has no discretion to refuse to extradite if there is any evidence, however scant or suspect, supporting each of the elements of the offence alleged.  This narrow approach to judicial discretion should not be applied in extradition matters, in my opinion.  The decision to remove a trial judge's discretion reflects confidence that, given the strict rules of admissibility of evidence on criminal trials, a properly instructed jury is capable of performing the task of assessing the reliability of the evidence and weighing its sufficiency without the assistance of the judge.  The accused is not denied the protection of the trier of fact reviewing and weighing the evidence.  The effect of applying this test in extradition proceedings, by contrast, is to deprive the subject of any review of the reliability or sufficiency of the evidence.  Put another way, the limited judicial discretion to keep evidence from a Canadian jury does not have the same negative constitutional implications as the removal of an extradition judge's discretion to decline to commit for extradition.  In the latter case, removal of the extradition may deprive the subject of his or her constitutional right to a meaningful judicial determination before the subject is sent out of the country and loses his or her liberty."

In the matter at hand, each side has characterized the strength of the record of the case to accommodate their purposes.  Mr. Bayne said it was bereft of evidence; Mr. Lefrancois suggested that it showed a strong circumstantial case.  In my view this is not a case where extradition is a rubber stamp or a foregone conclusion.  A clear, objective, full review of the evidence will be required.  In terms of its consideration under S. 515(10)c) I

9

Decision - Maranger, J.

2009 CanLII 26600 (ON SC)

would categorize the strength of the Crown's case as moderate to high, rather than reaching its maximum force as described in R. V Mordue.

The Circumstances Surrounding the Commission of the Offence

    This factor on the face of it would also appear to be clearly at the highest level of concern.  It was a carefully orchestrated act of terrorism with a view to killing as many innocent people amongst a targeted group as possible.  However, it has been suggested that in analyzing this factor I should also consider that the offence took place 28 years ago, the character of the accused and the support he has in the community.

    In R. V A.B. 2004 CCC (3d) Justice Ducharme took a broad approach when considering this factor, including scrutinizing the person charged with the offence.  At paragraph 30 he indicated that:

> "Any consideration of the circumstances of the offence must also take into consideration the antecedents and personal circumstances of the offender."

    In this case the evidence presented at the bail hearing suggests that Hassan Diab is a very well-liked, well-respected scholar, and that very intelligent, accomplished members of the community who have come to know him cringe at the notion that he could possibly be the perpetrator of this heinous crime.  A petition signed by 40 or more academics from Carleton University and the numerous letters of support from a wide range of scholars attest to this finding.  It is also clear that he has no criminal record anywhere.  Whether a court should consider the attributes of an individual under the "circumstances surrounding the commission of

10

Decision - Maranger, J.

2009 CanLII 26600 (ON SC)

the offence" in the S. 515 c) analysis is debatable, especially when a person's character is matched up against allegations of a terrorist bombing.  That being said however, I do believe the consideration of the character of a person applying for bail can be examined under the broader wording of "having regard to all of the circumstances" contained in that section.

It seems logical, perhaps even self-evident, that an accused's lack of criminal record, evidence of good character, peaceful lifestyle for a sustained period of time and support from his fellow professionals ought to be a consideration when measuring the impact this particular person's release might have on the public's perception of the administration of justice.  When all things are considered, I do not believe that this is a case where detention is necessary to maintain confidence in the administration of justice.

The Plan of Release Proposed by the Applicant

The plan of release offered here includes five sureties willing to cumulatively pledge bonds that total over $250,000.  The Applicant is also willing to privately finance electronic monitoring through Gemtech Incorporated, including GPS monitoring.

The Crown has correctly highlighted some weaknesses in each surety standing alone.  Two of the proposed sureties, Mr. Alsalah Ottem and Mr. El-Kadri are virtual strangers to Mr. Diab and are willing to post bonds and participate in his plan of release for reasons founded in personal beliefs concerning the treatment of a specific group.

The main surety and the person who will have the primary

11

Decision - Maranger, J.

2009 CanLII 26600 (ON SC)

responsibility of supervising the Applicant is his current common-law spouse, Rania Tfaily.  It is with her that the accused will reside.  The Prosecution did its level best in cross-examination to portray Ms. Tfaily as an over-trusting, love-struck young woman who will be easily manipulated by the Applicant.  I did not get this impression at all from listening to Ms. Tfaily.  She came across as a very clear-minded, intelligent woman who knows precisely what she's getting into.  She has excelled in her field, she's a tenured university professor at 30 years of age with a PhD.  Her motivation for acting as Mr. Diab's surety seems more as a result of a belief in his innocence and in friendship to him than out of blind love.  She indicated she would report any breach of bail conditions.  She stated that the reputation she has amassed in Ottawa professionally and otherwise is not something that she would jeopardize.  I believe her.

The other proposed sureties, Peter Gose, the Chairperson of the Sociology Department at Carleton University, Mr. Diab's employer, and Rabbi Chark were impressive people who clearly understood the responsibility of being a surety and who are both willing to risk substantial bonds to back up their words.

If an individual in Mr. Diab's situation is to be released, given our responsibilities as a nation to our treaty partner, France, and the extremely serious charges he is facing in that country, a plan of release would have to be fairly exceptional before a court could find that the applicant has met his onus.  I can say that the plan proposed here fits that description.

In Canada a citizen has the right to reasonable bail.  This is a right guaranteed by our Charter of Rights and Freedoms.  It applies with equal force to all Canadians, regardless of their

12

Decision - Maranger, J.

country of origin.  Furthermore, our long-held belief in the presumption of innocence has brought our criminal justice system to the point where the denial of bail is the clear exception and where appropriate release is the norm.

When all things are considered I'm satisfied that the concerns raised under S. 515(10)(a), (b) and c) of the Criminal Code together with the understanding that an overarching principle exists here, being our nation's responsibility to a treaty partner, can be properly addressed through the granting of a bail order with very very strict conditions.

Therefore, Hassan Diab shall be released pending his extradition hearing on a recognizance with five sureties being the following individuals who will sign bonds in the corresponding amounts:

1)    Rania Tfaily in the amount of $15,000 without deposit;

2)    Peter Gose in the amount of $100,000 without deposit;

3)    Hussein Alsalah Ottem in the amount of $100,000 without deposit;

4)    Nour El-Kadri in the amount of $70,000 without deposit;

5)    Rabbi Arie Chark in the amount of $5,000 without deposit.

-     he shall reside at 2606-900 Dynes Road, Ottawa, with the surety Rania Tfaily;

-     he shall obey a curfew of 9:00 p.m. to 7:00 a.m., however he shall not be away from his place of residence except to attend court, be at his place of employment or medical emergencies, unless in the company of one of his sureties;

-     he shall surrender to the appropriate police service all valid and expired passports;

-     he is precluded thereafter from possessing any travel

13

Decision - Maranger, J.

2009 CanLII 26600 (ON SC)

documentation and from applying for any such
documentation anywhere;

-       he shall, at his expense, be monitored by an electronic
surveillance system provided by Jemtech Incorporated.  It
shall include GPS monitoring;

-       the residence and subject shall be inspected with whatever
reasonable frequency the police require;

-       he shall remain within the City of Ottawa;

-       he shall keep the peace and be of good behaviour.

Are there any conditions the Crown might think appropriate apart
from those listed?

MS. SCHRIEK: Your Honour, just on that point, might I have a
moment just to confer with my colleagues?  Mr. Lefrancois is not
here today.

THE COURT: Sure.  All right.  We'll take 15 minutes.

MS. SCHRIEK: Yes, that's fine.

                     R E C E S S            (10:35 a.m.)


U P O N   R E S U M I N G :            (11:00 a.m.)

MS. SCHRIEK: Thank you, Your Honour.  I've had a chance to
confer with some of my colleagues back at the Department of
Justice.  I was just reviewing with Mr. Bayne some of the
conditions I would ask Your Honour to consider imposing
additionally.  I didn't get through the list but most of them.

        What I would additionally be asking Your Honour imposing
as a condition was that there be no contact directly or indirectly
with Mr. Youssef El-Khalil and his wife Sana Selhab.  And Mr.
Bayne has indicated to me that he thinks there should be an
exception for contact via counsel.

14

Decision - Maranger, J.

2009 CanLII 26600 (ON SC)

MR. BAYNE: Absolutely.  Or agents on behalf of counsel.

MS. SCHRIEK: Well, I would insist that it be counsel and not an agent on behalf of counsel.  I mean, that's the exception.  That's the....

THE COURT: Well, you mean like an employee of Mr. Bayne's? Is that what you're talking about?  Or somebody you get....

MR. BAYNE: No.  The problem is from the evidence Mr. El-Khalil is in Lebanon...

THE COURT: Right.

MR. BAYNE: ...and I'm here.

THE COURT: No - the contact would be restricted to Mr. Diab not having contact.  That's your purpose, right?

MS. SCHRIEK: Right.

MR. BAYNE: Right.

MS. SCHRIEK: That's my point.

THE COURT: The condition would be that Mr. Diab is not to contact directly or indirectly the named parties.

MS. SCHRIEK: Right.  Mr. Youssef....

THE COURT: All right.  That doesn't preclude counsel from accessing potential witnesses to prepare and/or argue an extradition hearing.

MS. SCHRIEK: Right.

THE COURT: I agree with that condition, Madam Crown, being added.

MS. SCHRIEK: Also, Your Honour, I would ask you to - the Crown would seek a condition that Mr. Diab be required to report to the RCMP once a week at 155 McArthur Detachment.  I know this was offered up in Mr. Diab's testimony.

THE COURT: I have no problem with that either.

15

Decision - Maranger, J.

2009 CanLII 26600 (ON SC)

MS. SCHRIEK: All right.  Other than that, Your Honour, we're also looking for a condition that Mr. Diab not obtain any further cell phones and that he not add any additional phone lines to the residence where he will be residing.

THE COURT: I don't have any difficulty with that.

MS. SCHRIEK: All right.  We would ask as well that there's a standard condition that's usually on the release forms which I think it's condition number 10 on this form, that precludes the released person from possessing any weapons and so on.  Really, our concern there of course is any explosive materials.  I think it's the last item on the list, but I'd ask that that condition - aside from....

THE COURT: That condition can be checked off as well.

MS. SCHRIEK: All right.  And, Your Honour, my friend had a concern with knives, so I've crossed it out and agreed that we can take knives out of the mix.  Obviously we're not suggesting Mr. Diab have no access to a common knife in his own home.

THE COURT: Okay.

