1  DAVID L. ANDERSON (CABN 149604)
   United States Attorney
2
   HALLIE HOFFMAN (CABN 210020)
3  Chief, Criminal Division

4  KERRY A. MONACO (NYBN 4712360)
   Trial Attorney, U.S. Department of Justice
5
   MAUREEN C. BESSETTE (CABN 165775)
6  Assistant United States Attorney

7       1301 Clay Street, Suite 340S
        Oakland, California 94612
8       Telephone: (510) 637-3680
        Fax: (510) 637-3724
9       Maureen.bessette@usdoj.gov

10 Attorneys for United States of America

11              UNITED STATES DISTRICT COURT

12             NORTHERN DISTRICT OF CALIFORNIA

13                   OAKLAND DIVISION

14 IN THE MATTER OF THE EXTRADITION    )  CASE NO. 4:19-MJ-70677 MAG
   OF DONALD KOLLMAR                   )
15                                     )  UNITED STATES REPLY TO KOLLMAR'S
                                       )  OPPOSITION TO EXTRADITION
16                                     )
                                       )  January 30, 2020 at 1:30 p.m.
17                                     )  Hon. Kandis A. Westmore
                                       )  Courtroom: #4
18 _____    )

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

INTRODUCTION ..............................................................................................................1

ARGUMENT ..................................................................................................................2

I.  The Crimes for Which Kollmar's Extradition Is Sought Satisfy the Dual Criminality Requirement.....2

    A.    The Conduct Underlying the Rape Charge Would Be Criminal if Committed in the United States .................................................................................3

    B.    The Conduct Underlying the Indecent Assault Charge Would Be Criminal if Committed in the United States .................................................................5

II.  The Extradition Request Contains Sufficient Evidence of Probable Cause ..........................................7

    A.    Canada's Evidence Establishes Probable Cause that Kollmar Committed Rape ...............9

    B.    Canada's Evidence Establishes Probable Cause that Kollmar Committed Indecent Assault.................................................................................11

    C.    Kollmar's Attempt to Undermine the Victim's Credibility in this Extradition Proceeding is Inappropriate .................................................12

III.  Kollmar's Extradition Is Not Barred Due To Lapse in Time .........................................................15

    A.    Extradition Is Not Barred By Principles in Canada's Charter of Rights and Freedoms.................................................................................16

    B.    The Treaty Does Not Bar Extradition Based on the California Statute of Limitations .................................................................................18

CONCLUSION................................................................................................................21

1

## **TABLE OF AUTHORITIES**

2

Cases

3    *Ahmad v. Wigen*, 726 F. Supp. 389 (E.D.N.Y. 1989), *aff'd*, 910 F.2d 1063 (2d Cir. 1990) ............... 8, 13

4    *Arias Leiva v. Warden*, 928 F.3d 1281 (11th Cir. 2019) ..................................................... 17

5    BankAmerica Pension Plan v. McMath, 206 F.3d 821 (9th Cir. 2000) .................................. 8

6    *Barapind v. Enomoto*, 400 F.3d 744 (9th Cir. 2005) ........................................................ 12

7    *Bovio v. United States*, 989 F.2d 255 (7th Cir. 1993) ...................................................... 13

8    *Bruce v. Terhune*, 376 F.3d 950 (9th Cir. 2004) .............................................................. 7

9    *Caplan v. Vokes*, 649 F.2d 1336 (9th Cir. 1981) ............................................................. 2

10    *Charlton v. Kelly*, 229 U.S. 447 (1913) ...................................................................... 12

11    *Choe v. Torres*, 525 F.3d 733 (9th Cir. 2008) ........................................................ 12, 17

12    *Clarey v. Gregg*, 138 F.3d 764 (9th Cir. 1998) ........................................................... 2, 4

13    *Collins v. Loisel*, 259 U.S. 309 (1922) ................................................................... 8, 13

14    *Commonwealth v. Bethlehem*, 570 A.2d 563 (Pa. Super. Ct. 1989) ................................. 20

15    *Cucuzzella v. Keliikoa*, 638 F.2d 105 (9th Cir. 1981) ...................................................... 2

16    Emami v. U.S. Dist. Court for the N. Dist. of Cal., 834 F.2d 1444 (9th Cir. 1987) ............... 6, 13

17    *Glucksman v. Henkel*, 221 U.S. (1911) ..................................................................... 19

18    *Harshbarger v. Regan*, 599 F.3d 290 (3d Cir. 2010) ..................................................... 20

19    *In re Extradition of Kraiselburd*, 786 F.2d 1395 (9th Cir. 1986) ...................................... 16

20    *In re Extradition of Shaw*, No. 14-CV-81475-WM, 2015 WL 3442022 (S.D. Fla. May 28, 2015) ......... 13

21    *In re Wadge*, 15 F. 864 (S.D.N.Y. 1883) .................................................................... 13

22    *Kamrin v. United States*, 725 F.2d 1225 (9th Cir. 1984) ............................................. 16, 18

23    *Kolovrat v. Oregon*, 366 U.S. 187 (1961) ................................................................... 17

24    *Martin v. Warden, Atlanta Penitentiary*, 993 F.2d 824 (11th Cir. 1993) ............................ 17

25    *Martinez v. United States*, 828 F.3d 457 (6th Cir. 2016) ........................................... 16, 17

26    *Matter of Extradition of Atta*, 706 F. Supp. 1032 (E.D.N.Y. 1989) .................................. 13

27    Matter of Requested Extradition of Kirby, 106 F.3d 855 (9th Cir. 1996) .............................. 16

28    *Matter of the Extradition of Martinelli Berrocal*, 2017 WL 3776953 (S.D. Fla. Aug. 31, 2017) ........ 8, 13

*Matter of the Extradition of Sylvester*, 2006 WL 6323514 (M.D. Pa. Feb. 14, 2006)..............................20

*People v. Young*, 105 P.3d 487 (Cal. 2005) ....................................................................8

*Quinn v. Robinson*, 783 F.2d 776 (9th Cir. 1986)................................................13, 14, 19

*Santos v. Thomas*, 830 F.3d 1002- (9th Cir. 2016) ........................................................12

*Shapiro v. Ferrandina*, 478 F.2d 894 (2d Cir. 1973)......................................................13

Sumitomo Shoji America, Inc. v. Avagliano, 457 U.S. 176 (1982) .....................................19

*Theron v. U.S. Marshal*, 832 F.2d 492 (9th Cir. 1987)................................................2, 20

United States ex rel. Sakaguchi v. Kaululukui, 520 F.2d 726 (9th Cir.1975) .........................19

*United States v. Garfias*, 2009 WL 2580641 (N.D. Cal. Aug. 20, 2009) ..........................2, 16

*Yapp v. Reno*, 26 F.3d 1562 (11th Cir. 1994) ............................................................16, 17

*Yordanov v. Milusnic*, 250 F. Supp. 3d 540 (C.D. Cal. 2017) ...........................................6

Statutes

18 U.S.C. § 2243 ..................................................................................4, 5, 6, 20

18 U.S.C. § 2243(a) ..................................................................................4, 5, 6

18 U.S.C. § 2244 ..................................................................................6, 20

18 U.S.C. § 2244(a)(3) ..................................................................................5, 6

18 U.S.C. § 2246(2)(A) ..................................................................................4, 6

18 U.S.C. § 2246(3) ..................................................................................6

18 U.S.C. § 3299 ..................................................................................20

California Penal Code § 261 ..................................................................................3

California Penal Code § 261(a)(2) ..................................................................................3

California Penal Code § 261(b) ..................................................................................4

California Penal Code § 261.5 ..................................................................................5

California Penal Code § 263 ..................................................................................3

California Penal Code § 264(c)(2) ..................................................................................4

California Penal Code § 288(a) ..................................................................................7

California Penal Code § 288(a)(c) ..................................................................................7

California Penal Code § 288(c)(1) ..................................................................................7

Criminal Code of Canada Section 143(a) ............................................................. 9, 10

Criminal Code of Canada Section 143(b) ................................................................. 9

Criminal Code of Canada Section 149 ..................................................................... 11

Treaties

*Treaty on Extradition Between the United States of America and Canada*, U.S.-Can., Dec. 3, 1971, 27 U.S.T. 983, as amended by the *Protocol Amending the Extradition Treaty with Canada*, U.S.-Can., Jan. 11, 1988, S. TREATY DOC. NO. 101-17 (1990), and the *Second Protocol Amending the Extradition Treaty with Canada*, U.S.-Can., Jan. 12, 2001, S. TREATY DOC. NO. 107-11 (2002) (collectively the "Treaty") ......................................................................................... passim

Secondary Authorities

U.S. Customs and Border Protection *Western Hemisphere Travel Initiative (WHIT) Frequently Asked Questions*, https://www.cbp.gov/print/293511 (last visited January 3, 2020) ...................................... 15

# INTRODUCTION

On July 10, 2019, the United States, on behalf of Canada and in accordance with the United States' treaty obligations, filed its Memorandum of Law in Support of the Extradition of Donald Kollmar ("Kollmar") to Canada, pursuant to the Extradition Treaty between the United States and Canada.  Canada is seeking Kollmar's extradition so that he may face trial on one count of rape and one count of indecent assault.  Kollmar filed his Memorandum in Opposition to Extradition on December 10, 2019.

Kollmar presents three challenges to the certification of his extradition.  All of his arguments lack merit.  *First*, he argues that the crimes for which he is sought in Canada are not extraditable offenses because they do not equate to U.S. criminal offenses.  However, as set forth below, he is applying the wrong legal standard for determining dual criminality, and under the correct conduct-based test, dual criminality is satisfied.  *Second*, he erroneously asserts that Canada failed to present sufficient evidence to establish probable cause and inappropriately attempts to submit contradictory evidence in an effort to undermine the victim's credibility.  As explained below, the extradition request and accompanying documentary evidence are more than sufficient to establish a reasonable belief that Kollmar committed the crimes for which his extradition is sought, which is all that is required in this extradition proceeding.  *Third*, Kollmar is incorrect that his extradition is barred by lapse of time.  The Treaty bars extradition only if the Canadian statute of limitations has run, and as set forth in the extradition request, the crimes for which extradition is sought are not subject to any statute of limitations period in Canada.  Accordingly, the Court should certify Kollmar's extradition to the Secretary of State for surrender to Canada.

///

///

///

1

**ARGUMENT**

2   **I.    The Crimes for Which Kollmar's Extradition Is Sought Satisfy the Dual Criminality Requirement**

3

4           Pursuant to Article 2 of the Treaty, "extradition shall be granted for conduct which constitutes an

5   offense punishable by the laws of both Contracting Parties by imprisonment or other form of detention

6   for a term exceeding one year or any greater punishment." ECF 39-1 at bates 85.  To determine whether

7   this dual criminality requirement is met, the Court looks to the description of the criminal conduct

8   provided by Canada in support of its charges and determines whether that conduct would be criminal

9   under U.S. federal law, the law of the state in which the hearing is held, or the law of a preponderance of

10  the states.[1]  *See*, *e.g.*, *Cucuzzella v. Keliikoa*, 638 F.2d 105, 107 (9th Cir. 1981); *Caplan v. Vokes*, 649

11  F.2d 1336, 1334 n.16 (9th Cir. 1981); *Theron v. U.S. Marshal*, 832 F.2d 492, 496 (9th Cir. 1987)

12  (abrogated on other grounds).

13          It is the nature of the fugitive's conduct, not the elements of the foreign offense, that controls

14  which U.S. offense is most analogous for purposes of determining dual criminality.  *See*, *e.g., Clarey v.*

15  *Gregg*, 138 F.3d 764, 766 (9th Cir. 1998) ("The primary focus of dual criminality has always been on

16  the conduct charged; the elements of the analogous offenses need not be identical."); *United States v.*

17  *Garfias*, 2009 WL 2580641, at *4 (N.D. Cal. Aug. 20, 2009) ("More significantly, when a U.S. court

18  determines which offense is the most analogous to the one charged by the foreign country for extradition

19  purposes, the court should focus on the "nature of [the] conduct," not just the charging label applied in

20  the requesting state") (quoting *Clarey*, 138 F.3d at 766).  Contrary to Kollmar's contentions, ECF 66-1

21  at 27, 28-29, it is therefore irrelevant whether the foreign statute criminalizes more conduct than the U.S.

22  statute.  *E.g.*, *Clarey*, 138 F.3d at 765 (rejecting a fugitive's argument that dual criminality was not

23  satisfied because the foreign statute criminalized more conduct than the U.S. statute and stating,

24  "differences between statutes aimed at the same category of conduct do not defeat dual criminality.").

25  Instead, the relevant inquiry is whether the conduct underlying the charges for which Canada seeks

26

27          [1] While Kollmar states that he "preserves" his argument that only federal law, and not state law, should be considered when determining dual criminality, he does not provide any authority for his

28  position or otherwise contest the cases cited by the government in its initial brief.  ECF 66-1 at 28.

