1   DAVID L. ANDERSON (CABN 149604)
United States Attorney

2

HALLIE HOFFMAN (CABN 210020)
3   Chief, Criminal Division

4   MAUREEN C. BESSETTE (CABN 165775)
Assistant United States Attorney
5

      1301 Clay Street, Suite 340S
6       Oakland, California 94608
       Telephone: (510) 637-3691
7       Fax: (510) 637-3724
       E-mail: Maureen.Bessette@usdoj.gov
8

Attorneys for United States of America
9

10              UNITED STATES DISTRICT COURT

11           NORTHERN DISTRICT OF CALIFORNIA

12                OAKLAND DIVISION

13   IN THE MATTER OF THE EXTRADITION  )  No. 4-19-MJ-70677 MAG
   OF DON KOLLMAR AKA DONALD      )
14   KOLLMAR                    )  U.S. NOTICE OF SECOND SUPPLEMENTAL
                          )  INFORMATION IN SUPPORT OF REQUEST FOR
15                        )  EXTRADITION AND MOTION FOR SEALING
                        )  ORDER
16  _____)

17       The United States of America, by its attorney, Maureen C. Bessette, Assistant U.S. Attorney for

18  the Northern District of California, hereby moves to file the attached supplemental information, received

19  from Canada, which includes a Supplemental Affidavit of Law of Erin Nicole Rivers, Prosecutor,

20  Ministry of the Attorney General of Ontario and Exhibit A, FAQ document published by U.S. Customs

21  and Border Protection. In support of its motion, the government states that it received the above

22  information from Canada in support of the Extradition of Don Kollmar.

23       I declare the foregoing under penalty of perjury.

24  Dated: January 21, 2020             Respectfully submitted,

25                                   DAVID L. ANDERSON
                                United States Attorney
26                                  _____/s/_____
                                MAUREEN C. BESSETTE
27                                  Assistant United States Attorney
                                  Northern District of California
28

# ATTACHMENT

Embassy of the United States of America

## Certificate to be Attached to Documentary Evidence Accompanying Requisitions in the United States for Extradition

## AMERICAN FOREIGN SERVICE

Ottawa, Canada, January 9, 2020

I, Richard M. Mills, Chargé d'Affaires of the United States of America at Ottawa, Canada, hereby certify that the annexed papers, being authenticated supporting documents proposed to be used upon an application for the extradition from the United States of Donald KOLLMAR who stands charged in the Province of Ontario with one count of indecent assault, contrary to section 149 of the *Criminal Code* and one count of rape, contrary to sections 143 and 144 of the *Criminal Code* are properly and legally authenticated so as to entitle them to be received in evidence for similar purposes by the tribunals of Canada, as required by Title 18, United States Code, Section 3190.

In witness whereof I hereunto sign my name and cause my seal of office to be affixed this 9th day of January, 2020.



Richard M. Mills
Chargé d'Affaires of the
United States of America

SENSITIVE BUT UNCLASSIFIED

Foreign Service



Department of            Ministère de la Justice
Justice                  Canada
Canada

## CERTIFICATE OF AUTHENTICATION

IN THE MATTER OF the request for the extradition of **Donald KOLLMAR** from the United States of America to Canada

I, Cathy Chalifour, Senior Counsel, International Assistance Group, Department of Justice of Canada, do hereby certify:

THAT attached to this Certificate is authenticated supplemental documentation presented by Canada in support of the request for the extradition of **Donald KOLLMAR** who stands charged in the Province of Ontario with one count of indecent assault, contrary to section 149 of the *Criminal Code* and one count of rape, contrary to sections 143 and 144 of the *Criminal Code*.

THAT the supplemental documentation attached to this certificate is composed of:

- the Supplemental Affidavit of Law of Erin Nicole Rivers, Prosecutor, Ministry of the Attorney General of Ontario to which is appended:

    - as exhibit "A", a "FAQ" document published by U.S. Customs and Border Protection.

THAT Vallery Bayly, whose original signature appears at the end of the Affidavit of ERIN NICOLE RIVERS, is a Barrister & Solicitor and a Commissioner of Oaths for the Province of Ontario, having been duly commissioned and duly authorized by the laws thereof to administer oaths and to take affidavits within the said Province.

The Seal of the Minister of Justice of Canada is hereby affixed this 8ᵗʰ day of January, 2020.

Cathy Chalifour

| | | |
|---|---|---|
| CANADA | ) | HER MAJESTY THE QUEEN |
| | ) | |
| PROVINCE OF ONTARIO | ) | v. |
| | ) | |
| TORONTO REGION | ) | DONALD KOLLMAR |

IN THE MATTER of a request by Canada for the extradition of DONALD KOLLMAR from the United States of America with respect to offences under the *Criminal Code* of Canada.

---

## SUPPLEMENTARY AFFIDAVIT OF ERIN NICOLE RIVERS

---

I, **Erin Nicole Rivers,** of the City of Toronto, in the Toronto Region, in the Province of Ontario, **MAKE OATH AND SAY AS FOLLOWS:**

### A. REQUEST FOR ADDITIONAL INFORMATION

1.      On December 23, 2019, I received a request from the U.S. authorities for additional information in relation to the matter of Donald KOLLMAR. As a result, I provide the following information to supplement my affidavit of law, dated June 20, 2019.

### B. Sections 7, 11(a) and 11(b) of the Charter

2.      Article 4 of the Treaty on Extradition Between the Government of Canada and the Government of the United States of America provides that extradition shall not be granted when the prosecution for the offence "has become barred by lapse of time according to the laws of the requesting State".

3.      In Canadian law, prosecution of less-serious, "summary conviction" offences is statute barred after the statutory time-limit. Prosecution for these offences after the applicable time period is "barred for lapse of time" under article 4 of the *Treaty*. However, there is no applicable limitation period to "bar" prosecution for indictable offences. Sections 7, 11(a) and 11(b) of the

*Charter of Rights and Freedoms* do not "bar" prosecution of these offences for lapse of time, but rather provide a *Charter* remedy in some cases, after a prosecution has already been initiated. The availability of such a remedy is highly dependent on the particular facts in each case.