MS. SCHRIEK: All right.  And then - let's see if I can read my own writing here.  We are also asking Your Honour to - we just want to be clear that the release now is meant to be, as I understand it, upon the electronic monitoring being put in place, so we would ask that the condition be worded that he is only to be released once that system is in fact in place and that the bracelet can be attached onto him.  Otherwise of course it defeats a bit the purpose if he's released and then it's done only sometime later.

THE COURT: Is that feasible today?

MR. BAYNE: Maybe I can help a little, Your Honour.  We spoke with Michael Nguyen.  The electronic monitoring may be done today or tomorrow, but if there's GPS involved he suggested

16

Decision - Maranger, J.

2009 CanLII 26600 (ON SC)

getting the hardware - it may take a day.  It may take two days. And so I was going to ask Your Honour, because I expect this is going to happen tomorrow or the next day, and Mr. Diab will then be at the jail, so maybe the release order - we're going to attend today to the various sureties signing their recognizances.  That will be taken care of.  Mr. Diab can then sign the other conditions from the jail.  Maybe there should be one other explicit instruction to the jail that some sort of document from Michael Nguyen of Gemtech that the electronic monitoring and GPS have been satisfactorily set up.  And it will require of course that before they let him walk out of the jail that he's got the two separate bracelets attached.

THE COURT: All right.  Then the order will go accordingly.

MR. BAYNE: Okay.

THE COURT: That the documentation and technical machinery required to fulfill that part of the order can be dealt with at the jail. Does that work?

MR. BAYNE: Yes.  And that the jail should be satisfied on a document from - whether it's a letter, but Mr. Nguyen from Gemtech.

THE COURT: A document from a representative of Gemtech shall satisfy that particular obligation.

MS. SCHRIEK: Right.  And as I understand Mr. Bayne, he is agreeing that in fact the bracelets be attached as he's leaving.

THE COURT: Right.  Sure.  It's part of the order.

MS. SCHRIEK: All right.  Thank you.  That was part of our concern as well.

THE COURT: Okay.  Is there anything further?

MS. SCHRIEK: And I guess there's two final ones.  We're asking that he be required to report any change of address.  I know there

17

Decision - Maranger, J.

2009 CanLII 26600 (ON SC)

was no suggestion that there would be any, but it's kind of a standard condition.

THE COURT: That's mandatory, yes.

MS. SCHRIEK: Right.

THE COURT: That condition would be included.

MS. SCHRIEK: Right.  And finally, Your Honour, we would ask if you would consider as well imposing a condition that Mr. Diab consent to his e-mails and phone calls being monitored while he's there living at Ms. Tfaily's residence at 900 Dynes Road.

MR. BAYNE: I would object to that strongly.

THE COURT: Given the breadth of the conditions that have been imposed here I don't think that's required.  Plus, it could seriously interfere with his ability to communicate with counsel and so on. So I'm not going to go along with that condition, Crown.

MS. SCHRIEK: All right, Your Honour.  Thank you.  Those I think are the remainder of the conditions that we had sought in this matter.

MR. BAYNE: Your Honour, may I ask you - do you consider a driver's licence to be a travel document?  It's the only thing that could be obliquely construed in his possession.  I don't know frankly if he still has his driver's licence.

MR. DIAB: It's been confiscated.

MR. BAYNE: It's been confiscated as well?  But I guess if he's driving to and from work, if the work materializes, so there's that question.

THE COURT: I don't know where you can travel with a driver's licence anymore.  I don't know which country you can get into with a driver's licence.  You can't get into the United States anymore with a driver's licence I don't think.  Any comment on that?  I

18

Decision - Maranger, J.

2009 CanLII 26600 (ON SC)

mean, travel documents, I of course meant passports and so on.  I wasn't overly concerned about a driver's licence.

MS. SCHRIEK: Of course one could always re-apply for a passport.  I take Your Honour's comment about it's not....

THE COURT: Well, part of the condition is he's not to apply, he's not to take any steps whatsoever to obtain any travel documents. That's in the order.

I don't take a driver's licence to mean a travel document, to put it simply.  And when I crafted the conditions I didn't consider it as a travel document.

MR. BAYNE: And that's helpful, Your Honour.  And a couple of other matters of clarification so we don't get into trouble with your order through misunderstanding.

What about while he's en route either to work, court or a medical appointment?  He's not otherwise to be out of the residence outside of the company of a surety, but what if he's left the residence....

THE COURT: He has to be in the company of a surety to get to and from your office, work or a medical emergency.

MR. BAYNE: All right.  Thank you.

THE COURT: Well, maybe not - a medical emergency might be a difficulty.  Save and except a medical emergency but on attendances to court, lawyers, employment, he's to be in the company of a surety to and from.

MR. BAYNE: Okay.  I understand that.  And in respect of staying in Ottawa, do you mean the Regional Municipality of Ottawa-Carleton?  Do you mean the new amalgamated City?  I just don't want to....

THE COURT: No - you're being - better safe than sorry and I

19

Decision - Maranger, J.

2009 CanLII 26600 (ON SC)

don't fault you there.  The Greater City of Ottawa, if that encompasses - that encompasses Hull I think, does it?   Or Gatineau?

MR. BAYNE: The City doesn't but the Ottawa-Hull area would.  I know my friend and I, when we were talking before you came back in, I had understood my friend to say that what the Crown was seeking that he be restricted to the Ottawa-Gatineau area.

THE COURT: The Ottawa-Gatineau area.  For clarity purposes it's the Ottawa-Gatineau area, what we have come to know as - I mean, whenever they measure the population of this area they include Gatineau now, so that area.

MR. BAYNE: Thank you very much.

MS. SCHRIEK: Just two final clarifications.  The officer advices me, Your Honour, that we do in fact have the driver's licence of Mr. Diab and that can simply be returned to him.  So following your comment earlier...

THE COURT: Yes.

MS. SCHRIEK: ...we can do that.  And the final question I have is really just a question with regard to the sureties.  Since certainly myself have never been involved in a case where there have been so many sureties being proposed - usually it's one...

THE COURT: Neither have I.

MS. SCHRIEK: ...or maybe two, and so I'm not really sure, and it just sort of occurred to me as I sat down, what are the conditions that are going to be imposed upon the sureties?  What is Your Honour's thought on that matter, because certainly they've made it clear that they're not available all the time.  Mr. Gose for example....

THE COURT: Well, the primary surety is Ms. Tfaily...

20

Decision - Maranger, J.

2009 CanLII 26600 (ON SC)

MS. SCHRIEK: Right.

THE COURT: ...so, I mean, the condition imposed upon them is that they are supervisors of Mr. Diab and the function of a surety in a case such as this is this: Mr. Diab has specific conditions. Now he's got five different people that can assure the Court and society that he's got to abide by those conditions.  Ms. Tfaily is clearly going to be the primary surety in that he's going to be living with her.  As to how he gets about to and from different areas, it may be if Ms. Tfaily is not available one of the other sureties might be available for that purpose.  Any one of them can contact on any breach at any time.  Because it's almost a virtual house arrest in the sense that he's only allowed to be out with a surety, there's no specific role to any one surety.  They all have a part to play in this and it's up to the sureties to make sure he's abiding by the conditions.

MS. SCHRIEK: All right.  So no specific conditions that you envisage at this point for the sureties.

THE COURT: Save and except that he resides with Ms. Tfaily.

MS. SCHRIEK: To ensure that the conditions are being respected I guess.

THE COURT: What would you suggest?

MS. SCHRIEK: Something along the lines to ensure that the conditions are being met.  But of course the difficulty - although it can be quite impressive on the one hand to have these persons that have lent money, of course when we look further down the road at the estreatment hearing, the only way that there can be any liability if there's a fault in that is that the conditions of the sureties have to be quite clear.  And in this case I guess I'm not entirely sure what - they're supposed to monitor him, but we've

21

Decision - Maranger, J.

2009 CanLII 26600 (ON SC)

heard from the various sureties. One had offered I believe that he could come by once a week. There was all sort of testimony in that vein. Some were available more than others, so I'm not sure how Your Honour would see fit to word that.

THE COURT: Any comments on that, Mr. Bayne?

MR. BAYNE: No. I think you get into a problem when you start specifying Mr. A. has to do this, this and this. It seems to me Your Honour has set out a list of conditions all of which will be known to each surety and they all play a role. I think you identified it correctly saying maybe no one would satisfy as a release plan but together they have a collective responsibility.

THE COURT: I agree. Given the following: electronic monitoring, door knock by the police and the primary surety being one of the people he lives with, the only way he can breach a condition would be with one of the other sureties knowing about it. That's the - for him to be outside of the residence outside of curfew a surety has to know about it because he has to be with a surety. Plus he's being electronically monitored. That's the purpose of it. I'm not going to specify what one has to do.

MS. SCHRIEK: No, and I wasn't proposing that. I was thinking more of a general....

THE COURT: No, I'm satisfied with the way it's crafted, Madam Crown.

MS. SCHRIEK: All right.

THE COURT: Thank you.

MS. SCHRIEK: Thank you.

THE COURT: Anything further?

MS. SCHRIEK: Nothing.

MR. BAYNE: No, thank you.

22

Decision - Maranger, J.

2009 CanLII 26600 (ON SC)

THE COURT: So we're back together on April 9th?

MS. SCHRIEK: April 9th.  Your Honour, I just add at this point in time it's certainly been an interesting experience for myself but I will not be continuing on with Mr. Lefrancois.  I've already explained to Mr. Bayne the last time - I was sort of on loan if you will from the Province of Ontario and I'm going back to the Province of Ontario.

THE COURT: Oh - I'm sorry to hear that.

MS. SCHRIEK: In any case - I just wanted to let you know.

THE COURT: Thank you for your work.

<u>A D J O U R N E D</u>                    (11:30 a.m.)

\*\*\*\*\*\*\*\*\*\*

2009 CanLII 26600 (ON SC)

23.

Certification

I, J. Walsh, certify that this document is a true and accurate transcription to the best of my skill and ability of the recordings of R. V Hassan Diab, in the Ontario Superior Court of Justice held at Ottawa, Ontario, taken from Recording No. 31-85.