1  Kollmar's extradition would have violated either U.S. federal or state laws at the time Canada requested

2  Kollmar's extradition.  Applying this correct conduct-based test, it is clear that Kollmar's conduct

3  underlying the charges of rape and indecent assault would be criminal under U.S. law.[2]

4         **A.**      **The Conduct Underlying the Rape Charge Would Be Criminal if Committed in the**

5                  **United States**

6         With respect to the charge of rape, the extradition request states that the charge is based on

7  conduct that occurred on the weekend of Mother's Day in 1977, specifically when the victim was 14

8  years' old.[3]  ECF 39-1 at bates 15.  Specifically, it is alleged that on that date, Kollmar partially

9  penetrated the victim's vagina with his penis without her "genuine consent," as demonstrated by her lack

10  of desire for the sexual contact and her "constant fear of Kollmar, who exploited his position of

11  authority over her" and who physically assaulted her and threatened to physically assault her on several

12  occasions.  *Id.* at 15-16.

13         Kollmar concedes that dual criminality has been established on this charge because of the

14  Canadian rape offense equates to California Penal Code § 261.[4]  ECF 66-1 at 30-31.  Indeed, the

15  conduct described in the extradition request would satisfy the elements of California Penal Code § 261,

16  which provides, "Rape is an act of sexual intercourse accomplished with a person not the spouse of the

17  perpetrator, under any of the following circumstances . . . Where it is accomplished against a person's

18  will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the

19  person or another."  California Penal Code § 261(a)(2).  Any amount of sexual penetration is sufficient

20  to complete the crime of rape.  California Penal Code § 263.  Further, for purposes of California's rape

21  statute, "duress" is defined as:

22

23       [2] Significantly, Kollmar fails to present any arguments as to why the underlying conduct charged
in Canada would not be criminal in the United States.  ECF 66-1 at 27-31.  Instead, he appears to

24  misunderstand the bases for the Canadian charges and attempts to confuse the issues by engaging in a
convoluted comparison of the elements of the Canadian and U.S. offenses.  *Id.* at 27-30.  However, as

25  discussed *supra*, that is not the correct analysis for determining whether dual criminality exists.

26       [3] The victim's date of birth is ███████.  ECF 55 at PDF 97.  According to Kollmar's
passport, Kollmar was born on █████████.  ECF 64-1 at PDF 131 (Kollmar's U.S. passport).

27       [4] It appears Kollmar may have reached this conclusion by applying an incorrect analysis.  As a
result, the government provides this Court with a thorough explanation of how dual criminality is

28  established for the rape charge.

> A direct or implied threat of force, violence, danger, or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to perform an act which otherwise would not have been performed, or acquiesce in an act to which one otherwise would not have submitted. The total circumstances, including the age of the victim, and his or her relationship to the defendant, are factors to consider in appraising the existence of duress.

California Penal Code § 261(b).  Rape is punishable by up to 11 years' imprisonment when the victim is a 14-year-old child.  California Penal Code § 264(c)(2).

The extradition request described conduct that would satisfy all of the elements of a rape charge under California law.  Specifically, Kollmar is accused of penetrating the victim's vagina with his penis against the victim's will by means of duress.  Indeed, the extradition request demonstrates that, the victim, who was 14 years' old at the time, did not want the sexual contact with Kollmar, and she acquiesced out of fear stemming from Kollmar's position of authority over her, past incidents of physical violence against her, and past threats of physical violence against her.  ECF 39-1 at bates 16. Accordingly, Kollmar's alleged conduct underlying the Canadian rape charge could be charged as rape under California law.  Dual criminality on the charge of rape is therefore satisfied.

Additionally, Kollmar's conduct underlying the rape charge could be charged in the United States under 18 U.S.C. § 2243(a).  Section 2243(a) makes it a crime punishable by up to 15 years' imprisonment for a person to, *inter alia*, "knowingly engage[] in a sexual act with another person who has attained the age of 12 years but has not attained the age of sixteen years" when the victim "is at least four years younger than the person so engaging."  Here, Canada is charging Kollmar with knowingly penetrating the victim's vagina with his penis, unquestionably a sexual act defined in 18 U.S.C. § 2246(2)(A), when the victim was 14 years old and he was more than four years older than her.  ECF 39-1 at bates 15; *see supra* note 3.  The elements of 18 U.S.C. § 2243(a) are therefore satisfied.

Kollmar's argument as to why section 2243 cannot satisfy dual criminality is incorrect.  The fact that Canada is not pursuing a statutory rape charge does not prevent the use of an age-based U.S. statute to satisfy dual criminality.  *See* ECF 66-1 at 29-30.  As discussed *supra,* the Court is required to look at the underlying conduct supporting the Canadian charge to determine how that conduct could be charged in the United States.  *See*, *e.g., Clarey*, 138 F.3d at 766.  Here, Canada is expressly charging Kollmar

1   with rape based on sexual conduct he committed against the victim when she was 14 years' old and he

2   was more than four years older than the victim.  ECF 39-1 at bates 15.  Accordingly, Kollmar's charged

3   conduct is criminal under section 2243, and that is sufficient to satisfy dual criminality for purposes of

4   the rape charge.[5]

5   **B.     The Conduct Underlying the Indecent Assault Charge Would Be Criminal if**
          **Committed in the United States**

6

7        In connection with the charge of indecent assault, the extradition request states that Kollmar

8   committed indecent assault when he fondled the victim's breasts and genitals, inserted his fingers into

9   her vagina, and masturbated her without her "genuine consent."  ECF 39-1 at bates 17.  As set forth in

10  the victim's statement, Kollmar told her that it was important that she have an orgasm when he

11  masturbated her, and he would get angry if she did not.  ECF 55 at PDF 47-48, 123, 152.  The victim

12  also explained that Kollmar would get angry if the victim was not being affectionate enough, so he

13  forced her to learn massage at age 13.  *Id.* at 38, 149.  Kollmar insisted that both he and the victim be

14  nude and that she massage his genitals, sometimes three or four hours at a time.  *Id.* at 38-39, 149.  The

15  victim stated that Kollmar's penis "was always erect," which she found "frightening" and "scary."  *Id.* at

16  39, 149.  According to the victim, this conduct occurred in both Toronto, Ontario, and Sudbury, Ontario

17  between the spring of 1976 and the spring of 1979, when the victim was between ages 13 and 16.  *See*

18  ECF 55 at PDF 34-37, 39, 47, 94-96, 99-100, 106-08, 121-22, 148-49, 152.

19       If committed in the United States, Kollmar's conduct could be criminally charged under 18

20  U.S.C. § 2244(a)(3).  This provision makes it a crime punishable by up to two years' imprisonment for a

21  person to violate 18 U.S.C. § 2243(a) by engaging in sexual contact, instead of a sexual act as required

22  by § 2243(a).  Sexual contact is defined as "the intentional touching, either directly or through the

23

24       [5] For the same reasons, Kollmar's conduct underlying the rape charge could also be charged
    under California Penal Code 261.5, which provides, "Unlawful sexual intercourse is an act of sexual
25  intercourse accomplished with a person who is not the spouse of the perpetrator, if the person is a minor.
    For the purposes of this section, a 'minor' is a person under the age of 18 years and an 'adult' is a person
26  who is at least 18 years of age . . . Any person 21 years of age or older who engages in an act of
    unlawful sexual intercourse with a minor who is under 16 years of age is guilty of either a misdemeanor
27  or a felony, and shall be punished by imprisonment in a county jail not exceeding one year, or by
    imprisonment pursuant to subdivision (h) of Section 1170 for two, three, or four years."
28

1   clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks of any person with an intent to

2   abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person."  18 U.S.C.

3   § 2246(3).  As discussed *supra* Section II(A), section 2243(a) makes it a crime to "knowingly engage[]

4   in a sexual act with another person who has attained the age of 12 years but has not attained the age of

5   sixteen years" when the victim "is at least four years younger than the person so engaging."

6          As described in the extradition request, Kollmar knowingly engaged in sexual contact with the

7   victim when he fondled the victim's breasts and genitals, inserted his fingers into the victim's vagina,

8   and masturbated the victim with the goal of her achieving orgasm.  This conduct began when the victim

9   was age 13 and continued for several years.  While some of the conduct may have occurred after the

10  victim attained the age of 16, the victim made clear that Kollmar performed each type of conduct

11  described above, including masturbating her with the goal of achieving orgasm, before her 16th

12  birthday.  *See*, *e.g.*, ECF 55 at PDF 47 (stating that Kollmar began masturbating her shortly after he

13  penetrated her for the first time when she was age 14), 99-100 (confirming that Kollmar began fondling

14  her breasts and genitals in his van in Toronto, Ontario, in the spring of 1976 when she was age 13).  As

15  previously established, Kollmar is more than four years older than the victim.  *See supra* note 3.

16  Accordingly, the conduct underlying Canada's charge of indecent assault could be charged under 18

17  U.S.C. § 2244(a)(3) if committed in the United States.

18         Kollmar has failed to demonstrate that his conduct could not be criminally charged under

19  section 2244(a)(3).  *First,* the fact that 18 U.S.C. §§ 2243, 2244 contain additional elements to satisfy

20  U.S. federal jurisdictional requirements is not relevant.  ECF 66-1 at 29.  Article 2(2)(i) of the Treaty

21  states that an offense may be considered extraditable "notwithstanding that conduct . . . required for the

22  purpose of establishing jurisdiction, forms part of the offense in the United States."  ECF 39-1 at bates

23  85; *Emami v. U.S. Dist. Court for the N. Dist. of Cal.*, 834 F.2d 1444, 1450 (9th Cir. 1987) ("It does not

24  matter that the German statute does not contain the jurisdictional element of a use of the mails.");

25  *Yordanov v. Milusnic*, 250 F. Supp. 3d 540, 548 (C.D. Cal. 2017) ("Where a federal criminal statute is

26  used, an element of the crime that is purely jurisdictional . . . may be disregarded for purposes of the

27  dual criminality analysis.").  *Second*, as discussed *supra* Section II(A), this U.S. statute can satisfy dual

28

1 | criminality even though Canada is not pursuing a statutory rape charge against Kollmar because the

2 | charged conduct underlying the Canadian charge satisfies the elements of this U.S. offense.

3 |        Additionally, Kollmar's conduct could be charged under California Penal Code § 288(a), (c).

4 | California Penal Code § 288(a) punishes up to eight years' imprisonment "a person who willfully and

5 | lewdly commits any lewd or lascivious act, including any of the acts constituting other crimes provided

6 | for in Part 1, upon or with the body, or any part or member thereof, of a child who is under the age of 14

7 | years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that

8 | person or the child."  Section 288(c)(1) punishes by up to three years' imprisonment the same acts

9 | described in section 288(a) committed against a child of age 14 or 15 when the perpetrator is at least ten

10 | years older than the victim.

11 |        Kollmar's alleged conduct satisfies all of the elements of these state offenses.  As described

12 | above, Kollmar is accused of committing sexual acts when he fondled the victim's breasts and genitals,

13 | inserted his fingers into the victim's vagina, and masturbated the victim with the goal of her achieving

14 | orgasm.  Kollmar began fondling the victim's breasts and genitals when she was age 13, and he began

15 | masturbating the victim when she was age 14.  *See*, *e.g.*, ECF 55 at PDF 47, 99-100.  Kollmar is more

16 | than ten years older than the victim.  *See supra* note 3.  Accordingly, Kollmar's conduct underlying the

17 | indecent assault charge is also criminally punishable as a felony under California Penal Code § 288(a),

18 | (c).

19 |        Because the conduct underlying both of the criminal charges for which Kollmar's extradition is

20 | sought could be punished "by imprisonment or other form of detention for a term exceeding one year or

21 | any greater punishment" had it been committed in the United States, the Court should find that dual

22 | criminality is satisfied as to both charges.

23 | **II.    The Extradition Request Contains Sufficient Evidence of Probable Cause**

24 |        The primary evidence in support of the extradition request are statements from the victim

25 | describing the conduct Kollmar inflicted upon her.  The testimony of a single witness can be sufficient

26 | to satisfy the beyond-a-reasonable-doubt standard required for a conviction under U.S. law.  *E.g.*, *Bruce*

27 | *v. Terhune*, 376 F.3d 950, 954 (9th Cir. 2004) (finding no due process violation in a jury instruction

28 |

1   providing that the testimony of a single witness could be sufficient to convict without corroboration);

2   *People v. Young*, 105 P.3d 487, 505 (Cal. 2005) ("Unless the testimony is physically impossible or

3   inherently improbable, testimony of a single witness is sufficient to support a conviction.").  As such,

4   the victim's statements against Kollmar may satisfy the probable cause standard for purposes of this

5   extradition proceeding so long as they set forth reasons to believe Kollmar committed the offenses for

6   which his extradition is sought.