### Section 11(b)

4.     The Supreme Court of Canada has made clear in Argentina (Republic) v. Mellino that proceedings barred by "lapse of time" are only those barred by a limitation period. Section 11(b) of the Charter has no application:

> Counsel for Mellino, however, argued that s. 11(*b*) of the Charter applied to Mellino by virtue of art. V of the treaty, which provides that extradition shall not take place if "exemption from prosecution or punishment has been acquired by lapse of time, according to the laws of the state applying or applied to". This provision was obviously intended to bring into operation statutes of limitations that exist in some countries prohibiting prosecution for certain crimes after a stated lapse of time: for an example, see *R. v. Brixton Prison (Gov.); Ex parte Van der Auwera*, [1907] 2 K.B. 157. Such statutes are relatively easy to apply at an extradition hearing; one simply has to compute the time in accordance with the provisions of the statute. Section 11(*b*), on the other hand, is not an exemption in that sense. It gives a Charter remedy for delay when a prosecution has been initiated; no fixed time is involved. One must take into account such matters as whether the delay is unreasonable having regard to the time particular procedures ordinarily take. In extradition matters, this would surely require an inquiry into how proceedings are conducted in the foreign country and involve comparing them with ours. As well, a thorough examination of the facts surrounding the delay would have to be made, a function, as I explained in *Schmidt*, wholly out of keeping with extradition proceedings. It would require much stronger words than these to persuade me that a treaty provision of this kind was intended to expand the application of our constitutional standards for expeditious prosecutions to the international arena. In the present case, it would require considerable adaptations to apply s. 11(*b*) to the relevant delay. The delay principally complained of is the time elapsed between the time Mellino was discharged following the first extradition hearing and the initiation of the second.[1]

5.     As the Supreme Court explains in the above passage, unlike a limitation period, determination of whether a stay is warranted under section 11(b) is a complicated analysis. In *R. v. Jordan*,[2] the Supreme Court of Canada set out a 30-month ceiling, beyond which delay is presumptively unreasonable. However, delay attributed to the defence is deducted from the

---

[1] *Argentina (Republic) v. Mellino*, [1987] 1 S.C.R. 536.
[2] *R. v. Jordan*, 2016 SCC 27.

calculation, and exceptional circumstances can justify delay in excess of the 30-month ceiling.

6.  "Exceptional circumstances" are those circumstances that are reasonably unforeseen or reasonably unavoidable, and which generate delay the Crown cannot reasonably remedy. In *Jordan*, the Court stated that "[c]ases with an international dimension, such as cases requiring the extradition of an accused from a foreign jurisdiction, may also meet the definition [of exceptional circumstances]".[3]

7.  Canadian Courts have found "exceptional circumstances" and/or "defence delay" where an offender charged in Canada was residing in another country and/or their whereabouts were not known to Canadian authorities. For example:

- In *R. v. Singleton*, the British Columbia Court of Appeal (in a case pre-dating *Jordan*) specifically addressed the extent to which Canadian authorities must go to locate an accused in another country in the context of an 11(b) application. The offender was charged in 1997 with offences committed between 1988 and 1990. However, by the time he was charged in 1997, he had moved back to the United States. From October 1998 to October 2002, the police made no effort to locate him. He was located in October 2002, and extradition proceedings commenced. The offender was returned to Canada in September 2006. In finding that the delay while the offender's whereabouts were unknown was not attributable to the Crown, the Court stated:

    > […] while the state has an obligation to act with reasonable diligence to bring an accused who is outside of Canada to trial within a reasonable time, whether that obligation has been met is to be determined contextually, considering the investigative avenues available to the police force or investigating agency involved. When an accused is in a foreign country from which he or she can be extradited and his or her whereabouts are known, Canadian prosecution officials are obligated to pursue extradition in a reasonable and timely manner. If they fail to do so, as in *MacIntosh*, the ensuing delay will be attributed to the Crown. […]

    > In my view, on the record of this case, it cannot be said that the police failed to act with reasonable diligence. Attempting to locate someone in a country as vast as the United States with no idea of where to look is akin to trying to find the proverbial needle in a haystack. […][4]

- In *R. v. Burke*, the Ontario Court of Appeal found that the trial judge erred in issuing a stay under s. 11(b) where the respondent was charged with abduction and sexual assault in 1986, but then fled to the U.S. in violation of his bail. A Canada-wide warrant was issued. The respondent assumed a false identity in the U.S., and was charged with offences in the U.S.

---

[3] *R. v. Jordan*, 2016 SCC 27, at paras. 69-71.
[4] *R. v. Singleton*, 2014 BCCA 232

in 1987. He was sentenced to 52 years imprisonment. In 2000, police learned that he was eligible for parole in 2013, and in 2015, he was deported back to Canada. His trial was scheduled to begin in July 2017. The Ontario Court of Appeal found that the delay from the time the charges were laid until the respondent was returned to Canada was illegitimate defence delay, caused directly by the respondent to frustrate the proceedings.[5]

- In *R. v. Magiri*, Justice McWatt of the Ontario Superior Court of Justice accepted the Crown's argument that a delay of 10 months during which the accused was not in Canada was a "discrete event" and exceptional circumstance. McWatt J. held that the police could not have foreseen that the applicant would leave Canada, and that once he was located and arrested, the Crown and police made concerted efforts to remedy the delay.[6]

- In *R. v. J.S.*, Justice Speyer of the Ontario Court of Justice found that a period of 42 months during which the accused was in Nicaragua was defence delay. The accused quit his job in Toronto and relocated to Nicaragua in September 2013, and was subsequently charged with offences against his wife in October 2013. Justice Speyer found that the accused knew that there was an outstanding warrant for his arrest, and actively avoided being found by Canadian authorities. The police had no information that the accused was in Nicaragua.[7]

- In *R. v. Thind*, Justice Coroza of the Ontario Superior Court of Justice found that the almost 3-year period between the laying of an information and the accused's arrest was a "discrete event" because the accused was out of the country and could not be located and arrested. In this case, the accused was residing in Australia. The police made reasonable efforts to locate the accused, and attempted to contact him by leaving messages for him on the phone and with his mother. The RCMP also attempted to contact Bond University in Australia where it was believed the accused was attending school, but were unable to obtain any information due to privacy laws. The RCMP also asked that the accused be flagged in CBSA systems. The RCMP actions were not perfect, but "a standard of perfection is not placed upon the police".[8]

*Section 11(a)*

8.    Section 11(a) of the *Charter* guarantees a person charged with an offence the right "to be informed without unreasonable delay of the specific offence". It provides two forms of protection (i) notice of the specific offence; and (ii) the right to be informed without unreasonable delay. Pre-*Jordan*, the Ontario Court of Appeal approved of an analysis under s. 11(a) using the same factors under s. 11(b). As a result, the same factors as under the 11(b) analysis (such as the international dimension and the fact that Kollmar was residing in a different country and his whereabouts unknown to Canadian authorities) will be relevant to determining whether the delay was

---

[5] *R. v. Burke*, 2018 ONCA 594
[6] *R. v. Magiri*, 2017 ONSC 2818, at paras. 15-18
[7] *R. v. H.S.*, 2018 ONCJ 162.
[8] *R. v. Thind*, 2018 ONSC 1337.