................................................
J. Walsh,
Certified Court Reporter

# IN THE SUPREME COURT OF BRITISH COLUMBIA

Citation:     *Republic of France v. Wang,*
              2014 BCSC 2689

Date: 20140714
Docket: 26604
Registry: Vancouver

2014 BCSC 2689 (CanLII)

**In the Matter of the *Extradition Act,* S.C. 1999, c. 18 as Amended**

Between:

**The Attorney General of Canada on behalf of
the Republic of France**

Requesting State

And:

**Jie Lu Wang**

Person Sought

Before: The Honourable Madam Justice Gropper

## Oral Reasons for Judgment Re: Judicial Interim Release

In Chambers

| | |
|---|---|
| Counsel for the Attorney General of Canada on behalf of the Requesting State: | D.B. Majzub<br>A. Majawa |
| Counsel for the Person Sought: | D.J. Martin<br>C.L. Leggett |
| Place and Date of Trial/Hearing: | Vancouver, B.C.<br>July 14, 2014 |
| Place and Date of Judgment: | Vancouver, B.C.<br>July 14, 2014 |

[1]     This is an application for the judicial interim release of Mr. Wang, who was arrested under a provisional arrest warrant under the *Extradition Act*, S.C. 1999, c. 18.

[2]     The provisions of s. 515 of the *Criminal Code*, R.S.C. 1985, c. C-46 apply to these proceedings. Sections 515(10)(a), (b), and (c) describe the grounds for detention. The primary ground is whether Mr. Wang poses a flight risk. The secondary ground is whether there is a substantial likelihood that Mr. Wang will commit a criminal offence or interfere with the administration of justice while on release. The tertiary ground is whether detention is necessary to maintain public confidence in the administration of justice, having regard to the circumstances enumerated under that subparagraph.

[3]     The parties agree that the consideration for me is whether the primary ground is engaged, that is, whether Mr. Wang poses a flight risk such that his future attendance in court may not be ensured.

[4]     I have determined that because Mr. Wang is not ordinarily resident in Canada, and therefore, he bears the onus of proving why his continued detention is not justified. In considering whether to grant release, I must consider the strength of the case against Mr. Wang, bearing in mind, as always, that he is presumed to be innocent.

### Facts

[5]     The facts are alleged by the Attorney General in paras. 3 and 4 of its submissions:

> [3]     Mr. Wang was arrested pursuant to a warrant issued under s. 13 of the [*Extradition*] *Act* on July 10, 2014. The warrant was issued by Madam Justice Fisher on the strength of an affidavit sworn by Constable Alexandre Viens of the RCMP. The affidavit confirms that French judicial authorities issued an arrest warrant for Mr. Wang on February 14, 2014, and that he has been charged by French authorities for conduct amounting to the Canadian

2014 BCSC 2689 (CanLII)

offences of money laundering and conspiracy to launder money. The affidavit also provides a summary of the facts set out in the provisional arrest request submitted to Canada by French authorities. The allegations are as follows:

a)      Between October 24 and 30, 2013, the agro-food company Seretram located in Labatut, France, was a victim of organized fraud resulting from payments totalling over 17,385,114 EUR which were fraudulently transferred into the account of Oasis Tree Ltd. in the United Kingdom. Seretram notified the French authorities that it was a victim of fraud relating to those transfer payments.

b)      The fraud was perpetuated by individuals who contacted Seretram's accountant and who posed as representatives of a financial firm purportedly acting on behalf of Seretram's financial directors. These individuals forged Seretram's financial directors' signatures on transaction orders instructing the accountant to make various monetary transfers to specific bank accounts. The accountant acted on these instructions and transferred funds to the account of Oasis Tree Ltd. in the United Kingdom.

c)      Between October 29, 2013, and November 1, 2013, these funds were then transferred from the United Kingdom through 73 bank transactions to bank accounts [in] mainland China and Hong Kong.

d)      In particular, on October 29, 2013, the Hong Kong bank account held by the company Art Champ Investment Ltd., whose director is Guobao Tu, was credited 848,308 EUR by way of a transfer from the account of Oasis Tree Ltd. in the United Kingdom. On November 4, 2013, 728,400 of these euros were then transferred into the account of Vantage Star Ltd. in Hong Kong, which is a company managed by Mr. Wang. That same day, the money was transferred to Guobao Tu's personal account.

2014 BCSC 2689 (CanLII)

2014 BCSC 2689 (CanLII)

e)      On November 4 and 18, 2013, the account of Mr. Wang's company, Vantage Star Ltd., was credited with more than 2,532,986 EUR from the account of Guobao Tu and Art Champ Investment Ltd.

f)      On November 8 and 11, 2013 Vantage Star Ltd. transferred 1,895,000 EUR to a designated account in France in order to make a real estate acquisition to the benefit of Mr. Wang. The intermediaries of that transaction were Guobao Tu and Liangzhu Chen. These funds were seized by order of the French judiciary.

g)      Documents were obtained on February 11 and 12, 2014 through search warrants executed in Paris, France, related to the real estate transaction [referred to] above. These documents confirmed Mr. Wang's involvement and association with Vantage Star Ltd. and this real estate transaction. The authorities also seized documents pertaining to Guobao Tu's involvement in the real estate transaction and documents that confirmed Guobao Tu's association with Wang.

[4]      Furthermore, according to the affidavit, Mr. Wang, a Chinese National and non-resident of Canada, arrived at Vancouver International Airport aboard a flight from Shanghai on July 8, 2014. He was placed on an immigration hold by CBSA officers in order to determine his admissibility to Canada in light of the allegations of serious criminality arising from the outstanding French criminal charges.

[6]      In regard to the facts as alleged by the Attorney General, Mr. Wang says that he knows Mr. Chen, and Mr. Chen has misused his identification. He says there are no documents showing that Mr. Wang directed the funds. Mr. Wang would also have to be aware of the fact that the funds were the proceeds of crime to be found guilty.

[7]      Finally, Mr. Wang points out that he flew to Vancouver, where he was placed under arrest, whereas if he remained in China, he would not be subject to extradition either to France or Canada.

2014 BCSC 2689 (CanLII)

## Position of the Parties

[8]     The Crown says that the strength of the case supports Mr. Wang's continuing detention, as does the seriousness of the offence of money laundering and the potential jail sentence and/or fine Mr. Wang faces if convicted.

[9]     The defence argues that the strength of the case put forward by the Attorney General is undermined by the lack of facts, and while the offence is serious, it is not as serious as offences such as murder or drug offences where bail has been granted in an extradition hearing. In respect of that matter, the Attorney General notes that because of Canada's international treaty obligations, a risk of absconding must be examined even more carefully than it might be in domestic proceedings.

## Discussion

[10]     The question I must address is: does Mr. Wang pose a flight risk? I will refer to the following facts in making my determination:

   a)  he has no criminal record;

   b)  he has no history of flight;

   c)  he has the financial means to facilitate flight;

   d)  he has a residence in Vancouver worth over $2 million in which he has equity of $1 million;

   e)  he has visited and stayed in Canada at least three times before;

   f)  his son attends Shawnigan Lake School on Vancouver Island; and

   g)  Mr. Wang has a prominent friend in the Vancouver business community who agrees to be a surety.

[11]     I have considered the cases provided by counsel and find that Mr. Wang has met the onus of showing why his continuing detention is not justified.

[12]     In respect of the strength of the case, I do not find it to be as strong as the Crown suggests and agree that it is undermined to some extent by the factors referred to by the defence. I accept the seriousness of the offence as described by the Crown, but Mr. Wang has no criminal record and no history of flight. His connection to Canada, while not the basis of a finding that he is ordinarily resident here, is not tenuous. He has a home. He has a friend who is prepared to support him. He has a son who attends school here and he has an application for residency status pending.

[13]     I am satisfied that conditions on Mr. Wang's release can address the concerns raised by the Attorney General.

[14]     Mr. Wang has agreed to pledge his own home for his release. In respect of the surety, Mr. Wang has suggested $100,000, while the Attorney General has suggested $1,000,000.

## Orders

[15]     I find it appropriate to release Mr. Wang pending the extradition hearing upon his entering a recognizance with the pledging of the equity of his own home of $1,000,000 and the surety deposit of $200,000, subject to terms and conditions. I direct the registry not to require an appraisal of the property but to rely on the ownership documents provided to me with regards to its value.

[16]     The terms and conditions for Mr. Wang's release are as follows:

   a)  To keep the peace and be of good behaviour.

   b)  To report to the court when required to do so.

   c)  To report to a bail supervisor at the Vancouver West Community Corrections Office, located at 202 - 1855 Burrard Street, within 48 hours of his release and thereafter as directed by the bail supervisor, but not less than once per week in person.

2014 BCSC 2689 (CanLII)

d)  To reside at the address of 1488 West 54th Avenue in Vancouver, British Columbia, and not change his place of residence without prior written permission of the bail supervisor or by court order.

e)  To be in his place of residence between the hours of 11:00 p.m. and 6:00 a.m. unless he has prior written permission of his bail supervisor or the court to be absent during those hours.

f)  To present himself at the door of his residence for any bail supervisor or police officer who attends for the purpose of confirming his compliance with these terms.

g)  To remain in the Province of British Columbia.

h)  To surrender his passport and any other travel documents to the registrar of the Supreme Court of British Columbia and not apply for any passport, visa or other travel documents.

i)  To not have any direct or indirect communications or contact with Guobao Tu and Liangzhu Chen, subject to contact through counsel.


"Gropper J."

# IN THE SUPREME COURT OF BRITISH COLUMBIA

Citation:  *U.S.A. v. Ellingson,*
2018 BCSC 1962

Date: 20181102
Docket: 27733
Registry: Vancouver

2018 BCSC 1962 (CanLII)

In the Matter of the *Extradition Act*, S.C. 1999, c. 18, as amended

and

In the Matter of the Attorney General of Canada
on behalf of the United States of America

and

James Ellingson

Before: The Honourable Madam Justice DeWitt-Van Oosten

Corrected Reasons:  These reasons were amended at
paras. 46–48 on November 23, 2018.

## Ruling on Judicial Interim Release

| | |
|---|---|
| Counsel for the Attorney General of Canada on behalf of Requesting State: | Diba B. Majzub Sheida Rezapour |
| Counsel for the Person Sought: | Ian Donaldson, Q.C. K. Leslie, A/S |
| Place and Date of Hearing: | Vancouver, B.C. November 1, 2018 |
| Place and Date of Judgment: | Vancouver, B.C. November 2, 2018 |

[1]      This *Ruling* was delivered in the form of oral reasons.  It has since been edited for publication.

## I.      OVERVIEW

[2]      The United States has given notice that it seeks to extradite James Ellingson in connection with an alleged conspiracy to sell drugs through the Internet.

[3]      Since 2014, U.S. authorities have been investigating a number of persons, including Mr. Ellingson, for (a) conspiracy to violate the narcotics laws of the United States; (b) conspiracy to import narcotics into the United States; and (c) conspiracy to commit money laundering.