7         The Court granted limited discovery of the victim's written and oral statements to Canadian

8   authorities for the purpose of determining whether Canada's summary of the victim's statement in the

9   extradition request, through an affidavit from Detective Constable Robert Speakman ("Speakman

10   Affidavit"), was accurate.  See ECF 48 at 6.  Notably, Kollmar does not challenge the accuracy of the

11   victim's account as set forth in the Speakman Affidavit, the sole purpose for which discovery was

12   granted.  See ECF 66-1 at 31-36.

13         In any event, extradition courts "'must accept as true all of the statements and offers of proof by

14   the demanding state, reserving the weighing of evidence . . . for the courts in the requesting country."  *In*

15   *the Matter of the Extradition of Martinelli Berrocal*, 2017 WL 3776953, at *35 (S.D. Fla. Aug. 31,

16   2017) (citation and internal quotation marks omitted); *see also*, *e.g.*, *Collins v. Loisel*, 259 U.S. 309, 316

17   (1922); *Ahmad v. Wigen*, 726 F. Supp. 389, 399-400 (E.D.N.Y. 1989), *aff'd*, 910 F.2d 1063 (2d Cir.

18   1990) ("The primary source of evidence for the probable cause determination is the extradition request,

19   and any evidence submitted in it is deemed truthful for purposes of this determination.") (quotation

20   omitted).

21         In his brief, Kollmar challenges only whether Canada submitted sufficient evidence to establish

22   probable cause with respect to the rape charge; he does not present any arguments in his brief

23   challenging the sufficiency of evidence related to the indecent assault charge.  *See* ECF 66-1 31-36.  He

24   has therefore waived his right to challenge whether there is sufficient evidence of probable cause that he

25   committed the indecent assault offense.  *See*, *e.g.*, *BankAmerica Pension Plan v. McMath*, 206 F.3d 821,

26   826 (9th Cir. 2000) ("A party abandons an issue when it has a full and fair opportunity to ventilate its

27   views with respect to an issue and instead chooses a position that removes the issue from the case.").

28

1   However, even if Kollmar were contesting probable cause on both charges, his arguments would fail for

2   the reasons set forth below.

3        **A.**    **Canada's Evidence Establishes Probable Cause that Kollmar Committed Rape**

4           To constitute rape under Section 143(a) of the Criminal Code of Canada, the prosecution must

5   establish that a male person had sexual intercourse with a female person who was not his wife and did

6   not consent to the sexual intercourse.[6]  ECF 39-1 at bates 8.  The prosecution must also prove that the

7   perpetrator knew, or was reckless or willfully blind, to the victim's lack of consent.  *Id.* at 11.  To

8   establish lack of consent, the Canadian courts look to the subjective state of mind of the victim to

9   determine whether consent was voluntarily and freely provided, with consideration given to the

10  relationship between the perpetrator and victim and any threats or fear of bodily harm.  *Id.* at 9-10.

11          As set forth in the extradition request and supplementary materials, the victim's written and oral

12  statements to the Canadian authorities establish probable cause on all of the elements of Section 143(a)

13  of the Criminal Code of Canada.  The victim told Canadian authorities that, on Mother's Day weekend

14  in 1977, when she was 14 years' old, Kollmar penetrated her vagina with his penis.  ECF 55 at PDF 47-

15  48, 152-53.  He only "partially penetrated" her because he purportedly wanted her to remain a virgin

16  until he married her.  *Id.* at 47, 152.  He did this on four or five more occasions between spring of 1977

17  and spring of 1979, when she was age 16.  *Id.* at 138, 152.  The victim also told authorities that "99% of

18  the time," Kollmar preluded these sexual encounters by "verbally humiliating and demoralizing" her for

19  up to two hours at a time.  *Id.* at 151.  Specifically, he called her names such as, "stupid," "a piece of

20  shit," "fat and ugly," and told her that she was "a terrible person" who should be ashamed of herself.  *Id*.

21  He also told her that she "must submit [her] will to him."  *Id*.

22          In addition to feeling humiliated and degraded immediately prior to the sexual abuse, the victim

23  also stated that Kollmar "intimidated" her, such that she was never free from fear, intimidation, or

24

---

25       [6] A person can also be guilty of rape under Section 143(b) if consent is given but that consent is

26  "extorted by threats or fear of bodily harm," "is obtained by impersonating her husband" or "is obtained
   by false and fraudulent representations as to the nature and quality of the act."  ECF 39-1 at bates 8.

27  According to the extradition request, the Canadian prosecutor intends to rely primarily on Section
   143(a), lack of consent.  *Id.* at 8; *see also id.* at 15-17 (setting forth the theory of rape based on lack of

28  the victim's genuine consent).

1   oppression in his presence.  *E.g.*, *id.* at 28, 40, 43-44, 48, 147, 150-52.  The victim felt that she could not

2   tell anyone about the abuse because Kollmar was a well-respected man in the community, and Kollmar

3   had told her that no one would believe her if she told anyone.  *Id.* at 33-34, 51-52, 59, 148, 150, 153.

4   She told Canadian authorities that she now saw Kollmar's behavior as a form of "brain washing."  *Id.* at

5   131.  Kollmar also physically assaulted the victim on occasion, as well as threatened to assault her on

6   other occasions.  *Id.* at 45, 151-52.

7          As the extradition request sets forth, this testimony from the victim is sufficient to establish

8   probable cause that Kollmar committed rape in violation of Section 143(a) of the Criminal Code of

9   Canada.  In particular, Kollmar's partial penetration of the victim, who was not Kollmar's wife,

10   constitutes a necessary act under the Canadian statute.  ECF 39-1 at bates 15.  Additionally, the

11   Canadian prosecutor has set forth why, under Canadian law, Kollmar's acts were committed without the

12   victim's "genuine consent."  Specifically, the prosecutor explained that the relationship of authority

13   Kollmar had over the victim, the victim's stated fear of Kollmar, the threats of violence, and the

14   incidents of violence, constituted sufficient evidence that the victim did not provide valid consent to be

15   sexually touched.  *Id.* at 16-17.  The prosecutor also explained that, in light of these circumstances and

16   the victim's reluctance to participate in these sexual activities, Kollmar knew, or was reckless or

17   willfully blind to, the victim's lack of consent to the sexual activity.  *Id.* at 17.  Accordingly, there is

18   probable cause to believe that Kollmar committed rape against the victim in violation of in violation of

19   Section 143(a) of the Criminal Code of Canada.

20          Kollmar's arguments to the contrary are meritless.  *First*, Kollmar's argument that he did not use

21   force or violence to commit the rape is misplaced.  ECF 66-1 at 35.  Canada's legal theory does not turn

22   on whether Kollmar used physical violence against the victim to induce sexual intercourse; rather,

23   Kollmar is guilty of the offense if he engaged in sexual intercourse without the consent of the victim.

24   As Canadian authorities explained, lack of consent may be proven through myriad of factors that do not

25   include physical violence.  ECF 39-1 at bates 9-10.  *Second*, Kollmar's physical violence against the

26   victim need not be contemporaneous with the sexual encounter to vitiate consent.  ECF 66-1 at 35.  The

27   victim described an ongoing, constant pattern of fear and intimidation, which are sufficient to negate

28

1   valid consent under Canadian law.  ECF 39-1 at bates 16-17.  *Third*, the fact that the victim never used

2   the term "rape" is irrelevant because she described acts that meet the legal definition of rape.  ECF 66-1

3   at 35.  *Lastly*, the fact Kollmar may have believed the victim "had this special love for him as well" does

4   not prove that he lacked the requisite understanding of the victim's state of mind.  *Id.*  Given the years of

5   sexual, physical, and emotional abuse Kollmar inflicted upon the victim, a reasonable person could

6   conclude that Kollmar knew, or at least was reckless or willfully blind to, the victim's lack of consent to

7   the sexual intercourse.  Accordingly, there is sufficient evidence to establish probable cause that

8   Kollmar committed rape.

9   **B.    Canada's Evidence Establishes Probable Cause that Kollmar Committed Indecent
        Assault**

10

11   Section 149 of the Criminal Code of Canada provides that a person is guilty of indecent assault if

12   he touches the victim in an indecent manner without the victim's consent.  ECF 39-1 at bates 12-13.

13   Under Canadian law, touching is "indecent" if it has a sexual purpose.  *Id.*  Whether a touching is

14   indecent is determined by the objective facts, not the mental state of the alleged perpetrator.  *Id.* at 13.

15   For purposes of this statute, lack of consent is determined in the same manner as rape, as described in

16   the previous subsection.  *Id.*  Prosecutors must also establish that the perpetrator intended to touch the

17   victim and either knew, was reckless, or was willfully blind to the victim's lack of consent.  *Id.*

18   The victim described numerous incidents of unwanted sexual touching at the hands of Kollmar.

19   Specifically, the victim explained that, in Sudbury, Ontario, Kollmar took the victim on walks away

20   from the victim's family, at which point he would fondle the victim's breasts.  ECF 55 at PDF 34-36,

21   121-22, 148.  The victim also stated that, when meeting Kollmar in Toronto, Ontario, Kollmar fondled

22   the victim's breasts and genitals while in his van.  *Id.* at 37, 149.  Kollmar later progressed to inserting

23   his fingers into the victim's vagina and masturbating her.  *Id.* at 39, 47, 149, 152.

24   Consistent with the Canadian prosecutor's analysis, the victim's testimony in this regard is

25   sufficient to establish probable cause that Kollmar committed indecent assault against the victim.  *First*,

26   he repeatedly touched the victim in a sexual manner.  *Second*, as set forth in the previous subsection, the

27   victim did not genuinely consent to Kollmar's sexual touching.  *See supra* pp. 10-11.  *Third*, for the

28

1    same reasons Kollmar knew, or was reckless or willfully blind, to the victim's lack of consent to the

2    sexual intercourse, he was also aware of the victim's lack of consent over the sexual touching. *See*

3    *supra* pp. 11-12.  Accordingly, the extradition request provides sufficient evidence of probable cause

4    that Kollmar committed both rape and indecent assault in violation of Canadian law.

5         **C.    Kollmar's Attempt to Undermine the Victim's Credibility in this Extradition**
              **Proceeding is Inappropriate**
6

7         Kollmar spends much of his probable cause argument attempting to undermine the victim's

8    credibility by alleging inconsistencies and implausibilities within the victim's statements, as well as

9    submitting documentary evidence he claims contradicts the victim's statements.  ECF 66-1 at 31-34.

10   These arguments are not appropriate in an extradition proceeding.  Indeed, the Court already

11   admonished Kollmar from submitting contradictory evidence in effort to undermine the victim's

12   credibility.  Specifically, when the Court issued its order granting limited discovery of the victim's oral

13   and written statements to the Canadian authorities, the Court stated, "discovery of these two statements

14   is warranted, for the limited purpose of determining whether the Speakman Affidavit correctly

15   characterizes the [victim's] statements.  The Court will **not** consider attacks on [the victim's] credibility

16   if such attacks are based on contradictory evidence."  ECF 48 at 6 (emphasis in original) (citing *Choe v.*

17   *Torres*, 525 F.3d 733, 740 (9th Cir. 2008); *Barapind v. Enomoto*, 400 F.3d 744, 749 (9th Cir. 2005)).

18        Indeed, Kollmar's effort to convert the continued extradition hearing into a mini-trial on

19   credibility is foreclosed by precedent.  *See*, *e.g.*, *Charlton v. Kelly*, 229 U.S. 447, 461 (1913) (extradition

20   magistrate did not err by excluding "witnesses produced to contradict the testimony for the prosecution"

21   because such an "objection . . . should be taken before or at the time of his trial for the crime, and heard

22   by the court having jurisdiction of the crime"); *Santos v. Thomas*, 830 F.3d 1002-03 (9th Cir. 2016) (en

23   banc) (defense evidence that poses a "conflict of credibility" is inadmissible contradictory evidence);

24   *Choe*, 525 F.3d at 740 (witness' alleged lack of credibility was "merely a weakness" in the

25   government's case and did not "completely obliterate the evidence of probable cause"); *Barapind*, 400

26   F.3d at 744 (affidavit that contradicted allegations in the extradition request "constituted conflicting

27   evidence, the credibility of which could not be assessed without a trial" and was properly excluded);

28

*Emami*, 834 F.2d at 1452 ("An extradition proceeding is not a trial; the relevant determination is confined to whether a prima facie case of guilt exists that is sufficient to make it proper to hold the extraditee for trial."); *Quinn v. Robinson*, 783 F.2d 776, 815 (9th Cir. 1986) ("The magistrate does not weigh conflicting evidence and make factual determinations but, rather, determines only whether there is competent evidence to support the belief that the accused has committed the charged offense."); *see also Bovio v. United States*, 989 F.2d 255, 259 (7th Cir. 1993) (fugitive has no right to attack the credibility of witnesses at an extradition hearing, as issues of credibility are to be determined at trial); *Shapiro v. Ferrandina*, 478 F.2d 894, 905 (2d Cir. 1973) (evidence that would pose conflict of credibility "should properly await trial in Israel").  Rather, as noted previously, the Court must accept the victim's statement as true for purposes of this extradition hearing.  *See*, *e.g.*, *Collins*, 259 U.S. at 316; *Martinelli Berrocal*, 2017 WL 3776953, at *35; *Ahmad*, 726 F. Supp. at 399-400.