"unreasonable".

9.     However, unlike under s. 11(b), s. 11(a) requires an accused to show on a balance of probabilities that he was prejudiced by the delay in informing him of the charges against him. Typically, courts are concerned with prejudice to the accused's ability to mount a defence due to a failure to preserve or gather evidence.

10.     Kollmar alleges several bases upon which he has been prejudiced. Without a full evidentiary record of a *Charter* application, it is impossible to fully assess whether these bases have merit. However, on the information available:

- The prejudice alleged from the death of John Hanas is minimal. The complainant did not allege that Hanas was present for any aspect of the sexual abuse, nor was an active participant in her abuse. Kollmar has not established that Hanas would have possessed relevant evidence.

- The prejudice alleged from Kollmar's inability to obtain records had he been aware of the charges in 1997 is uncertain, and not established to have been caused by the state's delay in informing him of the charges. His ability to produce documentation of the sale of the Keele Street property belies his suggestion that he was unable to obtain documentation. Further, it is not established that further documentation would have been obtainable in 1997. Standard retention periods banking and other documents is often 7 years, and by 1997 this retention period would have already expired, calling into question whether such documentation would have been available at that time.

### *Section 7*

11.     Section 7 of the *Charter* guarantees the right to life, liberty and security of the person, and the right not to be deprived thereof except in accordance with the principles of fundamental justice. This section applies at all stages of the investigatory and judicial process.

12.     Section 7 is most commonly invoked to argue that *pre-charge* delay, as 11(b) is most often invoked to address post-charge delay.

13.     The s. 7 analysis requires the determination (1) that the right to life liberty and security of the person is engaged and deprived by the state; and (2) that this deprivation is not in accordance with the principles of fundamental justice.

14.     Delay is relevant under s. 7 not because of the length of the delay itself, but as a result of the *effect* of the delay on the fairness of the trial. Both pre-charge or post-charge delay are relevant, however the fairness of a trial is "not automatically undermined by even a lengthy pre-charge delay". It is the *effect* of delay, not its length, that matters to the fairness of a trial under s. 7.[9] Further, under the s. 7 analysis, prejudice caused by delay is relevant to section 7 "only when it is directly attributable to delay caused by the state".[10]

15.     In Kollmar's case, the pre-charge delay is not delay "caused by the state". Before the complainant came forward in 1997, the state was not aware of the allegations therefore not responsible for the delay.

16.     The only delay that *could* be "caused by the state" is delay from the time charges were laid in 1997 until today. However, as discussed above in the 11(b) analysis, the state is not held to a standard of perfection. The fact that Kollmar was out of the country and his whereabouts unknown to the Canadian authorities will be relevant in determining whether the delay, and any prejudice arising from that delay, was "caused by the state", and if so, whether it was "not in accordance with the principles of fundamental justice".

17.     The section 7 analysis, like the s. 11(a) and (b) analysis, is highly fact-dependent and context-driven. It is an analysis that must be conducted on a full evidentiary record. It would be inappropriate to conduct these analyses at this stage of proceedings, without the benefit of such an evidentiary record.

### C. Passport Requirements

18.     I have reviewed documentation publicly available from U.S. Customs and Border Protection, and the Canadian Border Services Agency. Based on a review of that documentation, I understand that until 2007, travel between Canada and the United States for Canadian and U.S. citizens did not require the presentation of a passport.

---

[9] *R. v. L.(W.K.)*, [1991] 1 S.C.R. 1091; *Mills v. The Queen*, [1986] 1 S.C.R. 863; *R. v. Hunt*, [2016] N.J. No. 372, dissenting reasons of Hoegg J.A. adopted by S.C.C. in 2017 SCC 25.
[10] *Blencoe v. British Columbia (Human Rights Commission)*, 2000 SCC 44, at paras. 68-69; *R. v. Hunt*, [2016] N.J. No. 372, dissenting reasons of Hoegg J.A. adopted by S.C.C. in 2017 SCC 25.

19.     The following information is taken from a "FAQ" document published by U.S. Customs and Border Protection, and publicly available. A copy of that document is attached to this affidavit as "**EXHIBIT A**".

20.     U.S. Customs and Border Protection describes the historical requirements for entry to the United States as follows:

Historically, U.S. and Canadian citizen travelers were able to offer an oral declaration alone or could present any of over 8,000 different documents to prove identity and citizenship. The 9/11 Commission recommended and Congress mandated the requirement that all travelers – including U.S. and Canadian citizens – present a passport or other secure document that denotes both citizenship and identity when entering the United States.

21.     After 9/11, the U.S. implemented the Western Hemisphere Travel Initiative, implementing document requirements for travel by land or sea into the United States from Canada, Mexico, the Caribbean and Bermuda. As of June 1, 2009, U.S. adult citizens entering the United States at land and sea ports were required to present one of the following:

- U.S. Passport;
- Passport Card;
- Enhanced Driver's Licence;
- Trusted Traveler Program card (NEXUS, SENTRI or FAST);
- U.S. Military identification card when travelling on official orders;
- U.S. Merchant Mariner document when travelling on official business; or
- Form I-872 American Indian Card; or
- Enhanced Tribal Card.

22.     As of June 1, 2009, Canadian adult citizens entering the United States were required to present:

- Canadian Passport;
- Enhanced Driver's License; or
- Trusted Traveler Program card (NEXUS, SENTRI or FAST).