[4]      The offences are alleged to have occurred between 2011 and 2013.  If Mr. Ellingson is extradited to the United States and successfully prosecuted, he will face a mandatory minimum sentence of 10 years' imprisonment.

[5]      In January 2018, a Magistrate with the United States District Court in the Southern District of New York issued an arrest warrant for Mr. Ellingson.  He has been charged with the offences noted in para. [3] above.

[6]      On October 26, 2018, the Attorney General of Canada received authorization to apply for a provisional warrant on the U.S. charges.  The application was made and a warrant granted.

[7]      Three days later, on October 29, Mr. Ellingson was arrested in Vancouver.

[8]      He has since appeared before me seeking judicial interim release on the provisional warrant.  Canada's Minister of Justice has not yet issued authority under s. 15 of the *Extradition Act*, S.C. 1999, c. 18, as amended, to proceed with an application for an order of committal.

[9]      It is the position of the requesting state, represented by counsel for the Attorney General of Canada, that Mr. Ellingson should be detained in custody pending the authority to proceed.

2018 BCSC 1962 (CanLII)

2018 BCSC 1962 (CanLII)

[10]　Counsel for Mr. Ellingson submits there is no basis for a detention order.  He argues that his client should be released on a surety bail, with stringent terms.

## II.　　FACTUAL BACKGROUND

[11]　The United States is still in the process of putting its package together in support of an authority to proceed.  As such, I have relatively limited information about the nature of the offences with which Mr. Ellingson is charged, and/or the evidence gathered in support.

[12]　At the interim release hearing, however, the requesting state filed an affidavit prepared by Cpl. Todd Storozuk in support of the application for a provisional warrant.

[13]　The affidavit sets out the basic facts underlying the charges against Mr. Ellingson.  They consist of:

- the U.S. investigation arises out of illegal drugs sales that are said to have occurred through an Internet marketplace known as the "Silk Road";

- this marketplace was accessible only through the "darkweb" of the Internet and operated between 2011 and 2013;

- it is alleged that purchasers and sellers of drugs on the Silk Road would open accounts with a unique "username" or "handle", as well as a unique password, and, using these accounts, they conducted illicit transactions;

- all of the transactions would be paid for with Bitcoins;

- the owner of the Silk Road, Ross William Ulbricht, was arrested in October 2013.  After his arrest, the FBI seized various servers associated with the Silk Road in Iceland, as well as backup servers in the United States.  The servers contained databases with Silk Road records showing various transactions, as well as private messages exchanged between Silk Road users;

- from server data, authorities identified a number of transactions conducted by users associated with a seller account named "Marijuanaismymuse".  These transactions occurred between November 2011 and October 2013;

- data associated with Marijuanaismymuse showed sales of:

   a)  more than 4 kilograms of methamphetamine;

   b)  more than 100 grams of heroin;

   c)  more than two kilograms of cocaine;

   d)  about one-half gram of LSD;

   e)  approximately 7 kilograms of MDMA; and,

   f)  more than 19 kilograms of marijuana, among other narcotics;

- Marijuanaismymuse is alleged to have sold drugs to customers on the Silk Road in exchange for Bitcoins.  Payment for the sales were credited by the Silk Road to Marijuanaismymuse;

- U.S. authorities have gathered evidence that they say links James Ellingson to Marijuanaismymuse, consisting of:

   a)  some of the drug proceeds sent to Marijuanaismymuse were subsequently traced to two Bitcoin exchange accounts registered to Mr. Ellingson. One of these accounts was opened in August 2013 in the name of Mr. Ellingson using an email address, jamesellingson@gmail.com, information that included his Canadian driver's licence number, and utility bills in his name.  On his arrest, a driver's licence with this number was found in his possession and seized;

   b)  authorities traced other Bitcoin transactions originating from Marijuanaismymuse to an account held by CaVirtEx, a former Bitcoin exchanger.  Records associated with CaVirtEx show that in May 2013, this account was opened in the name of James Ellingson, using the same driver's licence number, utility bills information and Vancouver address that was used in opening the exchange accounts mentioned above;

   c)  U.S. authorities obtained records from Google relating to Mr. Ellingson's Gmail account.  These records contained an email dated September 23, 2013 with a username of Marijuanaismymuse and what appears to be a password to the Marijuanaismymuse Silk Road account.  The Gmail records also contained notations of drug weights, names and prices consistent with server data from the Silk Road; and,

   d)  in 2013, someone with the username Redandwhite communicated with, and received Bitcoin payments from Mr. Ulbricht, in connection with purported attempts to begin selling narcotics on the Silk Road.  A laptop recovered from Mr. Ulbricht contained a

2018 BCSC 1962 (CanLII)

file labelled "save_red", which housed multiple photographs referenced in the communications.  The photographs were sent by Redandwhite and consisted of packaged drugs and Canadian currency.  Some of the photographs showed a man in front of a building holding an envelope with a numerical code.  Based on a comparative analysis with Mr. Ellingson's driver's licence, authorities have identified him as the person in the photograph.

## III.    ANALYSIS

### LEGAL PRINCIPLES

[14]    Pursuant to s. 19 of the *Extradition Act*, judicial interim release in the extradition context is governed by Part XVI of the *Criminal Code*, R.S.C. 1985, c. C-46.

[15]    As such, s. 515(10) of the *Code* is engaged and Mr. Ellingson's detention in custody while awaiting an authority to proceed must be justified on primary, secondary or tertiary grounds.

[16]    Counsel for the requesting state submits that under Canadian law, the offences that Mr. Ellingson has been charged with are analogous to conspiracy to traffic in substances that are listed in Schedules I, II and III of the *Controlled Drugs and Substances Act*, S.C. 1996, c. 19 [*CDSA*] contrary to s. 5(1) of the *CDSA* and s. 465(1)(c) of the *Criminal Code.*

[17]    Mr. Ellingson's lawyer does not take issue with this analogy.  As a result, he accepts that under s. 515(6)(d) of the *Code*, his client is functionally in a reverse onus position on the issue of interim release.

[18]    The requesting state argues that Mr. Ellingson's detention is justified on the primary and secondary grounds.  In light of the reverse onus, to obtain his release, Mr. Ellingson must show that his detention is not justified having regard to these same grounds: *R. v. Pearson* (1992), 77 C.C.C. (3d) 124 (S.C.C.) at p. 142.

[19]    In deciding whether Mr. Ellingson has met this burden, the Court must take a more stringent approach to the assessment of primary ground concerns than might otherwise be the case in domestic proceedings:

> … the courts in this Country have long recognized that a correct approach to extradition proceedings is characterized by good faith in honouring Canada's international obligations … adherence to that principle requires a court considering a bail application … <u>to limit the assumption of risk of non-appearance more severely than might otherwise be acceptable in the case of domestic proceedings.</u>
>
> *United States v. Ross*, 1993 CarswellBC 2753 (CA) at para. 15 [Internal references omitted]; as cited in *United States of America v. Patterson*, 2015 BCSC 579 at para. 17.
>
> [Emphasis added.]

### MR. ELLINGSON'S POSITION

[20]    Mr. Ellingson has not provided an affidavit in support of his release. However, a "biographical sketch" prepared by his counsel was filed as an exhibit on the hearing.  The requesting state has not taken issue with the accuracy of the information contained therein.

[21]    Mr. Ellingson is 42 years old and a Canadian citizen.

[22]    He has a criminal record that includes three convictions for possessing drugs for the purpose of trafficking, and one conviction for trafficking.  In 2006, he received a two-year jail sentence for possession for the purpose.

[23]    His record also includes seven other convictions: criminal harassment (x 3); possession of a prohibited or restricted weapon; driving while prohibited; assault; and, breach of probation.  The breach of probation is the last registered conviction, occurring in 2007.  Mr. Ellingson received a $300 fine for that offence.  I do not know the circumstances surrounding the breach; however, the requesting state acknowledges that in light of the imposed penalty, it was likely not serious in nature.

2018 BCSC 1962 (CanLII)

[24]    His counsel describes the criminal record as "modest" and of "some vintage".
He says most of the convictions resulted from a drug addiction that Mr. Ellingson
now has under control.

[25]    Mr. Ellingson has a high school education and works with a brother and his
father in a family-owned furniture liquidation business.  He also works part time at a
motorcycle apparel company in Gastown, handling the company's promotions and
social media.

[26]    Mr. Ellingson lives with his common-law partner in Vancouver, Kirsten Guzek.
They have been together for approximately 10 years.  Ms. Guzek works as a graphic
designer and co-owns the residence in which they are living.  Her mother is the
second person registered on title.

[27]    Mr. Ellingson has lived in Vancouver for more than 20 years.  His family also
resides in the area, including his father and two brothers.  He has a 21-year-old
daughter from a previous relationship who lives in Washington State.  One of
Mr. Ellingson's brothers has had serious health issues since 2014 and Mr. Ellingson
provides him with assistance.

[28]    Mr. Ellingson is also dealing with a health issue of his own.  He is scheduled
to undergo surgery on December 13, 2018 to reset a bolt in one of his arms that has
come loose after a previous operation.

[29]    In light of this overall context, his counsel argues that Mr. Ellingson has deep
roots in the Vancouver community; many reasons to remain in this jurisdiction; and,
he has shown a disinclination for criminal offending since 2007.

[30]    In support of his release, he is prepared to offer a substantial surety bail
(Ms. Guzek and her mother are willing to stand as sureties in the amount of
$75,000), and he agrees to stringent bail terms.  From his perspective, it is not
necessary that he remain in custody to meet any primary or secondary concerns that
might reasonably arise in this case.

2018 BCSC 1962 (CanLII)

2018 BCSC 1962 (CanLII)

[31]     Counsel for Mr. Ellingson accepts that the offences alleged against his client are serious.

[32]     However, he takes the position that the evidence put forward on behalf of the U.S. authorities is not strong and, more importantly, the mere fact of serious allegations, even when supported by solid evidence, does not justify detention as a matter of course.  This is so even with a reverse onus on bail.  For example, he points out that  there are many cases in which persons facing serious allegations have been released post-conviction on bail pending appeal.  See, for example, *R. v. Mapara*, 2001 BCCA 508.  Mr. Ellingson is, of course, presumed innocent of the allegations made against him.

[33]     Specific to the extradition context, Mr. Ellingson points to *United States of America v. Cheema*, 2007 BCCA 624 (conspiracy to import significant amounts of drugs), and *U.S.A. v. Graham*, 2004 BCCA 162 (an allegation of murder).  In both cases, the accused was released.

[34]     Nine reference letters have been filed in support of Mr. Ellingson.