Moreover, Kollmar overstates the impact of any alleged inconsistencies.  To obliterate probable cause based on an allegation of inconsistency is "a very difficult standard to meet," *In re Extradition of Shaw*, No. 14-CV-81475-WM, 2015 WL 3442022, at *9 (S.D. Fla. May 28, 2015), if not impossible, especially where "[t]he primary source of evidence for the probable cause determination is the extradition request, and any evidence submitted in it is deemed truthful for purposes of this determination," *Matter of Extradition of Atta*, 706 F. Supp. 1032, 1051 (E.D.N.Y. 1989) (citing *Collins*, 259 U.S. at 315-16).

The canon against making credibility determinations in extradition proceedings does not mean that this Court must rely solely on the fact that Kollmar is subject to an arrest warrant in Canada when making its probable cause finding.  Instead, the government submits, as it did previously, that this Court should consider the evidence underlying the Canadian charges, supplied in the request for Kollmar's extradition and supplementary materials, and determine whether such evidence satisfies the U.S. probable cause standard.  Contrary to Kollmar's assertion, ECF 66-1 at 33, Canada need not submit corroborating evidence where the victim's statements are sufficient on their own to establish probable cause.[7]  *See*, *e.g.*, *Collins*, 259 U.S. at 316 (quoting *In re Wadge*, 15 F. 864, 866 (S.D.N.Y. 1883));

---

[7] Specifically, Kollmar's complaint about the lack of written statement from the victim's father falls flat because this Court already determined that it "does not go to probable cause" and need not be

*Quinn*, 783 F.2d at 815.  Rather, as set forth in the previous subsections, the evidence submitted by Canada is more than sufficient to establish probable cause that Kollmar committed the two offenses for which his extradition is being sought.

In any event, many of Kollmar's alleged inconsistencies and implausibilities are based on misstatements of the record or otherwise do not undermine the victim's credibility.  For example, Kollmar erroneously attempts to undermine the victim's credibility in the following ways:[8]

- Kollmar claims the victim's story is implausible because no one else noticed Kollmar's alleged abuse of the victim.  ECF 66-1 at 19, 32.  However, the victim told Canadian authorities that the physical and sexual abuse took place while she and Kollmar were alone.  *E.g.*, ECF 55 at PDF 34, 37, 45, 148-49.  Thus, it would make sense that no one witnessed the abuse.[9]  Moreover, the victim stated that other members of the Students of Light were aware that she was spending a substantial amount of time with Kollmar alone because she was confronted by these individuals for taking up too much of Kollmar's time.  *Id.* at 37-38, 149.

- Kollmar argues that the victim lacks credibility because the Students of Light did not own the property on Keele Street in Toronto until February 1977, after the victim claimed to have been abused at that property.[10]  ECF 66-1 at 18, 33.  However, the victim told Canadian authorities that the Students of Light rented the property on Keele Street for some time before purchasing it.  ECF 55 at PDF 36, 148.  Thus, the timing of the purchase of property does not undermine the victim's claim.  Moreover, the victim's account is consistent with documents Kollmar submitted demonstrating that the Students of Light purchased the property on Keele Street for no money, which indicates that the organization may have purchased the property from someone with whom they had a prior existing relationship.  ECF 64-3 at 14.

- Kollmar asserts that the incident the victim described in Buffalo, New York, could not have happened because Kollmar's passport does not show any trips between Toronto and Buffalo during the relevant time period.  ECF 66-1 at 15, 32-33.  This argument is not compelling.  *First*, the incident in Buffalo is not part of the charged offenses, ECF 39-1 at

---

provided.  ECF 48 at 7.

[8] The government does not venture to contest every alleged inconsistency or implausibility cited in Kollmar's brief because credibility determinations are not appropriate in extradition proceedings.  *See supra* pp. 13-15.  Indeed, the victim is not available to respond to Kollmar's claims, and Kollmar will have the opportunity to question the victim's credibility during his trial in Canada.  However, the government wishes to provide the Court with some examples of the ways in which Kollmar's purported inconsistencies or implausibilities fail to undermine the victim's credibility.

[9] If no one witnessed the abuse, it would also make sense that none of Kollmar's purported character witnesses referenced Kollmar's abuse in their supporting affidavits.  ECF 66-1 at 19-20 (implying that the victim lacks credibility because her description of Kollmar is inconsistent with other individuals who know him).

[10] The victim told authorities that she first began making trips to Toronto to stay at the property on Keele Street property in the spring of 1976, when she was 14 years' old.  ECF 55 at PDF 99-100, 106.

bates 17, and as such, is limited value.  *Second*, prior to 2009, citizens of the United States and Canada could travel between these two countries without presenting a passport.  Instead, travelers were permitted to make oral declarations of citizenship or present one of approximately 8,000 documents to prove identity and citizenship.  *See* U.S. Customs and Border Protection *Western Hemisphere Travel Initiative (WHIT) Frequently Asked Questions*, https://www.cbp.gov/print/293511 (last visited January 3, 2020); Add. at 5-6, 15.  Thus, the absence of stamps in Kollmar's passport does not disprove the victim's claims.

- Kollmar also implies that the victim was untruthful because she stated that Kollmar gave her a massage in the "front living room" of his parents' home in Buffalo, while Kollmar's parents did not own a home with a front and back living room until after the date alleged by the victim.  ECF 66-1 at 15-16.  The victim stated that Kollmar gave her a two-hour naked massage in the "front living room" of his parents' home, but she never claimed the home had more than one living room.  ECF 55 at PDF 30, 83, 147.  Accordingly, Kollmar's attempt to undermine the victim's credibility on this point is not persuasive.

- Kollmar further questions the victim's account of the incidents in Buffalo because his private investigator was unable to confirm the existence of commercial flights between Toronto and Buffalo during the relevant time period.  ECF 66-1 at 15, 32-33.  However, Kollmar's private investigator does not provide any information about the nature or extent of his search for commercial flights during this time period.  *See* ECF 64-3 at 2.  He merely states that he was "unable to locate any information that supported the allegation that any such flights existed during that time period."  This absence of evidence neither proves nor disproves the victim's account.

For the foregoing reasons, the documentary evidence submitted in support of Canada's extradition request is sufficient to establish probable cause to believe that Kollmar committed the offenses for which extradition is sought.

## III.   Kollmar's Extradition Is Not Barred Due To Lapse in Time

Article 4(1)(ii) of the Treaty states that extradition shall not be granted "when the prosecution for the offense has become barred by lapse of time according to the laws of the requesting state."  ECF 39-1 at bates 94.  The extradition request confirms, and Kollmar does not dispute, that the prosecution of the offenses for which Kollmar's extradition is sought is not barred by any applicable Canadian statute of limitation.  ECF 39-1 at bates 15; ECF 66-1 at 36.    Notwithstanding this, Kollmar asserts that his extradition is barred under Article 4(1)(ii) because, according to him, the lapse of time between when the offenses occurred and when charges were brought violates Canada's Charter of Rights and Freedoms.  ECF 66-1 at 36, ECF 64-2.  This is incorrect.  Kollmar also erroneously argues that his extradition is barred due to a lapse of time according to California's statute of limitations.

///

1

2

### A.   Extradition Is Not Barred By Principles in Canada's Charter of Rights and Freedoms

3

4   Contrary to Kollmar's assertion, the same constitutional concepts generally applicable in

criminal cases are not applicable in international extradition cases, which are not criminal cases.  *See*,

5   *e.g.*, *Matter of Requested Extradition of Kirby*, 106 F.3d 855, 857 n.1 (9th Cir. 1996) ("The [extradition]

6   case before us is neither a civil case nor a criminal case."); *In re Extradition of Kraiselburd*, 786 F.2d

7   1395, 1398 (9th Cir. 1986) (declining to read constitutional principles into an extradition treaty); *Kamrin*

8   *v. United States*, 725 F.2d 1225, 1227-28 (9th Cir. 1984) (same).  Indeed, courts have repeatedly held

9   that the type of "lapse of time" provision contained in Article 4, which is commonly found in extradition

10   treaties, refers only to the running of the applicable statute of limitations, and not to constitutional

11   principles.  *See*, *e.g.*, *Martinez v. United States*, 828 F.3d 457-64 (6th Cir. 2016) (en banc) (holding that

12   the "lapse of time" provision in an extradition treaty did not incorporate the Sixth Amendment's speedy-

13   trial protections, but rather, refers only to the applicable statute of limitations); *Yapp v. Reno*, 26 F.3d

14   1562, 1566-68 (11th Cir. 1994) (same); *Garfias*, 2009 WL 2580641, at *2-3 (collecting cases).  The

15   government is not aware of any reported cases in support of Kollmar's attempt to import constitutional

16   requirements into a treaty's lapse of time provision.  Significantly, Kollmar does not cite to any.  *See*

17   ECF 66-1 at 36.

18   There are compelling reasons why constitutional principles are not incorporated into "lapse of

19   time" provisions in extradition treaties.  According to Kollmar's own Canadian lawyer, the Canadian

20   Charter does not demand a fixed time limit for finding a violation of "inordinate delay and lapse of time

21   in laying criminal charges," but rather, a breach of the Charter may be established where the delay in

22   bringing charges is found to be "unreasonable" based on a fact-specific analysis of the particular case.

23   ECF 64-2 at 2-3.  Incorporating such flexible constitutional principles into a treaty provision would

24   require courts to assess the reasonableness of a foreign government's action without sufficient

25   information about that country's procedures or applicable legal standards, either in general or in the

26   specific case.  This would be in tension with the rule of non-inquiry in international extradition cases,

27   which prohibits U.S. courts from examining the criminal justice systems of foreign nations in reviewing

28

1  extradition requests.  *See Yapp*, 26 F.3d at 1567-68; *Martinez*, 828 F.3d at 463-64.  Moreover, this

2  would be inconsistent with the intent of the parties, who did not incorporate constitutional principles into

3  Article 4 of the Treaty.  *See Martinez*, 828 F.3d at 464 ("Before we task the courts of both countries with

4  refereeing these elusive and deeply sensitive inquiries, we should be sure the negotiating countries

5  wanted them as umpires"); *Yapp*, 26 F.3d at 1568 ("We do not think the parties who negotiated the . . .

6  Extradition Treaty would have intended to abrogate the rule of non-inquiry without stating their

7  intention to do so more explicitly").  Thus, Kollmar's argument is more appropriate to raise as a defense

8  to his criminal proceedings in Canada, not during his extradition proceedings in the United States.

9         Significantly, this position is consistent with Canada's view of the Treaty.[11]  According to

10  Canadian authorities, the lapse of time provision in the Treaty does not incorporate Sections 7 or 11 of

11  the Canada's Charter of Rights and Freedoms, but rather, refers only to statutory bars on when criminal

12  prosecutions can be brought.  *See* Add. at 1.  Indeed, the Supreme Court of Canada has determined that

13  the Treaty's lapse of time provision refers only to the statute of limitations, not Section 11 of the

14  Charter.  *Id.* at 1-2.  The treaty partners' consistent interpretation of a treaty provision is entitled to

15  significant deference.  *See, e.g., Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961) (giving deference to the

16  interpretation of treaty a provision as set forth in diplomatic notes exchanged between the responsible

17  agencies of the United States and of Yugoslavia); *Arias Leiva v. Warden*, 928 F.3d 1281 (11th Cir.

18  2019) (finding that the U.S.-Colombia extradition treaty is in full force and effect because, *inter alia*,

19  both the United States and Colombia understand it to be in effect).