23.     It is only after the implementation of these requirements in 2009 that a valid passport was required for travel by a Canadian or U.S. citizen between Canada and the United States. Before 2009, Canadian and U.S. travellers could travel between Canada and the U.S. on an oral declaration

7

or present numerous other documents to establish identity and citizenship.

24.    At the time KOLLMAR is alleged to have committed these offences, including travelling between the U.S. and Canada, a passport was not required. As a result, the lack of passport stamps evidencing his entry/exit from Canada has no bearing on the complainant's credibility.

### D. Property Sale

25.    Kollmar has provided documentation of a sale of a property on Keele Street on December 17, 1976. He suggests that this establishes that Students of Light were not associated with the property at the time that the victim alleges. In my opinion, this document has limited evidentiary value for impugning the complainant's credibility, for the following reasons:

- In the victim's written statement that she provided to police during her February 25, 1997 interview, she described that the property at 301 Keele street "was a house that was rented and eventually purchased by this group of people who called themselves "Students of Light" or "SOL"." As a result, the sale of the property to Students of Light after the property was *already* in use by Students of Light for some time is consistent with the victim's account.

- The sale document indicates that the property was sold for "nil". This appears much more consistent with the acquisition of a property from an individual with whom Students of Light had an existing relationship (and who perhaps was associated with Students of Light). This is also consistent with Students of Light having been using the property before the sale.

26.    This Affidavit is made in good faith in support of a request by Canada for the extradition of KOLLMAR with respect to the alleged offences, and for no improper purpose.

**SWORN BEFORE ME** at the City     )
of Toronto in the Toronto Region     )
in the Province of Ontario, Canada,     )
this 7th day of January, 2020     )

Vallery Bayly
Barrister & Solicitor
Commissioner of Oaths     LSO# : 74904K

Erin Nicole Rivers
Crown Counsel

8

HER MAJESTY THE QUEEN

v.

DONALD KOLLMAR

IN THE MATTER of a request by Canada for the extradition of DONALD KOLLMAR from the United States of America with respect to offences under the *Criminal Code* of Canada.

---

## SUPPLEMENTARY AFFIDAVIT OF ERIN NICOLE RIVERS

---

**MINISTRY OF THE ATTORNEY GENERAL FOR THE PROVINCE OF ONTARIO**
Crown Law Office – Criminal
720 Bay Street, 10th Floor
Toronto, Ontario
M7A 2S9

12/30/2019                    Western Hemisphere Travel Initiative (WHTI) Frequently Asked Questions

Published on *U.S. Customs and Border Protection* (https://www.cbp.gov (https://www.cbp.gov))

AFFIDAVIT OF *Jinn Nicole Rivers*
SWORN BEFORE ME
this *7th* day of *January* 20 20
*Valery*
*Bayly* LSO# *74904K*   A Commissioner, etc.

Travel Document Requirements for Entry into the United States by Land or Sea

What is the Western Hemisphere Travel Initiative? (/print/293511#faq-What-is-the-Western-Hemisphere-Travel-Initiative?)

The Western Hemisphere Travel Initiative (WHTI) is the plan to implement a key 9/11 Commission recommendation and a requirement of the Intelligence Reform and Terrorism Prevention Act of 2004. WHTI establishes document requirements for travel by land or sea into the United States from Canada, Mexico, the Caribbean and Bermuda. Travel between the U.S. mainland and U.S. territories such as Puerto Rico and the U.S. Virgin Islands is not affected.

What requirements changed on June 1, 2009? (/print/293511#faq-What-requirements-changed-on-June-1,-2009?)

U.S., Canadian, and Bermudian citizens must now present approved travel documents when entering the United States at land or sea ports of entry.

Why is WHTI being implemented for land and sea travel? (/print/293511#faq-Why-is-WHTI-being-implemented-for-land-and-sea-travel?)

The goal of secure, standardized travel documents is to strengthen border security while facilitating entry into the United States for U.S. citizens and legitimate international travelers, making the process more secure, more efficient and more convenient.

What types of documents are accepted as of June 1, 2009 for entry into the United States via land or sea by U.S. and Canadian citizens? (/print/293511#faq-What-types-of-documents-are-accepted-as-of-June-1,-2009-for-entry-into-the-United-States-via-land-or-sea-by-U.S.-and-Canadian-citizens?)

U.S. citizen adult travelers can present a valid:

- U.S. Passport;
- Passport Card;
- Enhanced Driver's License;
- Trusted Traveler Program card (NEXUS, SENTRI or FAST);
- U.S. Military identification card when traveling on official orders;
- U.S. Merchant Mariner document when traveling on official business; or
- Form I-872 American Indian Card; or
- Enhanced Tribal Card (when available).

Canadian citizen adult travelers can present a valid:

- Canadian passport;
- Enhanced Driver's License; or
- Trusted Traveler Program card (NEXUS, SENTRI or FAST).

**What is required for U.S. and Canadian children?** (/print/293511#faq-What-is-required-for-U.S.-and-Canadian-children?)

U.S. and Canadian citizen children under age 16 arriving by land or sea from a contiguous territory (Mexico, Canada and the Caribbean) may present an original or copy of his or her birth certificate, a Consular Report of Birth Abroad, a Naturalization Certificate, or a Canadian Citizenship Card.

For groups of children, U.S. and Canadian citizen children under age 19 arriving by land or sea from a contiguous territory and traveling with a school group, religious group, social or cultural organization, or sports team, may also present an original or copy of his or her birth certificate, a Consular Report of Birth Abroad, a Naturalization Certificate, or a Canadian Citizenship Card.

The group should provide, on organizational letterhead:

- The name of the group and supervising adult.
- A list of the children on the trip, the primary home address, phone number, date of birth, place of birth, and name of at least one parent or legal guardian for each child.
- A written and signed statement of the supervising adult certifying that he or she has obtained parental or legal guardian consent for each participating child.

**How do WHTI document requirements affect Native Americans?** (/print/293511#faq-How-do-WHTI-document-requirements-affect-Native-Americans?)

The American Indian Card (Form I-872) is currently a WHTI-compliant document for entry by land or sea.

CBP is currently working with several Native American tribes toward the development of Enhanced Tribal Cards (ETCs), which upon designation by CBP, will be WHTI-compliant documents.