[35]     Collectively, these letters speak of Mr. Ellingson's increased maturity and self-respect since he conquered his drug addiction; a minimal risk of flight, particularly if persons that Mr. Ellingson cares about stand as his sureties; they say he is loyal and committed to his family and friends; and, based on what they have personally observed, he has been "sober" for ten years.  As opposed to his past conduct, he now lives a "quiet life".

[36]     The credibility of the personal beliefs and observations put forward in these letters, although not in affidavit form, was not challenged.

### REQUESTING STATE'S POSITION

[37]     Counsel for the requesting state argues that Mr. Ellingson's criminal record shows he lives a "criminal lifestyle", with a history of non-compliance with court orders.

2018 BCSC 1962 (CanLII)

[38]     Mr. Ellingson is alleged to have been involved in "high level drug trafficking".
The requesting state says the Court can infer that he is the type of individual who
likely has "access to a large amount of funds and … sophisticated organizations
which can assist in a flight from justice": citing *R. v. Pearson* at p. 145.

[39]     Indeed, I am told that U.S. authorities believe Mr. Ellingson has made an
estimated $2 million in profits from drug trafficking activities.  However, this
proposition has not been substantiated with evidence of specifics.

[40]     If successfully extradited and prosecuted, Mr. Ellingson faces a minimum 10-
year prison term.  From the perspective of the requesting state, this reality provides
Mr. Ellingson with strong motivation to flee.

[41]     The requesting state also has secondary ground concerns.  It argues that the
U.S. charges are consistent with Mr. Ellingson's prior convictions and form part of a
pattern or continuum of long-standing and entrenched criminality.  Trafficking in
drugs is a "way of life" for him and the state argues that as such, bail restrictions are
unlikely to deter him from re-offending.

[42]     Moreover, the allegations against him involve activity that is technologically
sophisticated and hard to detect – illicit drug transactions on the "darkweb".  If
released, the ability to monitor Mr. Ellingson's conduct effectively is limited.
Detention is the only way to eliminate the risk of re-offending.  The requesting state
has no confidence that if Mr. Ellingson's family members act as sureties, they have
the capacity to provide the level of supervision required.

[43]     Relevant to this submission, I note that Mr. Ellingson's father was arrested
earlier this year for extradition to the U.S. in respect of narcotics trafficking.  As I
understand it, he is currently on bail pending the extradition process.

[44]     The requesting state also points out that Mr. Ellingson was in a relationship
with Ms. Guzek at the time the U.S. offences are said to have occurred.

2018 BCSC 1962 (CanLII)

### APPLICATION OF LEGAL PRINCIPLES

[45]   I am satisfied that the evidence laid out in Cpl. Storozuk's affidavit credibly supports a link between Mr. Ellingson and Marijuanaismymuse, the Silk Road and high-level, illicit drug transactions.

[46]   Mr. Ellingson's lawyer referred me to a Notice of Civil Claim filed by British Columbia's Director of Civil Forfeiture in December 2017, which alleges that in 2013, an individual by the name of D.A.L. was interacting with drug purchasers on the Silk Road under the "vendor alias" of Marijuanaismymuse.  D.A.L. is said to have "obtained purchase orders for illegal drugs on the Silk Road website from customers in Canada, the United States, and elsewhere in the world".  The Director of Civil Forfeiture alleges that in response to these orders, D.A.L. delivered drugs by mail in exchange for Bitcoins.

[47]   Counsel for Mr. Ellingson argues that the allegations made in the Notice of Civil Claim, identifying D.A.L. as the "vendor" behind Marijuanaismymuse, raise serious questions about the strength of the U.S. case against Mr. Ellingson.

[48]   I agree with the requesting state that the allegations made by U.S. authorities in the extradition matter, and the case put forward by the Director of Civil Forfeiture against D.A.L., are logically reconcilable.  Mr. Ellingson is alleged to be part of a conspiracy, involving one or more persons.  Within this context, it is rationally conceivable that more than one person would have access to Marijuanaismymuse as a vehicle for illicit drug sales.  The allegations put forward in the Notice of Civil Claim do not negate the possibility of other persons' involvement, even in a leadership role.

[49]   As such, I do not accede to Mr. Ellingson's suggestion that the evidence against him is of little or no probative value.  According to Cpl. Storozuk's affidavit, proceeds received by Marijuanaismymuse have been traced to two Bitcoin exchange accounts registered in the name of James Ellingson, using his personal information, as well as a CaVirtex account.  There is also evidence that under the username of Redandwhite, Mr. Ellingson engaged in direct communication with the

owner of the Silk Road about the act of selling drugs through this marketplace. This suggests more than peripheral involvement.

[50]     For the purposes of the judicial interim release hearing, I find that the evidence before me supports a direct link between Mr. Ellingson and Marijuanaismymuse, the Silk Road and illicit drug transactions, as an alleged principal offender.

[51]     The more important question is whether Mr. Ellingson has shown that keeping him in custody is not necessary to ensure his future attendance in the extradition proceedings, and/or prevent him from re-offending.

[52]     On the primary ground, I am satisfied that James Ellingson has deep roots in Vancouver, including employment, a common-law relationship of long-standing duration, extended family, and a relationship with his 21-year-old child that is made accessible by virtue of the close proximity between their respective domiciles.

[53]     I accept that Mr. Ellingson is closely connected to his immediate and extended family, and that these individuals play an active role in his day-to-day existence. A number of them were present at the interim release hearing, showing their support. Two of them are prepared to stand as sureties, recognizing that doing so puts their personal equity at risk.

[54]     The degree of connectedness with family is also readily apparent from the letters put before me. I accept that this connection functions as a strong disincentive to Mr. Ellingson fleeing the jurisdiction. In doing so, Mr. Ellingson would likely cut himself off from a support network to which he has a strong attachment.

[55]     Mr. Ellingson has a substantial criminal record, dating from 1999 to 2007. However, I note that over the eight-year period, his record shows only one conviction for breach of a court order (probation), and for that conviction, he received a small fine. There is no substantiated history of non-compliance with court orders, including failures to attend court or not reporting while under bail supervision.

2018 BCSC 1962 (CanLII)

2018 BCSC 1962 (CanLII)

[56]    The requesting state asks that I infer from Mr. Ellingson's criminal background that he likely has access to significant funds and/or associates who could assist him with flight.  However, on the material before me, this inference would be speculative. Mr. Ellingson's last drug-related conviction was 12 years ago.  The affidavit of Cpl. Storozuk asserts that Mr. Ellingson has "substantial financial resources from his drug trafficking business", but no details in support of the assertion have been provided.  The affidavit simply makes a bald assertion to this effect.

[57]    There is evidence that in October 2018, Mr. Ellingson attempted to travel to Cuba, a country without an extradition treaty with the United States.  However, Mr. Ellingson says this was a planned vacation with his common-law partner and the requesting state accepts it is not in a position to establish the contrary.  It does not rely on the trip to Cuba in support of its primary ground concerns.

[58]    In the particular circumstances of this case, I am satisfied that a surety bail, with stringent conditions, including bail supervision, restrictions on Mr. Ellingson's travel, and residency and curfew conditions, sufficiently reduce the risk of flight to meet the requirements of the "Ross principle" (noted above, para. [19]).

[59]    In respect of secondary ground concerns, Mr. Ellingson's last conviction for drug trafficking was in 2006.  The U.S. offences are alleged to have occurred between 2011 and 2013.  Five years has passed since then and I have no evidence of further substantiated offending.  I accept that Mr. Ellingson's drug addiction, which fueled his prior criminality, is under control.  At the very least, I have no evidence to the contrary.  The secondary ground concerns advanced by the requesting state, in the circumstances of this case, are not compelling.

[60]    In my view, the facts before me are qualitatively different from *United States v. Woo*, 2014 BCSC 947, an interim release ruling relied on by the requesting state.

[61]    In *Woo*, the U.S. sought to extradite Mr. Woo for conspiracy to traffic in cocaine.  It was alleged that Mr. Woo conspired with others to traffic 50 kilograms of cocaine in the U.S. in December 2006.  The cocaine was destined for Canada.

During the investigation, U.S. authorities gathered wiretap evidence against individuals alleged to be involved in the scheme.  This included a conversation between Mr. Woo and another individual in which they discussed past narcotics transactions, narcotics debts, and a transaction planned to take place in December 2006 involving the sale of 50 kilograms of cocaine: *Woo* at para. 2.

[62]    Mr. Woo had a criminal record for trafficking and, importantly, for committing an indictable offence for the benefit of, or at the direction of, a criminal organization. The conviction post-dated the offences investigated by the U.S. authorities, showing a continued engagement in criminality.  The connection to organized crime weighed heavily with the hearing Judge in declining to release Mr. Woo from custody, notwithstanding established roots in Vancouver:

> [13]    It is of concern to this court that, as recently May of 2010, Mr. Woo was convicted of conspiracy to commit the indictable offence of trafficking in large quantities of cocaine from British Columbia to Quebec. It appears that Mr. Woo's conviction in 2010 relates to different circumstances of trafficking than those alleged by the Attorney General for which extradition is sought. Mr. Woo has been involved in cross-Canada drug trafficking and with a criminal organization. Both his past criminal activity and his alleged involvement in drug trafficking in the U.S. appear to be connected to his presence in Quebec. He also seems to have been associated with some of the same individuals in Quebec who have been convicted of similar offences in both matters. His record together with his conduct forming the basis of the extradition request show that he has connections with organized crime. This suggests that Mr. Woo likely has access to large sums of money and there exists reason to doubt that, if released, he will attend court in respect of this matter. If extradited and convicted in the United States, Mr. Woo faces a maximum sentence of 25 years' imprisonment. This creates an incentive for him not to attend as required in the extradition proceedings.
>
> [*Woo.* Emphasis added.]

[63]    *Woo* is a case in which the concerns expressed by the Supreme Court in *R. v. Pearson* about persons associated with high-level drug trafficking having a resource base to assist with flight, found concrete meaning.

[64]    In *Woo*, a surety bail was offered.  However, the hearing Judge was not able to tell from the information before him which of Mr. Woo's supporters were prepared

2018 BCSC 1962 (CanLII)

2018 BCSC 1962 (CanLII)

to act as sureties, how much they were actually prepared to post, and who would be personally responsible for Mr. Woo's compliance with bail conditions: at para. 15.