20         Moreover, the extent, if any, to which an unfair delay should factor into the United States'

21  extradition decision is a determination that should be left to the Secretary of State.  *See, e.g., Choe*, 525

22  F.3d at 741-42 ("To the extent there was a delay, this is a matter left for the Secretary of State's

23  consideration"); *Martin v. Warden, Atlanta Penitentiary*, 993 F.2d 824, 830 (11th Cir. 1993) (fugitive

24  "should direct his argument that extradition is unjust in this case based on Canada's alleged lengthy

25

26         [11] Canada submitted an informal supplement to the United States on January 2, 2020, which is
attached as an addendum to this brief.  Canada will submit the supplement through formal, diplomatic

27  channels, and the government anticipates submitting the formal supplement to the Court in advance of
the extradition hearing on January 30, 2020.  The government expects the formal supplement to be

28  substantively identical to the informal supplement provided in the addendum.

delay in seeking extradition or on humanitarian grounds to the Executive Branch").  Such a judgment
clearly affects foreign relations, not to mention the requesting country's willingness to honor extradition
requests from the United States.  It also requires a level of knowledge of another country's judicial
systems, procedures, resources and other factors that the Secretary of State is in a better position to
know and evaluate.  *Cf. Kamrin*, 725 F.2d at 829 (adoption of speedy extradition right would conflict
with the rule of non-inquiry, which generally "precludes extradition magistrates from assessing the
investigative, judicial, and penal systems of foreign nations when reviewing an extradition request").

However, even if the Court were to address Kollmar's argument that his prosecution is barred
under Sections 7, 11(a), and 11(b) of the Canadian Charter, as the Canadian prosecutor has detailed, his
argument fails.  See Add. 1-5.  According to Canadian authorities, the Canadian Supreme Court, in
interpreting Section 11(b) of the Canadian charter, established a 30-month deadline by which
prosecution must commence, but that deadline can be excused in cases of "exceptional circumstances."
Add. at 2.  Numerous Canadian courts have found that "exceptional circumstances" exist where the
defendant was charged in Canada but residing in another country, like Kollmar.  *Id.* at 2-4.  Similarly,
Section 11(a) of the Charter looks to the same factors as 11(b) when determining whether a delay in
notifying the defendant of charges against him was unreasonable.  *Id.* at 4.  Moreover, as required by
Section 11(a), Kollmar will likely be unable to establish that he is prejudiced in his ability to amount a
defense or preserve or gather evidence.  *See id.*  Lastly, Section 7, which provides protections for delays
in bringing charges against a defendant, only applies to delays directly attributable to the government.
*Id.* at 5.  Here, the Canadian government was not aware of the crimes until many years after they
occurred, and such delay therefore cannot be attributed to the government.  Even to the extent there was
a delay between the victim's statement and the charges being filed, Kollmar was not in Canada during
that time period, and thus, Kollmar may have difficulty establishing a violation under Section 7 of the
Canadian Charter.

**B.      The Treaty Does Not Bar Extradition Based on the California Statute of Limitations**

Kollmar is also incorrect that the Treaty prohibits extradition if prosecution were barred by the
California statutes of limitation.  *See* ECF 66-1 at 36-38.  Kollmar's argument ignores the plain language

1   of the Treaty's lapse of time provision, Article 4, which provides that only the Canadian statutes of

2   limitation apply to extradition requests filed in the United States.  ECF 39-1 at bates 94; *see also supra*

3   pp. 18-19.

4           His attempt to read an additional statute of limitations requirement into Article 10 of the Treaty

5   is misplaced.  As Kollmar acknowledged, Article 10(1) provides:

6           Extradition shall be granted only if the evidence be found sufficient, according to the
        laws of the place where the person sought shall be found, either to justify his committal

7           for trial if the offense of which he is accused had been committed in its territory or to
        prove that he is the identical person convicted by the courts of the requesting state.

8

9   ECF 39-1 at bates 97.  Through a plain reading of this provision, this Article refers to the evidentiary

10  standard the requesting country must meet in order to secure an individual's extradition.  In the case of a

11  person who is sought in the United States and has not yet been prosecuted, like Kollmar, this provision

12  requires that the extradition request meet the U.S. evidentiary standard of probable cause that would be

13  required to justify Kollmar's committal for trial had the offenses occurred in the United States.  Indeed,

14  the Ninth Circuit has held that the type of provision contained in Article 10(1) of the Treaty refers to the

15  requirement that an extradition request meet the U.S. probable cause standard.  *E.g.*, *Quinn*, 783 F.2d at

16  783 (addressing a similar provision in the United States-United Kingdom extradition treaty and noting

17  that "United States courts have interpreted this provision in similar treaties as requiring a showing by the

18  requesting party that there is probable cause to believe that the accused has committed the charged

19  offense.") (citing *Glucksman v. Henkel*, 221 U.S. at 512 (1911); *United States ex rel. Sakaguchi v.*

20  *Kaululukui*, 520 F.2d 726, 729-31 (9th Cir.1975)).  Indeed, Article 10(1) does not contain any reference

21  to statutes of limitations.

22          Reading a U.S. statute of limitations requirement into Article 10(1) would also run afoul of

23  Article 4(1)(ii), the Treaty's designated lapse of time provision that specifically requires the application

24  of the requesting state's statute of limitations—Canada in this case.  The Court should not interpret the

25  Treaty in a manner that would call one of its provisions into question.  *See*, *e.g.*, *Sumitomo Shoji*

26  *America, Inc. v. Avagliano*, 457 U.S. 176, 185 (1982) ("Our role is limited to giving effect to the intent

27  of the Treaty parties.").  Indeed, had the parties had intended for both parties' statutes of limitations to

28

1   apply in all extradition requests, they could have done so in Article 4(1)(ii).  Instead, Article 4(1)(ii) is

2   clear that the parties intended that only the requesting state's statute of limitations apply.[12]

3          The single, unpublished, out-of-circuit case to which Kollmar cites does not compel a different

4   conclusion.  ECF 66-1 at 37-38 (citing *In the Matter of the Extradition of Sylvester*, 2006 WL 6323514

5   (M.D. Pa. Feb. 14, 2006)).  In *Sylvester*, the court analyzed Article 10(1) of the U.S.-Canada Treaty, and

6   found that, because Pennsylvania law requires the prosecution to prove as an element of every criminal

7   offense that an applicable statute of limitations did not bar prosecution, the extradition request must

8   establish probable cause that the Pennsylvania statute of limitation had not run.  2006 WL 6323514, at

9   *2 (citing to *Commonwealth v. Bethlehem*, 570 A.2d 563, 568 (Pa. Super.  Ct. 1989)).  However, the

10  persuasiveness of the *Sylvester* decision was subsequently called into question by the Third Circuit

11  Court of Appeals in *Harshbarger v. Regan*, 599 F.3d 290, 294 (3d Cir. 2010) (upholding a decision from

12  the same district court as *Sylvester* finding *Sylvester* "unpersuasive" in its interpretation of Article 10(1)

13  and application of Pennsylvania law).  Additionally, the *Sylvester* court fails to address, let alone

14  resolve, the tension between its application of the U.S. statute of limitations under Article 10(1) of the

15  Treaty and the plain language of Article 4(1)(ii) requiring the contrary.  *See Sylvester*, 2006 WL

16  6323514, at *2-3.

17         Here, the parties do not dispute the prosecution of the offenses for which extradition is sought is

18  not barred by any statute of limitation in Canada, the requesting state.  ECF 39-1 at bates 15; ECF 66-1

19  at 36.  Accordingly, Kollmar's extradition is not barred due to a lapse in time.

20  ///

21  ///

22  ///

23

24

25

26         [12] Even if the U.S. statute of limitations were relevant to this case, case law is clear that it is the

27  federal, not state, statutes of limitations that govern the analysis.  *E.g.*, *Theron*, 832 F.2d at 499.
    Pursuant to 18 U.S.C. § 3299, there is no statute of limitations for the sexual abuse offenses at 18 U.S.C.

28  §§ 2243, 2244.

U.S. REPLY TO KOLLMAR'S OPPOSITION TO EXTRADITION
CASE NO. 4:19-MJ-70677 MAG                    20

1

**CONCLUSION**

2        For the reasons set forth in the government's memorandum in support of extradition and this

3  reply, the United States requests that the Court certify to the Secretary of State that Kollmar is

4  extraditable to Canada on the charges for which his extradition is requested.

5

6  Dated:  January 7, 2020                          Respectfully submitted,

7

8                                                    DAVID L. ANDERSON
                                                     United States Attorney
9

                                                      /s/ Kerry A. Monaco
10                                                   KERRY A. MONACO
                                                     Trial Attorney, U.S. Department of Justice
11

12                                                   MAUREEN C. BESSETTE
                                                     Assistant United States Attorney
13                                                   Northern District of California

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11

# ADDENDUM

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| Ministry of the Attorney General | Ministère du Procureure générale | |
|---|---|---|
| Crown Law Office<br>Criminal | Bureau des avocats<br>de la Couronne – droit criminel |  |
| 720 Bay Street<br>10th Floor<br>Toronto ON M7A 2S9<br>Tel: (416) 326-4600<br>Fax: (416) 326-4656 | 720 rue Bay<br>10e étage<br>Toronto ON M7A 2S9<br>Tél.:   (416) 326-4600<br>Téléc: (416) 326-4656 | |

December 31, 2019

Cathy Chalifour, Senior Counsel
International Assistance Group
Department of Justice Canada
284 Wellington Street
Room EMB 2072B
Ottawa, Ontario Canada
K1A 0H8

Dear Ms. Chalifour:

**Re:    Don Kollmar**

Please accept this letter in response to the request for additional information relating to a potential *Charter* argument, Kollmar's lack of passport stamps documenting his travel between the U.S. and Canada, and documentation of the sale of a Keele Street property in 1976.

### *Sections 7, 11(a) and 11(b) of the Charter*

Article 4 of the *Treaty on Extradition Between the Government of Canada and the Government of the United States of America* provides that extradition shall not be granted when the prosecution for the offence "has become barred by lapse of time according to the laws of the requesting State".

In Canadian law, prosecution of less-serious, "summary conviction" offences is statute barred after the statutory time-limit. Prosecution for these offences after the applicable time period is "barred for lapse of time" under article 4 of the *Treaty*. However, there is no applicable limitation period to "bar" prosecution for indictable offences. Sections 7, 11(a) and 11(b) of the *Charter of Rights and Freedoms* do not "bar" prosecution of these offences for lapse of time, but rather provide a *Charter* remedy in some cases, after a prosecution has already been initiated. The availability of such a remedy is highly dependent on the particular facts in each case.

#### *Section 11(b)*

The Supreme Court of Canada has made clear in *Argentina (Republic) v. Mellino* that proceedings barred by "lapse of time" are *only* those barred by a limitation period. Section 11(b) of the *Charter* has no application:

Counsel for Mellino, however, argued that s. 11(*b*) of the Charter applied to Mellino by virtue of art. V of the treaty, which provides that extradition shall not take place if "exemption from prosecution or punishment has been acquired by lapse of time, according to the laws of the state applying or applied to". This provision was obviously intended to bring into operation statutes of limitations that exist in some countries prohibiting prosecution for certain crimes after a stated lapse of time: for an example, see *R. v. Brixton Prison (Gov.); Ex parte Van der Auwera*, [1907] 2 K.B. 157. Such statutes are relatively easy to apply at an extradition hearing; one simply has to compute the time in accordance with the provisions of the statute. Section 11(*b*), on the other hand, is not an exemption in that sense. It gives a Charter remedy for delay when a prosecution has been initiated; no fixed time is involved. One must take into account such matters as whether the delay is unreasonable having regard to the time particular procedures ordinarily take. In extradition matters, this would surely require an inquiry into how proceedings are conducted in the foreign country and involve comparing them with ours. As well, a thorough examination of the facts surrounding the delay would have to be made, a function, as I explained in *Schmidt*, wholly out of keeping with extradition proceedings. It would require must stronger words than these to persuade me that a treaty provision of this kind was intended to expand the application of our constitutional standards for expeditious prosecutions to the international arena. In the present case, it would require considerable adaptations to apply s. 11(*b*) to the relevant delay. The delay principally complained of is the time elapsed between the time Mellino was discharged following the first extradition hearing and the initiation of the second.[1]

As the Supreme Court explains in the above passage, unlike a limitation period, determination of whether a stay is warranted under section 11(b) is a complicated analysis. In *R. v. Jordan*,[2] the Supreme Court set out a 30-month ceiling, beyond which delay is presumptively unreasonable. However, delay attributed to the defence is deducted from the calculation, and exceptional circumstances can justify delay in excess of the 30-month ceiling.

"Exceptional circumstances" are those circumstances that are reasonably unforeseen or reasonably unavoidable, and which generate delay the Crown cannot reasonably remedy. In *Jordan*, the Court stated that "[c]ases with an international dimension, such as cases requiring the extradition of an accused from a foreign jurisdiction, may also meet the definition [of exceptional circumstances]".[3]

Canadian Courts have found "exceptional circumstances" and/or "defence delay" where an offender charged in Canada was residing in another country and/or their whereabouts were not known to Canadian authorities. For example:

- In *R. v. Singleton*, the British Columbia Court of Appeal (in a case pre-dating *Jordan*) specifically addressed the extent to which Canadian authorities must go to locate an accused in another country in the context of an 11(b) application. The offender was charged in 1997 with offences committed between 1988 and 1990. However, by the time he was charged in 1997, he had moved back to the United States. From October 1998 to

---

[1] *Argentina (Republic) v. Mellino*, [1987] 1 S.C.R. 536.