**What about military personnel?** (/print/293511#faq-What-about-military-personnel?)

U.S. citizen members of the U.S. Armed Forces (Active Duty or Reserves) who are coming to or departing from the United States under official orders (to include leave orders) may present a military identification card and the official orders when entering the United States. Those not under official travel or leave orders and presenting a military ID will not be considered WHTI-compliant.

Alien members of the United States Armed Forces, and alien members of the force of a NATO country, who are coming to or departing from the United States under official orders should present their military identification and official orders.

**What is required for Bermudian citizens?** (/print/293511#faq-What-is-required-for-Bermudian-citizens?)

All Bermudian citizens are required to present a valid passport issued by Bermuda or the United Kingdom.

**W hose document requirements are not affected by this change?** (/print/293511#faq-W-hose-document-requirements-are-not-affected-by-this-change?)

WHTI does not affect document requirements for Mexican citizens and U.S. Lawful Permanent Residents.

**What are the document requirements for U.S. Lawful Permanent Residents?** (/print/293511#faq-What-are-the-document-requirements-for-U.S.-Lawful-Permanent-Residents?)

U.S. Lawful Permanent Residents are still required to present a valid permanent resident card (Form I-551), or other valid evidence of permanent residence status.A passport is not required.

**What are the document requirements for Mexican citizens?** (/print/293511#faq-What-are-the-document-requirements-for-Mexican-citizens?)

Mexican citizens, including children, are required to present a passport with visa, or a Border Crossing Card. Mexican citizens may present a Border Crossing Card (BCC) as a stand-alone document for entry from Mexico only (by land or by pleasure vessel or ferry). The BCC also serves as a nonimmigrant visa, and together with a valid passport, it meets the documentary requirements for entry at all land, air, and sea ports of entry.

**Is the Border Crossing Card (DSP-150) only acceptable for Mexican citizens traveling from Mexico? What about travel from Canada?** (/print/293511#faq-Is-the-Border-Crossing-Card-(DSP-150)-only-acceptable-for-Mexican-citizens-traveling-from-Mexico?-What-about-travel-from-Canada?)

The Border Crossing Card is acceptable as a stand-alone document (by itself) only for travel from Mexico by land, or by pleasure vessel or ferry. Together with a valid passport, though, it meets the documentary requirements for entry at all land, air, and sea ports of entry (to include travel from Canada).

12/30/2019

Case 4:19-mj-70677-MAG   Document 79   Filed 01/21/20   Page 17 of 27
Western Hemisphere Travel Initiative (WHTI) Frequently Asked Questions

How do these requirements affect First Responders or medical emergency situations? (/print/293511#faq-How-do-these-requirements-affect-First-Responders-or-medical-emergency-situations?)

The implementation of WHTI does not prevent CBP from continuing to allow U.S. and foreign nationals without a WHTI-compliant document to enter the country on a case-by-case basis in the event of unforeseen medical or non-medical emergency situations, or in cases of humanitarian or national interest. This has been a common practice for decades, and allows expedited processing for unforeseen emergencies such as first responder action and patients involved in medical emergencies on both sides of the border. CBP port management will continue to coordinate with local emergency departments to ensure that local procedures are in place and emergency situations are facilitated.

Please note however, that for emergency first response personnel who regularly and routinely cross the border into the United States, obtaining a passport or other acceptable alternative document is likely to be the most expedient means of crossing the border.

## Traveling by Sea

How will the new requirements affect passengers going on cruises? (/print/293511#faq-How-will-the-new-requirements-affect-passengers-going-on-cruises?)

U.S. citizens who board a cruise ship at a port within the United States, travel only within the Western Hemisphere, and return to the same U.S. port on the same ship (referred to as a "closed loop" cruise), may present a government issued photo identification, along with proof of citizenship (an original or copy of his or her birth certificate, a Consular report of Birth Abroad, or a Certificate of Naturalization).

Please be aware that you may still be required to present a passport to enter the countries your cruise ship is visiting. Check with your cruise line to ensure you have the appropriate documents.

How are ferries and small boats (pleasure vessels) affected? (/print/293511#faq-How-are-ferries-and-small-boats-(pleasure-vessels)-affected?)

Ferries and small boats are processed much like land travel, and all individuals traveling by these modes of travel are subject to the new requirements.

What if I have an I-68 registration? Will I still need a passport? (/print/293511#faq-What-if-I-have-an-I-68-registration?-Will-I-still-need-a-passport?)

Yes, boaters who have an I-68 form will still be required to abide by the new travel document requirements. Beginning June 1, 2009, Canadian Boat Landing (I-68) permits and Local Boater Option (LBO) registrations will only be issued to applicants presenting WHTI-compliant documents. I-68 permits and LBO registrations issued prior to June 1 will remain valid throughout 2009.

Please note that a NEXUS card is an alternative to a passport, and ensuring that you have either a NEXUS card or a passport will enable you to continue to use telephonic clearance procedures currently in place for I-68 holders. An I-68 form is similar to any kind of vehicle registration, and is not an identity document or a travel document.

Will travelers from U.S. territories need to present a passport to enter the United States? (/print/293511#faq-Will-travelers-from-U.S.-territories-need-to-present-a-passport-to-enter-the-United-States?)

No. U.S. territories are considered a part of the United States. U.S. citizens traveling directly from a U.S. territory are not considered to have left the country and do not need to present a passport. U.S. territories include the following: Guam, Puerto Rico, the U.S. Virgin Islands, American Samoa, Swains Island and the Commonwealth of the Northern Mariana Islands.

What if I don't have an approved travel document? (/print/293511#faq-What-if-I-don't-have-an-approved-travel-document?)

Travelers should apply for approved travel documents as soon as possible, as it can take several weeks to receive a document that will comply with new requirements under the Western Hemisphere Travel Initiative.

CBP is committed to working with travelers to ensure they have access to and can obtain appropriate travel documents. U.S. and Canadian citizens who lack WHTI-compliant documents but are otherwise admissible will not be denied entry into the United States on June 1, and are encouraged to continue with their travel plans and to obtain facilitative and secure WHTI travel documents as soon as possible. Travelers without the proper documents may be delayed while CBP officers work to confirm citizenship and identity.