[65]     In the case before me, there is no evidence of substantiated criminal organization connections and two sureties have been identified, with a definitive amount attached to the proposed surety bail.  Mr. Ellingson's common-law partner, who to my knowledge has no criminal record, is prepared to monitor Mr. Ellingson, recognizing that non-compliance could result in a substantial financial loss. Mr. Ellingson's bail can also include regular reporting conditions to an independent third party, namely, a bail supervisor, and curfew monitoring by law enforcement.

[66]     I appreciate that Mr. Ellingson has been charged with serious offences and, if extradited and convicted, he faces a lengthy period of imprisonment.  I also appreciate that he has a criminal record for drug trafficking.  However, in consideration of the circumstances, as a whole, I am satisfied he has shown his detention in custody pending the extradition process is not justified.

[67]     In my view, releasing Mr. Ellingson on a $75,000 surety bail with two sureties, and stringent monitoring conditions, would not undermine public confidence in the administration of justice, once fully informed of the relevant circumstances.

## IV.     DISPOSITION

[68]     Mr. Ellingson, please stand.

[69]     For the reasons provided, I order pursuant to s. 515(2) of the *Criminal Code* that you be released upon entering into a $5,000 recognizance, without deposit, but with two sureties in the amount of $75,000 on the following conditions:

a)     You must report in person to the bail supervisor at 275 East Cordova Street, Vancouver, British Columbia within 24 hours of your release from custody, unless you have obtained prior to your release, written permission from a bail supervisor to report elsewhere or within a different timeframe.  After that, you must report as directed by the bail supervisor, but no less than once per week and all reporting must be in person.

b)     You must reside at 710 East 6th Avenue, Vancouver, British Columbia and not change your residence without the advance written permission of your bail supervisor.

c)     You must provide your bail supervisor with any and all phone numbers at which you may be contacted, and you must not change those phone numbers without the advance written permission of your bail supervisor.

d)     You must obey a daily curfew by being in your residence between the hours of 5:00 p.m. and 6:00 a.m.  You must not leave your residence during these hours except for personal medical emergencies, or with the advance written permission of your bail supervisor, and on the terms and conditions set by the bail supervisor.

e)     You must present yourself immediately at the door to your residence or answer the phone when your bail supervisor or any other peace officer attends the residence or calls to check on you during your curfew.

f)     You must not leave British Columbia.

g)     Within 72 hours of your release from custody, you must surrender to the Vancouver Supreme Court Registry all of your travel documents, including any passport, Nexus card, travel visa or enhanced driver's licence, and thereafter, you must not obtain any further travel documents.

h)     You must carry a copy of your recognizance, as well as any written permission provided by your bail supervisor, at all times when you are outside of your residence.  If a peace officer stops you for any reason, you must immediately provide the peace officer with a copy of those documents without being asked to do so.

i)     You must not possess or consume drugs except in accordance with a medical prescription.

j)     You must not possess drug paraphernalia that is suitable for the sale or consumption of drugs that has not been prescribed for you.

k)     You must have no contact or communication, directly or indirectly, with Russell Ulbricht.

l)     You are prohibited from possessing a firearm, cross-bow, prohibited weapon, restricted weapon, prohibited device, ammunition, prohibited ammunition or explosive substance, or all of those things, until you are dealt with according to law.

2018 BCSC 1962 (CanLII)

2018 BCSC 1962 (CanLII)

m)     If you have any such items in your possession, prior to or immediately upon your release from custody, you must contact the Federal Serious Organized Crime Section of the Royal Canadian Mounted Police in Surrey, British Columbia, or have someone contact the Royal Canadian Mounted Police on your behalf, and make arrangements with a peace officer for the surrender of those items in compliance with the terms of this order.

[Discussion with counsel.]

[70]    THE COURT:  I will change the curfew hours to 6:00 p.m. to 6:00 a.m.  The exceptions, which are "personal medical emergencies … or advance permission [to be outside the residence] by the bail supervisor", will remain intact.

[Further discussion with counsel.]

[71]    THE COURT:  Term (a) of the recognizance will read: "You must report in person to a bail supervisor within 72 hours of your release from custody …"

"DeWitt-Van Oosten J."

# COURT OF APPEAL FOR BRITISH COLUMBIA

Citation:     *United States of America v. Virdi,*
              2016 BCCA 315

Date: 20160711
Docket: CA42370

2016 BCCA 315 (CanLII)

**In the Matter of the *Extradition Act*, S.C. 1999, c. 18, as amended**

Between:

**Attorney General of Canada on behalf of
the United States of America**

Respondent

And

**Jasvir Singh Virdi**

Appellant

Before:        The Honourable Mr. Justice Savage
               (In Chambers)

On appeal from:  An order of the Supreme Court for British Columbia,
dated November 21, 2014 (*United States of America v. Virdi*, 2014 BCSC 2349,
Vancouver Registry 26248).

## Oral Reasons for Judgment

| | |
|---|---|
| Counsel for the Appellant: | D. Markovitz |
| Counsel for the Respondent: | K. Swift |
| Place and Date of Hearing: | Vancouver, British Columbia<br>July 11, 2016 |
| Place and Date of Judgment: | Vancouver, British Columbia<br>July 11, 2016 |

2016 BCCA 315 (CanLII)

*Summary:*

*The applicant applied for an order that he be released from custody pending an application for leave to appeal to the Supreme Court of Canada against his surrender order for extradition. The same criteria apply on an application for release pending application for leave to appeal to the Supreme Court of Canada as does for release pending appeal to this Court. Held, application allowed, bail granted on conditions.*

[1]    **SAVAGE J.A.**:  Mr. Virdi applies for an order that he be released from custody pending an application for leave to appeal to the Supreme Court of Canada against his surrender order for extradition to the United States of America issued by the Minister of Justice on June 11, 2015.

[2]    In 2003, Mr. Virdi failed to report that he was carrying more than $10,000 upon entering Canada from Washington State. In 2008, he pleaded guilty to failing to report exportation of a monetary instrument in the U.S. District Court for the Western District of Washington, and signed a plea agreement admitting the offence. Later in 2008, he decided to no longer voluntarily subject himself to the proceedings and did not attend his sentencing hearing.

[3]    On November 21, 2014, Mr. Virdi was committed for extradition under s. 29(1) of the *Extradition Act*, S.C. 1999, c. 18 (the "*Act*"). On June 11, 2015, the Minister of Justice (the "Minister") ordered his surrender pursuant to s. 40 of the *Act*.

[4]    Mr. Virdi appealed his committal for extradition to be sentenced on a currency offence and tried on a charge of failing to appear. He also sought judicial review of the Minister's order for surrender. On July 7, 2016, his appeal was dismissed by this Court in *United States v. Virdi*, 2016 BCCA 291.

[5]    The same criteria apply on an application for release pending application for leave to appeal to the Supreme Court of Canada as does for release pending appeal to this Court: *Czech Republic v. Ganis*, 2007 BCCA 194 (Prowse J.A. in Chambers), leave to appeal ref'd [2007] S.C.C.A. No. 111.

2016 BCCA 315 (CanLII)

[6]      Section 20 of the *Act* incorporates by reference s. 679 of the *Criminal Code.* Section 679(3) of the *Criminal Code* provides that a justice of this Court may order an appellant be released from custody pending the determination of his appeal if the appellant establishes that:

> a)  the appeal or application for leave to appeal is not frivolous;
>
> b)  he will surrender himself into custody in accordance with the terms of the order; and
>
> c)  his detention is not necessary in the public interest.

[7]      "Frivolous" is a term of art. Frivolous appeals have been described as having "absolutely no possibility of success", "wasting the time of the Court" and being "doomed to failure": *United States of America v. Bennett*, 2014 BCCA 159 at para. 14.

[8]      The likelihood that the appellant will surrender himself into custody is evaluated by examining his previous compliance with bail conditions and other factors like his employment, family, and housing status.

[9]      However, the degree of risk of flight is enhanced where extradition proceedings have reached the final stage of appeal. In *Thailand v. Saxena*, 2006 BCCA 145, Madam Justice Saunders held Canada's international commitments play a part in such proceedings:

[13]    I recognize that there has been compliance with the terms established by Mr. Justice Oppal which I earlier generally described, and that the terms do severely limit the risk of flight. However, as Mr. Justice Oppal observed, no order of judicial interim release is foolproof against flight from the jurisdiction. <u>In my view, that residual risk is greater now that the extradition process is so far advanced and the decisions to date have favoured Thailand. The degree of risk of flight that may be acceptable in dealing with a person facing charges in Canada may not be acceptable when the issue is not just the individual facing up to the charges against him but also Canada's honour, good faith and satisfaction of its international commitments:</u> *United States of America v. Ross.* Given the late stage we are at with the consequent inherent and heightened attraction of flight, combined with the earlier experience in which Mr. Saxena put into motion machinery for flight. I am persuaded that he has not met the second criteria in this case.

[Emphasis added.]

[10]    The public interest component in s. 679(3)(c) of the *Criminal Code* involves a balancing of the principle of enforceability with the opposing principle of reviewability. Enforceability relates to the public interest in a person convicted of a serious offence being denied bail. Reviewability relates to the public interest in judgments being reviewed and errors corrected: *R. v. Mapara,* 2001 BCCA 508.

[11]    The strength of the grounds of appeal can be evaluated in this inquiry. The greater the seriousness of the offence, the stronger the grounds required to shift the balance from enforceability to reviewability: *R. v. Gingras; R. v. Porisky*, 2012 BCCA 467 at para. 31. While the offence is serious, it is much less serious than, for example, offences involving violence.

[12]    Mr. Virdi proposes two grounds for his leave to appeal to the Supreme Court:

    a)  The Court of Appeal erred in not remitting the arguments raised on appeal to the Minister for his Consideration.
    b)  The finding that it was "too late" to invoke his s. 6(1) rights under the *Charter* is an error in law and is of national importance.

[13]    In my view the grounds for his appeal are weak. That said, to say they are utterly devoid of merit or doomed to fail, may be stating the case too strongly.

[14]    With respect to the second factor, I am cognizant of the comments of Madam Justice Saunders in *Saxena*. The extradition proceeding is very advanced and all

decisions so far have gone against Mr. Virdi. The fact that Mr. Virdi chose to no longer participate in U.S. proceedings after pleading guilty weighs against his release. Although he argues that the plea was made in circumstances of duress, in my view the presumption of innocence has been displaced.

[15]     On the other hand, Mr. Virdi has abided by his bail conditions in the past. He has strong familial support: a wife of 46 years, adult children, and aging parents. He takes care of his family financially. He is under a contract of employment and has a steady residence. He has had a $250,000 surety in place during the proceedings and it is available again.