[2] *R. v. Jordan*, 2016 SCC 27.

[3] *R. v. Jordan*, 2016 SCC 27, at paras. 69-71.

October 2002, the police made no effort to locate him. He was located in October 2002, and extradition proceedings commenced. The offender was returned to Canada in September 2006. In finding that the delay while the offender's whereabouts were unknown was not attributable to the Crown, the Court stated:

> [...] while the state has an obligation to act with reasonable diligence to bring an accused who is outside of Canada to trial within a reasonable time, whether that obligation has been met is to be determined contextually, considering the investigative avenues available to the police force or investigating agency involved. When an accused is in a foreign country from which he or she can be extradited and his or her whereabouts are known, Canadian prosecution officials are obligated to pursue extradition in a reasonable and timely manner. If they fail to do so, as in *MacIntosh*, the ensuing delay will be attributed to the Crown. [...]

> In my view, on the record of this case, it cannot be said that the police failed to act with reasonable diligence. Attempting to locate someone in a country as vast as the United States with no idea of where to look is akin to trying to find the proverbial needle in a haystack. [...][4]

- In *R. v. Burke*, the Ontario Court of Appeal found that the trial judge erred in issuing a stay under s. 11(b) where the respondent was charged with abduction and sexual assault in 1986, but then fled to the U.S. in violation of his bail. A Canada-wide warrant was issued. The respondent assumed a false identity in the U.S., and was charged with offences in the U.S. in 1987. He was sentenced to 52 years imprisonment. In 2000, police learned that he was eligible for parole in 2013, and in 2015, he was deported back to Canada. His trial was scheduled to begin in July 2017. The Ontario Court of Appeal found that the delay from the time the charges were laid until the respondent was returned to Canada was illegitimate defence delay, caused directly by the respondent to frustrate the proceedings.[5]

- In *R. v. Magiri*, Justice McWatt of the Ontario Superior Court of Justice accepted the Crown's argument that a delay of 10 months during which the accused was not in Canada was a "discrete event" and exceptional circumstance. McWatt J. held that the police could not have foreseen that the applicant would leave Canada, and that once he was located and arrested, the Crown and police made concerted efforts to remedy the delay.[6]

- In *R. v. J.S.*, Justice Speyer of the Ontario Court of Justice found that a period of 42 months during which the accused was in Nicaragua was defence delay. The accused quit his job in Toronto and relocated to Nicaragua in September 2013, and was subsequently charged with offences against his wife in October 2013. Justice Speyer found that the accused knew that there was an outstanding warrant for his arrest, and actively avoided being found by Canadian authorities. The police had no information that the accused was in Nicaragua.[7]

- In *R. v. Thind*, Justice Coroza of the Ontario Superior Court of Justice found that the almost 3-year period between the laying of an information and the accused's arrest was a "discrete event" because the accused was out of the country and could not be located and

---

[4] *R. v. Singleton*, 2014 BCCA 232

[5] *R. v. Burke*, 2018 ONCA 594

[6] *R. v. Magiri*, 2017 ONSC 2818, at paras. 15-18

[7] *R. v. H.S.*, 2018 ONCJ 162.

arrested. In this case, the accused was residing in Australia. The police made reasonable efforts to locate the accused, and attempted to contact him by leaving messages for him on the phone and with his mother. The RCMP also attempted to contact Bond University in Australia where it was believed the accused was attending school, but were unable to obtain any information due to privacy laws. The RCMP also asked that the accused be flagged in CBSA systems. The RCMP actions were not perfect, but "a standard of perfection is not placed upon the police".[8]

## Section 11(a)

Section 11(a) of the *Charter* guarantees a person charged with an offence the right "to be informed without unreasonable delay of the specific offence". It provides two forms of protection (i) notice of the specific offence; and (ii) the right to be informed without unreasonable delay. Pre-*Jordan*, the Ontario Court of Appeal approved of an analysis under s. 11(a) using the same factors under s. 11(b). As a result, the same factors as under the 11(b) analysis (such as the international dimension and the fact that Kollmar was residing in a different country and his whereabouts unknown to Canadian authorities) will be relevant to determining whether the delay was "unreasonable".

However, unlike under s. 11(b), s. 11(a) requires an accused to show on a balance of probabilities that he was prejudiced by the delay in informing him of the charges against him. Typically, courts are concerned with prejudice to the accused's ability to mount a defence due to a failure to preserve or gather evidence.

Kollmar alleges several bases upon which he has been prejudiced. Without a full evidentiary record of a *Charter* application, it is impossible to fully assess whether these bases have merit. However, on the information available:

- The prejudice alleged from the death of John Hanas is minimal. The complainant did not allege that Hanas was present for any aspect of the sexual abuse, nor was an active participant in her abuse. Kollmar has not established that Hanas would have possessed relevant evidence.

- The prejudice alleged from Kollmar's inability to obtain records had he been aware of the charges in 1997 is uncertain, and not established to have been caused by the state's delay in informing him of the charges. His ability to produce documentation of the sale of the Keele Street property belies his suggestion that he was unable to obtain documentation. Further, it is not established that further documentation would have been obtainable in 1997. Standard retention periods banking and other documents is often 7 years, and by 1997 this retention period would have already expired, calling into question whether such documentation would have been available at that time.

---

[8] *R. v. Thind*, 2018 ONSC 1337.

*Section 7*

Section 7 of the *Charter* guarantees the right to life, liberty and security of the person, and the right not to be deprived thereof except in accordance with the principles of fundamental justice. This section applies at all stages of the investigatory and judicial process.

Section 7 is most commonly invoked to argue that *pre-charge* delay, as 11(b) is most often invoked to address post-charge delay.

The s. 7 analysis requires the determination (1) that the right to life liberty and security of the person is engaged and deprived by the state; and (2) that this deprivation is not in accordance with the principles of fundamental justice.

Delay is relevant under s. 7 not because of the length of the delay itself, but as a result of the *effect* of the delay on the fairness of the trial. Both pre-charge or post-charge delay are relevant, however the fairness of a trial is "not automatically undermined by even a lengthy pre-charge delay". It is the *effect* of delay, not its length, that matters to the fairness of a trial under s. 7.[9] Further, under the s. 7 analysis, prejudice caused by delay is relevant to section 7 "only when it is directly attributable to delay caused by the state".[10]

In Kollmar's case, the pre-charge delay is not delay "caused by the state". Before the complainant came forward in 1997, the state was not aware of the allegations therefore not responsible for the delay.

The only delay that *could* be "caused by the state" is delay from the time charges were laid in 1997 until today. However, as discussed above in the 11(b) analysis, the state is not held to a standard of perfection. The fact that Kollmar was out of the country and his whereabouts unknown to the Canadian authorities will be relevant in determining whether the delay, and any prejudice arising from that delay, was "caused by the state", and if so, whether it was "not in accordance with the principles of fundamental justice".

The section 7 analysis, like the s. 11(a) and (b) analysis, is highly fact-dependent and context-driven. It is an analysis that must be conducted on a full evidentiary record. It would be inappropriate to conduct these analyses at this stage of proceedings, without the benefit of such an evidentiary record.

**Passport Requirements**

I have reviewed documentation publicly available from U.S. Customs and Border Protection, and the Canadian Border Services Agency. Based on a review of that documentation, I understand that until 2007, travel between Canada and the United States for Canadian and U.S. citizens did not require the presentation of a passport.

The following information is taken from a "FAQ" document published by U.S. Customs and Border Protection, and publicly available. A copy of that document is enclosed.

---

[9] *R. v. L.(W.K.)*, [1991] 1 S.C.R. 1091; *Mills v. The Queen*, [1986] 1 S.C.R. 863; *R. v. Hunt*, [2016] N.J. No. 372, dissenting reasons of Hoegg J.A. adopted by S.C.C. in 2017 SCC 25.

[10] *Blencoe v. British Columbia (Human Rights Commission)*, 2000 SCC 44, at paras. 68-69; *R. v. Hunt*, [2016] N.J. No. 372, dissenting reasons of Hoegg J.A. adopted by S.C.C. in 2017 SCC 25.

U.S. Customs and Border Protection describes the historical requirements for entry to the United States as follows:

> Historically, U.S. and Canadian citizen travelers were able to offer an oral declaration alone or could present any of over 8,000 different documents to prove identity and citizenship. The 9/11 Commission recommended and Congress mandated the requirement that all travelers – including U.S. and Canadian citizens – present a passport or other secure document that denotes both citizenship and identity when entering the United States.

After 9/11, the U.S. implemented the Western Hemisphere Travel Initiative, implementing document requirements for travel by land or sea into the United States from Canada, Mexico, the Caribbean and Bermuda. As of June 1, 2009, U.S. adult citizens entering the United States at land and sea ports were required to present one of the following:

- U.S. Passport;
- Passport Card;
- Enhanced Driver's Licence;
- Trusted Traveler Program card (NEXUS, SENTRI or FAST);
- U.S. Military identification card when travelling on official orders;
- U.S. Merchant Mariner document when travelling on official business; or
- Form I-872 American Indian Card; or
- Enhanced Tribal Card.

As of June 1, 2009, Canadian adult citizens entering the United States were required to present:

- Canadian Passport;
- Enhanced Driver's License; or
- Trusted Traveler Program card (NEXUS, SENTRI or FAST).

It is only after the implementation of these requirements in 2009 that a valid passport was required for travel by a Canadian or U.S. citizen between Canada and the United States. Before 2009, Canadian and U.S. travellers could travel between Canada and the U.S. on an oral declaration or present numerous other documents to establish identity and citizenship.

At the time KOLLMAR is alleged to have committed these offences, including travelling between the U.S. and Canada, a passport was not required. As a result, the lack of passport stamps evidencing his entry/exit from Canada has no bearing on the complainant's credibility.

### *Property Sale*

Kollmar has provided documentation of a sale of a property on Keele Street on December 17, 1976. He suggests that this establishes that Students of Light were not associated with the property at the time that the victim alleges. In my opinion, this document has limited evidentiary value for impugning the complainant's credibility, for the following reasons:

- In the victim's written statement that she provided to police during her February 25, 1997 interview, she described that the property at 301 Keele street "was a house that was rented and eventually purchased by this group of people who called themselves "Students of Light" or "SOL"." As a result, the sale of the property to Students of Light after the property was *already* in use by Students of Light for some time is consistent with the victim's account.

- The sale document indicates that the property was sold for "nil". This appears much more consistent with the acquisition of a property from an individual with whom Students of Light had an existing relationship (and who perhaps was associated with Students of Light). This is also consistent with Students of Light having been using the property before the sale.

I trust that this is of assistance.

Yours sincerely,

E. Nicole Rivers
Crown Counsel
Encl.

Published on *U.S. Customs and Border Protection* (https://www.cbp.gov (https://www.cbp.gov))

Travel Document Requirements for Entry into the United States by Land or Sea

> What is the Western Hemisphere Travel Initiative? (/print/293511#faq-What-is-the-Western-Hemisphere-Travel-Initiative?)

> The Western Hemisphere Travel Initiative (WHTI) is the plan to implement a key 9/11 Commission recommendation and a requirement of the Intelligence Reform and Terrorism Prevention Act of 2004. WHTI establishes document requirements for travel by land or sea into the United States from Canada, Mexico, the Caribbean and Bermuda. Travel between the U.S. mainland and U.S. territories such as Puerto Rico and the U.S. Virgin Islands is not affected.

> What requirements changed on June 1, 2009? (/print/293511#faq-What-requirements-changed-on-June-1,-2009?)

> U.S., Canadian, and Bermudian citizens must now present approved travel documents when entering the United States at land or sea ports of entry.

> Why is WHTI being implemented for land and sea travel? (/print/293511#faq-Why-is-WHTI-being-implemented-for-land-and-sea-travel?)

> The goal of secure, standardized travel documents is to strengthen border security while facilitating entry into the United States for U.S. citizens and legitimate international travelers, making the process more secure, more efficient and more convenient.

> What types of documents are accepted as of June 1, 2009 for entry into the United States via land or sea by U.S. and Canadian citizens? (/print/293511#faq-What-types-of-documents-are-accepted-as-of-June-1,-2009-for-entry-into-the-United-States-via-land-or-sea-by-U.S.-and-Canadian-citizens?)

U.S. citizen adult travelers can present a valid:

- U.S. Passport;
- Passport Card;
- Enhanced Driver's License;
- Trusted Traveler Program card (NEXUS, SENTRI or FAST);
- U.S. Military identification card when traveling on official orders;
- U.S. Merchant Mariner document when traveling on official business; or
- Form I-872 American Indian Card; or
- Enhanced Tribal Card (when available).