What is a U.S. Passport Card? (/print/293511#faq-What-is-a-U.S.-Passport-Card?)

A U.S. Passport Card is a low-cost, limited-use travel document produced by the Department of State acceptable for land and sea travel to enter the United States from within the Western Hemisphere. The Passport Card was specifically designed to meet the unique challenges at the land borders. They currently are not accepted for international air travel. However, they can be used for identification purposes at TSA screening checkpoints for domestic air travel.

What is an Enhanced Driver's License? (/print/293511#faq-What-is-an-Enhanced-Driver's-License?)

Enhanced Driver's Licenses (EDLs) are new, low cost, convenient travel documents that denote both identity and citizenship. (Enhanced Identification Cards, where available, are also WHTI compliant travel documents providing both proof of identity and citizenship.)

Washington, Vermont, New York, and Michigan are issuing EDLs for U.S. citizens who are residents of their states, which may be used instead of a passport to enter the United State from Canada, Mexico, and the Caribbean. EDLs contain features such as a radio frequency identification (RFID) chip and machine-readable zones that will facilitate the entry process at land and sea ports of entry. EDLs were specifically designed to meet the unique challenges at the land borders, and are not accepted for international air travel. However, they can be used for identification purposes at Transportation Security Administration (TSA) screening checkpoints for domestic air travel.

British Columbia, Manitoba, Ontario, and Quebec are issuing WHTI-compliant EDLs to Canadian citizens who are residents of their provinces.

Will I be able to use an Enhanced Driver's License at border crossings outside of my state or province? (/print/293511#faq-Will-I-be-able-to-use-an-Enhanced-Driver's-License-at-border-crossings-outside-of-my-state-or-province?)

Yes. EDLs are acceptable for entry into the U.S. from Canada, Mexico, Bermuda, and the Caribbean at any land or sea port of entry – not just at ports of entry in the issuing states or provinces.

What are the NEXUS, SENTRI and FAST programs? (/print/293511#faq-What-are-the-NEXUS,-SENTRI-and-FAST-programs?)

U.S. Customs and Border Protection's (CBP's) Trusted Traveler Programs provide expedited cross-border travel for pre-approved, low risk travelers and commercial truck drivers through dedicated lanes and kiosks. Members in these voluntary programs must meet certain eligibility requirements and pay a five-year membership fee. NEXUS (the northern border program) and SENTRI (the southern border program) are for passengers; FAST (Free and Secure Trade) is the commercial equivalent for truck drivers.

For a complete list of participating locations, eligibility requirements, and application information, please visit the "Travel" link at www.cbp.gov (http://www.cbp.gov) [1] and click "Trusted Traveler Programs."

Does a passport or other WHTI-compliant document have to be valid? (/print/293511#faq-Does-a-passport-or-other-WHTI-compliant-document-have-to-be-valid?)

Yes. In order to be WHTI-compliant, the document must be valid.

For Canadian and Bermudian citizens, the document (passport, Enhanced Driver's License, or Trusted Traveler Program card) must be valid for the entire period of admission.

What if I don't have a valid, approved travel document? (/print/293511#faq-What-if-I-don't-have-a-valid,-approved-travel-document?)

Travelers should apply for approved travel documents as soon as possible, as it can take several weeks to receive a document that will comply with new requirements under the Western Hemisphere Travel Initiative.

CBP is committed to working with travelers to ensure they have access to and can obtain appropriate travel documents. U.S. and Canadian citizens who lack WHTI-compliant documents but are otherwise admissible will not be denied entry into the United States on June 1, and are encouraged to continue with their travel plans and to obtain facilitative and secure WHTI travel documents as soon as possible. Travelers without the proper documents may be delayed while CBP officers work to confirm citizenship and identity.

Where can I go to obtain a passport or U.S. passport card? (/print/293511#faq-Where-can-I-go-to-obtain-a-passport-or-U.S.-passport-card?)

The Department of State issues passports and U.S. Passport Cards. Visit their web page at www.state.gov (http://www.state.gov) [2] for information on locations.

Where can I go to obtain a birth certificate? (/print/293511#faq-Where-can-I-go-to-obtain-a-birth-certificate?)

You may obtain a birth certificate by contacting the appropriate agency in the state where you were born. A listing of agencies may be found through the National Center for Health Statistics at www.cdc.gov/nchs (http://www.cdc.gov/nchs) [3].

Does my birth certificate need to be a certified, original copy? (/print/293511#faq-Does-my-birth-certificate-need-to-be-a-certified,-original-copy?)

CBP recommends that, where possible, an original or a certified copy of your birth certificate be presented. However, under certain circumstances, e.g., if you have sent the original in for a passport application, a copy may be accepted.

What happens if my documents are lost or stolen before I return to the United States? What happens if I don't have any documents when I need to cross the border back into the US at a land or sea port of entry? (/print/293511#faq-What-happens-if-my-documents-are-lost-or-stolen-before-I-return-to-the-United-States?-What-happens-if-I-don't-have-any-documents-when-I-need-to-cross-the-border-back-into-the-US-at-a-land-or-sea-port-of-entry?)

CBP regularly handles unforeseen emergency situations in an appropriate manner and will continue to do so upon full WHTI implementation on June 1, 2009. CBP will continue to facilitate U.S. or Canadian citizens that need to return to their home country due to emergent circumstances but lack a WHTI-compliant document.

U.S. citizens lacking WHTI-compliant documents will not be refused entry into the United States, but may be delayed as CBP officers work to verify identity and citizenship.

## Legislative Background

Why are travel requirements for land and sea travel to the US changing? (/print/293511#faq-Why-are-travel-requirements-for-land-and-sea-travel-to-the-US-changing?)

The Western Hemisphere Travel Initiative (WHTI) is the joint Department of State (DOS) and Department of Homeland Security (DHS) plan to implement the statutory mandates of the Intelligence Reform and Terrorism Prevention Act of 2004 (IRTPA).

WHTI establishes document requirements for travelers entering the United States who were previously exempt, including citizens of the U.S., Canada, and Bermuda.

Historically, U.S. and Canadian citizen travelers were able to offer an oral declaration alone or could present any of over 8,000 different documents to prove identity and citizenship. The 9/11 Commission recommended and Congress mandated the requirement that all travelers – including U.S. and Canadian citizens – present a passport or other secure document that denotes both citizenship and identity when entering the United States.