[16]     The material before me on balance satisfies the second criteria of the test has been met, namely, that he will surrender himself into custody in accordance with an order of this Court.

[17]     The third factor concerns the public interest. In this case, the balancing of reviewability and enforceability is important. There is a public interest in a person who has been convicted of a serious offence being denied bail. That said, the offence in this case is not one of violence or one where there is any obvious victim, such as a case of fraud, although it is still a serious offence. I am satisfied in this case that, despite the, perhaps, novel arguments, that the interests of reviewability are a factor here.

[18]     In the result, I would grant bail on the conditions that applied to Mr. Virdi while his appeal was outstanding to this Court, and on the further condition that he surrender himself into custody on the date prior to the determination of his application for leave to appeal to the Supreme Court of Canada.

[submissions]

[19]     The appellant, unless he is detained for some cause other than the within extradition proceedings, will be released from custody pending the determination of his appeal of committal order and judicial review upon the appellant entering into a

2016 BCCA 315 (CanLII)

recognizance with one or more sureties in the sum of $250,000 with the conditions that follow:

(a)     The appellant shall keep the peace and be of good behaviour.

(b)     The appellant shall report, in person, to the Bail Supervisor, 275 East Cordova Street, Vancouver, British Columbia, within 72 hours upon his release and thereafter as directed by the Bail Supervisor once per week, alternating one week in person and the following week by telephone.

(c)     The appellant shall remain in the Province of British Columbia at all times unless he has obtained the written consent of the Bail Supervisor or further Order of the Court.

(d)     The appellant shall reside at 6713 - 124A Street, Surrey, British Columbia and shall not change his address without the prior written permission of his Bail Supervisor.

(e)     The appellant shall surrender all travel documents including valid or expired passports and visas, if any, to the Registrar of this Court, and shall not apply for any new travel documents.

(f)     The appellant shall not be found outside of his Residence between the hours of 12:00 a.m. and 6:00 a.m. except as follows: a) with the prior written permission of the Bail Supervisor. Such consent is to be given only for compelling personal, family, employment or medical reasons; b) when travelling directly to or returning directly from his place of employment or while in the course of his employment. The appellant shall provide the Bail Supervisor with written proof of employment if requested to do so; c) in the event of a medical emergency and then only when travelling directly or returning directly from a hospital emergency ward; d) when travelling directly or returning directly from a scheduled court appearance or a scheduled appointment with his Bail Supervisor.

2016 BCCA 315 (CanLII)

(g)     The appellant shall respond personally and immediately to the telephone when a Peace Officer or Bail Supervisor makes a telephone call to his residence for the purpose of determining his compliance with the curfew condition of this Order.

(h)     The appellant shall present himself at the door of his residence at the request of a Peace Officer who attends for the purpose of checking his compliance with these conditions.

(i)     The appellant shall not have any contact, directly or indirectly with Amrik Cheema.

(j)     The appellant shall carry a copy of this recognizance with him at all times when not at his residence.

(k)     The appellant shall surrender himself into custody at the Sheriff's Office at the Law Courts, 800 Smithe Street, Vancouver, British Columbia, on whichever of the following dates occur first:

> i.     the day prior to the date set for the release of the decision of the Supreme Court of Canada for the delivery of the judgment of his leave application. If that day follows a statutory holiday, then surrender shall be on the immediately previous non-weekend work day;

> ii.     if he abandons his leave application to the Supreme Court of Canada, within 24 hours of the day he abandons his leave application; or

> iii.     at 9:00 a.m. on Tuesday, October 11, 2016.

"The Honourable Mr. Justice Savage"

2016 BCCA 315 (CanLII)

# COURT OF APPEAL FOR ONTARIO

DATE: 20170208
DOCKET: M47407

Laskin J.A. (In Chambers)

BETWEEN

The Attorney General of Canada on behalf of the United States of America

Responding Party

and

Delroy McGowan

Applicant

James Lockyer and Gabriel Gross-Stein, for the applicant

Adrienne Rice, for the responding party

Heard: January 23, 2017

## ENDORSEMENT

[1]     Delroy McGowan has been committed for extradition. He applied under s. 20(b) of the *Extradition Act*[1] for bail pending the Minister's surrender decision. On January 23, 2017, I granted him bail with reasons to follow. These are my reasons.

---

[1] S.C. 1999, c. 18.

2017 CanLII 94592 (ON CA)

2017 CanLII 94592 (ON CA)

## A.   BACKGROUND

[2]   The background is unusual. In 2001, McGowan was charged in Cook County, Illinois with possession of and trafficking in 105 kilograms of marijuana. He attended court dates until early May 2004. Then he received advice from his counsel that if convicted, he could face 30 to 60 years in jail. He fled to Jamaica and in November 2004, he was convicted in his absence. In February 2005, he was sentenced to 16 years in custody, again in his absence.

[3]   In 2006, McGowan immigrated to Canada and has been living here ever since in Brampton, Ontario. In 2009, he became a Canadian citizen. He is engaged to be married, and in 2014, he and his fiancée bought a house together. They have extensive family in the Brampton area. Until these present proceedings, McGowan worked as a train master for CN. He is now 44 years old. Apart from his convictions in Illinois, he has no criminal record.

## B.   EXTRADITION PROCEEDINGS

[4]   In April 2016, McGowan's mother died in Jamaica. He went to renew his passport so he could go to the funeral. He was then arrested under the *Extradition Act*.

[5]   On June 10, 2016, Durno J. released McGowan on a recognizance of bail in the amount of $750,000 pending his committal hearing. He has five sureties,

four relatives of his and his fiancée. He has complied with all of the conditions of his release.

[6]     On January 23, 2017, McGowan consented to his committal for extradition. He now seeks bail pending the Minister's surrender decision.

## C.     DISCUSSION

[7]     Under s. 20 of the *Extradition Act*, the criteria for bail in s. 679 of the *Criminal Code* apply "with any modifications that the circumstances require". The criteria for bail under s. 679(3) of the *Code* are threefold. McGowan must show:

> 1.     The application – in his case his request not to be surrendered for extradition – is not frivolous;
> 2.     He will surrender himself into custody when ordered; and
> 3.     His detention is not necessary in the public interest.

[8]     I was satisfied McGowan met this three-part test.

### (a) McGowan's application is not frivolous

[9]     In the typical application for bail pending appeal of a committal order, or pending the Minister's surrender decision, the applicant has not yet been convicted. This case is different. McGowan has been convicted, which may suggest that his position on the merits is not strong. I accept that to be so. But although his request not to be surrendered may not be strong, I cannot say it is frivolous. The Minister has a broad discretion under s. 44(1)(a) of the *Extradition Act* to refuse to make a surrender order if satisfied that the order "would be unjust

2017 CanLII 94592 (ON CA)

Page:  4

2017 CanLII 94592 (ON CA)

or oppressive having regard to all the relevant circumstances". Here, those circumstances include:

- McGowan was tried and sentenced in his absence, a procedure not permitted under Canadian law;

- Section 47(b) of the Extradition Act specifically provides that the Minister may refuse to make a surrender order if the person was convicted in his or her absence and could not, on surrender, have the case reviewed. Admittedly McGowan was convicted in his absence because he chose not to appear for his trial. Moreover, on the material submitted to me it is unclear whether, if surrendered, McGowan could have his case reviewed in Illinois. Still, I cannot dismiss out of hand the relevance of s. 47(b) to the Minister's surrender decision;

- The sentence of 16 years for a marijuana offence seems high, despite the large quantity of the drug involved;

- McGowan is a Canadian citizen and has been a contributing member of the community with substantial family support for a decade.

### (b) McGowan will surrender into custody when ordered

[10]   In one sense, as the Crown argued, McGowan has been a fugitive from justice for over a decade. But I am satisfied he will surrender himself into custody if required to do so.

[11]   He appeared for his extradition hearing and consented to committal knowing he may be sent back to the United States. He has complied fully with his terms of release. Durno J., in lengthy reasons, found McGowan "to be a candid and truthful witness". Durno J. also found McGowan's sureties to be "terrific", "diligent", and "exceptional". He especially found McGowan's cousin Stafford

Page:  5

2017 CanLII 94592 (ON CA)

Lowe, a school vice-principal, to be a person who would ensure that all the sureties and McGowan himself were fulfilling their obligations. Moreover, McGowan is subject to electronic monitoring and has no passport. He is not a flight risk.

### (c) McGowan's detention is not necessary in the public interest

[12]   After careful consideration, and taking account of Canada's obligations to the United States in extradition proceedings, Durno J. concluded that McGowan's detention was not necessary to achieve the purpose of maintaining confidence in the administration of justice. Durno J. reached that conclusion likely knowing that McGowan's committal for extradition was inevitable.

[13]   I see no reason to second guess Durno J.'s conclusion, especially in the light of his strong findings on McGowan's credibility and the credibility of McGowan's sureties. Moreover, McGowan has been living in Ontario for over ten years. Up until last April, no extradition proceedings were taken against him. The public interest would not be adversely affected if McGowan remained on bail for a few more months as the Minister considers her surrender decision.

### D.    CONCLUSION

[14]   McGowan is released on bail pending the Minister's surrender decision on the terms of the release order, which I have already signed.

"John Laskin J.A."

**Singh c. Attorney General of Canada**                    **2017 QCCS 3379**

# SUPERIOR COURT
### (Criminal and Penal Division)

CANADA
PROVINCE OF QUEBEC
DISTRICT OF MONTREAL


No:     500-36-008575-170 / 500-36-008576-178


DATE:  July 24, 2017
_____

**BY THE HONOURABLE  DANIEL ROYER, J.S.C.**
_____

**CHARAN SINGH**
         Applicant
v.
**THE ATTORNEY GENERAL OF CANADA, on behalf of the United States of America**
         Respondent
AND
**GUY DELAND**
         Applicant
v.
**THE ATTORNEY GENERAL OF CANADA, on behalf of the United States of America**
         Respondent
_____

JUDGMENT RENDERED ORALLY ON JULY 19, 2017[1]
_____


[1]     The decision will apply to both applicants.

_____

[1]    This judgment was originally given orally in open court. As permitted by *CCP* art. 334 and according to *Kellogg's Company of Canada* v. *Procureur général du Québec*, [1978] C.A. 258, pp. 259 and 260, the Court has modified the text solely to improve presentation and understanding.

2017 QCCS 3379 (CanLII)

2017 QCCS 3379 (CanLII)

## I.    OVERVIEW

[2]     Guy Deland and Charan Singh, Canadian citizens, are requested by the Western District of New York to stand trial on criminal charges related to weapons trafficking and firearms exportation.