Canadian citizen adult travelers can present a valid:

- Canadian passport;
- Enhanced Driver's License; or
- Trusted Traveler Program card (NEXUS, SENTRI or FAST).

---

What is required for U.S. and Canadian children? (/print/293511#faq-What-is-required-for-U.S.-and-Canadian-children?)

U.S. and Canadian citizen children under age 16 arriving by land or sea from a contiguous territory (Mexico, Canada and the Caribbean) may present an original or copy of his or her birth certificate, a Consular Report of Birth Abroad, a Naturalization Certificate, or a Canadian Citizenship Card.

For groups of children, U.S. and Canadian citizen children under age 19 arriving by land or sea from a contiguous territory and traveling with a school group, religious group, social or cultural organization, or sports team, may also present an original or copy of his or her birth certificate, a Consular Report of Birth Abroad, a Naturalization Certificate, or a Canadian Citizenship Card.

The group should provide, on organizational letterhead:

- The name of the group and supervising adult.
- A list of the children on the trip, the primary home address, phone number, date of birth, place of birth, and name of at least one parent or legal guardian for each child.
- A written and signed statement of the supervising adult certifying that he or she has obtained parental or legal guardian consent for each participating child.

---

How do WHTI document requirements affect Native Americans? (/print/293511#faq-How-do-WHTI-document-requirements-affect-Native-Americans?)

The American Indian Card (Form I-872) is currently a WHTI-compliant document for entry by land or sea.

CBP is currently working with several Native American tribes toward the development of Enhanced Tribal Cards (ETCs), which upon designation by CBP, will be WHTI-compliant documents.

---

What about military personnel? (/print/293511#faq-What-about-military-personnel?)

U.S. citizen members of the U.S. Armed Forces (Active Duty or Reserves) who are coming to or departing from the United States under official orders (to include leave orders) may present a military identification card and the official orders when entering the United States. Those not under official travel or leave orders and presenting a military ID will not be considered WHTI-compliant.

Alien members of the United States Armed Forces, and alien members of the force of a NATO country, who are coming to or departing from the United States under official orders should present their military identification and official orders.

### What is required for Bermudian citizens? (/print/293511#faq-What-is-required-for-Bermudian-citizens?)

All Bermudian citizens are required to present a valid passport issued by Bermuda or the United Kingdom.

### W hose document requirements are not affected by this change? (/print/293511#faq-W-hose-document-requirements-are-not-affected-by-this-change?)

WHTI does not affect document requirements for Mexican citizens and U.S. Lawful Permanent Residents.

### What are the document requirements for U.S. Lawful Permanent Residents? (/print/293511#faq-What-are-the-document-requirements-for-U.S.-Lawful-Permanent-Residents?)

U.S. Lawful Permanent Residents are still required to present a valid permanent resident card (Form I-551), or other valid evidence of permanent residence status.A passport is not required.

### What are the document requirements for Mexican citizens? (/print/293511#faq-What-are-the-document-requirements-for-Mexican-citizens?)

Mexican citizens, including children, are required to present a passport with visa, or a Border Crossing Card. Mexican citizens may present a Border Crossing Card (BCC) as a stand-alone document for entry from Mexico only (by land or by pleasure vessel or ferry). The BCC also serves as a nonimmigrant visa, and together with a valid passport, it meets the documentary requirements for entry at all land, air, and sea ports of entry.

### Is the Border Crossing Card (DSP-150) only acceptable for Mexican citizens traveling from Mexico? What about travel from Canada? (/print/293511#faq-Is-the-Border-Crossing-Card-(DSP-150)-only-acceptable-for-Mexican-citizens-traveling-from-Mexico?-What-about-travel-from-Canada?)

The Border Crossing Card is acceptable as a stand-alone document (by itself) only for travel from Mexico by land, or by pleasure vessel or ferry. Together with a valid passport, though, it meets the documentary requirements for entry at all land, air, and sea ports of entry (to include travel from Canada).

How do these requirements affect First Responders or medical emergency situations? (/print/293511#faq-How-do-these-requirements-affect-First-Responders-or-medical-emergency-situations?)

The implementation of WHTI does not prevent CBP from continuing to allow U.S. and foreign nationals without a WHTI-compliant document to enter the country on a case-by-case basis in the event of unforeseen medical or non-medical emergency situations, or in cases of humanitarian or national interest. This has been a common practice for decades, and allows expedited processing for unforeseen emergencies such as first responder action and patients involved in medical emergencies on both sides of the border. CBP port management will continue to coordinate with local emergency departments to ensure that local procedures are in place and emergency situations are facilitated.

Please note however, that for emergency first response personnel who regularly and routinely cross the border into the United States, obtaining a passport or other acceptable alternative document is likely to be the most expedient means of crossing the border.

## Traveling by Sea

How will the new requirements affect passengers going on cruises? (/print/293511#faq-How-will-the-new-requirements-affect-passengers-going-on-cruises?)

U.S. citizens who board a cruise ship at a port within the United States, travel only within the Western Hemisphere, and return to the same U.S. port on the same ship (referred to as a "closed loop" cruise), may present a government issued photo identification, along with proof of citizenship (an original or copy of his or her birth certificate, a Consular report of Birth Abroad, or a Certificate of Naturalization).

Please be aware that you may still be required to present a passport to enter the countries your cruise ship is visiting. Check with your cruise line to ensure you have the appropriate documents.

How are ferries and small boats (pleasure vessels) affected? (/print/293511#faq-How-are-ferries-and-small-boats-(pleasure-vessels)-affected?)

Ferries and small boats are processed much like land travel, and all individuals traveling by these modes of travel are subject to the new requirements.

What if I have an I-68 registration? Will I still need a passport? (/print/293511#faq-What-if-I-have-an-I-68-registration?-Will-I-still-need-a-passport?)

Yes, boaters who have an I-68 form will still be required to abide by the new travel document requirements. Beginning June 1, 2009, Canadian Boat Landing (I-68) permits and Local Boater Option (LBO) registrations will only be issued to applicants presenting WHTI-compliant documents. I-68 permits and LBO registrations issued prior to June 1 will remain valid throughout 2009.

Please note that a NEXUS card is an alternative to a passport, and ensuring that you have either a NEXUS card or a passport will enable you to continue to use telephonic clearance procedures currently in place for I-68 holders. An I-68 form is similar to any kind of vehicle registration, and is not an identity document or a travel document.

Will travelers from U.S. territories need to present a passport to enter the United States? (/print/293511#faq-Will-travelers-from-U.S.-territories-need-to-present-a-passport-to-enter-the-United-States?)

No. U.S. territories are considered a part of the United States. U.S. citizens traveling directly from a U.S. territory are not considered to have left the country and do not need to present a passport. U.S. territories include the following: Guam, Puerto Rico, the U.S. Virgin Islands, American Samoa, Swains Island and the Commonwealth of the Northern Mariana Islands.

What if I don't have an approved travel document? (/print/293511#faq-What-if-I-don't-have-an-approved-travel-document?)

Travelers should apply for approved travel documents as soon as possible, as it can take several weeks to receive a document that will comply with new requirements under the Western Hemisphere Travel Initiative.

CBP is committed to working with travelers to ensure they have access to and can obtain appropriate travel documents. U.S. and Canadian citizens who lack WHTI-compliant documents but are otherwise admissible will not be denied entry into the United States on June 1, and are encouraged to continue with their travel plans and to obtain facilitative and secure WHTI travel documents as soon as possible. Travelers without the proper documents may be delayed while CBP officers work to confirm citizenship and identity.

What is a U.S. Passport Card? (/print/293511#faq-What-is-a-U.S.-Passport-Card?)

A U.S. Passport Card is a low-cost, limited-use travel document produced by the Department of State acceptable for land and sea travel to enter the United States from within the Western Hemisphere. The Passport Card was specifically designed to meet the unique challenges at the land borders. They currently are not accepted for international air travel. However, they can be used for identification purposes at TSA screening checkpoints for domestic air travel.

What is an Enhanced Driver's License? (/print/293511#faq-What-is-an-Enhanced-Driver's-License?)

Enhanced Driver's Licenses (EDLs) are new, low cost, convenient travel documents that denote both identity and citizenship. (Enhanced Identification Cards, where available, are also WHTI compliant travel documents providing both proof of identity and citizenship.)

Washington, Vermont, New York, and Michigan are issuing EDLs for U.S. citizens who are residents of their states, which may be used instead of a passport to enter the United State from Canada, Mexico, and the Caribbean. EDLs contain features such as a radio frequency identification (RFID) chip and machine-readable zones that will facilitate the entry process at land and sea ports of entry. EDLs were specifically designed to meet the unique challenges at the land borders, and are not accepted for international air travel. However, they can be used for identification purposes at Transportation Security Administration (TSA) screening checkpoints for domestic air travel.

British Columbia, Manitoba, Ontario, and Quebec are issuing WHTI-compliant EDLs to Canadian citizens who are residents of their provinces.

Will I be able to use an Enhanced Driver's License at border crossings outside of my state or province? (/print/293511#faq-Will-I-be-able-to-use-an-Enhanced-Driver's-License-at-border-crossings-outside-of-my-state-or-province?)

Yes. EDLs are acceptable for entry into the U.S. from Canada, Mexico, Bermuda, and the Caribbean at any land or sea port of entry – not just at ports of entry in the issuing states or provinces.

What are the NEXUS, SENTRI and FAST programs? (/print/293511#faq-What-are-the-NEXUS,-SENTRI-and-FAST-programs?)

U.S. Customs and Border Protection's (CBP's) Trusted Traveler Programs provide expedited cross-border travel for pre-approved, low risk travelers and commercial truck drivers through dedicated lanes and kiosks. Members in these voluntary programs must meet certain eligibility requirements and pay a five-year membership fee. NEXUS (the northern border program) and SENTRI (the southern border program) are for passengers; FAST (Free and Secure Trade) is the commercial equivalent for truck drivers.

For a complete list of participating locations, eligibility requirements, and application information, please visit the "Travel" link at www.cbp.gov (http://www.cbp.gov) [1] and click "Trusted Traveler Programs."

Does a passport or other WHTI-compliant document have to be valid? (/print/293511#faq-Does-a-passport-or-other-WHTI-compliant-document-have-to-be-valid?)

Yes. In order to be WHTI-compliant, the document must be valid.

For Canadian and Bermudian citizens, the document (passport, Enhanced Driver's License, or Trusted Traveler Program card) must be valid for the entire period of admission.

What if I don't have a valid, approved travel document? (/print/293511#faq-What-if-I-don't-have-a-valid,-approved-travel-document?)

Travelers should apply for approved travel documents as soon as possible, as it can take several weeks to receive a document that will comply with new requirements under the Western Hemisphere Travel Initiative.

CBP is committed to working with travelers to ensure they have access to and can obtain appropriate travel documents. U.S. and Canadian citizens who lack WHTI-compliant documents but are otherwise admissible will not be denied entry into the United States on June 1, and are encouraged to continue with their travel plans and to obtain facilitative and secure WHTI travel documents as soon as possible. Travelers without the proper documents may be delayed while CBP officers work to confirm citizenship and identity.

Where can I go to obtain a passport or U.S. passport card? (/print/293511#faq-Where-can-I-go-to-obtain-a-passport-or-U.S.-passport-card?)

The Department of State issues passports and U.S. Passport Cards. Visit their web page at www.state.gov (http://www.state.gov) [2] for information on locations.

Where can I go to obtain a birth certificate? (/print/293511#faq-Where-can-I-go-to-obtain-a-birth-certificate?)

You may obtain a birth certificate by contacting the appropriate agency in the state where you were born. A listing of agencies may be found through the National Center for Health Statistics at www.cdc.gov/nchs (http://www.cdc.gov/nchs) [3].

Does my birth certificate need to be a certified, original copy? (/print/293511#faq-Does-my-birth-certificate-need-to-be-a-certified,-original-copy?)

CBP recommends that, where possible, an original or a certified copy of your birth certificate be presented. However, under certain circumstances, e.g., if you have sent the original in for a passport application, a copy may be accepted.

What happens if my documents are lost or stolen before I return to the United States? What happens if I don't have any documents when I need to cross the border back into the US at a land or sea port of entry? (/print/293511#faq-What-happens-if-my-documents-are-lost-or-stolen-before-I-return-to-the-United-States?-What-happens-if-I-don't-have-any-documents-when-I-need-to-cross-the-border-back-into-the-US-at-a-land-or-sea-port-of-entry?)

CBP regularly handles unforeseen emergency situations in an appropriate manner and will continue to do so upon full WHTI implementation on June 1, 2009. CBP will continue to facilitate U.S. or Canadian citizens that need to return to their home country due to emergent circumstances but lack a WHTI-compliant document.