This requirement was successfully implemented for air travel on January 23, 2007. Since then, compliance has been and continues to be extremely high – over 99%.

How will the Departments of Homeland Security and State increase the security of our borders without causing backups at the land borders? (/print/293511#faq-How-will-the-Departments-of-Homeland-Security-and-State-increase-the-security-of-our-

12/30/2019

Case 4:19-mj-70677-MAG Document 79 Filed 01/21/20 Page 22 of 27
Western Hemisphere Travel Initiative (WHTI) Frequently Asked Questions

borders-without-causing-backups-at-the-land-borders?)

DHS and DOS are using vicinity Radio Frequency Identification (RFID) technology for documents to meet WHTI requirements.

The use of RFID-enabled travel documents helps speed processing at the border by providing CBP officers at land border ports with passenger and law enforcement information in advance of the traveler's arrival at the vehicle inspection booth.

The technology also automates law enforcement checks to facilitate the processing of legitimate travelers while focusing attention on higher-risk individuals. This results in reduced processing time and a more secure process.

RFID technology has been used successfully along our land borders with Canada and Mexico since 1995. Through trusted traveler programs, such as NEXUS, SENTRI and FAST, U.S. border officials are able to facilitate legitimate cross-border travel and trade. Today, RFID technology can be found in car keys, highway toll tags and security access cards.

Which websites should I visit for information on WHTI? (/print/293511#faq-Which-websites-should-I-visit-for-information-on-WHTI?)

For more information on WHTI document requirements, and links to related web sites, go to www.cbp.gov (http://www.cbp.gov) [1] or www.state.gov/travelers (https://www.state.gov/travelers) [4].

Western Hemisphere Travel Initiative Air FAQs

What is it, whom does it affect and when did it go into effect? (/print/293511#faq-What-is-it,-whom-does-it-affect-and-when-did-it-go-into-effect?)

The air portion of The Western Hemisphere Travel Initiative (WHTI) requires, with some exceptions, citizens of the United States, Canada, Mexico, and the British Overseas Territory of Bermuda to present a passport to enter or depart the United States when arriving by air from any part of the Western Hemisphere.

Whom does the travel initiative affect? (/print/293511#faq-Whom-does-the-travel-initiative-affect?)

U.S. citizens need a passport to enter the United States by air from Canada, Mexico, Bermuda, South and Central America, and the Caribbean (otherwise known as the Western Hemisphere).

Also under this rule, citizens of Mexico, Canada, and Bermuda are required to have a passport when entering the United States by air.

While United States citizens are currently required to have passports to enter most countries in Central and South America, this rule makes clear that the passport must be presented upon return to the United States as well.

When was the travel initiative implemented? (/print/293511#faq-When-was-the-travel-initiative-implemented?)

- Phase 1: As of January 23, 2007, U.S. citizens and citizens of Canada, Mexico and Bermuda traveling by air between the U.S. and Canada, Mexico, Central and South America, the Caribbean, and Bermuda are required to present a valid passport to enter or depart the U.S.
- Phase 2: As of June 1, 2009, U.S. and Canadian citizens who enter the U.S. at land and sea ports of entry from within the Western Hemisphere are required to present a WHTI-compliant travel document such as a valid passport, U.S. passport card, Trusted Traveler Program card (NEXUS/SENTRI/FAST) or an Enhanced Driver's License. Verbal claims of citizenship and identity alone are no longer sufficient to establish identity and citizenship for entry into the United States.

How do I get a passport? (/print/293511#faq-How-do-I-get-a-passport?)

United States citizens can visit the U.S. State Department's Travel (https://www.state.gov/travelers) [4] website, or call the U.S. National Passport Information Center: 1-877-4USA-PPT; TDD/TTY: 1-888-874-7793. Additionally, instructions for obtaining a passport are available through the U.S. Postal Service.

Please allow a sufficient amount of time to apply and receive the passport in advance of travel. Processing of the passport application takes approximately six to eight weeks. If you need to travel urgently and require a passport sooner, please visit the U.S. State Department's Travel (https://www.state.gov/travelers) [4] website for additional information.

Peak domestic passport processing is between January and July. For faster service, we recommend applying between August and December. U.S. citizens living outside the U.S. should contact the nearest U.S. embassy or consulate.

Foreign nationals should contact their respective governments to obtain passports.

How many U.S. citizens currently hold passports? (/print/293511#faq-How-many-U.S.-citizens-currently-hold-passports?)

According to the State Department, approximately 109 million citizens hold U.S. passports.

How are U.S. lawful permanent residents (LPRs) affected by the passport requirement? (/print/293511#faq-How-are-U.S.-lawful-permanent-residents-(LPRs)-affected-by-the-passport-requirement?)

LPRs are able to use their Alien Registration Card (Form I-551), issued by DHS, or other valid evidence of permanent residence status to apply for entry to the United States.

What if I am an LPR but my children are U.S. Citizens? (/print/293511#faq-What-if-I-am-an-LPR-but-my-children-are-U.S.-Citizens?)

Children who are U.S. Citizens need to obtain a passport even if their parents are Green Card holders.

What do I need to travel to Canada or Mexico? (/print/293511#faq-What-do-I-need-to-travel-to-Canada-or-Mexico?)

Different countries may have different travel document requirements. It is best to check with the country you are visiting to determine the appropriate travel document requirements (for instance, whether you need a passport and/or visa). You can find out more by referring to the State Department website.

I am a Mexican citizen and have a valid Border Crossing Card (BCC). Am I required to also present a passport to travel to the United States by air? (/print/293511#faq-I-am-a-Mexican-citizen-and-have-a-valid-Border-Crossing-Card-(BCC).-Am-I-required-to-also-present-a-passport-to-travel-to-the-United-States-by-air?)

Yes. Under this final rule, Mexican citizens, just like U.S., Canadian and Bermudan citizens, are required to present a passport for air travel. The BCC, while currently serving in lieu of a passport and visa for land border crossings within the border region, may also be used as a visitor's visa. However, due to the unique circumstances of air travel, it was felt that the additional presentation of a passport was necessary.