[3]     We know from the summary of the facts sent by the US Department of Justice and from the testimony of the RCMP officer, Mathew Howell that the applicants tried to traffic and export firearms illegally without getting the licence permitting them to do so. Thus, we must conclude that there is nevertheless a legal way to do it. The evidence submitted also shows that the undercover agent was offered a Blackberry with a special feature to erase information transmitted by the members of the group who all used these kind of devices for communication.

[4]     The United States of America will submit a request for extradition to the Canadian authorities within 60 days after the provisional arrests. Messrs. Deland and Singh were arrested on June 21, 2017 following the issuance of a provisional arrest warrant. They are detained since then.

[5]     They are applying for a judicial interim release while the extradition procedures are pending. The Attorney General of Canada, representing the United States of America, opposes the release of the applicants. In the case of Mr. Singh, the Attorney General contends that the detention is necessary to ensure his attendance in court mostly because of the serious risks of flight created by the gravity of the offences and the significant penalties attached to the conviction.

[6]     The Attorney General also contends that the detention is necessary to maintain confidence in the administration of justice. Moreover, in the case of Mr. Deland, the Attorney General also contends that the detention is necessary for the protection or safety of the public mostly because of his prior extradition case.

## II.    GUARANTEES OFFERED BY THE APPLICANTS

[7]     The applicants offer certain guarantees to convince the Court to grant them bail.

[8]     Mr. Deland solemnly declares that he will commit to respecting all the conditions imposed by the Court. He will reside with his girlfriend Stephanie Devine at the same place he has been residing for the last seven years with her two children, aged 11 and 15 whom he is taking care of. He has no criminal record in Canada but was convicted in 2009 in the United States of America for a fraud case. He is willing to keep the peace and have a good behavior, be present to each court dates, sign an engagement without deposit for an amount of $10,000, remit his Canadian passport and abstain from applying for a new one, report to a police station once a week and respect a curfew.

[9]     Stephanie Devine, who has been residing with Mr. Deland during the last seven years, solemnly declares that he is taking care of her two children. She will formally

commit to contact the police if Mr. Deland breaches his conditions. She is willing to engage herself for an amount of $5,000 without deposit plus $10,000 with deposit to ensure that he respects his conditions. She is aware of the seriousness of the expected accusations.

[10]    As for Mr. Singh, he solemnly declares that he will commit to respecting the conditions that could be imposed. He will reside with his wife and three children at the same place he has been residing for over ten years. He has a prior conviction of fraud, one of driving while impaired and one of failure to stop at the scene of an accident. He is willing to keep the peace and have a good behavior, attend court when required, surrender his Canadian and Malaysian passports and sign an engagement without deposit of $10,000. According to his testimony, he works as a truck driver for D Square Transports.

[11]    Mr. Singh's wife, Satwant Sidhu, solemnly declares that she has been married to Mr. Singh since 1995, that they have three children together that still reside at home and that she will alert the police if Mr. Singh breaches his conditions. She is willing to act as a surety and make a deposit of $25,000 and could also obtain another mortgage on the house if necessary. She is also aware of the seriousness of the expected accusations.

## III.    BURDEN OF PROOF UNDER SECTION 515(10) OF THE *CRIMINAL CODE*

[12]    The Attorney General submits that the onus is on the applicants to satisfy the Court that their detention is not justified under the three grounds set out by the *Criminal Code*. The submission is founded according to section 515(6)(a)(vi) of the *Criminal Code* as the equivalent Canadian offences of weapons trafficking and firearms exportation refer to sections 99 and 103 of the *Criminal Code*. There is a reversal of onus for these charges in a judicial interim release hearing. Mr. Deland and Mr. Singh plead that what occurred is at best a failed attempt to export firearms. The reversal of onus would not apply to attempts to commit crimes. Furthermore, section 99 would not apply to this case since the applicants are not the sellers. The Court will not decide on the issue since the applicants satisfy the burden on the three grounds of the analysis pursuant to section 515(10) of the *Criminal Code*.

## IV.    ANALYSIS

[13]    On the first ground of the analysis, the Court cannot agree that the risk of flight is serious because the applicants are facing serious penalties associated with the charged offences. That reasoning would render bail exceptional in the extradition process.

[14]    There is nothing in the evidence presented in this judicial interim release hearing suggesting that the applicants will not comply with the conditions that would be imposed on them. Moreover, the information provided by the Western District of New York's Department of Justice indicates that Mr. Deland has been on a supervised release for a

2017 QCCS 3379 (CanLII)

2017 QCCS 3379 (CanLII)

period of three years following his sentence of imprisonment in 2009. There is no indication that he has not complied with the terms of his release conditions. The facts related to his extradition in 2005 are 20 years old. It is worth saying that Mr. Deland was not detained until the committal hearing in this previous extradition case and there is no indication he has breached his conditions then.

[15]    As for Mr. Singh, except for the failure to stop at the scene of an accident, the two other previous convictions are also more than 20 years old.

[16]    The undertakings made by the applicants and their wife or girlfriend are sufficient to guarantee their presence in Court. The fact that both the applicants have resided with their wife or girlfriend and children for many years considerably diminishes the risk of flight. Mr. Deland and Ms. Devine have less to offer than Mr. Singh and his wife. That is not a reason to deny bail since it is all they have. The Court also reminds that it is a job to work at home for the family by cooking, doing the laundry and taking care of the children.

[17]    The Court finds that the applicants have fulfilled the burden on the first ground of the analysis.

[18]    On the second ground, the Court cannot follow the Attorney General's contention that Mr. Deland would represent a danger to the public while Mr. Singh would not. The argument is based mostly on Mr. Deland's previous extradition case. The fact is that Mr. Deland did not commit offences during these extradition procedures which concern facts that happened 20 years ago. Mr. Deland has no previous conviction in Canada. Apart from the nature of the charges, there is nothing in evidence suggesting that either of the applicants represent a danger for the public. The applicants have fulfilled the burden on the second ground of the analysis.

[19]    On the third ground, the detention is not necessary to maintain confidence in the administration of justice. The strength of the case is difficult to evaluate at this point. While the offences are serious and the applicants are liable, on conviction, for a substantial term of imprisonment, the extent of their participation in the crimes is not clear at the moment, neither is the real length of imprisonment they are facing. The maximum sentence of 85 years of imprisonment is not a reliable indication of the real term of imprisonment the applicants are facing.

[20]    In the present case and in regard to all the circumstances, a well-informed and reasonable public would not be shocked by the judicial release of the applicants during the extradition process. This public would also be informed that the RCMP officer Mathew Howell has testified that Mr. Aydan Sin, allegedly the head of this criminal group and Mr. Deland's superior, was also arrested and granted bail during the extradition process.

**FOR THESE REASONS:**

[21]    The motions for judicial interim release are granted.

[22]    Both applicants are granted bail.

[23]    The conditions will be as follows:

[24]    For Mr. Guy Deland :

    24.1.    Stephanie Devine will act as surety and make a cash deposit of $10,000 at the Office of the Superior Court and a recognizance of $10,000 without deposit;

    24.2.    Mr. Deland will keep the peace, be of good behaviour and appear in Court whenever required;

    24.3.    He will turn in his Canadian passport to the Office of the Superior Court prior to his release and abstain from applying for a new passport or travel document from any country;

    24.4.    He will remain within the Province of Québec;

    24.5.    He will reside at [...27] in Pierrefonds, Québec [...];

    24.6.    He will not change address without prior authorization of the Court;

    24.7.    He will be at this address between 11:00 p.m. and 6:00 a.m. except for reasons of legitimate employment or medical emergencies;

    24.8.    He will provide a landline telephone number registered to this address and answer any calls made by law enforcement during his curfew. This number will be [...82];

    24.9.    He will not communicate with Charan Singh or Aydan Sin except in the presence of their attorneys and for the preparation of his extradition hearing;

    24.10. He will not possess any firearm, cross-bow, prohibited weapon, restricted weapon, prohibited device, ammunition, prohibited ammunition or explosive substance, or all those things as defined by the *Criminal Code*;

    24.11. He will report to the RCMP station located at 2200 Reverchon, Suite 288, Dorval, Québec, between 9:00 a.m. and 4:00 p.m. and sign the register twice a week on Mondays and Wednesdays beginning on the first

2017 QCCS 3379 (CanLII)

500-36-008575-170/500-36-008576-178                                      PAGE: 6

Monday or Wednesday after his release.

[25]    For Mr. Charan Singh:

25.1.   Satwant Sidhu will act as surety and make a cash deposit of $10,000 at the Office of the Superior Court and a recognizance of $100,000 without deposit;

25.2.   Mr. Singh will keep the peace, be of good behaviour and appear in Court whenever required;

25.3.   He will turn in his Canadian and Malaysian passports to the Office of the Superior Court prior to his release and abstain from applying for a new passport or travel document from any country;

25.4.   He will remain within the Province of Québec;

25.5.   He will reside at [...] in L'Île-Perrot, Québec [...];

25.6.   He will not change address without prior authorization of the Court;

25.7.   He will be at this address between 11:00 p.m. and 6:00 a.m. except for reasons of legitimate employment or medical emergencies;

25.8.   He will provide a landline telephone number registered to this address and answer any calls made by law enforcement during his curfew. This number will be [...44];

25.9.   He will not communicate with Guy Deland or Aydan Sin except in the presence of their attorneys and for the preparation of his extradition hearing;

25.10.  He will not possess any firearm, cross-bow, prohibited weapon, restricted weapon, prohibited device, ammunition, prohibited ammunition or explosive substance, or all those things as defined by the *Criminal Code*;

25.11.  He will report to the RCMP station located at 2200 Reverchon, Suite 288, Dorval, Québec, between 9:00 a.m. and 4:00 p.m. and sign the register once a week on Fridays beginning on the first Friday after his release.

_____
DANIEL ROYER, J.S.C.

500-36-008575-170

2017 QCCS 3379 (CanLII)

500-36-008575-170/500-36-008576-178                                          PAGE: 7

Me Louis-Nicholas Coupal-Schmidt
Coupal Chauvelo s.a.
Attorney for Charan Singh

Me Maguy Hachem
Substitute Attorney General of Canada, on behalf of the United Stated of America
Attorney for the Respondent

500-36-008576-178
Me Caroline Braun
Me Nicolas Welt
Aide juridique de Montréal
Attorneys for Guy Deland


Me Maguy Hachem
Substitute Attorney General of Canada, on behalf of the United Stated of America
Attorney for the Respondent

Hearing Date:        July 19, 2017

2017 QCCS 3379 (CanLII)