U.S. citizens lacking WHTI-compliant documents will not be refused entry into the United States, but may be delayed as CBP officers work to verify identity and citizenship.

## Legislative Background

Why are travel requirements for land and sea travel to the US changing? (/print/293511#faq-Why-are-travel-requirements-for-land-and-sea-travel-to-the-US-changing?)

The Western Hemisphere Travel Initiative (WHTI) is the joint Department of State (DOS) and Department of Homeland Security (DHS) plan to implement the statutory mandates of the Intelligence Reform and Terrorism Prevention Act of 2004 (IRTPA).

WHTI establishes document requirements for travelers entering the United States who were previously exempt, including citizens of the U.S., Canada, and Bermuda.

Historically, U.S. and Canadian citizen travelers were able to offer an oral declaration alone or could present any of over 8,000 different documents to prove identity and citizenship. The 9/11 Commission recommended and Congress mandated the requirement that all travelers – including U.S. and Canadian citizens – present a passport or other secure document that denotes both citizenship and identity when entering the United States.

This requirement was successfully implemented for air travel on January 23, 2007. Since then, compliance has been and continues to be extremely high – over 99%.

How will the Departments of Homeland Security and State increase the security of our borders without causing backups at the land borders? (/print/293511#faq-How-will-the-Departments-of-Homeland-Security-and-State-increase-the-security-of-our-

borders-without-causing-backups-at-the-land-borders?)

DHS and DOS are using vicinity Radio Frequency Identification (RFID) technology for documents to meet WHTI requirements.

The use of RFID-enabled travel documents helps speed processing at the border by providing CBP officers at land border ports with passenger and law enforcement information in advance of the traveler's arrival at the vehicle inspection booth.

The technology also automates law enforcement checks to facilitate the processing of legitimate travelers while focusing attention on higher-risk individuals. This results in reduced processing time and a more secure process.

RFID technology has been used successfully along our land borders with Canada and Mexico since 1995. Through trusted traveler programs, such as NEXUS, SENTRI and FAST, U.S. border officials are able to facilitate legitimate cross-border travel and trade. Today, RFID technology can be found in car keys, highway toll tags and security access cards.

Which websites should I visit for information on WHTI? (/print/293511#faq-Which-websites-should-I-visit-for-information-on-WHTI?)

For more information on WHTI document requirements, and links to related web sites, go to www.cbp.gov (http://www.cbp.gov) [1] or www.state.gov/travelers (https://www.state.gov/travelers) [4].

### Western Hemisphere Travel Initiative Air FAQs

What is it, whom does it affect and when did it go into effect? (/print/293511#faq-What-is-it,-whom-does-it-affect-and-when-did-it-go-into-effect?)

The air portion of The Western Hemisphere Travel Initiative (WHTI) requires, with some exceptions, citizens of the United States, Canada, Mexico, and the British Overseas Territory of Bermuda to present a passport to enter or depart the United States when arriving by air from any part of the Western Hemisphere.

Whom does the travel initiative affect? (/print/293511#faq-Whom-does-the-travel-initiative-affect?)

U.S. citizens need a passport to enter the United States by air from Canada, Mexico, Bermuda, South and Central America, and the Caribbean (otherwise known as the Western Hemisphere).

Also under this rule, citizens of Mexico, Canada, and Bermuda are required to have a passport when entering the United States by air.

While United States citizens are currently required to have passports to enter most countries in Central and South America, this rule makes clear that the passport must be presented upon return to the United States as well.

## When was the travel initiative implemented? (/print/293511#faq-When-was-the-travel-initiative-implemented?)

- Phase 1: As of January 23, 2007, U.S. citizens and citizens of Canada, Mexico and Bermuda traveling by air between the U.S. and Canada, Mexico, Central and South America, the Caribbean, and Bermuda are required to present a valid passport to enter or depart the U.S.
- Phase 2: As of June 1, 2009, U.S. and Canadian citizens who enter the U.S. at land and sea ports of entry from within the Western Hemisphere are required to present a WHTI-compliant travel document such as a valid passport, U.S. passport card, Trusted Traveler Program card (NEXUS/SENTRI/FAST) or an Enhanced Driver's License. Verbal claims of citizenship and identity alone are no longer sufficient to establish identity and citizenship for entry into the United States.

## How do I get a passport? (/print/293511#faq-How-do-I-get-a-passport?)

United States citizens can visit the U.S. State Department's Travel (https://www.state.gov/travelers) [4] website, or call the U.S. National Passport Information Center: 1-877-4USA-PPT; TDD/TTY: 1-888-874-7793. Additionally, instructions for obtaining a passport are available through the U.S. Postal Service.

Please allow a sufficient amount of time to apply and receive the passport in advance of travel. Processing of the passport application takes approximately six to eight weeks. If you need to travel urgently and require a passport sooner, please visit the U.S. State Department's Travel (https://www.state.gov/travelers) [4] website for additional information.

Peak domestic passport processing is between January and July. For faster service, we recommend applying between August and December. U.S. citizens living outside the U.S. should contact the nearest U.S. embassy or consulate.

Foreign nationals should contact their respective governments to obtain passports.

## How many U.S. citizens currently hold passports? (/print/293511#faq-How-many-U.S.-citizens-currently-hold-passports?)

According to the State Department, approximately 109 million citizens hold U.S. passports.

How are U.S. lawful permanent residents (LPRs) affected by the passport requirement? (/print/293511#faq-How-are-U.S.-lawful-permanent-residents-(LPRs)-affected-by-the-passport-requirement?)

LPRs are able to use their Alien Registration Card (Form I-551), issued by DHS, or other valid evidence of permanent residence status to apply for entry to the United States.

What if I am an LPR but my children are U.S. Citizens? (/print/293511#faq-What-if-I-am-an-LPR-but-my-children-are-U.S.-Citizens?)

Children who are U.S. Citizens need to obtain a passport even if their parents are Green Card holders.

What do I need to travel to Canada or Mexico? (/print/293511#faq-What-do-I-need-to-travel-to-Canada-or-Mexico?)

Different countries may have different travel document requirements. It is best to check with the country you are visiting to determine the appropriate travel document requirements (for instance, whether you need a passport and/or visa). You can find out more by referring to the State Department website.

I am a Mexican citizen and have a valid Border Crossing Card (BCC). Am I required to also present a passport to travel to the United States by air? (/print/293511#faq-I-am-a-Mexican-citizen-and-have-a-valid-Border-Crossing-Card-(BCC).-Am-I-required-to-also-present-a-passport-to-travel-to-the-United-States-by-air?)

Yes. Under this final rule, Mexican citizens, just like U.S., Canadian and Bermudan citizens, are required to present a passport for air travel. The BCC, while currently serving in lieu of a passport and visa for land border crossings within the border region, may also be used as a visitor's visa. However, due to the unique circumstances of air travel, it was felt that the additional presentation of a passport was necessary.

What happens to persons who attempt to enter or re-enter the country without a passport or an alternative travel document? (/print/293511#faq-What-happens-to-persons-who-attempt-to-enter-or-re-enter-the-country-without-a-passport-or-an-alternative-travel-document?)

For the general public, people who apply for entry but do not have appropriate documentation will likely be referred for secondary screening at the port. In secondary, Customs and Border Protection officers will evaluate evidence of citizenship or identity the individual may have and will verify all information against available databases. For foreign nationals, a determination will be made at

that time whether to admit the individual. However, to prevent delay at the ports of entry, we would encourage all travelers to obtain the appropriate documents before they travel.

In addition, the State Department has processes to assist U.S. citizens overseas to obtain emergency travel documentation for those with lost or stolen passports.

Do travelers from U.S. territories need to present a passport to enter the United States? (/print/293511#faq-Do-travelers-from-U.S.-territories-need-to-present-a-passport-to-enter-the-United-States?)

No. These territories are a part of the United States. U.S. citizens returning directly from a U.S. territory are not considered to have left the U.S. and do not need to present a passport. U.S. territories include the following: Guam, Puerto Rico, the U.S. Virgin Islands, American Samoa, Swains Island and the Commonwealth of the Northern Mariana Islands. If the traveler also visited non-U.S. territories, he/she is required to present a passport.

Although U.S. citizens are not required to present a passport when departing U.S. territories and traveling to the mainland, having evidence of citizenship (e.g., U.S. passport, birth certificate, Trusted Traveler Program card) or lawful permanent residence (e.g., green card) available will help CBP expedite your customs processing.

Additionally, although not required to present a passport, travelers departing the U.S. territories for the U.S. mainland are subject to customs and agriculture restrictions. Travelers are entitled to a $1,600 duty-free exemption, as long as they remained in the U.S. territories for 48 hours or longer. After the $1,600 duty-free exemption, travelers will be required to pay a flat rate of 1.5% on the next $1,000 worth of goods purchased.

CBP officers may also conduct baggage checks or ask additional questions as part of standard inspections of outbound passengers, to prevent any non-native species of plants, pests or plant diseases, which may be present in one of the islands from being introduced to the mainland. For example, a pre-departure examination is performed on all passengers and cargo moving from Hawaii to the mainland U.S. The purpose of this examination is to prevent movement of fruit flies and fruit fly host material. These rules also apply to Caribbean islands, including the U.S. Virgin Islands and Puerto Rico. For more information on what agricultural goods can be brought from U.S. territories and Hawaii, please visit the USDA website.

Does the passport requirement affect offshore U.S. citizens or LPR fishermen? (/print/293511#faq-Does-the-passport-requirement-affect-offshore-U.S.-citizens-or-LPR-fishermen?)

The passport requirement does not apply to U.S. citizens or LPR's who fish offshore, so long as they do not land in foreign soil.

For example, someone fishing in the Caribbean would only have to present a passport upon return if they traveled from a U.S. state or territory (Puerto Rico is a U.S. territory, and the U.S. Virgin Islands consist of St. Thomas, St. John, St. Croix, and Water Island, and many smaller islands) and landed in Jamaica, the Bahamas, or any non-U.S. territory.

Nonresident aliens may not be employed aboard any U.S.-based fishing vessel as "D" crew members.

---

Other than a passport, what types of documents are acceptable for air travel? (/print/293511#faq-Other-than-a-passport,-what-types-of-documents-are-acceptable-for-air-travel?)

Individuals traveling by air within the Western Hemisphere are required to present a passport for admission to the U.S. with limited exceptions.

This Final Rule outlines two additional documents that are acceptable for air travel. The first is the Merchant Mariner Document (MMD) issued by the U.S. Coast Guard that will be acceptable for use under WHTI by U.S. citizen merchant mariners traveling on official business. The other document is the NEXUS card, for which enrollment is limited to citizens of Canada and the United States, lawful permanent residents of the United States and permanent residents of Canada.

---

Can the NEXUS card be used at any air location? (/print/293511#faq-Can-the-NEXUS-card-be-used-at-any-air-location?)

NEXUS cards will only be accepted in conjunction with the NEXUS program at designated NEXUS sites.

---

How are members of the U.S. armed forces affected by the passport requirement? (/print/293511#faq-How-are-members-of-the-U.S.-armed-forces-affected-by-the-passport-requirement?)

There are no changes proposed for members of the U.S. armed forces traveling on active duty.

Currently, an individual traveling as a member of the United States armed forces on active duty is not required to present a valid passport to enter or depart the United States. There are no changes under the air rule for members of the U.S. armed forces.

This does not apply to spouses and dependents of these military members. Spouses and dependents are required to present a passport (and valid visa, if applicable) when traveling into the United States under WHTI.

How are members of the NATO Armed Forces affected by the passport requirement? (/print/293511#faq-How-are-members-of-the-NATO-Armed-Forces-affected-by-the-passport-requirement?)

There are no changes proposed for members of the U.S. armed forces traveling on active duty.

Currently, an individual traveling as a member of the United States armed forces on active duty is not required to present a valid passport to enter or depart the United States. There are no changes under the air rule for members of the U.S. armed forces. Any future changes, if necessary, will be addressed during the second phase of the WHTI rulemaking process.

This does not apply to spouses and dependents of these military members. Spouses and dependents will be required to present a passport (and valid visa, if applicable) when traveling into the United States under WHTI.

Do the documentation requirements apply to children? (/print/293511#faq-Do-the-documentation-requirements-apply-to-children?)

Yes, all children ranging in age from birth to 18 years-of-age are required to present their own passport when entering the United States at airports.

---

**Last modified:** Monday, July 29, 2019 - 10:59

---

**Source URL:** https://www.cbp.gov/travel/us-citizens/western-hemisphere-travel-initiative/faqs
**Links**
[1] http://www.cbp.gov
[2] http://www.state.gov
[3] http://www.cdc.gov/nchs
[4] https://www.state.gov/travelers