What happens to persons who attempt to enter or re-enter the country without a passport or an alternative travel document? (/print/293511#faq-What-happens-to-persons-who-attempt-to-enter-or-re-enter-the-country-without-a-passport-or-an-alternative-travel-document?)

For the general public, people who apply for entry but do not have appropriate documentation will likely be referred for secondary screening at the port. In secondary, Customs and Border Protection officers will evaluate evidence of citizenship or identity the individual may have and will verify all information against available databases. For foreign nationals, a determination will be made at

that time whether to admit the individual. However, to prevent delay at the ports of entry, we would encourage all travelers to obtain the appropriate documents before they travel.

In addition, the State Department has processes to assist U.S. citizens overseas to obtain emergency travel documentation for those with lost or stolen passports.

Do travelers from U.S. territories need to present a passport to enter the United States? (/print/293511#faq-Do-travelers-from-U.S.-territories-need-to-present-a-passport-to-enter-the-United-States?)

No. These territories are a part of the United States. U.S. citizens returning directly from a U.S. territory are not considered to have left the U.S. and do not need to present a passport. U.S. territories include the following: Guam, Puerto Rico, the U.S. Virgin Islands, American Samoa, Swains Island and the Commonwealth of the Northern Mariana Islands. If the traveler also visited non-U.S. territories, he/she is required to present a passport.

Although U.S. citizens are not required to present a passport when departing U.S. territories and traveling to the mainland, having evidence of citizenship (e.g., U.S. passport, birth certificate, Trusted Traveler Program card) or lawful permanent residence (e.g., green card) available will help CBP expedite your customs processing.

Additionally, although not required to present a passport, travelers departing the U.S. territories for the U.S. mainland are subject to customs and agriculture restrictions. Travelers are entitled to a $1,600 duty-free exemption, as long as they remained in the U.S. territories for 48 hours or longer. After the $1,600 duty-free exemption, travelers will be required to pay a flat rate of 1.5% on the next $1,000 worth of goods purchased.

CBP officers may also conduct baggage checks or ask additional questions as part of standard inspections of outbound passengers, to prevent any non-native species of plants, pests or plant diseases, which may be present in one of the islands from being introduced to the mainland. For example, a pre-departure examination is performed on all passengers and cargo moving from Hawaii to the mainland U.S. The purpose of this examination is to prevent movement of fruit flies and fruit fly host material. These rules also apply to Caribbean islands, including the U.S. Virgin Islands and Puerto Rico. For more information on what agricultural goods can be brought from U.S. territories and Hawaii, please visit the USDA website.

Does the passport requirement affect offshore U.S. citizens or LPR fishermen? (/print/293511#faq-Does-the-passport-requirement-affect-offshore-U.S.-citizens-or-LPR-fishermen?)

The passport requirement does not apply to U.S. citizens or LPR's who fish offshore, so long as they do not land in foreign soil.

12/30/2019

Case 4:19-mj-70677-MAG   Document 79   Filed 01/21/20   Page 26 of 27
Western Hemisphere Travel Initiative (WHTI) Frequently Asked Questions

For example, someone fishing in the Caribbean would only have to present a passport upon return if they traveled from a U.S. state or territory (Puerto Rico is a U.S. territory, and the U.S. Virgin Islands consist of St. Thomas, St. John, St. Croix, and Water Island, and many smaller islands) and landed in Jamaica, the Bahamas, or any non-U.S. territory.

Nonresident aliens may not be employed aboard any U.S.-based fishing vessel as "D" crew members.

Other than a passport, what types of documents are acceptable for air travel? (/print/293511#faq-Other-than-a-passport,-what-types-of-documents-are-acceptable-for-air-travel?)

Individuals traveling by air within the Western Hemisphere are required to present a passport for admission to the U.S. with limited exceptions.

This Final Rule outlines two additional documents that are acceptable for air travel. The first is the Merchant Mariner Document (MMD) issued by the U.S. Coast Guard that will be acceptable for use under WHTI by U.S. citizen merchant mariners traveling on official business. The other document is the NEXUS card, for which enrollment is limited to citizens of Canada and the United States, lawful permanent residents of the United States and permanent residents of Canada.

Can the NEXUS card be used at any air location? (/print/293511#faq-Can-the-NEXUS-card-be-used-at-any-air-location?)

NEXUS cards will only be accepted in conjunction with the NEXUS program at designated NEXUS sites.

How are members of the U.S. armed forces affected by the passport requirement? (/print/293511#faq-How-are-members-of-the-U.S.-armed-forces-affected-by-the-passport-requirement?)

There are no changes proposed for members of the U.S. armed forces traveling on active duty.

Currently, an individual traveling as a member of the United States armed forces on active duty is not required to present a valid passport to enter or depart the United States. There are no changes under the air rule for members of the U.S. armed forces.

This does not apply to spouses and dependents of these military members. Spouses and dependents are required to present a passport (and valid visa, if applicable) when traveling into the United States under WHTI.


12/30/2019

Case 4:19-mj-70677-MAG   Document 79   Filed 01/21/20   Page 27 of 27
Western Hemisphere Travel Initiative (WHTI) Frequently Asked Questions

How are members of the NATO Armed Forces affected by the passport requirement? (/print/293511#faq-How-are-members-of-the-NATO-Armed-Forces-affected-by-the-passport-requirement?)

There are no changes proposed for members of the U.S. armed forces traveling on active duty.

Currently, an individual traveling as a member of the United States armed forces on active duty is not required to present a valid passport to enter or depart the United States. There are no changes under the air rule for members of the U.S. armed forces. Any future changes, if necessary, will be addressed during the second phase of the WHTI rulemaking process.

This does not apply to spouses and dependents of these military members. Spouses and dependents will be required to present a passport (and valid visa, if applicable) when traveling into the United States under WHTI.

Do the documentation requirements apply to children? (/print/293511#faq-Do-the-documentation-requirements-apply-to-children?)

Yes, all children ranging in age from birth to 18 years-of-age are required to present their own passport when entering the United States at airports.

**Last modified:** Monday, July 29, 2019 - 10:59

**Source URL:** https://www.cbp.gov/travel/us-citizens/western-hemisphere-travel-initiative/faqs
**Links**
[1] http://www.cbp.gov
[2] http://www.state.gov
[3] http://www.cdc.gov/nchs
[4] https://www.state.gov/travelers