COLEMAN & BALOGH LLP
ETHAN A. BALOGH, No. 172224
235 Montgomery Street, Suite 1070
San Francisco, CA 94104
Telephone: 415.391.0440
Facsimile: 415.373.3901
eab@colemanbalogh.com

Attorneys for Arrestee
DONALD KOLLMAR

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF DON KOLLMAR | Case No. 4:19-70677 MAG<br><br>SUPPLEMENTAL DECLARATION OF BRIAN GREENSPAN |

I, Brian Greenspan, declare under penalty of perjury as follows:

1.  I am a criminal defence lawyer in Toronto, Canada. Unless otherwise expressly noted, I state the following on personal knowledge. I have practiced exclusively criminal defence for the past 45 years. I have significant experience defending cases involving constitutional issues, including claims for relief under the *Charter of Rights and Freedoms*. I have been retained by Mr. Kollmar in Canada to defend the charges.

2.  I have reviewed the material submitted by the Canadian authorities to the American authorities in response to my declaration dated December 12, 2019.

3.  For the reasons set out below, each and every case presented by Canada in its response are clearly inapplicable to this case.

4.  The Canadian authorities have submitted that *Argentina (Republic) v. Mellino* holds that s. 11(b) has no application to extradition proceedings, and, as such, is of no utility in interpreting "lapse of time" provisions in extradition treaties. This is incorrect. In *Mellino*, the Supreme Court of Canada held that s. 11(b) does not



1

apply to remedy lapse of time in extradition hearings occurring in Canada where a *foreign state* is seeking the extradition of a person *from Canada*.[1] Under the facts, circumstances, and lapse of time argument limited to the extradition process, Canada cannot apply its constitutional standards to prosecutions in other states.[2] As Argentina was the requesting state, Canada's *Charter* was not applicable to determining whether the prosecution was barred by this lapse of time.

5.     The delay complained of in *Mellino* was delay in the extradition hearing itself, as the issue was whether s. 11(b) ought to apply to an extradition hearing in Canada. The Supreme Court held that s. 11(b) does not apply to extradition proceedings in Canada where the accused is being extradited to face prosecution in another state. The Supreme Court did not address the issue of whether s. 11(b) of the *Charter* ought to apply, by virtue of a lapse of time provision in an extradition treaty, where Canada is the requesting state.

6.     The holding in *Mellino* is therefore profoundly different from

---

[1] *Argentina (Republic) v. Mellino*, [1987] 1 S.C.R. 536 at 547.
[2] *Ibid* at 548.

the situation that exists here, where it is Canada that initiated the prosecution and where it is Canada that is seeking Mr. Kollmar's extradition. Section 11(b) is self-evidently relevant to assessing whether the prosecution of Mr. Kollmar would be barred by lapse of time in Caanda, as it is s. 11(b) that determines whether Canada is constitutionally entitled to prosecute Mr. Kollmar after such extraordinary delay between the laying of charges and the initiation of extradition proceedings.

7.     It is clear on the record submitted by Canada that Mr. Kollmar was subject to prosecution in 1997 when an arrest warrant was issued. Despite this, Canada failed to take any steps to inform him of the charges or execute the warrant. That is why it is not correct to assume that a Canadian court would find exceptional circumstances and/or defence delay, and that Mr. Kollmar could therefore be subject to prosecution in Canada. All of the cases upon which the Canadian authorities rely are either distinguishable or no longer good law.



8.     First, *R. v. Singleton*[3] was a 2014 decision of the British Columbia Court of Appeal which has been superseded by the 2016 decision of the Supreme Court of Canada in *R. v. Jordan*.[4] In any event, *Singleton* is distinguishable: the accused there had *actual knowledge* of criminal charges, as he had been charged with a criminal offence and appeared in court in Canada one month prior to moving to the United States. The RCMP were actively apprised of the accused's location in the United States, and corresponded with the local police department about the accused until the accused moved to Wichita and the RCMP lost track of him. Charges were laid in December 1997, and the accused was aware of the charges as of mid-1998. He contacted a lawyer in British Columbia about the charges and advised the lawyer that he intended to move and "become greatly more obscure".[5] The lawyer provided the accused with copies of the charges, the arrest warrant, and the *Extradition Act*.[6] The accused then moved to Kansas, and the RCMP lost track of him. It was not until 2002 that the RCMP



---

[3] *R. v. Singleton*, 2014 BCCA 232.
[4] *R. v. Jordan*, 2016 SCC 27.
[5] *Singleton, supra* at para. 37.
[6] *Ibid* at para. 38.

began to diligently search for him.

9.     The British Columbia Court of Appeal held that the trial judge *had erred* when she concluded that the accused was responsible for the 4 year delay between 1998 and 2002 when he did not voluntarily return to Canada to face the charges. However, it held that this error had no impact because the accused had led no evidence of what else the police could have done to locate him. More importantly, it did not find that this was defence delay – it only held that the delay could not be allocated to the Crown. Under the pre-*Jordan* law, this would have been treated as inherent delay.

10.     This analysis would be very different post-*Jordan*. There is no longer any category of inherent delay: responsibility for delay either falls on the defence or on the state. While the state can justify its responsibility for certain delay by relying on exceptional circumstances, that onus nevertheless lies on the state. In any event, *Singleton* is factually distinguishable: the accused in that case was specifically informed of the charges and the possibility of extradition, and made the conscious and deliberate choice to move to a different

5

state in order to make himself harder to find. Here, Mr. Kollmar was never even informed of the charges. He made no attempt to hide, move states, or make himself "obscure". Indeed, he visited Canada at least *twenty times* after charges were laid and a warrant for his arrest was issued in 1997.[7] Canadian authorities had over twenty opportunities to inform Mr. Kollmar of the charges and arrest him. They failed each time. In my opinion, it would not be possible for any Canadian court to view the delay between 1997 and 2018 as defence delay.

11.    Second, *R. v. Burke* was a case where the accused was informed of the charges, fled to the United States in breach of his bail, and then spent over thirty years in custody in the United States after being convicted of a different offence.[8] His entire purpose in fleeing was to avoid capture and prosecution.[9] The Court therefore found that the lengthy delay while the accused was in the United States amounted to defence delay. This is obviously distinguishable, as Mr. Kollmar was never informed of the charges; made no attempt to flee the charges

---

[7] Memorandum of Law of Kollmar in Support of Release, footnote 2.
[8] *R. v. Burke*, 2018 ONCA 594.
[9] *Ibid* at para. 12.

6

or avoid capture or prosecution; and indeed, routinely presented himself to Canadian authorities as he regularly crossed the border between 1997 and 2018.

12.     Third, *R. v. Magiri* was a case where the accused provided DNA samples to the police pursuant to a warrant, then left for Kenya. The police made numerous efforts to find him after his departure: they issued a warrant; phoned him numerous times; visited his residence multiple times; and requested that the accused be flagged in the Canada Border Services Agency (CBSA) system. It was held that the police could not have foreseen that the accused would leave Canada after providing a DNA sample, and that the delay resulting from his departure was an exceptional circumstance.

13.     This too is distinguishable. Under Canadian law, an arrest warrant must be executed "forthwith".[10] This means that, where an accused is charged with a criminal offence and an arrest warrant is issued, the police must exercise reasonable diligence in attempting to

---

[10] *Criminal Code*, s. 511(1)(c).

find and arrest the accused. If the police cannot show that they exercised reasonable diligence, the Crown cannot attribute delay in arresting the accused to exceptional circumstances for the purpose of s. 11(b).[11] The police in *Magiri* exercised reasonable diligence in attempting to locate the accused. The police in this case did not. They did not even inform CBSA of the arrest warrant for over twenty years, allowing Mr. Kollmar to freely and routinely cross the border with no idea that charges had been laid and a warrant for his arrest was outstanding.

14.    Similarly, in *R. v. Thind*,[12] the police had acted diligently in attempting to find the accused. They phoned the accused and his mother and learned that he was attending school in Australia. They attempted to contact the university, but were denied assistance due to privacy laws. They then asked that the accused be flagged in the CBSA system so that he would be identified upon arrival in Canada. This was found to be reasonable diligence such that the delay was attributable

---

[11] See, e.g., *R. v. Nurse*, 2017 ONCJ 648, and *R. v. Sundralingam*, 2017 ONCJ 400.
[12] *R. v. Thind*, 2018 ONSC 1337.

to exceptional circumstances. No such similar finding could be made in this case.

15.   Fourth, in *R. v. H.S.*[13] there was a specific finding that the accused was aware of the charges prior to leaving Canada, and that the accused deliberately misled the police about his whereabouts in order to avoid detection.[14] This is far from the case here, where Mr. Kollmar had no knowledge of the charges, was never asked by the police about his whereabouts, and was indeed living openly under his name and travelling regularly to Canada.

16.   Canadian courts will only find defence delay in cases where the accused was living outside of Canada where there is evidence that the accused knew of the charge or was otherwise deliberately attempting to evade prosecution for the charge. There can be no defence delay here, as it is uncontested in the record submitted by Canada that Mr. Kollmar did not know of the charge between 1997 and his arrest in 2019.



---

[13] *R. v. H.S.*, 2018 ONCJ 162.
[14] *Ibid* at paras. 34-40.

17.    Canadian courts will also only find exceptional circumstances where the Crown can show that the police acted with reasonable diligence in attempting to find the accused. The prosecutor will not be able to demonstrate that here, as the police did nothing between 1997 and 2018 to attempt to execute the arrest warrant. No evidence of any such diligence was offered here. In my opinion the Crown will not be able to show reasonable diligence, and therefore will not be able to justify any delay in Canada based on exceptional circumstances. The delay in excess of 20 years between the initial charge and the date of this extradition proceeding is unreasonable, and Mr. Kollmar would be entitled to a stay of proceedings in Canada.

I state the foregoing is true and correct under penalty of perjury of the laws of the United States of America.

DATED:  January 28th, 2020

_____
                                              BRIAN GREENSPAN

10

# ATTACHMENTS (CASES)

536        ARGENTINA *v.* MELLINO        [1987] 1 S.C.R.

**The Republic of Argentina** *Appellant*

*v.*

**Hector Mellino** *Respondent*

INDEXED AS: ARGENTINA *v.* MELLINO

File No.: 19272.

1985: December 19; 1987: May 14.

Present: Dickson C.J. and Beetz, McIntyre, Lamer, Wilson, Le Dain and La Forest JJ.

ON APPEAL FROM THE COURT OF QUEEN'S BENCH FOR ALBERTA

*Appeal — Supreme Court of Canada — Jurisdiction — Extradition — Application for extradition dismissed by extradition judge — Whether Supreme Court of Canada has jurisdiction to entertain appeal — Supreme Court Act, R.S.C. 1970, c. S-19, ss. 2(1), 41.*

*Constitutional law — Charter of Rights — Application of Charter — Trial within a reasonable time — Extradition — Seventeen-month delay between respondent's discharge following the first extradition hearing and the initiation of the second — Delay not attributable to Canadian authorities — Whether s. 11(b) of the Charter applicable to an extradition hearing — Whether Charter applicable to the action of a foreign country — Canadian Charter of Rights and Freedoms, ss. 11(b), 32.*

*Constitutional law — Charter of Rights — Fundamental justice — Extradition — Abuse of process — Seventeen-month delay between respondent's discharge following the first extradition hearing and the initiation of the second — Delay not attributable to Canadian authorities — Whether such delay constitutes an abuse of process and contravenes s. 7 of the Charter — Whether s. 7 applicable — Canadian Charter of Rights and Freedoms, ss. 7, 32.*

*Constitutional law — Charter of Rights — Court of competent jurisdiction — Whether superior court judge, acting as extradition judge, a court of competent jurisdiction to grant remedies under s. 24(1) of the Charter.*

*Extradition — Jurisdiction of extradition judges — Whether extradition judge has jurisdiction to administer Charter remedies or to deal with defences that could be raised at trial.*

Respondent is alleged to have killed his wife at their home in Argentina. Shortly after his entry to Canada, a warrant of apprehension under the *Extradition Act* was

**République d'Argentine** *Appelante*

*c.*

**Hector Mellino** *Intimé*

RÉPERTORIÉ: ARGENTINE *c.* MELLINO

Nᵒ du greffe: 19272.

1985: 19 décembre; 1987: 14 mai.

Présents: Le juge en chef Dickson et les juges Beetz, McIntyre, Lamer, Wilson, Le Dain et La Forest.

EN APPEL DE LA COUR DU BANC DE LA REINE DE L'ALBERTA

*Appel — Cour suprême du Canada — Compétence — Extradition — Rejet d'une demande d'extradition par un juge d'extradition — Compétence de la Cour suprême du Canada pour entendre le pourvoi — Loi sur la Cour suprême, S.R.C. 1970, chap. S-19, art. 2(1), 41.*

*Droit constitutionnel — Charte des droits — Application de la Charte — Procès dans un délai raisonnable — Extradition — Retard de dix-sept mois entre la libération de l'intimé après la première audience d'extradition et le début de la seconde — Retard non attribuable aux autorités canadiennes — Applicabilité de l'art. 11b) de la Charte à une audience d'extradition — Applicabilité de la Charte aux actes d'un pays étranger — Charte canadienne des droits et libertés, art. 11b), 32.*

*Droit constitutionnel — Charte des droits — Justice fondamentale — Extradition — Abus des procédures — Retard de dix-sept mois entre la libération de l'intimé après la première audience d'extradition et le début de la seconde — Retard non attribuable aux autorités canadiennes — Ce retard constitue-t-il un abus des procédures et contrevient-il à l'art. 7 de la Charte? — L'article 7 s'applique-t-il? — Charte canadienne des droits et libertés, art. 7, 32.*

*Droit constitutionnel — Charte des droits — Tribunal compétent — Un juge de cour supérieure, agissant à titre de juge d'extradition, est-il un tribunal compétent pour accorder des réparations en vertu de l'art. 24(1) de la Charte?*

*Extradition — Compétence des juges d'extradition — Un juge d'extradition a-t-il compétence pour appliquer les réparations prévues dans la Charte ou pour examiner les moyens de défense qui pourraient être soulevés au procès?*

On reproche à l'intimé d'avoir tué sa femme chez eux en Argentine. Peu après son entrée au Canada, un mandat d'arrestation fut lancé en vertu de la *Loi sur*

issued and he was arrested on November 30, 1982. Held in custody until the extradition hearing, he was set free on February 1, 1983 when appellant failed to produce the necessary documentation within two months of the arrest as required by article XIV of the extradition treaty between Canada and Argentina. In June 1984, appellant made a second request for extradition and respondent was again arrested. At the outset of the extradition hearing on December 10, 1984, respondent made an application to have the proceedings stayed on two grounds: (1) that there was an infringement of s. 11(b) of the *Charter* (trial within a reasonable time); and (2) that the extradition proceedings constituted an abuse of process. The extradition judge found that respondent's right under s. 11(b) had been infringed, and pursuant to s. 24(1) of the *Charter*, dismissed the application for extradition and discharged him. The extradition judge held that in the absence of any reasonable explanation, the seventeen-month delay between the discharge of the respondent because of evidentiary problems in the first extradition proceedings and the institution of the second proceedings was inordinate.

*Held* (Lamer J. dissenting): The appeal should be allowed and the matter remitted to the extradition judge to continue the proceedings in accordance with the law.

### (1) *The Jurisdictional Issue*

This Court has jurisdiction to entertain the present appeal pursuant to s. 41 of the *Supreme Court Act*. In dismissing the application for extradition and discharging the respondent, the superior court judge, acting as an extradition judge, made a final judgment within the meaning of s. 41. The decision of this Court in *United States of America v. Link and Green*, [1955] S.C.R. 183, which reached the opposite conclusion, is inconsistent with the reasoning of this Court in more recent cases and should no longer be followed.

### Cases Cited

**Overruled**: *United States of America v. Link and Green*, [1955] S.C.R. 183; **considered**: *Hill v. The Queen*, [1955] S.C.R. 183; **considered**: *Hill v. The Queen*, [1977] 1 S.C.R. 827; *R. v. Gardiner*, [1982] 2 S.C.R. 368; **referred to**: *Commonwealth of Puerto Rico v. Hernandez*, [1975] 1 S.C.R. 228; *Goldhar v. The Queen*, [1960] S.C.R. 60.

### (2) *The Charter and the Abuse of Process Issues*

*Per* Dickson C.J. and Beetz, McIntyre, Le Dain and La Forest JJ.: The extradition judge erred in dismissing the application for extradition on the ground that the

*l'extradition* et il a été arrêté le 30 novembre 1982. Il a été détenu jusqu'à l'audience d'extradition et a été mis en liberté le 1ᵉʳ février 1983 lorsque l'appelante n'a pas réussi à produire la documentation nécessaire dans les deux mois qui suivent l'arrestation, comme l'exige l'article XIV du traité d'extradition entre le Canada et l'Argentine. En juin 1984, l'appelante a présenté une seconde demande d'extradition et l'intimé a été arrêté de nouveau. Le 10 décembre 1984, au début de l'audience d'extradition, l'intimé a présenté une demande en vue d'obtenir une suspension des procédures pour deux motifs: (1) il y avait eu violation de l'al. 11b) de la *Charte* (procès dans un délai raisonnable); et (2) les procédures d'extradition étaient abusives. Le juge d'extradition a conclu qu'on avait porté atteinte au droit reconnu à l'intimé par l'al. 11b) et, en se fondant sur le par. 24(1) de la *Charte*, il a rejeté la demande d'extradition et a remis l'intimé en liberté. Le juge d'extradition a conclu qu'à défaut de toute explication raisonnable la période de dix-sept mois qui s'est écoulée entre la libération de l'intimé à cause de problèmes de preuve éprouvés dans les premières procédures d'extradition et l'institution des secondes procédures était excessive.

*Arrêt* (le juge Lamer est dissident): Le pourvoi est accueilli et l'affaire renvoyée au juge d'extradition pour que les procédures suivent leur cours conformément à la loi.

### (1) *La question de compétence*

Cette Cour a compétence pour entendre le présent pourvoi en application de l'art. 41 de la *Loi sur la Cour suprême*. En rejetant la demande d'extradition en libérant l'intimé, le juge de cour supérieure, agissant à titre de juge d'extradition, a rendu un jugement définitif au sens de l'art. 41. L'arrêt de cette Cour *United States of America v. Link and Green*, [1955] R.C.S. 183, qui a tiré la conclusion contraire, est inconciliable avec le raisonnement adopté par cette Cour dans des arrêts plus récents et ne doit plus être suivi.

### Jurisprudence

**Arrêt renversé**: *United States of America v. Link and Green*, [1955] R.C.S. 183; **arrêts examinés**: *Hill c. La Reine*, [1977] 1 R.C.S. 827; *R. c. Gardiner*, [1982] 2 R.C.S. 368; **arrêts mentionnés**: *Commonwealth de Puerto Rico c. Hernandez*, [1975] 1 R.C.S. 228; *Goldhar v. The Queen*, [1960] R.C.S. 60.

### (2) *Les questions relatives à la Charte et à l'abus des procédures*

*Le* juge en chef Dickson et les juges Beetz, McIntyre, Le Dain et La Forest: Le juge d'extradition a commis une erreur en rejetant la demande d'extradition pour le

ARGENTINA *v.* MELLINO

respondent's right under s. 11(*b*) of the *Charter* has been infringed. Section 11 has no application to extradition hearings. It relates only to charges laid by the governments referred to in s. 32 of the *Charter*. Respondent was, of course, never charged in Canada by any of the governments to which the *Charter* applies. The prosecution for the offence was within the jurisdiction of Argentina.

Further, s. 11(*b*) did not apply to the respondent by virtue of article V of the extradition treaty which provides that extradition shall not take place if "exemption from prosecution or punishment has been acquired by lapse of time, according to the laws of the state applying or applied to". This provision was intended to bring into operation statutes of limitations that exist in some countries prohibiting prosecution for certain crimes after a stated lapse of time. Section 11(*b*) is not an exemption in that sense. It would require much stronger words to expand the application of our constitutional standards for expeditious prosecutions to the international arena.

The contentions that the proceedings should be stayed because the seventeen-month delay between respondent's discharge following the first extradition hearing and the initiation of the second constitute an abuse of process or a breach of s. 7 of the *Charter* must fail. First, the power to grant a stay for abuse of process, which can be exercised only in the clearest of cases, is not vested in a judge at an extradition hearing. Second, s. 7 had no application in this case because the delay cannot be attributed to Canadian authorities, which is a prerequisite to the application of the *Charter* by virtue of s. 32. The delay arose because of problems by the Argentinian authorities in framing the evidence in a form acceptable under Canadian law. Third, the delay in the present circumstances did not constitute an abuse of process or a contravention of the principles of fundamental justice. One cannot view delay resulting from the complexity involved in dealing with activities that reach across national boundaries and involve different systems of law and several levels of bureaucracies in the same way as that resulting in local prosecutions.

In any event, an extradition judge has no jurisdiction to deal with these issues and to grant the appropriate remedies. The role of the extradition judge is a modest one: absent express statutory or treaty authorization, the sole purpose of an extradition hearing is to ensure that the evidence establishes a *prima facie* case that the extradition crime has been committed. The procedure

motif qu'il y avait eu violation du droit que l'al. 11*b*) de la *Charte* garantit à l'intimé. L'article 11 ne s'applique pas aux audiences d'extradition. Il s'applique seulement aux accusations portées par les gouvernements visés par l'art. 32 de la *Charte*. L'intimé n'a évidemment jamais été inculpé au Canada par l'un ou l'autre des gouvernements auxquels s'applique la *Charte*. Les poursuites pour l'infraction relèvent de la compétence de l'Argentine.

De plus, l'al. 11*b*) ne s'applique pas à l'intimé en raison de l'article V du traité d'extradition qui porte qu'il n'y aura pas d'extradition si «la prescription des poursuites ou de la peine est acquise d'après les lois du pays auquel la demande est adressée». Cette disposition était censée faire jouer les lois de prescription qui existent dans quelques pays et qui interdisent les poursuites pour certains crimes à l'expiration d'un délai déterminé. L'alinéa 11*b*) ne crée pas de délai de prescription en ce sens. Il faudrait une formulation bien plus catégorique pour étendre jusque sur la scène internationale l'application de nos normes constitutionnelles visant à assurer des poursuites expéditives.

Les prétentions qu'il doit y avoir suspension d'instance pour le motif que la période de dix-sept mois qui s'est écoulée entre la libération de l'intimé après la première audience d'extradition et le début de la seconde constitue un abus des procédures ou une violation de l'art. 7 de la *Charte* doit échouer. Premièrement, le pouvoir d'accorder une suspension d'instance pour abus des procédures, qui ne doit être exercé que dans les cas les plus manifestes, n'est pas conféré au juge qui préside une audience d'extradition. Deuxièmement, l'art. 7 ne s'applique pas en l'espèce parce que le retard ne peut être imputé aux autorités canadiennes, ce qui constitue une condition de l'application de la *Charte* suivant l'art. 32. Le retard venait des problèmes qu'ont éprouvés les autorités argentines à présenter la preuve dans une forme acceptable en droit canadien. Troisièmement, le retard dans les présentes circonstances ne constitue pas un abus des procédures ou une contravention aux principes de justice naturelle. On ne saurait assimiler au retard résultant de poursuites locales celui qui est imputable aux complexités inhérentes aux activités d'envergure internationale qui relèvent de différents systèmes de droit et de plusieurs paliers de bureaucraties.

De toute façon, un juge d'extradition n'a pas compétence pour examiner ces questions et pour accorder les réparations appropriées. Le rôle d'un juge d'extradition est modeste: en l'absence d'une autorisation expresse découlant d'une loi ou d'un traité, l'unique but d'une audience d'extradition est de s'assurer que la preuve établit une apparence suffisante de la perpétration d'un

ARGENTINE *c.* MELLINO

bears a considerable affinity to a preliminary hearing, and the judge's powers have some similarity to those of a magistrate presiding at such a hearing. He has no jurisdiction to deal with defences that could be raised at trial and he has no *Charter* jurisdiction. The fact that an extradition judge is often a superior court judge does not alter the matter.

In the rare cases where the actions of Canadian officials in the extradition proceedings may give rise to the need for *Charter* review, the proceedings are to be reviewed by superior courts by means of a writ of *habeas corpus*. A court in *habeas corpus* proceedings is ordinarily confined to questions of jurisdiction, but as such proceedings are contemplated by Parliament as the sole means of review in extradition proceedings, a court in *habeas corpus* proceedings is obviously the court of competent jurisdiction for the purpose of s. 24 of the *Charter*.

Finally, there is nothing offensive to fundamental justice in surrendering in accordance with our extradition procedures an accused to a foreign country for trial in accordance with its traditional judicial processes for a crime alleged to have been committed there. Our courts must assume that he will be given a fair trial in the foreign country. There may be situations where it would be unjust to surrender a fugitive either because of the general condition of the governmental and judicial apparatus or, more likely, because some particular individual may be subjected to oppressive treatment. In such cases, the courts may, as guardians of the Constitution, on occasion have a useful role to play in reviewing the executive's exercise of discretion to surrender a fugitive. But it is obviously an area in which courts must tread with caution. The decision to surrender and the responsibility for the conduct of external relations, including the performance of Canada's obligations under extradition treaties, is vested in the executive.

*Per* Wilson J.: Section 11 of the *Charter* is applicable to extradition proceedings and s. 11(*b*) can properly be invoked when the delay in pursuing extradition in Canada is unreasonable. But any delay relied on under s. 11(*b*) must be delay caused by the Canadian authorities because under the principles of comity the Canadian court cannot require the foreign authorities to account for their delay. In the present case, the delay was due in large part to the conduct of the Argentinian authorities

crime donnant lieu à l'extradition. Cette procédure s'apparente en bien des points à une enquête préliminaire et les pouvoirs du juge ont des similarités avec ceux d'un magistrat qui préside une telle enquête. Il n'a pas compétence pour examiner les moyens de défense qui pourraient être soulevés au procès et il n'a aucune compétence en vertu de la *Charte*. Le fait qu'un juge d'extradition est souvent un juge de cour supérieure n'y change rien.

Dans les rares cas où les actes de fonctionnaires canadiens dans les procédures d'extradition peuvent donner lieu à un contrôle en vertu de la *Charte*, les procédures doivent être contrôlées par les cours supérieures au moyen d'un bref d'*habeas corpus*. Dans des procédures d'*habeas corpus*, le tribunal ne connaît normalement que des questions de compétence mais, étant donné que le Parlement a envisagé de telles procédures comme seul moyen de contrôle en matière d'extradition, il est évident qu'un tribunal saisi de procédures d'*habeas corpus* est un tribunal compétent aux fins de l'art. 24 de la *Charte*.

Enfin, on ne voit pas en quoi il serait choquant du point de vue de la justice fondamentale qu'un accusé soit livré à un pays étranger conformément à nos procédures d'extradition pour qu'il y soit jugé selon les procédures judiciaires traditionnelles de ce pays pour un crime qu'on lui reproche d'y avoir commis. Nos tribunaux doivent présumer qu'il subira un procès juste dans le pays étranger. On peut concevoir des situations où il serait injuste d'extrader un fugitif soit en raison de l'état général de l'appareil gouvernemental et judiciaire soit, ce qui est plus probable, parce qu'un individu donné pourrait être soumis à un traitement oppressif. En pareils cas, les tribunaux, en tant que gardiens de la Constitution, peuvent à l'occasion jouer un rôle utile en contrôlant l'exercice du pouvoir discrétionnaire de l'exécutif de livrer un fugitif. Mais ils doivent évidemment faire preuve de circonspection dans ce domaine. La décision d'extrader et la responsabilité des relations extérieures, y compris l'exécution des obligations du Canada en vertu des traités d'extradition, relèvent de l'exécutif.

*Le juge Wilson*: L'article 11 de la *Charte* s'applique à des procédures d'extradition et l'al. 11*b* peut être invoqué lorsque le retard mis à rechercher l'extradition au Canada est déraisonnable, mais tout délai invoqué en vertu de l'al. 11*b* doit être un retard imputable aux autorités canadiennes car, selon les principes de courtoisie internationale, le tribunal canadien ne peut pas demander aux autorités étrangères de rendre compte de leur retard. En l'espèce, le retard est dû en grande partie

and the extradition judge therefore was in error in discharging the respondent on the basis of s. 11(b).

Respondent's argument that the delay in the extradition proceedings constituted an abuse of process or a violation of s. 7 of the *Charter* must also fail since the essence of respondent's complaint was again the delay caused in large part by the Argentinian authorities.

An application may be made to an extradition judge under s. 24(1) of the *Charter* if, as in this case, he is also a superior court judge.

*Per* Lamer J. (dissenting): Section 11 of the *Charter* generally applies to extradition proceedings taking place in Canada in so far as it would apply to a preliminary inquiry. The right to be tried within a reasonable time is one of the rights guaranteed by s. 11 which is applicable to a preliminary inquiry and an extradition hearing. The liberty and security of the person subjected to the extradition hearing are affected by the holding of a hearing, and the principles of fundamental justice require that that hearing be resolved in a speedy manner. In the case at bar, the computation of time for the purposes of s. 11(b) started to run when the first extradition proceedings were instituted. If the seventeen-month delay between the discharge of the respondent in the first hearing and the institution of the second proceedings is unexplained, such delay constitutes an infringement of the right to be tried within a reasonable time under s. 11(b). It is irrelevant whether that delay was due to the acts of the Argentinian or the Canadian authorities.

An extradition judge is not a court of competent jurisdiction within the meaning of s. 24(1) of the *Charter* and an applicant should normally seek remedy in the superior court. However, as a matter of practice, an application under s. 24(1) can be made to the extradition judge if he is also a superior court judge. At the time of the application in this case, the law as to who had jurisdiction under s. 24(1) was not clear, and it might well be that, as a result, the authorities did not attempt to explain and justify the otherwise unacceptable delay. Consequently, the matters should be remitted to the superior court judge presiding at the extradition proceedings for completion of the s. 24(1) hearing and, subject to the decision on that issue, to terminate the extradition proceedings either way.

au comportement des autorités argentines et le juge d'extradition a donc commis une erreur en libérant l'intimé sur le fondement de l'al. 11b).

L'argument de l'intimé que le délai dans les procédures d'extradition constitue un emploi abusif des procédures ou une violation de l'art. 7 de la *Charte* doit également échouer puisque essentiellement la plainte de l'intimé porte sur le délai imputable en grande partie aux autorités argentines.

Une requête peut être adressée à un juge d'extradition en vertu du par. 24(1) de la *Charte*, si, comme en l'espèce, il est également un juge de cour supérieure.

*Le* juge Lamer (dissident): L'article 11 de la *Charte* s'applique de façon générale aux procédures d'extradition qui ont lieu au Canada dans la mesure où il s'appliquerait à une enquête préliminaire. Le droit d'être jugé dans un délai raisonnable est un des droits garantis par l'art. 11, qui est applicable à une enquête préliminaire et à une audience d'extradition. La liberté et la sécurité de la personne soumise à l'audience d'extradition sont menacées par la tenue d'une audience et les principes de justice fondamentale exigent que l'audience soit complétée rapidement. En l'espèce, le calcul aux fins de l'al. 11b) commençait à courir au moment où les premières procédures d'extradition ont été entamées. Le retard de dix-sept mois entre la libération de l'intimé à la première audience et le commencement des secondes procédures, s'il demeure inexpliqué, constitue une violation du droit d'être jugé dans un délai raisonnable énoncé à l'al. 11b). La question de savoir si le retard est dû aux actes des autorités argentines ou canadiennes n'a aucune importance.

Un juge d'extradition n'est pas un tribunal compétent au sens du par. 24(1) de la *Charte* et un requérant doit normalement s'adresser à une cour supérieure. Cependant, en pratique, une demande fondée sur le par. 24(1) peut être adressée au juge d'extradition s'il est également un juge de cour supérieure. À l'époque de la demande en l'espèce, le droit n'était pas encore fixé quant à savoir qui avait compétence en vertu du par. 24(1) et il se pourrait bien que, en conséquence, les autorités n'aient pas tenté d'expliquer et de justifier le retard par ailleurs inacceptable. L'affaire doit donc être renvoyée au juge de cour supérieure qui présidait les procédures d'extradition pour qu'il complète l'audience tenue en vertu du par. 24(1) et, sous réserve de la décision sur cette question, pour terminer les procédures d'extradition en conséquence.

ARGENTINE *c.* MELLINO

## Cases Cited

By La Forest J.

**Followed:** *Canada v. Schmidt*, [1987] 1 S.C.R. 500; **applied:** *Mills v. The Queen*, [1986] 1 S.C.R. 863; **referred to:** *Jhirad v. Ferrandina*, 536 F.2d 478 (1976); *Sabatier v. Dabrowski*, 586 F.2d 866 (1978); *Matter of Burt*, 737 F.2d 1477 (1984); *R. v. Brixton Prison (Governor of), Ex parte Van der Auwera*, [1907] 2 K.B. 157; *R. v. Jewitt*, [1985] 2 S.C.R. 128; *R. v. Young* (1984), 40 C.R. (3d) 289; *R. v. Morton and Thompson* (1868), 19 U.C.C.P. 9; *RWDSU v. Dolphin Delivery Ltd.*, [1986] 2 S.C.R. 573; *Attorney-General of Hong Kong v. Kwok-A-Sing* (1873), L.R. 5 P.C. 179; *Re Harsha (No. 2)* (1906), 11 C.C.C. 62; *Armstrong v. State of Wisconsin*, [1972] F.C. 1228; *Minister of Indian Affairs and Northern Development v. Ranville*, [1982] 2 S.C.R. 518; *Re Global Communications Ltd. and Attorney-General for Canada* (1984), 10 C.C.C. (3d) 97; *Re Insull*, [1933] 3 D.L.R. 709; *Re United States of America and Smith* (1984), 10 C.C.C. (3d) 540; *United States of America v. Beaurone* (1983), 27 Sask. R. 136; *Re Federal Republic of Germany and Rauca* (1983), 4 C.C.C. (3d) 385; *Royal Government of Greece v. Brixton Prison Governor*, [1969] 3 All E.R. 1337.

By Wilson J.

**Referred to:** *Canada v. Schmidt*, [1987] 1 S.C.R. 500; *United States v. Allard*, [1987] 1 S.C.R. 564.

By Lamer J. (dissenting)

*Canada v. Schmidt*, [1987] 1 S.C.R. 500; *Carter v. The Queen*, [1986] 1 S.C.R. 981; *United States v. Allard*, [1987] 1 S.C.R. 564.

## Statutes and Regulations Cited

*Canadian Charter of Rights and Freedoms*, ss. 7, 11(*b*), 24(1), 32.
*Extradition Act*, R.S.C. 1970, c. E-21.
Extradition Treaty Between the Argentina Republic and Great Britain, S.C. 1894, p. xlii, art. V, XIV.
*Fugitive Offenders Act*, R.S.C. 1970, c. F-32, s. 17.
*Supreme Court Act*, R.S.C. 1970, c. S-19, ss. 2(1) "the court appealed from", "final judgment", 41 [am. 1974-75-76, c. 18, s. 5].

## Authors Cited

Booth, V. E. Hartley. *British Extradition Law and Procedure*, vol. 1. Alphen Aan den Rijn (The Netherlands): Sijthoff & Noordhoff, 1980.

## Jurisprudence

Citée par le juge La Forest

**Arrêt suivi**: *Canada c. Schmidt*, [1987] 1 R.C.S. 500; **arrêt appliqué**: *Mills c. La Reine*, [1986] 1 R.C.S. 863; **arrêts mentionnés**: *Jhirad v. Ferrandina*, 536 F.2d 478 (1976); *Sabatier v. Dabrowski*, 586 F.2d 866 (1978); *Matter of Burt*, 737 F.2d 1477 (1984); *R. v. Brixton Prison (Governor of), Ex parte Van der Auwera*, [1907] 2 K.B. 157; *R. c. Jewitt*, [1985] 2 R.C.S. 128; *R. v. Young*, (1984), 40 C.R. (3d) 289; *R. v. Morton and Thompson* (1868), 19 U.C.C.P. 9; *SDGMR c. Dolphin Delivery Ltd.*, [1986] 2 R.C.S. 573; *Attorney-General of Hong Kong v. Kwok-A-Sing* (1873), L.R. 5 P.C. 179; *Re Harsha (No. 2)* (1906), 11 C.C.C. 62; *Armstrong c. État du Wisconsin*, [1972] C.F. 1228; *Ministre des Affaires indiennes et du Nord canadien c. Ranville*, [1982] 2 R.C.S. 518; *Re Global Communications Ltd. and Attorney-General for Canada* (1984), 10 C.C.C. (3d) 97; *Re Insull*, [1933] 3 D.L.R. 709; *Re United States of America and Smith* (1984), 10 C.C.C. (3d) 540; *United States of America v. Beaurone* (1983), 27 Sask. R. 136; *Re Federal Republic of Germany and Rauca* (1983), 4 C.C.C. (3d) 385; *Royal Government of Greece v. Brixton Prison Governor*, [1969] 3 All E.R. 1337.

Citée par le juge Wilson

**Arrêts mentionnés**: *Canada c. Schmidt*, [1987] 1 R.C.S. 500; *États-Unis c. Allard*, [1987] 1 R.C.S. 564.

Citée par le juge Lamer (dissident)

*Canada c. Schmidt*, [1987] 1 R.C.S. 500; *Carter c. La Reine*, [1986] 1 R.C.S. 981; *États-Unis c. Allard*, [1987] 1 R.C.S. 564.

## Lois et règlements cités

*Charte canadienne des droits et libertés*, art. 7, 11*b*), 24(1), 32.
*Loi sur la Cour suprême*, S.R.C. 1970, chap. S-19, art. 2(1) «la cour dont appel est interjeté», «jugement définitif», 41 [mod. 1974-75-76, chap. 18, art. 5].
*Loi sur les criminels fugitifs*, S.R.C. 1970, chap. F-32, art. 17.
*Loi sur l'extradition*, S.R.C. 1970, chap. E-21.
Traité d'extradition entre la République d'Argentine et la Grande-Bretagne, S.C. 1894, p. xlii, art. V, XIV.

## Doctrine citée

Booth, V. E. Hartley. *British Extradition Law and Procedure*, vol. 1. Alphen Aan den Rijn (The Netherlands): Sijthoff & Noordhoff, 1980.

APPEAL from a judgment of Waite J. of the Alberta Court of Queen's Bench[1], acting as an extradition judge, dismissing an application for extradition. Appeal allowed, Lamer J. dissenting.

*Douglas J. A. Rutherford, Q.C.*, and *Michael C. Blanchflower*, for the appellant.

*John D. James*, for the respondent.

The judgment of Dickson C.J. and Beetz, McIntyre, Le Dain and La Forest JJ. was delivered by

LA FOREST J.—This appeal concerns the application of ss. 7 and 11(*b*) of the *Canadian Charter of Rights and Freedoms* to extradition proceedings. These provisions read as follows:

7. Everyone has the right to life, liberty and security of the person and the right not to be deprived thereof except in accordance with the principles of fundamental justice.

11. Any person charged with an offence has the right

. . .

(*b*) to be tried within a reasonable time;

The appeal also raises the question of which courts have jurisdiction respecting breaches of the *Charter* in relation to extradition matters.

### Facts

On November 8, 1976, the respondent Hector Mellino is alleged to have shot and killed his wife at their home in Mendoza, Argentina. A warrant for his arrest was then issued by the appellant Republic of Argentina on June 27, 1977.

In 1979, Mellino was arrested in Uruguay and extradition proceedings were begun against him. However Argentina was unable to supply the necessary documentation within the time stipulated in its extradition treaty with Uruguay, and Mellino was accordingly released after two to three weeks' imprisonment.

POURVOI contre une décision du juge Waite de la Cour du Banc de la Reine de l'Alberta[1], agissant à titre de juge d'extradition, qui a rejeté une demande d'extradition. Pourvoi accueilli, le juge Lamer est dissident.

*Douglas J. A. Rutherford, c.r.*, et *Michael C. Blanchflower*, pour l'appelante.

*John D. James*, pour l'intimé.

Version française du jugement du juge en chef Dickson et des juges Beetz, McIntyre, Le Dain et La Forest rendu par

LE JUGE LA FOREST—Il s'agit d'un pourvoi visant à déterminer l'applicabilité de l'art. 7 et de l'al. 11*b*) de la *Charte canadienne des droits et libertés* à des procédures d'extradition. Ces dispositions sont ainsi conçues:

7. Chacun a droit à la vie, à la liberté et à la sécurité de sa personne; il ne peut être porté atteinte à ce droit qu'en conformité avec les principes de justice fondamentale.

11. Tout inculpé a le droit:

. . .

*b*) d'être jugé dans un délai raisonnable.

Le pourvoi soulève en outre la question de savoir quels tribunaux ont compétence relativement aux violations de la *Charte* dans des affaires d'extradition.

### Les faits

On reproche à l'intimé Hector Mellino d'avoir, le 8 novembre 1976, tué sa femme avec une arme à feu dans leur habitation à Mendoza (Argentine). Le 27 juin 1977, l'appelante, la République d'Argentine, a lancé contre l'intimé un mandat d'arrestation visant l'intimé.

En 1979, Mellino a été arrêté en Uruguay et des procédures d'extradition ont été engagées contre lui. L'Argentine n'a toutefois pu fournir la documentation nécessaire dans les délais stipulés par son traité d'extradition avec l'Uruguay, de sorte qu'il a été élargi après deux ou trois semaines d'emprisonnement.

---

[1] Alta. Q.B., December 11, 1984, No. 8401-1277-CB.

[1] B.R. Alb., 11 décembre 1984, n° 8401-1277-CB.

Mellino later made his way to the United States and eventually entered Canada in the Fall of 1982. On November 22, 1982, he was arrested in Calgary under the *Immigration Act*. Two days later, on November 24, 1982, a warrant for his apprehension was issued under the *Extradition Act*, R.S.C. 1970, c. E-21, and he was arrested on November 30. On December 6, 1982, Mellino was ordered to be held in custody until his extradition hearing, which was set for February 14, 1983. However, he was set free on February 1, 1983. By that time, two months had elapsed from the time of his apprehension, a period that brought into play article XIV of the extradition treaty between Canada and Argentina, which provides for a fugitive's release unless sufficient evidence is produced within that time to warrant his committal for surrender; see *Statutes of Canada*, 1894, p. xlii, at p. xlvii. Article XIV also makes provision for an extension of time but an application for this purpose by the Government of Canada to Brennan J. of the Court of Queen's Bench of Alberta was dismissed and Mellino was set free.

Mellino then applied for convention refugee status under the *Immigration Act*, and was granted that status on December 1, 1983. However, from some time during the Spring of 1983 up to the first half of 1984, meetings were held between officials of the Department of Justice of Canada and of Argentina regarding the preparation of evidence in a form admissible in a Canadian extradition hearing.

On June 19, 1984, Argentina made a second request for extradition. On June 29, a warrant of apprehension was issued by Rowbotham J., and on or about July 17, 1984, Mellino was again arrested. The extradition hearing was set for September 10, 1984, but on August 31 the Government of Canada applied to Dixon J. for an extension of time on the ground that a necessary witness, an Argentinian official, would be absent. The application was refused, but a further application on the same grounds to Quigley J. on September 10 was successful, and the extradition hearing was set for October 30, 1984. Subsequently, another applica-

*a*  Mellino s'est par la suite rendu aux États-Unis et est finalement entré au Canada à l'automne de 1982. Le 22 novembre 1982, il a été arrêté à Calgary en vertu de la *Loi sur l'immigration*. Deux jours plus tard, soit le 24 novembre 1982, un mandat d'arrestation fut lancé contre Mellino en vertu de la *Loi sur l'extradition*, S.R.C. 1970, chap. E-21, et il a été arrêté le 30 novembre. Le 6 décembre 1982, on a ordonné que Mellino soit

*b*  détenu en attendant son audience d'extradition, fixée au 14 février 1983. Il a cependant été mis en liberté le 1er février 1983. À ce moment-là, deux mois s'étaient écoulés depuis son arrestation, ce

*c*  qui a fait jouer l'article XIV du traité d'extradition entre le Canada et l'Argentine, qui prévoit l'élargissement d'un fugitif, à moins qu'on ne produise dans ce délai une preuve suffisante pour justifier sa détention en vue de l'extradition: voir *Statuts du*

*d Canada*, 1894, p. xlii, à la p. xlvii. L'article XIV prévoit en outre la prorogation du délai, mais une demande en prorogation adressée par le gouvernement du Canada au juge Brennan de la Cour du Banc de la Reine de l'Alberta a été rejetée et

*e*  Mellino a été libéré.

Mellino a alors demandé en vertu de la *Loi sur l'immigration* le statut de réfugié au sens de la Convention. Ce statut lui a été accordé le 1er

*f*  décembre 1983. Néanmoins, depuis le printemps de 1983 jusqu'à la fin du premier semestre de 1984, des réunions ont eu lieu entre des représentants du ministère de la Justice du Canada et leurs

*g*  homologues argentins relativement à la préparation de preuves dans une forme admissible aux fins d'une audience d'extradition au Canada.

Le 19 juin 1984, l'Argentine a présenté une

*h*  seconde demande d'extradition. Le 29 juin, le juge Rowbotham a lancé un mandat d'arrestation et, le 17 juillet 1984 ou vers cette date, Mellino a été arrêté de nouveau. L'audience d'extradition était fixée au 10 septembre 1984, mais le 31 août, le

*i*  gouvernement du Canada a saisi le juge Dixon d'une demande en prorogation du délai pour le motif qu'un témoin indispensable (un fonctionnaire argentin) serait absent. Cette demande fut rejetée, mais une nouvelle demande fondée sur le

*j*  même motif adressée au juge Quigley le 10 septembre a été accueillie et l'audience d'extradition a

tion for an extension of time was made, this time, however, by counsel for Mellino. The application was granted and the hearing adjourned to December 10, 1984, by which date Mellino had been in custody for nearly five months.

At the commencement of the extradition hearing on December 10, 1984, an application was made on behalf of Mellino to the presiding judge, Waite J., to have the proceedings stayed on two grounds: first, that there was an infringement of s. 11(*b*) of the *Charter* (trial within a reasonable time), and second, that the extradition proceedings constituted an abuse of process. On December 11, 1984, Waite J. found that Mellino's right under s. 11(*b*) of the *Charter* had been infringed or denied, and pursuant to s. 24(1) of the *Charter* dismissed the application for extradition and discharged Mellino. At the time of his discharge no evidence had been presented in support of the request for extradition.

Waite J. held that in the absence of any satisfactory or reasonable explanation, the 17-month delay between the discharge of Mellino because of evidentiary problems in the first extradition proceedings on February 1, 1983, and the institution of the second proceedings on June 29, 1984, was inordinate, especially having regard to the relatively simple requirements of the Act and the treaty, and the fact that Mellino's identity had been known to the Argentinian authorities since at least 1977. He noted that the second proceedings could not continue on September 10 as originally scheduled because of further evidentiary problems including the departure from Canada of an essential Argentinian witness. In his view, the delay in the proceedings was unreasonable within the meaning of s. 11(*b*) of the *Charter*, particularly since, as article XIV of the treaty indicated, in extradition proceedings, time was of the essence.

In dismissing the application and discharging Mellino pursuant to s. 24(1) of the *Charter*, Waite J. rejected the argument that a judge in an extradition proceeding was not a court of competent jurisdiction. An extradition judge was

*a* été fixée au 30 octobre 1984. Par la suite, il y a eu encore une demande de prorogation, présentée cette fois-ci par l'avocat de Mellino. On a fait droit à la demande et l'audience a été ajournée au 10 décembre 1984, de sorte que Mellino avait été détenu pendant presque cinq mois.

*b* Le 10 décembre 1984, au début de l'audience d'extradition, une demande de suspension d'instance a été présentée pour le compte de Mellino au juge Waite qui présidait. Deux motifs ont été invoqués: premièrement, il y avait eu violation de l'al. 11*b*) de la *Charte* (procès dans un délai raisonnable) et, deuxièmement, les procédures *c* d'extradition étaient abusives. Le 11 décembre 1984, le juge Waite a conclu qu'on avait porté atteinte au droit reconnu à Mellino par l'al. 11*b*) de la *Charte* et, se fondant sur le par. 24(1) de la *Charte*, il a rejeté la demande d'extradition et a *d* remis Mellino en liberté. Au moment de cette remise en liberté, aucun élément de preuve n'avait été produit à l'appui de la demande d'extradition.

*e* Le juge Waite a conclu qu'à défaut d'une explication satisfaisante ou raisonnable la période de dix-sept mois qui s'est écoulée entre la libération de Mellino le 1er février 1983 à cause de problèmes de preuve éprouvés dans les premières procédures *f* d'extradition et l'institution des secondes procédures le 29 juin 1984, était excessive, compte tenu surtout des exigences relativement simples de la Loi et du traité, et compte tenu du fait que les autorités argentines connaissaient l'identité de *g* Mellino depuis au moins 1977. Il a fait remarquer que, contrairement à ce qui avait été initialement prévu, les secondes procédures n'ont pu se poursuivre le 10 septembre en raison de nouveaux problèmes de preuve, dont le départ du Canada d'un *h* témoin argentin essentiel. À son avis, le retard dans les procédures était déraisonnable au sens de l'al. 11*b*) de la *Charte*, particulièrement puisque, comme l'indique l'article XIV du traité, le temps *i* constituait un élément capital dans les procédures d'extradition.

En rejetant la demande et en remettant Mellino en liberté en vertu du par. 24(1) de la *Charte*, le *j* juge Waite a repoussé l'argument selon lequel un juge qui préside des procédures d'extradition n'est pas un tribunal compétent. Selon lui, un juge qui

equivalent to a magistrate on a preliminary inquiry in the sense that he exercised the same powers and applied the same test to the evidence. But in other senses, the extradition judge had a much broader jurisdiction. First, he had additional powers under treaty and by statute. Second, he did not sit as a *persona designata* but as a court of law properly constituted. Finally, he was and remained a judge of a superior court with the jurisdiction and powers appertaining to that position.

Application for leave to this Court was granted on April 4, 1985, [1985] 1 S.C.R. xii.

### The Jurisdiction of this Court

This appeal is brought under s. 41 of the *Supreme Court Act*, R.S.C. 1970, c. S-19, which in broad terms empowers this Court to grant leave to appeal from any final or other judgment of the highest court of final resort in a province, or a judge thereof, in which judgment can be had in a particular case. The Act again underscores the breadth of the provision in s. 2(1) by defining "the court appealed from" as "the court from which the appeal is brought directly to the Supreme Court, whether such court is one of original jurisdiction or a court of appeal", and "final judgment" as "any judgment, rule, order or decision that determines in whole or in part any substantive right of any of the parties in controversy in any judicial proceeding". On a plain reading of these provisions, I would have thought it obvious that s. 41 applied to the present case. The decision of Waite J., from which this appeal is taken, finally dismissed the application for extradition on the ground that s. 11(*b*) of the *Charter* had been infringed.

A difficulty arises because in *United States of America v. Link and Green*, [1955] S.C.R. 183, this Court, in an oral judgment, held that it had no jurisdiction under s. 41 to grant leave from a refusal of an extradition judge to commit a fugitive because in its view this was not a "judgment"

siège en matière d'extradition est assimilable au magistrat qui préside une enquête préliminaire en ce sens qu'il exerce les mêmes pouvoirs et applique à la preuve le même critère. À d'autres points de vue, toutefois, la compétence du juge d'extradition est beaucoup plus large. En premier lieu, le traité et la Loi l'investissent de pouvoirs supplémentaires. En deuxième lieu, il siège non pas en tant que *persona designata*, mais en tant que cour de justice régulièrement constituée. Finalement, il est et demeure juge de cour supérieure, doté de la compétence et des pouvoirs qui se rattachent à cette qualité.

L'autorisation de pourvoi devant cette Cour a été accordée le 4 avril 1985, [1985] 1 R.C.S. xii.

### La compétence de cette Cour

Le pourvoi est fondé sur l'art. 41 de la *Loi sur la Cour suprême*, S.R.C. 1970, chap. S-19, qui en termes généraux habilite cette Cour à donner l'autorisation de se pourvoir de tout jugement, définitif ou autre, rendu par la plus haute cour de dernier ressort habilitée, dans une province, à rendre jugement dans l'affaire en question, ou par l'un des juges de cette cour. La portée étendue de cette disposition est soulignée au par. 2(1) de la Loi, suivant lequel l'expression «la cour dont appel est interjeté» signifie «la cour de laquelle l'appel est directement porté à la Cour suprême, que cette cour soit une cour de première instance ou une cour d'appel», et suivant lequel l'expression «jugement définitif» signifie «tout jugement, règle, ordonnance ou décision qui détermine en totalité ou en partie un droit absolu d'une des parties en cause dans une procédure judiciaire». Selon une interprétation littérale de ces dispositions, j'aurais tenu pour évident que l'art. 41 s'applique en l'espèce. La décision du juge Waite, contre laquelle a été formée le présent pourvoi, a définitivement rejeté la demande d'extradition pour cause de violation de l'al. 11*b*) de la *Charte*.

Une difficulté surgit parce que, dans l'affaire *United States of America v. Link and Green*, [1955] R.C.S. 183, cette Cour, dans un jugement oral, a conclu qu'elle n'avait pas compétence en vertu de l'art. 41 pour accorder une autorisation de pourvoi à l'encontre du refus d'un juge d'extradi-

within the meaning of s. 41 of the *Supreme Court Act*. Counsel for Argentina pointed out some factual distinctions between that case and the present, but in my view he rightly stressed the different contexts in which the two cases were decided. As I noted in *Canada v. Schmidt*, [1987] 1 S.C.R. 500, released contemporaneously with this case, the prevailing legislative policy at the time *Link and Green* was decided was against providing appeals in extradition cases. Equally, if not more important, most appeals to this Court were then as of right and, possibly as a defensive measure, the Court tended to interpret restrictively those areas of appeal over which it had control. As well, of course, this Court had just recently assumed the role of final court of appeal for Canada and the implications of this fact had not yet been fully apprehended.

While there were portents of things to come (see *Commonwealth of Puerto Rico v. Hernandez*, [1975] 1 S.C.R. 228, at pp. 231, 232, 240 and 243), a clear break with the earlier approach was not made until *Hill v. The Queen*, [1977] 1 S.C.R. 827. In that case, the Court refused to follow its earlier decision in *Goldhar v. The Queen*, [1960] S.C.R. 60, and held that it had jurisdiction under s. 41 to hear an appeal against sentence. Pigeon J., for the majority, noted at p. 850 that s. 41 was enacted substantially in its present form when appeals to the Privy Council (which had had unlimited jurisdiction with special leave) were abolished and this Court was made truly supreme. It was apparent, he added, "that the new provision was intended to effect the change from a limited specific jurisdiction to a broad general jurisdiction". Laskin C.J., in dissent but not on this point, gave further emphasis to the expanded jurisdiction under s. 41 by saying, at pp. 831-32, that he "would not exclude cases from the leave jurisdiction of this Court unless it is quite plain that they have been excluded by statute". Similar sentiments were expressed by the present Chief Justice, then Dickson J., in *R. v. Gardiner*, [1982] 2 S.C.R. 368. After a detailed review of the evolu-

tion d'ordonner la détention d'un fugitif car, de l'avis de la Cour, ce refus n'était pas un «jugement» au sens de l'art. 41 de la *Loi sur la Cour suprême*. L'avocat de l'Argentine a souligné certaines différences factuelles entre cette affaire-là et la présente espèce mais, selon moi, il a eu raison d'insister sur les contextes différents qui ont présidé à la décision des deux affaires. Comme je l'ai fait remarquer dans l'arrêt *Canada c. Schmidt*, [1987] 1 R.C.S. 500, rendu en même temps que le présent arrêt, la politique législative en vigueur à l'époque de l'arrêt *Link and Green* s'opposait aux appels en matière d'extradition. Qui plus est, la plupart des pourvois devant cette Cour se faisaient à l'époque de plein droit et, peut-être comme mesure défensive, la Cour avait tendance à interpréter de façon restrictive les sujets de pourvoi qu'elle pouvait contrôler. De plus, évidemment, cette Cour venait tout juste de se voir attribuer le rôle de Cour d'appel de dernier ressort pour le Canada et on n'en saisissait pas encore parfaitement toute la portée.

Bien qu'il y eût des présages de ce qui viendrait (voir *Commonwealth de Puerto Rico c. Hernandez*, [1975] 1 R.C.S. 228, aux pp. 231, 232, 240 et 243), ce n'est que dans l'arrêt *Hill c. La Reine*, [1977] 1 R.C.S. 827, qu'on s'est nettement démarqué par rapport à l'attitude antérieure. Dans cette affaire, la Cour a refusé de suivre son arrêt antérieur *Goldhar v. The Queen*, [1960] R.C.S. 60, et a conclu que l'art. 41 l'habilitait à entendre un pourvoi contre la peine imposée. Le juge Pigeon, au nom de la majorité, a fait remarquer, à la p. 850, que l'art. 41 avait été promulgué essentiellement dans sa forme actuelle en même temps que les appels au Conseil privé (qui avait joui d'une juridiction illimitée par voie d'autorisation) étaient abolis et cette Cour est devenue véritablement suprême. Il était évident, ajoutait-il, «que la nouvelle disposition visait à transformer la juridiction limitée de la Cour en une juridiction générale». Le juge en chef Laskin, dissident, mais non sur ce point, a mis davantage en relief la compétence élargie conférée par l'art. 41 lorsqu'il a dit, aux pp. 831 et 832, qu'il n'était «disposé à exclure de la juridiction de cette Cour par voie d'autorisation rien qui ne soit très clairement exclu par la loi». Le juge Dickson, maintenant Juge en chef, a exprimé

tion of the interpretation of s. 41; he concluded that "*Hill* mandated an expansive reading of s. 41(1), the better to enable this Court to discharge its role at the apex of the Canadian judicial system, as the court of last resort for all Canadians" (p. 404).

It will be obvious from the foregoing that *Link and Green* is inconsistent with the reasoning in more recent cases in this Court and should no longer be followed. I conclude, therefore, that this Court has jurisdiction to entertain the present appeal.

## Section 11(*b*) of the *Charter*

Waite J. treated the matter in the same way as if Mellino had been charged before him with a criminal offence in Canada, and held that s. 11(*b*) had been violated. Mellino was, of course, never charged in Canada by any of the governments to which the *Charter* applies (s. 32). Rather he was charged with an offence in Argentina by the government of that country in respect of an act that took place wholly in Argentina. The prosecution for the offence was, therefore, wholly within the jurisdiction of Argentina. As I indicated in *Schmidt*, *supra*, s. 11 of the *Charter* has no application to extradition hearings. It is interesting that the courts of the United States have interpreted the Sixth Amendment of their Constitution guaranteeing speedy trials as not applying to extradition proceedings: see *Jhirad v. Ferrandina*, 536 F.2d 478 (2d Cir. 1976); *Sabatier v. Dabrowski*, 586 F.2d 866 (1st Cir. 1978); *Matter of Burt*, 737 F.2d 1477 (7th Cir. 1984).

Counsel for Mellino, however, argued that s. 11(*b*) of the *Charter* applied to Mellino by virtue of article V of the treaty which provides that extradition shall not take place if "exemption from prosecution or punishment has been acquired by lapse of time, according to the laws of the state applying or applied to". This provision was obviously intended to bring into operation statutes of limitations that exist in some countries prohibiting

des opinions semblables dans l'arrêt *R. c. Gardiner*, [1982] 2 R.C.S. 368. Après une étude approfondie de l'évolution de l'interprétation de l'art. 41, il a conclu que «l'arrêt *Hill* a donné au par. 41(1) une interprétation plus libérale qui permet à cette Cour de remplir son rôle au sommet du système judiciaire canadien en tant que cour de dernier ressort pour tous les Canadiens» (p. 404).

Il ressort clairement de ce qui précède que l'arrêt *Link and Green* est inconciliable avec le raisonnement adopté dans des arrêts plus récents de cette Cour et qu'il ne doit plus être suivi. Je conclus en conséquence que cette Cour a compétence pour entendre le présent pourvoi.

## L'alinéa 11*b*) de la *Charte*

Le juge Waite a procédé comme si Mellino se trouvait accusé devant lui d'une infraction criminelle commise au Canada et a conclu à une violation de l'al. 11*b*). Mellino, évidemment, n'a jamais été inculpé au Canada par l'un ou l'autre des gouvernements auxquels s'applique la *Charte* (art. 32). Il est plutôt accusé en Argentine par le gouvernement de ce pays, relativement à un fait qui s'est déroulé en totalité en Argentine. Les poursuites pour l'infraction relèvent donc entièrement de la compétence de l'Argentine. Comme je l'ai souligné dans l'arrêt *Schmidt*, précité, l'art. 11 de la *Charte* ne s'applique pas aux audiences d'extradition. Il est d'ailleurs à noter que les tribunaux des États-Unis ont interprété le Sixième amendement de la Constitution américaine, qui garantit la célérité des procès, de manière à le rendre inapplicable aux procédures d'extradition: voir *Jhirad v. Ferrandina*, 536 F.2d 478 (2d Cir. 1976); *Sabatier v. Dabrowski*, 586 F.2d 866 (1st Cir. 1978); *Matter of Burt*, 737 F.2d 1477 (7th Cir. 1984).

L'avocat de Mellino a toutefois fait valoir que l'al. 11*b*) de la *Charte* s'appliquait à Mellino en raison de l'article V du traité selon lequel il n'y aura pas d'extradition si «la prescription des poursuites ou de la peine est acquise d'après les lois du pays auquel la demande est adressée» ou duquel la demande émane. Visiblement, cette disposition était censée faire jouer les lois sur la prescription qui existent dans certains pays et qui interdisent

prosecution for certain crimes after a stated lapse of time; for an example, see *R. v. Brixton Prison (Governor of), Ex parte Van der Auwera*, [1907] 2 K.B. 157. Such statutes are relatively easy to apply at an extradition hearing; one simply has to compute the time in accordance with the provisions of the statute. Section 11(*b*), on the other hand, is not an exemption in that sense. It gives a *Charter* remedy for delay when a prosecution has been initiated; no fixed time is involved. One must take into account such matters as whether the delay is unreasonable having regard to the time particular procedures ordinarily take. In extradition matters, this would surely require an inquiry into how proceedings are conducted in the foreign country and involve comparing them with ours. As well, a thorough examination of the facts surrounding the delay would have to be made, a function, as I explained in *Schmidt, supra*, wholly out of keeping with extradition proceedings. It would require much stronger words than these to persuade me that a treaty provision of this kind was intended to expand the application of our constitutional standards for expeditious prosecutions to the international arena. In the present case, it would require considerable adaptations to apply s. 11(*b*) to the relevant delay. The delay principally complained of is the time elapsed between the time Mellino was discharged following the first extradition hearing and the initiation of the second.

I conclude, therefore, that the extradition judge erred in discharging Mellino on this ground.

### Abuse of Process and s. 7 of the *Charter*

At the hearing and on this appeal, counsel for Mellino also argued that the delay in the proceedings constituted an abuse of process. For this position, he particularly relied on *R. v. Jewitt*, [1985] 2 S.C.R. 128. There, Dickson C.J., writing for the Court, adopted the view expressed by Dubin J.A. in *R. v. Young* (1984), 40 C.R. (3d) 289 (Ont. C.A.), at p. 329, that at common law there existed a discretionary power in a trial judge

les poursuites pour certains crimes à l'expiration d'un délai déterminé: pour un exemple, voir *R. v. Brixton Prison (Governor of), Ex parte Van der Auwera*, [1907] 2 K.B. 157. Il est relativement facile d'appliquer de telles lois à une audience d'extradition; en effet, on n'a qu'à calculer le délai conformément aux dispositions de la loi en question. L'alinéa 11*b*), par contre, ne crée pas de délai de prescription au sens où il le fait le traité. Il ouvre droit à un recours fondé sur la *Charte* pour les retards qui se produisent après que des poursuites ont été engagées; aucun délai précis n'est fixé. On doit se demander notamment si le retard est déraisonnable eu égard à la durée normale d'une procédure donnée. En matière d'extradition, cela nécessiterait certainement que l'on fasse enquête sur la manière dont les procédures se déroulent dans le pays étranger et qu'on les compare avec les nôtres. Il faudrait en outre entreprendre un examen minutieux des circonstances du retard, fonction qui, comme je l'ai précisé dans l'arrêt *Schmidt*, précité, ne convient guère à des procédures d'extradition. Une formulation bien plus catégorique que celle-là serait nécessaire pour me convaincre qu'une disposition de ce genre dans un traité est censée étendre jusque sur la scène internationale l'application de nos normes constitutionnelles visant à assurer des poursuites expéditives. En l'espèce, il faudrait effectuer de grandes adaptations pour que l'al. 11*b*) puisse s'appliquer au retard en cause. Le délai principalement en cause est le temps écoulé entre le moment de la mise en liberté de Mellino à l'issue de la première audience d'extradition et le moment où la seconde a débuté.

Je conclus donc que le juge d'extradition a commis une erreur en mettant Mellino en liberté pour ce motif.

### L'abus des procédures et l'art. 7 de la *Charte*

À l'audience d'extradition et devant cette Cour, l'avocat de Mellino a soutenu en outre que le retard en question constituait un abus des procédures. À l'appui de cette position, il a invoqué particulièrement l'arrêt *R. c. Jewitt*, [1985] 2 R.C.S. 128. Dans cette affaire, le juge en chef Dickson, qui a rédigé les motifs de la Cour, a fait sienne l'opinion exprimée par le juge Dubin de la Cour d'appel dans l'arrêt *R. v. Young* (1984), 40 C.R.

to stay proceedings in a criminal case for abuse of process

where compelling an accused to stand trial would violate those fundamental principles of justice which underlie the community's sense of fair play and decency and to prevent the abuse of a court's process through oppressive or vexatious proceedings. [pp. 136-37]

Dickson C.J., however, expressly repeated the caveat made in *Young* that this is "a power which can be exercised only in the 'clearest of cases' ".

It should be observed, however, that, according to those cases, the power to grant a stay for abuse of process is vested in the trial judge, not in a judge at a preliminary hearing. *Charter* considerations apart, a judge at extradition hearing is in a position more closely related to that of a magistrate at a preliminary hearing. Such matters are to be dealt with at the trial in the foreign country like other defences. That approach has been followed in Canada from the development of extradition procedures as one can see from the often quoted passage of Hagarty C.J. in *R. v. Morton and Thompson* (1868), 19 U.C.C.P. 9, at p. 20:

I have always felt disposed to give the fairest and most liberal interpretation to the provisions of an arrangement like this Extradition Treaty, entered into by two nations professing a common civilization, with a thousand miles of conterminous boundary. They properly agree that their respective territories shall not be the asylum for those who commit crimes abhorrent to the laws of both communities. They agree to surrender, on demand, such persons, to be dealt with according to the laws they are said to have violated. I have neither the right nor the desire to doubt that, when surrendered, they will be legally and fairly dealt with. We are not asked here to pronounce on their guilt or to commit them for trial: all this is left to the foreign tribunal. We in effect only send them to be examined before the magistrate, who will decide if a case be made out for their commitment; just as we send an offender against

(3d) 289 (C.A. Ont.), à la p. 329, savoir qu'en *common law* le juge du procès jouissait d'un pouvoir discrétionnaire de suspendre l'instance pour abus des procédures dans une affaire criminelle

lorsque forcer le prévenu à subir son procès violerait les principes de justice fondamentaux qui sous-tendent le sens du franc-jeu et de la décence qu'a la société, ainsi que d'empêcher l'abus des procédures de la cour par une procédure oppressive ou vexatoire. [pp. 136 et 137]

Le juge en chef Dickson a toutefois expressément réitéré la mise en garde faite dans l'arrêt *Young*, que c'est là «un pouvoir qui ne peut être exercé que dans les «cas les plus manifestes»».

Soulignons toutefois que, d'après cette jurisprudence, c'est le juge du procès et non le juge qui préside l'enquête préliminaire qui détient le pouvoir de prononcer la suspension d'instance pour abus des procédures. Indépendamment de la *Charte*, le juge à l'audience d'extradition se trouve dans une situation assimilable à celle du magistrat à l'enquête préliminaire. Comme les autres moyens de défense, ces questions doivent être abordées au cours du procès dans le pays étranger. Que telle ait été l'attitude du Canada depuis l'inauguration de procédures d'extradition ressort des propos souvent cités qu'a tenus le juge en chef Hagarty dans la décision *R. v. Morton and Thompson* (1868), 19 U.C.C.P. 9, à la p. 20:

[TRADUCTION] Je me suis toujours senti disposé à interpréter de la manière la plus juste et la plus libérale les dispositions d'une convention comme ce traité d'extradition conclu par deux nations qui se veulent d'une même civilisation et qui partagent une frontière de milliers de milles. Elles sont d'accord, comme il se doit d'ailleurs, que leurs territoires respectifs ne seront pas un asile pour ceux qui commettent des crimes constituant des infractions aux lois des deux pays. Ceux-ci conviennent d'extrader ces personnes sur demande pour qu'elles soient jugées conformément aux lois qu'on leur reproche d'avoir violées. Je n'ai ni le droit ni le désir de douter que, une fois les personnes en question extradées, on leur réserve un traitement qui soit juste et conforme à la loi. On ne nous demande pas ici de nous prononcer sur leur culpabilité ni de les renvoyer au procès: tout cela est laissé au soin du tribunal étranger. Nous ne faisons en réalité que les renvoyer devant le magistrat pour qu'elles soient interrogées et qu'il décide si la preuve justifie le renvoi au procès de la même façon que nous renvoyons un contrevenant à nos propres lois pour qu'il compa-

our own laws to appear on a warrant granted on the testimony of witnesses he has never seen.

In this Court, counsel intertwined his contention that there was an abuse of process with an argument based on s. 7 of the *Charter*. As with the simple abuse of process argument, this argument, too, assumes that an extradition judge has jurisdiction to deal with the issue and grant the appropriate remedies. It also assumes that the delay can be attributed to officials of the Canadian government, which I would have thought was a prerequisite to the application of the *Charter* by virtue of s. 32: see *RWDSU v. Dolphin Delivery Ltd.*, [1986] 2 S.C.R. 573. However, quite apart from these assumptions, which I shall address later, I am unable to accept this argument.

On the particular facts of this case, there would be a breach of s. 7 only if there had been an abuse of process, and that demands that the circumstances here were such as could be categorized as the "clearest of cases". I do not think this is such a case. The five-year delay between the laying of charges against Mellino and his arrest is not in issue. The extradition process began soon after his arrival in Canada. Immediately following his arrest, a warrant of apprehension under the *Extradition Act* was issued, and an extradition hearing was scheduled. When Argentina failed to produce the necessary documentation within two months of Mellino's arrest, he was discharged as required by the treaty. It is the delay that followed that is said to constitute an abuse of process. Since an extradition is not a trial, new proceedings may be initiated on the same or new evidence. Seventeen months after his discharge, Mellino was again arrested following a second request for his extradition by Argentina. During these months, Mellino was free. There is no evidence that he was being harassed or interfered with by officials. So far as the delay might be thought to affect his defence to the charge, that, primarily owing to his own actions, was already five years old and his ultimate defence was, therefore, unlikely to have been prejudiced by the lapse of another 17 months; see in this context *Jhirad v. Ferrandina, supra.* In my view, there was no abuse of process or contraven-

raisse en vertu d'un mandat lancé sur la foi des témoignages de personnes qu'il n'a jamais vues.

En cette Cour, l'avocat a marié à son argument selon lequel il y a eu abus des procédures un moyen fondé sur l'art. 7 de la *Charte*. Tout comme l'argument de l'abus des procédures pur et simple, ce moyen aussi suppose qu'un juge siégeant en matière d'extradition ait compétence pour examiner la question et pour accorder les redressements appropriés. Il suppose en outre que le retard en question puisse être imputé aux fonctionnaires du gouvernement canadien, ce qui, à mon avis, constitue une condition de l'application de la *Charte* suivant l'art. 32: voir *SDGMR c. Dolphin Delivery Ltd.*, [1986] 2 R.C.S. 573. Toutefois, indépendamment de ces suppositions, auxquelles je reviendrai plus loin, je ne puis retenir cet argument.

Étant donné les faits particuliers de la présente affaire, il n'y aurait violation de l'art. 7 que s'il y avait eu abus des procédures et, pour cela, il faudrait que l'on puisse ranger ces faits dans la catégorie des «cas les plus manifestes». Or, je ne crois pas que cela soit possible en l'espèce. L'intervalle de cinq ans entre le moment où les accusations ont été portées contre Mellino et le moment de son arrestation n'est pas en litige. On a amorcé les procédures d'extradition peu après son arrivée au Canada. Son arrestation a été suivie immédiatement d'un mandat d'arrestation lancé en vertu de la *Loi sur l'extradition* et une audience d'extradition a été prévue. Quand l'Argentine n'a pas produit dans les deux mois de l'arrestation de Mellino les documents requis, celui-ci a été mis en liberté conformément aux exigences du traité. C'est le retard subséquent que l'on prétend constituer un abus des procédures. Puisqu'une audience d'extradition n'est pas un procès, on peut engager des procédures nouvelles fondées soit sur la même preuve soit sur de nouveaux éléments de preuve. Dix-sept mois après sa mise en liberté, Mellino fut arrêté de nouveau à la suite d'une seconde demande d'extradition émanant de l'Argentine. Pendant cette période, Mellino était libre. Rien n'indique que les fonctionnaires exerçaient sur lui le moindre harcèlement. Dans la mesure où l'on pourrait considérer que le retard compromet ses possibilités de répondre à l'accusation, soulignons

tion of s. 7. I should perhaps add that while Waite J. found the delay to have been unreasonable for the purposes of s. 11(*b*) of the *Charter* (a ground already disposed of), he made no finding that such delay constituted an abuse of process or contravened the principles of fundamental justice.

In assessing the issue, a court must not overlook that extradition proceedings must be approached with a view to conform with Canada's international obligations. The courts have on many occasions reiterated that the requirements and technicalities of the criminal law apply only to a limited extent in extradition proceedings. One cannot view delay resulting from the complexity involved in dealing with activities that reach across national boundaries and involve different systems of law and several levels of bureaucracies in the same way as that in local prosecutions. This is especially so when one considers that extradition proceedings are but a small part of the many and variegated responsibilities of diplomatic officials. It is interesting that the time schedule set forth in article XIV has been described as hectic and criticized as too onerous: see V. E. Hartley Booth, *British Extradition Law and Procedure* (1980), vol. 1, at p. 42.

At all events, the assumption by a Canadian court of responsibility for supervising the conduct of the diplomatic and prosecutorial officials of a foreign state strikes me as being in fundamental conflict with the principle of comity on which extradition is based. Some protection is afforded the fugitive by article XIV, which provides for his release if the evidence is not forthcoming within a certain period. This, however, does not make time of the essence in the manner contemplated by the trial judge. The article simply ensures that a fugitive is not imprisoned indefinitely pending the presentation of evidence. Since a discharge at an

que, principalement à cause des actes de Mellino lui-même, cette accusation était déjà vieille de cinq ans, de sorte que l'écoulement de dix-sept mois de plus risquait peu probablement de nuire à sa défense: voir, dans ce contexte, l'arrêt *Jhirad v. Ferrandina*, précité. À mon avis, il n'y a eu ni abus des procédures ni violation de l'art. 7. Je devrais peut-être ajouter que le juge Waite, bien qu'il ait trouvé le retard déraisonnable aux fins de l'al. 11*b*) de la *Charte* (moyen déjà écarté), n'a pas conclu que ce retard constituait un abus des procédures ou contrevenait aux principes de justice fondamentale.

En étudiant la question en litige, un tribunal ne doit pas perdre de vue la nécessité dans des procédures d'extradition de viser à respecter les obligations internationales du Canada. À maintes reprises, les tribunaux ont souligné que les exigences et les formalités du droit criminel ne s'appliquent que dans une mesure restreinte à des procédures d'extradition. On ne saurait assimiler au retard résultant de poursuites locales celui imputable aux complexités inhérentes aux activités d'envergure internationale qui relèvent de différents systèmes de droit et de plusieurs paliers de bureaucraties. C'est d'autant plus vrai quand on considère que les procédures d'extradition ne représentent qu'une infime partie des responsabilités nombreuses et variées des fonctionnaires diplomatiques. Il est intéressant de noter qu'on reproche au délai prévu par l'article XIV d'être excessivement astreignant et trop sévère: voir V. E. Hartley Booth, *British Extradition Law and Procedure* (1980), vol. 1, à la p. 42.

Quoi qu'il en soit, si un tribunal canadien se chargeait de contrôler la conduite des fonctionnaires diplomatiques et du ministère public d'un État étranger, il me semble que cela entrerait fondamentalement en conflit avec le principe de courtoisie internationale sur lequel repose l'extradition. Une certaine mesure de protection est offerte au fugitif par l'article XIV, qui prévoit sa mise en liberté si la preuve requise n'est pas produite dans un délai précis. Cela ne veut toutefois pas dire que le temps soit une considération capitale au sens envisagé par le juge du procès. L'article ne fait que garantir un fugitif contre un emprisonnement de

ARGENTINA *v.* MELLINO   *La Forest J.*

extradition hearing for lack of evidence, like that at a preliminary hearing, is not final, it has long been recognized that new proceedings may be instituted on new, or even on the same evidence before the judge at the original hearing or another judge: see, for example, *Attorney-General of Hong Kong v. Kwok-A-Sing* (1873), L.R. 5 P.C. 179; *Re Harsha (No. 2)* (1906), 11 C.C.C. 62 (Ont. H.C.); *Armstrong v. State of Wisconsin*, [1972] F.C. 1228 (C.A.) This was recognized by the judge and the parties, who acted on that basis.

The record does not show that the delay was attributable to Canadian authorities, which as already stated appears necessary to trigger s. 7: see s. 32. So far as one can gather, delays arose because of problems by the Argentinian authorities in framing the evidence in a form acceptable under Canadian law. The delay did not arise out of the conduct of the Canadian proceedings. There is no suggestion that the necessary documentary evidence was available before the date of the second request for extradition.

Finally, counsel for Mellino relied on cases based on s. 17 of the *Fugitive Offenders Act*, R.S.C. 1970, c. F-32, which gives the courts power to review whether a surrender under that Act would be unjust or oppressive. But this is done in a completely different context. Surrender under that Act is not made under treaty obligation but as a matter of courtesy to Commonwealth countries. Consequently, Parliament has felt free to expressly authorize the courts not only to review on these grounds but to impose greater evidentiary demands on those seeking surrender. These tasks, I might add, would generally be easier to perform than they would be at an extradition hearing because Commonwealth countries are heirs to the British criminal justice system.

durée indéterminée en attendant la présentation de la preuve. Puisqu'une mise en liberté pour manque de preuves prononcée à une audience d'extradition n'est pas plus définitive que celle prononcée à une enquête préliminaire, on reconnaît depuis longtemps que des procédures nouvelles fondées sur des éléments de preuve nouveaux, ou encore sur la même preuve, peuvent être engagées devant le juge qui a présidé l'audience initiale ou devant un autre juge: voir, par exemple, *Attorney-General of Hong Kong v. Kwok-A-Sing* (1873), L.R. 5 P.C. 179; *Re Harsha (No. 2)* (1906), 11 C.C.C. 62 (H.C. Ont.); *Armstrong c. État du Wisconsin*, [1972] C.F. 1228 (C.A.) Ce fait a été reconnu par le juge et par les parties, qui ont agi en conséquence.

Rien dans le dossier n'indique que le retard était imputable aux autorités canadiennes, ce qui, répétons-le, paraît conditionner l'application de l'art. 7: voir l'art. 32. Autant qu'on puisse en juger, les retards venaient des problèmes qu'éprouvaient les autorités argentines à présenter la preuve dans une forme acceptable en droit canadien. Le retard n'était aucunement relié à la conduite des procédures canadiennes. On ne prétend pas que la preuve documentaire requise aurait pu être produite antérieurement à la date de la seconde demande d'extradition.

Finalement, l'avocat de Mellino a invoqué des décisions fondées sur l'art. 17 de la *Loi sur les criminels fugitifs*, S.R.C. 1970, chap. F-32, qui habilite les tribunaux à examiner si l'extradition d'un fugitif effectuée en vertu de cette loi serait injuste ou tyrannique. Toutefois, cela se fait dans un contexte tout à fait différent. L'extradition en vertu de ladite loi ne s'effectue pas en vertu des obligations conventionnelles, mais par courtoisie envers les pays membres du Commonwealth. Par conséquent, le Parlement s'est senti libre de donner aux tribunaux l'autorisation expresse non seulement d'exercer un contrôle pour les motifs susmentionnés, mais aussi d'imposer à ceux qui demandent l'extradition des exigences plus lourdes en matière de preuve. J'ajoute qu'il serait généralement plus facile de s'acquitter de ces tâches dans ce contexte précis qu'il ne le serait à une audience d'extradition, étant donné que les pays du Commonwealth ont hérité du système britannique de justice criminelle.

In my view, there was no abuse of process or contravention of s. 7.

## The Jurisdiction of the Extradition Judge

The foregoing is sufficient to dispose of the case, but it raises a further and important issue that merits attention. The extradition judge took the view that he enjoyed a much broader jurisdiction than that possessed by a magistrate presiding at a preliminary hearing under the *Criminal Code*. He was not, he affirmed, sitting as a *persona designata* but as a court of law and, as such, retained all his powers and jurisdiction as a judge of a superior court except to the extent that the treaty or a statute otherwise provided.

I cannot accept this proposition. It seems to me to ignore the modest function of an extradition hearing which (barring minimal statutory and treaty exceptions) is merely to determine whether the relevant crime falls within the appropriate treaty and whether the evidence presented is sufficient to justify the executive surrendering the fugitive to the requesting country for trial there. Responsibility for the conduct of our foreign relations, including the performance of Canada's obligations under extradition treaties, is, of course, vested in the executive. I repeat: the role of the extradition judge is a modest one; absent express statutory or treaty authorization, the sole purpose of an extradition hearing is to ensure that the evidence establishes a *prima facie* case that the extradition crime has been committed. The procedure bears a considerable affinity to a preliminary hearing, and the judge's powers have some similarity to those of a magistrate presiding at such a hearing, who, as this Court held in *Mills v. The Queen*, [1986] 1 S.C.R. 863, has no power to administer *Charter* remedies. Indeed, the reasoning in *Mills* appears to me to be even more applicable to an extradition judge.

The fact that an extradition judge is often a superior court judge does not alter the matter.

À mon avis, il n'y a eu ni abus des procédures ni violation de l'art. 7.

## La compétence du juge d'extradition

Quoique ces observations suffisent pour trancher l'affaire, elles soulèvent une autre question fort importante qui mérite notre attention. Le juge d'extradition a estimé qu'il jouissait d'une compétence beaucoup plus large que celle possédée par un magistrat qui préside une enquête préliminaire en vertu du *Code criminel*. Il siégeait, a-t-il affirmé, non pas en tant que *persona designata*, mais en tant que cour de justice et, en cette qualité, il conservait tous ses pouvoirs et toute sa compétence de juge de cour supérieure, sauf dans la mesure où le traité ou une loi en dispose autrement.

Je ne puis retenir cette proposition. Elle me semble ne pas tenir compte de la portée restreinte d'une audience d'extradition qui (mis à part certaines exceptions insignifiantes prévues par la loi et le traité) vise simplement à déterminer si le crime en cause relève du traité applicable et si la preuve produite suffit pour justifier que l'exécutif livre le fugitif au pays requérant pour qu'il y subisse son procès. C'est évidemment l'exécutif qui est investi de la responsabilité de diriger nos relations étrangères, ce qui comprend l'exécution des obligations imposées au Canada par des traités d'extradition. Je le répète: le rôle d'un juge d'extradition est modeste; en l'absence d'une autorisation expresse découlant d'une loi ou d'un traité, l'unique but d'une audience d'extradition est de s'assurer que la preuve établit une apparence suffisante de la perpétration d'un crime donnant lieu à l'extradition. Cette procédure s'apparente en bien des points à une enquête préliminaire et les pouvoirs du juge ont des similarités avec ceux d'un magistrat qui préside une telle enquête et qui, suivant la conclusion de cette Cour dans l'arrêt *Mills c. La Reine*, [1986] 1 R.C.S. 863, n'a pas compétence pour accorder des redressements en vertu de la *Charte*. De fait, le raisonnement dans l'arrêt *Mills* me paraît s'appliquer à plus forte raison à un juge d'extradition.

Le fait qu'un juge d'extradition est souvent un juge de cour supérieure n'y change rien. Cela n'a

This has nothing to do with the issue of *persona designata*, which was discussed in *Minister of Indian Affairs and Northern Development v. Ranville*, [1982] 2 S.C.R. 518, but rather with what the judge is authorized to do under the Act. The Act clearly spells out the duties of an extradition judge and it would be strange if his powers differed in accordance with whether he was a superior court judge, a county court judge or a commissioner. This reasoning has been adopted in relation to an extradition judge's power to grant bail: see, for example, *Re Global Communications Ltd. and Attorney-General for Canada* (1984), 10 C.C.C. (3d) 97 (Ont. C.A.) It is interesting that in England extradition hearings are held before magistrates. When the *Extradition Act* (which was closely patterned on the English Act) was enacted over 100 years ago in Canada, jurisdiction was no doubt assigned to the superior and county court judges and commissioners because of the conditions prevailing in the country at the time. Many of the justices of the peace at the time may have been thought not to be equal to the task. There is nothing to suggest that judges acting in extradition matters were to be given any greater powers than those traditionally possessed by the English magistrates.

In particular, it is not the business of an extradition judge to assume responsibility for reviewing the actions of foreign officials in preparing the evidence for an extradition hearing. This would seem to me to be in breach of the most elementary dictates of comity between sovereign states. A foreign state obviously has jurisdiction over the actions of its officials, although, no doubt, the executive of this country must, on occasion, consider such matters in exercising its discretion to surrender a fugitive.

Nor is an extradition judge empowered to weigh the ultimate issue of whether delay will affect the trial of the action in the foreign country. The treaty places Canada under an obligation to surrender the fugitive for trial in the requesting country where such issues are to be considered. The assumption that the requesting state will give the

rien à voir avec la question de *persona designata*, qu'on a étudiée dans l'arrêt *Ministre des Affaires indiennes et du Nord canadien c. Ranville*, [1982] 2 R.C.S. 518; ce qui est pertinent est plutôt ce que la Loi autorise le juge à faire. Or, la Loi énonce clairement les devoirs d'un juge d'extradition et il serait étrange que ses pouvoirs diffèrent selon qu'il s'agit d'un juge de cour supérieure, d'un juge de cour de comté ou d'un commissaire. Ce raisonnement a été adopté relativement au pouvoir d'un juge d'extradition de libérer sous caution: voir, par exemple, *Re Global Communications Ltd. and Attorney-General for Canada* (1984), 10 C.C.C. (3d) 97 (C.A. Ont.) Un point à retenir est qu'en Angleterre les audiences d'extradition se tiennent devant des magistrats. Quand l'*Acte d'extradition* (modelé de très près sur la loi anglaise) a été adopté au Canada il y a plus de cent ans, c'était sans doute en raison des conditions qui régnaient au pays à cette époque-là que compétence fut attribuée aux juges de cour supérieure et de comté et aux commissaires. On estimait peut-être qu'un bon nombre des juges de paix n'étaient pas à la hauteur de la tâche. Rien n'indique que les juges siégeant en matière d'extradition devaient être investis de pouvoirs plus grands que ceux que détenaient traditionnellement les magistrats anglais.

En particulier, il n'appartient nullement à un juge d'extradition de prendre sur lui de contrôler les actes accomplis par des fonctionnaires étrangers dans la préparation de la preuve en vue d'une audience d'extradition. Cela me semble contraire aux exigences les plus élémentaires de la courtoisie entre états souverains. Il va de soi qu'un état étranger a compétence sur les actes de ses fonctionnaires, quoique, sans aucun doute, l'exécutif de notre pays doive à l'occasion en tenir compte en exerçant son pouvoir discrétionnaire d'extrader un fugitif.

Un juge d'extradition n'a pas non plus le pouvoir de trancher la question fondamentale de savoir si le retard aura un effet sur l'instruction de l'action dans le pays étranger. Le traité met le Canada dans l'obligation de livrer le fugitif en vue d'un procès dans le pays requérant où ces questions devront être examinées. La présomption que l'état

fugitive a fair trial according to its laws underlies the whole theory and practice of extradition and our courts have over many years made it abundantly clear that an extradition judge should not give effect to any suggestion that the proceedings are oppressive or that the fugitive will not be given a fair trial or give proper weight to the evidence. In truth, the assumption by an extradition judge that delay or other defences would not be given appropriate consideration by the foreign court is even more offensive than the assumption of control over the actions of foreign diplomatic and prosecutorial officials. It amounts to a serious adverse reflection not only on a foreign government to whom Canada has a treaty obligation but on its judicial authorities concerning matters that are exclusively within their competence.

It would cripple the operation of our extradition arrangements if extradition judges were to arrogate the power to consider defences that should properly be raised at trial. How would we react to foreign courts exercising this kind of pre-emptive jurisdiction in relation to trials in this country? There are, as well, practical considerations such as the limited information available to an extradition judge and his jurisdictional inability to obtain it: see, for example, *Re Insull*, [1933] 3 D.L.R. 709 (Ont. S.C.); *Re United States of America and Smith* (1984), 10 C.C.C. (3d) 540 (Ont. C.A.), at p. 551; *United States of America v. Beaurone* (1983), 27 Sask. R. 136 (Q.B.), at p. 138. In *Schmidt, supra*, allusion was made that the general extradition procedure constituted a reasonable limit under s. 1 on the right a fugitive may have not to be surrendered for trial: see in this context *Re Federal Republic of Germany and Rauca* (1983), 4 C.C.C. (3d) 385 (Ont. C.A.) I also noted there that I see nothing offensive to fundamental justice in surrendering in accordance with our extradition procedures an accused to a foreign country for trial in accordance with its traditional judicial processes for a crime alleged to have been committed there. There may, it is true, conceivably be situations where it would be unjust to surrender a fugitive either because of the general condition

requérant accordera au fugitif un procès équitable en conformité avec ses lois sous-tend toute la théorie et la pratique de l'extradition et les tribunaux canadiens ont dit très clairement depuis bien des années qu'un juge d'extradition doit écarter tout argument alléguant que les procédures sont oppressives ou que le fugitif n'aura pas un procès équitable ou qu'on ne donnera pas à la preuve l'importance qu'elle mérite. À la vérité, il est encore plus choquant qu'un juge d'extradition suppose que le retard ou tout autre moyen de défense ne serait pas dûment examiné par le tribunal étranger qu'il décide de contrôler les actes des fonctionnaires diplomatiques et du ministère public étrangers. Cela équivaut à une critique sévère non seulement d'un gouvernement étranger envers lequel le Canada a des obligations conventionnelles, mais aussi de son pouvoir judiciaire relativement à des questions relevant exclusivement de leur compétence.

Cela nuirait gravement à l'application de nos conventions d'extradition si les juges d'extradition s'arrogeaient le pouvoir d'examiner des moyens de défense qui devraient normalement être soulevés au procès. Quelle serait notre réaction si des tribunaux étrangers préjugeaient de la sorte des procès au Canada? Il y a en outre des considérations d'ordre pratique, telles que le peu d'informations dont dispose un juge d'extradition et son défaut de compétence pour obtenir de plus amples renseignements: voir, par exemple, *Re Insull*, [1933] 3 D.L.R. 709 (C.S. Ont.); *Re United States of America and Smith* (1984), 10 C.C.C. (3d) 540 (C.A. Ont.), à la p. 551; *United States of America v. Beaurone* (1983), 27 Sask. R. 136 (B.R.), à la p. 138. Dans l'arrêt *Schmidt*, précité, on a fait mention que la procédure générale d'extradition constitue, aux fins de l'article premier, une restriction raisonnable du droit que peut avoir un fugitif de ne pas être extradé en vue d'un procès: voir dans ce contexte *Re Federal Republic of Germany and Rauca* (1983), 4 C.C.C. (3d) 385 (C.A. Ont.) J'ai souligné en outre que je ne vois pas en quoi il serait choquant du point de vue de la justice fondamentale qu'un accusé soit livré à un pays étranger conformément à nos procédures d'extradition pour qu'il y soit jugé selon les procédures judiciaires traditionnelles de ce pays pour un crime qu'on lui

of the governmental and judicial apparatus or, more likely, because some particular individual may be subjected to oppressive treatment. These are judgments, however, that are pre-eminently within the authority and competence of the executive to make. The courts may, as guardians of the Constitution, on occasion have a useful role to play in reviewing such decisions, but it is obviously an area in which courts must tread with caution.

Situations may, as is alleged in the present case, also conceivably arise where the Canadian officials who carry out the prosecution on behalf of the foreign state, do so in a manner that violates fundamental justice. In such cases, fundamental justice considerations may come into play that call for *Charter* review. However, not every delay raises such considerations; all the circumstances must be weighed; see in this context the American case of *Matter of Burt, supra.* It should also be noted that releasing a fugitive in such circumstances raises a serious problem. Is Canada to be absolved of its treaty obligation to a foreign state to surrender a fugitive because Canadian officials have been derelict in performing their duties regarding the request for surrender duly made by that state? This consideration, however, principally underlines the importance officials must attach to these matters. Theirs, acting on behalf of the executive, is the duty to carry out Canada's obligations. The courts, on the other hand, have the duty to ensure that actions of Canadian officials meet the standards of the *Charter*. Because of the seriousness of the matter, however, a court should not lightly attribute responsibility for delay to Canadian officials. In the present case what little there is on the record that could be looked upon as involving any lapses on the part of Canadian officials is highly tenuous. What the record reveals, instead, is that the delays came about from the difficulty experienced by the Argentinian authorities in organizing the evidence in a form acceptable under Canadian procedures. The circumstances are not, in my view, sufficiently lengthy or inconvenient as to make surrender under these circumstances suf-

reproche d'y avoir commis. Certes, on peut concevoir des situations où il serait injuste d'extrader un fugitif, soit en raison de l'état général de l'appareil gouvernemental et judiciaire soit, ce qui est plus probable, parce qu'un individu donné pourra être soumis à un traitement oppressif. Il s'agit toutefois là de jugements qui relèvent au premier chef du pouvoir et de la compétence de l'exécutif. Les tribunaux, en tant que gardiens de la Constitution, peuvent à l'occasion jouer un rôle utile en contrôlant de telles décisions, mais ils doivent évidemment faire preuve de la plus grande circonspection dans ce domaine.

Il se peut aussi que, comme on l'allègue en l'espèce, les fonctionnaires canadiens chargés d'exercer les poursuites pour le compte de l'état étranger procèdent d'une manière contraire à la justice fondamentale. En pareils cas, des considérations de justice fondamentale peuvent commander un contrôle en vertu de la *Charte*. Ce ne sont toutefois pas tous les retards qui soulèvent ces considérations; il faut peser toutes les circonstances; voir dans ce contexte l'arrêt américain *Matter of Burt*, précité. Soulignons en outre que la mise en liberté d'un fugitif dans de telles circonstances pose un problème sérieux. Le Canada doit-il être dégagé de son obligation conventionnelle envers l'État étranger d'extrader un fugitif parce que des fonctionnaires canadiens ont fait preuve de négligence dans l'exercice de leurs fonctions reliées à une demande d'extradition dûment présentée par cet État? Cette question, cependant, sert principalement à souligner l'importance que les fonctionnaires doivent attacher à ces questions. C'est à eux qu'il incombe de remplir, au nom de l'exécutif, les obligations du Canada. Le devoir des tribunaux, par contre, est de s'assurer que les actes des fonctionnaires canadiens satisfont aux normes de la *Charte*. Toutefois, en raison de la gravité de l'affaire, un tribunal ne doit pas inconsidérément imputer aux fonctionnaires canadiens la responsabilité d'un retard. En l'espèce, le peu d'éléments de preuve qui, d'après le dossier, pourraient être considérés comme établissant des manquements de la part des fonctionnaires canadiens, sont extrêmement faibles. Au contraire, il ressort du dossier que les retards ont résulté de la difficulté qu'ont éprouvée les autorités argentines à organiser la preuve

ficiently oppressive as to violate the principles of fundamental justice.

In the rare cases where the actions of Canadian executives or officials may give rise to the need for *Charter* review, I do not think the extradition judge has *Charter* jurisdiction. For reasons of efficiency, the Act and the treaty have strictly confined his role. Parliament has indicated how extradition proceedings are to be reviewed—by superior courts by means of the writ of *habeas corpus*. A court in *habeas corpus* proceedings is ordinarily confined to questions of jurisdiction, but as such proceedings are contemplated by Parliament as the sole means of review in extradition proceedings, and from which, moreover, it has provided appeals to the Court of Appeal and to this Court, a court in *habeas corpus* proceedings is obviously the court of competent jurisdiction for the purposes of s. 24 of the *Charter*. It is interesting that a somewhat similar approach has been taken in the United States. In *Matter of Burt*, *supra*, the United States Court of Appeals, Seventh Circuit, held that the merits of a petitioner's due process claim could be considered as part of a *habeas corpus* review. The court thus put it, at p. 1484:

We hold that federal courts undertaking habeas corpus review of extraditions have the authority to consider not only procedural defects in the extradition procedures that are of constitutional dimension, but also the substantive conduct of the United States in undertaking its decision to extradite if such conduct violates constitutional rights.

Not only are the actions of Canadian officials in relation to extradition proceedings subject to review under the *Charter*, so too as I noted in *Schmidt*, *supra*, is the executive's exercise of discretion in surrendering a fugitive. However, this jurisdiction, as I there observed, must be exercised

dans une forme acceptable aux fins des procédures canadiennes. À mon avis, les circonstances ne témoignent pas d'un retard à ce point long ou gênant qu'il rende l'extradition suffisamment oppressive pour qu'elle constitue une violation des principes de justice fondamentale.

Dans les rares cas où les actes des représentants de l'exécutif ou de fonctionnaires canadiens peuvent donner lieu à un contrôle en vertu de la *Charte*, je ne crois pas que le juge d'extradition ait compétence pour effectuer ce contrôle. Par souci d'efficacité, la Loi et le traité ont strictement circonscrit son rôle. Le Parlement a précisé comment doivent être contrôlées les procédures d'extradition—par les cours supérieures au moyen du bref d'*habeas corpus*. Dans des procédures d'*habeas corpus*, le tribunal ne connaît normalement que de questions de compétence mais, étant donné que le Parlement a envisagé de telles procédures comme seul moyen de contrôle en matière d'extradition et puisque le législateur a en outre prévu des appels devant la Cour d'appel et devant cette Cour en matière d'*habeas corpus*, il est évident qu'un tribunal saisi de procédures d'*habeas corpus* est le tribunal compétent aux fins de l'art. 24 de la *Charte*. Il est intéressant de constater qu'une méthode à peu près semblable a été adoptée aux États-Unis. En effet, dans l'arrêt *Matter of Burt*, précité, la Cour d'appel fédérale (7th Cir.) a conclu qu'il était loisible d'examiner au fond, dans le cadre d'un contrôle par voie d'*habeas corpus*, une réclamation relative au caractère équitable des procédures. La Cour d'appel s'est exprimée ainsi, à la p. 1484:

[TRADUCTION] Nous estimons que les tribunaux fédéraux qui exercent en matière d'extradition un contrôle par voie d'habeas corpus sont habilités à examiner non seulement les vices de forme des procédures d'extradition lorsque ces vices revêtent une dimension constitutionnelle, mais aussi la conduite des États-Unis dans la prise de sa décision au fond de procéder à l'extradition si celle-ci porte atteinte à des droits constitutionnels.

Ce ne sont pas seulement les actes des fonctionnaires canadiens relativement aux procédures d'extradition qui font l'objet d'un contrôle en vertu de la *Charte* car, comme je l'ai fait remarquer dans l'arrêt *Schmidt*, précité, l'exercice par l'exécutif du pouvoir discrétionnaire d'extrader un fugitif en fait

with the utmost circumspection consistent with the executive's pre-eminent position in matters of external relations. The courts may intervene if the decision to surrender a fugitive for trial in a foreign country would in the particular circumstances violate the principles of fundamental justice. But, as already noted, it does not violate such principles to surrender a person to be tried for a crime he is alleged to have committed in a foreign country in the absence of exceptional circumstances. Our courts must assume that he will be given a fair trial in the foreign country. Matters of due process generally are to be left for the courts to determine at the trial there as they would be if he were to be tried here. Attempts to pre-empt decisions on such matters, whether arising through delay or otherwise, would directly conflict with the principles of comity on which extradition is based; for a similar view in the United States, see *Jhirad v. Ferrandina*, *supra*. Should there be circumstances so substantial as to give rise to questions whether surrendering a fugitive would constitute a breach of fundamental justice, the extradition judge should bring them to the attention of the executive; see *Royal Government of Greece v. Brixton Prison Governor*, [1969] 3 All E.R. 1337 (H.L.).

Finally, in exercising jurisdiction over executive action, a court must firmly keep in mind that it is in the executive that the discretion to surrender a fugitive is vested. Consequently, barring obvious or urgent circumstances, the executive should not be pre-empted. In cases where the feared wrong may be avoided by interstate arrangements, it may be doubted that the courts should ordinarily intervene before the executive has made an order of surrender. As already mentioned, the primary responsibility for the conduct of external relations must lie with the executive. The executive may well be able to obtain sufficient assurances from the foreign country to ensure compliance with the require-

également l'objet. J'ai toutefois souligné dans le même arrêt que cette compétence doit s'exercer avec la plus grande circonspection de manière à respecter la position prééminente de l'exécutif en matière de relations extérieures. Les tribunaux peuvent intervenir si la décision d'extrader un fugitif en vue de son procès dans un pays étranger allait, dans les circonstances particulières, à l'encontre des principes de justice fondamentale. Mais, comme je l'ai déjà dit, ce n'est nullement une entorse à ces principes que de livrer une personne afin qu'elle soit jugée pour un crime qu'on lui reproche d'avoir commis dans un pays étranger en l'absence de circonstances exceptionnelles. Nos tribunaux doivent tenir pour acquis que cette personne aura un procès équitable dans le pays étranger. En règle générale, les questions touchant le caractère équitable des procédures doivent y être tranchées par les tribunaux à l'étape du procès, de la même manière qu'elles le seraient si le procès avait lieu ici. Toute tentative de préjuger de telles questions, que ce soit par suite d'un retard ou pour d'autres raisons, entrerait directement en conflit avec les principes de courtoisie qui sont à la base de l'extradition: pour un point de vue américain semblable, voir *Jhirad v. Ferrandina*, précité. Dans l'hypothèse où il existerait des circonstances à ce point importantes qu'elles soulèveraient des questions quant à savoir si l'extradition d'un fugitif constituerait un manquement à la justice fondamentale, il incomberait au juge d'extradition d'attirer l'attention de l'exécutif sur ces circonstances: voir *Royal Government of Greece v. Brixton Prison Governor*, [1969] 3 All E.R. 1337 (H.L.)

Finalement, lorsqu'un tribunal exerce sa compétence relative aux actes du pouvoir exécutif, il doit bien garder à l'esprit que c'est l'exécutif qui se trouve investi du pouvoir discrétionnaire d'extrader un fugitif. Par conséquent, à moins de circonstances criantes ou urgentes, il ne faut pas empêcher l'exécutif d'exercer son pouvoir discrétionnaire. Dans des cas où le tort appréhendé peut être évité au moyen d'accords internationaux, il est douteux que les tribunaux doivent normalement intervenir avant que l'exécutif n'ait ordonné l'extradition. Comme je l'ai déjà mentionné, c'est le pouvoir exécutif qui est responsable au premier chef de la conduite des relations extérieures. Il se

ments of fundamental justice. It would, of course, be open to the courts to review any such arrangements to ensure compliance with *Charter* requirements. However, a court would have to be extremely circumspect in taking such a course. It should not lightly assume that the executive has ignored its undoubted duty to ensure that its actions conform to constitutional requirements or that a foreign country would not act in good faith in complying with such assurances.

It is clear in any event that these issues are not to be dealt with by the extradition judge.

## Conclusion

For these reasons, I would allow the appeal, set aside the order of Waite J. and remit the matter to an extradition judge to continue the proceedings in accordance with the law.

The following are the reasons delivered by

LAMER J. (dissenting)—I have read the reasons of my colleague Justice La Forest and agree with him that this Court has jurisdiction to hear this appeal. I also agree with him that this matter should be remitted below albeit for a different purpose.

As I discussed in *Canada v. Schmidt*, [1987] 1 S.C.R. 500, s. 11 of the *Canadian Charter of Rights and Freedoms* generally applies to the extradition hearing in so far as it would apply to a preliminary inquiry. In my view, s. 11(*b*) is one of the rights guaranteed by s. 11 which is applicable to a preliminary inquiry and an extradition hearing. The liberty and security of the person subjected to the extradition hearing are affected by the holding of a hearing, and the principles of fundamental justice require that that hearing be resolved in a speedy manner.

The delay at issue here is the 17-month delay between the discharge of Mellino because of evi-

peut bien que l'exécutif puisse obtenir des assurances suffisantes du pays étranger pour garantir la conformité avec les exigences de la justice fondamentale. Bien entendu, il serait loisible aux tribunaux de contrôler tout accord de ce genre afin d'assurer le respect des exigences de la *Charte*. Il faudrait toutefois à ce moment-là qu'un tribunal se montre extrêmement circonspect. Il ne doit pas supposer à la légère que l'exécutif a manqué à son obligation incontestable de voir à ce que ses actes soient conformes aux exigences de la Constitution ni qu'un pays étranger ne respectera pas en toute bonne foi les assurances qu'il a données.

Il est clair en tout état de cause que ces questions ne relèvent pas de la compétence du juge d'extradition.

## Conclusion

Pour ces motifs, je suis d'avis d'accueillir le pourvoi, d'annuler l'ordonnance du juge Waite et de renvoyer l'affaire devant un juge d'extradition pour que les procédures se poursuivent en conformité avec la loi.

Version française des motifs rendus par

LE JUGE LAMER (dissident)—J'ai lu les motifs de mon collègue le juge La Forest et je suis d'accord avec lui pour dire que cette Cour a compétence pour entendre ce pourvoi. Je conviens également avec lui que cette affaire doit être renvoyée à l'instance inférieure compétente, quoique pour une fin différente.

Comme je l'ai indiqué dans *Canada c. Schmidt*, [1987] 1 R.C.S. 500, l'art. 11 de la *Charte canadienne des droits et libertés* s'applique de façon générale à l'audience d'extradition dans la mesure où il s'appliquerait à une enquête préliminaire. À mon avis, le droit énoncé à l'al. 11*b*) est l'un de ceux garantis par l'art. 11, qui est applicable à une enquête préliminaire et à une audience d'extradition. La liberté et la sécurité de la personne soumise à l'audience d'extradition sont menacées par la tenue d'une audience et les principes de justice fondamentale exigent que l'audience soit complétée rapidement.

Il y a eu en l'espèce un retard de dix-sept mois entre la libération de Mellino, à cause de problè-

dentiary problems in the first extradition proceedings and the institution of the second proceedings. As this Court held in *Carter v. The Queen*, [1986] 1 S.C.R. 981, at p. 985 with respect to the computation of time under s. 11(*b*):

> As I have indicated in *Mills v. The Queen,* [1986] 1 S.C.R. 863, which has been handed down this same day, the time frame to be considered in computing trial within a reasonable time generally runs only from the moment a person is charged. In passing, I might add that I say "generally" because there might be exceptional circumstances under which the time might run prior to the actual charge on which the accused will be tried. As an example, if the Crown withdraws the charge to substitute a different one but for the same transaction, the computation of time might well commence as of the first charge.

The computation of time for the purposes of s. 11(*b*) thus started to run when the first extradition proceedings were instituted. I am of the view that the 17-month delay between the discharge of the respondent in the first hearing and the institution of the second proceedings, if unexplained, constitutes an infringement of the right to be tried within a reasonable time under s. 11(*b*). It is in my view irrelevant whether that delay was due to the acts of the Argentinian or the Canadian authorities, as the respondent's right is no less infringed whatever may be the source of the delay. Further, both governments are in a sense partners in the undertaking and it could be said that there is a domestication of the conduct of the Argentinian authorities.

As I discussed in *United States v. Allard*, [1987] 1 S.C.R. 564, an extradition judge is not a court of competent jurisdiction under s. 24(1) and applicants should seek remedy in the superior court. The extradition judge in this case, however, was a judge of the Alberta Court of Queen's Bench, which is a superior court. As in *Allard*, I think that, as a matter of practice, an application under s. 24(1) can be made to the extradition judge if he is also a superior court judge. At the time of the application in this case, however, the law as to who had jurisdiction under s. 24(1) was not clear, and it might well be that, as a result, the

mes de preuve éprouvés dans les premières procédures d'extradition, et le début des secondes procédures. Comme cette Cour l'a décidé dans l'arrêt *Carter c. La Reine*, [1986] 1 R.C.S. 981, à la p. 985, relativement au calcul du délai visé à l'al. 11*b*):

> Comme je l'ai souligné dans l'arrêt *Mills c. La Reine* [1986] 1 R.C.S. 863, rendu en même temps que le présent arrêt, en déterminant si un procès a eu lieu dans un délai généralement raisonnable, on ne doit tenir compte que du temps qui s'écoule à partir de l'inculpation. En passant, je puis ajouter que je dis «généralement» parce qu'il pourrait y avoir des circonstances exceptionnelles dans lesquelles le délai pourrait courir avant le dépôt de l'accusation dont l'accusé aura à répondre. Par exemple, si la poursuite retire l'accusation pour la remplacer par une autre mais pour la même affaire, le calcul du délai pourrait bien commencer à partir de la première accusation.

Le calcul du délai aux fins de l'al. 11*b*) commençait donc à courir au moment où les premières procédures d'extradition ont été entamées. J'estime que le retard de dix-sept mois entre la libération de l'intimé à la première audience et le début des secondes procédures, s'il demeure inexpliqué, constitue une violation du droit d'être jugé dans un délai raisonnable énoncé à l'al. 11*b*). À mon avis, la question de savoir si le retard est dû aux actes des autorités argentines ou canadiennes n'a aucune importance car le droit de l'intimé n'est pas moins violé, quelle que soit la source du retard. De plus les deux gouvernements sont, en un sens, associés dans l'entreprise et on pourrait dire qu'il y a «canadianisation» de la conduite des autorités argentines.

Comme je l'ai dit dans l'affaire *États-Unis c. Allard*, [1987] 1 R.C.S. 564, un juge d'extradition n'est pas un tribunal compétent en vertu du par. 24(1) et les requérants devraient s'adresser à une cour supérieure. Le juge d'extradition en l'espèce est toutefois un juge de la Cour du Banc de la Reine de l'Alberta, qui est une cour supérieure. Comme dans l'affaire *Allard*, je pense que, en pratique, une demande fondée sur le par. 24(1) peut être adressée au juge d'extradition s'il est également un juge de cour supérieure. À l'époque de la demande en l'espèce cependant, le droit n'était pas encore fixé quant à savoir qui avait

authorities did not attempt to explain and justify the otherwise unacceptable delay. This being so, I would allow the appeal and send matters back to Waite J. so that he can complete the s. 24(1) hearing and, subject to his decision on that issue, terminate the extradition proceedings either way.

*a*

The following are the reasons delivered by

WILSON J.—I agree with Justice La Forest for the reasons given by him that this Court has jurisdiction to hear this appeal. I disagree with him, however, for the reasons I gave in *Canada v. Schmidt*, [1987] 1 S.C.R. 500, that s. 11 of the *Canadian Charter of Rights and Freedoms* has no application to extradition proceedings. I think that *Charter* rights may be pleaded in such proceedings and that (subject to the application of s. 1 which I leave open) there could undoubtedly come a point at which the delay in pursuing extradition in Canada would be unreasonable and s. 11(*b*) could properly be invoked. I do not believe, however, that this is such a case.

*b*

*c*

*d*

*e*

A lapse of time which might be unreasonable and constitute a violation of s. 11(*b*) in a purely domestic proceeding may, in my view, be fairly justified in a proceeding with foreign elements. But I do not think it appropriate for a Canadian court to call a foreign state to account for delay caused by it. To this extent I agree with La Forest J. as to the role of international comity. The Canadian court seized of the extradition proceedings can call the Canadian authorities to account and demand of them an explanation for any seemingly unreasonable delay but it cannot, in my view, do the same with the authorities in a foreign country. Accordingly, unlike my colleague Justice Lamer, I believe that any delay relied on under s. 11(*b*) must be delay caused by the Canadian authorities. The reason for this conclusion is, in essence, that an assessment of the reasonableness or otherwise of a delay presupposes the right to demand an explanation for it. If this right is not there, no assessment can be made. It

*f*

*g*

*h*

*i*

*j*

compétence en vertu du par. 24(1) et il se pourrait bien que, en conséquence, les autorités n'aient pas tenté d'expliquer et de justifier le retard par ailleurs inacceptable. Cela étant, je suis d'avis d'accueillir le pourvoi et de renvoyer l'affaire au juge Waite de manière qu'il puisse compléter l'audience tenue en vertu du par. 24(1) et, sous réserve de la décision sur cette question, pour terminer les procédures d'extradition en conséquence.

Version française des motifs rendus par

LE JUGE WILSON—Je conviens avec le juge La Forest, pour les motifs qu'il a donnés, que la Cour a compétence pour entendre le pourvoi. Je ne suis pas d'accord avec lui cependant pour dire, vu les motifs que j'ai donnés dans l'affaire *Canada c. Schmidt*, [1987] 1 R.C.S. 500, que l'art. 11 de la *Charte canadienne des droits et libertés* ne s'applique pas à des procédures d'extradition. Je pense que les droits que confère la *Charte* peuvent être invoqués dans ces procédures et que (sous réserve de l'application de l'article premier, question que je laisse en suspens) il peut sans aucun doute arriver un moment où le retard mis à rechercher une extradition au Canada deviendrait déraisonnable et permettrait d'invoquer l'al. 11*b*). Je ne crois pas cependant que ce soit le cas en l'espèce.

Un délai qui pourrait être déraisonnable et constituer une violation de l'al. 11*b*) dans une instance interne pure et simple peut, à mon avis, être parfaitement justifié dans une instance comportant des éléments étrangers. Mais je ne pense pas qu'un tribunal canadien devrait se permettre d'exiger de l'État étranger qu'il rende compte du délai dont il est responsable. Dans cette mesure, je partage l'opinion du juge La Forest sur le rôle que doit jouer la courtoisie internationale. Le tribunal canadien saisi des procédures d'extradition peut demander aux autorités canadiennes de rendre compte et d'expliquer tout délai qui paraît déraisonnable, mais il ne peut, à mon avis, le demander aux autorités d'un autre pays. C'est pourquoi, contrairement à mon collègue le juge Lamer, je crois que tout retard invoqué en vertu de l'al. 11*b*) doit avoir été causé par les autorités canadiennes. La raison en est que, essentiellement, pour déterminer si un délai est ou non raisonnable, il faut d'abord avoir le droit d'exiger qu'on l'explique. En

cannot be determined whether the foreign delay was reasonable or not. That delay cannot therefore be considered under s. 11(*b*).

This case and *United States v. Allard*, [1987] 1 S.C.R. 564 (released contemporaneously herewith), are distinguishable from *Schmidt* (also released contemporaneously) in this respect. No breach of international comity is involved in *Schmidt*. No autonomous foreign authority is being called to account in *Schmidt*. No foreign law is being criticized in *Schmidt*. The only issue in *Schmidt* is the scope of our own constitutional protections. Are they available to a person involved in Canadian extradition proceedings?

For the respondent to succeed in this case he would, in my view, have to establish that the delay caused by the Canadian authorities was unreasonable. Since I do not see how he could possibly discharge that burden on the facts of this case, I agree with La Forest J. that the extradition judge was in error in discharging Mellino on the basis that his s. 11(*b*) right had been violated.

With respect to Mellino's argument that the delay in the extradition proceedings constituted an abuse of process or a violation of s. 7 of the *Charter*, again for the reasons I gave in *Schmidt*, I think it was perfectly open to the accused to raise these issues in the extradition proceedings. However, since the essence of the complaint is again the delay which was in large part due to the conduct of the Argentinian authorities, the argument based on abuse of process or s. 7 of the *Charter* must also fail.

On the issue of the jurisdiction of the extradition court judge, I agree with Lamer J. that an application may be made to such a judge under s. 24(1) of the *Charter* if, as in this case, he is also a superior court judge.

I would allow the appeal and remit the matter back to Waite J. to continue the extradition proceedings in accordance with law.

l'absence de ce droit, on ne peut le déterminer. On ne peut décider si le délai d'origine étrangère est raisonnable ou non. Ce délai ne peut par conséquent faire l'objet d'un examen en vertu de l'al. 11*b*).

Cette affaire ainsi que l'arrêt *États-Unis c. Allard*, [1987] 1 R.C.S. 564, (rendu concurremment) doivent être distingués de l'arrêt *Schmidt* (également rendu aujourd'hui) à cet égard. Aucune atteinte à la courtoisie internationale n'est en cause dans l'affaire *Schmidt*. Aucune autorité étrangère autonome n'est appelée à rendre compte dans cette dernière affaire. Aucune loi étrangère n'y fait l'objet de critiques. La seule question en litige dans l'affaire *Schmidt* est la portée de nos propres garanties constitutionnelles. Une personne qui fait l'objet de procédures d'extradition canadiennes peut-elle s'en prévaloir?

Pour que l'intimé ait gain de cause en l'espèce, il lui faudrait, à mon avis, démontrer que le retard causé par les autorités canadiennes était déraisonnable. Comme je ne vois pas comment il pourrait parvenir à s'acquitter de ce fardeau étant donné les faits, je conviens avec le juge La Forest que le juge d'extradition a élargi Mellino à tort, en se fondant sur la violation du droit que lui confère l'al. 11*b*).

Quant à l'argument de Mellino que le délai relatif à la procédure d'extradition constituait un emploi abusif des procédures ou une violation de l'art. 7 de la *Charte*, ici encore, pour les raisons que j'ai données dans l'affaire *Schmidt*, je pense que l'accusé est parfaitement en droit d'exciper de ces moyens dans les procédures d'extradition. Mais, puisque essentiellement la plainte porte sur le délai, dû en grande partie au comportement des autorités argentines, l'argument fondé sur l'emploi abusif des procédures ou sur l'art. 7 de la *Charte* doit aussi être rejeté.

Sur la compétence du juge du tribunal d'extradition, je conviens avec le juge Lamer qu'une requête peut être faite à ce juge en vertu du par. 24(1) de la *Charte* si, comme en l'espèce, il est aussi juge d'une cour supérieure.

Je suis d'avis d'accueillir le pourvoi et de renvoyer l'affaire au juge Waite pour que les procédures d'extradition suivent leur cours, conformément à la loi.

*Appeal allowed,* LAMER J. *dissenting.*

*Solicitor for the appellant: Roger Tassé, Ottawa.*

*Solicitor for the respondent: John D. James, Calgary.*

*Pourvoi accueilli, le juge* LAMER *est dissident.*

*Procureur de l'appelante: Roger Tassé, Ottawa.*

*Procureur de l'intimé: John D. James, Calgary.*

R. *c.* JORDAN

**Barrett Richard Jordan** *Appellant*

*v.*

**Her Majesty The Queen** *Respondent*

and

**Attorney General of Alberta,
British Columbia Civil Liberties
Association and Criminal Lawyers'
Association (Ontario)** *Interveners*

Indexed as: R. *v.* Jordan

**2016 SCC 27**

File No.: 36068.

2015: October 7; 2016: July 8.

Present: McLachlin C.J. and Abella, Cromwell,
Moldaver, Karakatsanis, Wagner, Gascon, Côté and
Brown JJ.

ON APPEAL FROM THE COURT OF APPEAL FOR
BRITISH COLUMBIA

*Constitutional law — Charter of Rights — Right to
be tried within reasonable time — Delay of more than
four years between charges and end of trial — Whether
accused's right to be tried within reasonable time under
s. 11(b) of Canadian Charter of Rights and Freedoms in-
fringed — New framework for applying s. 11(b).*

J was charged in December 2008 for his role in a dial-
a-dope operation. His trial ended in February 2013. J
brought an application under s. 11(*b*) of the *Canadian
Charter of Rights and Freedoms*, seeking a stay of pro-
ceedings due to the delay. In dismissing the application,
the trial judge applied the framework set out in *R. v.
Morin*, [1992] 1 S.C.R. 771. Ultimately, J was convicted.
The Court of Appeal dismissed the appeal.

*Held*: The appeal should be allowed, the convictions
set aside and a stay of proceedings entered.

*Per* Abella, Moldaver, Karakatsanis, Côté and
Brown JJ.: The delay was unreasonable and J's s. 11(*b*)
*Charter* right was infringed. The *Morin* framework for

**Barrett Richard Jordan** *Appelant*

*c.*

**Sa Majesté la Reine** *Intimée*

et

**Procureur général de l'Alberta,
Association des libertés civiles de la
Colombie-Britannique et Criminal Lawyers'
Association (Ontario)** *Intervenants*

Répertorié : R. *c.* Jordan

**2016 CSC 27**

Nᵒ du greffe : 36068.

2015 : 7 octobre; 2016 : 8 juillet.

Présents : La juge en chef McLachlin et les juges Abella,
Cromwell, Moldaver, Karakatsanis, Wagner, Gascon,
Côté et Brown.

EN APPEL DE LA COUR D'APPEL DE LA
COLOMBIE-BRITANNIQUE

*Droit constitutionnel — Charte des droits — Procès
dans un délai raisonnable — Délai de plus de quatre ans
entre le dépôt des accusations et la fin du procès — Y
a-t-il eu atteinte au droit de l'accusé d'être jugé dans
un délai raisonnable que lui garantit l'art. 11b) de la
Charte canadienne des droits et libertés? — Nouveau
cadre d'analyse pour l'application de l'art. 11b).*

J a été inculpé en décembre 2008 pour avoir participé
à une opération de vente de drogue sur appel. Son procès
s'est terminé en février 2013. J a présenté une demande
fondée sur l'al. 11*b*) de la *Charte canadienne des droits
et libertés* en vue d'obtenir l'arrêt des procédures en rai-
son du délai. En rejetant la demande, le juge du procès
a appliqué le cadre d'analyse établi dans l'arrêt *R. c.
Morin*, [1992] 1 R.C.S. 771. En fin de compte, J a été
déclaré coupable. La Cour d'appel a rejeté l'appel.

*Arrêt* : Le pourvoi est accueilli, les déclarations de
culpabilité sont annulées et l'arrêt des procédures est or-
donné.

*Les juges* Abella, Moldaver, Karakatsanis, Côté et
Brown : Le délai était déraisonnable et le droit de J protégé
par l'al. 11*b*) de la *Charte* a été violé. Le cadre d'analyse

R.  *v*.  JORDAN

applying s. 11(*b*) has given rise to both doctrinal and practical problems, contributing to a culture of delay and complacency towards it. Doctrinally, the *Morin* framework is too unpredictable, too confusing, and too complex. It has itself become a burden on already over-burdened trial courts. From a practical perspective, the *Morin* framework's after-the-fact rationalization of delay does not encourage participants in the justice system to take preventative measures to address inefficient practices and resourcing problems.

A new framework is therefore required for applying s. 11(*b*). This framework is intended to focus the s. 11(*b*) analysis on the issues that matter and encourage all participants in the criminal justice system to cooperate in achieving reasonably prompt justice, with a view to fulfilling s. 11(*b*)'s important objectives.

At the heart of this new framework is a presumptive ceiling beyond which delay — from the charge to the actual or anticipated end of trial — is presumed to be unreasonable, unless exceptional circumstances justify it. The presumptive ceiling is 18 months for cases tried in the provincial court, and 30 months for cases in the superior court (or cases tried in the provincial court after a preliminary inquiry). Delay attributable to or waived by the defence does not count towards the presumptive ceiling.

Once the presumptive ceiling is exceeded, the burden is on the Crown to rebut the presumption of unreasonableness on the basis of exceptional circumstances. If the Crown cannot do so, a stay will follow. Exceptional circumstances lie outside the Crown's control in that (1) they are reasonably unforeseen or reasonably unavoidable, and (2) they cannot reasonably be remedied.

It is obviously impossible to identify in advance all circumstances that may qualify as exceptional for the purposes of adjudicating a s. 11(*b*) application. Ultimately, the determination of whether circumstances are exceptional will depend on the trial judge's good sense and experience. The list is not closed. However, in general, exceptional circumstances fall under two categories: discrete events and particularly complex cases.

établi dans *Morin* pour l'application de l'al. 11*b*) a engendré des problèmes sur les plans tant théorique que pratique, concourant ainsi à une culture des délais et de complaisance à l'endroit de cette culture. Sur le plan théorique, ce cadre d'analyse est trop imprévisible, trop difficile à saisir et trop complexe. Il est devenu lui-même un fardeau pour des tribunaux de première instance déjà surchargés. D'un point de vue pratique, la justification après coup du délai sur laquelle débouche le cadre établi dans *Morin* n'incite pas les participants au système de justice à prendre des mesures préventives pour remédier aux pratiques inefficaces et au manque de ressources.

Il faut donc recourir à un nouveau cadre d'analyse pour appliquer l'al. 11*b*). Ce cadre vise à ce que l'analyse d'une demande fondée sur cette disposition se concentre sur les questions qui importent et à inciter tous les participants au système de justice criminelle à collaborer pour administrer la justice d'une manière qui soit raisonnablement prompte afin de réaliser les objectifs importants visés par l'al. 11*b*).

Au cœur de ce nouveau cadre se trouve un plafond présumé au-delà duquel le délai entre le dépôt des accusations et la conclusion réelle ou anticipée du procès est présumé déraisonnable, à moins que des circonstances exceptionnelles le justifient. Ce plafond présumé est fixé à 18 mois pour les affaires instruites devant une cour provinciale et à 30 mois pour celles instruites devant une cour supérieure (ou celles instruites devant une cour provinciale à l'issue d'une enquête préliminaire). Le délai imputable à la défense ou celui qu'elle renonce à invoquer ne compte pas dans le calcul visant à déterminer si ce plafond est atteint.

Une fois que le plafond présumé a été dépassé, il incombe au ministère public de réfuter la présomption du caractère déraisonnable du délai en invoquant des circonstances exceptionnelles. S'il ne peut le faire, un arrêt des procédures doit suivre. Des circonstances exceptionnelles sont des circonstances indépendantes de la volonté du ministère public, c'est-à-dire (1) qu'elles sont raisonnablement imprévues ou raisonnablement inévitables, et (2) qu'on ne peut raisonnablement y remédier.

Il est manifestement impossible de déterminer a priori toutes les circonstances qui peuvent se qualifier d'exceptionnelles lorsqu'il s'agit de trancher une demande fondée sur l'al. 11*b*). En fin de compte, la réponse à cette question du caractère exceptionnel des circonstances dépendra du bon sens et de l'expérience du juge de première instance. Une liste des circonstances de ce type ne saurait être exhaustive. Elles se divisent toutefois généralement en deux catégories : les événements distincts et les affaires particulièrement complexes.

R. *c.* JORDAN

If the exceptional circumstance relates to a discrete event (such as an illness or unexpected event at trial), the delay reasonably attributable to that event is subtracted from the total delay. If the exceptional circumstance arises from the case's complexity, the delay is reasonable and no further analysis is required.

An exceptional circumstance is the only basis upon which the Crown can discharge its burden to justify a delay that exceeds the ceiling. The seriousness or gravity of the offence cannot be relied on, nor can chronic institutional delay. Most significantly, the absence of prejudice can in no circumstances be used to justify delays after the presumptive ceiling is breached. Once so much time has elapsed, only circumstances that are genuinely outside the Crown's control and ability to remedy may furnish a sufficient excuse for the prolonged delay.

Below the presumptive ceiling, however, the burden is on the defence to show that the delay is unreasonable. To do so, the defence must establish that (1) it took meaningful steps that demonstrate a sustained effort to expedite the proceedings, and (2) the case took markedly longer than it reasonably should have. Absent these two factors, the s. 11(*b*) application must fail. Stays beneath the presumptive ceiling should only be granted in clear cases.

As to the first factor, while the defence might not be able to resolve the Crown's or the trial court's challenges, it falls to the defence to show that it attempted to set the earliest possible hearing dates, was cooperative with and responsive to the Crown and the court, put the Crown on timely notice when delay was becoming a problem, and conducted all applications (including the s. 11(*b*) application) reasonably and expeditiously. At the same time, trial judges should not take this opportunity, with the benefit of hindsight, to question every decision made by the defence. The defence is required to act reasonably, not perfectly.

Turning to the second factor, the defence must show that the time the case has taken markedly exceeds the reasonable time requirements of the case. These requirements derive from a variety of factors, including the complexity of the case and local considerations. Determining the time the case reasonably should have taken is

Si la circonstance exceptionnelle concerne un événement distinct (comme une maladie ou un imprévu au procès), le délai raisonnablement attribuable à cet événement est soustrait du délai total. Si la circonstance exceptionnelle résulte de la complexité de l'affaire, le délai est raisonnable et aucune autre analyse n'est nécessaire.

Une circonstance exceptionnelle est le seul fondement permettant au ministère public de s'acquitter du fardeau qui lui incombera de justifier un délai qui excède le plafond établi. Ni la gravité de l'infraction ni les délais institutionnels chroniques ne peuvent servir à justifier le délai. Fait plus important encore, l'absence de préjudice ne peut en aucun cas servir à justifier des délais lorsque le plafond est dépassé. Quand il s'est écoulé autant de temps, seules des circonstances véritablement indépendantes de la volonté du ministère public et auxquelles celui-ci ne pouvait remédier peuvent donner une excuse suffisante pour justifier le délai prolongé.

Lorsque le délai est inférieur au plafond présumé, il incombe toutefois à la défense de démontrer le caractère déraisonnable du délai. Pour ce faire, elle doit démontrer (1) qu'elle a pris des mesures utiles qui font la preuve d'un effort soutenu pour accélérer l'instance, et (2) que le procès a été nettement plus long que ce qu'il aurait dû raisonnablement être. En l'absence de l'un ou l'autre de ces deux facteurs, la demande fondée sur l'al. 11*b*) doit être rejetée. Dans les cas où le délai est inférieur au plafond, l'arrêt des procédures ne doit être prononcé que dans les cas manifestes.

Quant au premier facteur, bien que la défense puisse être incapable de résoudre les défis auxquels sont confrontés le ministère public ou le tribunal de première instance, elle doit démontrer qu'elle a essayé d'obtenir les dates les plus rapprochées possible pour la tenue de l'audience, qu'elle a collaboré avec le ministère public et le tribunal et a répondu à leurs efforts, qu'elle a avisé le ministère public en temps opportun que le délai commençait à poser problème, et qu'elle a mené toutes les demandes (y compris celle fondée sur l'al. 11*b*)) de manière raisonnable et expéditive. Cela dit, le juge du procès ne doit pas profiter de l'occasion, avec l'avantage du recul, pour remettre en question chacune des décisions de la défense. Cette dernière est tenue d'agir raisonnablement, non pas à la perfection.

Quant au second facteur, la défense doit démontrer que le temps qu'a pris la cause excède de manière manifeste le délai qui aurait été raisonnablement nécessaire pour juger l'affaire. Ces exigences dépendent d'une panoplie de facteurs, y compris la complexité du dossier et des considérations de nature locale. Le fait de déterminer

not a matter of precise calculation, as has been the practice under the *Morin* framework.

For cases currently in the system, a contextual application of the new framework is required to avoid repeating the post-*Askov* situation, where tens of thousands of charges were stayed as a result of the abrupt change in the law. Therefore, for those cases, the new framework applies, subject to two qualifications. First, for cases in which the delay exceeds the ceiling, a transitional exceptional circumstance may arise where the charges were brought prior to the release of this decision. This transitional exceptional circumstance will apply when the Crown satisfies the court that the time the case has taken is justified based on the parties' reasonable reliance on the law as it previously existed. This requires a contextual assessment, sensitive to the manner in which the previous framework was applied, and the fact that the parties' behaviour cannot be judged strictly, against a standard of which they had no notice.

The second qualification applies to cases currently in the system in which the total delay (minus defence delay) falls below the ceiling. For these cases, the two criteria — defence initiative and whether the time the case has taken markedly exceeds what was reasonably required — must also be applied contextually, sensitive to the parties' reliance on the previous state of the law. Specifically, the defence need not demonstrate having taken initiative to expedite matters for the period of delay preceding this decision. Since defence initiative was not expressly required by the *Morin* framework, it would be unfair to require it for the period of time before the release of this decision. Further, if the delay was occasioned by an institutional delay that was, before this decision was released, reasonably acceptable in the relevant jurisdiction under the *Morin* framework, that institutional delay will be a component of the reasonable time requirements of the case for cases currently in the system.

In this case, the total delay between the charges and the end of trial was 49.5 months. As the trial judge found, four months of this delay were waived by J when he

le temps qu'aurait dû raisonnablement prendre une affaire à être jugée n'est pas une question de calculs précis, comme le veut la pratique instaurée par le cadre d'analyse établi dans *Morin*.

Pour les affaires en cours d'instance, une application contextuelle du nouveau cadre s'impose pour éviter que se reproduise ce qui s'est passé après le prononcé de l'arrêt *Askov*, alors que des dizaines de milliers d'accusations ont fait l'objet d'un arrêt des procédures en raison de la modification soudaine du droit. Par conséquent, le nouveau cadre s'applique à ces affaires, sujet à deux réserves. Premièrement, dans les cas où le délai excède le plafond, une mesure transitoire exceptionnelle peut s'appliquer lorsque les accusations ont été portées avant le prononcé du présent jugement. C'est le cas lorsque le ministère public convainc la cour que le temps qui s'est écoulé est justifié du fait que les parties se sont raisonnablement conformées au droit tel qu'il existait au préalable. Cela suppose qu'il faille procéder à un examen contextuel, eu égard à la manière dont l'ancien cadre a été appliqué et au fait que la conduite des parties ne peut être jugée rigoureusement en fonction d'une norme dont ils n'avaient pas connaissance.

La deuxième réserve s'applique aux affaires déjà en cours pour lesquelles le délai total (moins celui imputable à la défense) est inférieur au plafond. Pour ces causes, les tribunaux doivent appliquer les deux critères — soit celui relatif à l'initiative dont a fait preuve la défense et celui de la question de savoir si le temps qu'a mis la cause pour être entendue a excédé de manière manifeste le temps qui était raisonnablement requis — en fonction du contexte et en étant sensibles au fait que les parties se sont fiées à l'état du droit qui prévalait auparavant. Plus précisément, la défense n'a pas à démontrer qu'elle a pris des initiatives pour accélérer les choses au cours de la période qui a précédé le prononcé du présent jugement. Puisque de telles initiatives n'étaient pas expressément requises par le cadre d'analyse prévu dans *Morin*, il serait injuste d'exiger qu'elles aient été prises avant le prononcé de la présente décision. En outre, si le retard a été causé par un délai institutionnel raisonnablement acceptable dans le ressort en cause selon le cadre d'analyse prévu dans *Morin* qui prévalait avant le prononcé de la présente décision, ce retard institutionnel sera un des éléments du délai raisonnable nécessaire de la cause pour les affaires déjà en cours d'instance.

En l'espèce, le délai total qui s'est écoulé entre le dépôt des accusations et la fin du procès a été de 49 mois et demi. Comme l'a conclu le juge du procès, J a renoncé à

changed counsel shortly before the trial was set to begin, necessitating an adjournment. In addition, one and a half months of the delay were caused solely by J for the adjournment of the preliminary inquiry because his counsel was unavailable for closing submissions on the last day. This leaves a remaining delay of 44 months, an amount that vastly exceeds the presumptive ceiling of 30 months in the superior court. The Crown has failed to discharge its burden of demonstrating that the delay of 44 months (excluding defence delay) was reasonable. While the case against J may have been moderately complex given the amount of evidence and the number of co-accused, it was not so exceptionally complex that it would justify such a delay.

Nor does the transitional exceptional circumstance justify the delay in this case. Since J's charges were brought prior to the release of this decision, the Crown was operating without notice of the new framework within a jurisdiction with some systemic delay issues. But a total delay of 44 months (excluding defence delay), of which the vast majority was either Crown or institutional delay, in an ordinary dial-a-dope trafficking prosecution is simply unreasonable regardless of the framework under which the Crown was operating. Therefore, it cannot be said that the Crown's reliance on the previous state of the law was reasonable. While the Crown did make some efforts to bring the matter to trial more quickly, these efforts were too little and too late. And the systemic delay problems that existed at the time cannot justify the delay either. Much of the institutional delay could have been avoided had the Crown proceeded on the basis of a more reasonable plan by more accurately estimating the amount of time needed to present its case. To the extent that the trial judge held that this delay was reasonable, he erred.

All the parties were operating within the culture of complacency towards delay that has pervaded the criminal justice system in recent years. Broader structural and procedural changes, in addition to day-to-day efforts, are required to maintain the public's confidence by delivering justice in a timely manner. Ultimately, all participants in the justice system must work in concert to achieve speedier trials. After all, everyone stands to benefit from these

invoquer une période de quatre mois lorsqu'il a changé d'avocat peu de temps avant le début du procès, ce qui a nécessité un ajournement. En outre, un mois et demi du retard est exclusivement attribuable à J pour l'ajournement de l'enquête préliminaire parce que son avocat n'était pas disponible pour présenter ses observations finales la dernière journée. Il reste donc un délai de 44 mois, soit un délai qui excède considérablement le plafond présumé fixé à 30 mois pour les affaires instruites devant une cour supérieure. Le ministère public ne s'est pas acquitté de son fardeau de démontrer que le délai de 44 mois (excluant le délai attribuable à la défense) était raisonnable. Si le dossier opposé à J a pu être modérément complexe compte tenu de la somme d'éléments de preuve et du nombre de coaccusés, il n'était pas exceptionnellement complexe au point de justifier pareil délai.

L'application d'une mesure transitoire exceptionnelle ne justifie pas non plus le délai en l'espèce. Puisque les accusations contre J ont été portées avant le prononcé de la présente décision, le ministère public agissait sans connaissance du nouveau cadre d'analyse dans un ressort aux prises avec certains problèmes de retard systémique. Un total de 44 mois (excluant le délai attribuable à la défense) dont la majeure partie était imputable au ministère public ou d'ordre institutionnel pour une poursuite ordinaire pour vente de drogue sur appel est néanmoins tout simplement déraisonnable, quel qu'ait été le cadre d'analyse suivant lequel agissait le ministère public. On ne peut donc affirmer que le ministère public s'est fié d'une manière qui soit raisonnable à l'état du droit qui prévalait auparavant. Même si le ministère public a fait certains efforts pour que le procès se tienne plus rapidement, c'était trop peu trop tard. Les problèmes de retard systémique vécus à l'époque ne sauraient non plus justifier le temps qu'il a fallu pour instruire la cause. Le délai institutionnel aurait pu être évité en bonne partie si le ministère public avait procédé sur la base d'un plan plus raisonnable en estimant avec plus d'exactitude le temps qu'il lui fallait pour présenter sa preuve. Le juge du procès a commis une erreur en concluant que, en l'espèce, le délai était raisonnable.

Toutes les parties travaillaient dans une culture de complaisance à l'égard des délais qui s'est répandue dans le système de justice criminelle ces dernières années. Pour permettre aux tribunaux de maintenir la confiance du public en rendant justice en temps utile, il faut apporter des changements structurels et procéduraux supplémentaires au système en plus de fournir des efforts quotidiens. En fin de compte, tous les participants

efforts. Timely trials are possible. More than that, they are constitutionally required.

*Per* McLachlin C.J. and Cromwell, Wagner and Gascon JJ.: This Court's jurisprudence for dealing with alleged breaches of s. 11(*b*) of the *Canadian Charter of Rights and Freedoms* over the last 30 years supplies a clear answer to this appeal. Striking out in the completely new direction adopted by the majority is unnecessary. A reasonable time for trial under s. 11(*b*) cannot and should not be defined by numerical ceilings, as the majority concludes.

The right to be tried in a reasonable time is multi-factored, fact-sensitive, and case-specific; its application to specific cases is unavoidably complex. The relevant factors and general approach set out in *R. v. Morin*, [1992] 1 S.C.R. 771, respond to these complexities. With modest adjustments to make the analysis more straightforward and with some additional clarification, a revised *Morin* framework will continue to ensure that the constitutional right of accused persons to be tried in a reasonable time is defined and applied in a way that appropriately balances the many relevant considerations. In order to do so, the *Morin* considerations should be regrouped under four main analytical steps.

First, the accused must establish that there is a basis for the s. 11(*b*) inquiry. The court should look to the overall period between the charge and the completion of the trial to determine whether its length merits further inquiry.

Second, the court must determine on an objective basis what would be a reasonable time for the disposition of a case like the one under review — that is, how long a case of this nature should reasonably take. The objective standard of reasonableness has two components: institutional delay and inherent time requirements of the case. Both of these periods of time are to be determined objectively. The acceptable period of institutional delay is the period that is reasonably required for the court to be ready to hear the case once the parties are ready to proceed, and is determined in accordance with the administrative guidelines for institutional delay set out by this Court in *Morin*: eight to ten months before the provincial

au système de justice doivent travailler de concert pour accélérer le déroulement des procès. Après tout, c'est l'ensemble de la société qui bénéficiera de ces efforts. Instruire les procès en temps utile est possible. Mais plus encore, la Constitution l'exige.

*La* juge en chef McLachlin et les juges Cromwell, Wagner et Gascon : La jurisprudence élaborée par la Cour au cours des 30 dernières années pour traiter des allégations de violation de l'al. 11*b*) de la *Charte canadienne des droits et libertés* permet de répondre clairement à la question posée par le présent pourvoi. Il n'est pas nécessaire d'aller dans la direction entièrement nouvelle empruntée par les juges majoritaires. Le délai raisonnable pour juger un accusé, au sens où il faut l'entendre pour l'application de l'al. 11*b*), ne peut ni ne devrait être défini par des plafonds numériques, comme le concluent les juges majoritaires.

Le droit d'être jugé dans un délai raisonnable est fonction de nombreux facteurs, des faits et des particularités de chaque cas; son application à une affaire donnée est inévitablement complexe. Les facteurs pertinents et l'approche générale décrits dans *R. c. Morin*, [1992] 1 R.C.S. 771, tiennent compte de cette complexité. Sous réserve de quelques rajustements pour simplifier l'analyse et de certains éclaircissements supplémentaires, le cadre de l'arrêt *Morin* révisé permettra de continuer de veiller à ce que la définition et l'application du droit constitutionnel de l'accusé d'être jugé dans un délai raisonnable mettent comme il se doit en balance les nombreux facteurs pertinents. Pour ce faire, il y a lieu de regrouper les facteurs énumérés dans *Morin* en quatre grandes étapes analytiques.

Premièrement, l'accusé doit nécessairement faire la preuve de l'opportunité de procéder à une analyse fondée sur l'al. 11*b*) de la *Charte*. Le tribunal doit examiner l'ensemble de la période écoulée entre le dépôt des accusations et la clôture du procès pour décider si le temps qu'il a fallu justifie un examen plus approfondi.

Deuxièmement, le tribunal doit déterminer ce qui, objectivement, constituerait une durée de procès raisonnable dans le cas d'une affaire comme celle qui fait l'objet de l'examen, c'est-à-dire combien de temps devrait raisonnablement prendre une cause de même nature. La norme objective du caractère raisonnable comporte deux volets : le délai institutionnel et le délai inhérent au dossier. Ces deux délais doivent être établis de façon objective. Le délai institutionnel acceptable correspond au temps dont le tribunal a raisonnablement besoin pour être prêt à instruire l'affaire, une fois que les parties sont prêtes pour le procès. Il est déterminé selon les lignes directrices administratives applicables à ce type de délais que la Cour a énoncées dans

R. *c.* JORDAN

courts and six to eight months before the superior courts. These guidelines set some rough limits on the point at which inadequacy of state resources will be accepted as an excuse. The guidelines should not be understood as precluding allowance for any sudden and temporary strain on resources that causes a temporary congestion in the courts. The inherent time requirements of a case, on the other hand, represent the period of time that is reasonably required for the parties to be ready to proceed and to conclude the trial for a case similar in nature to the one before the court, and are to be determined on the basis of judicial experience, supplemented by submissions of counsel and evidence. In estimating a reasonable time period, the court should also take into account the liberty interests of the accused.

Third, the court must consider how much of the actual delay in the case counts against the state. This is done by subtracting the periods attributable to the defence, including any waived time periods, from the overall period of delay. When the accused consents to a date for trial offered by the court or to an adjournment sought by the Crown, that consent, without more, does not amount to waiver. The onus is on the Crown to demonstrate that this period is waived, that is, that the accused's conduct reveals something more than mere acquiescence in the inevitable, and that it meets the high bar of being clear, unequivocal, and informed acceptance. Delay resulting from unreasonable actions solely attributable to the accused must also be subtracted from the period for which the state is responsible, such as last-minute changes in counsel or adjournments flowing from a lack of diligence. It is also necessary to subtract from the actual delay any periods that, although not fairly attributable to the defence, are nonetheless not fairly counted against the state, including unavoidable delays due to inclement weather or illness of a trial participant.

Fourth, the court must determine whether the actual period of time that fairly counts against the state exceeds the reasonable time by more than can be justified on any acceptable basis. Where the actual time exceeds what would have been reasonable for a case of that nature, the result will be a finding of unreasonable delay unless

l'arrêt *Morin*, en l'occurrence, de huit à dix mois pour les instances qui se déroulent devant une cour provinciale et de six à huit mois pour celles qui se déroulent devant une cour supérieure. Ces lignes directrices établissent des limites approximatives en deçà desquelles l'insuffisance des ressources de l'État sera considérée comme une excuse acceptable. L'interprétation des lignes directrices devrait permettre de tenir compte de toute pression soudaine et temporaire sur les ressources qui cause un engorgement passager des tribunaux. En revanche, le délai inhérent à l'affaire correspond au délai raisonnablement nécessaire pour que les parties soient prêtes à procéder à l'instruction et pour mener l'affaire jusqu'à son dénouement, dans un dossier d'une nature semblable à celle du dossier dont la cour est saisie. Il est calculé en fonction de l'expérience judiciaire, complétée par les observations des avocats et par des éléments de preuve. Pour estimer une période de temps raisonnable, le tribunal devrait également tenir compte du droit à la liberté de la personne garanti à l'accusé.

Troisièmement, le tribunal doit se demander quelle portion du délai est imputable à l'État. Pour ce faire, il soustrait toute période attribuable à la défense — y compris les périodes qu'elle a renoncé à invoquer — de la totalité du délai. Lorsque l'accusé donne son consentement à la date de procès proposée par le tribunal ou à un ajournement réclamé par le ministère public, ce consentement, s'il est isolé, ne constitue pas une renonciation. Il incombe au ministère public de démontrer que l'accusé a renoncé à invoquer ce délai. Le ministère public doit prouver que, par sa conduite, l'accusé a signifié qu'il ne s'agissait pas de sa part d'une simple reconnaissance de l'inévitable. Ensuite, il doit satisfaire au critère rigoureux qui l'oblige à établir que l'accusé a accepté le délai de façon claire, non équivoque et éclairée. Les délais résultant de mesures déraisonnables imputables uniquement aux agissements de l'accusé doivent aussi être soustraits de la période dont l'État est responsable, comme les changements d'avocats survenus à la dernière minute ou les ajournements résultant d'un manque de diligence. Il est également nécessaire de soustraire du temps effectivement écoulé toute période qui, bien qu'elle ne soit pas légitimement imputable à la défense, ne peut néanmoins être reprochée légitimement non plus à l'État, y compris les délais inévitables attribuables aux intempéries ou à la maladie d'un des participants au procès.

Quatrièmement, le tribunal doit déterminer si la période qui peut légitimement être imputée à l'État excède le délai raisonnable d'une période plus longue que ce qui peut être justifié de quelque façon acceptable. Lorsque le temps qui s'est réellement écoulé excède ce qui aurait été raisonnable pour une cause de même nature, il faut

the Crown can show that the delay was justified. Even substantial excess delay may be justified and therefore reasonable where, for example, there is a particularly strong societal interest in the prosecution proceeding on its merits, or where the delay results from temporary and extraordinary pressures on counsel or the court system. However, it does not follow that in these conditions the excess period is invariably justified. The accused still may be able to demonstrate actual prejudice. Although actual prejudice need not be proved to find an infringement of s. 11(*b*), its presence would make unreasonable (in the particular circumstances of the case) a delay that might otherwise be objectively viewed as reasonable. As a result, justification may be found to be lacking.

Under this revised *Morin* framework, any delay in excess of the reasonable time requirements and any actual prejudice arising from the overall delay must be evaluated in light of societal interests: on one hand, fair treatment and prompt trial of accused persons and, on the other, determination of cases on their merits. If there are exceptionally strong societal interests in the prosecution of a case against an accused which substantially outweigh the societal interest and the interest of the accused person in prompt trials, these can serve as an acceptable basis upon which exceeding the inherent and institutional requirements of a case can be justified.

This approach is a slight reorientation of the *Morin* framework because the focus is more explicitly on the period of delay which exceeds what would have been reasonable. But there is no change in principle.

Applying these four steps of the revised *Morin* framework in this case, J's constitutional right to be tried within a reasonable time was violated. The 49.5-month delay from the charges to the end of the scheduled trial date is sufficient to trigger an inquiry into whether the delay is unreasonable. There were 10.5 months of inherent delay and 18 months of institutional delay. These findings make it appropriate to conclude that the reasonable time requirements for a case of this nature were 28.5 months. The case in fact took 49.5 months. The difference is 21 months. Of that, 4 months are attributable to the defence. The rest — a period of 17 months

conclure au caractère déraisonnable du délai, à moins que le ministère public puisse démontrer que ce dernier était justifié. Même les excédents importants peuvent se justifier, et donc être jugés raisonnables par, exemple, l'intérêt de la société à ce que le dossier soit jugé au fond est particulièrement élevé ou lorsque le délai résulte de pressions temporaires et exceptionnelles sur les avocats ou sur le système judiciaire. Cependant, on ne peut en conclure que, dans ces conditions, la période excédentaire sera systématiquement justifiée. L'accusé peut tout de même prouver qu'il a réellement subi un préjudice. Même s'il n'est pas nécessaire qu'un tel préjudice soit mis en preuve pour que le tribunal conclue à une violation de l'al. 11*b*), sa présence peut (dans les circonstances particulières de la cause) rendre déraisonnable un délai qui, autrement, pourrait être objectivement jugé raisonnable. Par conséquent, le tribunal pourra conclure à l'absence de justification.

Selon ce cadre de l'arrêt *Morin* révisé, le délai excédant le temps qui aurait raisonnablement été nécessaire pour juger l'affaire et le préjudice qu'a réellement subi l'accusé en raison du délai général doivent être évalués en fonction de l'intérêt qu'a la société, d'une part, à ce que les accusés soient jugés rapidement et équitablement et, d'autre part, à ce que les causes soient jugées au fond. Si la société a un intérêt particulièrement pressant à ce que l'accusé soit traduit en justice et que cet intérêt l'emporte nettement sur celui de la société et de l'accusé à ce que le procès ait lieu rapidement, cet intérêt pressant peut être considéré comme une raison acceptable justifiant un délai plus long que les délais inhérent et institutionnel propres à l'affaire.

Cette démarche intellectuelle se veut une légère réorientation du cadre d'analyse prescrit par l'arrêt *Morin* parce qu'il met l'accent plus explicitement sur la portion du délai qui excède ce qui aurait été raisonnable. Cette nouvelle approche ne constitue pas pour autant un changement de principe.

Appliquant en l'espèce ces quatre volets du cadre d'analyse de l'arrêt *Morin* révisé, il est conclu que le droit constitutionnel de J d'être jugé dans un délai raisonnable a été violé. Le délai de 49 mois et demi écoulé entre le dépôt des accusations et la date prévue de la fin du procès suffit pour justifier l'examen du caractère raisonnable ou non du délai. Le délai inhérent était de 10 mois et demi et le délai institutionnel était de 18 mois. Vu ces conclusions, il y a lieu de conclure que c'est un délai de 28 mois et demi qui aurait été raisonnable pour juger une affaire comme la présente espèce. Or, c'est en réalité 49 mois et demi qu'il a fallu pour le faire. Cela correspond à un écart de 21 mois.

— counts against the state. In other words, this case took almost a year and a half longer than what would be a reasonable period to prosecute a case of this nature. This is not a close case. The time to the end of trial greatly exceeds what would be a reasonable time to prosecute a similar case. While there are societal interests in the trial on the merits of the serious drug crimes alleged against J, these cannot make reasonable the grossly excessive time that it took society to bring him to trial.

In contrast, the majority's new framework is not an appropriate approach to interpreting and applying the s. 11(*b*) right, for several reasons. First, the new approach reduces reasonableness to numerical ceilings. Reasonableness cannot be judicially defined with precision or captured by a number. As well, the majority's judicially created ceilings largely uncouple the right to be tried within a reasonable time from the bedrock constitutional requirement of reasonableness, which is the core of the right.

Moreover, this approach unjustifiably diminishes the right to be tried within a reasonable time. When the elapsed time is below the ceiling, an accused would have to show not only that the case took markedly longer than it reasonably should have but also that he or she took meaningful steps that demonstrate a sustained effort to expedite the proceedings. This requirement has no bearing on whether the delay was unreasonable.

The majority's approach also exceeds the proper role of the Court. Creating fixed or presumptive ceilings is a task better left to legislatures. The ceilings place new limits on the exercise of the s. 11(*b*) right to a trial within a reasonable time for reasons of administrative efficiency that have nothing to do with whether the delay in a given case was or was not excessive. This is inconsistent with the judicial role.

As well, the ceilings have no support in the record in this case. What evidence there is in the record suggests that it would be unwise to establish these sorts of ceilings. For the vast majority of cases, the ceilings are so high that they risk being meaningless. They are unlikely

De cette période, 4 mois sont attribuables à la défense. Le reste — soit une période de 17 mois — est imputable à l'État. Autrement dit, la présente affaire a duré presque un an et demi de plus que ce qui aurait été raisonnable pour instruire le procès dans une cause de même nature. Il ne s'agit pas d'un cas limite. En effet, le délai qu'il a fallu pour traduire l'accusé en justice a été de loin supérieur à celui qui aurait été raisonnablement nécessaire pour juger une affaire semblable. Bien qu'il soit dans l'intérêt de la société qu'il y ait un procès au fond pour les crimes graves relatifs aux stupéfiants reprochés à J, cet intérêt ne saurait rendre raisonnable le délai manifestement excessif qu'il a fallu à la société pour le juger.

Par contre, le nouveau cadre proposé par les juges majoritaires n'est pas la bonne manière d'interpréter ou d'appliquer le droit garanti par l'al. 11(*b*), et ce, pour plusieurs raisons. Premièrement, la nouvelle approche ramène la question du caractère raisonnable à des plafonds numériques. Le caractère raisonnable est un concept qui ne peut être défini avec précision par les tribunaux et qu'on ne peut ramener à une valeur numérique. En outre, les plafonds que la majorité propose de créer par voie judiciaire dissocient en grande partie le droit d'être jugé dans un délai raisonnable de l'exigence constitutionnelle fondamentale du caractère raisonnable qui est au cœur de ce droit.

Cette approche restreint en outre de manière injustifiable le droit d'être jugé dans un délai raisonnable. Lorsque le temps écoulé sera inférieur au plafond fixé, l'accusé sera tenu de démontrer non seulement que l'affaire a duré beaucoup plus longtemps que ce qu'elle aurait raisonnablement dû, mais également qu'il a pris des mesures utiles qui font la preuve d'un effort soutenu pour accélérer l'instance. Cette exigence n'a aucune incidence sur la question de savoir si le délai a été déraisonnable.

L'approche des juges majoritaires outrepasse également le rôle dévolu à la Cour. La décision de créer des plafonds fixes ou présumés est une tâche qu'il vaut mieux laisser au législateur. Les plafonds assortissent de nouvelles restrictions l'exercice du droit d'être jugé dans un délai raisonnable garanti par l'al. 11(*b*) pour des raisons d'efficacité administrative qui n'ont rien à voir avec la question du caractère excessif ou non du délai dans un cas déterminé. L'imposition de tels plafonds est incompatible avec le rôle dévolu aux tribunaux.

De plus, le dossier en l'espèce n'appuie pas l'établissement des plafonds. Les éléments de preuve versés au dossier donnent en fait à penser qu'il serait imprudent de fixer ce type de plafonds. Dans la grande majorité des cas, les plafonds sont tellement élevés qu'ils risquent de

to address the culture of delay that is said to exist and are more likely to feed such a culture.

The majority's approach also risks negative consequences for the administration of justice. The presumptive ceilings are unlikely to improve the pace at which the vast majority of cases move through the system. As well, if this new framework were applied immediately, the majority's transitional provisions would not avoid the risk of thousands of judicial stays.

Moreover, the increased simplicity which is said to flow from the majority's new framework is likely illusory. Even if creating ceilings were an appropriate task for the courts and even if there were an appropriate evidentiary basis for them, there is little reason to think these ceilings would avoid the complexities inherent in deciding whether a particular delay is unreasonable. The majority's framework simply moves the complexities of the analysis to a new location: deciding whether to rebut the presumption that a delay is unreasonable if it exceeds the ceiling in particular cases.

Ultimately, the majority's new framework casts aside three decades of the Court's jurisprudence when no participant in the appeal called for such a wholesale change, has not been the subject of adversarial scrutiny or debate, and risks thousands of judicial stays. In short, the new framework is wrong in principle and unwise in practice.

## Cases Cited

By Moldaver, Karakatsanis and Brown JJ.

**Overruled:** *R. v. Morin*, [1992] 1 S.C.R. 771; **referred to:** *R. v. Askov*, [1990] 2 S.C.R. 1199; *R. v. Pidskalny*, 2013 SKCA 74, 299 C.C.C. (3d) 396; *R. v. Godin*, 2009 SCC 26, [2009] 2 S.C.R. 3; *R. v. Williamson*, 2016 SCC 28, [2016] 1 S.C.R. 741; *Ontario (Attorney General) v. Fraser*, 2011 SCC 20, [2011] 2 S.C.R. 3; *R. v. Henry*, 2005 SCC 76, [2005] 3 S.C.R. 609; *R. v. MacDougall*, [1998] 3 S.C.R. 45; *R. v. Conway*, [1989] 1 S.C.R. 1659; *R. v. Elliott* (2003), 114 C.R.R. (2d) 1; *R. v. Vassell*, 2016 SCC 26, [2016] 1 S.C.R. 625; *R. v. Auclair*, 2014 SCC 6, [2014] 1 S.C.R. 83; *R. v. Rodgerson*, 2015 SCC 38, [2015]

perdre tout leur sens. Ils risquent de ne contribuer d'aucune façon à pallier le problème de la soi-disant culture des délais. En fait, des plafonds aussi élevés risquent davantage d'alimenter une telle culture.

L'approche des juges majoritaires risque aussi d'entraîner des conséquences néfastes pour l'administration de la justice. Il est improbable que les plafonds présumés accélèrent le traitement de l'immense majorité des affaires judiciaires. En outre, si ce nouveau cadre était appliqué immédiatement, les dispositions transitoires proposées par les juges majoritaires ne permettraient pas d'éviter le risque que des milliers d'arrêts des procédures soient ordonnés par les tribunaux.

De plus, la simplicité accrue qui découlerait soi-disant du nouveau cadre proposé par les juges majoritaires est vraisemblablement illusoire. Même si la création de plafonds entrait dans les attributions des tribunaux et que la preuve présentée en l'espèce la justifiait, il y a peu de raison de penser que ces plafonds permettraient d'éviter les complexités inhérentes à l'obligation de décider si un délai particulier est déraisonnable. Le cadre élaboré par les juges majoritaires ne fait que déplacer la complexité de l'analyse : une décision sur l'opportunité de réfuter, dans des cas particuliers, la présomption selon laquelle un délai est déraisonnable s'il excède le plafond.

En fin de compte, le nouveau cadre proposé par les juges majoritaires met au rancart une trentaine d'années de jurisprudence de la Cour alors qu'aucun des participants au présent pourvoi n'a réclamé une telle transformation radicale de notre droit, que ce cadre n'a fait l'objet ni d'un débat contradictoire ni d'une analyse de la part des parties et qu'il risque d'entraîner des milliers d'arrêts des procédures ordonnés par les tribunaux. Bref, le nouveau cadre est erroné sur le plan théorique et peu judicieux sur le plan pratique.

## Jurisprudence

Citée par les juges Moldaver, Karakatsanis et Brown

**Arrêt renversé :** *R. c. Morin*, [1992] 1 R.C.S. 771; **arrêts mentionnés :** *R. c. Askov*, [1990] 2 R.C.S. 1199; *R. c. Pidskalny*, 2013 SKCA 74, 299 C.C.C. (3d) 396; *R. c. Godin*, 2009 CSC 26, [2009] 2 R.C.S. 3; *R. c. Williamson*, 2016 CSC 28, [2016] 1 R.C.S. 741; *Ontario (Procureur général) c. Fraser*, 2011 CSC 20, [2011] 2 R.C.S. 3; *R. c. Henry*, 2005 CSC 76, [2005] 3 R.C.S. 609; *R. c. MacDougall*, [1998] 3 R.C.S. 45; *R. c. Conway*, [1989] 1 R.C.S. 1659; *R. c. Elliott* (2003), 114 C.R.R. (2d) 1; *R. c. Vassell*, 2016 CSC 26, [2016] 1 R.C.S. 625; *R. c. Auclair*, 2014 CSC 6, [2014] 1 R.C.S. 83; *R. c. Rodgerson*, 2015

2 S.C.R. 760; *R. v. Tremblay*, [1987] 2 S.C.R. 435; *Canada (Attorney General) v. Hislop*, 2007 SCC 10, [2007] 1 S.C.R. 429; *R. v. Brydges*, [1990] 1 S.C.R. 190; *R. v. Feeney*, [1997] 2 S.C.R. 117; *Mills v. The Queen*, [1986] 1 S.C.R. 863; *R. v. Fearon*, 2014 SCC 77, [2014] 3 S.C.R. 621; *Lavallee, Rackel & Heintz v. Canada (Attorney General)*, 2002 SCC 61, [2002] 3 S.C.R. 209; *Canada (Attorney General) v. Federation of Law Societies of Canada*, 2015 SCC 7, [2015] 1 S.C.R. 401; *R. v. Omar*, 2007 ONCA 117, 84 O.R. (3d) 493; *R. v. Ghavami*, 2010 BCCA 126, 253 C.C.C. (3d) 74.

By Cromwell J.

**Applied:** *R. v. Morin*, [1992] 1 S.C.R. 771, aff'g (1990), 55 C.C.C. (3d) 209; **referred to:** *Mills v. The Queen*, [1986] 1 S.C.R. 863; *R. v. Rahey*, [1987] 1 S.C.R. 588; *R. v. Conway*, [1989] 1 S.C.R. 1659; *R. v. Smith*, [1989] 2 S.C.R. 1120; *R. v. Askov*, [1990] 2 S.C.R. 1199; *R. v. Godin*, 2009 SCC 26, [2009] 2 S.C.R. 3; *R. v. Beason* (1983), 36 C.R. (3d) 73; *R. v. Sharma*, [1992] 1 S.C.R. 814; *R. v. Brassard*, [1993] 4 S.C.R. 287; *R. v. Nuosci*, [1993] 4 S.C.R. 283; *R. v. Ghavami*, 2010 BCCA 126, 253 C.C.C. (3d) 74; *Beavers v. Haubert*, 198 U.S. 77 (1905).

**Statutes and Regulations Cited**

*Canadian Charter of Rights and Freedoms*, ss. 10(*b*), 11(*b*).
*Criminal Code*, R.S.C. 1985, c. C-46, s. 561.
*International Covenant on Civil and Political Rights*, Can. T.S. 1976 No. 47, art. 14(3)(c).
*Magna Carta* (1215), clause 40.
*Speedy Trial Act of 1974*, 18 U.S.C. § 3161 (2012).

**Authors Cited**

Alberta Justice and Solicitor General. Criminal Justice Division. "Injecting a Sense of Urgency: A new approach to delivering justice in serious and violent criminal cases", report by Greg Lepp, April 2013 (online: https://justice.alberta.ca/programs_services/criminal_pros/Documents/InjectingSenseUrgency.pdf).
Amsterdam, Anthony G. "Speedy Criminal Trial: Rights and Remedies" (1975), 27 *Stan. L. Rev.* 525.
B.C. Justice Reform Initiative. *A Criminal Justice System for the 21st Century: Final Report to the Minister of Justice and Attorney General Honourable Shirley Bond*, report by D. Geoffrey Cowper, Q.C., Chair. Victoria: The Initiative, 2012.

CSC 38, [2015] 2 R.C.S. 760; *R. c. Tremblay*, [1987] 2 R.C.S. 435; *Canada (Procureur général) c. Hislop*, 2007 CSC 10, [2007] 1 R.C.S. 429; *R. c. Brydges*, [1990] 1 R.C.S. 190; *R. c. Feeney*, [1997] 2 R.C.S. 117; *Mills c. La Reine*, [1986] 1 R.C.S. 863; *R. c. Fearon*, 2014 CSC 77, [2014] 3 R.C.S. 621; *Lavallee, Rackel & Heintz c. Canada (Procureur général)*, 2002 CSC 61, [2002] 3 R.C.S. 209; *Canada (Procureur général) c. Fédération des ordres professionnels de juristes du Canada*, 2015 CSC 7, [2015] 1 R.C.S. 401; *R. c. Omar*, 2007 ONCA 117, 84 O.R. (3d) 493; *R. c. Ghavami*, 2010 BCCA 126, 253 C.C.C. (3d) 74.

Citée par le juge Cromwell

**Arrêt appliqué :** *R. c. Morin*, [1992] 1 R.C.S. 771, conf. (1990), 55 C.C.C. (3d) 209; **arrêts mentionnés :** *Mills c. La Reine*, [1986] 1 R.C.S. 863; *R. c. Rahey*, [1987] 1 R.C.S. 588; *R. c. Conway*, [1989] 1 R.C.S. 1659; *R. c. Smith*, [1989] 2 R.C.S. 1120; *R. c. Askov*, [1990] 2 R.C.S. 1199; *R. c. Godin*, 2009 CSC 26, [2009] 2 R.C.S. 3; *R. c. Beason* (1983), 36 C.R. (3d) 73; *R. c. Sharma*, [1992] 1 R.C.S. 814; *R. c. Brassard*, [1993] 4 R.C.S. 287; *R. c. Nuosci*, [1993] 4 R.C.S. 283; *R. c. Ghavami*, 2010 BCCA 126, 253 C.C.C. (3d) 74; *Beavers c. Haubert*, 198 U.S. 77 (1905).

**Lois et règlements cités**

*Charte canadienne des droits et libertés*, art. 10*b*), 11*b*).
*Code criminel*, L.R.C. 1985, c. C-46, art. 561.
*Magna Carta* (1215), clause 40.
*Pacte international relatif aux droits civils et politiques*, R.T. Can. 1976 nᵒ 47, art. 14(3)c).
*Speedy Trial Act of 1974*, 18 U.S.C. § 3161 (2012).

**Doctrine et autres documents cités**

Alberta Justice and Solicitor General. Criminal Justice Division. « Injecting a Sense of Urgency : A new approach to delivering justice in serious and violent criminal cases », report by Greg Lepp, April 2013 (online : https://justice.alberta.ca/programs_services/criminal_pros/Documents/InjectingSenseUrgency.pdf).
Amsterdam, Anthony G. « Speedy Criminal Trial : Rights and Remedies » (1975), 27 *Stan. L. Rev.* 525.
B.C. Justice Reform Initiative. *A Criminal Justice System for the 21st Century : Final Report to the Minister of Justice and Attorney General Honourable Shirley Bond*, report by D. Geoffrey Cowper, Q.C., Chair. Victoria, The Initiative, 2012.

British Columbia. Provincial Court. "Justice Delayed: A Report of the Provincial Court of British Columbia Concerning Judicial Resources", September 14, 2010 (online: www.provincialcourt.bc.ca/downloads/pdf/Justice_Delayed_-_A_Report_of_the_Provincial_Court_of_British_Columbia_Concerning_Judicial_Resource.pdf).

British Columbia. Provincial Court. "The Semi-Annual Time to Trial Report of the Provincial Court of British Columbia to March 31, 2015" (online: www.provincialcourt.bc.ca/downloads/pdf/Time%20to%20Trial%20-%20Update%20(as%20at%20March%2031,%202015).pdf).

Canada. Department of Justice. "The Final Report on Early Case Consideration of the Steering Committee on Justice Efficiencies and Access to the Justice System", 2006 (online: www.justice.gc.ca/eng/rp-pr/csj-sjc/esc-cde/).

Canada. Law Reform Commission. Working Paper 67. *Trial Within a Reasonable Time: A Working Paper Prepared for the Law Reform Commission of Canada*. Ottawa: Canada Communication Group, 1994.

Code, Michael A. *Trial Within a Reasonable Time: A Short History of Recent Controversies Surrounding Speedy Trial Rights in Canada and the United States*. Scarborough, Ont.: Carswell, 1992.

Hill, Casey, and Jeremy Tatum. "Re-Chartering an Old Course Rather than Staying Anew in Remedying Unreasonable Delay under the Charter", paper presented at the Crown Defence Conference, Winnipeg, September 2012 (online: www.crowndefence.ca/wp-content/uploads/2011/05/Justice-Casey-Hill_Remedying-Unreasonable-Delay1.pdf).

Hogg, Peter W. *Constitutional Law of Canada*, 5th ed. Supp. Toronto: Carswell, 2007 (updated 2015, release 1).

Hopwood, Shon. "The Not So Speedy Trial Act" (2014), 89 *Wash. L. Rev.* 709.

LaFave, Wayne R., et al. *Criminal Procedure*, 5th ed. St. Paul, Minn.: West, 2009.

Lamer, Antonio. "The Role of Judges", address to the Empire Club of Canada, 1995 (online: http://speeches.empireclub.org/61076/data?n=1).

LeSage, Patrick J., and Michael Code. *Report of the Review of Large and Complex Criminal Case Procedures*. Toronto: Ontario Ministry of the Attorney General, 2008.

McLachlin, Beverley. "The Challenges We Face" (2007), 40 *U.B.C. L. Rev.* 819.

Ruby, Clayton C. "Trial Within a Reasonable Time under Section 11(b): the Ontario Court of Appeal

Canada. Commission de réforme du droit. Document de travail 67. *La tenue du procès dans un délai raisonnable : un document de travail préparé pour la Commission de réforme du droit du Canada*, Ottawa, Groupe Communication Canada, 1994.

Canada. Ministère de la Justice. « Rapport final sur l'examen prioritaire des dossiers du comité directeur sur l'efficacité et l'accès en matière de justice », 2006 (en ligne : www.justice.gc.ca/fra/pr-rp/sjc-csj/cde-esc/).

Code, Michael A. *Trial Within a Reasonable Time : A Short History of Recent Controversies Surrounding Speedy Trial Rights in Canada and the United States*, Scarborough (Ont.), Carswell, 1992.

Colombie-Britannique. Provincial Court. « Justice Delayed : A Report of the Provincial Court of British Columbia Concerning Judicial Resources », September 14, 2010 (online : www.provincialcourt.bc.ca/downloads/pdf/Justice_Delayed_-_A_Report_of_the_Provincial_Court_of_British_Columbia_Concerning_Judicial_Resource.pdf).

Colombie-Britannique. Provincial Court. « The Semi-Annual Time to Trial Report of the Provincial Court of British Columbia to March 31, 2015 » (online : www.provincialcourt.bc.ca/downloads/pdf/Time%20to%20Trial%20-%20Update%20(as%20at%20March%2031,%202015).pdf).

Commission de Venise (Commission européenne pour la démocratie par le droit). *Can excessive length of proceedings be remedied?* Strasbourg, Council of Europe Publishing, 2007.

Hill, Casey, and Jeremy Tatum. « Re-Chartering an Old Course Rather than Staying Anew in Remedying Unreasonable Delay under the Charter », paper presented at the Crown Defence Conference, Winnipeg, September 2012 (online : www.crowndefence.ca/wp-content/uploads/2011/05/Justice-Casey-Hill_Remedying-Unreasonable-Delay1.pdf).

Hogg, Peter W. *Constitutional Law of Canada*, 5th ed. Supp., Toronto, Carswell, 2007 (updated 2015, release 1).

Hopwood, Shon. « The Not So Speedy Trial Act » (2014), 89 *Wash. L. Rev.* 709.

LaFave, Wayne R., et al. *Criminal Procedure*, 5th ed., St. Paul (Minn.), West, 2009.

Lamer, Antonio. « The Role of Judges », address to the Empire Club of Canada, 1995 (online : http://speeches.empireclub.org/61076/data?n=1).

LeSage, Patrick J., et Michael Code. *Rapport sur l'examen de la procédure relative aux affaires criminelles complexes*, Toronto, ministère du Procureur général de l'Ontario, 2008.

Disconnects from the Supreme Court" (2013), 2 C.R. (7th) 91.

Venice Commission (European Commission for Democracy through Law). *Can excessive length of proceedings be remedied?* Strasbourg: Council of Europe Publishing, 2007.

McLachlin, Beverley. « The Challenges We Face » (2007), 40 *U.B.C. L. Rev.* 819.

Ruby, Clayton C. « Trial Within a Reasonable Time under Section 11(b) : the Ontario Court of Appeal Disconnects from the Supreme Court » (2013), 2 C.R. (7th) 91.

APPEAL from a judgment of the British Columbia Court of Appeal (Newbury, MacKenzie and Stromberg-Stein JJ.A.), 2014 BCCA 241, 357 B.C.A.C. 137, 611 W.A.C. 137, 313 C.R.R. (2d) 1, [2014] B.C.J. No. 1263 (QL), 2014 CarswellBC 1760 (WL Can.), affirming a decision of Verhoeven J., 2012 BCSC 1735, [2012] B.C.J. No. 2448 (QL), 2012 CarswellBC 3655 (WL Can.). Appeal allowed.

POURVOI contre un arrêt de la Cour d'appel de la Colombie-Britannique (les juges Newbury, MacKenzie et Stromberg-Stein), 2014 BCCA 241, 357 B.C.A.C. 137, 611 W.A.C. 137, 313 C.R.R. (2d) 1, [2014] B.C.J. No. 1263 (QL), 2014 CarswellBC 1760 (WL Can.), qui a confirmé une décision du juge Verhoeven, 2012 BCSC 1735, [2012] B.C.J. No. 2448 (QL), 2012 CarswellBC 3655 (WL Can.). Pourvoi accueilli.

*Eric V. Gottardi* and *Tony C. Paisana*, for the appellant.

*Eric V. Gottardi* et *Tony C. Paisana*, pour l'appelant.

*Croft Michaelson*, *Q.C.*, and *Peter R. LaPrairie*, for the respondent.

*Croft Michaelson*, *c.r.*, et *Peter R. LaPrairie*, pour l'intimée.

*Jolaine Antonio*, for the intervener the Attorney General of Alberta.

*Jolaine Antonio*, pour l'intervenant le procureur général de l'Alberta.

*Tim A. Dickson* and *Martin Twigg*, for the intervener the British Columbia Civil Liberties Association.

*Tim A. Dickson* et *Martin Twigg*, pour l'intervenante l'Association des libertés civiles de la Colombie-Britannique.

*Frank Addario* and *Erin Dann*, for the intervener the Criminal Lawyers' Association (Ontario).

*Frank Addario* et *Erin Dann*, pour l'intervenante Criminal Lawyers' Association (Ontario).

The judgment of Abella, Moldaver, Karakatsanis, Côté and Brown JJ. was delivered by

Version française du jugement des juges Abella, Moldaver, Karakatsanis, Côté et Brown rendu par

MOLDAVER, KARAKATSANIS AND BROWN JJ. —

LES JUGES MOLDAVER, KARAKATSANIS ET BROWN —

I. Introduction

I. Introduction

[1]   Timely justice is one of the hallmarks of a free and democratic society. In the criminal law context, it takes on special significance. Section 11(*b*) of the *Canadian Charter of Rights and Freedoms* attests to this, in that it guarantees the right of accused persons "to be tried within a reasonable time".

[1]   La justice rendue en temps utile est l'une des caractéristiques d'une société libre et démocratique. Elle revêt une importance particulière en matière criminelle. L'alinéa 11*b*) de la *Charte canadienne des droits et libertés* en est la preuve, puisqu'il garantit à l'inculpé le droit « d'être jugé dans un délai raisonnable ».

[2]   Moreover, the Canadian public expects their criminal justice system to bring accused persons to trial expeditiously. As the months following a criminal charge become years, everyone suffers. Accused persons remain in a state of uncertainty, often in pre-trial detention. Victims and their families who, in many cases, have suffered tragic losses cannot move forward with their lives. And the public, whose interest is served by promptly bringing those charged with criminal offences to trial, is justifiably frustrated by watching years pass before a trial occurs.

[3]   An efficient criminal justice system is therefore of utmost importance. The ability to provide fair trials within a reasonable time is an indicator of the health and proper functioning of the system itself. The stakes are indisputably high.

[4]   Our system, however, has come to tolerate excessive delays. The circumstances in this appeal are illustrative. Notwithstanding a delay of over four years in bringing a drug case of modest complexity to trial, both the trial judge and the Court of Appeal were of the view that the appellant was tried within a reasonable time. Their analyses are reflective of doctrinal and practical difficulties plaguing the current analytical framework governing s. 11(*b*). These difficulties have fostered a culture of complacency within the system towards delay.

[5]   A change of direction is therefore required. Below, we set out a new framework for applying s. 11(*b*). At the centre of this new framework is a presumptive ceiling on the time it should take to bring an accused person to trial: 18 months for cases going to trial in the provincial court, and 30 months for cases going to trial in the superior court. Of course, given the contextual nature of reasonableness, the framework accounts for case-specific factors both above and below the presumptive ceiling. This framework is intended to focus the s. 11(*b*) analysis on the issues that matter and encourage all participants in the criminal justice system to cooperate in achieving reasonably prompt justice,

[2]   La population canadienne s'attend en outre à ce que son système de justice criminelle juge les inculpés de manière diligente. Quand les mois suivant une inculpation au criminel deviennent des années, tout le monde en pâtit. Les inculpés demeurent dans l'incertitude et souvent détenus avant leur procès. Les victimes et leurs familles, qui dans bien des cas ont subi des pertes tragiques, ne peuvent tourner la page. Le public, quant à lui, dont l'intérêt est servi lorsque les inculpés sont traduits rapidement en justice, est frustré avec raison de voir des années passer avant la tenue d'un procès.

[3]   L'efficacité du système de justice criminelle est donc de la plus haute importance. La capacité de tenir des procès équitables dans un délai raisonnable est indicative de la santé et du bon fonctionnement du système lui-même. Les enjeux sont indubitablement élevés.

[4]   Notre système en est cependant venu à tolérer les délais excessifs, comme en font foi les circonstances du présent pourvoi. Même s'il a fallu plus de quatre ans aux autorités pour porter une affaire de drogue moyennement complexe devant les tribunaux, tant le juge du procès que la Cour d'appel ont estimé que l'appelant avait été jugé dans un délai raisonnable. Leurs analyses respectives traduisent les difficultés sur les plans théorique et pratique qui pèsent sur le test actuel applicable aux demandes fondées sur l'al. 11*b*). Ces difficultés ont fait naître au sein du système une culture de complaisance vis-à-vis des délais.

[5]   Un changement d'orientation s'impose donc. Nous exposerons ci-après un nouveau cadre d'analyse pour l'application de l'al. 11*b*). Au cœur de ce nouveau cadre se trouve un plafond présumé quant au temps maximal que cela devrait prendre pour traduire un inculpé en justice : 18 mois pour les procès instruits devant une cour provinciale et 30 mois pour ceux instruits devant une cour supérieure. Bien entendu, compte tenu de la nature contextuelle du caractère raisonnable, le cadre d'analyse prend en considération des facteurs propres à chaque cas, que le délai ait été supérieur ou inférieur au plafond. Il vise par ailleurs à faire en sorte que l'analyse d'une demande fondée sur

with a view to fulfilling s. 11(*b*)'s important objectives.

[6]   Applying this new framework, including its transitional features, we conclude that the appellant was not brought to trial within a reasonable time. We would allow the appeal, set aside his convictions and direct a stay of proceedings.

II. Facts

[7]   The appellant, Mr. Jordan, was arrested in December 2008 following an RCMP investigation into a "dial-a-dope" operation in Langley and Surrey, British Columbia. He was eventually charged with nine other co-accused on a 14-count information alleging various offences relating to possession and trafficking. Mr. Jordan remained in custody until February 2009, when he was released under strict house arrest and other restrictive bail conditions.

[8]   The 10 co-accused made numerous appearances through the early months of 2009 as they obtained counsel, made their elections, and coordinated schedules. By May 2009, all counsel had agreed that the preliminary inquiry would require approximately four days, and it was eventually set for May 13, 14, 17 and 18, 2010. Several of the co-accused entered guilty pleas or were severed from the information. By the time the preliminary inquiry commenced, there were five co-accused left on the information, including Mr. Jordan.

[9]   At the preliminary inquiry, it quickly became apparent that the initial time estimate of four days was too low. Crown counsel advised the preliminary inquiry judge that the Crown would be able to present all of the evidence against the four co-accused, but that the Crown would require significantly more

l'al. 11*b*) se concentre sur les questions qui importent et à inciter tous les participants au système de justice criminelle à collaborer pour que l'administration de la justice soit raisonnablement prompte afin de réaliser les objectifs importants visés par l'al. 11*b*).

[6]   Après avoir appliqué ce nouveau cadre, y compris ses modalités transitoires, nous concluons que l'appelant n'a pas été traduit en justice dans un délai raisonnable. Nous sommes donc d'avis d'accueillir le pourvoi, d'annuler les déclarations de culpabilité et d'ordonner l'arrêt des procédures.

II. Faits

[7]   L'appelant, M. Jordan, a été arrêté en décembre 2008, à la suite d'une enquête menée par la GRC sur une opération de « vente de drogue sur appel » à Langley et à Surrey, en Colombie-Britannique. Il a par la suite été inculpé en compagnie de neuf coaccusés dans une dénonciation comportant 14 chefs d'accusation leur reprochant plusieurs infractions relatives à la possession et au trafic de drogues. M. Jordan a été détenu jusqu'en février 2009, lorsqu'il a été libéré sous réserve de conditions strictes de détention à domicile et d'autres conditions restrictives de mise en liberté sous caution.

[8]   Les 10 coaccusés ont comparu à maintes reprises durant les premiers mois de 2009, période pendant laquelle ils ont obtenu les services d'un avocat, choisi leur mode de procès et coordonné les horaires. Au mois de mai 2009, tous les avocats avaient convenu que l'enquête préliminaire allait durer environ quatre jours, et il a finalement été prévu qu'elle se déroulerait les 13, 14, 17 et 18 mai 2010. Plusieurs des coaccusés ont plaidé coupables ou vu leur nom être retiré de la dénonciation. À l'ouverture de l'enquête préliminaire, cinq coaccusés, dont M. Jordan, étaient toujours visés par la dénonciation.

[9]   À l'enquête préliminaire, il est vite devenu évident que l'estimation initiale de quatre jours était insuffisante. Le procureur du ministère public a informé le juge présidant l'enquête préliminaire que le ministère public serait en mesure de produire toute la preuve pesant contre quatre des coaccusés, mais

court time to present the "mountain of evidence" it had in respect of Mr. Jordan. The parties sought and obtained continuation dates throughout 2010 and into 2011. In May 2011, Mr. Jordan (along with two co-accused) was committed to stand trial on all 14 counts. The preliminary inquiry — which ended up taking nine days of court time — had taken a full year to complete. It was now two and a half years since Mr. Jordan had been charged.

[10]   Following committal, the matter moved to the British Columbia Supreme Court. Crown counsel estimated that six weeks would be required for trial, and the trial was set for the first available six-week block — in September 2012. A new Crown counsel took over the file in July 2011, and wrote to Mr. Jordan's counsel advising of her estimate that only two to three weeks would be needed to present the Crown's case, and offering to seek earlier trial dates. Mr. Jordan's counsel did not respond to this offer. Later, in December 2011, one of the remaining two co-accused was severed from the information. Only Mr. Jordan and one co-accused remained.

[11]   As Mr. Jordan awaited trial, his liberty was restricted. He spent two months in custody following his arrest in December 2008, which was followed by close to four years of restrictive bail conditions. However, in July 2011, Mr. Jordan was convicted of prior drug charges and was sentenced to a 15-month conditional sentence order ("CSO"), which he served until October 2012. The conditions of the CSO were similar to the bail conditions Mr. Jordan was under for the charges at issue in this appeal. Therefore, for 15 months of the delay, Mr. Jordan's liberty was restricted by both the bail conditions and the CSO.

qu'il aurait besoin de beaucoup plus de temps d'audience pour présenter la [TRADUCTION] « montagne de preuve » dont il disposait à l'égard de M. Jordan. Les parties ont sollicité et obtenu des dates de prolongation durant toute l'année 2010 et au début de 2011. En mai 2011, M. Jordan (à l'instar de deux coaccusés) a été renvoyé à procès relativement aux 14 chefs d'accusation. En fin de compte, il avait donc fallu une année complète pour mener à terme l'enquête préliminaire, qui a accaparé neuf jours d'audience. Cela faisait alors deux ans et demi que M. Jordan avait été inculpé.

[10]   Après le renvoi à procès, l'affaire a été soumise à la Cour suprême de la Colombie-Britannique. Le procureur du ministère public a estimé à six semaines le temps qu'il faudrait pour instruire le procès, qui fut fixé au premier bloc de six semaines disponible, soit en septembre 2012. Une nouvelle procureure du ministère public s'est chargée du dossier à compter de juillet 2011. Elle a écrit à l'avocat de M. Jordan que, selon elle, le ministère public n'aurait besoin que de deux à trois semaines pour présenter sa preuve, et elle a offert de demander des dates d'instruction plus rapprochées. L'avocat de M. Jordan n'a pas répondu à cette offre. Plus tard, soit en décembre 2011, le nom d'un des deux coaccusés toujours en cause a été retiré de la dénonciation. Seuls M. Jordan et un coaccusé étaient donc toujours visés par la poursuite.

[11]   Pendant que M. Jordan attendait son procès, sa liberté a été restreinte. Il a passé deux mois en détention après son arrestation en décembre 2008, puis il a été assujetti pendant près de quatre ans à des conditions strictes de mise en liberté sous caution. Il a toutefois été déclaré coupable en juillet 2011 d'accusations antérieures liées aux drogues et a été condamné en lien avec ces accusations à une peine d'emprisonnement avec sursis de 15 mois qu'il a purgée jusqu'en octobre 2012. Les conditions de l'ordonnance de sursis s'apparentaient aux conditions de mise en liberté sous caution auxquelles était soumis M. Jordan pour les accusations en cause dans le présent pourvoi. Ainsi, pendant une partie du temps qu'il a fallu pour que se tienne le procès de M. Jordan, soit 15 mois, sa liberté était restreinte tant par les conditions de mise en liberté sous caution que par l'ordonnance de sursis.

[12]   At the start of his trial in September 2012, Mr. Jordan brought an application for a stay of proceedings alleging a breach of his s. 11(*b*) right to be tried within a reasonable time. This application was dismissed. The trial was adjourned, and it eventually concluded in February 2013 with his conviction on five drug-related offences. The total delay from Mr. Jordan's charges to the conclusion of the trial was 49.5 months.

## III.  Judgments Below

### A.  *British Columbia Supreme Court, 2012 BCSC 1735*

[13]   The trial judge found that the delay in bringing this matter to trial was not unreasonable, and declined to enter a stay of proceedings. In concluding there was no s. 11(*b*) breach, he applied the framework from this Court's decision in *R. v. Morin*, [1992] 1 S.C.R. 771, including the guidelines set out in it for how much institutional delay is generally tolerable.

[14]   The trial judge found that the inherent time requirements for this case were 10.5 months. He also found that, of the total delay, four months (incurred when Mr. Jordan changed counsel and requested an adjournment of his trial) were attributable to the defence, and two months were attributable to the Crown.

[15]   The bulk of the delay — 32.5 months — was attributable to institutional delay, of which 19 months occurred at the Provincial Court and 13.5 months occurred at the B.C. Supreme Court. This was, as the trial judge noted, well outside the *Morin* guidelines for tolerable institutional delay of eight to ten months in the provincial court, and six to eight months in the superior court. However, the trial judge held that institutional delay should be given less weight than Crown delay in the final balancing.

[12]   À l'ouverture de son procès en septembre 2012, M. Jordan a demandé un arrêt des procédures pour cause d'atteinte au droit d'être jugé dans un délai raisonnable que lui garantit l'al. 11*b*). Cette demande a été rejetée. Le procès a été ajourné et il s'est finalement conclu en février 2013 par la déclaration de culpabilité de M. Jordan pour cinq infractions relatives aux drogues. Il s'est donc écoulé au total 49 mois et demi entre le dépôt des accusations contre M. Jordan et la conclusion du procès.

## III.  Jugements des juridictions d'instances inférieures

### A.  *Cour suprême de la Colombie-Britannique, 2012 BCSC 1735*

[13]   Le juge du procès a conclu que le temps pris pour renvoyer la présente affaire à procès n'était pas déraisonnable et il a refusé de prononcer l'arrêt des procédures. En concluant qu'il n'y avait pas eu violation de l'al. 11*b*), il a appliqué le cadre d'analyse établi par la Cour dans son arrêt *R. c. Morin*, [1992] 1 R.C.S. 771, y compris les lignes directrices qui y sont énoncées quant à la durée du délai institutionnel qui sera généralement tolérable.

[14]   Selon le juge du procès, le délai inhérent à la présente affaire était de 10 mois et demi. Toujours selon lui, une partie de ce délai — en l'occurrence quatre mois (période au cours de laquelle M. Jordan a changé d'avocat et demandé l'ajournement de son procès) — était imputable à la défense, et deux mois au ministère public.

[15]   L'essentiel du délai — c.-à-d. 32 mois et demi — était d'ordre institutionnel, soit 19 mois devant la Cour provinciale et 13 mois et demi devant la Cour suprême de la Colombie-Britannique. Comme l'a fait remarquer le juge du procès, cela se situait bien au-delà des lignes directrices établies dans *Morin* pour qu'un délai institutionnel soit tolérable, soit de huit à dix mois si l'affaire est entendue par une cour provinciale et de six à huit mois si elle est entendue par une cour supérieure. Il a toutefois conclu que, dans la mise en balance finale, on doit accorder moins d'importance au délai institutionnel qu'au délai imputable au ministère public.

[16]   The trial judge then considered the issue of prejudice. He reasoned that if the institutional delay had been within the *Morin* guidelines, the trial would have concluded by May 2011. Most of the additional delay coincided with the term of Mr. Jordan's CSO. The trial judge therefore found that Mr. Jordan's liberty interest was not significantly prejudiced by the delay. While Mr. Jordan's security of the person was affected, any prejudice was minimized by the fact that he was facing other outstanding charges for much of the delay. Finally, he found no prejudice to Mr. Jordan's right to make full answer and defence because the Crown's case did not depend on the memory of witnesses.

[17]   The trial judge balanced all of the factors and concluded that Mr. Jordan's s. 11(*b*) right had not been infringed, due primarily to the fact that Mr. Jordan did not suffer significant prejudice.

B.   *British Columbia Court of Appeal, 2014 BCCA 241, 357 B.C.A.C. 137*

[18]   Mr. Jordan appealed. He argued that the trial judge erred in his assessment of prejudice and gave inadequate weight to the excessive institutional delay. The Court of Appeal found that the trial judge did not err in his attribution of the delay, or in his weighing of the institutional delay. Further, the trial judge's determination on prejudice was a finding of fact that was entitled to deference. Finally, the trial judge did not err by declining to infer prejudice based on the length of the delay alone. The appeal was dismissed.

[16]   Le juge du procès s'est ensuite penché sur la question du préjudice. Il a opiné que, si le délai institutionnel avait respecté les lignes directrices établies dans *Morin*, le procès se serait terminé en mai 2011. Cela dit, comme la majeure partie du délai supplémentaire avait coïncidé avec la peine d'emprisonnement avec sursis infligée à M. Jordan, le juge a conclu que le délai n'avait pas porté atteinte de façon notable au droit à la liberté de ce dernier. En outre, pour le juge, bien que la sécurité de la personne de M. Jordan ait été touchée, tout préjudice qu'il aurait pu subir a été réduit par le fait qu'il faisait face à d'autres accusations durant une grande partie du délai. Enfin, il a conclu à l'absence d'atteinte au droit de M. Jordan de présenter une défense pleine et entière parce que la preuve du ministère public ne reposait pas sur les souvenirs de témoins.

[17]   Le juge du procès a soupesé tous les facteurs et conclu qu'il n'y avait pas eu atteinte au droit garanti à M. Jordan par l'al. 11*b*), surtout parce qu'il n'avait pas subi de préjudice important.

B.   *Cour d'appel de la Colombie-Britannique, 2014 BCCA 241, 357 B.C.A.C. 137*

[18]   M. Jordan s'est pourvu en appel. Il a soutenu que le juge du procès avait mal évalué le préjudice et accordé trop peu de poids au délai institutionnel excessif. La Cour d'appel s'est dite d'avis que le juge du procès n'avait commis d'erreur ni dans son attribution du délai ni dans son appréciation du délai institutionnel. En outre, pour elle, la décision du juge du procès sur le préjudice était une conclusion de fait à l'égard de laquelle il fallait faire preuve de déférence. En dernier lieu, pour la Cour d'appel, le juge du procès n'avait pas commis d'erreur en refusant d'inférer l'existence d'un préjudice compte tenu de la longueur du délai à elle seule. L'appel a été rejeté.

IV.  Analysis

A.  *The Right to Be Tried Within a Reasonable Time Is Important to Individuals and Society as a Whole*

[19]    As we have said, the right to be tried within a reasonable time is central to the administration of Canada's system of criminal justice. It finds expression in the familiar maxim: "Justice delayed is justice denied." An unreasonable delay denies justice to the accused, victims and their families, and the public as a whole.

[20]    Trials within a reasonable time are an essential part of our criminal justice system's commitment to treating presumptively innocent accused persons in a manner that protects their interests in liberty, security of the person, and a fair trial. Liberty is engaged because a timely trial means an accused person will spend as little time as possible held in pre-trial custody or living in the community under release conditions. Security of the person is impacted because a long-delayed trial means prolonging the stress, anxiety, and stigma an accused may suffer. Fair trial interests are affected because the longer a trial is delayed, the more likely it is that some accused will be prejudiced in mounting a defence, owing to faded memories, unavailability of witnesses, or lost or degraded evidence.

[21]    At the same time, we recognize that some accused persons who are in fact guilty of their charges are content to see their trials delayed for as long as possible. Indeed, there are incentives for them to remain passive in the face of delay. Accused persons may seek to avoid responsibility for their crimes by embracing delay, in the hope that the case against them will fall apart or they will obtain a stay of proceedings. This operates to the detriment of the public and of the system of justice as a whole. Section 11(*b*) was not intended to be

IV.  Analyse

A.  *Le droit d'être jugé dans un délai raisonnable est important à la fois pour les individus et pour la société dans son ensemble*

[19]    Comme nous l'avons dit, le droit d'être jugé dans un délai raisonnable est d'une importance capitale pour l'administration du système de justice criminelle du Canada. Ce droit trouve son expression dans la maxime bien connue : « un retard à rendre justice équivaut à un déni de justice ». Un délai déraisonnable représente un déni de justice pour l'inculpé, les victimes, leurs familles et la population dans son ensemble.

[20]    Les procès instruits dans un délai raisonnable sont une part essentielle de l'engagement de notre système de justice criminelle de traiter les inculpés présumés innocents de manière à protéger leurs droits à la liberté, à la sécurité de leur personne et à un procès équitable. Le droit à la liberté est en cause parce qu'un procès instruit en temps utile permet à l'inculpé de demeurer le moins longtemps possible en détention avant son procès ou assujetti à des conditions de mise en liberté dans la collectivité. Le droit à la sécurité de la personne est touché parce qu'un retard considérable à tenir le procès a pour effet de prolonger le stress, l'anxiété et la stigmatisation qu'un inculpé peut subir. Enfin, le droit à un procès équitable est en cause, car plus un procès est retardé, plus certains inculpés risquent d'être lésés dans la préparation de leur défense à cause des souvenirs qui s'estompent, de l'indisponibilité de témoins ou encore de la perte ou de la détérioration d'éléments de preuve.

[21]    Parallèlement, nous reconnaissons que certains inculpés qui sont en fait coupables des accusations portées contre eux se réjouissent de voir leur procès être retardé le plus longtemps possible. En effet, ils peuvent avoir intérêt à demeurer passifs à l'égard du délai et vouloir échapper aux conséquences découlant de leurs crimes en en tirant profit, si la poursuite intentée contre eux s'effondre ou s'ils obtiennent un arrêt des procédures. Ce sont alors le public et le système de justice dans son ensemble qui souffrent du délai. L'alinéa 11*b*) n'est

a sword to frustrate the ends of justice (*Morin*, at pp. 801-2).

[22]   Of course, the interests protected by s. 11(*b*) extend beyond those of accused persons. Timely trials impact other people who play a role in and are affected by criminal trials, as well as the public's confidence in the administration of justice.

[23]   Victims of crime and their families may be devastated by criminal acts and therefore have a special interest in timely trials (*R. v. Askov*, [1990] 2 S.C.R. 1199, at pp. 1220-21). Delay aggravates victims' suffering, preventing them from moving on with their lives.

[24]   Timely trials allow victims and witnesses to make the best possible contribution to the trial, and minimize the "worry and frustration [they experience] until they have given their testimony" (*Askov*, at p. 1220). Repeated delays interrupt their personal, employment or business activities, creating inconvenience that may present a disincentive to their participation.

[25]   Last but certainly not least, timely trials are important to maintaining overall public confidence in the administration of justice. As McLachlin J. (as she then was) put it in *Morin*, "delays are of consequence not only to the accused, but may affect the public interest in the prompt and fair administration of justice" (p. 810). Crime is of serious concern to all members of the community. Unreasonable delay leaves the innocent in limbo and the guilty unpunished, thereby offending the community's sense of justice (see *Askov*, at p. 1220). Failure "to deal fairly, quickly and efficiently with criminal trials inevitably leads to the community's frustration with the judicial system and eventually to a feeling of contempt for court procedures" (p. 1221).

pourtant pas censé être une épée conçue pour faire échec aux fins de la justice (*Morin*, p. 801-802).

[22]   Bien entendu, les droits protégés par l'al. 11*b*) s'étendent au-delà de ceux des inculpés. En effet, les procès instruits en temps utile ont des répercussions sur les autres personnes qui interviennent dans les procès criminels et qui sont touchées par eux, de même que sur la confiance du public envers l'administration de la justice.

[23]   Les victimes d'actes criminels et leurs familles peuvent être anéanties par de tels actes et avoir de ce fait un intérêt particulier à ce que les procès se déroulent rondement (*R. c. Askov*, [1990] 2 R.C.S. 1199, p. 1220-1221). En effet, les délais exacerbent la souffrance des victimes et les empêchent de tourner la page.

[24]   En revanche, les procès instruits dans un délai raisonnable permettent aux victimes et aux témoins d'apporter la meilleure contribution possible au procès et minimisent l'« angoiss[e] et [la] frustration [qu'ils ressentent] jusqu'au témoignage lui-même » (*Askov*, p. 1220). Le cumul des délais interrompt pour sa part leurs activités personnelles, professionnelles ou commerciales, et crée des tracas qui peuvent les décourager de participer au procès.

[25]   Dernier élément, qui n'est toutefois certainement pas le moindre, les procès instruits en temps utile sont importants pour préserver la confiance générale du public envers l'administration de la justice. Comme l'a dit la juge McLachlin (maintenant Juge en chef) dans *Morin*, « [n]on seulement [les] délais ont des conséquences pour l'accusé, mais ils peuvent également avoir un effet sur l'intérêt du public dans l'administration rapide et équitable de la justice » (p. 810). Le crime préoccupe grandement tous les membres de la collectivité. Un délai déraisonnable place l'innocent dans une situation incertaine et permet au coupable de rester impuni, ce qui porte par le fait même atteinte au sens de la justice qu'a la société (voir *Askov*, p. 1220). Le défaut « de tenir les procès criminels avec équité, rapidité et efficacité amène inévitablement la société à douter [. . .] et, en fin de compte, à mépriser les procédures judiciaires » (p. 1221).

[26]   Extended delays undermine public confidence in the system. And public confidence is essential to the survival of the system itself, as "a fair and balanced criminal justice system simply cannot exist without the support of the community" (*Askov*, at p. 1221).

[27]   Canadians therefore rightly expect a system that can deliver quality justice in a reasonably efficient and timely manner. Fairness and timeliness are sometimes thought to be in mutual tension, but this is not so. As D. Geoffrey Cowper, Q.C., wrote in a report commissioned by the B.C. Justice Reform Initiative:

. . . the widely perceived conflict between justice and efficiency goals is not based in reason or sound analysis. The real experience of the system is that both must be pursued in order for each to be realised: they are, in practice, interdependent.

(*A Criminal Justice System for the 21st Century* (2012), at p. 75)

[28]   In short, timely trials further the interests of justice. They ensure that the system functions in a fair and efficient manner; tolerating trials after long delays does not. Swift, predictable justice, "the most powerful deterrent of crime" is seriously undermined and in some cases rendered illusory by delayed trials (McLachlin C.J., "The Challenges We Face", remarks to the Empire Club of Canada, published in (2007), 40 *U.B.C. L. Rev.* 819, at p. 825).

### B.   *Problems With the Current Framework*

[29]   While this Court has always recognized the importance of the right to a trial within a reasonable time, in our view, developments since *Morin* demonstrate that the system has lost its way. The framework set out in *Morin* has given rise to both

[26]   Le prolongement des délais mine la confiance du public envers le système. Or, cette confiance est essentielle à la survie du système lui-même, car « il ne peut y avoir de système équitable et équilibré de justice criminelle sans le soutien de la collectivité » (*Askov*, p. 1221).

[27]   Les Canadiens et Canadiennes s'attendent donc à juste titre à ce que notre système puisse rendre une justice de qualité d'une manière qui soit raisonnablement efficace et rapide. On croit parfois qu'il existe un tiraillement entre l'équité et la célérité. Il n'en est toutefois rien. Tel que l'a écrit D. Geoffrey Cowper, c.r., dans un rapport commandé par la B.C. Justice Reform Initiative :

[TRADUCTION] . . . le conflit largement perçu entre les objectifs de justice et d'efficacité ne repose pas sur la raison ou sur une analyse solide. La réalité du système, c'est qu'il faut tendre vers les deux pour que l'un et l'autre se réalisent : ils sont, en pratique, interdépendants.

(*A Criminal Justice System for the 21st Century* (2012), p. 75)

[28]   Bref, les procès instruits en temps utile servent l'administration de la justice. Ils sont le gage du fonctionnement équitable et efficace du système. Accepter que des procès se tiennent après de longs délais a l'effet contraire. La possibilité que justice soit rendue d'une manière rapide et prévisible, [TRADUCTION] « l'outil de dissuasion le plus efficace », est gravement diminuée et elle devient illusoire dans certains cas à cause du report des procès (la juge en chef McLachlin, « The Challenges We Face », allocution prononcée devant l'Empire Club of Canada, publiée dans (2007), 40 *U.B.C. L. Rev.* 819, p. 825).

### B.   *Failles du cadre actuel*

[29]   Bien que la Cour ait toujours reconnu l'importance du droit à un procès tenu dans un délai raisonnable, à nos yeux, les changements survenus depuis *Morin* démontrent que le système s'est égaré. Le cadre d'analyse établi dans cet arrêt a engendré

doctrinal and practical problems, contributing to a culture of delay and complacency towards it.

[30]   The *Morin* framework requires courts to balance four factors in determining whether a breach of s. 11(*b*) has occurred: (1) the length of the delay; (2) defence waiver; (3) the reasons for the delay, including the inherent needs of the case, defence delay, Crown delay, institutional delay, and other reasons for delay; and (4) prejudice to the accused's interests in liberty, security of the person, and a fair trial. Prejudice can be either actual or inferred from the length of the delay. Institutional delay in particular is assessed against a set of guidelines developed by this Court in *Morin*: eight to ten months in the provincial court, and a further six to eight months after committal for trial in the superior court. The *Morin* guidelines reflect the fact that resources are finite and there must accordingly be some tolerance for institutional delay. Institutional delay within or close to the guidelines has generally been considered to be reasonable.

[31]   This framework suffers from a number of related doctrinal shortcomings.

[32]   First, its application is highly unpredictable. It has been interpreted so as to permit endless flexibility, making it difficult to determine whether a breach has occurred. The absence of a consistent standard has turned s. 11(*b*) into something of a dice roll, and has led to the proliferation of lengthy and often complex s. 11(*b*) applications, thereby further burdening the system.

[33]   Second, as the parties and interveners point out, the treatment of prejudice has become one of the most fraught areas in the s. 11(*b*) jurisprudence: it is confusing, hard to prove, and highly subjective. As to the confusion prejudice has caused, courts have struggled to distinguish between "actual" and

des problèmes sur les plans tant théorique que pratique, concourant ainsi à une culture des délais et de complaisance à l'endroit de cette culture.

[30]   Le cadre d'analyse établi dans *Morin* exige des tribunaux qu'ils soupèsent quatre facteurs pour décider s'il y a eu violation de l'al. 11*b*) : (1) la longueur du délai; (2) la renonciation de la défense à invoquer une portion du délai; (3) les motifs du délai, y compris les besoins inhérents au dossier, le délai imputable à la défense, celui attribuable au ministère public, le délai institutionnel et les autres motifs du délai; (4) l'atteinte aux droits de l'inculpé à la liberté, à la sécurité de sa personne et à un procès équitable. Le préjudice peut avoir été réellement subi par l'accusé ou il peut être présumé compte tenu de la longueur du délai. Le délai institutionnel en particulier est évalué à l'aune d'un ensemble de lignes directrices établies par la Cour dans *Morin* : huit à dix mois devant une cour provinciale et six à huit mois de plus après le renvoi à procès devant une cour supérieure. Ces lignes directrices tiennent compte du fait que les ressources sont limitées et qu'il faut donc tolérer, jusqu'à un certain point, les délais institutionnels qui, lorsqu'ils étaient conformes ou presque aux lignes directrices, ont généralement été jugés raisonnables.

[31]   Ce cadre d'analyse souffre par ailleurs de plusieurs lacunes connexes sur le plan théorique.

[32]   Premièrement, son application est extrêmement imprévisible. On l'a interprété de façon à lui donner une souplesse infinie, d'où la difficulté de décider s'il y a eu ou non violation. L'absence d'une norme uniforme a transformé le recours à l'al. 11*b*) en une sorte de coup de dé et a entraîné la multiplication de demandes longues et souvent complexes fondées sur cette disposition, grevant ainsi encore davantage le système.

[33]   Deuxièmement, comme le soulignent les parties et les intervenants, le traitement de préjudice est désormais un des domaines de la jurisprudence relative à l'al. 11*b*) qui entraîne le plus de dissensions : le préjudice est difficile à prouver et son traitement porte à confusion en plus d'être hautement subjectif.

"inferred" prejudice. And attempts to draw this distinction have led to apparent inconsistencies, such as that prejudice might be inferred even when the evidence shows that the accused suffered no actual prejudice. Further, actual prejudice can be quite difficult to establish, particularly prejudice to security of the person or fair trial interests. Courts have also found that "it may not always be easy" to distinguish between prejudice stemming from the delay versus the charge itself (*R. v. Pidskalny*, 2013 SKCA 74, 299 C.C.C. (3d) 396, at para. 43). And even if sufficient evidence is adduced, the interpretation of that evidence is a highly subjective enterprise.

[34]   Despite this confusion, prejudice has, as this case demonstrates, become an important if not determinative factor. Long delays are considered "reasonable" if the accused is unable to demonstrate significant actual prejudice to his or her protected interests. This is a problem because the accused's and the public's interests in a trial within a reasonable time does not necessarily turn on how much suffering an accused has endured. Delayed trials may also cause prejudice to the administration of justice.

[35]   Third, the *Morin* framework requires a retrospective inquiry, since the analysis of delay arises only after the delay has been incurred. Courts and parties are operating within a framework that is designed not to prevent delay, but only to redress (or not redress) it. As a consequence, they are not motivated to manage "each case in advance to achieve *future compliance* with consistent standards" (M. A. Code, *Trial Within a Reasonable Time* (1992), at p. 117 (emphasis in original)). Courts are instead left to pick up the pieces once the delay has transpired. This after-the-fact review of past delay is understandably frustrating for trial judges, who have only one remedial tool at their disposal — a stay of proceedings. It is therefore

Pour pallier la confusion en cause, les tribunaux ont essayé tant bien que mal de distinguer le préjudice « que l'accusé a réellement subi » du préjudice « présumé ». Or, les tentatives en vue d'établir cette distinction ont mené à des incohérences apparentes, telle la possibilité d'inférer le préjudice même si la preuve démontre que l'accusé n'a, dans les faits, subi aucun préjudice. En outre, l'existence d'un tel préjudice peut être assez difficile à établir, particulièrement celui relatif à la sécurité de la personne et au droit à un procès équitable. En outre, les tribunaux ont conclu [TRADUCTION] « [qu']il n'est pas nécessairement toujours facile » de distinguer le préjudice qui découle du délai de celui qui découle de l'accusation en tant que telle (*R. c. Pidskalny*, 2013 SKCA 74, 299 C.C.C. (3d) 396, par. 43). Enfin, même lorsque la preuve produite suffit, son interprétation est un exercice hautement subjectif.

[34]   Malgré cette confusion, le préjudice est devenu un facteur important, voire déterminant, comme le démontre la présente affaire. Les longs délais sont jugés « raisonnables » si l'inculpé est incapable de prouver une atteinte réelle et importante à ses droits protégés. Cela pose problème parce que les droits de l'inculpé et du public à un procès dans un délai raisonnable ne sont pas nécessairement fonction du degré de souffrance éprouvée par l'inculpé. Les procès retardés peuvent aussi porter préjudice à l'administration de la justice.

[35]   Troisièmement, le cadre établi dans l'arrêt *Morin* commande une analyse rétrospective, car le délai n'est examiné qu'après qu'il soit survenu. Les tribunaux et les parties fonctionnent à l'intérieur d'un cadre conçu non pas pour prévenir le délai, mais uniquement pour y remédier (ou pas). Par conséquent, ils n'ont pas intérêt à gérer [TRADUCTION] « chaque instance à l'avance afin d'assurer *pour l'avenir le respect* de normes uniformes » (M. A. Code, *Trial Within a Reasonable Time* (1992), p. 117 (en italique dans l'original)). Les tribunaux en sont plutôt réduits à ramasser les pots cassés une fois que le délai s'est produit. Cet examen a posteriori d'un délai antérieur est naturellement frustrant pour les juges de première instance

unsurprising that courts have occasionally strained in applying the *Morin* framework to avoid a stay.[1]

[36]   The retrospective analysis required by *Morin* also encourages parties to quibble over rationalizations for vast periods of pre-trial delay. Here, for example, the Crown argues that the trial judge erred in characterizing most of the delay as Crown or institutional delay. Had he assessed it properly, the argument goes, he would have attributed only 5 to 8 months as Crown or institutional delay, as opposed to 34.5 months. Competing after-the-fact explanations allow for potentially limitless variations in permissible delay. As the intervener the Criminal Lawyers' Association (Ontario) submits: "Boundless flexibility is incompatible with the concept of a *Charter* right and has proved to serve witnesses, victims, defendants and the justice system's reputation poorly" (I.F., at para. 12).

[37]   Finally, the *Morin* framework is unduly complex. The minute accounting it requires might fairly be considered the bane of every trial judge's existence. Although Cromwell J. warned in *R. v. Godin*, 2009 SCC 26, [2009] 2 S.C.R. 3, that courts must avoid failing to see the forest for the trees (para. 18), courts and litigants have often done just that. Each day of the proceedings from charge to trial is argued about, accounted for, and explained away. This micro-counting is inefficient, relies on judicial "guesstimations", and has been applied in a way that allows for tolerance of ever-increasing delay.

qui n'ont qu'un seul recours à leur disposition : l'arrêt des procédures. Lorsqu'ils ont eu à appliquer le cadre d'analyse établi dans *Morin*, il n'est donc pas surprenant que les tribunaux se soient parfois donné du mal pour éviter l'arrêt des procédures[1].

[36]   L'analyse rétrospective commandée par l'arrêt *Morin* incite également les parties à ergoter sur les justifications de grandes parties du délai antérieur au procès. En l'espèce, par exemple, le ministère public prétend que le juge du procès a commis une erreur en affirmant que la majeure partie du délai était imputable au ministère public ou d'ordre institutionnel. Suivant cet argument, si le juge du procès avait évalué correctement le délai, il n'aurait imputé que de 5 à 8 mois, et non 34 mois et demi, au ministère public ou à des raisons de nature institutionnelle. Les explications contradictoires données après coup ouvrent la porte à une variété potentiellement infinie de délais acceptables. Comme le fait valoir l'intervenante Criminal Lawyers' Association (Ontario), [TRADUCTION] « [u]ne souplesse sans borne est incompatible avec la notion de droit garanti par la *Charte* et elle n'a rendu service ni aux témoins, ni aux victimes, ni aux défendeurs, ni à la réputation du système de justice » (m.i., par. 12).

[37]   Enfin, le cadre d'analyse établi dans *Morin* est indûment complexe. On peut considérer, à juste titre, que le calcul pointilleux qu'il exige empoisonne la vie de tous les juges de première instance. Même si dans *R. c. Godin*, 2009 CSC 26, [2009] 2 R.C.S. 3, le juge Cromwell a prévenu les tribunaux qu'ils doivent prendre garde en portant attention aux détails de ne pas perdre de vue l'ensemble de la situation (par. 18), c'est exactement ce qu'ont souvent fait les tribunaux et les parties. Chaque jour de l'instance, du dépôt des accusations jusqu'au procès, est débattu, comptabilisé et expliqué tant bien que mal. Ce microcalcul est inefficace, repose sur des « estimations empiriques » de la part des juges et a été utilisé d'une manière qui permet de tolérer des délais de plus en plus longs.

---

[1]   We were not invited to revisit the question of remedy. Accordingly, we refrain from doing so.

[1]   Comme on ne nous a pas demandé de revoir la question de la réparation, nous nous abstenons de le faire.

[38]   In sum, from a doctrinal perspective, the s. 11(*b*) framework is too unpredictable, too confusing, and too complex. It has itself become a burden on already over-burdened trial courts.

[39]   These doctrinal problems have contributed to problems in practice.

[40]   As we have observed, a culture of complacency towards delay has emerged in the criminal justice system (see, e.g., Alberta Justice and Solicitor General, Criminal Justice Division, "Injecting a Sense of Urgency: A new approach to delivering justice in serious and violent criminal cases", report by G. Lepp (April 2013) (online), at p. 17; Cowper, at p. 4; P. J. LeSage and M. Code, *Report of the Review of Large and Complex Criminal Case Procedures* (2008), at p. 15; Canada, Department of Justice, "The Final Report on Early Case Consideration of the Steering Committee on Justice Efficiencies and Access to the Justice System" (2006) (online), at pp. 5-6). Unnecessary procedures and adjournments, inefficient practices, and inadequate institutional resources are accepted as the norm and give rise to ever-increasing delay. This culture of delay "causes great harm to public confidence in the justice system" (LeSage and Code, at p. 16). It "rewards the wrong behaviour, frustrates the well-intentioned, makes frequent users of the system cynical and disillusioned, and frustrates the rehabilitative goals of the system" (Cowper, at p. 48).

[41]   The *Morin* framework does not address this culture of complacency. Delay is condemned or rationalized at the back end. As a result, participants in the justice system — police, Crown counsel, defence counsel, courts, provincial legislatures, and Parliament — are not encouraged to take preventative measures to address inefficient practices and resourcing problems. Some courts, with the cooperation of counsel, have undertaken commendable efforts to change courtroom culture, maximize efficiency, and minimize delay, thereby showing that it is possible to do better. Some legislative changes

[38]   Bref, le cadre d'analyse applicable aux demandes fondées sur l'al. 11*b*) est trop imprévisible, trop difficile à saisir et trop complexe sur le plan théorique. Il est devenu lui-même un fardeau pour des tribunaux de première instance déjà surchargés.

[39]   Ces problèmes sur le plan théorique ont concouru à l'existence de problèmes pratiques.

[40]   Comme nous l'avons vu, une culture de complaisance vis-à-vis les délais a fait son apparition au sein du système de justice criminelle (voir, p. ex., Alberta Justice and Solicitor General, Criminal Justice Division, « Injecting a Sense of Urgency : A new approach to delivering justice in serious and violent criminal cases », rapport préparé par G. Lepp (avril 2013) (en ligne), p. 17; Cowper, p. 4; P. J. LeSage et M. Code, *Rapport sur l'examen de la procédure relative aux affaires criminelles complexes* (2008), p. 15; Canada, ministère de la Justice, « Rapport final sur l'examen prioritaire des dossiers du comité directeur sur l'efficacité et l'accès en matière de justice » (2006) (en ligne), p. 5-6). Les procédures et ajournements inutiles de même que les pratiques inefficaces et la pénurie de ressources institutionnelles sont acceptés comme la norme et occasionnent des délais de plus en plus longs. Cette culture des délais « cause un tort important à la confiance du public envers le système de justice » (LeSage et Code, p. 20). Elle [TRADUCTION] « récompense les mauvais comportements, frustre les gens bien intentionnés, rend les habitués du système cyniques et désillusionnés, et contrecarre les objectifs de réinsertion sociale du système » (Cowper, p. 48).

[41]   Le cadre d'analyse établi dans *Morin* ne s'attaque pas à cette culture de complaisance. Le délai est sanctionné ou justifié après coup. En conséquence, les participants au système de justice — les policiers, les procureurs du ministère public, les avocats de la défense, les tribunaux, les législatures et le Parlement — ne sont pas incités à prendre des mesures préventives pour remédier aux pratiques inefficaces et au manque de ressources. Certains tribunaux, avec la collaboration des avocats, ont déployé des efforts louables pour changer la culture en salle d'audience, maximiser l'efficacité et réduire

R. v. JORDAN  *Moldaver J. et al.*

and government initiatives have also been taken. In many cases, however, much remains to be done.

[42]  Aggravating the tolerance for delay is the increased complexity of pre-trial and trial processes since *Morin*. New offences, procedures, obligations on the Crown and police, and legal tests have emerged. Many of them put a premium on fairness, reasonableness, and a fact-specific analysis. They take time. They also take up judges, courtrooms, and other resources.

[43]  Complexity is sometimes unavoidable in order to achieve fairness or ensure that the state lives up to its constitutional obligations. But the quality of justice does not always increase proportionally to the length and complexity of a trial. Unnecessary procedural steps and inefficient advocacy have the opposite effect, weighing down the entire system. A criminal proceeding does not take place in a vacuum. Each procedural step or motion that is improperly taken, or takes longer than it should, along with each charge that should not have been laid or pursued, deprives other worthy litigants of timely access to the courts.

[44]  The intervener Attorney General of Alberta submits that a change in courtroom culture is needed. This submission echoes former Chief Justice Lamer's two decades-old call for participants in the justice system to "find ways to retain a fair process . . . that can achieve practical results in a reasonable time and at reasonable expense" ("The Role of Judges", address to the Empire Club of Canada, 1995 (online)).

[45]  We agree. And, along with other participants in the justice system, this Court has a role to play in

les délais au minimum, démontrant ainsi qu'il est possible de faire mieux. Certaines mesures législatives et gouvernementales ont aussi été prises. Dans bien des cas, il reste toutefois beaucoup de travail à accomplir.

[42]  La tolérance envers les délais est exacerbée par la complexité accrue des processus préalables au procès et de ceux suivis durant les procès depuis *Morin*. De nouvelles infractions, procédures, obligations imposées au ministère public et à la police ainsi que de nouveaux tests juridiques ont fait leur apparition. Bon nombre d'entre eux privilégient l'équité, le caractère raisonnable et l'analyse axée sur les faits. Ils prennent du temps en plus d'accaparer les juges, les salles d'audience et d'autres ressources.

[43]  La complexité constitue parfois un passage obligé pour assurer l'équité du processus ou pour veiller à ce que l'État s'acquitte de ses obligations constitutionnelles. La qualité de la justice n'augmente cependant pas toujours proportionnellement à la longueur et à la complexité d'un procès. Les étapes procédurales inutiles et la défense inefficace des droits ont l'effet contraire et alourdissent tout le système. Un procès criminel ne se déroule pas en vase clos. Chaque étape procédurale ou requête qui est engagée à tort ou qui dure plus longtemps que nécessaire, ainsi que toute accusation qui n'aurait pas dû être portée ou poursuivie, empêche d'autres plaideurs méritants de se pourvoir en temps utile devant les tribunaux.

[44]  L'intervenant le procureur général de l'Alberta soutient qu'un changement de culture en salle d'audience s'impose. Cet argument fait écho à l'appel lancé il y a deux décennies par l'ancien juge en chef Lamer aux participants au système de justice de [TRADUCTION] « trouver des moyens de conserver un processus équitable [. . .] qui peu[t] aboutir à des résultats pratiques dans des délais raisonnables et à un coût raisonnable » (« The Role of Judges », allocution prononcée devant l'Empire Club of Canada, 1995 (en ligne)).

[45]  Nous sommes du même avis. D'ailleurs, à l'instar des autres participants au système de justice,

changing courtroom culture and facilitating a more efficient criminal justice system, thereby protecting the right to trial within a reasonable time. We accept Mr. Jordan's invitation — which was echoed by the Criminal Lawyers' Association (Ontario), the British Columbia Civil Liberties Association, and Mr. Williamson in the companion appeal of *R. v. Williamson*, 2016 SCC 28, [2016] 1 S.C.R. 741 — to revise the s. 11(*b*) analysis. While departing from a precedent of this Court "is a step not to be lightly undertaken" (*Ontario (Attorney General) v. Fraser*, 2011 SCC 20, [2011] 2 S.C.R. 3, at para. 56), as we have explained, "there are compelling reasons to do so" (*R. v. Henry*, 2005 SCC 76, [2005] 3 S.C.R. 609, at para. 44).

la Cour a un rôle à jouer afin de modifier la culture en salle d'audience et d'aider à rendre le système de justice criminelle plus efficace, protégeant ainsi le droit à un procès dans un délai raisonnable. Nous acceptons donc l'invitation de M. Jordan — qui a été reprise par la Criminal Lawyers' Association (Ontario) et l'Association des libertés civiles de la Colombie-Britannique ainsi que par M. Williamson dans le pourvoi connexe (*R. c. Williamson*, 2016 CSC 28, [2016] 1 R.C.S. 741) — de réviser le cadre d'analyse applicable à une demande fondée sur l'al. 11*b*). Bien qu'« il ne convien[ne] pas [d]'écarter un précédent de la Cour à la légère » (*Ontario (Procureur général) c. Fraser*, 2011 CSC 20, [2011] 2 R.C.S. 3, par. 56), comme nous l'avons expliqué, il y a « de[s] raisons impérieuses » de le faire en l'espèce (*R. c. Henry*, 2005 CSC 76, [2005] 3 R.C.S. 609, par. 44).

## V.   A New Framework for Section 11(*b*) Applications

## V.   Un nouveau cadre d'analyse applicable aux demandes fondées sur l'al. 11*b*)

A.   *Summary*

A.   *Résumé*

[46]   At the heart of the new framework is a ceiling beyond which delay is presumptively unreasonable. The presumptive ceiling is set at 18 months for cases going to trial in the provincial court, and at 30 months for cases going to trial in the superior court (or cases going to trial in the provincial court after a preliminary inquiry).

[46]   Au cœur du nouveau cadre d'analyse que nous prescrivons en l'espèce se trouve un plafond au-delà duquel le délai est présumé déraisonnable, sous réserve des précisions qui suivent. Ce « plafond présumé » est fixé à 18 mois pour les affaires instruites devant une cour provinciale et à 30 mois pour celles instruites devant une cour supérieure (ou celles instruites devant une cour provinciale à l'issue d'une enquête préliminaire).

[47]   If the total delay from the charge to the actual or anticipated end of trial (minus defence delay) *exceeds* the ceiling, then the delay is presumptively unreasonable. To rebut this presumption, the Crown must establish the presence of exceptional circumstances. If it cannot, the delay is unreasonable and a stay will follow.

[47]   Si le délai total entre le dépôt des accusations et la conclusion réelle ou anticipée du procès (moins les délais imputables à la défense) *dépasse* le plafond, il est présumé déraisonnable. Pour réfuter cette présomption, le ministère public doit établir la présence de circonstances exceptionnelles. S'il ne peut le faire, le délai est déraisonnable et un arrêt des procédures doit suivre.

[48]   If the total delay from the charge to the actual or anticipated end of trial (minus defence delay or a period of delay attributable to exceptional circumstances) falls *below* the presumptive ceiling, then the onus is on the defence to show that the

[48]   Si le délai total entre le dépôt des accusations et la conclusion réelle ou anticipée du procès (moins le délai imputable à la défense et la période découlant de circonstances exceptionnelles) se situe *en deçà* du plafond présumé, il incombe à la défense de

delay is unreasonable. To do so, the defence must establish that (1) it took meaningful steps that demonstrate a sustained effort to expedite the proceedings, *and* (2) the case took markedly longer than it reasonably should have. We expect stays beneath the ceiling to be rare, and limited to clear cases.

## B. *The Presumptive Ceiling*

[49]   The most important feature of the new framework is that it sets a ceiling beyond which delay is presumptively unreasonable. For cases going to trial in the provincial court, the presumptive ceiling is 18 months from the charge to the actual or anticipated end of trial. For cases going to trial in the superior court, the presumptive ceiling is 30 months from the charge to the actual or anticipated end of trial.[2] We note the 30-month ceiling would also apply to cases going to trial in the provincial court after a preliminary inquiry.[3] As we will discuss, defence-waived or -caused delay does not count in calculating whether the presumptive ceiling has been reached — that is, such delay is to be discounted.

démontrer le caractère déraisonnable du délai. Pour ce faire, elle doit prouver (1) qu'elle a pris des mesures utiles qui font la preuve d'un effort soutenu pour accélérer l'instance, *et* (2) que le procès a été nettement plus long qu'il aurait dû raisonnablement l'être. Nous nous attendons à ce que les arrêts de procédures prononcés dans des cas où le délai est inférieur au plafond soient rares, et limités aux cas manifestes.

## B. *Plafond présumé*

[49]   La caractéristique la plus importante du nouveau cadre d'analyse réside dans le fait qu'il fixe un plafond au-delà duquel le délai est présumé déraisonnable. Dans le cas des affaires instruites devant une cour provinciale, il est fixé à 18 mois entre le dépôt des accusations et la conclusion réelle ou anticipée du procès. Dans le cas des affaires instruites devant une cour supérieure, ce plafond est fixé à 30 mois entre le dépôt des accusations et la conclusion réelle ou anticipée du procès[2]. Signalons que le plafond de 30 mois s'applique également aux affaires instruites devant une cour provinciale au terme d'une enquête préliminaire[3]. Comme nous le verrons, les portions du délai que la défense renonce à invoquer ou celui qui lui est imputable ne comptent pas dans le calcul pour déterminer si le plafond en question a été ou non atteint. Autrement dit, ces délais doivent être ignorés.

---

[2]   This Court has held that s. 11(*b*) applies to sentencing proceedings (*R. v. MacDougall,* [1998] 3 S.C.R. 45). Some sentencing proceedings require significant time, for example, dangerous offender applications or situations in which expert reports are required, or extensive evidence is tendered. The issue of delay in sentencing, however, is not before us, and we make no comment about how this ceiling should apply to s. 11(*b*) applications brought after a conviction is entered, or whether additional time should be added to the ceiling in such cases.

[3]   While most proceedings with a preliminary inquiry are eventually tried in the superior court, this is not always the case. For example, a case may go to trial in the provincial court after a preliminary inquiry if the province in which the trial takes place offers this as an option (such as Quebec), or if the accused re-elects a trial in the provincial court following a preliminary inquiry. In either case, the 30-month ceiling would apply.

[2]   Selon la Cour, l'al. 11*b*) s'applique aux procédures de détermination de la peine (*R. c. MacDougall,* [1998] 3 R.C.S. 45). Certaines de ces procédures prennent beaucoup de temps. C'est le cas, par exemple, des demandes visant à faire déclarer un délinquant dangereux ou des situations dans lesquelles des rapports d'experts sont requis ou une preuve abondante est produite. La question du délai de détermination de la peine ne nous est toutefois pas soumise et nous ne nous prononçons ni sur la manière dont le plafond exposé précédemment devrait s'appliquer aux demandes présentées sur le fondement de l'al. 11*b*) après l'inscription d'une déclaration de culpabilité ni sur l'opportunité de prévoir un délai maximal plus long pour les cas de ce genre.

[3]   Bien que la plupart des instances où il y a enquête préliminaire soient instruites subséquemment devant une cour supérieure, ce n'est pas toujours le cas. Par exemple, il se peut qu'une affaire soit instruite devant une cour provinciale à l'issue d'une enquête préliminaire si la province où se déroule le procès en offre la possibilité (comme le Québec), ou si l'accusé change d'avis et opte pour un procès devant une cour de ce type au terme d'une enquête préliminaire. Le plafond de 30 mois s'appliquerait dans les deux cas.

[50]   A presumptive ceiling is required in order to give meaningful direction to the state on its constitutional obligations and to those who play an important role in ensuring that the trial concludes within a reasonable time: court administration, the police, Crown prosecutors, accused persons and their counsel, and judges. It is also intended to provide some assurance to accused persons, to victims and their families, to witnesses, and to the public that s. 11(*b*) is not a hollow promise.

[51]   While the presumptive ceiling will enhance analytical simplicity and foster constructive incentives, it is not the end of the exercise: as we will explain in greater detail, compelling case-specific factors remain relevant to assessing the reasonableness of a period of delay both above and below the ceiling. Obviously, reasonableness cannot be captured by a number alone, which is why the new framework is not solely a function of time. Contrary to what our colleague Cromwell J. asserts, we do not depart from the concept of reasonableness; we simply adopt a different view of how reasonableness should be assessed.

[52]   In setting the presumptive ceiling, we were guided by a number of considerations. First, it takes as a starting point the *Morin* guidelines.[4] In *Morin*, this Court set eight to ten months as a guide for institutional delay in the provincial court, and an additional six to eight months as a guide for institutional delay in the superior court following an accused's committal for trial. Thus, under *Morin*, a total of 14 to 18 months was the measure for proceedings involving both the provincial court and the superior court.

[50]   Un plafond présumé est nécessaire pour donner des directives valables à l'État sur ses obligations constitutionnelles ainsi qu'aux personnes qui jouent un rôle important pour garantir que le procès se conclut dans un délai raisonnable : les fonctionnaires responsables de l'administration des tribunaux, les policiers, les avocats du ministère public, les inculpés et leurs avocats, de même que les juges. Il vise aussi à donner aux inculpés, aux victimes et à leurs familles de même qu'aux témoins et au public une certaine assurance que l'al. 11*b*) n'est pas une promesse creuse.

[51]   Bien que le plafond présumé accroisse la simplicité de l'analyse et favorise les mesures incitatives constructives, il ne marque pas la fin de l'exercice : comme nous l'expliquerons plus en détail, les facteurs déterminants et propres à l'affaire demeurent pertinents pour apprécier le caractère raisonnable tant du délai supérieur au plafond que de celui inférieur à ce dernier. Évidemment, un nombre à lui seul ne peut définir le caractère raisonnable d'un délai. C'est pourquoi le nouveau cadre d'analyse n'est pas fondé strictement sur une question de temps. Contrairement à ce qu'affirme notre collègue le juge Cromwell, nous ne nous écartons pas de la notion du caractère raisonnable; nous avons tout simplement une opinion différente quant à la manière dont il convient de l'apprécier.

[52]   Pour fixer le plafond présumé, nous nous sommes appuyés sur plusieurs facteurs. En premier lieu, nous avons pris en compte les lignes directrices[4] établies dans *Morin*, où la Cour avait fixé comme balise une période de huit à dix mois pour le renvoi à procès d'un inculpé pour le délai institutionnel devant une cour provinciale et de six à huit mois de plus comme balise pour le délai institutionnel devant une cour supérieure. Ainsi, selon *Morin*, un délai total de 14 à 18 mois constituait la norme pour les poursuites engagées à la fois devant une cour provinciale et une cour supérieure.

---

[4]   We note that the appellant and some of the interveners submitted that the *Morin* guidelines were intended to apply to the *entire period* of delay, rather than just the segment of delay caused by a shortfall of institutional resources. This is incorrect. The only reasonable reading of this Court's decisions in *Askov*, *Morin*, and *Godin* is that the guidelines were intended to apply only to institutional delay, not the entire period of delay.

[4]   Soulignons que, d'après l'appelant et certains des intervenants, les lignes directrices établies dans l'arrêt *Morin* devaient s'appliquer à l'*ensemble* du délai, et non pas uniquement à la partie du délai attribuable au manque de ressources institutionnelles. C'est inexact. Selon la seule interprétation raisonnable que l'on peut faire des arrêts *Askov*, *Morin* et *Godin* de la Cour, les lignes directrices devaient s'appliquer uniquement au délai institutionnel, et non au délai total.

[53]   Second, the presumptive ceiling also reflects additional time to account for the other factors that can reasonably contribute to the time it takes to prosecute a case. These factors include the inherent time requirements of the case and the increased complexity of criminal cases since *Morin*. In this way, the ceiling takes into account the significant role that process now plays in our criminal justice system.

[54]   Third, although prejudice will no longer play an explicit role in the s. 11(*b*) analysis, it informs the setting of the presumptive ceiling. Once the ceiling is breached, we presume that accused persons will have suffered prejudice to their *Charter*-protected liberty, security of the person, and fair trial interests. As this Court wrote in *Morin*, "prejudice to the accused can be inferred from prolonged delay" (p. 801; see also *Godin*, at para. 37). This is not, we stress, a rebuttable presumption: once the ceiling is breached, an absence of actual prejudice cannot convert an unreasonable delay into a reasonable one.

[55]   Fourth, the presumptive ceiling has an important public interest component. The clarity and assurance it provides will build public confidence in the administration of justice.

[56]   We also make this observation about the presumptive ceiling. It is not an aspirational target. Rather, it is the point at which delay becomes presumptively unreasonable. The public should expect that most cases can and should be resolved before reaching the ceiling. For this reason, as we will explain, the Crown bears the onus of justifying delays that exceed the ceiling. It is also for this reason that an accused may in clear cases still demonstrate that his or her right to be tried within a reasonable time has been infringed, even before the ceiling has been breached.

[57]   There is little reason to be satisfied with a presumptive ceiling on trial delay set at 18 months for cases going to trial in the provincial court, and

[53]   En deuxième lieu, le plafond présumé prévoit du temps supplémentaire pour tenir compte des autres facteurs qui peuvent raisonnablement influer sur le temps qu'il faut pour intenter des poursuites. Au nombre de ces facteurs figurent les délais inhérents à l'affaire et la complexité accrue des affaires criminelles depuis *Morin*. Le plafond prend ainsi en considération la place importante qu'occupe la procédure dans notre système de justice criminelle.

[54]   En troisième lieu, bien que le préjudice ne constituera plus explicitement un facteur dans l'analyse applicable à une demande fondée sur l'al. 11*b*), il éclaire les paramètres du plafond présumé. En effet, une fois que ce dernier a été dépassé, nous tenons pour acquis que l'inculpé a subi une atteinte à ses droits à la liberté, à la sécurité de sa personne et à un procès équitable protégés par la *Charte*. Comme l'a dit la Cour dans *Morin*, « on peut déduire qu'un délai prolongé peut causer un préjudice à l'accusé » (p. 801; voir aussi *Godin*, par. 37). Soulignons qu'il ne s'agit pas d'une présomption réfutable : une fois que le plafond a été dépassé, le fait que l'accusé n'ait pas réellement subi de préjudice ne saurait transformer le délai déraisonnable en délai raisonnable.

[55]   En quatrième lieu, le plafond présumé a une dimension d'intérêt public importante. La clarté et l'assurance qu'il offre aideront à bâtir la confiance du public envers l'administration de la justice.

[56]   Une remarque supplémentaire quant à ce plafond : il ne s'agit pas d'un objectif ambitieux. C'est plutôt le point à partir duquel le délai est présumé déraisonnable. Le public peut donc s'attendre à ce que la plupart des affaires puissent être réglées avant que le plafond ne soit atteint, et qu'elles le soient. Voilà pourquoi, comme nous l'expliquerons, il incombe désormais au ministère public de justifier les délais qui dépassent le plafond. C'est aussi pour cette raison que l'inculpé pourra, dans les cas manifestes, démontrer qu'il y a eu atteinte à son droit d'être jugé dans un délai raisonnable, et ce, même avant l'atteinte du plafond.

[57]   Il n'y a guère de raisons de se contenter d'un plafond présumé fixé à 18 mois pour les affaires instruites devant une cour provinciale et d'un plafond

30 months for cases going to trial in the superior court. This is a long time to wait for justice. But the ceiling reflects the realities we currently face. We may have to revisit these numbers and the considerations that inform them in the future.

[58]   Our colleague Cromwell J. misapprehends the effect of the presumptive ceiling, asserting that this framework "reduces reasonableness to two numerical ceilings" (para. 254). As we will explain in greater detail, this is clearly not so. The presumptive ceiling marks the point at which the burden shifts from the defence to prove that the delay was unreasonable, to the Crown to justify the length of time the case has taken. As our colleague acknowledges, pursuant to our framework, "the judge must look at the circumstances of the particular case at hand" in assessing the reasonableness of a delay (para. 301).

[59]   We now turn to discussing the various case-specific factors that must be accounted for both above and below the presumptive ceiling.

C.  *Accounting for Defence Delay*

[60]   Application of this framework, as under the *Morin* framework, begins with calculating the total delay from the charge to the actual or anticipated end of trial. Once that is determined, delay attributable to the defence must be subtracted. The defence should not be allowed to benefit from its own delay-causing conduct. As Sopinka J. wrote in *Morin*: "The purpose of s. 11(*b*) is to expedite trials and minimize prejudice and not to avoid trials on the merits" (p. 802).

[61]   Defence delay has two components. The first is delay waived by the defence (*Askov*, at pp. 1228-29; *Morin*, at pp. 790-91). Waiver can be explicit or implicit, but in either case, it must be clear and

fixé à 30 mois pour les affaires instruites devant une cour supérieure. Il s'agit de longs délais pour que justice soit rendue. Cependant, ces plafonds reflètent les réalités auxquelles nous devons faire face; nous aurons peut-être un jour à revoir ces chiffres et les considérations qui les sous-tendent.

[58]   Notre collègue, le juge Cromwell, interprète mal l'effet du plafond présumé lorsqu'il affirme que le cadre d'analyse que nous proposons « ramène la question du caractère raisonnable à deux plafonds numériques » (par. 254). Comme nous l'expliquerons plus en détail, ce n'est clairement pas le cas. Le plafond présumé situe le moment à partir duquel le fardeau qui incombe à la défense de prouver que le délai a été déraisonnable passe au ministère public qui doit alors justifier le temps qu'il a fallu pour instruire l'affaire. Comme le reconnaît notre collègue, selon le cadre d'analyse que nous proposons, « le juge devra [. . .] examiner les circonstances du cas qui lui est soumis » pour juger du caractère raisonnable d'un délai (par. 301).

[59]   Nous aborderons maintenant les divers facteurs propres à chaque cas dont il faut tenir compte pour juger du caractère raisonnable des délais, qu'ils soient inférieurs ou supérieurs au plafond présumé.

C.  *Prise en compte du délai imputable à la défense*

[60]   L'application du cadre d'analyse établi en l'espèce, tout comme celle du cadre établi dans *Morin*, commence par le calcul du délai total entre le dépôt des accusations et la conclusion réelle ou anticipée du procès. Une fois ce délai établi, il faut en soustraire le délai imputable à la défense. En effet, cette dernière ne doit pas être autorisée à profiter de sa propre conduite à l'origine du délai. Pour reprendre les propos du juge Sopinka dans *Morin*, « [l]'alinéa 11*b*) a pour but d'accélérer les procès et de réduire les préjudices et non pas d'éviter qu'une personne subisse son procès sur le fond » (p. 802).

[61]   Le délai imputable à la défense comporte deux volets. Le premier concerne le délai que la défense renonce à invoquer (*Askov*, p. 1228-1229; *Morin*, p. 790-791). La renonciation peut être

unequivocal. The accused must have full knowledge of his or her rights, as well as the effect waiver will have on those rights. However, as in the past, "[i]n considering the issue of 'waiver' in the context of s. 11(*b*), it must be remembered that it is not the right itself which is being waived, but merely the inclusion of specific periods in the overall assessment of reasonableness" (*R. v. Conway*, [1989] 1 S.C.R. 1659, per L'Heureux-Dubé J., at p. 1686).

[62]   Accused persons sometimes, either before or during their preliminary hearing, wish to re-elect from a superior court trial to a provincial court trial for legitimate reasons. To do so, the Crown's consent must be obtained (*Criminal Code*, R.S.C. 1985, c. C-46, s. 561). Of course, it would generally be open to the Crown to ask the accused to waive the delay stemming from the re-election as a condition of its consent.

[63]   The second component of defence delay is delay caused solely by the conduct of the defence. This kind of defence delay comprises "those situations where the accused's acts either directly caused the delay . . . or the acts of the accused are shown to be a deliberate and calculated tactic employed to delay the trial" (*Askov*, at pp. 1227-28). Deliberate and calculated defence tactics aimed at causing delay, which include frivolous applications and requests, are the most straightforward examples of defence delay. Trial judges should generally dismiss such applications and requests the moment it becomes apparent they are frivolous.

[64]   As another example, the defence will have directly caused the delay if the court and the Crown are ready to proceed, but the defence is not. The period of delay resulting from that unavailability will be attributed to the defence. However, periods of time during which the court and the Crown are unavailable will not constitute defence delay, even if defence counsel is also unavailable. This should discourage unnecessary inquiries into defence counsel availability at each appearance. Beyond defence

explicite ou implicite, mais elle doit être claire et sans équivoque dans les deux cas. L'inculpé doit avoir pleinement connaissance de ses droits et de l'effet que la renonciation aura sur eux. Comme par le passé toutefois, « [d]ans l'examen de la question de la "renonciation", dans le contexte de l'al. 11*b*), il ne faut pas perdre de vue [qu'elle] ne vise pas le droit lui-même, mais simplement l'inclusion de certaines périodes dans l'appréciation générale du caractère raisonnable » (*R. c. Conway*, [1989] 1 R.C.S. 1659, la juge L'Heureux-Dubé, p. 1686).

[62]   Les accusés ont parfois des raisons valables de vouloir réexercer leur option et de choisir — soit avant, soit pendant leur enquête préliminaire — de ne plus être jugés par une cour supérieure, mais plutôt de l'être par une cour provinciale. Pour ce faire, ils doivent obtenir le consentement du poursuivant (*Code criminel*, L.R.C. 1985, c. C-46, art. 561). Bien sûr, il serait généralement loisible au ministère public de poser comme condition à son consentement que l'accusé renonce à invoquer le délai découlant du nouveau choix.

[63]   Le deuxième volet du délai imputable à la défense concerne le délai qui résulte uniquement de la conduite de cette dernière. Ce genre de délai englobe « les cas où la conduite de l'accusé a causé directement [. . .] le délai [. . .] ou ceux où les actes de [ce dernier] révèlent le recours délibéré à une tactique qui vise à retarder le procès » (*Askov*, p. 1227-1228). Le recours délibéré de la défense à des tactiques dilatoires, notamment à des demandes frivoles, est l'exemple le plus simple de délai imputable à la défense. Les juges de première instance doivent généralement rejeter pareilles demandes dès qu'il apparaît évident qu'elles sont frivoles.

[64]   Autre exemple, la défense cause directement le délai si le tribunal et le ministère public sont prêts à procéder, mais pas elle. Le retard découlant de ce manque de disponibilité sera imputé à la défense. Toutefois, les périodes durant lesquelles le tribunal et le ministère public ne sont pas disponibles ne constituent pas un délai imputable à la défense même si l'avocat de la défense n'est pas disponible lui non plus. Cela devrait décourager les interrogations inutiles sur la disponibilité de l'avocat

unavailability, it will of course be open to trial judges to find that other defence actions or conduct have caused delay (see, e.g., *R. v. Elliott* (2003), 114 C.R.R. (2d) 1 (Ont. C.A.), at paras. 175-82).

[65]   To be clear, defence actions legitimately taken to respond to the charges fall outside the ambit of defence delay. For example, the defence must be allowed preparation time, even where the court and the Crown are ready to proceed. In addition, defence applications and requests that are not frivolous will also generally not count against the defence. We have already accounted for procedural requirements in setting the ceiling. And such a deduction would run contrary to the accused's right to make full answer and defence. While this is by no means an exact science, first instance judges are uniquely positioned to gauge the legitimacy of defence actions.

[66]   To summarize, as a first step, total delay must be calculated, and defence delay must be deducted. Defence delay comprises delays waived by the defence, and delays caused solely or directly by the defence's conduct. Defence actions legitimately taken to respond to the charges do not constitute defence delay.

[67]   The next step of the analysis depends upon whether the remaining delay — that is, the delay which was not caused by the defence — is *above* or *below* the presumptive ceiling.

D.  *Above the Ceiling — Presumptively Unreasonable Delay*

[68]   Delay (minus defence delay) that exceeds the ceiling is presumptively unreasonable. The Crown may rebut this presumption by showing that the delay is reasonable because of the presence of exceptional circumstances.

de la défense lors de chaque comparution. Outre le manque de disponibilité de la défense, le juge du procès peut évidemment conclure que d'autres mesures ou actes de la défense ont causé le délai (voir, p. ex., *R. c. Elliott* (2003), 114 C.R.R. (2d) 1 (C.A. Ont.), par. 175-182).

[65]   Pour éviter toute confusion, nous précisons que le temps nécessaire pour traiter les mesures prises légitimement par la défense afin de répondre aux accusations portées contre elle est exclu du délai qui lui est imputable. Par exemple, il faut donner à la défense le temps de se préparer, même lorsque le tribunal et le ministère public sont prêts à procéder. Qui plus est, les demandes non frivoles de la défense ne compteront généralement pas non plus contre elle. Nous avons déjà tenu compte des exigences procédurales au moment de fixer le plafond, et pareille déduction irait à l'encontre du droit de l'inculpé de présenter une défense pleine et entière. Bien qu'il ne s'agisse aucunement d'une science exacte, les juges de première instance sont particulièrement bien placés pour juger de la légitimité des agissements de la défense.

[66]   En somme, il faut tout d'abord calculer le délai total et en déduire le délai imputable à la défense, lequel comprend les périodes que la défense renonce à invoquer et les retards causés uniquement ou directement par sa conduite, sachant que le temps nécessaire pour traiter les mesures qu'elle prend légitimement afin de répondre aux accusations ne constitue pas un délai qui lui est imputable.

[67]   La suite de l'analyse dépend de la question de savoir si le reste du délai — c'est-à-dire le délai qui n'a pas été causé par la défense — se situe *au-delà* ou *en deçà* du plafond présumé.

D.  *Au-delà du plafond — Le délai est présumé déraisonnable*

[68]   Un délai (moins celui attribuable à la défense) qui excède le plafond est présumé déraisonnable. Le ministère public peut réfuter cette présomption en démontrant que ce délai a été raisonnable vu l'existence de circonstances exceptionnelles.

Exceptional Circumstances

[69]   Exceptional circumstances lie *outside the Crown's control* in the sense that (1) they are reasonably unforeseen *or* reasonably unavoidable, *and* (2) Crown counsel cannot reasonably remedy the delays emanating from those circumstances once they arise. So long as they meet this definition, they will be considered exceptional. They need not meet a further hurdle of being rare or entirely uncommon.

[70]   It is not enough for the Crown, once the ceiling is breached, to point to a past difficulty. It must also show that it took reasonable available steps to avoid and address the problem *before* the delay exceeded the ceiling. This might include prompt resort to case management processes to seek the assistance of the court, or seeking assistance from the defence to streamline evidence or issues for trial or to coordinate pre-trial applications, or resorting to any other appropriate procedural means. The Crown, we emphasize, is not required to show that the steps it took were ultimately successful — rather, just that it took reasonable steps in an attempt to avoid the delay.

[71]   It is obviously impossible to identify in advance all circumstances that may qualify as "exceptional" for the purposes of adjudicating a s. 11(*b*) application. Ultimately, the determination of whether circumstances are "exceptional" will depend on the trial judge's good sense and experience. The list is not closed. However, in general, exceptional circumstances fall under two categories: discrete events and particularly complex cases.

[72]   Commencing with the former, by way of illustration, it is to be expected that medical or family emergencies (whether on the part of the accused,

Circonstances exceptionnelles

[69]   Des circonstances exceptionnelles sont des circonstances *indépendantes de la volonté du ministère public*, c'est-à-dire (1) qu'elles sont raisonnablement imprévues *ou* raisonnablement inévitables, *et* (2) que l'avocat du ministère public ne peut raisonnablement remédier aux délais lorsqu'ils surviennent. Dans la mesure où elles répondent à cette définition, les circonstances sont jugées exceptionnelles. Il n'est pas nécessaire qu'elles satisfassent à un autre critère en étant rares ou tout à fait insolites.

[70]   Une fois que le plafond est dépassé, le ministère public ne peut se contenter d'invoquer une difficulté passée. Il doit aussi démontrer qu'il a pris des mesures raisonnables qui étaient à sa portée pour éviter et régler le problème *avant* que le délai maximal applicable — le plafond — ne soit dépassé. Il pourrait notamment démontrer avoir recouru promptement aux processus de gestion d'instance pour obtenir l'aide du tribunal, avoir sollicité l'assistance de la défense pour simplifier la preuve ou les questions en litige ou pour coordonner les demandes préalables au procès, ou encore avoir utilisé tout autre moyen procédural approprié. Le ministère public, soulignons-le, n'est pas tenu de démontrer que les mesures qu'il a prises ont été couronnées de succès — il doit plutôt uniquement établir qu'il a pris des mesures raisonnables pour éviter le délai.

[71]   Il est manifestement impossible de déterminer a priori toutes les circonstances qui peuvent se qualifier d'« exceptionnelles » lorsqu'il s'agit de trancher une demande fondée sur l'al. 11*b*). En fin de compte, la réponse à cette question du caractère « exceptionnel » des circonstances dépendra du bon sens et de l'expérience du juge de première instance. Une liste des circonstances de ce type ne saurait être exhaustive. Ces circonstances se divisent toutefois généralement en deux catégories : les événements distincts et les affaires particulièrement complexes.

[72]   Commençons, à titre d'illustration, par les événements distincts. On peut s'attendre à ce que les urgences médicales ou familiales (de l'accusé, de

important witnesses, counsel or the trial judge) would generally qualify. Cases with an international dimension, such as cases requiring the extradition of an accused from a foreign jurisdiction, may also meet the definition.

[73]   Discrete, exceptional events that arise at trial may also qualify and require some elaboration. Trials are not well-oiled machines. Unforeseeable or unavoidable developments can cause cases to quickly go awry, leading to delay. For example, a complainant might unexpectedly recant while testifying, requiring the Crown to change its case. In addition, if the trial goes longer than reasonably expected — even where the parties have made a good faith effort to establish realistic time estimates — then it is likely the delay was unavoidable and may therefore amount to an exceptional circumstance.

[74]   Trial judges should be alive to the practical realities of trials, especially when the trial was scheduled to conclude below the ceiling but, in the end, exceeded it. In such cases, the focus should be on whether the Crown made reasonable efforts to respond and to conclude the trial under the ceiling. Trial judges should also bear in mind that when an issue arises at trial close to the ceiling, it will be more difficult for the Crown and the court to respond with a timely solution. For this reason, it is likely that unforeseeable or unavoidable delays occurring during trials that are scheduled to wrap up close to the ceiling will qualify as presenting exceptional circumstances.

[75]   The period of delay caused by any discrete exceptional events must be subtracted from the total period of delay for the purpose of determining whether the ceiling has been exceeded. Of course, the Crown must always be prepared to mitigate

témoins importants, d'un avocat ou du juge de première instance) satisferont généralement aux conditions exigées. Les affaires revêtant une dimension internationale, comme celles qui exigent que l'accusé soit extradé d'un pays étranger, peuvent également répondre à la définition.

[73]   Les événements distincts et exceptionnels qui surviennent au procès peuvent également satisfaire aux conditions requises, et exigent certaines précisions. Les procès ne constituent pas des machines bien huilées. Des événements imprévisibles ou inévitables peuvent faire rapidement mal tourner une affaire et entraîner des délais. À titre d'exemple, un plaignant peu, de manière inattendue, se rétracter pendant son témoignage, ce qui oblige le ministère public à modifier son approche. En outre, si le procès a été plus long que ce à quoi on pouvait raisonnablement s'attendre — même lorsque les parties ont fait des efforts de bonne foi pour établir des estimations de temps réalistes —, le délai était vraisemblablement inévitable et est donc susceptible de constituer une circonstance exceptionnelle.

[74]   Le juge de première instance doit être conscient des difficultés pratiques d'un procès, en particulier lorsque ce dernier devait se conclure dans un délai inférieur au plafond établi, mais que, en fin de compte, il l'a excédé. Dans de tels cas, l'analyse doit s'attacher à la question de savoir si le ministère public s'est raisonnablement efforcé de réagir à la situation et de conclure le procès dans un délai inférieur au plafond. Le juge du procès doit également garder à l'esprit que, lorsqu'une question est soulevée au procès peu avant l'expiration du délai maximal applicable, il sera plus difficile pour le ministère public et le tribunal de trouver une solution en temps utile. C'est pourquoi il est probable que des délais imprévisibles ou inévitables qui surviennent lors de procès devant se conclure peu avant l'atteinte du plafond applicable soient qualifiés de circonstances exceptionnelles.

[75]   La durée du délai causé par tout événement exceptionnel distinct doit être soustraite de la durée totale du délai lorsqu'il s'agit de déterminer s'il y a ou non dépassement du plafond applicable. Bien sûr, le ministère public doit toujours être prêt

the delay resulting from a discrete exceptional circumstance. So too must the justice system. Within reason, the Crown and the justice system should be capable of prioritizing cases that have faltered due to unforeseen events (see *R. v. Vassell*, 2016 SCC 26, [2016] 1 S.C.R. 625). Thus, any portion of the delay that the Crown and the system could reasonably have mitigated may not be subtracted (i.e. it may not be appropriate to subtract the entire period of delay occasioned by discrete exceptional events).

[76]   If the remaining delay falls below the ceiling, the accused may still demonstrate in clear cases that the delay is unreasonable as outlined below. If, however, the remaining delay exceeds the ceiling, the delay is unreasonable and a stay of proceedings must be entered.

[77]   As indicated, exceptional circumstances also cover a second category, namely, cases that are particularly complex. This too requires elaboration. Particularly complex cases are cases that, because of the nature of the *evidence* or the nature of the *issues*, require an inordinate amount of trial or preparation time such that the delay is justified. As for the nature of the evidence, hallmarks of particularly complex cases include voluminous disclosure, a large number of witnesses, significant requirements for expert evidence, and charges covering a long period of time. Particularly complex cases arising from the nature of the issues may be characterized by, among other things, a large number of charges and pre-trial applications, novel or complicated legal issues, and a large number of significant issues in dispute. Proceeding jointly against multiple co-accused, so long as it is in the interest of justice to do so, may also impact the complexity of the case.

à atténuer le délai découlant d'une circonstance exceptionnelle distincte. Il doit en être de même du système de justice. Dans la mesure de ce qui est raisonnable, le ministère public et le système judiciaire devraient être en mesure de donner la priorité aux causes dont le déroulement a été défaillant en raison d'événements imprévus (voir *R. c. Vassell*, 2016 CSC 26, [2016] 1 R.C.S. 625). Ainsi, toute portion du délai que le ministère public et le système judiciaire pourraient raisonnablement avoir atténué ne peut être soustraite du délai total écoulé (c.-à-d. qu'il pourrait ne pas être indiqué de soustraire l'entièreté de la période découlant des événements exceptionnels distincts).

[76]   Comme il sera expliqué ci-après, si le délai restant est inférieur au plafond, l'accusé peut toujours démontrer, dans des cas manifestes, qu'il est néanmoins déraisonnable. Si, toutefois, le délai restant excède ce plafond, il est déraisonnable et un arrêt des procédures doit être ordonné.

[77]   Comme nous l'avons précisé antérieurement, il existe aussi une seconde catégorie de circonstances exceptionnelles : les affaires particulièrement complexes. Ici encore, certaines précisions s'imposent. Les affaires de ce genre sont celles qui, eu égard à la nature de la *preuve* ou des *questions soulevées*, exigent un procès ou une période de préparation d'une durée exceptionnelle, si bien que le délai est justifié. Pour ce qui est de la nature de la preuve, les affaires particulièrement complexes présentent notamment les caractéristiques suivantes : la communication d'une preuve volumineuse, un grand nombre de témoins, des exigences importantes applicables au témoignage d'expert, ainsi que des accusations qui portent sur de longues périodes. Les causes particulièrement complexes en raison de la nature des questions soulevées peuvent se caractériser notamment par un grand nombre d'accusations et de demandes préalables au procès, par la présence de questions de droit inédites ou complexes, ainsi que par un grand nombre de questions litigieuses importantes. Le fait de poursuivre conjointement plusieurs coaccusés, dans la mesure où il est dans l'intérêt de la justice de le faire, peut aussi avoir une incidence sur la complexité de la cause.

[78]   A typical murder trial will not usually be sufficiently complex to comprise an exceptional circumstance. However, if an inordinate amount of trial or preparation time is needed as a result of the nature of the evidence or the issues such that the time the case has taken is justified, the complexity of the case will qualify as presenting an exceptional circumstance.

[79]   It bears reiterating that such determinations fall well within the trial judge's expertise. And, of course, the trial judge will also want to consider whether the Crown, having initiated what could reasonably be expected to be a complex prosecution, developed and followed a concrete plan to minimize the delay occasioned by such complexity (*R. v. Auclair*, 2014 SCC 6, [2014] 1 S.C.R. 83, at para. 2). Where it has failed to do so, the Crown will not be able to show exceptional circumstances, because it will not be able to show that the circumstances were outside its control. In a similar vein, and for the same reason, the Crown may wish to consider whether multiple charges for the same conduct, or trying multiple co-accused together, will unduly complicate a proceeding. While the court plays no supervisory role for such decisions, Crown counsel must be alive to the fact that any delay resulting from their prosecutorial discretion must conform to the accused's s. 11(*b*) right (see, e.g., *Vassell*). As this Court said in *R. v. Rodgerson*, 2015 SCC 38, [2015] 2 S.C.R. 760:

Certainly, it is within the Crown's discretion to prosecute charges where the evidence would permit a reasonable jury to convict. However, some semblance of a cost-benefit analysis would serve the justice system well. Where the additional or heightened charges are marginal, and pursuing them would necessitate a substantially more complex trial process and jury charge, the Crown should carefully consider whether the public interest would be better served by either declining to prosecute the marginal charges from the outset or deciding not

[78]   Un procès pour meurtre typique ne sera en général pas suffisamment complexe pour constituer une circonstance exceptionnelle. Cependant, si un procès ou une période de préparation d'une durée exceptionnelle s'imposent compte tenu de la nature de la preuve ou des questions soulevées — de sorte que la durée de l'affaire est justifiée —, on pourra conclure que la complexité du dossier constitue une circonstance exceptionnelle.

[79]   Il convient de rappeler que ces décisions relèvent entièrement de l'expertise du juge de première instance. Bien entendu, celui-ci voudra également se pencher sur la question de savoir si le ministère public, qui a introduit ce qui semblait raisonnablement être une poursuite complexe, a établi et suivi un plan concret pour réduire au minimum les retards occasionnés par une telle complexité (*R. c. Auclair*, 2014 CSC 6, [2014] 1 R.C.S. 83, par. 2). S'il ne l'a pas fait, le ministère public ne sera pas en mesure d'établir l'existence de circonstances exceptionnelles, parce qu'il ne pourra pas démontrer que les circonstances en question étaient indépendantes de sa volonté. Dans le même ordre d'idées, et pour la même raison, le ministère public pourrait vouloir se demander si l'existence de multiples accusations pour la même conduite ou si le fait de juger plusieurs coaccusés en même temps a pour effet de compliquer indûment l'instance. Même si le tribunal ne joue aucun rôle de surveillance à l'égard de telles décisions, l'avocat du ministère public doit être conscient du fait que tout délai qui découle de l'exercice du pouvoir discrétionnaire du poursuivant doit respecter les droits de l'accusé protégés par l'al. 11*b*) (voir, p. ex., *Vassell*). Comme la Cour l'a affirmé dans *R. c. Rodgerson*, 2015 CSC 38, [2015] 2 R.C.S. 760 :

Certes, il est loisible au ministère public d'intenter des poursuites lorsque la preuve permettrait à un jury raisonnable de déclarer l'accusé coupable. Toutefois, une sorte d'analyse de rentabilité servirait également le système de justice. Lorsque les autres accusations ou les accusations plus sévères sont d'importance secondaire et que la poursuite relative à ces accusations nécessiterait un procès et des directives au jury beaucoup plus complexes, le ministère public devrait sérieusement se demander si l'intérêt public serait mieux servi en décidant dès le départ

to pursue them once the evidence at trial is complete. [para. 45]

[80]   Where the trial judge finds that the case was particularly complex such that the time the case has taken is justified, the delay is reasonable and no stay will issue. No further analysis is required.

[81]   To be clear, the presence of exceptional circumstances is *the only basis* upon which the Crown can discharge its burden to justify a delay that exceeds the ceiling. As discussed, an exceptional circumstance can arise from a discrete event (such as an illness, extradition proceeding, or unexpected event at trial) or from a case's complexity. The seriousness or gravity of the offence cannot be relied on, although the more complex cases will often be those involving serious charges, such as terrorism, organized crime, and gang-related activity. Nor can chronic institutional delay be relied upon. Perhaps most significantly, the absence of prejudice can in no circumstances be used to justify delays after the ceiling is breached. Once so much time has elapsed, only circumstances that are genuinely outside the Crown's control and ability to remedy may furnish a sufficient excuse for the prolonged delay.

### E.   *Below the Presumptive Ceiling*

[82]   A delay may be unreasonable even if it falls below the presumptive ceiling. If the total delay from the charge to the actual or anticipated end of trial (minus defence delay and delay attributable to exceptional circumstances that are discrete in nature) is less than 18 months for cases going to trial in the provincial court, or 30 months for cases going to trial in the superior court, then the defence bears the onus to show that the delay is unreasonable. To do so, the defence must establish

de ne pas intenter de poursuite relativement aux accusations d'importance secondaire, ou en décidant de ne pas y donner suite lorsque la preuve au procès est complète. [par. 45]

[80]   Lorsque le juge conclut que l'affaire était particulièrement complexe, de sorte que sa durée était justifiée, le délai est jugé raisonnable et aucun arrêt des procédures n'est ordonné. Aucune autre analyse n'est nécessaire.

[81]   En termes clairs, la présence de circonstances exceptionnelles sera *le seul fondement* permettant au ministère public de s'acquitter du fardeau qui lui incombera de justifier un délai qui excède le plafond établi. Comme nous l'avons vu, une circonstance exceptionnelle peut découler d'un événement distinct (comme une maladie, une procédure d'extradition ou un imprévu au procès) ou de la complexité d'une cause. La gravité de l'infraction ne peut servir à justifier le délai, même si les causes plus complexes seront souvent celles qui mettent en cause des accusations graves, comme le terrorisme, le crime organisé et les activités liées à une organisation criminelle. Les délais institutionnels chroniques ne peuvent non plus servir de fondement au dépassement du plafond. Fait peut-être plus important encore, l'absence de préjudice ne peut en aucun cas servir à justifier des délais lorsque le plafond est dépassé. Quand il s'est écoulé autant de temps, seules des circonstances véritablement indépendantes de la volonté du ministère public et auxquelles celui-ci ne pouvait remédier peuvent donner une excuse suffisante pour justifier le délai prolongé.

### E.   *Délai inférieur au plafond présumé*

[82]   Un délai peut être déraisonnable même s'il est inférieur au plafond présumé applicable. Si le temps total écoulé entre le dépôt des accusations et la conclusion réelle ou prévue du procès — moins les retards imputables à la défense et ceux attribuables à des circonstances exceptionnelles de nature distincte — est inférieur à 18 mois pour les affaires instruites devant une cour provinciale, ou à 30 mois pour celles portées devant une cour supérieure, il incombe à la défense de démontrer

two things: (1) it took meaningful steps that demonstrate a sustained effort to expedite the proceedings, *and* (2) the case took markedly longer than it reasonably should have. Absent these two factors, the s. 11(*b*) application must fail.

[83]   We expect stays beneath the ceiling to be granted only in clear cases. As we have said, in setting the ceiling, we factored in the tolerance for reasonable institutional delay established in *Morin*, as well as the inherent needs and the increased complexity of most cases.

### (1) Defence Initiative — Meaningful and Sustained Steps

[84]   To discharge its onus where delay falls below the ceiling, the defence must demonstrate that it took meaningful, sustained steps to expedite the proceedings. "Action or non-action by the accused which is inconsistent with a desire for a timely trial is something that the court must consider" (*Morin*, at p. 802). Here, the trial judge should consider what the defence could have done, and what it actually did, to get the case heard as quickly as possible. Substance matters, not form.

[85]   To satisfy this criterion, it is not enough for the defence to make token efforts such as to simply put on the record that it wanted an earlier trial date. Since the defence benefits from a strong presumption in favour of a stay once the ceiling is exceeded, it is incumbent on the defence, in order to justify a stay below the ceiling, to demonstrate having taken meaningful and sustained steps to be tried quickly. While the defence might not be able to resolve the Crown's or the trial court's challenges, it falls to the defence to show that it attempted to set the earliest possible hearing dates, was cooperative with and responsive to the Crown and the court, put the

que celui-ci a été déraisonnable. Pour ce faire, la défense doit établir deux choses : (1) qu'elle a pris des mesures utiles qui font la preuve d'un effort soutenu pour accélérer l'instance, *et* (2) que le procès a été nettement plus long qu'il aurait dû raisonnablement l'être. En l'absence de l'un ou l'autre de ces deux facteurs, la demande fondée sur l'al. 11*b*) doit être rejetée.

[83]   Nous nous attendons à ce que les arrêts de procédures accordés dans le contexte de délais inférieurs au plafond ne le soient que dans des cas manifestes. Comme nous l'avons mentionné, en établissant le plafond, nous avons tenu compte de l'indulgence voulue pour le délai institutionnel raisonnable établi dans *Morin*, de même que des besoins inhérents à la plupart des causes et de leur complexité accrue.

### (1) L'initiative dont a fait preuve la défense — Mesures utiles et soutenues

[84]   Pour s'acquitter du fardeau qui lui incombe lorsque le délai est inférieur au plafond applicable, la défense doit démontrer qu'elle a pris des mesures utiles et soutenues pour accélérer la procédure. « Le tribunal doit tenir compte de l'action ou de l'inaction de l'accusé qui ne correspond pas à un désir d'être jugé rapidement » (*Morin*, p. 802). En l'espèce, le juge du procès devrait se demander ce que la défense aurait pu faire, et ce qu'elle a effectivement fait, pour que la cause soit entendue le plus rapidement possible. Ce qui importe, c'est le fond et non la forme.

[85]   Pour satisfaire à ce critère, la défense ne peut se contenter de faire des efforts symboliques comme de simplement consigner au dossier qu'elle voulait une date de procès plus hâtive. Comme elle bénéficie d'une forte présomption pour un arrêt des procédures en cas de dépassement du délai maximal applicable, pour en obtenir un lorsque ce plafond n'est pas franchi, la défense doit démontrer qu'elle a pris des mesures utiles et soutenues pour que l'accusé soit jugé rapidement. Bien qu'elle puisse être incapable de résoudre les défis auxquels sont confrontés le ministère public ou le tribunal de première instance, la défense doit démontrer

Crown on timely notice when delay was becoming a problem, and conducted all applications (including the s. 11(*b*) application) reasonably and expeditiously. At the same time, trial judges should not take this opportunity, with the benefit of hindsight, to question every decision made by the defence. The defence is required to act reasonably, not perfectly.

[86]   Our colleague Cromwell J. criticizes this requirement as diminishing the right to be tried within a reasonable time. We respectfully disagree. First, this Court already considers defence conduct in assessing s. 11(*b*) applications. And the level of diligence displayed by the accused is relevant in the context of other *Charter* rights as well, like the s. 10(*b*) right to counsel (*R. v. Tremblay*, [1987] 2 S.C.R. 435, at p. 439). Second, as mentioned, the requirement of defence initiative below the ceiling is a corollary to the Crown's justificatory burden above the ceiling. Third, this requirement reflects the practical reality that a level of cooperation between the parties is necessary in planning and conducting a trial. Encouraging the defence to be part of the solution will have positive ramifications not only for individual cases but for the entire justice system, thereby enhancing — rather than diminishing — timely justice.

qu'elle a essayé d'obtenir les dates les plus rapprochées possible pour la tenue de l'audience, qu'elle a collaboré avec le ministère public et le tribunal et a répondu à leurs efforts, qu'elle a avisé le ministère public en temps opportun que le délai commençait à poser problème, et qu'elle a mené toutes les demandes (y compris celle fondée sur l'al. 11*b*)) de manière raisonnable et expéditive. Cela dit, le juge du procès ne doit pas profiter de l'occasion, avec l'avantage du recul, pour remettre en question chacune des décisions de la défense. Cette dernière est tenue d'agir raisonnablement, non pas à la perfection.

[86]   Notre collègue, le juge Cromwell, critique cette exigence parce qu'il estime qu'elle restreint le droit d'être jugé dans un délai raisonnable. Soit dit en tout respect, nous ne sommes pas d'accord. Premièrement, la Cour prend déjà en considération la conduite de la défense pour juger des demandes fondées sur l'al. 11*b*). En outre, le degré de diligence dont a fait preuve l'accusé est aussi pertinent dans le contexte d'autres droits protégés par la *Charte*, par exemple en ce qui a trait au droit d'avoir recours à l'assistance d'un avocat prévu à l'al. 10*b*) (*R. c. Tremblay*, [1987] 2 R.C.S. 435, p. 439). Deuxièmement, comme nous l'avons mentionné, l'exigence quant à l'initiative dont doit avoir fait preuve la défense lorsque le délai est inférieur au plafond est le corollaire du fardeau qui incombe au ministère public de justifier le temps qu'il a fallu pour instruire l'affaire dans les cas où le délai a dépassé le plafond. Troisièmement, cette exigence est le reflet de la réalité sur le plan pratique qu'il faut un certain degré de coopération entre les parties pour planifier et instruire un procès. Encourager la défense à faire partie de la solution aura des conséquences positives non seulement pour les causes prises individuellement, mais également pour l'ensemble du système de justice, et cela aura pour conséquence d'améliorer la performance de ce dernier sur le plan des délais et non l'inverse.

(2)  Reasonable Time Requirements of the Case
— Time Markedly Exceeded

[87]   Next, the defence must show that the time the case has taken markedly exceeds the reasonable time requirements of the case. The reasonable time requirements of a case derive from a variety of factors, including the complexity of the case, local considerations, and whether the Crown took reasonable steps to expedite the proceedings.

[88]   The reasonable time requirements of the case will increase proportionally to a case's complexity. As Sopinka J. wrote in *Morin*: "All other factors being equal, the more complicated a case, the longer it will take counsel to prepare for trial and for the trial to be conducted once it begins" (pp. 791-92).

[89]   In considering the reasonable time requirements of the case, trial judges should also employ the knowledge they have of their own jurisdiction, including how long a case of that nature typically takes to get to trial in light of the relevant local and systemic circumstances.

[90]   Where the Crown has done its part to ensure that the matter proceeds expeditiously — including genuinely responding to defence efforts, seeking opportunities to streamline the issues and evidence, and adapting to evolving circumstances as the case progresses — it is unlikely that the reasonable time requirements of the case will have been markedly exceeded. As with assessing the conduct of the defence, trial judges should not hold the Crown to a standard of perfection.

[91]   Determining whether the time the case has taken markedly exceeds what was reasonably required is not a matter of precise calculation. Trial judges should not parse each day or month, as has

(2)  Délai raisonnable nécessaire pour juger l'affaire — Délai dépassé de manière manifeste

[87]   En outre, la défense doit démontrer que le temps qu'a pris la cause excède de manière manifeste le délai qui aurait été raisonnablement nécessaire pour juger l'affaire. Le délai raisonnable nécessaire pour instruire une cause dépend d'une panoplie de facteurs, y compris la complexité du dossier, des considérations de nature locale, et la question de savoir si le ministère public a pris des mesures raisonnables pour accélérer l'instance.

[88]   Ce délai raisonnable nécessaire augmente proportionnellement à la complexité de l'affaire. Comme l'a écrit le juge Sopinka dans l'arrêt *Morin*, « [t]ous les autres facteurs étant égaux, une affaire plus compliquée demandera plus de temps de préparation à l'avocat et le procès durera plus longtemps une fois qu'il sera commencé » (p. 792).

[89]   Lorsqu'il examine le délai raisonnable nécessaire pour instruire une cause, le juge du procès doit aussi tenir compte de la connaissance qu'il a de sa propre juridiction, y compris du temps que prend généralement un procès du type de celui dont il est saisi pour arriver à procès eu égard aux circonstances locales et systémiques.

[90]   Lorsque le ministère public a contribué à garantir que le dossier procède de manière diligente — y compris en répondant réellement aux efforts de la défense, en cherchant les occasions de simplifier les questions en litige et la preuve, de même qu'en adaptant son approche aux circonstances au fur et à mesure que le dossier a progressé —, il est improbable que le délai raisonnable nécessaire de l'instance ait été dépassé de manière manifeste. À l'instar de l'attitude qu'il doit adopter lorsqu'il examine la conduite de la défense, le juge du procès ne doit pas exiger du ministère public qu'il satisfasse à une norme de perfection.

[91]   Le fait de déterminer si le temps qu'a pris une affaire à être jugée a excédé de manière manifeste ce qui était raisonnablement nécessaire n'est pas une question de calculs précis. Le juge de

been the common practice since *Morin*, to determine whether each step was reasonably required. Instead, trial judges should step back from the minutiae and adopt a bird's-eye view of the case. All this said, this determination is a question of fact falling well within the expertise of the trial judge (*Morin*, per Sopinka J., at pp. 791-92).

### F. *Applying the New Framework to Cases Already in the System*

[92]   When this Court released its decision in *Askov*, tens of thousands of charges were stayed in Ontario alone as a result of the abrupt change in the law. Such swift and drastic consequences risk undermining the integrity of the administration of justice.

[93]   We recognize that this new framework is a departure from the law that was applied to s. 11(*b*) applications in the past. A judicial change in the law is presumed to operate retroactively and apply to past conduct (*Canada (Attorney General) v. Hislop*, 2007 SCC 10, [2007] 1 S.C.R. 429, at para. 84). Slightly more relaxed rules apply to judicial changes to the interpretation of constitutional provisions (para. 88). Transition periods, suspended declarations of invalidity, and purely prospective remedies are part of the discretionary remedial framework of our constitutional law (paras. 88-92; *R. v. Brydges*, [1990] 1 S.C.R. 190, at pp. 217-18; *R. v. Feeney*, [1997] 2 S.C.R. 117).

[94]   Here, there are a variety of reasons to apply the framework contextually and flexibly for cases currently in the system, one being that it is not fair to strictly judge participants in the criminal justice system against standards of which they had no notice. Further, this new framework creates incentives for both the Crown and the defence to expedite criminal cases. However, in jurisdictions where

première instance ne devrait pas disséquer chaque jour ou chaque mois pour déterminer si chaque étape était raisonnablement nécessaire — comme le veut la pratique courante depuis l'arrêt *Morin*. Il devrait plutôt prendre du recul par rapport aux menus détails et examiner l'affaire dans son ensemble. Cela dit, cette détermination est une question de fait qui relève entièrement de l'expertise du juge de première instance (*Morin*, le juge Sopinka, p. 791-792).

### F. *Appliquer le nouveau cadre d'analyse aux affaires déjà en cours*

[92]   Quand la Cour a rendu sa décision dans *Askov*, des dizaines de milliers d'accusations ont fait l'objet d'un arrêt des procédures en Ontario seulement, en raison de la modification soudaine du droit. De tels virages et les conséquences radicales qu'ils entraînent peuvent compromettre l'intégrité de l'administration de la justice.

[93]   Nous reconnaissons que le nouveau cadre d'analyse établi en l'espèce s'écarte des règles qui s'appliquaient antérieurement aux demandes fondées sur l'al. 11*b*). Une modification judiciaire du droit applicable est présumée avoir une application rétroactive et s'appliquer à une conduite antérieure (*Canada (Procureur général) c. Hislop*, 2007 CSC 10, [2007] 1 R.C.S. 429, par. 84). Des règles légèrement plus souples s'appliquent lorsque les tribunaux modifient l'interprétation donnée à des dispositions constitutionnelles (par. 88). L'établissement d'une période de transition, la suspension de la période d'invalidité et les mesures de redressement valables uniquement pour l'avenir font partie du cadre réparateur discrétionnaire établi par notre droit constitutionnel (par. 88-92; *R. c. Brydges*, [1990] 1 R.C.S. 190, p. 217-218; *R. c. Feeney*, [1997] 2 R.C.S. 117).

[94]   Dans le cas présent, il existe diverses raisons pour appliquer le cadre d'analyse selon le contexte et avec souplesse aux affaires déjà en cours, l'une étant qu'il ne serait pas juste de juger rigoureusement les participants au système de justice criminelle au regard de normes dont ils n'avaient pas connaissance. De plus, ce nouveau régime incite tant le ministère public que la défense à accélérer

prolonged delays are the norm, it will take time for these incentives to shift the culture. As well, the administration of justice cannot tolerate a recurrence of what transpired after the release of *Askov*, and this contextual application of the framework is intended to ensure that the post-*Askov* situation is not repeated.

[95]   The new framework, including the presumptive ceiling, applies to cases currently in the system, subject to two qualifications.

[96]   First, for cases in which the delay *exceeds* the ceiling, a transitional exceptional circumstance may arise where the charges were brought prior to the release of this decision. This transitional exceptional circumstance will apply when the Crown satisfies the court that the time the case has taken is justified based on the parties' reasonable reliance on the law as it previously existed. This requires a contextual assessment, sensitive to the manner in which the previous framework was applied, and the fact that the parties' behaviour cannot be judged strictly, against a standard of which they had no notice. For example, prejudice and the seriousness of the offence often played a decisive role in whether delay was unreasonable under the previous framework. For cases currently in the system, these considerations can therefore inform whether the parties' reliance on the previous state of the law was reasonable. Of course, if the parties have had time following the release of this decision to correct their behaviour, and the system has had some time to adapt, the trial judge should take this into account.

[97]   Moreover, the delay may exceed the ceiling because the case is of moderate complexity in a jurisdiction with significant institutional delay problems. Judges in jurisdictions plagued by lengthy, persistent, and notorious institutional delays should account for this reality, as Crown counsel's behaviour is constrained by systemic delay issues. Parliament, the legislatures, and Crown counsel need

le déroulement des affaires criminelles. Cependant, dans les ressorts où les longs délais sont la norme, il va falloir du temps avant que ces mesures d'incitation n'opèrent un changement de culture. En outre, l'administration de la justice ne saurait tolérer une répétition de ce qui s'est passé après le prononcé de l'arrêt *Askov*, et l'application contextuelle que nous proposons du cadre d'analyse vise à garantir qu'une telle situation ne se reproduira pas.

[95]   Le nouveau cadre d'analyse, y compris le plafond présumé, s'applique aux affaires déjà en cours, sujet à deux réserves.

[96]   Premièrement, dans les cas où le délai *excède* le plafond, une mesure transitoire exceptionnelle peut s'appliquer lorsque les accusations ont été portées avant le prononcé du présent jugement. C'est le cas lorsque le ministère public convainc la cour que le temps qui s'est écoulé est justifié du fait que les parties se sont raisonnablement conformées au droit tel qu'il existait au préalable. Cela suppose qu'il faille procéder à un examen contextuel, eu égard à la manière dont l'ancien cadre a été appliqué et au fait que la conduite des parties ne peut être jugée rigoureusement en fonction d'une norme dont ils n'avaient pas connaissance. Par exemple, le préjudice subi et la gravité de l'infraction ont souvent joué un rôle décisif dans la décision quant au caractère raisonnable du délai lorsqu'il s'est agi d'appliquer l'ancien cadre d'analyse. Pour les causes en cours d'instance, ces considérations peuvent donc aider à déterminer si les parties se sont raisonnablement fondées sur l'état antérieur du droit. Bien entendu, si, après le prononcé du présent jugement, les parties ont eu le temps de corriger leur conduite et le système a disposé d'un certain temps pour s'adapter, le juge du procès doit en tenir compte.

[97]   Par ailleurs, le délai peut excéder le plafond parce que la cause est moyennement complexe dans une région confrontée à des problèmes de délais institutionnels importants. Les juges qui œuvrent dans les juridictions où sévissent de longs délais institutionnels tenaces et connus doivent tenir compte de cette réalité, puisque les problèmes de délais systémiques limitent ce que peuvent faire

time to respond to this decision, and stays of proceedings cannot be granted *en masse* simply because problems with institutional delay currently exist. As we have said, the administration of justice cannot countenance a recurrence of *Askov*. This transitional exceptional circumstance recognizes that change takes time, and institutional delay — even if it is significant — will not automatically result in a stay of proceedings.

[98]   On the other hand, the s. 11(*b*) rights of all accused persons cannot be held in abeyance while the system works to respond to this new framework. Section 11(*b*) breaches will still be found and stays of proceedings will still be entered for cases currently in the system. For example, if the delay in a simple case vastly exceeds the ceiling because of repeated mistakes or missteps by the Crown, the delay might be unreasonable even though the parties were operating under the previous framework. The analysis must always be contextual. We rely on the good sense of trial judges to determine the reasonableness of the delay in the circumstances of each case.

[99]   The second qualification applies to cases currently in the system in which the total delay (minus defence delay) falls *below* the ceiling. For these cases, the two criteria — defence initiative and whether the time the case has taken markedly exceeds what was reasonably required — must also be applied contextually, sensitive to the parties' reliance on the previous state of the law. Specifically, the defence need not demonstrate having taken initiative to expedite matters for the period of delay preceding this decision. Since defence initiative was not expressly required by the *Morin* framework, it would be unfair to require it for the period of time before the release of this decision. However, in close cases, any defence initiative during that time

les avocats du ministère public. Ces derniers, le Parlement et les législatures ont besoin de temps pour réagir à la présente décision et des arrêts de procédures ne peuvent être accordés en bloc uniquement parce qu'il existe présentement des problèmes importants de délais institutionnels. Comme nous l'avons souligné, l'administration de la justice ne peut pas se permettre une répétition des conséquences qu'a eues la décision *Askov*. La mesure transitoire exceptionnelle dont il est question ici reconnaît qu'il faut du temps pour implanter des changements et que les délais institutionnels — même s'ils sont importants — ne donneront pas automatiquement lieu à des arrêts de procédures.

[98]   Les droits de tous les accusés protégés par l'al. 11*b*) ne peuvent pas pour autant être suspendus pendant que le système cherche à s'adapter au nouveau cadre d'analyse établi en l'espèce. Les tribunaux vont donc continuer à conclure à la violation des droits protégés par l'al. 11*b*) et des causes pendantes feront encore l'objet d'ordonnances d'arrêt des procédures. Par exemple, dans une cause simple, si le délai excède considérablement le plafond en raison d'erreurs et d'impairs répétés du ministère public, le délai pourrait être jugé déraisonnable même si les parties agissaient en fonction de l'ancien cadre d'analyse. L'examen doit toujours être contextuel. Nous nous fions au bon sens des juges de première instance pour juger du caractère raisonnable du délai dans les circonstances de chaque cas.

[99]   La deuxième réserve s'applique aux affaires déjà en cours pour lesquelles le délai total (moins celui imputable à la défense) est *inférieur* au plafond. Pour ces causes, les tribunaux doivent appliquer les deux critères — soit celui relatif à l'initiative dont a fait preuve la défense et celui de la question de savoir si le temps qu'a mis la cause pour être entendue a excédé de manière manifeste le temps qui était raisonnablement requis — en fonction du contexte et en étant sensible au fait que les parties se sont fiées à l'état du droit qui prévalait auparavant. Plus précisément, la défense n'a pas à démontrer qu'elle a pris des initiatives pour accélérer les choses au cours de la période qui a précédé le prononcé du présent jugement. Puisque de telles initiatives n'étaient pas

would assist the defence in showing that the delay markedly exceeds what was reasonably required. The trial judge must also still consider action or inaction by the accused that may be inconsistent with a desire for a timely trial (*Morin*, at p. 802).

expressément requises par le cadre d'analyse prévu dans *Morin*, il serait injuste d'exiger qu'elles aient été prises avant le prononcé de la présente décision. Cela dit, dans les causes où le décalage entre le délai écoulé et le délai raisonnable est ténu, toute mesure qu'aurait prise la défense durant ce temps l'aidera à démontrer que le délai excède de manière manifeste ce qui était raisonnablement nécessaire. Dans ce cas de figure, le juge du procès doit tout de même tenir compte de l'action ou de l'inaction de l'accusé qui peut être incompatible avec le désir que le procès soit tenu en temps opportun (*Morin*, p. 802).

[100]   Further, if the delay was occasioned by an institutional delay that was reasonably acceptable in the relevant jurisdiction under the *Morin* framework before this decision was released, that institutional delay will be a component of the reasonable time requirements of the case for cases currently in the system.

[100]   En outre, si le retard a été causé par un délai institutionnel raisonnablement acceptable dans le ressort en cause selon le cadre d'analyse prévu dans *Morin* qui prévalait avant le prononcé de la présente décision, ce retard institutionnel sera un des éléments du délai raisonnable nécessaire de la cause pour les affaires déjà en cours d'instance.

[101]   We note that given the level of institutional delay tolerated under the previous approach, a stay of proceedings below the ceiling will be even more difficult to obtain for cases currently in the system. We also emphasize that for cases in which the charge is brought shortly after the release of this decision, the reasonable time requirements of the case must reflect this high level of tolerance for institutional delay in particular localities.

[101]   Nous soulignons que, compte tenu du niveau de délai institutionnel toléré suivant l'approche qui prévalait antérieurement, un arrêt des procédures sera encore plus difficile à obtenir pour les causes en cours d'instance lorsque le délai est inférieur au plafond. Nous soulignons aussi que, dans les causes pour lesquelles l'accusé sera inculpé peu de temps après le prononcé du présent jugement, les exigences en matière de délai raisonnable devront refléter ce haut degré de tolérance pour les délais institutionnels dans certaines localités en particulier.

[102]   Ultimately, for most cases that are already in the system, the release of this decision should not automatically transform what would previously have been considered a reasonable delay into an unreasonable one. Change takes time. In his dissenting opinion in *Mills v. The Queen*, [1986] 1 S.C.R. 863, Lamer J. (as he then was) was alive to this concern and his comments are apposite here:

[102]   En définitive, pour la plupart des affaires en cours d'instance, le prononcé du présent jugement ne devrait pas transformer automatiquement en un délai déraisonnable ce qui aurait antérieurement été considéré comme un délai raisonnable. Il faut du temps pour changer les choses. En rédigeant ses motifs dissidents dans l'arrêt *Mills c. La Reine*, [1986] 1 R.C.S. 863, le juge Lamer (plus tard Juge en chef) était conscient de cette réalité et ses commentaires sont pertinents en l'espèce :

This case is the first to have presented this Court with the opportunity of establishing appropriate guidelines for the application of s. 11(*b*). The full scope of the section, and the nature of the obligation it has imposed upon the

Cette affaire est la première qui offre à la Cour l'occasion de donner des directives appropriées sur l'application de l'al. 11*b*). La portée exacte de l'alinéa et la nature de l'obligation qu'il impose au gouvernement et aux tribunaux

government and the courts has remained uncertain for the period prior to the rendering of this judgment.

Given this uncertainty and the terminative nature of the remedy for a violation of the section, i.e., a stay of proceedings, I am of the view that a transitional approach is appropriate, and indeed necessary, to enable the courts and the governments to properly discharge their burden under s. 11(*b*). This is not to say that different criteria ought to apply during the transitional period, that is, the period prior to the rendering of this judgment, but rather that the behaviour of the accused and the authorities must be evaluated in its proper context. In other words, it would be inaccurate to give effect to behaviour which occurred prior to this judgment against a standard the parameters of which were unknown to all. [Emphasis added; p. 948.]

[103]   We echo Lamer J.'s remarks. For cases already in the system, the presumptive ceiling still applies; however, "the behaviour of the accused and the authorities" — which is an important consideration in the new framework — "must be evaluated in its proper context" (*Mills*, at p. 948). The reasonableness of a period of time to prosecute a case takes its colour from the surrounding circumstances. Reliance on the law as it then stood is one such circumstance.

[104]   We disagree with Cromwell J. that our framework's allowance for present realities somehow creates a *Charter* amnesty. For cases currently in the system, the s. 11(*b*) right will receive no less protection than it does now. The point is that, on an ongoing basis, our framework has the potential to effect positive change within the justice system, rather than succumb to the culture of complacency we have described.

G.   *Concluding Comments on the New Framework*

[105]   The new framework for s. 11(*b*) can be summarized as follows:

demeuraient incertaines avant que le présent arrêt ne soit rendu.

Vu cette incertitude et la nature décisive de la réparation en cas d'infraction à l'alinéa, c.-à-d. une suspension d'instance, je suis d'avis qu'une période transitoire est utile et même s'impose pour permettre aux tribunaux et au gouvernement de s'acquitter correctement de leurs obligations en vertu de l'al. 11*b*. Cela ne veut pas dire que des critères différents devraient s'appliquer pendant la période de transition, c'est-à-dire la période antérieure au présent jugement, mais plutôt que le comportement de l'inculpé et des autorités doit être évalué dans son contexte particulier. En d'autres termes, il ne serait pas approprié de donner suite à un comportement adopté antérieurement à ce jugement par rapport à une norme dont les éléments étaient inconnus de tous. [Nous soulignons; p. 948.]

[103]   Nous faisons nôtres les observations du juge Lamer. Le plafond présumé continue de s'appliquer dans les affaires en cours d'instance; toutefois, « le comportement de l'inculpé et des autorités » — qui constitue une considération importante dans le nouveau cadre d'analyse — « doit être évalué dans son contexte particulier » (*Mills*, p. 948). Le caractère raisonnable du temps qu'il faut pour traduire un accusé en justice dépend des circonstances en cause. Le fait de s'être fondé sur l'état du droit qui était alors en vigueur constitue l'une de ces circonstances.

[104]   Nous ne partageons pas l'avis du juge Cromwell selon lequel, en tenant compte de la réalité actuelle, notre cadre d'analyse soustrait certaines causes à l'application de la *Charte*. Dans les affaires en cours d'instance, le droit protégé par l'al. 11*b* ne bénéficiera pas d'une protection moindre qu'à l'heure actuelle. En fait, notre cadre a le potentiel de constamment entraîner des changements positifs dans le système judiciaire, plutôt que de succomber à la culture de complaisance dont nous avons parlé.

G.   *Observations finales sur le nouveau cadre d'analyse*

[105]   Le nouveau cadre d'analyse applicable aux demandes fondées sur l'al. 11*b*) peut être résumé comme suit :

- There is a ceiling beyond which delay becomes presumptively unreasonable. The presumptive ceiling is 18 months for cases tried in the provincial court, and 30 months for cases in the superior court (or cases tried in the provincial court after a preliminary inquiry). Defence delay does not count towards the presumptive ceiling.

- **Once the presumptive ceiling is exceeded**, the burden shifts to the Crown to rebut the presumption of unreasonableness on the basis of exceptional circumstances. Exceptional circumstances lie outside the Crown's control in that (1) they are reasonably unforeseen or reasonably unavoidable, and (2) they cannot reasonably be remedied. If the exceptional circumstance relates to a discrete event, the delay reasonably attributable to that event is subtracted. If the exceptional circumstance arises from the case's complexity, the delay is reasonable.

- **Below the presumptive ceiling**, in clear cases, the defence may show that the delay is unreasonable. To do so, the defence must establish two things: (1) it took meaningful steps that demonstrate a sustained effort to expedite the proceedings; and (2) the case took markedly longer than it reasonably should have.

- **For cases currently in the system**, the framework must be applied flexibly and contextually, with due sensitivity to the parties' reliance on the previous state of the law.

[106]   As part of the process of developing this framework, we conducted a qualitative review of nearly every reported s. 11(*b*) appellate decision from the past 10 years, and many decisions from trial courts. These cases assisted in developing the definition of exceptional circumstances, as they

- Il existe un plafond au-delà duquel le délai est présumé déraisonnable. Ce plafond présumé est de 18 mois pour les affaires instruites devant une cour provinciale, et de 30 mois pour celles portées devant une cour supérieure (ou pour les affaires instruites devant une cour provinciale au terme d'une enquête préliminaire). Les délais imputables à la défense ne comptent pas dans le calcul visant à déterminer si ce plafond est atteint.

- **Une fois le plafond présumé dépassé**, le fardeau est inversé et le ministère public doit réfuter la présomption du caractère déraisonnable du délai en invoquant des circonstances exceptionnelles. Il doit s'agir de circonstances indépendantes de la volonté du ministère public, c'est-à-dire de circonstances (1) raisonnablement imprévues ou raisonnablement inévitables, et (2) auxquelles il ne peut pas être raisonnablement remédié. Si la circonstance exceptionnelle concerne un événement distinct, le délai attribuable à cet événement doit être soustrait du délai total. Si la circonstance exceptionnelle résulte de la complexité de l'affaire, le délai est raisonnable.

- **Lorsque le délai est inférieur au plafond présumé**, la défense, dans des cas manifestes, peut faire la preuve que le délai est déraisonnable. Pour ce faire, elle doit démontrer deux choses : (1) qu'elle a pris des mesures utiles qui font la preuve d'un effort soutenu pour accélérer l'instance, et (2) que le délai a été nettement plus long qu'il aurait dû raisonnablement l'être.

- **Pour les affaires en cours d'instance**, le tribunal doit appliquer le cadre d'analyse selon le contexte et avec souplesse, tout en étant sensible au fait que les parties se sont fiées à l'état du droit qui prévalait auparavant.

[106]   Pour élaborer ce cadre d'analyse, nous avons procédé à un examen qualitatif de pratiquement tous les arrêts publiés portant sur l'al. 11*b*) rendus en appel au cours des 10 dernières années de même que de nombreux jugements de première instance. Les décisions en question ont aidé à définir

highlighted the types of circumstances that judges have found to justify prolonged delays. By reading these cases with the new framework in mind, we were able to get a rough sense of how the new framework would have played out in some past cases. Indeed, we note that in the seminal case of *Askov*, the delay was in the range of 30 months, as it was in *Godin* some 19 years later, and in both cases, this Court found the delays to be unreasonable.

[107]    It is also clear from this case law review that the ceiling will not permit the parties or the courts to operate business as usual. The ceiling is designed to encourage conduct and the allocation of resources that promote timely trials. The jurisprudence from the past decade demonstrates that the current approach to s. 11(*b*) does not encourage good behaviour. Finger pointing is more common than problem solving. This body of decisions makes it clear that the incentives inherent in the status quo fall short in the ways we have described.

[108]    We acknowledge that this new framework represents a significant shift from past practice. First, its standpoint is prospective. Participants in the criminal justice system will know, *in advance*, the bounds of reasonableness so proactive measures can be taken to remedy any delay. And the public will more clearly understand what it means to hold a trial within a reasonable time. Enhanced clarity and predictability befits a *Charter* right of such fundamental importance to our criminal justice system.

[109]    Second, the new framework resolves the difficulties surrounding the concept of prejudice. Instead of being an express analytical factor, the concept of prejudice underpins the entire framework. Prejudice is accounted for in the creation of the ceiling. It also has a strong relationship with defence

ce qui constitue des circonstances exceptionnelles, puisqu'elles mettent en lumière les types de circonstances que les juges ont estimé justifier de longs délais. En lisant ces décisions avec le nouveau cadre d'analyse à l'esprit, nous sommes en mesure d'avoir une idée générale de la façon dont ce cadre se serait appliqué dans certaines affaires passées. D'ailleurs, nous soulignons que dans l'arrêt de principe *Askov*, le délai était de l'ordre de 30 mois, tout comme dans l'affaire *Godin* quelque 19 ans plus tard, et que, dans les deux cas, la Cour a jugé le délai déraisonnable.

[107]    Il ressort aussi clairement de cet examen de la jurisprudence qu'avec le plafond, les parties ne pourront pas continuer à agir comme elles avaient l'habitude de le faire. En effet, il est conçu pour encourager une conduite et une répartition des ressources qui mèneront à la tenue de procès en temps utile. La jurisprudence de la dernière décennie illustre que la manière dont l'al. 11*b*) est appliqué présentement n'encourage pas les bons comportements. En effet, il est plus fréquent de jeter le blâme que de résoudre les problèmes. Bref, selon cette jurisprudence, et pour les raisons que nous avons exposées, les mesures incitatives actuelles pour réduire la durée des procédures judiciaires sont manifestement insuffisantes.

[108]    Certes, le nouveau cadre d'analyse que nous prescrivons ici représente un virage important par rapport à la pratique antérieure. Premièrement, le point de vue adopté est prospectif. Les participants au système de justice criminelle connaîtront, *à l'avance*, les limites du délai raisonnable et pourront donc prendre des mesures proactives pour remédier aux délais. Par ailleurs, le public comprendra mieux ce que signifie le fait de tenir un procès dans un délai raisonnable. Une clarté et une prévisibilité accrues cadrent bien avec un droit protégé par la *Charte* qui revêt une telle importance pour notre système de justice criminelle.

[109]    Deuxièmement, le nouveau cadre d'analyse résout les difficultés relatives au concept de préjudice. Plutôt que d'être un facteur analytique en tant que tel, le concept de préjudice sous-tend l'ensemble du cadre. En effet, il en a été tenu compte dans l'établissement du plafond. Ce préjudice a également

initiative, in that we can expect accused persons who are truly prejudiced to be proactive in moving the matter along.

[110]    Prejudice has been one of the most fraught areas of s. 11(*b*) jurisprudence for over two decades. Understanding prejudice as informing the setting of the ceiling, rather than treating prejudice as an express analytical factor, also better recognizes that, as we have said, prolonged delays cause prejudice to not just specific accused persons, but also victims, witnesses, and the system of justice as a whole.

[111]    Third, the new framework reduces, although does not eliminate, the need to engage in complicated micro-counting. While judges will still have to determine defence delay, the inquiry beneath the ceiling into whether the case took markedly longer than it reasonably should have replaces the micro-counting process with a global assessment. This inquiry need only arise if the accused has taken meaningful and sustained steps to expedite matters. And above the ceiling, a s. 11(*b*) analysis is triggered only where the Crown seeks to rely on exceptional circumstances. A framework that is simpler to apply is itself of value: ". . . we must remind ourselves that the best test will be relatively easy to apply; otherwise, stay applications themselves will contribute to the already heavy load on trial judges and compound the problem of delay" (*Morin*, per McLachlin J., at p. 810).

[112]    In addition, the new framework will help facilitate a much-needed shift in culture. In creating incentives for both sides, it seeks to enhance accountability by fostering proactive, preventative problem solving. From the Crown's perspective, the framework clarifies the content of the Crown's ever-present constitutional obligation to bring the accused to trial within a reasonable time. Above the

un lien étroit avec l'initiative dont fait preuve la défense, dans la mesure où nous pouvons nous attendre à ce que les personnes accusées qui subissent réellement un préjudice soient proactives pour faire avancer leur dossier.

[110]    Le traitement du préjudice est le domaine de la jurisprudence relative à l'al. 11*b*) qui a créé le plus de dissension depuis deux décennies. Traiter le préjudice comme un élément contribuant à l'établissement du plafond, plutôt que comme un facteur d'analyse, reflète également mieux, comme nous l'avons dit, le fait que les délais prolongés causent un préjudice non seulement aux accusés, mais également aux victimes, aux témoins et au système de justice dans son ensemble.

[111]    Troisièmement, le nouveau cadre d'analyse atténue, sans toutefois l'éliminer, la nécessité d'un microcalcul complexe. Même si les juges ont tout de même à déterminer le délai attribuable à la défense, l'analyse d'un délai qui se situe en deçà du plafond — pour déterminer si la cause a pris de manière manifeste plus de temps qu'il aurait été raisonnable qu'elle prenne — remplace la méthode du microcalcul par une évaluation globale. Cet examen n'est par ailleurs nécessaire que si l'accusé a pris des mesures utiles et soutenues pour accélérer les choses. Par contre, lorsque le plafond est dépassé, une analyse fondée sur l'al. 11*b*) n'est déclenchée que lorsque le ministère public entend invoquer des circonstances exceptionnelles. Un cadre d'analyse plus simple à appliquer a une valeur en soi : « . . . il faut se rappeler que le meilleur critère sera relativement facile à appliquer; autrement, les demandes d'arrêt des procédures s'ajouteront aux nombreuses affaires dont les juges des procès sont déjà saisis et aggraveront le problème des délais » (*Morin*, la juge McLachlin, p. 810).

[112]    En outre, le nouveau cadre d'analyse contribuera à faciliter un changement de culture dont on a grand besoin. En établissant des mesures propres à inciter les deux parties à accélérer le déroulement de l'instance, ce cadre vise à accroître la responsabilisation en favorisant une approche proactive et préventive de résolution de problèmes. Du point de vue du ministère public, le cadre d'analyse en question

R. *v.* JORDAN   *Moldaver J. et al.*

ceiling, the Crown will only be able to discharge its burden if it can show that it should not be held accountable for the circumstances which caused the ceiling to be breached because they were genuinely outside its control. Crown counsel will be motivated to act proactively throughout the proceedings to preserve its ability to justify a delay that exceeds the ceiling, should the need arise. Below the ceiling, a diligent, proactive Crown will be a strong indication that the case did not take markedly longer than reasonably necessary.

clarifie l'obligation constitutionnelle qu'il a toujours eue de traduire l'accusé en justice dans un délai raisonnable. Lorsque le plafond est dépassé, le ministère public ne se sera acquitté de son fardeau de preuve que s'il est en mesure de démontrer qu'il ne devrait pas être tenu responsable des circonstances ayant mené au dépassement du plafond, puisqu'elles étaient véritablement indépendantes de sa volonté. L'avocat du ministère public sera motivé à agir de façon proactive tout au long de la procédure pour rester en mesure, au besoin, de justifier un délai qui excède le plafond applicable. En deçà du plafond, la présence au dossier d'un représentant du ministère public diligent et proactif est une indication forte que la cause n'a pas pris plus longtemps de manière manifeste que ce qu'il était raisonnable qu'elle prenne.

[113]   The new framework also encourages the defence to be part of the solution. If an accused brings a s. 11(*b*) application when the total delay (minus defence delay and delay attributable to exceptional circumstances that are discrete in nature) falls below the ceiling, the defence must demonstrate that it took meaningful and sustained steps to expedite the proceedings as a prerequisite to a stay. Further, the deduction of defence delay from total delay as a starting point in the analysis clearly indicates that the defence cannot benefit from its own delay-causing action or inaction.

[113]   Le nouveau cadre d'analyse encourage également la défense à contribuer à la résolution du problème. Si l'accusé présente une demande fondée sur l'al. 11*b*) avant que le délai total — moins les retards qui lui sont imputables et ceux attribuables à des circonstances exceptionnelles distinctes — ne dépasse le plafond, pour obtenir un arrêt des procédures, la défense doit démontrer qu'elle a pris des mesures utiles et soutenues pour accélérer le cours de l'instance. De plus, la déduction des retards attribuables à la défense comme point de départ de l'analyse indique clairement qu'elle ne peut tirer avantage de sa propre action ou de sa propre inaction lorsque celle-ci a pour effet de causer un délai.

[114]   The new framework makes courts more accountable, too. Absent exceptional circumstances, the ceiling limits the extent to which judges can tolerate delays before a stay must be imposed. Indeed, courts are important players in changing courtroom culture. Many courts have developed robust case management and trial scheduling processes, focussing attention on possible sources of delay (such as pre-trial applications or unrealistic estimates of trial length) and thereby seeking to avoid or minimize unnecessary delay. Some courts, however, have not.

[114]   Le nouveau cadre d'analyse responsabilise aussi davantage les tribunaux. En l'absence de circonstances exceptionnelles, le plafond applicable maximal fixé établit une limite en ce qui a trait à la mesure dans laquelle les juges peuvent tolérer des délais avant de devoir ordonner un arrêt des procédures. En effet, les tribunaux jouent un rôle important pour changer la culture en salle d'audience. Ils sont nombreux à avoir établi des procédures solides de gestion d'instance et de planification des audiences, en portant une attention particulière aux sources potentielles de délai (comme les requêtes préalables au procès ou les estimations irréalistes de la durée de procès), tentant ainsi d'éviter ou d'atténuer les délais inutiles. Certains tribunaux, toutefois, ne l'ont pas fait.

[115]    As we have said, this Court also has a role to play. On many occasions, this Court has established detailed guidelines and minimum requirements to give meaningful content to constitutional rights in the criminal law context (see, e.g., *R. v. Fearon*, 2014 SCC 77, [2014] 3 S.C.R. 621, at para. 83; *Lavallee, Rackel & Heintz v. Canada (Attorney General)*, 2002 SCC 61, [2002] 3 S.C.R. 209, at para. 49; *Canada (Attorney General) v. Federation of Law Societies of Canada*, 2015 SCC 7, [2015] 1 S.C.R. 401, at paras. 53-56). Section 11(*b*) has received its content in much the same way. Cromwell J.'s framework, like ours, and like *Morin* and *Askov*, is entirely judicially created. And, like ours, and like *Morin* and *Askov*, it relies heavily on numerical guidelines (with such guidelines acting as guideposts, not absolute limitation periods). Our approach is entirely consistent with the judicial role.

[116]    Ultimately, all participants in the justice system must work in concert to achieve speedier trials. After all, everyone stands to benefit from these efforts. As Sharpe J.A. wrote in *R. v. Omar*, 2007 ONCA 117, 84 O.R. (3d) 493:

The judicial system, like all other public institutions, has limited resources at its disposal, as do the litigants and legal aid. . . . It is in the interest of all constituencies — those accused of crimes, the police, Crown counsel, defence counsel, and judges both at trial and on appeal — to make the most of the limited resources at our disposal. [para. 32]

[117]    Sharpe J.A.'s reference to finite resources is an important point. We are aware that resource issues are rarely far below the surface of most s. 11(*b*) applications. By encouraging all justice system participants to be more proactive, some resource issues will naturally be resolved because parties will be encouraged to eliminate or avoid inefficient practices. At the same time, the new framework implicates the sufficiency of resources by reminding legislators and ministers that unreasonable delay in bringing

[115]    Comme nous l'avons déjà dit, la Cour a aussi un rôle à jouer. Elle a maintes fois établi des lignes directrices détaillées et des exigences minimales pour donner un contenu véritable aux droits constitutionnels en matière criminelle (voir, p. ex., *R. c. Fearon*, 2014 CSC 77, [2014] 3 R.C.S. 621, par. 83; *Lavallee, Rackel & Heintz c. Canada (Procureur général)*, 2002 CSC 61, [2002] 3 R.C.S. 209, par. 49; *Canada (Procureur général) c. Fédération des ordres professionnels de juristes du Canada*, 2015 CSC 7, [2015] 1 R.C.S. 401, par. 53-56). L'alinéa 11*b*) a reçu son contenu essentiellement de la même façon. Le cadre d'analyse proposé par le juge Cromwell, tout comme le nôtre et ceux des arrêts *Morin* et *Askov*, est d'origine purement judiciaire. En outre, à l'instar du nôtre et de ceux des arrêts *Morin* et *Askov*, le cadre qu'il propose s'appuie en grande partie sur des lignes directrices numériques — qui servent de points de repère et non de délais de prescription absolus. Notre approche est donc tout à fait conforme à la fonction judiciaire.

[116]    En fin de compte, tous les participants au système de justice doivent travailler de concert pour accélérer le déroulement des procès. Après tout, c'est l'ensemble de la société qui bénéficiera de ces efforts. Comme l'a écrit le juge Sharpe dans *R. c. Omar*, 2007 ONCA 117, 84 O.R. (3d) 493 :

[TRADUCTION] Comme toutes les autres institutions publiques, le système judiciaire dispose de ressources limitées, et il en va de même pour les plaideurs et l'aide juridique. [. . .] Il est dans l'intérêt de tous les groupes concernés — les personnes accusées d'un crime, la police, l'avocat du ministère public, l'avocat de la défense et les juges de première instance et d'appel — de tirer le plus grand parti possible des ressources limitées dont dispose le système judiciaire. [par. 32]

[117]    Les ressources limitées dont parle le juge Sharpe constituent un enjeu important. Nous savons que, dans la plupart des demandes fondées sur l'al. 11*b*), on a rarement à gratter longtemps pour voir apparaître la question des ressources. En encourageant tous les participants au système de justice à se montrer plus proactifs, certaines questions relatives aux ressources se régleront de manière naturelle, parce que les parties seront encouragées à éliminer ou à éviter les pratiques inefficaces. Le

accused persons to trial is not merely contrary to the public interest: it is constitutionally impermissible, and will be treated as such.

## VI.   Application to This Case

[118]   Having established the new framework for s. 11(*b*), we now turn to the case before us.

[119]   The first step in determining whether Mr. Jordan's s. 11(*b*) right was infringed is to determine the total delay between the charges and the end of trial. In this case, the total delay was 49.5 months.

[120]   Turning to the first case-specific factor that must be accounted for, the next step is to determine whether any of that delay was waived or caused solely by the defence. We see no reason to interfere with the trial judge's finding that four months of this delay were waived by Mr. Jordan when he changed counsel shortly before the trial was set to begin, necessitating an adjournment.

[121]   The more difficult assessment is whether any of the remaining delay was caused solely by the action or inaction of the defence. The Crown argues that the trial judge erred by failing to attribute significant periods of delay to the defence, and that the defence was equally culpable in the delay in bringing this matter to trial. The Crown cited several examples: the defence consented to numerous adjournments; defence counsel initially suggested the four-day estimate for the preliminary inquiry; defence counsel's unavailability resulted in the preliminary inquiry not being completed as scheduled in December 2010; defence counsel failed to respond to the Crown's offer in July 2011 of an earlier trial; and there was no evidence that defence

nouveau cadre d'analyse fait par ailleurs intervenir la suffisance des ressources en rappelant aux législateurs et aux ministres que le fait de tarder déraisonnablement à traduire un accusé en justice est non seulement contraire à l'intérêt public, mais aussi inacceptable sur le plan constitutionnel, et qu'il sera considéré comme tel.

## VI.   Application en l'espèce

[118]   Ayant établi le nouveau cadre d'analyse applicable aux demandes fondées sur l'al. 11*b*), nous nous pencherons maintenant sur l'affaire dont nous sommes saisis.

[119]   La première étape en vue de déterminer s'il y a eu atteinte au droit que garantit l'al. 11*b*) à M. Jordan consiste à calculer le délai total qui s'est écoulé entre le dépôt des accusations et la fin du procès. En l'espèce, il s'agit de 49 mois et demi.

[120]   Nous penchant maintenant sur le premier facteur propre à l'espèce dont il faut tenir compte, l'étape suivante consiste à établir si la défense a renoncé à invoquer certaines périodes ou si certains retards lui sont exclusivement attribuables. Nous ne voyons aucune raison de modifier la conclusion du juge de première instance selon laquelle M. Jordan a renoncé à invoquer une période de quatre mois lorsqu'il a changé d'avocat peu de temps avant le début du procès, ce qui a nécessité un ajournement.

[121]   La tâche la plus difficile consiste à déterminer si une partie du délai restant résulte exclusivement de l'action ou de l'inaction de la défense. Le ministère public soutient que le juge de première instance a commis une erreur en omettant d'attribuer certains longs délais à la défense, et que cette dernière a sa part de responsabilité quant au temps qu'il a fallu pour que son dossier soit porté devant les tribunaux. Le ministère public a cité plusieurs exemples : la défense a consenti à de nombreux ajournements; l'avocat de la défense a, au départ, estimé à quatre jours la durée de l'enquête préliminaire; vu la non-disponibilité de l'avocat de la défense, l'enquête préliminaire n'a pas pu se terminer comme prévu en décembre 2010; l'avocat de

counsel would have been available for trial earlier than June 2012.

[122]    While these instances that the Crown points to are symptomatic of the systemic complacency towards delay that we have described, most of them are not attributable solely to the defence. The Crown and defence both share responsibility for the preliminary inquiry underestimation. Similarly, responsibility for the delay resulting from consent adjournments and the defence's failure to respond to the Crown's offer of a shorter trial time in July 2011 should not be borne solely by the defence. These adjournments were part of the legitimate procedural requirements of the case, and it does not appear from the record that any occurred when the Crown and court were otherwise ready to proceed. Further, there was no evidence that, had the defence responded to the Crown's offer of an earlier trial, the Crown and the court would have been able to accommodate an earlier date. Rather, the only evidence before the trial judge was that the earliest available trial dates were in September 2012.

[123]    The defence should, however, bear responsibility for the delay resulting from the adjournment of the preliminary inquiry necessitated by defence counsel's unavailability for closing submissions on December 22, 2010, the last day scheduled for the preliminary inquiry. We would only attribute one and a half months of that delay to the defence, however, given the evidence that Crown counsel was unable to attend at the first available continuation date for the preliminary inquiry of February 3, 2011.

[124]    In total then, four months of delay were waived by the defence and one and a half months of

la défense n'a pas répondu à l'offre que lui a faite le ministère public, en juillet 2011, de tenir le procès plus tôt; rien dans la preuve n'indique que l'avocat de la défense aurait été disponible pour le procès avant juin 2012.

[122]    Bien que les exemples cités par le ministère public soient symptomatiques de la complaisance systémique que nous avons décrite, la plupart des délais qui en ont découlé ne sont pas uniquement attribuables à la défense. Le ministère public et la défense se partagent la responsabilité quant au fait d'avoir sous-estimé la durée de l'enquête préliminaire. De même, la responsabilité découlant du retard attribuable aux ajournements sur consentement et du fait que la défense n'a pas répondu à l'offre faite par le ministère public en juillet 2011 de tenir le procès plus tôt ne devrait pas être assumée uniquement par la défense. Ces ajournements faisaient partie des exigences procédurales légitimes de l'affaire, et il ne ressort pas du dossier qu'un ajournement a été ordonné alors que le ministère public et le tribunal étaient par ailleurs prêts à procéder. De plus, rien dans la preuve n'indique que, si la défense avait répondu à l'offre de tenir le procès plus tôt faite par le ministère public, ce dernier et le tribunal auraient été en mesure de s'accommoder d'une date d'instruction plus rapprochée. Au contraire, les seuls éléments de preuve dont disposait le juge de première instance indiquaient que les dates d'instruction les plus rapprochées étaient celles proposées en septembre 2012.

[123]    Cela dit, la défense devrait assumer une part de responsabilité pour le délai qui a résulté de l'ajournement de l'enquête préliminaire ordonné parce que son avocat n'était pas disponible pour présenter ses observations finales le 22 décembre 2010, soit la dernière journée prévue pour l'enquête préliminaire. Nous sommes cependant d'avis d'attribuer seulement un mois et demi de ce retard à la défense puisque, selon la preuve, l'avocat du ministère public ne pouvait pas se présenter à la première date disponible pour la reprise de l'enquête préliminaire, soit le 3 février 2011.

[124]    Au total, la défense a donc renoncé à invoquer une période de quatre mois, et un mois et

delay were caused solely by the defence. This leaves a remaining delay of 44 months, an amount that vastly exceeds the presumptive ceiling of 30 months in the superior court. The burden is therefore on the Crown to demonstrate that the delay is reasonable in light of exceptional circumstances.

[125]    There is nothing in the record to indicate that any discrete, exceptional circumstances arose. And although particularly complex cases may present an exceptional circumstance, this is not one of those cases. In terms of the legal issues, while Mr. Jordan was initially charged along with nine other co-accused, this number quickly dropped as the case progressed. At the time of trial, only one co-accused remained on the indictment with Mr. Jordan. Further, none of the alleged offences involved novel or complex points of law. Relatively few pre-trial applications were scheduled. In short, the legal issues in Mr. Jordan's case were not particularly complex.

[126]    As for the evidence, it was substantial but it was relatively straightforward. It consisted of surveillance evidence by police officers, undercover buys by police officers, a small amount of expert evidence regarding how dial-a-dope operations are conducted, and a search warrant for Mr. Jordan's apartment. There was nothing particularly complex about this evidence.

[127]    In the end, while the case against Mr. Jordan may have been moderately complex given the amount of evidence and the number of co-accused, it was not so exceptionally complex that it would justify a delay of 44 months (excluding defence delay).

[128]    However, since Mr. Jordan's charges were brought prior to the release of this decision, we must also consider whether the transitional exceptional circumstance justifies the delay. In our view, it does not. We recognize that the Crown was operating without notice of this change in the law within

demi de retard lui est exclusivement attribuable. Il reste donc un délai de 44 mois, soit un délai qui excède considérablement le plafond présumé de 30 mois pour les affaires instruites devant une cour supérieure. Il appartient donc au ministère public de démontrer que ce délai a été raisonnable, compte tenu de circonstances exceptionnelles.

[125]    Rien dans le dossier n'indique que soient survenues des circonstances uniques ou exceptionnelles. En outre, même si le caractère particulièrement complexe de certaines causes peut constituer une circonstance particulière, la présente cause n'en est pas une qui ait ce caractère. En ce qui a trait aux questions juridiques, même si M. Jordan a été accusé à l'origine conjointement avec neuf coaccusés, ce nombre a rapidement diminué au fur et à mesure que le dossier progressait. Au moment du procès, il ne restait sur la dénonciation qu'un seul coaccusé avec M. Jordan. De plus, aucune des infractions reprochées ne soulevait de points de droit nouveaux ou complexes. Relativement peu de requêtes avant procès ont été fixées pour audition. Bref, les questions de droit soulevées dans le dossier de M. Jordan n'étaient pas particulièrement complexes.

[126]    Quant à la preuve, elle était volumineuse, mais relativement simple. Il s'agissait d'une preuve de surveillance policière, d'achats clandestins effectués par des policiers, d'une courte preuve d'expert sur la façon dont les opérations de ventes de drogues sur appel sont menées et d'un mandat de perquisition visant l'appartement de M. Jordan. Cette preuve n'avait rien de particulièrement complexe.

[127]    En définitive, si le dossier opposé à M. Jordan a pu être moyennement complexe compte tenu de la somme d'éléments de preuve et du nombre de coaccusés, il n'était pas exceptionnellement complexe au point de justifier un délai de 44 mois (excluant le délai attribuable à la défense).

[128]    Cela dit, puisque les accusations contre M. Jordan ont été portées avant le prononcé de la présente décision, nous devons également déterminer si les circonstances sont telles qu'il est justifié d'appliquer une mesure transitoire exceptionnelle dans le cadre de l'examen du délai. À notre avis, ce

a jurisdiction with some systemic delay issues. But a total delay of 44 months (excluding defence delay), of which the vast majority was either Crown or institutional delay, in an ordinary dial-a-dope trafficking prosecution is simply unreasonable regardless of the framework under which the Crown was operating. Therefore, it cannot be said that the Crown's reliance on the previous state of the law was reasonable.

[129]   We note that a good portion of the delay resulted from the inaccurate assessment of the time required for the preliminary inquiry, and in particular, the Crown's failure to communicate with the parties with a view to tying down the evidence that it needed to call at the preliminary inquiry. A similar problem occurred with the trial. While the fault for the delay in bringing this matter to trial certainly did not lie solely with Crown counsel, it is equally clear that the Crown prosecutors assigned to the case did not have a solid plan for bringing the matter to trial within a reasonable time. The Crown was aware of potential s. 11(*b*) issues as early as December 2010, yet it took few steps to expedite the matter. Instead, the Crown was content to rely on an overly large estimate of trial time without attempting to streamline the issues or consider severing the co-accused from the indictment.

[130]   The Crown did make a good faith effort to bring the matter to trial more quickly in light of the s. 11(*b*) issue when Crown counsel wrote to defence counsel in July 2011 with a revised estimate of the length of the Crown's case. But by this point, approximately 31 months had already elapsed from the date of Mr. Jordan's charges. This is a substantial length of time to wait before making efforts to expedite the matter. At this point, the scheduled trial was still more than a year away.

n'est pas le cas. Certes, le ministère public agissait sans connaissance de ce changement du droit et dans un ressort aux prises avec certains problèmes de retard systémique. Un total de 44 mois (excluant le délai attribuable à la défense) dont la majeure partie était imputable au ministère public ou d'ordre institutionnel pour une poursuite ordinaire pour vente de drogue sur appel est néanmoins tout simplement déraisonnable, quel qu'ait été le cadre d'analyse suivant lequel agissait le ministère public. On ne peut donc affirmer que le ministère public s'est fié d'une manière qui soit raisonnable à l'état du droit qui prévalait auparavant.

[129]   Notons qu'une part importante du délai a découlé de la mauvaise évaluation du temps nécessaire pour procéder à l'enquête préliminaire, et notamment, de l'omission par le ministère public de communiquer avec les parties afin de préciser quelle preuve il devait produire durant cette enquête préliminaire. Un problème similaire s'est posé quant au procès. S'il est vrai que le temps qu'il a fallu pour amener le présent dossier à procès n'est pas uniquement attribuable à l'avocat du ministère public, il est tout aussi manifeste que les procureurs de ce dernier assignés au dossier n'avaient pas de stratégie solide pour que le procès se tienne dans un délai raisonnable. Le ministère public savait, dès décembre 2010, que des questions fondées sur l'al. 11*b*) étaient susceptibles d'être soulevées. Or, il n'a pris que peu de mesures pour accélérer le processus. Il s'est plutôt contenté de s'appuyer sur une estimation exagérée de la durée du procès sans tenter de simplifier les questions en litige ou d'examiner la possibilité de dissocier le coaccusé de l'acte d'accusation.

[130]   Le ministère public a bel et bien fait un effort de bonne foi pour accélérer la tenue du procès, vu la question de l'al. 11*b*), lorsque sa représentante a écrit à l'avocat de la défense en juillet 2011 pour lui faire part d'un estimé révisé de la durée de la présentation de sa preuve. À ce moment, il s'était toutefois déjà écoulé environ 31 mois depuis le dépôt des accusations contre M. Jordan, soit une période considérable avant de faire des efforts pour accélérer les choses, d'autant plus que, à ce point, il restait encore un an avant la date prévue du procès.

[131]    While the Crown did make some efforts to bring the matter to trial more quickly, these efforts were too little and too late. The previous state of the law cannot reasonably support the Crown's conduct. And the systemic delay problems that existed in the Surrey Provincial Court at the time cannot justify the delay either. As discussed, much of the institutional delay could have been avoided had the Crown proceeded on the basis of a more reasonable plan.

[132]    To the extent that the trial judge held that this delay was reasonable under the *Morin* framework, he erred. Citing the Court of Appeal's decision in *R. v. Ghavami*, 2010 BCCA 126, 253 C.C.C. (3d) 74, at para. 52, he incorrectly held that institutional delay is entitled to less weight than delay within the Crown's control. The parties agree that this was in error.

[133]    It follows that the delay was unreasonable and Mr. Jordan's s. 11(*b*) right was infringed.

VII.  <u>Conclusion</u>

[134]    The right to a trial within a reasonable time has aptly been described as "discipline for the justice system", in that it may cause "discomfort in the short term but [it will bring] achievement in the long term" (Code, at pp. 133-34).

[135]    In this case, the system was undisciplined. It failed. Mr. Jordan's s. 11(*b*) right was breached when it took 49.5 months to bring him to trial. All the parties were operating within the culture of complacency towards delay that has pervaded the criminal justice system in recent years. There is simply no reasonable explanation for why the matter took as long as it did. The appeal must be allowed, the convictions set aside and a stay of proceedings entered.

[131]    Même si le ministère public a fait certains efforts pour que le procès se tienne plus rapidement, c'était trop peu trop tard et l'état antérieur du droit ne peut pas raisonnablement justifier sa conduite. Les problèmes de retard systémique que connaissait la Cour provinciale au palais de justice de Surrey à l'époque ne sauraient non plus justifier le délai. Rappelons que le délai institutionnel aurait pu être évité en bonne partie si le ministère public avait procédé sur la base d'un plan plus raisonnable.

[132]    Le juge du procès a commis une erreur en concluant que, en l'espèce, le délai était raisonnable suivant le cadre établi dans *Morin*. Citant l'arrêt de la Cour d'appel *R. c. Ghavami*, 2010 BCCA 126, 253 C.C.C. (3d) 74, par. 52, il a conclu à tort que le délai institutionnel a moins d'importance que celui dont est responsable le ministère public. Les parties s'entendent pour dire qu'il s'agissait là d'une erreur.

[133]    Le délai écoulé était donc déraisonnable et le droit de M. Jordan protégé par l'al. 11*b*) a été violé.

VII.  <u>Conclusion</u>

[134]    Le droit d'être jugé dans un délai raisonnable a été décrit avec justesse comme représentant une forme de [TRADUCTION] « discipline pour le système judiciaire », en ce sens que cette discipline peut occasionner « certains désagréments à court terme, mais [qu'elle donnera] des résultats à long terme » (Code, p. 133-134).

[135]    En l'espèce, le système de justice a manqué de discipline. Il a échoué. Le fait qu'il a fallu 49 mois et demi pour que M. Jordan se rende à procès constitue une atteinte au droit que lui garantit l'al. 11*b*). Toutes les parties travaillaient dans une culture de complaisance à l'égard des délais qui s'est répandue dans le système de justice criminelle ces dernières années. Il n'existe tout simplement aucune explication raisonnable pour justifier un aussi long délai en l'espèce. L'appel doit être accueilli, les déclarations de culpabilité être annulées et un arrêt des procédures être ordonné.

[136]   We agree with Cromwell J. that our differences of opinion are indeed fundamental. In our view, given the considerable doctrinal and practical problems confronting the *Morin* approach, further minor refinements to the model are incapable of responding to the challenges facing timely justice in this country.

[137]   Real change will require the efforts and coordination of all participants in the criminal justice system.[5]

[138]   For Crown counsel, this means making reasonable and responsible decisions regarding who to prosecute and for what, delivering on their disclosure obligations promptly with the cooperation of police, creating plans for complex prosecutions, and using court time efficiently. It may also require enhanced Crown discretion for resolving individual cases. For defence counsel, this means actively advancing their clients' right to a trial within a reasonable time, collaborating with Crown counsel when appropriate and, like Crown counsel, using court time efficiently. Both parties should focus on making reasonable admissions, streamlining the evidence, and anticipating issues that need to be resolved in advance.

[139]   For the courts, this means implementing more efficient procedures, including scheduling practices. Trial courts may wish to review their case management regimes to ensure that they provide the tools for parties to collaborate and conduct cases efficiently. Trial judges should make reasonable efforts to control and manage the conduct of trials. Appellate courts must support these efforts by affording deference to case management choices made by courts below. All courts, including this

[136]   Nous convenons avec le juge Cromwell que nos divergences d'opinions sont fondamentales. À notre avis, compte tenu du grand nombre de problèmes sur les plans tant théorique que pratique auxquels se bute l'approche préconisée par l'arrêt *Morin*, apporter des ajustements mineurs supplémentaires à ce modèle ne saurait permettre de relever les défis auxquels on fait face dans l'ensemble du pays lorsqu'il s'agit de rendre justice en temps utile.

[137]   Un changement réel nécessitera que tous les participants au système de justice criminelle fassent des efforts et se coordonnent[5].

[138]   Pour l'avocat du ministère public, cela signifie qu'il devra prendre des décisions raisonnables et responsables lorsqu'il s'agira de déterminer qui — et pour quelle infraction — poursuivre, de s'acquitter de ses obligations de communication de la preuve rapidement en collaboration avec la police, d'établir des plans pour les poursuites complexes et d'utiliser de façon efficace le temps du tribunal. Il pourrait aussi être nécessaire que le ministère public dispose d'un pouvoir discrétionnaire accru pour qu'il puisse résoudre certains cas particuliers. L'avocat de la défense, pour sa part, devra faire valoir activement les droits de son client à un procès tenu dans un délai raisonnable, collaborer avec l'avocat du ministère public lorsque cela sera indiqué et, tout comme ce dernier, utiliser de façon efficace le temps du tribunal. Les deux parties devront être soucieuses de faire des admissions raisonnables, de simplifier la preuve et d'anticiper les questions devant être tranchées à l'avance.

[139]   Pour leur part, les tribunaux devront mettre en œuvre des procédures plus efficaces, notamment des pratiques d'établissement de calendriers pour les procès. Les tribunaux de première instance souhaiteront peut-être revoir leurs régimes de gestion des instances pour s'assurer que ceux-ci fournissent aux parties les outils nécessaires pour collaborer et mener les dossiers de façon efficace. Les juges devront en outre faire des efforts raisonnables pour diriger et gérer le déroulement des procès. Les tribunaux d'appel

---

[5]   See, for example, some of the recommendations contained in LeSage and Code.

[5]   Voir, par exemple, certaines des recommandations énoncées dans LeSage et Code.

Court, must be mindful of the impact of their decisions on the conduct of trials.

[140]   For provincial legislatures and Parliament, this may mean taking a fresh look at rules, procedures, and other areas of the criminal law to ensure that they are more conducive to timely justice and that the criminal process focusses on what is truly necessary to a fair trial. Legal Aid has a role to play in securing the participation of experienced defence counsel, particularly for long, complex trials. And Parliament may wish to consider the value of preliminary inquiries in light of expanded disclosure obligations. Government will also need to consider whether the criminal justice system (and any initiatives aimed at reducing delay) is adequately resourced.

[141]   Thus, broader structural and procedural changes, in addition to day-to-day efforts, are required to maintain the public's confidence by delivering justice in a timely manner. Timely trials are possible. More than that, they are constitutionally required.

The reasons of McLachlin C.J. and Cromwell, Wagner and Gascon JJ. were delivered by

Cromwell J. —

I. Introduction

A. *Overview*

[142]   Every person charged with an offence in Canada has a constitutional right to be tried within a reasonable time: *Canadian Charter of Rights and*

devront appuyer ces efforts en faisant preuve de déférence à l'égard des choix des cours de première instance en matière de gestion des instances. Enfin, tous les tribunaux, y compris la Cour, devront tenir compte de l'impact de leurs décisions sur le déroulement des procès.

[140]   Les législatures provinciales et le Parlement pourront quant à eux jeter un regard neuf sur les règles, les procédures et les autres secteurs du droit criminel pour s'assurer, d'une part, que ceux-ci soient plus propices à permettre que justice soit rendue en temps utile, et, d'autre part, que la procédure criminelle mette l'accent sur ce qui est vraiment nécessaire pour la tenue d'un procès équitable. Les services d'aide juridique auront un rôle à jouer lorsqu'il s'agira d'assurer la participation d'avocats de la défense expérimentés, en particulier pour les procès longs et complexes. Par ailleurs, le Parlement voudra peut-être se pencher sur la question de la valeur des enquêtes préliminaires à la lumière des obligations accrues en matière de communication de la preuve. Le gouvernement devra aussi examiner si le système de justice criminelle bénéficie de ressources suffisantes, notamment pour appuyer les initiatives visant à réduire les délais.

[141]   Ainsi, pour permettre aux tribunaux de maintenir la confiance du public en rendant justice en temps utile, il faut apporter des changements structurels et procéduraux supplémentaires au système en plus de fournir des efforts quotidiens. Instruire les procès en temps utile est possible. Mais plus encore, la Constitution l'exige.

Version française des motifs de la juge en chef McLachlin et des juges Cromwell, Wagner et Gascon rendus par

Le juge Cromwell —

I. Introduction

A. *Vue d'ensemble*

[142]   Au Canada, en application de l'al. 11*b*) de la *Charte canadienne des droits et libertés*, tout inculpé a le droit constitutionnel d'être jugé dans un

*Freedoms*, s. 11(*b*). The right has ancient origins and finds expression across legal systems. In the Great Charter of 1215 (the *Magna Carta*) the King promised that "[t]o no one will we . . . delay right or justice": clause 40. The *International Covenant on Civil and Political Rights* (1966), Can. T.S. 1976 No. 47, calls for trial "without undue delay": art. 14(3)(c). A right of this nature is also found in the United States, New Zealand, Australia, India, South Africa, the Caribbean, the United Kingdom, Ireland, and in the European Union, among others: see Justice C. Hill and J. Tatum, "Re-Chartering an Old Course Rather than Staying Anew in Remedying Unreasonable Delay under the Charter" (paper presented at the Crown Defence Conference in Winnipeg September 2012) (online), at p. 59.

[143]    This Court over the last 30 years has developed a sophisticated jurisprudence for dealing with allegations of s. 11(*b*) breaches: see *Mills v. The Queen*, [1986] 1 S.C.R. 863; *R. v. Rahey*, [1987] 1 S.C.R. 588; *R. v. Conway*, [1989] 1 S.C.R. 1659; *R. v. Smith*, [1989] 2 S.C.R. 1120; *R. v. Askov*, [1990] 2 S.C.R. 1199; *R. v. Morin*, [1992] 1 S.C.R. 771; and *R. v. Godin*, 2009 SCC 26, [2009] 2 S.C.R. 3. The framework developed in this jurisprudence, which is most fully set out in *Morin*, identifies the many considerations that should be taken into account in order to determine whether the time to try a particular criminal case is reasonable.

[144]    Determining reasonableness requires a court to balance a number of factors, including the length of the delay, waiver of any time periods by the accused, the reasons for the delay, including the time requirements for the case, the actions of the parties, limitations on institutional resources, and prejudice to the person charged. It is necessary to consider these factors on a case-by-case basis: the answer to the question of whether an accused is tried within a reasonable time is inherently case-specific.

délai raisonnable. Ce droit, dont les origines sont anciennes, est reconnu dans plusieurs systèmes juridiques. Dans la Grande Charte de 1215 (la *Magna Carta*), le roi avait pris l'engagement que [TRADUCTION] « [n]ous ne [. . .] refuserons ou différerons le droit d'obtenir justice à personne » : clause 40. Le *Pacte international relatif aux droits civils et politiques* (1966), R.T. Can. 1976 nᵒ 47, prévoit le droit d'être jugé « sans retard excessif » : art. 14(3)c). Des garanties semblables existent aussi notamment aux États-Unis, en Nouvelle-Zélande, en Australie, en Inde, en Afrique du Sud, dans les Antilles, au Royaume-Uni, en Irlande et au sein de l'Union européenne : voir le juge C. Hill et J. Tatum, « Re-Chartering an Old Course Rather than Staying Anew in Remedying Unreasonable Delay under the Charter » (document présenté à la conférence conjointe des procureurs du ministère public et des avocats de la défense tenue à Winnipeg septembre 2012) (en ligne), p. 59.

[143]    Au cours des 30 dernières années, la Cour a élaboré une jurisprudence subtile pour traiter des allégations de violation de l'al. 11*b*) de la *Charte* : voir *Mills c. La Reine*, [1986] 1 R.C.S. 863; *R. c. Rahey*, [1987] 1 R.C.S. 588; *R. c. Conway*, [1989] 1 R.C.S. 1659; *R. c. Smith*, [1989] 2 R.C.S. 1120; *R. c. Askov*, [1990] 2 R.C.S. 1199; *R. c. Morin*, [1992] 1 R.C.S. 771; et *R. c. Godin*, 2009 CSC 26, [2009] 2 R.C.S. 3. Le cadre d'analyse qui a été élaboré dans cette jurisprudence, et dont on trouve l'exposé le plus complet dans l'arrêt *Morin*, dresse la liste des nombreux facteurs qui doivent être pris en compte afin de juger du caractère raisonnable ou non du délai qu'il a fallu pour juger une affaire criminelle donnée.

[144]    L'examen du caractère raisonnable oblige le tribunal à mettre en balance un certain nombre de facteurs, dont la longueur du délai, la renonciation par l'accusé à invoquer certaines périodes dans le calcul du délai, les raisons du délai — y compris le délai nécessaire au traitement de l'affaire —, les agissements des parties, les limites des ressources institutionnelles et le préjudice subi par l'accusé. Il est nécessaire d'examiner ces facteurs au cas par cas puisque la réponse à la question de savoir si l'accusé a été jugé dans un délai raisonnable est fondamentalement propre à chaque affaire.

[145]    There is much wisdom, based on accumulated experience, in the Court's jurisprudence about unreasonable delay. But the Court has made adjustments over time and has been clear that further adjustments will likely need to be made in the future. As Sopinka J. wrote in *Morin*, "Embarking as we did on uncharted waters it is not surprising that the course we steered has required, and may require in the future, some alteration in its direction to accord with experience": p. 784. To be sure, some issues that need clarification have arisen in the case law and this appeal provides an opportunity to provide such clarification. But the orientation of our jurisprudence to case-specific determinations of reasonableness is sound. With modest adjustments to make the analysis more straightforward and with some additional clarification, that approach will continue to ensure that the constitutional right of accused persons to be tried in a reasonable time is defined and applied in a way that appropriately balances the many relevant considerations.

[146]    My reasons on this appeal and those of my colleagues, Justices Moldaver, Karakatsanis and Brown, present contrasting visions of how our s. 11(*b*) jurisprudence should develop.

[147]    My colleagues would define reasonableness by assigning a number of months of delay — "ceiling[s]" (para. 5) — that will be taken to be reasonable unless the accused establishes not only that the case took markedly longer that it reasonably should have, but also that he or she took meaningful steps that demonstrate a sustained effort to expedite the proceedings. As I see it, this is not an appropriate approach to interpreting and applying the s. 11(*b*) right for several reasons. First, reasonableness cannot be captured by a number; the ceilings substitute a right for "trial under the ceiling[s]" (para. 74) for the constitutional right to be tried within a reasonable time. Second, creating these

[145]    La jurisprudence de la Cour sur les délais déraisonnables est empreinte de sagesse, vu l'expérience accumulée au fil des ans. La Cour y a pourtant effectué avec le temps des rajustements et a exprimé clairement que d'autres correctifs devront encore probablement y être apportés. En effet, ainsi que le juge Sopinka l'a écrit dans l'arrêt *Morin*, « [n]aviguant comme nous l'avons fait en eaux inconnues, il n'est pas surprenant que le cap que nous avons adopté ait nécessité certaines modifications pour se conformer à l'expérience et qu'il pourra en exiger d'autres à l'avenir » : p. 784. La jurisprudence démontre certes qu'il est nécessaire de préciser le cadre d'analyse, et le présent pourvoi nous donne l'occasion de le faire. L'orientation générale de notre jurisprudence qui consiste à juger du caractère raisonnable en fonction des particularités de chaque affaire est toutefois judicieuse. Sous réserve de quelques rajustements pour simplifier l'analyse et de certains éclaircissements supplémentaires, cette approche nous permettra de continuer à veiller à ce que la définition et l'application du droit constitutionnel de l'accusé d'être jugé dans un délai raisonnable mettent comme il se doit en balance les nombreux facteurs pertinents.

[146]    Les motifs que j'expose dans le présent pourvoi et ceux que formulent mes collègues, les juges Moldaver, Karakatsanis et Brown, s'opposent sur l'évolution à donner à la jurisprudence relative à l'al. 11*b*).

[147]    Mes collègues définissent le caractère raisonnable en fixant à un certain nombre de mois — des « plafond[s] » (par. 5) — les délais qui seront jugés raisonnables, à moins que l'accusé établisse non seulement que le procès a été nettement plus long qu'il aurait dû raisonnablement l'être, mais également qu'il a pris des mesures véritables qui font la preuve d'un effort soutenu pour accélérer l'instance. À mon sens, ce n'est pas la bonne manière d'interpréter ou d'appliquer le droit garanti par l'al. 11*b*), et ce, pour plusieurs raisons. Premièrement, le caractère raisonnable ne peut être déterminé par un nombre, puisque les plafonds substituent alors au droit d'être jugé dans un délai

types of ceilings is a task better left to legislation. Third, the ceilings are not supported by the record or by my colleagues' analysis of the last 10 years of s. 11(*b*) jurisprudence and have not been the subject of adversarial debate. Fourth, there is a serious risk that the introduction of these ceilings will put thousands of cases at risk of being judicially stayed. Fifth, the ceilings are unlikely to achieve the simplicity that is claimed for them. Finally, setting aside 30 years of jurisprudence and striking out in this new direction is unnecessary. My colleagues easily conclude that our existing jurisprudence supplies a clear answer to this appeal: paras. 125 and 128. I agree with them that it does: the appeal must be allowed and a stay of proceedings entered.

[148]   In contrast, my view is that a reasonable time for trial under s. 11(*b*) cannot and should not be defined by numerical ceilings. The accumulated wisdom of the past 30 years of jurisprudence, modestly clarified, provides a workable framework to determine whether the right to be tried in a reasonable time has been breached in a particular case.

### B.   *The Nature of the Section 11(b) Right*

[149]   The right to be tried within a reasonable time is easy to state and understand: people charged with offences should be tried within a reasonable time. Determining whether the right has been breached in a specific case, however, may be far from straightforward. The right is by its very nature fact-sensitive and case-specific. There are several reasons for this.

raisonnable le droit à un « procès dans un délai inférieur au[x] plafond[s] » : par. 74. Deuxièmement, il vaut mieux laisser la création de ce genre de plafonds au législateur. Troisièmement, ni le dossier ni l'analyse de la jurisprudence des 10 dernières années relative à l'al. 11*b*) effectuée par mes collègues ne justifient les plafonds établis et ceux-ci n'ont en outre pas fait l'objet d'un débat contradictoire. Quatrièmement, l'introduction de ces plafonds risque sérieusement d'obliger les tribunaux à prononcer l'arrêt des procédures dans des milliers d'affaires. Cinquièmement, il est peu probable que l'application des plafonds soit aussi simple qu'on le prétend. Enfin, il n'est pas nécessaire d'écarter 30 ans de jurisprudence et d'aller dans une nouvelle direction qui n'en tient pas compte. Mes collègues sont facilement arrivés à la conclusion que la jurisprudence actuelle de la Cour permet de répondre clairement à la question posée par le présent pourvoi : par. 125 et 128. Je suis d'accord avec eux sur ce point : le pourvoi doit être accueilli et l'arrêt des procédures doit être ordonné.

[148]   J'estime par contre que le délai raisonnable pour juger un accusé, au sens où il faut l'entendre pour l'application de l'al. 11*b*), ne peut ni ne devrait être défini par des plafonds numériques. La sagesse qui se dégage de l'expérience accumulée par 30 années de jurisprudence fournit, avec de modestes éclaircissements, un cadre d'analyse réaliste pour déterminer si, dans une affaire donnée, il a été porté atteinte au droit d'être jugé dans un délai raisonnable.

### B.   *Nature du droit protégé par l'al. 11b)*

[149]   Il est facile d'énoncer et de comprendre le droit d'être jugé dans un délai raisonnable : les personnes accusées d'avoir commis des infractions devraient être jugées dans un délai raisonnable. La réponse à la question de savoir s'il y a eu atteinte à ce droit dans une affaire donnée est, elle, toutefois, loin d'être simple. Ce droit est intrinsèquement fonction des faits et des particularités de chaque affaire, ce qui s'explique par plusieurs facteurs.

[150]    First, the term "delay" is not entirely apt. While delay has a pejorative connotation, delay, in the sense of the passage of time, is inherent in any legal proceeding. In fact, some delay may be desirable. As stated by Lamer J., dissenting but not on this point, with Dickson C.J. concurring, undue haste itself can make a trial unfair: see *Mills*, at p. 941. Therefore, delay only becomes problematic when it is unreasonable.

[151]    Second, unreasonableness is not conducive to being captured by a set of rules: a reasonable time for the disposition of one case may be entirely unreasonable for another. Reasonableness is an inherently contextual concept, the application of which depends on the particular circumstances of each case. This makes it difficult and in fact unwise to try to establish the reasonable time requirements of a case by a numerical guideline. Inevitably, the ceiling will be too high for some cases and too low for others. More fundamentally, a fixed guideline is inconsistent with the notion of reasonableness in the context of the infinitely varied situations that arise in real cases.

[152]    Third, the *Charter* protects only against state action. Even if a case took too long to be dealt with, there will only be a breach of the right if that unreasonable delay counts against the state. And so it follows that the focus is not on unreasonable delay in general, but on unreasonable delay that properly counts against the state. We must therefore attribute responsibility for the delay that has occurred and only factor in the delay which can fairly be counted against the state in deciding whether the *Charter* right has been infringed.

[153]    Finally, s. 11(*b*) implicates several distinct interests, both individual and societal. Excessive delay implicates the liberty, security, and fair trial

[150]    Premièrement, il faut admettre que le mot « délai » n'est pas le terme le mieux choisi. Bien qu'il comporte, en anglais, une connotation péjorative, le mot « délai », au sens de passage du temps, est indissociable de toute procédure judiciaire. En fait, un certain délai peut même être souhaitable. Ainsi que l'a affirmé le juge Lamer, dissident, mais pas sur ce point (avec l'appui du juge en chef Dickson), la précipitation elle-même peut provoquer une atteinte au droit à un procès équitable : voir *Mills*, p. 941. Un délai ne devient donc problématique que lorsqu'il est déraisonnable.

[151]    Deuxièmement, la notion de caractère déraisonnable se prête mal à l'établissement de règles : en effet, ce qui constitue un délai raisonnable pour trancher une affaire peut s'avérer tout à fait déraisonnable dans un autre cas. Le caractère raisonnable est un concept intrinsèquement contextuel et son application dépend des circonstances particulières de chaque espèce. Il est donc difficile et, en fait, imprudent de tenter de définir le délai qui serait raisonnable dans une affaire donnée au moyen d'une valeur numérique. Inévitablement, le plafond sera trop élevé dans certaines affaires et trop bas dans d'autres. Plus fondamentalement, l'établissement de lignes directrices fixes ne cadre pas avec la notion de caractère raisonnable dans la mesure où la réalité donne lieu à des situations infiniment variées.

[152]    Troisièmement, la *Charte* ne protège que contre les agissements de l'État. Même si l'instruction d'une affaire accuse d'importants retards, on ne pourra conclure qu'il y a eu atteinte au droit d'être jugé dans un délai raisonnable que si le délai en cause peut être reproché à l'État. Il s'ensuit donc qu'il faut mettre l'accent non pas sur le délai déraisonnable dans son ensemble, mais sur le délai déraisonnable qui peut être légitimement imputé à l'État. Pour décider s'il y a eu atteinte au droit protégé par la *Charte*, il faut donc attribuer la responsabilité du délai qui est survenu et ne tenir compte que de celui que l'on peut légitimement imputer à l'État.

[153]    Enfin, l'alinéa 11*b*) fait intervenir plusieurs intérêts distincts, sur les plans à la fois individuel et social. Les délais excessifs mettent en cause le droit

interests of persons charged, as well as society's interest in the prompt disposition of criminal matters and in having criminal matters determined on their merits: *Morin*, at p. 786. Historically, the liberty interest was the focus: *Mills*, at p. 918, per Lamer J.; *Rahey*, at p. 642, per La Forest J., concurring.

[154]   More recently, the "overlong subjection to the vexations and vicissitudes of a pending criminal accusation" — the stigmatization, loss of privacy, stress and anxiety of those awaiting trial — has been recognized as implicating the security of the person charged: *Rahey*, at p. 605, per Lamer J., quoting A. G. Amsterdam, "Speedy Criminal Trial: Rights and Remedies" (1975), 27 *Stan. L. Rev.* 525, at p. 533; see also *Mills*, at pp. 919-20. As Cory J. for the majority put it in *Askov*, at p. 1219:

There could be no greater frustration imaginable for innocent persons charged with an offence than to be denied the opportunity of demonstrating their innocence for an unconscionable time as a result of unreasonable delays in their trial. The time awaiting trial must be exquisite agony for accused persons and their immediate family.

[155]   A third interest protected by s. 11(*b*) is the accused's interest in mounting a full and fair defence. As Sopinka J. said in *Morin*, the "right to a fair trial is protected [by s. 11(*b*)] by attempting to ensure that proceedings take place while evidence is available and fresh": p. 786. When delay is present, "justice may be denied. Witnesses forget, witnesses disappear. The quality of evidence may deteriorate": p. 810, per McLachlin J. (as she then was), concurring. Delay "can prejudice the ability of the defendant to lead evidence, cross-examine witnesses, or otherwise to raise a defence": *Godin*, at para. 30.

[156]   Finally, the right to be tried within a reasonable time has a societal dimension: see e.g. *Askov*, at p. 1219, per Cory J. But societal interests do not

à la liberté et à la sécurité de l'accusé ainsi que son droit à un procès équitable. Ils ont aussi une incidence sur l'intérêt de la société à ce que les affaires criminelles soient jugées au fond rapidement : *Morin*, p. 786. Auparavant, l'accent était mis sur le droit à la liberté : *Mills*, p. 918, le juge Lamer; *Rahey*, p. 642, avec l'appui du juge La Forest.

[154]   Plus récemment, on a reconnu que [TRADUCTION] « [l']assujettissement trop long aux vexations et aux vicissitudes d'une accusation criminelle pendante » — la stigmatisation de l'accusé, l'atteinte à sa vie privée ainsi que la tension et l'angoisse des personnes en attente d'un procès — compromettait aussi la sécurité de l'inculpé : *Rahey*, p. 605, le juge Lamer citant A. G. Amsterdam, « Speedy Criminal Trial : Rights and Remedies » (1975), 27 *Stan. L. Rev.* 525, p. 533; voir également *Mills*, p. 919-920. Ainsi que le juge Cory l'a expliqué dans l'arrêt *Askov*, p. 1219 :

Il est difficile d'imaginer pire frustration pour des personnes innocentes qui sont accusées d'une infraction que celle d'être privées pendant un temps démesurément long de la possibilité de prouver leur innocence, et cela, en raison de délais excessifs à leur faire subir leur procès. L'attente d'un procès doit être un supplice pour les accusés et leur famille immédiate.

[155]   Le droit de l'accusé de préparer une défense pleine et entière est le troisième droit que garantit l'al. 11*b*). Ainsi que le juge Sopinka l'a écrit dans l'arrêt *Morin*, « [p]our ce qui est du droit à un procès équitable, il est protégé [par l'al. 11*b*)] par la tentative de faire en sorte que les procédures aient lieu pendant que la preuve est disponible et récente » : p. 786. « Lorsque les procès sont retardés, il peut y avoir déni de justice. Des témoins oublient ou disparaissent. La qualité de la preuve peut se détériorer » : p. 810, avec l'appui de la juge McLachlin (maintenant Juge en chef). Les délais « peuvent compromettre [la] capacité [de l'accusé] de présenter des éléments de preuve, de contre-interroger les témoins ou de se défendre autrement » : *Godin*, par. 30.

[156]   Enfin, le droit d'être jugé dans un délai raisonnable comporte une dimension sociale : voir, p. ex., *Askov*, p. 1219, le juge Cory. Cela dit, les

all point in the same direction. On one hand, the wider community has an interest in "ensuring that those who transgress the law are brought to trial and dealt with according to the law" (pp. 1219-20) and in "preventing an accused from using the [s. 11(*b*)] guarantee as a means of escaping trial": p. 1227. On the other hand, there is a broad societal interest in ensuring that individuals on trial are "treated fairly and justly": p. 1220. The community benefits "by the quick resolution of the case either by reintegrating into society the accused found to be innocent or if found guilty by dealing with the accused according to the law" and witnesses and victims benefit from a prompt resolution of a criminal matter: *ibid.*

[157]   While the right to be tried within a reasonable time implicates all of these interests, it is important to recognize that it is a free-standing right. As Martin J.A. put it in *R. v. Beason* (1983), 36 C.R. (3d) 73 (Ont. C.A.), at p. 96, cited with approval in *Morin*, at p. 786: "Trials held within a reasonable time have an intrinsic value." As such, actual impairment of the various interests protected by s. 11(*b*) "need not be proven by the accused to render the section operative": *Conway*, at p. 1694, per Lamer J.; see also *Mills*, at p. 926, per Lamer J. The proper approach is to "recognize that prejudice underlies the right, while recognizing at the same time that actual proven prejudice need not be, indeed, is not, relevant to establishing a violation of s. 11(*b*)": *Mills*, at p. 926, per Lamer J.

[158]   To sum up, the right to be tried in a reasonable time is multi-factored, fact-sensitive, and case-specific. Like other broadly expressed constitutional guarantees, its application to specific cases is unavoidably complex. Our experience to date suggests that the relevant factors and general approach set out in *Morin* respond to these complexities. However, experience also suggests that the way in which *Morin* has come to be applied is unduly complicated and that aspects of the relevant factors require clarification. This can be done without losing

intérêts de la société ne vont pas tous dans le même sens. D'une part, la société dans son ensemble a un intérêt « à s'assurer que ceux qui transgressent la loi soient traduits en justice et traités selon la loi » (p. 1219) et « à ce que ce droit garanti [par l'al. 11*b*] ne devienne pas un moyen pour l'accusé de se soustraire à son procès » : p. 1227. D'autre part, il est dans l'intérêt de la société en général que les personnes appelées à subir leur procès soient « traitées avec justice et équité » : p. 1220. Elle profite « de la célérité avec laquelle la cause arrive à son terme soit par la réinsertion de l'accusé dans la société, s'il est reconnu innocent, soit par l'application des sanctions prévues par la loi, s'il est reconnu coupable », et il est en outre avantageux tant pour les témoins que pour les victimes que les affaires criminelles soient jugées rapidement : *ibid.*

[157]   Bien que le droit d'être jugé dans un délai raisonnable fasse intervenir tous ces intérêts, il est important de reconnaître qu'il s'agit d'un droit indépendant. Ainsi que le juge Martin l'a expliqué dans l'arrêt *R. c. Beason* (1983), 36 C.R. (3d) 73 (C.A. Ont.), p. 96, cité et approuvé dans l'arrêt *Morin*, p. 786 : [TRADUCTION] « Les procès tenus dans un délai raisonnable ont une valeur intrinsèque. » Pour cette raison, « il n'incombe pas à l'accusé de prouver » qu'il y a effectivement eu atteinte à l'un des droits protégés par l'al. 11*b*) « pour que l'article soit applicable » : *Conway*, p. 1694, le juge Lamer; voir aussi *Mills*, p. 926, le juge Lamer. À mon avis, la démarche appropriée consiste à « reconnaître qu'un préjudice est sous-jacent à ce droit, tout en admettant aussi qu'un dommage réel prouvé n'a pas à être pertinent, ni d'ailleurs ne l'est, pour établir qu'il y a violation de l'al. 11*b*) » : *Mills*, p. 926, le juge Lamer.

[158]   En somme, le droit d'être jugé dans un délai raisonnable est fonction de nombreux facteurs, des faits et des particularités de chaque cas. Tout comme d'autres garanties constitutionnelles exprimées en termes généraux, son application à une affaire donnée est inévitablement complexe. Notre expérience à ce jour nous indique que les facteurs pertinents et l'approche générale décrits dans l'arrêt *Morin* tiennent compte de cette complexité. Toutefois, l'expérience indique également que la façon dont l'arrêt *Morin* a été appliqué est inutilement

the case-specific focus on whether a particular case has been or will be tried within a reasonable time.

compliquée et que certains aspects des facteurs pertinents nécessitent des éclaircissements. Il est possible de se livrer à cet exercice sans perdre de vue la nécessité d'examiner si une affaire donnée a été ou sera jugée dans un délai raisonnable.

## II. The Analytical Framework

## II. Le cadre analytique

[159]   The purpose of carrying out the s. 11(*b*) analysis is to decide whether the length of time to try the case which counts against the state is "substantially longer than can be justified on any acceptable basis": *Smith*, at p. 1138. If so, the delay is unreasonable and in breach of s. 11(*b*).

[159]   L'analyse fondée sur l'al. 11*b*) vise à décider si la portion du délai écoulé pour juger l'affaire en cause qui peut être imputée au ministère public constitue un délai « beaucoup plus long que ce qui peut être justifié de quelque façon acceptable » : *Smith*, p. 1138. Si oui, le délai est déraisonnable et il porte atteinte au droit protégé par l'al. 11*b*).

[160]   The *Morin* framework identifies and describes the many factors that are relevant to whether a delay is reasonable or unreasonable. But one of the limitations of the framework is that it provides little assistance as to how these various factors are to be weighed in order to reach a final conclusion. In order to simplify and clarify this analysis, it will be helpful to regroup the *Morin* considerations under four main analytical steps, which may be framed as questions to guide a court when confronted with a s. 11(*b*) claim. Doing so will make what is being considered and why more apparent, without losing the necessarily case-specific focus of the reasonableness inquiry. The questions are:

[160]   Le cadre d'analyse établi dans l'arrêt *Morin* énumère et décrit les nombreux facteurs pertinents pour déterminer si un délai est ou non raisonnable. Toutefois, ce cadre comporte une lacune, en ce qu'il ne détermine pas vraiment de quelle manière ces différents facteurs doivent être mis en balance pour tirer une conclusion définitive. Pour simplifier et clarifier l'analyse, il est donc utile de regrouper ces facteurs en quatre grandes étapes analytiques que je formulerai sous forme de questions. Ce sont ces dernières qui guideront les cours de justice dans l'analyse d'un moyen fondé sur l'al. 11*b*). Cet exercice permettra de faire ressortir les éléments à examiner et la raison pour laquelle ils doivent l'être, sans perdre de vue la nécessité de mener l'examen du caractère raisonnable en fonction des particularités de l'affaire. Voici ces questions :

1.   Is an unreasonable delay inquiry justified?

1.   L'analyse du délai déraisonnable est-elle justifiée?

2.   What is a reasonable time for the disposition of a case like this one?

2.   Quel serait le délai raisonnable pour juger une affaire comme celle dont le tribunal est saisi?

3.   How much of the delay that actually occurred counts against the state?

3.   Quelle portion du délai effectivement écoulé peut-on attribuer à l'État?

4.   Was the delay that counts against the state unreasonable?

4.   Le délai attribuable à l'État était-il déraisonnable?

[161]   This framework, along with elaboration of the relevant considerations, will clarify questions that have arisen in this case, namely: whether different periods of delay receive different weighting in the analysis; what is meant by "waiver" by the accused; and what is the role of prejudice in the analysis.

[162]   I will now turn to a brief elaboration of each of these four analytical steps.

A.  *Is an Unreasonable Delay Inquiry Justified?*

[163]   The accused must establish as a threshold matter that there is a basis for the *Charter* inquiry. The court should look to the overall period between the charge and the completion of the trial to determine whether its length is such that it merits further inquiry. As stated by McLachlin J. in her concurring opinion in *Morin*, this determination can be made by referring to "'norms' representing the time reasonably taken to bring the offence charged to the point of trial in all the circumstances": p. 811. If there is no reasonable basis to think that the delay in question is excessive, the accused's s. 11(*b*) claim fails and the inquiry stops at this stage.

B.  *What Is a Reasonable Time for the Disposition of a Case Like This One?*

[164]   This second analytical step is to determine on an objective basis what would be a reasonable time for the trial of a case like the one under review. The objective standard of reasonableness has two components: institutional delay and inherent time requirements of the case. The period of institutional delay is the period that is reasonably required for the court to be ready to hear the case (including interlocutory motions) once the parties are ready to proceed. The reasonable inherent time requirements of the case represent the period of time that is reasonably required for the parties to be ready to proceed and to

[161]   Ce cadre d'analyse, auquel viendront se greffer quelques considérations pertinentes, permettra de clarifier des questions qui ont été soulevées en l'espèce, soit : Différents délais sont-ils soupesés différemment dans le cadre de l'analyse? Que doit-on entendre par « renonciation » par l'accusé? Quel rôle joue le préjudice dans l'analyse d'un moyen fondé sur l'al. 11*b*).

[162]   Je vais maintenant passer brièvement en revue chacune des quatre étapes de l'analyse.

A.  *L'analyse du délai déraisonnable est-elle justifiée?*

[163]   Dans un premier temps, l'accusé doit nécessairement faire la preuve de l'opportunité de procéder à une analyse fondée sur la *Charte*. Le tribunal doit examiner l'ensemble de la période écoulée entre le dépôt des accusations et la clôture du procès pour décider si le temps qu'il a fallu justifie un examen plus approfondi. Je suis d'accord avec l'opinion concordante de la juge McLachlin dans l'arrêt *Morin* selon laquelle il est possible de trouver la réponse à cette question dans des « "normes" qui représentent le temps qu'il faut normalement pour que l'infraction reprochée vienne à l'audience dans toutes les circonstances » : p. 811. S'il n'y a aucun motif raisonnable de croire que le délai en question est excessif, le moyen tiré par l'accusé de l'al. 11*b*) est mal fondé et l'examen cesse à cette étape.

B.  *Quel serait le délai raisonnable pour juger une affaire comme celle dont le tribunal est saisi?*

[164]   La deuxième étape de l'analyse est axée sur la recherche de ce qui, objectivement, constituerait une durée de procès raisonnable dans le cas d'une affaire comme celle qui fait l'objet de l'examen. La norme objective du caractère raisonnable comporte deux volets : le délai institutionnel et le délai inhérent au dossier. Le délai institutionnel correspond au temps dont le tribunal a raisonnablement besoin pour être prêt à instruire l'affaire (y compris les requêtes préliminaires), une fois que les parties sont prêtes pour le procès. Le délai inhérent au dossier qui est raisonnable correspond au délai

conclude the trial for a case similar in nature to the one before the court.

raisonnablement nécessaire pour que les parties soient prêtes à procéder à l'instruction et pour mener l'affaire jusqu'à son dénouement, dans un dossier d'une nature semblable à celle du dossier dont la cour est saisie.

[165]   Both of these periods of time are to be determined objectively. The acceptable period of institutional delay is determined in accordance with the administrative guidelines for institutional delay set out by this Court in *Morin*: eight to ten months before the provincial courts and six to eight months before the superior courts (see *Morin*, at pp. 798-99). The inherent time requirements of a case, on the other hand, are to be determined on the basis of judicial experience, supplemented by submissions of counsel and evidence in relation to the reasonable time requirements of a case of a similar nature to the one before the court. As I will describe below, these two elements must be distinguished in the s. 11(*b*) analysis.

[165]   Ces deux délais doivent être établis de façon objective. Le délai institutionnel acceptable est déterminé selon les lignes directrices administratives applicables à ce type de délai que la Cour a énoncées dans l'arrêt *Morin*, en l'occurrence, entre huit et dix mois pour les instances qui se déroulent devant une cour provinciale et entre six et huit mois pour celles qui se déroulent devant une cour supérieure : voir *Morin*, p. 798-799. En revanche, le délai inhérent à l'affaire est calculé en fonction de l'expérience judiciaire, complété par les observations des avocats et par des éléments de preuve relatifs aux délais inhérents raisonnables dans des affaires de nature semblable à celle dont le tribunal est saisi. Comme nous le verrons plus loin, il y a lieu d'établir une distinction entre ces deux éléments dans le cadre de l'analyse fondée sur l'al. 11*b*).

#### (1)   Institutional Delay

#### (1)   Le délai institutionnel

[166]   Institutional delay is the period of time that results from the inadequacy of institutional resources. The period of institutional delay "starts to run when the parties are ready for trial but the system cannot accommodate them": *Morin*, at pp. 794-95. At this stage of the objective analysis, the court will determine an acceptable period of time for the court to be available to hear the case once the parties are ready to proceed.

[166]   Le délai institutionnel est la période attribuable à l'insuffisance des ressources institutionnelles. Il « commence lorsque les parties sont prêtes pour le procès mais le système ne peut leur permettre de procéder » : *Morin*, p. 795. À cette étape de l'analyse objective, le tribunal établira ce qui constitue un délai acceptable pour qu'il soit en mesure d'instruire l'affaire une fois que les parties sont prêtes pour le procès.

##### (a)   *The Morin Administrative Guidelines Are Appropriate for Determining Institutional Delay*

##### a)   *Les lignes directrices administratives énoncées dans l'arrêt Morin permettent de déterminer le délai institutionnel*

[167]   As stated in *Morin*, "Institutional delay is the most common source of delay and the most difficult to reconcile with the dictates of s. 11(*b*) of the *Charter*": p. 794. The difficulty arises because we do not live in a "Utopia" in which there is always fully adequate funding, personnel, and facilities in order to administer criminal matters: p. 795.

[167]   Comme la Cour l'a déclaré dans l'arrêt *Morin*, « [l]e délai institutionnel est la source la plus commune de délai et la plus difficile à faire correspondre aux exigences de l'al. 11*b*) de la *Charte* » : p. 794. Le problème réside dans le fait que nous ne vivons pas « en Utopie », un pays où le financement, les effectifs et les installations seraient

The courts must account for both the fact that the state does not have unlimited funds to attribute to the administration of the criminal justice system and the fact that an accused has a fundamental *Charter* right to be tried within a reasonable time: *ibid.*

[168]   The period of institutional delay is generally not case-specific, unlike the inherent time requirements of a particular case. Institutional delay is therefore more amenable to generalization based on evidence than is the element of the reasonable inherent time requirements of particular types of cases. Moreover, institutional delay is largely the result of government choices about how to allocate resources. Accordingly, the courts "cannot simply accede to the government's allocation of resources and tailor the period of permissible delay accordingly": *Morin*, at p. 795.

[169]   The *Morin* administrative guidelines, namely eight to ten months for trials in provincial courts and six to eight months for trials before the superior courts, were established on the basis of extensive statistical and expert evidence. There is no basis in the record in this case to revise them and I would therefore confirm these guidelines as appropriate for determining reasonable institutional delay.

(b)   *Determining Institutional Delay*

[170]   I would add two comments about determining institutional delay using the *Morin* administrative guidelines.

[171]   First, in determining where a particular case should fit within the range established by the *Morin* guidelines, the court should consider whether the accused is in remand custody pending trial or subject to stringent bail conditions in identifying a reasonable period of institutional delay for a particular type of case. The period of reasonable institutional delay should generally be at the lower end of the range in these circumstances because these types of cases

toujours parfaitement suffisants pour satisfaire aux besoins de l'administration de la justice criminelle : p. 795. Les tribunaux doivent tenir compte à la fois du fait que l'État ne dispose pas de fonds illimités à consacrer à l'administration du système de justice criminelle et du fait que la *Charte* reconnaît à l'accusé le droit fondamental d'être jugé dans un délai raisonnable : *ibid.*

[168]   Le délai institutionnel n'est généralement pas tributaire des particularités de l'affaire en cause, contrairement à son délai inhérent. Il se prête donc mieux à une généralisation fondée sur la preuve que le délai inhérent raisonnable de certains types de causes. De plus, le délai institutionnel résulte en grande partie des choix gouvernementaux en matière de répartition des ressources. Par conséquent, une cour de justice « ne peut pas simplement accepter [cette] répartition [. . .] par le gouvernement et déterminer en conséquence la longueur du délai acceptable » : *Morin*, p. 795.

[169]   Les lignes directrices administratives énoncées dans l'arrêt *Morin*, qui sont de huit à dix mois s'agissant des cours provinciales et de six à huit mois s'agissant des cours supérieures, ont été établies à partir d'une abondante preuve statistique et d'expert. En l'espèce, rien dans le dossier ne justifie de les modifier et, en conséquence, je confirme qu'elles conviennent pour déterminer le délai institutionnel raisonnable.

b)   *Établissement du délai institutionnel*

[170]   Je tiens à ajouter deux commentaires concernant l'établissement du délai institutionnel à partir des lignes directrices administratives énoncées dans l'arrêt *Morin.*

[171]   En premier lieu, pour savoir quelles périodes visées par ces lignes directrices conviennent à une affaire donnée, le tribunal devrait se demander si l'accusé est détenu de façon provisoire en attente de son procès ou si sa mise en liberté est assortie de conditions rigoureuses pour déterminer, s'agissant d'un type d'affaires particulier, ce qui constitue un délai institutionnel raisonnable. Un tel délai devrait, en règle générale, se situer à l'extrémité inférieure du

should receive higher priority by the courts. This period might even be shortened below the range described in the guidelines. As Sopinka J. put it *Morin*:

If an accused is in custody or, while not in custody, subject to restrictive bail terms or conditions or otherwise experiences substantial prejudice, the period of acceptable institutional delay may be shortened to reflect the court's concern. [p. 798]

[172]   Second, the guidelines should not be understood as precluding allowance for any "sudden and temporary strain on resources" that causes a temporary congestion in the courts: *Morin*, at p. 797. As I discuss at the final step of the analysis, even a properly resourced system will occasionally buckle under an unusually heavy onslaught of work.

### (2)   The Inherent Time Requirements of the Case

(a)   *Introduction*

[173]   The inherent time requirements of a case include the time periods that are reasonably necessary to conclude the proceedings for a case similar in nature to the one before the court. In *Morin*, Sopinka J. described some of the inherent time requirements of the case as including the time required "in processing the charge, retention of counsel, applications for bail and other pre-trial procedures" along with "police and administration paperwork, disclosure, etc.": pp. 791-92. Separate consideration of these inherent time requirements is essential given the almost infinitely variable circumstances of particular cases.

[174]   As Lamer J. described in *Mills*, the inquiry into the inherent time requirements of a case will necessarily require judges to "rely heavily upon

spectre en pareilles circonstances, parce que ce type d'affaires devrait se voir accorder une plus grande priorité de la part des tribunaux. Il pourrait peut-être même être plus court que celui prévu par les lignes directrices. Ainsi que le juge Sopinka l'a expliqué dans l'arrêt *Morin* :

Si l'accusé est sous garde ou, bien que n'étant pas sous garde, s'il est assujetti à des conditions de cautionnement restrictives ou s'il subit quelque autre préjudice important, la longueur du délai institutionnel acceptable peut être réduite afin de répondre à la préoccupation du tribunal. [p. 798]

[172]   En deuxième lieu, l'interprétation des lignes directrices devrait permettre de tenir compte de toute « pression soudaine et temporaire [sur les ressources] » qui cause un engorgement passager des tribunaux : *Morin*, p. 797. Comme je l'expliquerai lorsque je traiterai de la dernière étape de l'analyse, même un système disposant de ressources suffisantes connaît parfois des ratés en cas de surcharge de travail inusitée.

### (2)   Le délai inhérent à l'affaire

a)   *Introduction*

[173]   Le délai inhérent à une affaire s'entend notamment des délais raisonnablement nécessaires pour mener l'instance à son terme dans une affaire de nature semblable à celle dont la cour est saisie. Dans l'arrêt *Morin*, le juge Sopinka a expliqué que, par délai inhérent à une affaire, on entend notamment le temps nécessaire « pour traiter l'accusation, retenir les services d'un avocat, régler les demandes de cautionnement et les autres procédures préalables au procès », mais aussi pour tenir compte de la préparation des « documents de la police et de l'administration, [ainsi que de la] communicatio[n] de la preuve, etc. » : p. 791-792. Il est essentiel que le délai inhérent à une affaire soit examiné séparément, puisque les circonstances varient presque à l'infini d'une affaire à l'autre.

[174]   Comme le juge Lamer l'a expliqué dans l'arrêt *Mills*, pour pouvoir déterminer le délai inhérent à une affaire, les juges doivent nécessairement

their practical experience and good sense": p. 932. Judges should "undertake an objective assessment of the delay which may be required in the circumstances of the case": *ibid.* This inquiry is "wholly objective" (p. 931):

. . . the court must fix an <u>objective and realistic time period</u> for the preparation of the type of case which is at bar. It must determine the period which would <u>normally be required</u>, taking into account the number of charges, the number of accused, the complexity and volume and similar objective elements, for the preparation and completion of the case . . . . [Emphasis added; p. 932.]

In the end, we must rely on the good sense and experience of trial judges to determine what would constitute a reasonable period of time required for a particular type of case.

[175]   The inherent time requirements of a case are to be determined objectively on a case-by-case basis.

(b)   *Determining the Inherent Time Requirements*

[176]   The elements to be considered are the amounts of time reasonably required in processing the charge, retaining counsel, applying for bail, completing police and administration paperwork, making disclosure, dealing with pre-trial applications, preparing for and arguing the preliminary inquiry and/ or the trial, and trying a case similar in the nature to the one before the court. Included are such things as the time reasonably required to reschedule after a mistrial, the time to resolve legal issues, the time to convene a judicial pre-trial, and a reasonable time to try the case: see e.g. Hill and Tatum, at pp. 14-15.

[177]   If a case is more complex, the estimate of the reasonable time period required to dispose of the case will be higher. Given the type of case before the court, it may be expected that there

« faire largement appel à leur expérience pratique et à leur bon sens » : p. 932. Ils doivent « procéder à une évaluation objective du délai requis dans les circonstances de l'espèce » : *ibid*. Cet examen est « entièrement objectif » (p. 931) :

. . . le tribunal doit fixer <u>une période de temps objective et réaliste</u> pour la préparation du genre d'affaires dont il est saisi. Il doit déterminer le temps qui serait <u>normalement requis</u>, compte tenu du nombre d'accusations, du nombre d'accusés, de la complexité et du volume de l'affaire et d'éléments objectifs similaires, pour la préparation et la constitution du dossier . . . [Je souligne; p. 932.]

En fin de compte, nous devons faire largement appel au bon sens et à l'expérience pratique des juges de première instance pour déterminer ce qui constitue un délai raisonnable nécessaire dans un cas particulier.

[175]   Le délai inhérent à une affaire doit être déterminé de façon objective et au cas par cas.

b)   *Détermination du délai inhérent*

[176]   Les facteurs dont il y a lieu de tenir compte sont les suivants : les délais raisonnablement nécessaires pour traiter l'accusation, pour retenir les services d'un avocat, pour demander un cautionnement, pour s'acquitter des formalités policières et administratives, pour procéder à la communication de la preuve, pour s'occuper des demandes préalables au procès, pour préparer l'enquête préliminaire ainsi que l'instruction et les débats y afférents, et pour instruire une affaire de nature semblable à celle dont la cour est saisie. Il faut aussi tenir compte du temps raisonnablement nécessaire pour fixer une nouvelle date d'instruction en cas d'annulation du procès, de celui nécessaire pour régler des questions de droit, du temps requis pour la tenue d'une conférence préparatoire et de la période raisonnable requise pour juger l'affaire : voir, p. ex., Hill et Tatum, p. 14-15.

[177]   Plus l'affaire est complexe, plus le délai raisonnable nécessaire estimé pour décider de l'affaire sera élevé. Selon le type d'affaires dont le tribunal est saisi, on peut s'attendre à un nombre plus élevé

will be more pre-trial motions, or particular types of motions. Most s. 11(*b*) applications are considered after the fact, and any incidental proceedings to a trial could help guide this analysis. However, courts should avoid *ex post facto* analysis focusing on whether certain motions in the case before them were unreasonably or unnecessarily taken. The objective nature of this inquiry involves an analysis of the type of case before the court, and all the motions and other pre-trial procedures that could reasonably be expected in such a case.

[178]   One example is a case involving a large amount of disclosure, where it could reasonably be expected that such disclosure would lengthen the inherent time requirements to try the case. However, disclosure may be a major factor contributing to delay and should be approached on the basis that the Crown has a duty to make disclosure fully, but also promptly. And defence counsel must not engage in unnecessary fishing expeditions. The reasonable estimation of the objective inherent time requirements of a case must assume both prompt disclosure and the absence of unnecessary fishing expeditions.

[179]   Also included in the inherent time requirements of a case is the time required for counsel, both Crown and defence, to be available and to prepare the case: see *Morin*, at p. 791. In *Morin*, Sopinka J. noted that the courts must take account of the fact that "counsel for the prosecution and the defence cannot be expected to devote their time exclusively to one case": p. 792. Or, as I put it in *Godin*, s. 11(*b*) does not require counsel to "hold themselves in a state of perpetual availability": para. 23. The court should estimate the reasonable amount of time required for Crown and defence counsel to prepare and to make themselves available in the type of case before them. This estimation is objective, and does not include an analysis of the record which may demonstrate that counsel

de requêtes préalables ou à la présentation de types particuliers de requêtes. La plupart des demandes fondées sur l'al. 11*b*) sont examinées après coup et toute procédure accessoire à un procès pourrait orienter cette analyse. Toutefois, les tribunaux devraient éviter les analyses a posteriori qui viseraient à déterminer si certaines requêtes présentées en cours d'instance ont été déposées inutilement ou de façon abusive. La nature objective de l'examen suppose que le tribunal analyse le type de dossiers soumis au tribunal, ainsi que toute autre mesure préalable au procès à laquelle on peut raisonnablement s'attendre en pareil cas.

[178]   On peut penser, par exemple, à une affaire comportant une quantité importante de documents à communiquer au préalable et dans laquelle on pourrait raisonnablement s'attendre à ce que cette communication prolonge le délai inhérent à l'instruction de l'affaire. Cela dit, la communication préalable est un facteur susceptible de contribuer de manière importante aux délais et elle devrait être envisagée en tenant compte du principe selon lequel le ministère public est non seulement tenu de faire une communication complète, mais qu'il doit le faire sans tarder. Pour leur part, les avocats de la défense ne doivent pas se livrer à des recherches à l'aveuglette inutiles. L'estimation raisonnable du délai objectif inhérent à une affaire doit reposer à la fois sur une communication rapide de la preuve et sur l'absence de recherches à l'aveuglette inutiles.

[179]   La détermination du délai inhérent à une affaire tient également compte du temps dont les avocats, tant celui de la poursuite que celui de la défense, ont besoin pour se rendre disponibles et pour préparer la cause : voir *Morin*, p. 791. Dans cet arrêt, le juge Sopinka a fait observer que les tribunaux devaient tenir compte du fait qu'« on ne peut s'attendre que l'avocat de la poursuite et celui de la défense consacrent leur temps exclusivement à une affaire » : p. 792. Autrement dit, comme je l'ai expliqué dans l'arrêt *Godin*, l'al. 11*b*) n'exige pas que les avocats « demeurent disponibles en tout temps » : par. 23. Le tribunal devrait estimer le délai raisonnable dont l'avocat de la poursuite et celui de la défense ont besoin pour se préparer et pour se rendre disponibles dans le type d'affaire en cause.

was available before or after this estimated time period.

[180]   *Morin* provides an example of how this may be done. Sopinka J. specifically found that "[a]n additional period for inherent time requirements must be allowed" for the post-preliminary inquiry "second stage": p. 793. He further inferred, absent concrete evidence to the contrary, that counsel would have required 2 months to make themselves prepared and available for trial and for the matter to be heard, leaving the other 12 months to institutional delay: pp. 804-6. Similarly, in *R. v. Sharma*, [1992] 1 S.C.R. 814, at pp. 825-26, Sopinka J. estimated 3 months of inherent time requirements in the 12-month period from the set date appearance to the trial date.

[181]   Finally, in estimating a reasonable time period for the inherent time requirements of a case, the court should also take into account the liberty interests of the accused. If an accused is in custody or under stringent conditions of release, such as house arrest, counsel and the court system should accord his or her case priority over those of accused persons subject to less onerous conditions pending trial.

   (c)  *Do the Periods of Institutional Delay and Inherent Time Requirements Overlap?*

[182]   The question has arisen of whether the periods of institutional delay (i.e. the time for the court to be ready to hear the matter) and inherent delay (i.e. the time reasonably required for the parties to be ready to proceed and to conclude the trial for a case similar in nature to the one before the court) overlap. On occasion, the elements of institutional and inherent requirements have been intermingled in the application of the s. 11(*b*) framework such as in considering periods of time during which both counsel and the court are unavailable: see e.g. C. Ruby, "Trial

Il s'agit d'une estimation objective, sans analyse du dossier qui pourrait démontrer que l'avocat était disponible avant ou après cette période de temps estimée.

[180]   L'affaire *Morin* illustre comment on peut s'y prendre pour procéder à une telle estimation. Le juge Sopinka a expressément conclu qu'« [i]l convient d'accorder une période supplémentaire pour les délais inhérents [au] second volet », postérieur à l'enquête préliminaire : p. 793. Il a également estimé, en l'absence d'éléments de preuve concrets démontrant le contraire, qu'il aurait fallu 2 mois pour que les avocats se préparent et soient disponibles pour le procès et pour que l'affaire soit instruite, de sorte qu'on pouvait attribuer les 12 autres mois au délai institutionnel : p. 804-806. De même, dans l'arrêt *R. c. Sharma*, [1992] 1 R.C.S. 814, p. 825-826, le juge Sopinka a estimé que le délai inhérent représentait 3 des 12 mois du temps écoulé entre la date fixée pour la comparution et la date du procès.

[181]   Enfin, pour estimer une période de temps raisonnable en ce qui concerne le délai inhérent à l'affaire, le tribunal devrait également tenir compte du droit à la liberté de la personne garanti à l'accusé. Si ce dernier est en détention ou qu'il est assujetti à des conditions strictes de remise en liberté, telle l'obligation de demeurer en détention à domicile, les avocats et le système de justice devraient accorder la priorité à son dossier par rapport à ceux des accusés qui sont assujettis à des conditions moins strictes en attente de leur procès.

   c)  *Le délai institutionnel et le délai inhérent à une affaire se chevauchent-ils?*

[182]   La question de savoir si le délai institutionnel — c.-à-d. le temps nécessaire pour que le tribunal soit prêt à instruire l'affaire — et le délai inhérent — c.-à-d. le temps raisonnablement nécessaire pour que les parties soient prêtes à procéder, et ce, jusqu'au dénouement du procès, dans une affaire de nature semblable à celle que le tribunal doit examiner — se chevauchent a été posée. Il est arrivé dans le passé que ces éléments, le délai institutionnel et le délai inhérent, s'entremêlent lors de l'application du cadre d'analyse applicable à une demande fondée

Within a Reasonable Time under Section 11(b): the Ontario Court of Appeal Disconnects from the Supreme Court" (2013), 2 C.R. (7th) 91, at p. 94, citing *Morin*, at p. 793. The short answer to this question of overlap, however, is that, on the objective determination of how much time the case should reasonably take, the two periods are distinct.

[183]   The reasonable inherent time requirements are concerned with identifying a reasonable period to get a case similar in nature to the one before the court ready for trial and to complete the trial. The inherent time requirements are not determined, for instance, with reference to the actual availability of particular counsel and court, but rather they are determined by an objective estimation. The other element, the acceptable period of institutional delay, is the amount of time reasonably required for the court to be ready to hear the case once the parties are ready to proceed. This is expressed with reference to the *Morin* guidelines. These guidelines do not relate to inherent time requirements; they reflect only the acceptable period of *institutional delay*.

### (3)   Conclusion on Objectively Reasonable Time Requirements

[184]   To sum up, in assessing a claim under s. 11(*b*), the courts must first determine the reasonable time requirements, objectively viewed, for the type of case before them. Simply put, the courts must determine how long the case should reasonably take (or have taken). This consists, first, of the length of time required for that type of case to be prepared, heard, and decided (i.e. the case's inherent time requirements). The second element is the additional time required for the court to be available to hear the parties beyond the point at which they should be prepared to proceed (i.e. the period of institutional delay). This period of institutional delay is assessed by applying the administrative guidelines developed

sur l'al. 11*b*). Cela s'est produit notamment lorsqu'il fallait tenir compte de périodes pendant lesquelles ni les avocats ni le tribunal n'étaient disponibles : voir, p. ex., C. Ruby, « Trial Within a Reasonable Time under Section 11(b) : the Ontario Court of Appeal Disconnects from the Supreme Court » (2013), 2 C.R. (7th) 91, p. 94, citant l'arrêt *Morin*, p. 793. Cela dit, pour répondre brièvement à cette question du chevauchement, il suffit de signaler que dès lors que l'on détermine de façon objective combien de temps l'instruction de l'affaire devrait raisonnablement prendre, ces deux périodes sont distinctes.

[183]   Le concept de délai inhérent raisonnable vise à définir l'espace de temps raisonnable pour qu'une affaire de nature semblable à celle que le tribunal doit examiner soit prête pour le procès, et pour que ce dernier soit instruit. Le délai inhérent n'est pas déterminé, par exemple, en fonction de la disponibilité réelle des avocats ou de la juridiction concernés, mais bien selon une estimation objective. L'autre élément, soit le délai institutionnel acceptable, correspond à la période de temps dont le tribunal a raisonnablement besoin pour être en mesure de commencer à instruire l'affaire une fois que les parties sont prêtes pour le procès. Ces considérations s'inspirent des lignes directrices de l'arrêt *Morin*, qui ne concernent pas le délai inhérent à l'affaire, mais uniquement le *délai institutionnel* acceptable.

### (3)   Conclusion sur le délai objectivement raisonnable

[184]   Pour résumer, lorsqu'il est appelé à juger un moyen fondé sur l'al. 11*b*), le tribunal doit d'abord déterminer, de façon objective, les délais raisonnables dans le cas du type d'affaires dont il est saisi. En un mot, il doit déterminer combien de temps le procès devrait raisonnablement prendre (ou aurait dû prendre). Pour ce faire, il doit tout d'abord évaluer le temps nécessaire pour préparer, instruire et trancher ce type d'affaires (autrement dit, le délai inhérent à l'affaire). Ensuite, il doit tenir compte de la période supplémentaire de temps qu'il faut pour être en mesure d'entendre les parties à partir du moment où celles-ci sont censées être prêtes pour le procès (c.-à-d. le délai institutionnel).

in *Askov* and *Morin*: eight to ten months in provincial court and six to eight months in superior court. These guidelines set some rough limits on the point at which inadequacy of state resources will be accepted as an excuse for excessive delay.

Ce délai institutionnel est apprécié en appliquant les lignes directrices administratives élaborées dans les arrêts *Askov* et *Morin*, soit de huit à dix mois s'agissant des cours provinciales, et de six à huit mois s'agissant des cours supérieures. Ces lignes directrices établissent des limites approximatives en deçà desquelles l'insuffisance des ressources de l'État sera considérée comme une excuse acceptable justifiant un délai excessif.

### C.  *How Much of the Delay That Actually Occurred Counts Against the State?*

### C.  *Quelle portion du délai effectivement écoulé peut-on attribuer à l'État?*

[185]   Having addressed the objective elements of the analysis — the reasonable institutional delay and the reasonable inherent time requirements of the case — the judge moves on to compare those objectively reasonable time periods against the time actually taken in the case before the court, to determine whether the overall delay is reasonable. Delay in excess of the objectively required time may be reasonable if it is not attributable to the state. As mentioned at the outset, s. 11(*b*) protects only against unreasonable delay attributable to the state. The period fairly attributable to the state excludes any time period fairly attributable to the accused — including "waiver" — and any extraordinary and unavoidable delays that should not be counted against the state. The main task at this step of the analysis is to identify any portion of the actual elapsed time that should not count against the state.

[185]   Pour déterminer si l'ensemble du délai est raisonnable, après avoir traité des éléments objectifs de l'analyse — le délai institutionnel raisonnable et le délai inhérent raisonnable de l'affaire —, le tribunal devra comparer ces délais objectivement raisonnables avec le temps durant lequel l'affaire a réellement été devant le tribunal. La période qui excède le temps objectivement nécessaire peut être jugée raisonnable si elle n'est pas imputable à l'État. En effet, comme nous l'avons mentionné dès le départ, l'al. 11*b*) ne protège que contre les délais déraisonnables imputables à ce dernier. Pour définir la période qui est légitimement imputable à l'État, on exclut toute celle légitimement attribuable à l'accusé — y compris toute période à laquelle il a « renoncé » — et tout délai extraordinaire et inévitable qui ne peut être reproché à l'État. Ainsi, la tâche principale du tribunal à cette étape de l'analyse consiste à déterminer quelle portion du temps effectivement écoulé ne peut être imputée à l'État.

#### (1)   Delay Attributable to the Accused

#### (1)   Délai imputable à l'accusé

[186]   Delay attributable to the accused includes any period "waived" by the accused, and other delays attributable to the accused.

[186]   On inclut dans le délai imputable à l'accusé toute période à laquelle il a « renoncé » ainsi que de tout autre délai qui lui est attribuable.

#### (a)   *Waiver*

#### a)   *Renonciation*

[187]   The concept of "waiver" by the accused in the s. 11(*b*) context has given rise to some confusion and this case provides an opportunity to bring further clarity to that issue.

[187]   Dans le contexte de l'application de l'al. 11*b*), le concept de « renonciation » par l'accusé est à l'origine d'une certaine confusion, et la présente affaire nous donne l'occasion de clarifier quelque peu la question.

[188]   First, the language of "waiver" in this context may be misleading. As stated by this Court in *Conway*, when the courts speak of "waiver" in the context of s. 11(*b*), "it is not the right itself which is being waived but merely the inclusion of specific periods in the overall assessment of reasonableness": p. 1686. This means that periods of time to which the accused has or is deemed to have agreed will not count towards any determination of unreasonable delay.

[189]   Second, there is admittedly some lack of clarity in our jurisprudence as to whether the accused's consent to an adjournment sought by the Crown constitutes "waiver" of the resulting delay. In *Smith*, this Court created a rebuttable inference of waiver if defence consents to a future trial date. This proposition was qualified, however, by the point that "inaction or acquiescence on the part of the accused, short of waiver", does not result in a forfeiture of an accused's s. 11(*b*) rights: *Smith*, at p. 1136. In *Morin*, Sopinka J. explained that the accused's consent to a trial date "can give rise to an inference of waiver", but this is not the case "if consent to a date amounts to mere acquiescence in the inevitable": p. 790. This Court, albeit in very short decisions, upheld this approach in *R. v. Brassard*, [1993] 4 S.C.R. 287, at p. 287, and *R. v. Nuosci*, [1993] 4 S.C.R. 283, at p. 284, stating that consent to a future date *will* be characterized as waiver in the absence of evidence that it is acquiescence.

[190]   A rebuttable inference of waiver from the accused's consent to an adjournment does not sit well with the settled law that waiver must be clear, unequivocal and must be established by the Crown: see e.g. *Askov*, at p. 1232. As noted in *Morin*, the waiver must be done "with full knowledge of the rights the procedure was enacted to protect and of

[188]   Tout d'abord, dans le présent contexte, le terme « renonciation » peut être trompeur. Je précise donc que, comme la Cour l'a déclaré dans l'arrêt *Conway*, lorsque les tribunaux parlent de « renonciation » dans le contexte de l'application de l'al. 11*b*), « il ne faut pas perdre de vue qu'[elle] ne vise pas le droit lui-même, mais simplement l'inclusion de certaines périodes dans l'appréciation générale du caractère raisonnable » : p. 1686. Il s'ensuit que les périodes auxquelles l'accusé a ou est censé avoir consenti n'entrent pas dans le calcul du délai déraisonnable.

[189]   Ensuite, il faut reconnaître que notre jurisprudence manque de clarté quant à la question de savoir si le consentement donné par l'accusé à un ajournement réclamé par le ministère public emporte « renonciation » de sa part à invoquer le délai qui en résulte. Dans l'arrêt *Smith*, la Cour a créé une présomption réfutable de renonciation dans le cas où la défense consentirait au report de la date du procès. La Cour a toutefois nuancé cette affirmation en expliquant que « l'inaction ou l'acquiescement de la part de l'accusé, ne comportant pas une renonciation, » ne peut entraîner la déchéance du droit qui lui est garanti par l'al. 11*b*) : *Smith*, p. 1136. Dans l'arrêt *Morin*, le juge Sopinka a expliqué que le fait pour l'accusé de consentir à une date de procès « peut permettre de déduire qu'il a eu renonciation », mais que ce n'est pas le cas « si le consentement à une date équivaut à une simple reconnaissance de l'inévitable » : p. 790. Même s'il s'agit de décisions très brèves, la Cour a confirmé ce raisonnement dans les arrêts *R. c. Brassard*, [1993] 4 R.C.S. 287, p. 287, et *R. c. Nuosci*, [1993] 4 R.C.S. 283, p. 284, déclarant que, à défaut d'éléments de preuve tendant à démontrer qu'il s'agit d'un acquiescement, le consentement de l'accusé au report de la date du procès *est* considéré comme une renonciation.

[190]   L'idée d'une présomption réfutable de renonciation découlant du consentement par l'accusé à un ajournement cadre mal avec la jurisprudence établie suivant laquelle, d'une part, la renonciation doit être claire et sans équivoque et, d'autre part, il incombe au ministère public d'en faire la preuve : voir, p. ex., *Askov*, p. 1232. Comme la

the effect that waiver will have on those rights", and such a test is "stringent": p. 790.

[191]    I conclude that, when the accused consents to a date for trial offered by the court or to an adjournment sought by the Crown, that consent, without more, does not amount to waiver. The onus is on the Crown to demonstrate that this period is waived, that is, that the accused's conduct reveals something more than "mere acquiescence in the inevitable" and that it meets the high bar of being clear, unequivocal, and informed acceptance that the period of time will not count against the state.

#### (b)   *Other Delay Attributable to the Accused*

[192]    All steps that are reasonably necessary to make full answer and defence are properly part of the inherent time requirements of the case and do not count against either the Crown or the accused. However, delay resulting from unreasonable actions solely attributable to the accused must be subtracted from the period for which the state is responsible.

[193]    Unreasonable actions by the accused may take diverse forms, such as last-minute changes in counsel or adjournments flowing from a lack of diligence (e.g. failure to pursue or review disclosure in a timely way; pursuit of unnecessary information; failure to attend court appearances or to give timely notice of intended *Charter* applications, particularly during case scheduling; unreasonable rejection of earlier dates for preliminary hearing, trial or other court appearances (see Hill and Tatum, at pp. 17-18); and a lack of sufficient effort to accommodate dates available to the court and the prosecution). It is obvious that delays caused by attempts to obstruct the course of the trial, that amount to "deliberate and calculated tactic[s] employed to delay the trial", or

Cour l'a fait observer dans l'arrêt *Morin*, la renonciation doit être faite « en pleine connaissance des droits que la procédure était destinée à protéger et de l'effet de la renonciation sur ces droits » et, a-t-elle ajouté, ce critère est « stric[t] » : p. 790.

[191]    Je conclus donc que, lorsque l'accusé donne son consentement à la date de procès proposée par le tribunal ou à un ajournement réclamé par le ministère public, ce consentement, s'il est isolé, ne constitue pas une renonciation. Il incombe au ministère public de démontrer que l'accusé a renoncé à invoquer ce délai. Autrement dit, en pareil cas, le ministère public doit d'abord prouver que, par sa conduite, l'accusé a signifié qu'il ne s'agissait pas de sa part d'une « simple reconnaissance de l'inévitable ». Ensuite, il doit satisfaire au critère rigoureux qui l'oblige à établir que l'accusé a accepté de façon claire, non équivoque et éclairée que ce délai ne soit pas imputé à l'État.

#### b)   *Autre délai attribuable à l'accusé*

[192]    Tous les délais découlant des démarches raisonnablement nécessaires entreprises pour que l'accusé soit en mesure de présenter une défense pleine et entière font légitimement partie du délai inhérent à l'affaire et ne peuvent être imputés ni à ce dernier ni au ministère public. Toutefois, les délais résultant de mesures déraisonnables imputables uniquement aux agissements de l'accusé doivent être soustraits de la période dont l'État est responsable.

[193]    Les mesures déraisonnables prises par l'accusé peuvent revêtir diverses formes. Il peut s'agir de changements d'avocats survenus à la dernière minute ou d'ajournements résultant d'un manque de diligence (p. ex., en faisant défaut de tenter d'obtenir la communication de documents ou de les examiner en temps utile; en présentant des demandes de renseignements inutiles; en omettant de comparaître devant le tribunal ou de donner dans le délai prescrit un avis de son intention de présenter une requête fondée sur la *Charte*, en particulier lors de la confection du rôle; en refusant de manière abusive d'accepter une date hâtive d'audience préliminaire, de procès ou d'autres comparutions devant le tribunal (voir Hill et Tatum, p. 17-18); et en omettant de

other vexatious or bad faith conduct by the accused, cannot count against the state: *Askov*, at p. 1228.

faire des efforts suffisants pour s'accommoder des dates auxquelles le tribunal et le ministère public sont disposés à procéder). Évidemment, les délais attribuables au « recours délibéré à [des] tactique[s] qui vise[nt] à retarder le procès » ou à toute autre conduite vexatoire ou entachée de mauvaise foi par l'accusé ne sauraient être reprochés à l'État : *Askov*, p. 1228.

[194]    The question of whether the actions of the accused were unreasonable must be viewed through the lens of reasonable conduct of counsel and the accused at the time the judgments had to be made, not with the benefit of hindsight. The accused must not be penalized for taking all reasonable steps to make full answer and defence even if, with the benefit of hindsight, they were not particularly fruitful.

[194]    La question de savoir si les actes de l'accusé étaient déraisonnables doit être examinée à l'aune du critère de la conduite raisonnable de l'avocat et de l'accusé au moment où les décisions en question devaient être prises, et non avec l'avantage que procure le recul. L'accusé ne doit pas être pénalisé parce qu'il a pris toutes les mesures raisonnables pour présenter une défense pleine et entière, et ce, même si, a posteriori, il s'avère que ces démarches n'ont pas été très utiles.

### (2)   Extraordinary and Unavoidable Delays That Should Not Count Against the State

### (2)   Délais extraordinaires et inévitables qui ne sauraient être imputés à l'État

[195]    It is also necessary to subtract from the actual delay any periods that, although not fairly attributable to the defence, are nonetheless not fairly counted against the state. Such time periods could include unavoidable delays due to inclement weather or illness of a trial participant.

[195]    Il est également nécessaire de soustraire du temps effectivement écoulé toute période qui, bien qu'elle ne soit pas légitimement imputable à la défense, ne peut néanmoins être reprochée légitimement non plus à l'État. Mentionnons à titre d'exemple les délais inévitables attribuables aux intempéries ou à la maladie d'un des participants au procès.

### D.   *Was the Delay That Counts Against the State Unreasonable?*

### D.   *Le délai attribuable à l'État était-il déraisonnable?*

[196]    At this point in the analysis, the judge has determined the reasonable time a case ought to have taken, and the period of time that fairly counts against the state that it actually took. The next and final step is to determine whether this actual period of time exceeds the reasonable time by more than can be justified on any acceptable basis. This approach is a slight reorientation of the *Morin* framework because the focus is more explicitly on the period of delay which exceeds what would have been reasonable. But there is no change in principle.

[196]    À cette étape de l'analyse, le juge a estimé combien de temps le procès aurait raisonnablement dû prendre et il a déterminé la portion de la durée réelle du procès qui peut légitimement être imputée à l'État. La prochaine et dernière étape de son analyse consistera à déterminer si ce délai excède le délai raisonnable d'une période plus longue que ce qui peut être justifié de quelque façon acceptable. Cette démarche intellectuelle se veut une légère réorientation du cadre d'analyse prescrit par l'arrêt *Morin* parce qu'il met l'accent plus explicitement sur la portion du délai qui excède ce qui aurait été raisonnable. Cette nouvelle approche ne constitue pas pour autant un changement de principe.

(1)  Can the Delay Beyond What Would Have Been Reasonable Be Justified?

[197]    Determining whether the actual delay was longer than what would have been reasonable is a simple matter of arithmetic. However, qualifying the extent of that excess delay as justified or not requires evaluation. As stated in *Morin*, at p. 787: "The general approach to a determination as to whether the right has been denied is not by the application of a mathematical or administrative formula" but rather by judicial determination.

[198]    Where the actual time exceeds what would have been reasonable for a case of that nature, the result will be a finding of unreasonable delay unless the Crown can show that the delay was justified having regard to the length of the excess delay balanced against certain other factors described below. The point at which the amount of time beyond what would have been a reasonable delay becomes unreasonable cannot be described with precision. We can say, however, that where the delay exceeds what would have been reasonable, justification is required and, as the length of the excess delay increases, justification will be more difficult. Even substantial excess delay may be justified and therefore reasonable where, for example, there is a particularly strong societal interest in the prosecution proceeding on its merits, or where the delay results from temporary and extraordinary pressures on counsel and the court system. However, it does not follow that in these conditions the excess period is invariably justified. As I will discuss, given proof of actual prejudice to the accused or of abusive or negligent conduct on the part of the Crown which contributed to the delay, justification may be found to be lacking.

[199]    The focus must remain on the fundamental question at this point in the analysis: whether the amount of excess delay can be "justified on any acceptable basis": *Smith*, at p. 1138.

(1)  Le délai qui excède ce qui aurait été raisonnable peut-il être justifié?

[197]    Pour déterminer si le délai qui s'est réellement écoulé a été plus long que ce qui aurait été raisonnable, il suffit d'un simple calcul. Toutefois, pour décider si le délai excédentaire est justifié ou non, il faut poursuivre l'analyse. Ainsi que la Cour l'a déclaré dans l'arrêt *Morin*, p. 787 : « La méthode générale pour déterminer s'il y a eu violation du droit ne consiste pas dans l'application d'une formule mathématique ou administrative », mais plutôt dans une décision judiciaire.

[198]    Lorsque le temps qui s'est réellement écoulé excède ce qui aurait été raisonnable pour une cause de même nature, il faut conclure au caractère déraisonnable du délai, à moins que le ministère public puisse démontrer que ce dernier était justifié à la lumière de la mise en balance de l'ampleur de l'excédent et de certains autres facteurs décrits ci-après. Le point de bascule à partir duquel le temps réellement écoulé devient déraisonnable ne peut être défini précisément. Nous pouvons toutefois affirmer que lorsque le délai excède ce qui aurait été raisonnable, il faudra le justifier, et que plus l'excédent est long, plus il sera difficile de le justifier. Cela dit, même les excédents importants peuvent se justifier, et donc être jugés raisonnables lorsque, par exemple, l'intérêt de la société à ce que le dossier soit jugé au fond est particulièrement élevé ou lorsque le délai résulte de pressions temporaires et exceptionnelles sur les avocats ou sur le système judiciaire. Cependant, on ne peut en conclure que, dans ces conditions, la période excédentaire sera systématiquement justifiée. Comme je vais en discuter, en présence de preuve que l'accusé a réellement subi un préjudice ou d'une conduite abusive ou négligente du ministère public qui a contribué au délai, le tribunal pourra conclure à l'absence de justification.

[199]    Il faut continuer à mettre l'accent sur la question fondamentale à cette étape de l'analyse, soit celle de savoir si le délai excédentaire peut être « justifié de quelque façon acceptable » : *Smith*, p. 1138.

### (2)   The Role of Prejudice in the Analysis

[200]   The role of prejudice in the unreasonable delay analysis has become unduly complicated. The jurisprudence has distinguished between inferred and actual prejudice and, in some cases, it appears that it has been almost impossible to succeed on an unreasonable delay claim without proof of either type of prejudice.

[201]   I would clarify the role of prejudice in the following ways.

[202]   First, I would affirm the statements in previous cases to the effect that actual prejudice is not necessary to establish a breach of s. 11(*b*): see e.g. *Mills*, at p. 926, per Lamer J.; *Askov*, at p. 1232, per Cory J. The question is whether the delay is unreasonable, not whether an unreasonable delay has, in addition to being unreasonable, caused identifiable and actual prejudice.

[203]   Second, and as explained earlier, actual prejudice to the liberty interests of the accused, notably being detained in custody or subject to very restrictive bail conditions pending trial, is taken into account in deciding what a reasonable time for trial would be. Prejudice of this nature during the period of reasonable delay need not be considered again in the final assessment of whether the delay is unreasonable.

[204]   Third, prejudice to an accused's security and fair trial interests in the general sense — such as stress and stigma or the erosion of evidence — is already considered in this revised framework. Defining the reasonable time requirements of a case recognizes that delay beyond this point will cause such stress and erosion of fair trial interests, regardless of any evidence the Crown may bring to

### (2)   Le rôle du préjudice dans l'analyse

[200]   Le rôle que joue le préjudice dans l'analyse du délai déraisonnable est devenu inutilement compliqué. La jurisprudence a établi une distinction entre le préjudice présumé et le préjudice réellement subi par l'accusé et, dans certains cas, il semble qu'il soit devenu presque impossible d'obtenir gain de cause lorsqu'on présente une demande fondée sur un délai déraisonnable si l'on ne peut faire la preuve d'un type ou l'autre de préjudice.

[201]   Dans les paragraphes qui suivent, je vais clarifier le rôle du préjudice.

[202]   Premièrement, je confirme les affirmations faites dans la jurisprudence suivant lesquelles il n'est pas nécessaire de prouver que l'accusé a réellement subi un préjudice pour que le tribunal conclue à une violation de l'al. 11*b*) : voir, p. ex., *Mills*, p. 926, le juge Lamer; *Askov*, p. 1232, le juge Cory. Il s'agit de savoir si le délai est déraisonnable et non de savoir si un délai déraisonnable a, outre le fait qu'il est déraisonnable, réellement entraîné un préjudice tangible.

[203]   Deuxièmement, comme je l'ai déjà expliqué, pour déterminer en quoi devrait consister la durée raisonnable d'un procès, on tient compte de l'atteinte concrète causée aux droits à la liberté de l'accusé et notamment, le cas échéant, du fait qu'il est détenu sous garde ou qu'il est soumis à des conditions très contraignantes de remise en liberté en attendant la tenue de son procès. Ainsi, à l'étape finale de l'évaluation du caractère raisonnable du délai, il n'est pas nécessaire de tenir compte de nouveau de ce type de préjudice qu'il a pu subir au cours de la période correspondant au délai raisonnable.

[204]   Troisièmement, selon le cadre d'analyse révisé décrit dans les présents motifs, à cette étape, il a déjà été tenu compte du préjudice causé aux droits de l'accusé à la sécurité de sa personne et à un procès équitable en général — avec, notamment, la prise en considération du stress ou de la stigmatisation dont il a été victime ou de l'érosion de la preuve. En définissant la durée raisonnable de

the contrary. Prejudice to these interests during the period of reasonable delay need not be explicitly considered as a separate factor in this final inquiry, and the court should not consider evidence on any vague, general effect that the delay may have had on the security or fair trial interests of the accused.

[205]   Fourth, specific examples of actual prejudice to an accused's security and fair trial rights, such as the loss of employment or death of a witness (this, of course, is not an exhaustive list), are properly considered at the final stage of the analysis.

[206]   Lastly, the absence of actual prejudice cannot make reasonable what would otherwise be an unreasonable delay. Actual prejudice need not be proved to find an infringement of s. 11(*b*) and its absence cannot be used to excuse otherwise unreasonable delay. However, even if the excess delay does not exceed the objectively determined reasonable time requirements of a case of that nature, the accused still may be able to demonstrate actual prejudice, thus making unreasonable (in the particular circumstances of the case) a delay that might otherwise be objectively viewed as reasonable.

(3)   Extraordinary Reasons for the Delay

[207]   Exceptional cases may arise which merit further consideration of the various reasons for the delay at this final stage of the inquiry.

l'instance, on reconnaît que tout délai supplémentaire causera un stress à l'accusé et portera atteinte à son droit à un procès équitable, et ce, indépendamment de toute preuve contraire que pourrait présenter le ministère public. Il n'est donc pas nécessaire de tenir compte expressément de l'atteinte qui a été portée à ces droits au cours de la période constituant un délai raisonnable et de considérer ces facteurs comme des éléments distincts lors de l'analyse finale. En outre, le tribunal ne devrait pas tenir compte d'éléments de preuve portant sur les conséquences vagues et générales que le délai a pu avoir sur les droits de l'accusé à la sécurité de sa personne ou à un procès équitable.

[205]   Quatrièmement, des exemples précis de cas où l'accusé a réellement subi un préjudice découlant d'une atteinte à son droit à la sécurité de sa personne et à un procès équitable, tels que la perte d'un emploi ou le décès d'un témoin (ce qui, bien sûr, ne constitue pas une liste exhaustive), sont des exemples de circonstances dont le tribunal tient légitimement compte à cette étape finale de l'analyse.

[206]   Enfin, le fait que l'accusé n'ait pas réellement subi de préjudice ne peut rendre raisonnable un délai qui, autrement, serait déraisonnable. Il n'est pas nécessaire qu'un tel préjudice soit mis en preuve pour que le tribunal conclue à une violation de l'al. 11*b*), et son absence ne peut pas être invoquée pour excuser un délai autrement déraisonnable. Toutefois, même si le délai excédentaire n'est pas plus long que le délai objectivement jugé raisonnablement nécessaire pour juger une affaire comme celle dont la cour est saisie, l'accusé peut prouver qu'il a réellement subi un préjudice et ainsi établir le caractère déraisonnable du délai (dans les circonstances particulières de sa cause), même si celui-ci, autrement, pourrait être objectivement jugé raisonnable.

(3)   Raisons extraordinaires invoquées pour justifier le délai

[207]   Des situations exceptionnelles peuvent survenir et justifier à cette ultime étape de l'analyse un examen plus approfondi des diverses raisons pour lesquelles le délai en cause s'est écoulé.

[208]   In most cases, the elements of delay apart from delay attributable to the accused will be given equal weight, contrary to the approach in *R. v. Ghavami*, 2010 BCCA 126, 253 C.C.C. (3d) 74, at para. 52. Specifically, institutional delay and other delay that is counted against the state are generally given equal weight. Abusive or grossly negligent Crown conduct causing delay counts more heavily against the state in determining whether the excessive delay may be justified on any acceptable basis. Such conduct not only undermines the accused's rights, but is contrary to society's interest in an effective and fair justice system.

[209]   Conversely, institutional delay that is attributable to exceptional and temporary conditions in the justice system may be excused or given somewhat less weight against the state in the overall balancing and may in some cases justify excusing what would otherwise be excessive delay. This should generally be done, however, only if the state has made reasonable efforts to alleviate those conditions: *Askov*, at p. 1242.

### (4)   Are There Especially Strong Societal Interests in the Prosecution on the Merits of the Case?

[210]   As discussed above, s. 11(*b*) encompasses "a community or societal interest" to "see that the justice system works fairly, efficiently and with reasonable dispatch": *Askov*, at pp. 1219 and 1221. This societal interest supports prompt disposition of criminal cases. However, there is also a societal interest in "ensuring that those who transgress the law are brought to trial": pp. 1219-20. Societal interests must be considered "in conjunction" with the interests of the accused in the interpretation of s. 11(*b*): p. 1222.

[211]   In McLachlin J.'s concurring opinion in *Morin*, she held that the societal interests in bringing the accused to trial should be considered in the determination of s. 11(*b*) claims: the "true issue at stake"

[208]   Dans la plupart des cas, contrairement à la méthode préconisée dans l'arrêt *R. c. Ghavami*, 2010 BCCA 126, 253 C.C.C. (3d) 74, par. 52, on accorde la même importance aux divers éléments du délai, mis à part le délai dont l'accusé est responsable. Plus précisément, en règle générale, on accorde la même importance au délai institutionnel et à tout délai imputable à l'État. Toutefois, le délai attribuable à une négligence grave ou à un comportement abusif de la part du ministère public pèse plus lourd contre l'État lorsqu'il s'agit de déterminer si le délai excédentaire peut être justifié de quelque façon acceptable. Ce genre de comportement a non seulement pour effet de miner les droits de l'accusé, mais il va à l'encontre de l'intérêt qu'a la société à ce que le système de justice soit efficace et équitable.

[209]   En revanche, les délais institutionnels attribuables à des circonstances exceptionnelles et temporaires dans le système de justice peuvent être excusés ou peser un peu moins lourd contre l'État au moment de la mise en balance générale et, dans certains cas, justifier ce qui constituerait autrement un délai excessif. Cela ne devrait toutefois se produire que si l'État a fait des efforts raisonnables pour minimiser la portée de ces circonstances : *Askov*, p. 1242.

### (4)   Y a-t-il, pour la société, un intérêt particulièrement pressant à ce que le procès soit instruit au fond?

[210]   Comme je l'ai déjà expliqué, l'al. 11*b*) vise « un droit collectif ou social » de « s'attendre à ce que le système de justice fonctionne de façon équitable, efficace et avec une célérité raisonnable » : *Askov*, p. 1219 et 1221. Cet intérêt de la société milite pour un règlement rapide des affaires criminelles. Toutefois, il est également dans l'intérêt de la société de « s'assurer que ceux qui transgressent la loi soient traduits en justice » : p. 1219. Pour interpréter l'al. 11*b*), on doit donc tenir compte de l'intérêt de la société « en plus » des protections garanties à l'accusé : p. 1222.

[211]   Dans l'opinion concordante qu'elle a exprimée dans l'arrêt *Morin*, la juge McLachlin a expliqué que l'intérêt qu'a la société à ce que l'accusé soit traduit en justice doit être pris en considération

in a s. 11(*b*) analysis is the "determination of where the line should be drawn between conflicting interests", i.e. those of the accused and those of society: p. 809. Whether a delay becomes unreasonable, on the spectrum of delays apparent in criminal proceedings, must be determined by an analysis in which the interests of society in bringing those accused of crimes to trial are balanced against the rights of the person accused of a crime: pp. 809-10. To this I would add the societal interest in prompt disposition of criminal matters.

[212]   I agree with this balancing approach. Under the revised framework I propose, the delay in excess of the reasonable time requirements of the case and any actual prejudice arising from the overall delay must be evaluated in light of societal interests: on one hand, fair treatment *and* prompt trial of accused persons and, on the other, determination of cases on their merits. As noted by Cory J. in *Askov*, more serious offences will carry commensurately stronger societal demands that the accused be brought to trial: p. 1226. These interests, however, are in effect factored into the determination of what would be a reasonable time for the disposition of a case like this one. But if there are exceptionally strong societal interests in the prosecution of a case against an accused which substantially outweigh the societal interest and the interest of the accused person in prompt trials, these can serve as an "acceptable basis" upon which exceeding the inherent and institutional requirements of a case can be justified.

E.   *Summary of the Analytical Framework*

[213]   If the accused first establishes a basis that justifies a s. 11(*b*) inquiry, the court must then undertake an objective inquiry to determine what would be the reasonable time requirements to dispose of a case similar in nature to the one before the court (the inherent time requirements) and how

lorsqu'il s'agit de trancher une requête fondée sur l'al. 11*b*). La « véritable question en litige » dans le cadre d'une analyse fondée sur cette disposition consiste à se demander « où se trouve la limite entre des intérêts opposés », en l'occurrence, ceux de l'accusé et ceux de la société : p. 809. Pour trancher la question de savoir si un délai est déraisonnable — compte tenu des divers délais qui surviennent dans le cadre des procès criminels —, il convient d'analyser l'intérêt qu'a la société à traduire l'accusé en justice et de mettre ce droit en balance avec ceux de ce dernier : p. 809-810. J'ajouterais à cela l'intérêt de la société à ce que les affaires criminelles soient jugées promptement.

[212]   Je souscris à cette approche qui préconise une mise en balance. Selon le cadre révisé que je propose, le délai excédant le temps qui aurait raisonnablement été nécessaire pour juger l'affaire et le préjudice qu'a réellement subi l'accusé en raison du délai général doivent être évalués en fonction de l'intérêt qu'a la société, d'une part, à ce que les accusés soient jugés rapidement *et* équitablement et, d'autre part, à ce que les causes soient jugées au fond. Comme le juge Cory l'a fait observer dans l'arrêt *Askov*, plus un crime est grave, plus la société exige avec force que l'accusé subisse un procès : p. 1226. Le cadre d'analyse tient toutefois effectivement compte de ces intérêts pour déterminer ce qui constituerait un délai raisonnable pour juger une affaire de même nature. Cependant, si la société a un intérêt particulièrement pressant à ce que l'accusé soit traduit en justice et que cet intérêt l'emporte nettement sur celui de la société et de l'accusé à ce que le procès ait lieu rapidement, cet intérêt pressant peut être considéré comme une « raison acceptable » justifiant un délai plus long que les délais inhérent et institutionnel propres à l'affaire.

E.   *Résumé du cadre analytique*

[213]   Si l'accusé établit tout d'abord l'existence de raisons justifiant un examen fondé sur l'al. 11*b*), le tribunal doit ensuite entreprendre une analyse objective pour déterminer quels sont les délais raisonnablement nécessaires pour juger une affaire de nature semblable à celle dont il est saisi (le délai

long it would reasonably take the court to hear it once the parties are ready for hearing (the institutional delay).

[214]   Next, the court must consider how much of the actual delay in the case counts against the state. This is done by subtracting the periods attributable to the defence, including any waived time periods, from the overall period of delay from charge to trial.

[215]   Finally, the court must consider whether and to what extent the actual delay exceeds the reasonable time requirements of a case, and whether this can be "justified on any acceptable basis". If the actual delay that counts against the state is longer than the reasonable time requirements of a case, then the delay will generally be considered unreasonable. The converse is also the case. However, there may be countervailing considerations, such as the presence of actual prejudice, exceptionally strong societal interests, or exceptional circumstances such as Crown misconduct or exceptional and temporary conditions affecting the justice system. These may either shorten or lengthen the period that would otherwise be unreasonable delay.

[216]   This straightforward framework does not attempt to gloss over the inherent complexity of determining what delays are unreasonable. It merely clarifies where the various relevant considerations fit into the analysis and how they relate to each other. It also simplifies the analysis of prejudice and makes clear that, as a general rule, institutional and Crown delay should be given equal weight. It retains the focus on the circumstances of the particular case and builds on the accumulated experience found in 30 years of this Court's jurisprudence.

inhérent à l'affaire) et déterminer combien de temps il faudrait raisonnablement au tribunal pour juger l'affaire à partir du moment où les parties sont prêtes pour l'instruction (le délai institutionnel).

[214]   Le tribunal doit ensuite se demander quelle portion du délai est imputable à l'État. Pour ce faire, il soustrait toute période attribuable à la défense — y compris les périodes qu'elle a renoncé à invoquer — de la totalité de la période écoulée entre le dépôt des accusations et le procès.

[215]   Enfin, le tribunal doit se demander si, et dans quelle mesure, le temps qu'il a réellement fallu pour instruire l'affaire excède le délai raisonnable nécessaire pour instruire une cause de même nature et si cet excédent peut être « justifié de quelque façon acceptable ». Si le délai que l'on peut reprocher à l'État est plus long que le délai raisonnablement nécessaire pour juger l'affaire, le tribunal conclura généralement à son caractère déraisonnable. L'inverse est également vrai. Toutefois, il peut exister des circonstances atténuantes, telles que le fait pour l'accusé d'avoir réellement subi un préjudice, des intérêts sociétaux exceptionnellement pressants, des circonstances extraordinaires, dont l'inconduite du ministère public, ou encore une situation exceptionnelle et temporaire ayant une incidence sur le système de justice. Ces facteurs peuvent prolonger ou abréger ce qui constituerait autrement un délai déraisonnable.

[216]   Ce cadre d'analyse est simple, mais il tient compte de la complexité inhérente à la détermination des délais déraisonnables. Il vient simplement préciser le rôle que jouent les différents facteurs pertinents dans l'analyse et les liens qu'ils ont entre eux. En outre, il simplifie l'analyse du préjudice et indique clairement qu'il y a lieu, en règle générale, d'accorder la même importance au délai institutionnel et à celui qui est attribuable au ministère public. Enfin, ce cadre continue à mettre l'accent sur les circonstances propres à l'affaire et il met à profit l'expérience accumulée par 30 années de jurisprudence de la Cour.

## III. Application

[217]   Although, as noted, this appeal would also be allowed applying the existing *Morin* analysis, it will be useful by way of illustration to analyze it under the modified framework that I have just described.

### A. *Facts*

[218]   In 2008, the RCMP conducted a single, straightforward undercover investigation into a "dial-a-dope" operation involving the sale of drugs out of the Langley and Surrey areas of British Columbia. Undercover police officers purchased cocaine six times over seven months, calling a number associated with Mr. Jordan. On December 17, 2008, the police executed a search warrant, seizing 42.3 grams of heroin and just under 1.5 kilograms of cocaine and crack cocaine from the apartment that Mr. Jordan and his then-girlfriend, Ms. Kristina Gaudet, shared. On December 17, 2008, the police arrested Mr. Jordan and Ms. Gaudet. Mr. Jordan was charged with possession for the purposes of trafficking on December 18, and Ms. Gaudet was charged on February 20, 2009.

[219]   From December 18, 2008 to February 16, 2009, Mr. Jordan was in custody. He was released on February 16, on strict conditions, including house arrest. During this time, the Crown swore additional and amended informations. Ultimately, 10 accused were charged. Mr. Jordan, as the main target of the investigation and prosecution, faced six charges.

[220]   The accused elected to be tried in British Columbia Supreme Court. Crown and defence counsel agreed upon a preliminary hearing. For

## III. Application

[217]   Bien que, comme je l'ai indiqué précédemment, le présent pourvoi serait également accueilli suivant le cadre d'analyse existant énoncé dans l'arrêt *Morin* et applicable jusqu'à maintenant, il est néanmoins utile de se livrer à l'analyse modifiée que je viens de décrire pour illustrer comment elle s'applique.

### A. *Les faits*

[218]   En 2008, la GRC a ouvert une enquête secrète peu complexe sur une opération dite de « vente de drogues sur appel » portant sur le commerce de stupéfiants dans les régions de Langley et de Surrey, en Colombie-Britannique. Des agents d'infiltration ont acheté de la cocaïne à six reprises sur une période de sept mois en composant un numéro de téléphone associé à M. Jordan. Le 17 décembre 2008, des policiers ont exécuté un mandat de perquisition et saisi 42,3 grammes d'héroïne ainsi qu'un peu moins de 1,5 kilo de cocaïne et de crack dans l'appartement qu'occupaient alors M. Jordan et sa petite amie de l'époque, M^me Kristina Gaudet. Le 17 décembre 2008, les policiers ont arrêté M. Jordan et M^me Gaudet. Le 18 décembre, le premier a été accusé de possession de drogue en vue d'en faire le trafic. La seconde, pour sa part, a été accusée le 20 février 2009.

[219]   Entre le 18 décembre 2008 et le 16 février 2009, M. Jordan est demeuré en détention. Il a été remis en liberté le 16 février sous réserve de conditions strictes, dont l'obligation de demeurer en détention à domicile. Pendant cette période, le ministère public a fait d'autres dénonciations sous serment et a apporté des modifications à certaines des dénonciations déjà au dossier. En fin de compte, 10 individus ont été accusés. M. Jordan, en tant que principale cible de l'enquête et de la poursuite, faisait face à six accusations.

[220]   L'accusé a choisi de subir son procès devant la Cour suprême de la Colombie-Britannique. Le ministère public et l'avocat de la défense se sont

24 months, the preliminary hearing process was held before the Provincial Court; it took another 16 months to obtain a Supreme Court trial date for the two remaining accused.

B. *Judicial History*

   (1)  British Columbia Supreme Court, 2012 BCSC 1735

[221]    Verhoeven J. of the British Columbia Supreme Court dismissed Mr. Jordan's s. 11(*b*) motion. He reached the following conclusions with respect to the total time to the end of the trial:

- Total length of delay: 49.5 months

- Inherent requirements: 10.5 months

- Crown delay: 2 months

- Institutional delay: 32.5 months

- Accused delay: 4 months

[222]    Some of the delay present in this case was due to an underestimation of the time required to conduct the preliminary inquiry. While the Crown argued that the subsequent delay should be attributable to the defence, the trial judge ultimately attributed it as institutional delay, citing a lack of evidence supporting the Crown's claims.

[223]    The trial judge ultimately concluded that the accused only waived four months of the delay, due to a last-minute change in counsel. He rejected the Crown's arguments that the delay before the superior court was waived. The Crown relied upon a letter it sent to defence counsel, asking whether the latter would be interested in an earlier trial date based upon a three-week (as opposed to a six-week) trial estimation. Defence counsel did not respond to this letter, and there was no evidence as to the reason

entendus sur la tenue d'une enquête préliminaire. Pendant 24 mois, le processus d'enquête préliminaire s'est déroulé devant la Cour provinciale, et il a fallu 16 mois de plus pour obtenir une date de procès devant la Cour suprême pour les deux accusés restants.

B. *Décision des juridictions d'instances inférieures*

   (1)  Cour suprême de la Colombie-Britannique, 2012 BCSC 1735

[221]    Le juge Verhoeven de la Cour suprême de la Colombie-Britannique a rejeté la requête de M. Jordan fondée sur l'al. 11*b*). Il a tiré les conclusions suivantes au sujet du temps total écoulé avant la fin du procès :

- Durée totale du délai : 49,5 mois

- Délai inhérent : 10,5 mois

- Délai imputable au ministère public : 2 mois

- Délai institutionnel : 32,5 mois

- Délai imputable à l'accusé : 4 mois

[222]    En l'espèce, une portion du délai a été causée par une sous-estimation du temps nécessaire pour mener l'enquête préliminaire. Le ministère public a soutenu que le délai qui en a découlé devait être imputé à la défense. Le juge du procès l'a cependant qualifié de délai institutionnel, citant le manque de preuves à l'appui des prétentions du ministère public.

[223]    En fin de compte, le juge du procès a conclu que l'accusé n'avait renoncé qu'à quatre mois du délai total, une renonciation découlant du fait qu'il avait décidé à la dernière minute de changer d'avocat. Ainsi, le juge a rejeté les arguments du ministère public suivant lesquels l'accusé avait renoncé à invoquer le délai écoulé devant la cour supérieure. Au soutien de sa prétention, le ministère public a invoqué la lettre qu'il avait envoyée à l'avocat de la défense dans laquelle il demandait

behind this. The trial judge found that this did not amount to clear and unequivocal waiver.

à ce dernier s'il était intéressé à ce que la date du procès soit rapprochée après avoir estimé sa durée à trois semaines (plutôt qu'à six). L'avocat de la défense n'a pas répondu à cette lettre et aucun élément de preuve n'explique cette attitude. Pour le juge du procès, cette attitude ne pouvait être interprétée comme une renonciation claire et non équivoque.

[224]    The trial judge estimated eight months of inherent time requirements before the provincial court (five months of intake requirements, two months for scheduling and preparation, and one month for the hearing and decision), and two and a half months before the superior court (two months to accommodate counsel scheduling, two weeks for the trial itself).

[224]    Le juge du procès a estimé à huit mois le délai inhérent à la portion de l'instance qui s'est déroulée en cour provinciale (cinq mois pour le délai préparatoire, deux mois pour la mise au rôle et la préparation et un mois pour l'audience et la décision) et à deux mois et demi celle qui s'est déroulée en cour supérieure (deux mois pour trouver des dates convenant aux avocats et deux semaines pour le procès lui-même).

[225]    The trial judge found that no time was attributable to the accused, but that the Crown was responsible for two months due to unavailability to continue the preliminary inquiry.

[225]    Le juge du procès a conclu qu'aucun délai ne pouvait être reproché à l'accusé, mais que le ministère public était responsable d'une période de deux mois parce qu'il n'avait pas été disponible pour continuer l'enquête préliminaire.

[226]    The trial judge concluded that there was 19 months of institutional delay before the provincial court, noting the evidence supporting the shortage of institutional resources in those courts in British Columbia. He further concluded that there was 13.5 months of institutional delay before the superior court.

[226]    Le juge du procès a conclu en outre qu'il fallait compter 19 mois de délai d'ordre institutionnel en cour provinciale, faisant observer que, selon la preuve, les juridictions en cause de la Colombie-Britannique souffraient d'un manque de ressources institutionnelles. Il a également conclu à un délai institutionnel de 13 mois et demi pour la portion de l'instance qui s'est déroulée devant la cour supérieure.

[227]    The trial judge then considered both actual prejudice and inferred prejudice. He concluded that the accused was not greatly prejudiced with respect to any of his liberty or fair trial interests but that he did suffer some prejudice to his security interests in the form of stress and worry. However, he held that the prior charges against Mr. Jordan "substantially reduc[e] the degree of prejudice" that would otherwise be assigned to Mr. Jordan's security interests: para. 124 (CanLII).

[227]    Le juge du procès s'est ensuite penché sur la question du préjudice, tant celui réellement subi que celui présumé du fait du délai. Il a conclu que le délai n'avait pas vraiment porté atteinte aux droits à la liberté ou à un procès équitable de l'accusé, mais que son droit à la sécurité de sa personne avait été enfreint en raison du stress et de l'inquiétude qu'il avait vécus. Le juge a toutefois estimé que les accusations portées antérieurement contre M. Jordan [TRADUCTION] « [avaient] atténu[é] considérablement l'ampleur de l'atteinte » que l'on aurait autrement jugé avoir été portée au droit de M. Jordan à la sécurité de sa personne : par. 124 (CanLII).

[228]   The trial judge concluded that the delay present in Mr. Jordan's case "substantially exceeded" the guidelines: para. 138. However, the delay was not unreasonable given the seriousness of the offences charged, the lack of substantial prejudice against the accused, and the reduced weight attributed to institutional delay.

### (2) British Columbia Court of Appeal, 2014 BCCA 241, 357 B.C.A.C. 137

[229]   The British Columbia Court of Appeal dismissed Mr. Jordan's appeal.

[230]   Justice Stromberg-Stein agreed with the facts laid out by the trial judge. She also confirmed that the "application judge identified and applied the correct legal authorities and principles": para. 13.

[231]   On the first ground of appeal, Mr. Jordan argued that the judge should have used the full 34.5 months of delay in his s. 11(*b*) analysis, instead of the 17 months outside of the *Morin* guidelines. However, the court concluded that the application judge correctly assessed the delay period.

[232]   Next, Mr. Jordan argued that the trial judge erred in attaching less weight to institutional delay. Justice Stromberg-Stein found that the judge's assessment of 34.5 months as institutional delay was not based on a proper evidentiary record. However, this assessment was favourable to Mr. Jordan, and she declined to interfere with Verhoeven J.'s weighing of the institutional delay in comparison to other factors.

[233]   Finally, Mr. Jordan claimed that the trial judge erred in his assessment of prejudice: by using the wrong quantum of delay and by failing to make a meaningful finding of inferred prejudice. The application judge found that Mr. Jordan experienced "some degree" of prejudice, but not a "substantial" degree of prejudice: C.A. reasons, at para. 46. This finding of fact is reviewable on a standard of

[228]   Selon le juge du procès, dans le cas de M. Jordan, le délai [TRADUCTION] « était de loin supérieur » à celui prévu par les lignes directrices : par. 138. Toutefois, il n'était pas déraisonnable compte tenu de la gravité des infractions reprochées, du fait que l'accusé n'avait pas subi de grave préjudice et de l'importance atténuée accordée au délai institutionnel.

### (2) Cour d'appel de la Colombie-Britannique, 2014 BCCA 241, 357 B.C.A.C. 137

[229]   La Cour d'appel de la Colombie-Britannique a débouté M. Jordan de son appel.

[230]   La juge Stromberg-Stein a accepté les faits relatés par le juge du procès. Elle a également confirmé que [TRADUCTION] « [ce dernier] a défini et appliqué les bons précédents et les bons principes juridiques » : par. 13.

[231]   Comme premier moyen d'appel, M. Jordan a soutenu que le juge du procès aurait dû appliquer en totalité les 34,5 mois de délai écoulé dans son analyse fondée sur l'al. 11*b*), plutôt que les 17 mois excédant les lignes directrices de l'arrêt *Morin*. La Cour d'appel a cependant conclu que le juge du procès avait bien évalué la durée du délai.

[232]   M. Jordan a ensuite soutenu que le juge du procès avait commis une erreur en accordant moins d'importance au délai institutionnel. La juge Stromberg-Stein a conclu que la décision du juge du procès de qualifier 34,5 mois de délai institutionnel n'était pas fondée sur une preuve adéquate. Toutefois, comme cette évaluation était favorable à M. Jordan, la juge Stromberg-Stein a refusé de modifier la mise en balance qu'a faite le juge Verhoeven du délai institutionnel et des autres facteurs.

[233]   Enfin, M. Jordan a affirmé que le juge du procès avait commis une erreur dans son évaluation du préjudice en retenant une durée de délai erronée et en ne tirant pas de véritable conclusion au sujet du préjudice présumé. Pour le juge du procès, M. Jordan avait subi [TRADUCTION] « un certain » préjudice, mais pas un préjudice « important » : C.A., par. 46. Cette conclusion de fait est

palpable and overriding error. The Court of Appeal found that the trial judge's assessment did not rise to this degree. The court affirmed the trial judge's findings regarding actual prejudice, and held that the judge was "alive to the possibility of inferring prejudice" and did, in fact, infer some degree of prejudice from the delay: para. 51.

assujettie à la norme de contrôle de l'erreur manifeste et dominante. Or, la Cour d'appel a estimé que l'évaluation du juge du procès n'avait pas atteint ce seuil. Elle a confirmé les conclusions tirées par ce dernier au sujet du préjudice réellement subi et conclu que celui-ci s'était montré « ouvert à la possibilité de conclure à l'existence d'un préjudice présumé » et qu'il avait, de fait, jugé que le délai avait causé un certain préjudice : par. 51.

C.  *Analysis*

[234]   Applying the analytical framework from *Morin* as elaborated and clarified above, I conclude that Mr. Jordan's appeal should be allowed and the charges against him stayed because his constitutional right to be tried within a reasonable time was violated in this case. I will briefly consider the four steps in the analytic framework.

C.  *Analyse*

[234]   Appliquant le cadre analytique qui a été énoncé dans l'arrêt *Morin* en tenant compte des explications et clarifications qui précèdent, je conclus qu'il y a lieu de faire droit au pourvoi de M. Jordan et de suspendre les accusations portées contre lui, puisque son droit constitutionnel d'être jugé dans un délai raisonnable a été violé. Je vais maintenant examiner brièvement chacun des quatre volets que comporte le cadre d'analyse.

(1)   Is an Unreasonable Delay Inquiry Justified?

(1)   L'analyse du délai déraisonnable est-elle justifiée?

[235]   I agree with the trial judge that the 49.5-month delay from the charges to the end of the scheduled trial date is sufficient to trigger an inquiry into whether the delay is unreasonable.

[235]   Je suis d'accord avec le juge du procès pour affirmer que le délai de 49 mois et demi écoulé entre le dépôt des accusations et la date prévue de la fin du procès suffit pour justifier l'examen du caractère raisonnable ou non du délai.

(2)   What Is a Reasonable Time for the Disposition of a Case Like This One?

(2)   Quel serait le délai raisonnable pour juger une affaire comme celle dont le tribunal est saisi?

(a)   *Inherent Time Requirements*

a)   *Délai inhérent à l'affaire*

[236]   The trial judge identified the periods of inherent delay present in the case as being 10.5 months. While the trial judge did not approach this on a purely objective basis, I nonetheless find no reason to interfere with this assessment as representing the reasonable inherent time requirements of a case of this nature, even treating this case as involving an in-custody accused or an accused subject to very restrictive bail conditions.

[236]   Le juge du procès a fixé à 10 mois et demi le délai inhérent à la présente affaire. Bien qu'il n'ait pas abordé cet aspect du dossier sous un angle purement objectif, je conclus néanmoins que rien ne justifie de modifier cette évaluation, qui est à l'image du délai inhérent raisonnable dans une affaire de la nature de la présente cause, même si l'accusé visé a été détenu ou a fait l'objet de conditions de remise en liberté sous caution très rigoureuses.

(b)  *Institutional Delay*

[237]   This case proceeded through the Provincial Court and the Supreme Court of British Columbia. Under the *Morin* administrative guidelines, the reasonable institutional delays for both levels of court total between 14 and 18 months. Although it is debatable whether accepting the upper end of the range is appropriate in a case of this nature, for the purposes of my analysis I will proceed on the basis that 18 months of institutional delay would be reasonable.

[238]   It follows that a reasonable period for the disposition of this case was 28.5 months.

(3)  How Much of the Delay That Actually Occurred Counts Against the State?

[239]   We know that this case took 49.5 months in total. To determine the amount of delay that counts against the state we must subtract any period attributable to the defence and any period of unusual or unforeseen delay not fairly counted against the Crown.

(a)  *Delay Attributable to the Defence*

[240]   The Crown's main argument is that the trial judge erred in categorizing so much of the delay as institutional. The Crown makes multiple submissions regarding the categorization of delay between the charge to the arraignment hearing, from the arraignment hearing to the preliminary inquiry, of the adjournments of the preliminary inquiry, and in setting the six-week trial. For many of these submissions, the Crown argues that various periods should be considered "waiver" or conduct otherwise attributable to the defence.

b)  *Délai institutionnel*

[237]   La présente affaire a été instruite par la Cour provinciale et par la Cour suprême de la Colombie-Britannique. Selon les lignes directrices administratives énoncées dans l'arrêt *Morin*, les délais institutionnels raisonnables dans les cas où la cause est entendue par ces deux niveaux de juridiction totalisent entre 14 et 18 mois. Bien qu'on puisse débattre de l'opportunité, dans un cas comme celui-ci, d'accepter un chiffre se situant à l'extrémité supérieure de la fourchette, pour les besoins de mon analyse, je vais tenir pour acquis qu'un délai institutionnel de 18 mois serait raisonnable.

[238]   Compte tenu de ce qui précède, le délai raisonnable pour trancher la présente affaire aurait donc été de 28 mois et demi.

(3)  Quelle portion du délai effectivement écoulé peut-on imputer à l'État?

[239]   Nous savons que, dans la présente affaire, le procès a duré en tout 49 mois et demi. Pour déterminer la portion de ce délai que l'on peut imputer à l'État, il faut soustraire de ce total toute période qui peut être attribuée à la défense et toutes celles inusitées ou imprévues que l'on ne saurait reprocher au ministère public.

a)  *Délai imputable à la défense*

[240]   Selon le principal argument du ministère public, le juge du procès a commis une erreur en qualifiant d'institutionnelle une trop grande portion du délai. Le ministère public a formulé de nombreux arguments au sujet de la caractérisation du délai écoulé entre le dépôt des accusations et l'audience relative à l'interpellation, de celui survenu entre cette dernière et l'enquête préliminaire, ainsi qu'au sujet des ajournements de l'enquête préliminaire et de la mise au rôle d'un procès de six semaines. Se fondant sur ces arguments, le ministère public soutient que diverses périodes devraient être considérées comme une « renonciation » ou comme un délai imputable à la défense.

[241]    As stated above, for any period to be considered waived by the defence, the defence must have so indicated in clear and unequivocal terms. The trial judge noted that Mr. Jordan agreed that four months of the delay was "waived" because it resulted from his last-minute change in counsel. However, I see no reason to attribute any other period as being "waived" by Mr. Jordan. Moreover, I see no reason to classify any other period as being fairly attributable to Mr. Jordan.

(b)  *Exceptional or Unavoidable Delay*

[242]    No such delay is present here.

(4)  Was the Delay That Counts Against the State Unreasonable?

[243]    As discussed earlier, the reasonable time requirements for a case of this nature were 28.5 months. The case in fact took 49.5 months. The difference is 21 months. Of that, 4 months are attributable to the defence. The rest — a period of 17 months — counts against the state. In other words, this case took almost a year and a half longer than what would be a reasonable period to prosecute a case of this nature.

[244]    This is not a close case. The time to the end of trial greatly exceeds what would be a reasonable time to prosecute a case of this nature. While there are societal interests in the trial on the merits of the serious drug crimes alleged against Mr. Jordan, these cannot make reasonable the grossly excessive time that it took society to bring him to trial.

D.  *Other Issues Raised*

[245]    The parties raised a number of other issues, explicitly or implicitly, to which I will briefly respond.

[241]    Je le répète, pour que le tribunal conclue à la renonciation par la défense à invoquer un délai, cette dernière doit avoir affirmé de façon claire et non équivoque que telle était son intention. Le juge du procès a noté que M. Jordan a admis avoir « renoncé » à un délai de quatre mois parce que ce dernier était la conséquence de sa décision de dernière minute de changer d'avocat. Cela dit, je ne vois aucune raison pour conclure que M. Jordan a « renoncé » à quelque autre délai que ce soit. Qui plus est, je ne vois aucune raison pour attribuer légitimement quelque autre délai à M. Jordan.

b)  *Délai exceptionnel ou inévitable*

[242]    Il n'y a eu aucun délai exceptionnel ou inévitable dans le cas qui nous occupe.

(4)  Le délai attribuable à l'État était-il déraisonnable?

[243]    Comme nous l'avons déjà vu, c'est un délai de 28 mois et demi qui aurait été raisonnable pour juger une affaire de la nature de celle dont nous sommes saisis. Or, c'est en réalité 49 mois et demi qu'il a fallu pour le faire. Cela correspond à un écart de 21 mois. De cette période, 4 mois sont attribuables à la défense. Le reste — soit une période de 17 mois — est imputable à l'État. Autrement dit, la présente affaire a duré presque un an et demi de plus que ce qui aurait été raisonnable pour instruire le procès dans une cause de même nature.

[244]    Il ne s'agit pas d'un cas limite. En effet, le délai qu'il a fallu pour traduire l'accusé en justice a été de loin supérieur à celui qui aurait été raisonnablement nécessaire pour juger une affaire de cette nature. Bien qu'il soit dans l'intérêt de la société qu'il y ait un procès au fond pour les crimes graves relatifs aux stupéfiants reprochés à M. Jordan, cet intérêt ne saurait rendre raisonnable le délai manifestement excessif qu'il a fallu à la société pour le juger.

D.  *Autres questions soulevées*

[245]    Les parties ont soulevé explicitement ou implicitement plusieurs autres questions auxquelles je vais brièvement répondre.

(1)   Should some delay where the courts are unavailable be classified as inherent requirements if defence counsel is also unavailable?

[246]   The inherent requirements of a case are determined objectively and when this is done as described earlier in my reasons, there is no overlap between the inherent requirements and institutional delay.

(2)   Should institutional delay be accorded "less weight" in determining the overall reasonableness of the delay?

[247]   Under the revised framework, institutional delay is not given less weight than other delay that counts against the state.

(3)   Does the accused's consent to an adjournment or later trial date constitute "waiver"?

[248]   The onus is on the Crown to demonstrate that, when an accused agrees to an adjournment initiated by the Crown or to a trial date, it amounts to "waiver" and not "mere acquiescence in the inevitable".

(4)   Should inherent requirements be subtracted from the final quantum of delay when assessing the overall reasonableness of the delay?

[249]   Inherent requirements are not "subtracted" but are rather considered along with institutional delay in deciding what period of delay would be reasonable for a case of this nature.

(5)   Can the constitutionally tolerable length of institutional delay be extended if the accused did not suffer "substantial" or "significant" prejudice?

(1)   Devrait-on qualifier un délai d'inhérent lorsque le tribunal n'est pas disponible, si l'avocat de la défense n'est pas non plus disponible?

[246]   Le délai inhérent à l'affaire est déterminé de façon objective et lorsque cette évaluation est effectuée conformément à la méthode que j'ai exposée dans les présents motifs, il n'y a pas de chevauchement entre le délai inhérent et le délai institutionnel.

(2)   Devrait-on accorder « moins d'importance » au délai institutionnel pour évaluer le caractère raisonnable du délai en général?

[247]   Selon le cadre d'analyse révisé que j'ai décrit précédemment, le délai institutionnel ne se voit pas accorder moins d'importance que les autres délais imputables à l'État.

(3)   Le consentement de l'accusé à un ajournement ou au report de la date du procès emporte-t-il « renonciation »?

[248]   Il incombe au ministère public de démontrer que, lorsque l'accusé consent à un ajournement proposé par le ministère public ou à une date de procès, cet acquiescement emporte « renonciation » et qu'il ne s'agit pas d'une « simple reconnaissance de l'inévitable ».

(4)   Devrait-on soustraire le délai inhérent du délai final pour évaluer le caractère raisonnable du délai en général?

[249]   Le tribunal ne « soustrait » pas le délai inhérent, mais il en tient compte, de même que du délai institutionnel, pour décider de la longueur du délai raisonnable dans une affaire de la nature de celle dont il est saisi.

(5)   La durée du délai institutionnel jugée acceptable du point de vue constitutionnel peut-elle être prolongée si l'accusé n'a pas subi de préjudice « grave » ou « important »?

[250]   As explained earlier, the answer is no: proof of actual prejudice is not required to find unreasonable delay.

(6)   Did the trial judge err in finding that the accused only suffered "some" and not "substantial" prejudice?

[251]   I see no reason to interfere with the trial judge's reasons to this effect.

(7)   Did the trial judge err when categorizing the delays in this case, specifically in attributing so much of the delay to Crown and institutional delay?

[252]   I see no reason to interfere with the trial judge's classification of delay in this case.

E.   *Conclusion*

[253]   I would allow the appeal and would stay the charges against Mr. Jordan.

IV.   The Approach of Justices Moldaver, Karakatsanis and Brown

[254]   It will by now be obvious that I fundamentally disagree with the approach proposed by my colleagues. It is, in my respectful view, both unwarranted and unwise. The proposed approach reduces reasonableness to two numerical ceilings. But doing so uncouples the right to be tried within a reasonable time from the Constitution's text and purpose in a way that is difficult to square with our jurisprudence, exceeds the proper role of the Court by creating time periods which appear to have no basis or rationale in the evidence before the Court, and risks negative consequences for the administration of justice. Based on the limited evidence in the record, the presumptive time periods proposed by my colleagues are unlikely to improve the pace at which the vast majority of cases move through the

[250]   Comme je l'ai expliqué précédemment, il faut répondre par la négative à cette question. Il n'est pas nécessaire de prouver que l'accusé a réellement subi un préjudice pour que le tribunal juge le délai déraisonnable.

(6)   Le juge du procès a-t-il commis une erreur en concluant que l'accusé n'avait subi qu'un « certain » préjudice et non pas un préjudice « important »?

[251]   Je ne vois aucune raison de modifier les conclusions du juge du procès sur ce point.

(7)   Le juge du procès a-t-il commis une erreur en qualifiant les délais dans le cas qui nous occupe, notamment en qualifiant une portion aussi importante de la période en cause de délai attribuable au ministère public et de délai institutionnel?

[252]   Je ne vois aucune raison de modifier la façon dont le juge du procès a qualifié les délais en l'espèce.

E.   *Dispositif*

[253]   J'accueillerais le pourvoi et j'ordonnerais l'arrêt des procédures intentées contre M. Jordan.

IV.   L'approche préconisée par les juges Moldaver, Karakatsanis et Brown

[254]   Je crois qu'il est d'ores et déjà évident que je suis fondamentalement en désaccord avec l'approche préconisée par mes collègues. À mon avis, cette approche est à la fois injustifiée et imprudente. Elle ramène la question du caractère raisonnable à deux plafonds numériques. Mais, ce faisant, elle dissocie le droit d'être jugé dans un délai raisonnable du texte et de l'objet de la Constitution d'une façon qui est difficile à concilier avec notre jurisprudence; elle outrepasse le rôle dévolu à la Cour en créant des plafonds qui semblent n'avoir aucune logique ni raison d'être compte tenu de la preuve soumise à la Cour; et elle risque d'entraîner des conséquences néfastes pour l'administration de la justice. Selon la preuve limitée qui a été versée au dossier, il est improbable que les délais

system while risking judicial stays for potentially thousands of cases. Moreover, the increased simplicity which is said to flow from this approach is likely illusory. The complexity inherent in determining unreasonable delay has been moved into deciding whether to "rebut" the presumption that a delay is unreasonable if it exceeds the ceiling in particular cases: para. 47.

présumés proposés par mes collègues accélèrent le traitement de l'immense majorité des affaires judiciaires. Ils risquent plutôt d'entraîner un arrêt des procédures dans des milliers de causes. De plus, la simplicité accrue qui découlerait soi-disant de cette méthode est vraisemblablement illusoire. En effet, en appliquant l'approche que préconisent mes collègues, la complexité inhérente à la détermination du délai déraisonnable ne fait que se métamorphoser en une décision sur l'opportunité de « réfuter », dans des cas particuliers, la présomption selon laquelle un délai est déraisonnable s'il excède le plafond : par. 47.

A.  *Reasonableness Cannot Be Captured by a Number*

A.  *Le caractère raisonnable est un concept qu'on ne peut ramener à une valeur numérique*

[255]   One of the themes that appears throughout the Court's jurisprudence on the right to be tried within a reasonable time is that reasonableness cannot be judicially defined with precision or captured by a number. The proposed ceilings are deeply inconsistent with this constant in our jurisprudence.

[255]   Selon un des thèmes récurrents de la jurisprudence de la Cour sur le droit d'être jugé dans un délai raisonnable, le caractère raisonnable est un concept qui ne peut être défini avec précision par les tribunaux et qu'on ne peut ramener à une valeur numérique. Or, les plafonds proposés contredisent carrément la jurisprudence constante de la Cour sur ce point.

[256]   In *Mills*, where this Court first considered the scope of s. 11(*b*), Lamer J. wrote that a "reasonable" time to trial cannot be determined with reference to specific numbers:

[256]   Dans l'arrêt *Mills*, où la Cour s'est penchée pour la première fois sur la portée de l'al. 11(*b*), le juge Lamer a affirmé que le délai « raisonnable » avant le procès ne pouvait être défini par une valeur numérique :

Reasonableness is an elusive concept which cannot be juridically defined with precision and certainty. Under s. 11(*b*), however, as we are dealing with reasonableness as regards the passage of time, we have the advantage of being able to refer to precise stages of proceedings and events.

La notion de ce qui est raisonnable est difficile à cerner et à définir juridiquement avec précision et certitude. À l'alinéa 11*b*) cependant, comme nous envisageons le caractère raisonnable du délai écoulé, nous avons l'avantage de pouvoir nous référer à des étapes précises des procédures et des événements.

This is not to say that reasonableness can be predetermined with precision. That would be "falling victim to the tyranny of numbers". But the advantage to be found when dealing with time is that reasonableness can be determined with the help of the precision surrounding the happening of certain events, e.g. arraignment, the preliminary inquiry, the trial, and the time elapsed between. [p. 923]

Ceci ne veut pas dire que ce qui est raisonnable peut être fixé à l'avance avec précision. Ce serait « être victime de la tyrannie des chiffres ». Mais l'avantage existant lorsqu'on a affaire au délai est que le caractère raisonnable est déterminable grâce à la précision qui entoure la survenance de certains événements, par exemple, l'interpellation, l'enquête préliminaire, le procès et l'intervalle de temps les séparant. [p. 923]

[257]    In *Conway*, L'Heureux-Dubé J. wrote for the majority that the "protection afforded by s. 11(*b*) of the *Charter* is not expressed in absolute terms" and that "the right to a speedy trial 'is necessarily relative. It is consistent with delays and depends upon circumstances'": p. 1672, quoting *Beavers v. Haubert*, 198 U.S. 77 (1905), at p. 87.

[258]    In *Smith*, Sopinka J. for the Court elaborated on this point:

The question is, at what point does the delay become unreasonable? If this were simply a function of time, the matter could be easily resolved. Indeed a sliding scale of times could be developed with respect to specified offences which could be adjusted because of the special circumstances of the case. But it is not simply a function of time, but of time and several other factors. What those basic factors are is not the subject of disagreement. [p. 1131]

[259]    In *Askov* and *Morin*, this Court again reiterated the importance of the balancing test in determining reasonable delay. In fact, in *Morin*, this Court specifically declined to create an administrative guideline for the "inherent" or "intake" time requirements of a case, noting the "significant variation between some categories of offences": p. 792. Sopinka J. wrote that as "the number and complexity of [intake requirements of a case] increase, so does the amount of delay that is reasonable": *ibid.*

[260]    Thus, the Court has said on several occasions that reasonable inherent time requirements for cases do not lend themselves to the creation of administrative guidelines.

[261]    Moreover, a judicially fixed ceiling for overall case disposition is at odds with jurisprudence arising from every other jurisdiction with a speedy trial guarantee of which I am aware. In *Trial Within a Reasonable Time* (1992), Michael A. Code wrote that "[i]t is generally foreign to the U.S. speedy trial jurisprudence to establish numerical standards of

[257]    Dans l'arrêt *Conway*, la juge L'Heureux-Dubé écrivait pour les juges majoritaires que « [l]a protection offerte par l'al. 11*b*) de la *Charte* n'est pas exprimée en termes absolus » et que « le droit d'être jugé promptement [. . .] [TRADUCTION] "est nécessairement relatif. Il admet des retards et sa nature dépend des circonstances" » : p. 1672, citant *Beavers c. Haubert*, 198 U.S. 77 (1905), p. 87.

[258]    Dans l'arrêt *Smith*, le juge Sopinka est allé plus loin en donnant les précisions suivantes, au nom de la Cour :

La question est de savoir à quel point le délai devient déraisonnable. S'il s'agissait simplement d'une question de temps, la question pourrait être facilement tranchée. En fait, on pourrait mettre au point une mesure de temps relative à certaines infractions qui pourrait être ajustée en fonction des circonstances spéciales de l'affaire. Toutefois, il s'agit non pas d'une simple question de temps, mais d'une question de temps et de plusieurs autres facteurs. Il n'y a pas de désaccord au sujet de la nature de ces facteurs fondamentaux. [p. 1131]

[259]    Dans les arrêts *Askov* et *Morin*, la Cour a rappelé l'importance de l'exercice de mise en balance pour fixer un délai raisonnable. De fait, dans l'arrêt *Morin*, elle a expressément refusé d'établir des lignes directrices administratives en ce qui a trait à la durée des délais « inhérent » ou « préparatoire », faisant observer qu'il pouvait y avoir « une différence importante entre certaines catégories d'infractions » : p. 792-793. Le juge Sopinka a précisé que « [s]i le nombre et la complexité [des mesures préparatoires] augmentent, la longueur du délai raisonnable augmente également » : p. 792.

[260]    La Cour a donc affirmé à plusieurs reprises que le concept de délai inhérent raisonnable pour juger une affaire se prête mal à l'élaboration de lignes directrices administratives.

[261]    En outre, le fait d'établir par voie judiciaire un plafond fixe pour l'ensemble des causes contredit la jurisprudence de tous les autres pays où, à ma connaissance, il existe une garantie de procès rapides. Dans son ouvrage *Trial Within a Reasonable Time* (1992), Michael A. Code écrit que [TRADUCTION] « l'idée de fixer des normes numériques de

any kind": p. 119. The presence of time limitations, whether judicial or statutory, are virtually unheard of in European jurisdictions. In *Can excessive length of proceedings be remedied?* (2007), the Venice Commission polled a number of jurisdictions ranging from Albania to the former Yugoslav Republic of Macedonia, all of which replied in the negative to the questions as to whether there was a deadline or fixed time frame in which the competent authorities need rule on a criminal matter: Section II (pp. 65-322). Statutory timelines are, of course, an entirely different matter and I will have more to say about them in a moment.

[262]    There is no parallel between the administrative guidelines for institutional delay adopted in *Askov* and *Morin* and the ceilings for overall delay proposed in my colleagues' reasons. As I have explained, institutional delay is concerned with how long one should have to wait for the court to be ready to hear the case. This is not a question that depends to any significant extent on the particular circumstances of the case. It is mainly a question of resources. It is quintessentially a judicial function under the Constitution to set some clear limits on the point at which the state's plea of inadequate resources must give way to the constitutionally guaranteed right to be tried within a reasonable time. The administrative guidelines in *Askov* and *Morin* serve the reasonableness analysis by defining when state-provided court services should reasonably be available. Unlike the proposed ceilings, the administrative guidelines do not attempt to define what would be a reasonable time for trying all cases in all circumstances. Moreover, the administrative guidelines were intended to be generous and established "neither a limitation period nor a fixed ceiling on delay": *Morin*, at pp. 795-96.

quelque ordre que ce soit est, de façon générale, étrangère à la jurisprudence américaine sur l'obligation d'instruire les procès rapidement » : p. 119. Les délais de prescription, qu'ils soient d'origine judiciaire ou législative, sont aussi pratiquement inconnus en Europe. Dans son rapport intitulé *Can excessive length of proceedings be remedied?* (2007), la Commission de Venise a mené un sondage auprès de plusieurs pays, allant de l'Albanie à l'ancienne République yougoslave de Macédoine. Ceux-ci ont tous répondu par la négative à la question de savoir si leurs autorités compétentes étaient soumises à un délai à ne pas dépasser ou à une échéance fixe pour juger une affaire criminelle : section II (p. 65-322). Bien entendu, les délais prévus par la loi sont dans une catégorie à part, et j'y reviendrai un peu plus loin.

[262]    Il n'y a aucun parallèle entre les lignes directrices administratives en matière de délais institutionnels qui ont été adoptées dans les arrêts *Askov* et *Morin* et les plafonds que proposent mes collègues dans leurs motifs en ce qui concerne le délai total nécessaire pour juger une affaire. Comme je l'ai déjà expliqué, le délai institutionnel concerne le temps que l'on devrait avoir à attendre avant que le tribunal ne soit prêt à instruire l'affaire. Cette question n'a pour ainsi dire rien à voir avec les circonstances particulières de l'affaire. Il s'agit surtout d'une question de ressources et il revient essentiellement aux tribunaux, en vertu de la Constitution, de préciser clairement dans quelles circonstances le manque de ressources invoqué par l'État doit céder devant le droit garanti par la *Charte* d'être jugé dans un délai raisonnable. Les lignes directrices administratives énoncées dans les arrêts *Askov* et *Morin* sont utiles à l'analyse du caractère raisonnable puisqu'elles précisent dans quelle mesure les services judiciaires offerts par l'État devraient raisonnablement être accessibles. Contrairement aux plafonds proposés, les lignes directrices administratives ne tentent pas de définir ce qui constituerait un délai d'instruction raisonnable qui s'appliquerait à toutes les affaires dans toutes les situations. En outre, elles ont été conçues pour être généreuses et pour ne prévoir « ni une période de prescription, ni une durée maximale » : *Morin*, p. 796.

R. *v.* JORDAN   *Cromwell J.*

[263]   The proposed judicially created "ceilings" largely uncouple the right to be tried within a reasonable time from the concept of reasonableness which is the core of the right. The bedrock constitutional requirement of reasonableness in each particular case is replaced with a fixed ceiling and is thus converted into a requirement to comply with a judicially legislated metric. This is inconsistent with the purpose of the right, which after all, is to guarantee trial within a reasonable time. Reducing "reasonableness" to a judicially created ceiling, which applies regardless of context, does not achieve this purpose.

[264]   Moreover, this approach unjustifiably diminishes the right to be tried within a reasonable time. As I see it, a case is not tried within a reasonable time if it has taken "markedly longer than it reasonably should have" (para. 48) to be tried. Other than in very unusual circumstances, that is what an accused has to show to establish a breach of s. 11(*b*) of the *Charter*. But that is not enough under the proposed framework. When the elapsed time is below the ceiling, an accused would have to show not only that the case took "markedly longer" than it reasonably should have but also that he or she "took meaningful steps that demonstrate a sustained effort to expedite the proceedings": para. 48. This requirement has no bearing on whether the time to trial was unreasonable. It is, in effect, a judicially created diminishment of a constitutional right, and one for which there is no justification. I see no basis in the constitutional text or the jurisprudence for imposing this burden on an accused person.

[265]   My colleagues' "qualitative review of nearly every reported s. 11(*b*) appellate decision from the past 10 years, and many decisions from trial courts" (para. 106) suggests that my concerns on this score are not theoretical. That examination shows that our superior courts found unreasonable delay in 20 percent of the cases where the delay was at or under the 30-month ceiling. The percentage is about the

[263]   Les « plafonds » que l'on propose de créer par voie judiciaire dissocient en grande partie le droit d'être jugé dans un délai raisonnable du concept de caractère raisonnable qui est au cœur de ce droit. L'exigence constitutionnelle fondamentale du caractère raisonnable dans chaque cas donné est remplacée par des plafonds fixes, et est ainsi transformée en une obligation de se conformer à une valeur numérique dictée par le droit prétorien. Cette approche contredit par ailleurs la raison d'être de ce droit, qui vise après tout à garantir la tenue d'un procès dans un délai raisonnable. Réduire la notion de « caractère raisonnable » à un plafond créé au moyen d'une règle de droit prétorienne qui s'applique sans tenir compte du contexte ne réalise pas cet objectif.

[264]   Cette approche restreint en outre de manière injustifiable le droit d'être jugé dans un délai raisonnable. À mon sens, un accusé n'a pas été jugé dans un tel délai si le procès a été « nettement plus long qu'il aurait dû raisonnablement l'être » : par. 48. Sauf dans des circonstances fort inusitées, c'est pourtant ce que l'accusé devra démontrer pour établir qu'il y a eu violation de l'al. 11*b*) de la *Charte*. Le cadre d'analyse proposé exige cependant encore davantage. Lorsque le temps écoulé sera inférieur au plafond fixé, l'accusé sera tenu de démontrer non seulement que l'affaire a duré « nettement plus long[temps] » que ce qu'elle aurait raisonnablement dû prendre, mais également qu'il « a pris des mesures utiles qui font la preuve d'un effort soutenu pour accélérer l'instance » : par. 48. Cette exigence n'a aucune incidence sur la question de savoir si le délai écoulé avant l'instruction a été déraisonnable. Il s'agit en fait d'une restriction injustifiée apportée par les tribunaux à un droit constitutionnel. Je ne vois, ni dans le texte constitutionnel ni dans la jurisprudence, rien qui justifie de faire porter un tel fardeau à l'accusé.

[265]   L'analyse qualitative qu'ont menée mes collègues de « pratiquement tous les arrêts publiés portant sur l'al. 11*b*) rendus en appel au cours des 10 dernières années de même que de nombreux jugements de première instance » (par. 106) donne à penser que mes préoccupations à ce chapitre ne sont pas théoriques. En effet, il ressort de cet examen que nos cours supérieures ont jugé le délai

same for the provincial court cases at or under the ceiling. But under the proposed framework, none of these cases could be stayed absent proof by the accused that they had attempted to actively expedite the process. Imposing this burden is contrary to the Court's holding in *Askov* that "it is the responsibility of the Crown to bring the accused to trial" and that "any inquiry into the conduct of the accused should in no way absolve the Crown from its responsibility to bring the accused to trial": p. 1227.

déraisonnable dans 20 p. 100 des cas où il était de 30 mois ou moins. Le pourcentage est à peu près le même pour les causes portées devant une cour provinciale où le délai était inférieur au plafond ou l'avait atteint. Or, selon le cadre proposé, aucun de ces procès ne pourrait faire l'objet d'un arrêt des procédures à moins que les accusés ne démontrent qu'ils ont pris des mesures pour accélérer l'instance. Imposer ce fardeau est contraire à la conclusion de la Cour dans *Askov* selon laquelle, d'une part, « il incombe au ministère public de faire subir à un accusé son procès » et, d'autre part, « l'examen des actes de l'accusé ne doit en rien soustraire le ministère public à sa responsabilité de soumettre [celui-ci] à son procès » : p. 1227.

[266]   The proposed approach in effect substitutes a right to be "tried under the ceiling" for a right to be tried within a reasonable time. In doing so, it unjustifiably diminishes the right guaranteed by the *Charter* and sets aside a central teaching of our s. 11(*b*) jurisprudence — that reasonableness cannot be captured by a number.

[266]   L'approche proposée a pour effet de remplacer le droit d'être jugé dans un délai raisonnable par celui d'être « jugé conformément au plafond fixé ». Elle a ainsi pour effet de restreindre de manière injustifiable un droit garanti par la *Charte* et de faire abstraction d'un enseignement central de la jurisprudence de la Cour relative à l'al. 11*b*) — soit que le caractère raisonnable est un concept que l'on ne peut ramener à une valeur numérique.

B.   *Creating Presumptive Ceilings for Reasonableness Is a Legislative, Not a Judicial Task*

B.   *Établir des plafonds qui créent une présomption en matière de caractère raisonnable est une tâche qui revient au législateur et non aux tribunaux*

[267]   Creating fixed or presumptive ceilings is a task better left to legislatures. If such ceilings are to be created, Parliament should do so. As Lamer J. stated in *Mills*: "There is no magic moment beyond which a violation will be deemed to have occurred, and this Court should refrain from legislating same" (p. 942; see also *Conway*, at p. 1697 (concurring)).

[267]   La décision de créer des plafonds fixes ou présumés est une tâche qu'il vaut mieux laisser au législateur, et si de tels plafonds doivent être créés, c'est au législateur de s'en charger. Comme le juge Lamer l'a déclaré l'arrêt *Mills* : « Il n'y a pas de moment magique après lequel une violation sera censée avoir lieu et cette Cour devrait éviter d'en adopter un » (p. 942; voir également *Conway*, p. 1697 (opinion concordante)).

[268]   Prof. P. W. Hogg's *Constitutional Law of Canada* (5th ed. Supp.) notes that a number of commentators have advocated that Parliament enact fixed time limits for trials: s. 52.5. The Law Reform Commission in *Trial Within a Reasonable Time: A Working Paper Prepared for the Law Reform Commission of Canada* (1994) ("*Working Paper*") pointed to a

[268]   Dans son ouvrage *Constitutional Law of Canada* (5e éd. suppl.), le professeur P. W. Hogg signale qu'un certain nombre de commentateurs ont préconisé l'adoption par le législateur de délais fixes en ce qui a trait aux procès : par. 52.5. Qui plus est, dans son rapport intitulé *La tenue du procès dans un délai raisonnable : un document de*

number of considerations that weigh in favour of legislative standards, instead of judicially imposed ceilings: pp. 5-6.

[269]    First, courts do not, and should not, function as legislatures. As the *Working Paper* put it:

The courts have been given a greatly expanded role with the *Charter*, but their essential function has not changed. They do not function as legislating bodies; their principal task is adjudicating conflicts brought before them. Rather, it is the role of Parliament to advance and enhance constitutional rights through legislative standards which the *Charter*, by its very nature, can provide only in general terms. As Chief Justice Dickson stated in *Hunter v. Southam Inc.*[, [1984] 2 S.C.R. 145, at p. 169]:

   While the courts are guardians of the Constitution and of individuals' rights under it, it is the legislature's responsibility to enact legislation that embodies appropriate safeguards to comply with the Constitution's requirements. [p. 5]

[270]    The *Working Paper* also pointed out that legislative timelines can be more easily changed:

   Another advantage of statutory rules or internal court goals is that they can more easily be adjusted and fine-tuned: constitutional standards, in contrast, are difficult to amend. This will be particularly valuable in the case of the right to a trial within a reasonable time. [p. 6]

[271]    In addition, the *Working Paper* noted that legislation can more comprehensively address the root causes of delay:

   In addition, statutory provisions are not restricted to establishing time-limits. A *Charter* decision can do little beyond setting a maximum allowable delay and providing a remedy when it is exceeded. While this approach may be satisfactory from the perspective of the individual accused, it does not address the societal interest.

*travail préparé pour la Commission de réforme du droit du Canada* (1994) (« *Document de travail* »), la Commission de réforme du droit a mis en lumière plusieurs facteurs qui militent pour l'adoption de normes législatives plutôt que de plafonds imposés par les tribunaux : p. 5-6.

[269]    Tout d'abord, la Commission a signalé que les tribunaux ne doivent pas et ne devraient pas s'arroger le rôle du législateur. Ainsi qu'elle l'expliquait dans le *Document de travail* :

Le pouvoir judiciaire a vu son rôle grandement élargi après l'adoption de la *Charte*, mais sa fonction essentielle n'a pas changé. Le fonctionnement des tribunaux n'est pas celui des corps législatifs : leur tâche principale est de trancher les litiges dont ils sont saisis. Il incombe plutôt au Parlement de parfaire les droits constitutionnels en adoptant des mesures législatives que la *Charte*, en raison de sa nature même, ne peut qu'énoncer en termes généraux. Comme le déclarait le juge en chef Dickson dans l'arrêt *Hunter c. Southam* [*Inc.*, [1984] 2 R.C.S. 145, p. 169] :

   Même si les tribunaux sont les gardiens de la Constitution et des droits qu'elle confère aux particuliers, il incombe à la législature d'adopter des lois qui contiennent les garanties appropriées permettant de satisfaire aux exigences de la Constitution. [p. 5-6]

[270]    Ensuite, la Commission soulignait dans le *Document de travail* qu'il est plus facile de modifier des délais prescrits par la loi :

   Contrairement aux normes constitutionnelles qui sont difficiles à modifier, les mesures législatives et administratives sont préférables, car elles peuvent être plus facilement ajustées ou finement réglées. Celles-ci s'avéreront particulièrement utiles pour faire respecter le droit d'être jugé dans un délai raisonnable. [p. 6]

[271]    Enfin, la Commission faisait observer que les lois peuvent aborder de façon plus exhaustive les causes profondes du problème des délais :

   De plus, les dispositions législatives ne servent pas uniquement à fixer des limites de temps. Une décision fondée sur la *Charte* ne peut guère plus que déterminer le délai maximal permis et accorder réparation si celui-ci n'est pas respecté. Bien que cette approche puisse être satisfaisante du point de vue de l'accusé, elle ne prend

Statutory provisions, on the other hand, can address the underlying causes of delay, rather than merely responding to failures to meet the standard. [p. 6]

[272]   Creating presumptive, fixed ceilings is a matter for Parliament, not for this Court, in my respectful view.

[273]   My colleagues write, and I agree, that giving meaningful content to constitutional rights is entirely consistent with the judicial role: para. 115. But that is not what the proposed ceilings do. The proposed ceilings do not so much define the content of the s. 11(*b*) right to a trial within a reasonable time as place new limits on the exercise of that right for reasons of administrative efficiency that have nothing to do with whether the delay in a given case was or was not excessive. In my respectful view, this is inconsistent with the judicial role.

## C.  *The Proposed Presumptive Ceilings Are Not Supported by the Record*

[274]   The proposed ceilings have no support in the record that was placed before the Court in this case. The Court did not hear argument about the impact of imposing them, which remains unknown.

[275]   Moreover, the ceilings appear to be illogical. The ceilings accept the *Morin* guidelines for institutional delay: 8 to 10 months in provincial courts and 14 to 18 months in cases involving a preliminary hearing and a trial (para. 52). This means that the proposed ceilings allow 8 to 10 months for the inherent time requirements of the case in provincial courts, which seems long, while allowing only marginally more inherent time requirements (12 to 16 months) for cases — generally significantly more complex cases — that involve a preliminary inquiry and a trial. As well, under the ceilings, the seriousness or gravity of the offence cannot be relied on to discharge the onus which the ceilings impose: para. 81. Yet under the transitional

pas en compte l'intérêt de la société. En revanche, les mesures législatives peuvent s'attaquer aux causes sous-jacentes aux délais et non simplement régler les cas de non-respect de la norme. [p. 6-7]

[272]   Soit dit en tout respect, j'estime que c'est effectivement au législateur et non à la Cour qu'il revient de créer des plafonds fixes présumés.

[273]   Mes collègues écrivent — et j'abonde tout à fait dans leur sens à cet égard — qu'il est entièrement conforme à la fonction judiciaire de donner un contenu réel aux droits constitutionnels : par. 115. Mais ce n'est pas l'effet qu'entraînent les plafonds proposés. De fait, ces derniers n'ont pas tant pour effet de préciser la teneur du droit d'être jugé dans un délai raisonnable garanti par l'al. 11*b*) que celui d'assortir de nouvelles restrictions l'exercice de ce droit pour des raisons d'efficacité administrative qui n'ont rien à voir avec la question du caractère excessif ou non du délai dans un cas déterminé. À mon avis, l'imposition de tels plafonds est incompatible avec le rôle dévolu aux tribunaux.

## C.  *Le dossier n'appuie pas la création des plafonds proposés*

[274]   Rien dans le dossier qui a été soumis à la Cour en l'espèce n'appuie par ailleurs l'établissement des plafonds proposés. La Cour n'a pas entendu d'arguments sur les conséquences de leur imposition, qui demeurent donc inconnues.

[275]   De plus, les plafonds semblent illogiques. Ils reprennent les lignes directrices données dans l'arrêt *Morin* en ce qui concerne le délai institutionnel : 8 à 10 mois pour les procès tenus devant les cours provinciales et 14 à 18 mois pour les procès comportant une enquête préliminaire et un procès (par. 52). On constate donc que les plafonds proposés prévoient 8 à 10 mois comme balise pour le délai inhérent dans le cas d'un procès se déroulant devant une cour provinciale. Cela semble long, d'autant plus que ces mêmes plafonds n'accordent que peu de temps supplémentaire (soit 12 à 16 mois) pour les procès qui comportent une enquête préliminaire en plus d'un procès — et qui sont, en règle générale, beaucoup plus complexes.

scheme, this remains a relevant factor: para. 96. The illogical result is that serious offences are more likely to be stayed under the ceilings than under the transitional scheme.

[276]   What evidence there is in the record suggests that it would be unwise to establish these sorts of ceilings. For the vast majority of cases, the ceilings are so high that they risk being meaningless. They are unlikely to address the culture of delay that is said to exist. If anything, such high ceilings are more likely to feed such a culture rather than eliminate it.

[277]   Consider the statistical information that we have in the record which is from the Provincial Court of British Columbia. It suggests that the proposed ceiling for the provincial courts is too high to be of any use in encouraging more expeditious justice in the vast majority of cases.

[278]   The proposed ceiling is set for 18 months in provincial courts. But the median time to disposition of matters in the Provincial Court of British Columbia was 95 days in 2011-2012, with the average being 259 days, both well below the proposed ceiling: B.C. Justice Reform Initiative, *A Criminal Justice System for the 21st Century* (2012), at p. 30. Of course, these statistics relate to all matters, the vast majority of which (about 95 percent) are disposed of without trial: p. 33. The time to trial varies widely by court location with the time to the commencement of trial for a 2-day case varying in the Provincial Court from 12 to 16 months: p. 34. (I note that this period does not include the period from intake until a trial date is set and measures only to the beginning, not the end of the trial: "Justice Delayed: A Report of the Provincial Court of British Columbia Concerning Judicial Resources" (September 2010) (online), at p. 21.) But there is not much here to lead

De même, dans le contexte de l'application des plafonds, le sérieux et la gravité de l'infraction ne peuvent servir à inverser le fardeau qu'ils imposent : par. 81. Or, suivant le régime transitoire proposé par mes collègues, il s'agit d'un facteur qui demeure pertinent : par. 96. Il en résulte une situation illogique où, en appliquant les plafonds, les procès intentés à l'égard d'infractions graves sont plus susceptibles de faire l'objet d'arrêts des procédures que ceux visés par le régime transitoire.

[276]   Les éléments de preuve versés au dossier donnent en outre à penser qu'il serait imprudent de fixer ce type de plafonds. Dans la grande majorité des cas, les plafonds sont tellement élevés qu'ils risquent de perdre tout leur sens. Ils risquent de ne contribuer d'aucune façon à pallier le problème de la soi-disant culture des délais. En fait, des plafonds aussi élevés risquent davantage d'alimenter une telle culture que de l'éliminer.

[277]   Prenons par exemple les statistiques de la Cour provinciale de la Colombie-Britannique qui sont citées au dossier. Elles suggèrent que le plafond proposé pour les cours provinciales est trop haut pour servir de quelque façon que ce soit dans la vaste majorité des cas à encourager le traitement plus rapide des dossiers par les tribunaux.

[278]   En effet, bien que le plafond proposé soit fixé à 18 mois dans le cas des cours provinciales, le temps médian qui s'est écoulé dans cette juridiction en Colombie-Britannique jusqu'au dénouement des affaires dont elle a été saisie a été de 95 jours en 2011-2012 et la moyenne de 259 jours. Or, dans les deux cas, ces chiffres se situent bien en deçà du plafond proposé : B.C. Justice Reform Initiative, *A Criminal Justice System for the 21st Century* (2012), p. 30. Évidemment, ces statistiques concernent l'ensemble des causes, dont l'immense majorité (soit environ 95 p. 100) se termine sans procès : p. 33. De plus, le temps écoulé avant le procès varie considérablement selon l'emplacement géographique du tribunal, comme en fait foi le cas de la Cour provinciale de la Colombie-Britannique où le délai écoulé avant l'ouverture du procès, dans le cas d'une affaire de 2 jours, varie de 12 à 16 mois : p. 34. (Je constate que cette période ne tient pas compte du délai écoulé

one to think that the ceilings will do anything to improve the timeliness of the vast majority of criminal cases in the Provincial Court. And, as I will discuss shortly, the ceilings put a small percentage of the total caseload, but a large number of long cases, at serious risk of judicial stay.

[279]   The "qualitative review" conducted by Justices Moldaver, Karakatsanis, and Brown "assisted in developing the definition of exceptional circumstances" and provided "a rough sense of how the new framework would have played out in some past cases": para. 106. This examination has not been the subject of adversarial scrutiny or debate, and how it "assisted" in developing the definition of exceptional circumstances is unstated. In any case, the examination as I have reviewed it suggests that the proposed ceilings are unrealistic and that their implementation risks large numbers of judicial stays.

[280]   What does this examination tell us about the appropriateness of the ceilings? Consider first the superior court cases over the past 10 years in which stays were granted. The average "net" delay was about 44 months, with the median "net" delay being about 37 months. This provides no support for a ceiling of 30 months for superior court cases. The examination is no more supportive in relation to the provincial courts. Looking at provincial court cases in which stays were granted, the average "net" delay was about 27 months and the median was 24.5 months (I have excluded Quebec from this calculation because of the distinctive jurisdiction of the Court of Québec). Once again, my colleagues' examination of the cases fails to support

du début des mesures préparatoires jusqu'à ce que la date du procès soit fixée et qu'il prend en considération uniquement le temps écoulé jusqu'à l'ouverture du procès et non jusqu'à sa clôture : « Justice Delayed : A Report of the Provincial Court of British Columbia Concerning Judicial Resources » (septembre 2010) (en ligne), p. 21.) Dans ces circonstances, force est de reconnaître qu'on dispose de bien peu d'éléments pour pouvoir conclure que les plafonds contribueront de quelque manière que ce soit à accélérer le déroulement de l'immense majorité des instances criminelles introduites devant la Cour provinciale. En outre, comme je vais l'expliquer sous peu, les plafonds exposent un faible pourcentage du total des causes, mais un grand nombre de longs procès, à un risque sérieux de faire l'objet d'un arrêt des procédures.

[279]   L'« examen qualitatif » de la jurisprudence mené par les juges Moldaver, Karatkasanis et Brown a « aidé à définir ce qui constitue des circonstances exceptionnelles » et a donné « une idée générale de la façon dont ce cadre se serait appliqué dans certaines affaires passées » : par. 106. Il n'a toutefois pas fait l'objet d'un débat contradictoire ou d'une analyse et rien n'est dit quant à la façon dont il a « aidé » à définir ce qui constitue des circonstances exceptionnelles. Quoi qu'il en soit, cet examen, comme je l'ai expliqué, tend à indiquer que les plafonds proposés sont irréalistes et que leur mise en œuvre risque d'entraîner un grand nombre d'arrêts des procédures.

[280]   Que nous dit par ailleurs cet examen quant à l'à-propos des plafonds? Arrêtons-nous tout d'abord sur les décisions des cours supérieures ont accordé un arrêt des procédures au cours des 10 dernières années. Dans ces cas, le délai moyen « net » a été d'environ 44 mois, et le délai médian « net » de près de 37 mois. Ces délais n'appuient nullement le plafond de 30 mois proposé pour les affaires portées devant une cour supérieure. L'examen n'est guère plus concluant dans le cas des cours provinciales. Si l'on examine les décisions de ces cours dans lesquelles un arrêt des procédures a été ordonné, on constate que le délai moyen « net » a été d'environ 27 mois, et le délai médian « net » de 24 mois et demi (j'ai exclu le Québec

R. *v.* JORDAN   *Cromwell J.*

the proposed ceiling of 18 months for provincial court cases.

[281]   Developing the proposed ceilings in the absence of evidence and submissions by counsel contrasts with the Court's development of the administrative guidelines for institutional delay in *Askov* and *Morin*. In those cases, the Court had the benefit of extensive evidence including statistical information from comparable jurisdictions and expert opinion: *Morin*, at p. 797. The record in *Morin* included four volumes of evidence, largely consisting of evidence from three experts with exhibits on the issue of institutional delay across various jurisdictions in Canada — in fact, two volumes of the record were exclusively devoted to such information. This record contained evidence from a solicitor in the region of Durham, the region at issue in *Morin*, who was a member of the trial delay reduction committee in the region. His evidence included statistical information and information about the efforts made to reduce delay in the region. Furthermore, the record included extensive evidence from Professor Baar, who "has written and consulted extensively on court administration in general and case flow management in particular in Canada, the United States and other jurisdictions": *R. v. Morin* (1990), 55 C.C.C. (3d) 209 (Ont. C.A.), at p. 213. This extensive record enabled the Court to analyze the respective caseloads of provincial courts and superior courts, the increase in caseload in particular regions (including in Durham), reasons for the growth in this caseload, and the abilities of various courts to handle the increasing caseload: see *Morin* (S.C.C.), at pp. 798-99. The broad range set out in the administrative guidelines in *Morin* (eight to ten months in provincial court; six to eight months from committal to trial) was derived from the considerable mass of evidence then before the Court.

de ce calcul en raison de la compétence distincte de la Cour du Québec). Encore une fois, l'examen que mes collègues font de ces décisions n'appuie pas le plafond de 18 mois proposé dans le cas des procès en cour provinciale.

[281]   Fixer les plafonds proposés sans disposer d'éléments de preuve ou d'arguments des avocats tranche avec la façon dont la Cour a élaboré ses lignes directrices en matière de délai institutionnel dans les arrêts *Askov* et *Morin*. Dans ces affaires, la Cour bénéficiait d'une preuve abondante, dont des statistiques provenant de juridictions comparables, ainsi que des avis d'experts : *Morin*, p. 797. Dans l'affaire *Morin*, le dossier comprenait quatre recueils de preuve composés en grande partie du témoignage de trois experts et de pièces portant sur la question des délais institutionnels dans diverses provinces canadiennes; en fait, deux des volumes du dossier étaient exclusivement consacrés à ces renseignements. On trouvait dans ce dossier le témoignage d'un procureur de la région de Durham, membre du comité chargé de proposer des solutions pour réduire les délais judiciaires dans cette région — celle qui était en cause dans l'affaire *Morin*. Cet expert avait cité des statistiques et des renseignements concernant les mesures prises pour réduire les délais dans cette région. De plus, le dossier contenait le témoignage détaillé du professeur Baar qui [TRADUCTION] « a beaucoup écrit et consulté sur la question de l'administration judiciaire en général et sur la gestion des instances, notamment au Canada, aux États-Unis et ailleurs » : *R. c. Morin* (1990), 55 C.C.C. (3d) 209 (C.A. Ont.), p. 213. Grâce à ce dossier fouillé, la Cour a été en mesure d'analyser le nombre de dossiers des cours provinciales et des cours supérieures, la hausse du nombre de causes dans certaines régions — y compris celle de Durham —, les raisons de l'augmentation du nombre de causes et la capacité de diverses juridictions à faire face à cette augmentation : voir *Morin* (C.S.C.), p. 798-799. Le large éventail proposé dans les lignes directrices administratives par l'arrêt *Morin* (de huit à dix mois, s'agissant des cours provinciales, et de six à huit mois entre l'envoi à procès et le procès) s'inspirait de cette preuve abondante alors portée à l'attention de la Cour.

D. *There Is a Significant Risk of Negative Consequences*

[282]   My colleagues acknowledge that, if their new framework were applied immediately, there would be a risk of thousands of cases being off-side the new ceilings and being judicially stayed as a result: para. 98. There are worrying signs in the limited record that we do have that large numbers of cases (although not a large percentage of the total cases dealt with by the courts) would be at risk if the presumptive ceilings were applied.

[283]   The record indicates that, in the British Columbia Provincial Court, as of March 31, 2010, there were over 2,000 adult criminal cases pending for over 18 months. As of 2011, this represented 13 percent of the caseload of the Provincial Court. As of 2012, 4 percent of pending cases in the Provincial Court had been in the system for more than two years: "Justice Delayed", at p. 23; B.C. Justice Reform Initiative, at p. 35. Thus the limited record that we do have suggests that the proposed ceiling of 18 months in provincial courts, if applied now, would put thousands of prosecutions in the Provincial Court at serious risk of being judicially stayed. Dramatic improvements for the group of cases at the top end of the delays would be required to avoid thousands of judicial stays under the proposed ceilings.

[284]   The examination of the case law undertaken by my colleagues increases rather than diminishes this concern. As I noted earlier, the average time for stays in superior courts, based on that analysis, is about 44 months, with the median being about 37 months. This time period significantly exceeds the proposed 30-month ceiling. If these figures can be relied on, they suggest that the proposed ceilings

D. *Il y a un risque important de conséquences néfastes*

[282]   Mes collègues reconnaissent que, si le nouveau cadre qu'ils proposent était appliqué immédiatement, des milliers d'instances risqueraient de ne pas respecter les nouveaux plafonds et de faire l'objet d'un arrêt des procédures pour cette raison : par. 98. Le dossier limité soumis à la Cour renferme des éléments faisant craindre qu'un grand nombre d'affaires (même s'il s'agit d'un faible pourcentage de l'ensemble des causes dont sont saisis les tribunaux) risquerait de faire d'objet d'un arrêt des procédures si les plafonds présumés devaient s'y appliquer dès à présent.

[283]   En effet, suivant le dossier, à la Cour provinciale de la Colombie-Britannique, il y avait en date du 31 mars 2010 plus de 2 000 causes en matière criminelle concernant des adultes qui étaient en instance depuis plus de 18 mois. En 2011, les affaires de ce type représentaient 13 p. 100 de toutes celles portées devant la Cour provinciale, tandis qu'en 2012, 4 p. 100 des affaires portées devant cette cour étaient pendantes depuis plus de deux ans : « Justice Delayed », p. 23; B.C. Justice Reform Initiative, p. 35. Ainsi, suivant le dossier limité dont nous disposons, il y a lieu de penser que, s'il était appliqué dès maintenant, le plafond de 18 mois proposé pour les causes entendues devant les cours provinciales exposerait des milliers de poursuites introduites devant celle de la Colombie-Britannique au risque sérieux de faire l'objet d'un arrêt des procédures. Il faudrait donc que les délais pour instruire des causes appartenant à cet ensemble d'affaires dont les délais accumulés sont les plus longs fassent l'objet d'une amélioration spectaculaire pour éviter que des milliers d'arrêts des procédures soient provoqués par les plafonds proposés.

[284]   Loin d'apaiser ces préoccupations, l'examen de la jurisprudence entrepris par mes collègues ne fait donc que les raviver. Je le répète, selon cette analyse, le délai moyen pour lequel les cours supérieures ont accordé un arrêt des procédures était d'environ 44 mois, et le délai médian d'environ 37 mois. Or, ces délais dépassent de beaucoup le plafond de 30 mois proposé. Si ces chiffrent sont

would require unrealistic and improbable improvement in case processing times to avoid many judicial stays.

[285]    The transitional regime which my colleagues propose is intended to avoid the problems that would arise from immediate application of the presumptive ceilings. In my view, these transitional provisions will not avoid the risk of thousands of judicial stays of proceedings.

[286]    Although my colleagues maintain that different criteria should not apply during the transitional period, they in fact establish different criteria for transitional cases. To take only one example, there will be a "transitional exceptional circumstance" if the parties reasonably relied on the law as it previously existed and have not had time "to correct their behaviour": para. 96. In other words, the ceilings do not apply to some transitional cases.

[287]    The basic problem with this is that transitional provisions create a *Charter* amnesty. What is unreasonable according to the Constitution is treated as if it were reasonable. The justification for this is that parties require time to correct their behaviour following the release of this decision. However, this sort of *Charter* amnesty is contrary to our s. 11(*b*) jurisprudence.

[288]    *Morin* ruled against transitional provisions in s. 11(*b*) cases and explained why purporting to set up a parallel system of rules to govern existing cases is wrong in principle. Sopinka J. for the majority wrote, at pp. 797-98:

fiables, ils indiquent que les plafonds proposés exigeraient une amélioration tout aussi improbable qu'irréaliste dans le délai de traitement des dossiers pour qu'un grand nombre d'arrêts des procédures soit évité.

[285]    Le régime transitoire proposé par mes collègues vise à éviter les problèmes qui découleraient de l'application immédiate des plafonds présumés. À mon avis, ce régime ne permettra pas d'éviter le risque que des milliers d'arrêts des procédures soient ordonnés par les tribunaux.

[286]    Bien que mes collègues maintiennent que l'on ne devrait pas appliquer des critères différents au cours de la période transitoire, ils établissent en fait de tels critères pour les dossiers en cours d'instance durant cette période. Pour ne prendre qu'un seul exemple, mentionnons qu'on appliquerait une « mesure transitoire exceptionnelle » si les parties s'étaient raisonnablement conformées au droit tel qu'il existait auparavant et qu'elles n'auraient pas eu le temps de « corriger leur conduite » : par. 96. Autrement dit, les plafonds ne s'appliqueront pas dans certaines situations visées par les mesures transitoires.

[287]    Le problème fondamental de cette approche réside dans le fait que ces dispositions transitoires créent une dispense d'application de la *Charte*, et qu'une situation que la Constitution considère comme déraisonnable sera jugée raisonnable. Pour justifier cette approche, mes collègues font valoir que les parties ont besoin de temps pour corriger leur conduite à la suite du prononcé de la présente décision. Toutefois, ce type de dispense d'application de la *Charte* va à l'encontre de notre jurisprudence relative à l'al. 11*b*).

[288]    L'arrêt *Morin* a écarté le recours aux dispositions transitoires dans le cas des affaires mettant en jeu l'al. 11*b*) et expliqué la raison pour laquelle on aurait tort, en principe, d'établir un système parallèle de règles pour régir les situations existantes. Le juge Sopinka a écrit ce qui suit, au nom des juges majoritaires, p. 797-798 :

. . . the Court of Appeal purported to apply a transitional period to accommodate the situation in Durham. While a transitional period may have been appropriate immediately after the *Charter* came into effect, it is not appropriate any longer. This Court so held in *Askov*. The use of a transitional period implies a fixed period during which unreasonable delay will be tolerated while the system adjusts to a new set of rules. It imposes a general moratorium on certain *Charter* rights. For this reason and quite apart from the statement in *Askov* that the transitional period had ended, I would not find it appropriate in this case. It appears to me undesirable to impose a moratorium on *Charter* rights every time a region of the country experiences unusual strain on its resources. It is preferable to simply treat this as one factor in the overall decision as to whether a particular delay is unreasonable. [Emphasis added.]

[289]   In my opinion, this teaching is both authoritative and sensible. I would continue to apply it.

[290]   Moreover, my colleagues indicate that the proposed transitional exception applies to problems of institutional delay. But it is hard to see how this can be justified by the need to give parties an opportunity to correct their behaviour. The guidelines for reasonable institutional delay were established (at the very latest) in *Morin*, almost a quarter of a century ago. Twenty-four years is long enough for parties to modify their behaviour to comply. No transitional arrangements for institutional delay can now be justified.

[291]   My colleagues write that the "contextual application of the [new] framework is intended to ensure that the post-*Askov* situation [in which tens of thousands of charges were stayed in Ontario alone] is not repeated": para. 94. In other words, the hope is that the presumptive ceilings that are unrealistic now will become realistic in the fairly near future. But there is no basis in the record or in logical reasoning to suppose that these ceilings, if dramatically unrealistic now, will become less unrealistic

. . . la Cour d'appel a voulu appliquer une période de transition pour tenir compte de la situation dans le district de Durham. Bien qu'une période de transition ait pu convenir immédiatement après l'entrée en vigueur de la *Charte*, ce n'est désormais plus le cas. C'est ce que notre Cour a jugé dans l'arrêt *Askov*. L'utilisation d'une période de transition sous-entend une période déterminée durant laquelle un délai déraisonnable sera toléré pendant que le système s'ajuste à de nouvelles règles. Elle impose un moratoire général à certains droits que confère la *Charte*. Pour ce motif et indépendamment de la déclaration dans l'arrêt *Askov* selon laquelle la période de transition avait pris fin, je suis d'avis qu'une telle période de transition ne convient pas en l'espèce. Il ne me paraît pas souhaitable d'imposer un moratoire aux droits que confère la *Charte* chaque fois qu'une pression inhabituelle se manifeste à l'égard des ressources d'une région du pays. Il est préférable de traiter simplement cette situation comme un facteur qu'il faut prendre en compte dans la décision globale de savoir si un délai en particulier est déraisonnable. [Je souligne.]

[289]   À mon avis, cet enseignement fait autorité en plus d'être logique. Je continuerais de l'appliquer.

[290]   En outre, mes collègues indiquent que l'exception transitoire proposée s'applique au problème causé par les délais institutionnels. Il est toutefois difficile de voir comment cette exception peut se justifier par la nécessité d'accorder aux parties la possibilité de corriger leur conduite. L'énoncé le plus récent des lignes directrices en matière de délais institutionnels raisonnables remonte à l'arrêt *Morin*, il y a déjà presque un quart de siècle. Les parties ont eu amplement le temps, depuis 24 ans, de modifier leur conduite et de s'amender, et aucune disposition transitoire ne saurait maintenant se justifier en ce qui a trait aux délais institutionnels.

[291]   Mes collègues écrivent que « l'application contextuelle que nous proposons du [nouveau] cadre d'analyse vise à garantir [que la situation qui s'est produite après le prononcé de l'arrêt *Askov*, où des dizaines de milliers d'accusations ont été suspendues en Ontario seulement] ne se reproduira pas » : par. 94. Autrement dit, on espère que les plafonds présumés qui sont irréalistes pour le moment deviennent réalistes dans un avenir assez rapproché. Or, rien dans le dossier ou selon tout raisonnement

with the passage of time. In my respectful view, this Court should not impose on the criminal justice system the risk that thousands of prosecutions will be judicially stayed. Doing so is especially regrettable when it is done, as is proposed here, in a virtual factual vacuum, with no opportunity for submissions about either the wisdom of this approach or the accuracy of the assumptions on which it is based.

[292]   My colleagues maintain that there is a "culture of complacency towards delay" (para. 40) that has emerged in the criminal justice system, which is not addressed by the *Morin* framework. They argue that their revised approach to s. 11(*b*) is warranted, given that under the current framework "participants in the justice system . . . are not encouraged to take preventative measures to address inefficient practices and resourcing problems": para. 41. But, contrary to these broad and unsupported generalizations, even the limited record before the Court indicates that the problem of excessive delay has been the focus of extensive attention by the British Columbia Provincial Court and by the governments of British Columbia, Alberta, Newfoundland and Labrador, and Ontario. The most recent statistics in the record indicate that the situation is, if anything, getting better, not worse: see "The Semi-Annual Time to Trial Report of the Provincial Court of British Columbia to March 31, 2015" (online), at p. 5.

[293]   Imposing judicially created ceilings as an aspect of our s. 11(*b*) jurisprudence presents risks. If we are to take these risks through the imposition of ceilings or other time limits, these limits should be created by legislation and informed by facts.

logique ne permet de penser que, s'ils sont parfaitement irréalistes maintenant, ces plafonds deviendront moins irréalistes avec le temps. Soit dit en tout respect, je ne crois pas qu'il convienne que la Cour impose au système de justice criminelle le risque que des milliers de poursuites soient abandonnées avant le procès par suite d'un arrêt des procédures. Il serait d'autant plus regrettable d'agir comme le proposent mes collègues, vu l'absence quasi totale de fondement factuel, et sans que la Cour ait eu l'occasion de recevoir des observations quant à la sagesse de cette approche ou quant à la justesse des hypothèses sur lesquelles elle est fondée.

[292]   Mes collègues maintiennent qu'« une culture de complaisance vis-à-vis les délais » (par. 40) a fait son apparition dans le système de justice criminelle et que le cadre d'analyse établi dans l'arrêt *Morin* ne s'attaque pas à ce problème. Selon eux, il est justifié de réviser le cadre d'analyse applicable aux demandes fondées sur l'al. 11*b*) compte tenu du fait qu'avec le cadre d'analyse actuel « les participants au système de justice [. . .] ne sont pas incités à prendre des mesures préventives pour remédier aux pratiques inefficaces et au manque de ressources » : par. 41. Or, contrairement à ces généralisations vagues et non appuyées, il ressort du dossier même limité dont nous disposons que la Cour provinciale de la Colombie-Britannique et les gouvernements de la Colombie-Britannique, de l'Alberta, de Terre-Neuve-et-Labrador et de l'Ontario se sont attaqués sérieusement au problème des délais excessifs. Les statistiques les plus récentes versées au dossier démontrent de fait que, loin d'empirer, la situation tend à s'améliorer : voir « The Semi-Annual Time to Trial Report of the Provincial Court of British Columbia to March 31, 2015 » (en ligne), p. 5.

[293]   Bref, imposer des plafonds d'origine prétorienne dans le cadre de notre jurisprudence relative à l'al. 11*b*) présente des risques. S'il fallait courir de tels risques en imposant des plafonds ou d'autres délais, ceux-ci devraient être fixés par voie législative et être fondés sur des faits.

E.   *The Promised Simplicity of the Ceilings Is Likely Illusory*

[294]   Even if creating ceilings were an appropriate task for the courts and even if there were an appropriate evidentiary basis for them, there is little reason to think these presumptive ceilings would avoid the complexities inherent in deciding whether a particular delay is unreasonable in all of the circumstances.

[295]   We can look to the experience of other jurisdictions. It appears that even fixed limitation periods set by legislatures have not succeeded in avoiding complexity. Various states in the United States have created statutory time limitation periods dealing with overall delay in criminal proceedings. At the federal level, there is the *Speedy Trial Act of 1974*, 18 U.S.C. § 3161, and there are similar provisions in many states: W. R. LaFave et al., *Criminal Procedure* (5th ed. 2009), at pp. 892-93. These provisions create time limitations, but also include a number of contingencies to account for the plethora of different circumstances under which criminal cases may arise: pp. 895-97. In short, to be workable, the legislated limits inevitably require that a number of factors be balanced and considered in determining whether any case or charge should be dismissed: p. 897. But these contingencies and this balancing simply give rise to the sort of litigation that the limits were supposed to avoid: see S. Hopwood, "The Not So Speedy Trial Act" (2014), 89 *Wash. L. Rev*. 709, at p. 715.

[296]   Turning to the proposed scheme, it seems to me that rather than avoiding complexity, it simply moves the complexities of the analysis to a new location.

[297]   I turn first to cases in which the delay exceeds the presumptive ceiling. Departure from the ceiling may be required by a variety of circumstances: "discrete exceptional events" (para. 75), including delay caused by unexpected recantation

E.   *La simplicité promise des plafonds est vraisemblablement illusoire*

[294]   Même si la création de plafonds entrait dans les attributions des tribunaux et que la preuve présentée en l'espèce la justifiait, il y a peu de raison de penser que ces plafonds présumés permettraient d'éviter les complexités inhérentes à l'obligation de décider si un délai particulier est déraisonnable compte tenu de l'ensemble des circonstances.

[295]   À cet égard, nous pourrions tirer des enseignements de l'expérience vécue dans d'autres pays. Il semble, en effet, que même les délais fixes prescrits ailleurs par le législateur n'aient pas suffi pour éviter la complexité de la tâche. Aux États-Unis, divers États ont créé, par voie législative, des délais de prescription qui imposent un délai total maximal dans le cas des poursuites criminelles. Au palier fédéral, le législateur a adopté la *Speedy Trial Act of 1974*, 18 U.S.C. § 3161, et des dispositions similaires ont été adoptées dans de nombreux États : W. R. LaFave et autres, *Criminal Procedure* (5e éd. 2009), p. 892-893. Ces dispositions prescrivent des délais, mais prévoient également plusieurs éventualités pour tenir compte des innombrables circonstances dans lesquelles surviennent les procès criminels : p. 895-897. Bref, pour être efficaces, les délais fixés par la loi exigent immanquablement qu'on tienne compte d'un grand nombre de facteurs et qu'on les mette en balance pour déterminer s'il y a lieu de rejeter une affaire ou une accusation : p. 897. Or, ces éventualités et cette mise en balance donnent précisément lieu au genre de litiges que les délais étaient censés permettre d'éviter : voir S. Hopwood, « The Not So Speedy Trial Act » (2014), 89 *Wash. L. Rev.* 709, p. 715.

[296]   Pour revenir au régime proposé par mes collègues, il me semble qu'au lieu d'éviter la complexité de l'analyse, il ne fait que la déplacer.

[297]   Voyons d'abord ce qu'il en est dans les cas où le délai excède le plafond présumé. Des dérogations à l'application du plafond peuvent être nécessaires en raison de diverses circonstances : des « événements exceptionnels distincts » (par. 75)

by a complainant and other unforeseen trial delays; delay resulting from a case's particular "complexity" (para. 77); and whether particular periods of delay could reasonably have been mitigated. It is hard to see how this framework is likely to bring greater simplicity to the analysis.

[298]   The same applies to the burden on the defence in cases which fall below the ceilings. Under the proposed framework, the defence has the burden to show, first, that the time required to dispose of the case "markedly exceeds the reasonable time requirements of the case": para. 87. In order to consider a defence attempt to discharge this burden, the court will have to consider a variety of factors, including "the complexity of the case, local considerations, and whether the Crown took reasonable steps to expedite the proceedings": *ibid.* These factors largely mirror the test under the existing jurisprudence.

[299]   The defence must also show that it took "meaningful, sustained steps to expedite the proceedings": para. 84. The defence must show that "it attempted to set the earliest possible hearing dates, was cooperative with and responsive to the Crown and the court, put the Crown on timely notice when delay was becoming a problem, and conducted all applications . . . reasonably": para. 85. I have already explained why I think it is inappropriate to impose this burden. But putting that aside, the need for these inquiries increases rather than reduces the complexity of the analysis mandated by the existing jurisprudence.

[300]   Finally, consider the proposed transitional provisions. It is unexplained how the Crown will be able to satisfy the court that "the time the case has taken is justified based on the parties' reasonable

— y compris les délais causés par des rétractations inattendues par le plaignant et d'autres délais imprévus durant le procès —, des délais qui découlent de la « complexité » (par. 77) particulière du dossier, et la question de savoir si certaines périodes particulières auraient raisonnablement pu être minimisées. Il est difficile de voir comment ce cadre serait susceptible de simplifier ne serait-ce qu'un tant soit peu l'analyse.

[298]   Il en est de même pour le fardeau dont devra s'acquitter la défense lorsque le délai sera inférieur aux plafonds. Suivant le cadre d'analyse proposé, la défense aura à démontrer, tout d'abord, que le temps qu'il a fallu pour trancher l'affaire « excède de manière manifeste le délai qui aurait été raisonnablement nécessaire pour juger l'affaire » : par. 87. Pour juger de la tentative de la défense de s'acquitter de ce fardeau, le tribunal aura à tenir compte de divers facteurs, y compris « la complexité du dossier, des considérations de nature locale, et la question de savoir si le ministère public a pris des mesures raisonnables pour accélérer l'instance » : *ibid*. Or, ces facteurs sont pratiquement le reflet du test que prescrit la jurisprudence actuelle.

[299]   La défense aura aussi à démontrer qu'elle a pris « des mesures utiles et soutenues pour accélérer la procédure » : par. 84. Elle aura en outre à prouver qu'elle « a essayé d'obtenir les dates les plus rapprochées possible pour la tenue de l'audience, qu'elle a collaboré avec le ministère public et le tribunal et a répondu à leurs efforts, qu'elle a avisé le ministère public en temps opportun que le délai commençait à poser problème, et qu'elle a mené toutes les demandes [. . .] de manière raisonnable » : par. 85. J'ai déjà expliqué pourquoi j'estime qu'il ne convient pas de lui imposer ce fardeau. Mais, outre cette explication, exiger que les tribunaux soient astreints à de tels examens aura pour effet d'augmenter plutôt que de réduire la complexité de l'analyse prescrite par la jurisprudence actuelle.

[300]   Examinons finalement les dispositions transitoires proposées. Mes collègues ne précisent pas comment le ministère public s'y prendra pour convaincre le tribunal que « le temps qui

reliance on the law as it previously existed" in the relevant jurisdiction, let alone how it will be shown that "the parties have [or have not] had time following the release of this decision to correct their behaviour": para. 96. Little imagination is needed to see the ballooning evidentiary implications of these elements of the scheme. Also, it seems that for transitional cases below the ceiling, unlike cases subject to the new template, the defence does not have to prove having taken initiative to expedite matters in the period preceding this decision in order to make out a case of unreasonable delay. But doing so will assist the defence claim of unreasonable delay. The result is that even in transitional cases, the parties will be parsing the record to show how the defence did, or did not, try to move things along.

[301]   These considerations suggest that the proposed presumptive ceilings will do little to simplify the task of determining whether the delay in a particular case violates the accused's right to be tried within a reasonable time. In one way or the other, the judge must look at the circumstances of the particular case at hand.

F.   *Conclusion*

[302]   I am not convinced that this Court should impose the scheme proposed by my colleagues. It diminishes *Charter* rights. It casts aside three decades of the Court's jurisprudence when no participant in the appeal called for such a wholesale change — and this in the context of a case in which all of us agree that the result is clear under the existing jurisprudence. It has not been the subject of adversarial scrutiny or debate. The record does not support the particular ceilings selected. Nor, so far as I can tell, does the Court-conducted examination of reported cases. And it risks repetition of the *Askov* aftermath in which thousands of prosecutions were

s'est écoulé est justifié du fait que les parties se sont raisonnablement conformées au droit tel qu'il existait au préalable » dans le territoire en cause, et encore moins comment on pourra démontrer qu'« après le prononcé du présent jugement, les parties ont [ou n'ont pas] eu le temps de corriger leur conduite » : par. 96. Il n'est pas nécessaire de faire preuve de beaucoup d'imagination pour concevoir les répercussions considérables qu'auront ces aspects du régime sur la preuve. Dans les affaires visées par les dispositions transitoires, il semble par ailleurs que, dans les cas où le délai total sera inférieur au plafond, contrairement à ce qui lui incombera dans les affaires visées par le nouveau modèle, la défense n'aura pas l'obligation de démontrer qu'elle a fait le nécessaire pour accélérer le déroulement de l'instance au cours de la période précédant la présente décision. Toutefois, si elle le faisait, elle obtiendrait plus facilement gain de cause sur son moyen fondé sur l'existence d'un délai déraisonnable. Ainsi, même dans les cas transitoires, les parties auront à disséquer le dossier pour démontrer comment la défense a fait ou non le nécessaire pour faire progresser l'affaire.

[301]   Ces considérations donnent à penser que les plafonds présumés contribueront fort peu à faciliter la tâche de déterminer si le délai écoulé dans un cas précis a enfreint le droit de l'accusé d'être jugé dans un délai raisonnable. Le tribunal devra de toute façon examiner les circonstances du cas qui lui est soumis.

F.   *Conclusion*

[302]   Je ne suis pas convaincu que la Cour devrait imposer l'approche proposée par mes collègues. Elle restreint les droits consacrés par la *Charte*. Elle écarte une trentaine d'années de jurisprudence de la Cour alors qu'aucun des participants au présent pourvoi n'a réclamé une telle transformation radicale de notre droit, et ce, dans le contexte d'une affaire dans laquelle nous nous entendons tous pour dire que le résultat est clair selon la jurisprudence actuelle. En outre, l'approche proposée n'a fait l'objet ni d'un débat contradictoire ni d'une analyse de la part des parties. Le dossier n'appuie pas les plafonds retenus en l'espèce,

judicially stayed. In short, the proposed scheme is, in my respectful view, wrong in principle and unwise in practice.

pas plus, pour autant que j'ai pu le constater, que l'examen par mes collègues des décisions publiées. Cette nouvelle approche risque en outre de déclencher une répétition de ce qui s'est produit dans la foulée de l'arrêt *Askov*, quand des milliers de procès se sont soldés par un arrêt des procédures. Bref, à mon avis, le cadre d'analyse proposé est erroné sur le plan théorique et peu judicieux sur le plan pratique.

## V. Disposition

[303]   I would allow the appeal and enter a stay of proceedings.

*Appeal allowed.*

*Solicitors for the appellant: Peck and Company, Vancouver.*

*Solicitor for the respondent: Public Prosecution Service of Canada, Vancouver.*

*Solicitor for the intervener the Attorney General of Alberta: Attorney General of Alberta, Calgary.*

*Solicitors for the intervener the British Columbia Civil Liberties Association: Farris, Vaughan, Wills & Murphy, Vancouver.*

*Solicitors for the intervener the Criminal Lawyers' Association (Ontario): Addario Law Group, Toronto.*

## V. Dispositif

[303]   J'accueillerais le pourvoi et j'ordonnerais l'arrêt des procédures.

*Pourvoi accueilli.*

*Procureurs de l'appelant : Peck and Company, Vancouver.*

*Procureur de l'intimée : Service des poursuites pénales du Canada, Vancouver.*

*Procureur de l'intervenant le procureur général de l'Alberta : Procureur général de l'Alberta, Calgary.*

*Procureurs de l'intervenante l'Association des libertés civiles de la Colombie-Britannique : Farris, Vaughan, Wills & Murphy, Vancouver.*

*Procureurs de l'intervenante Criminal Lawyers' Association (Ontario) : Addario Law Group, Toronto.*

WARNING

The President of the panel hearing this appeal directs that the following should be attached to the file:

An order restricting publication in this proceeding under ss. 486.4(1), (2), (2.1), (2.2), (3) or (4) or 486.6(1) or (2) of the *Criminal Code* shall continue.  These sections of *the Criminal Code* provide:

486.4(1)     Subject to subsection (2), the presiding judge or justice may make an order directing that any information that could identify the victim or a witness shall not be published in any document or broadcast or transmitted in any way, in proceedings in respect of

(a)     any of the following offences;

(i)     an offence under section 151, 152, 153, 153.1, 155, 159, 160, 162, 163.1, 170, 171, 171.1, 172, 172.1, 172.2, 173, 210, 211, 213, 271, 272, 273, 279.01, 279.011, 279.02, 279.03, 280, 281, 286.1, 286.2, 286.3, 346 or 347, or

(ii)     any offence under this Act, as it read at any time before the day on which this subparagraph comes into force, if the conduct alleged involves a violation of the complainant's sexual integrity and that conduct would be an offence referred to in subparagraph (i) if it occurred on or after that day; or

(iii)     REPEALED: S.C. 2014, c. 25, s. 22(2), effective December 6, 2014 (Act, s. 49).

(b)     two or more offences being dealt with in the same proceeding, at least one of which is an offence referred to in paragraph (a).

(2)     In proceedings in respect of the offences referred to in paragraph (1)(a) or (b), the presiding judge or justice shall

(a)     at the first reasonable opportunity, inform any witness under the age of eighteen years and the victim of the right to make an application for the order; and

(b)     on application made by the victim, the prosecutor or any such witness, make the order.

2018 ONCA 594 (CanLII)

Page: 2

(2.1) Subject to subsection (2.2), in proceedings in respect of an offence other than an offence referred to in subsection (1), if the victim is under the age of 18 years, the presiding judge or justice may make an order directing that any information that could identify the victim shall not be published in any document or broadcast or transmitted in any way.

(2.2) In proceedings in respect of an offence other than an offence referred to in subsection (1), if the victim is under the age of 18 years, the presiding judge or justice shall

> (a) as soon as feasible, inform the victim of their right to make an application for the order; and

> (b) on application of the victim or the prosecutor, make the order.

(3)     In proceedings in respect of an offence under section 163.1, a judge or justice shall make an order directing that any information that could identify a witness who is under the age of eighteen years, or any person who is the subject of a representation, written material or a recording that constitutes child pornography within the meaning of that section, shall not be published in any document or broadcast or transmitted in any way.

(4)     An order made under this section does not apply in respect of the disclosure of information in the course of the administration of justice when it is not the purpose of the disclosure to make the information known in the community. 2005, c. 32, s. 15; 2005, c. 43, s. 8(3)(b); 2010, c. 3, s. 5; 2012, c. 1, s. 29; 2014, c. 25, ss. 22,48; 2015, c. 13, s. 18..

486.6(1)     Every person who fails to comply with an order made under subsection 486.4(1), (2) or (3) or 486.5(1) or (2) is guilty of an offence punishable on summary conviction.

(2)     For greater certainty, an order referred to in subsection (1) applies to prohibit, in relation to proceedings taken against any person who fails to comply with the order, the publication in any document or the broadcasting or transmission in any way of information that could identify a victim, witness or justice system

2018 ONCA 594 (CanLII)

Page:  3

participant whose identity is protected by the order. 2005, c. 32, s. 15.

# COURT OF APPEAL FOR ONTARIO

CITATION: R. v. Burke, 2018 ONCA 594
DATE: 20180627
DOCKET: C63913

Hourigan, Pardu and Nordheimer JJ.A.

BETWEEN

Her Majesty the Queen

Applicant/Appellant

and

Raymond Burke

Respondent

Lorna Bolton for the Crown, appellant

Brian Eberdt for the respondent

Heard: June 19, 2018

On appeal from the order of Justice J.A. Thorburn of the Superior Court of Justice with reasons reported at 2017 ONSC 3261.

## REASONS FOR DECISION

[1]     The respondent was charged with the abduction and violent sexual assault of two different women in 1986. He fled to the United States of America, in violation of the terms of his bail. A Canada-wide warrant was issued for his arrest. He assumed a false identity. In 1987, he was charged in the United States with assault, aggravated robbery and kidnapping of a third woman. In 1988, he

2018 ONCA 594 (CanLII)

Page:  2

was sentenced to 52 years imprisonment in the United States. At the time, there was no extradition treaty that would have allowed Canadian authorities to bring the respondent to Canada to stand trial while he was serving his sentence in the United States.

[2]     In 2000, Toronto police were advised that the respondent was eligible for parole in May 2013. In 2003, an amendment was made to the relevant extradition treaty which would have permitted Canadian authorities to seek temporary extradition to proceed with the trial of the Ontario charges but no such efforts were made.

[3]     In August 2015, Toronto police were advised that the respondent was being released from prison and would be returned to Canada. On October 26, 2015 he was deported back to Canada and was arrested on arrival. His trial was scheduled to begin July 31, 2017 and be completed, within a period less than two years after his return to Ontario. However, the charges were stayed on the respondent's application alleging that his right to trial within a reasonable time had been violated. The Crown appeals.

[4]     We agree with the Crown's argument that these charges should not have been stayed, and that all of the delay caused by the respondent's flight in violation of his bail conditions should be treated as defence delay.

2018 ONCA 594 (CanLII)

Page:  3

2018 ONCA 594 (CanLII)

**Trial judge's reasons**

[5]    The trial judge held that the Crown ought to have sought the temporary surrender of the respondent pursuant to the amendment to the extradition treaty between Canada and the United States. She accordingly characterized the 12 and one half year period between April 30, 2003 when the amendment came into force and October 26, 2015 when the respondent was returned to Canada as Crown delay "vastly beyond the timeframe articulated in *Jordan*" and also "unreasonable" under the *Morin* framework.

**Analysis**

[6]    The trial judge did not have the benefit of the analysis in *R. v. Cody,* 2017 SCC 31, [2017] 1 S.C.R. 659. .

[7]    The Supreme Court of Canada held, in both *Cody* and in *R. v. Jordan*, 2016 SCC 27, [2016] 1 S.C.R. 631, that in order to determine whether there has been unreasonable delay, "defence delay" is to be deducted from the overall period of delay – from charge to the anticipated end of trial.

[8]    In *Cody,* at paras. 26-28, the Supreme Court elaborated on the notion of defence delay and explained it is "delay that is caused solely or directly by the conduct of the defence" and that the analysis of defence delay is "intended to prevent the defence from benefitting from "its own delay-causing action or inaction" (citation omitted).

Page:  4

2018 ONCA 594 (CanLII)

[9]     The Supreme Court said further, at para. 30:

> The only deductible defence delay under this component is, therefore, that which: (1) is solely or directly caused by the accused person; and (2) flows from defence action that is illegitimate insomuch as it is not taken to respond to the charges. As we said in *Jordan*, the most straightforward example is "[d]eliberate and calculated defence tactics aimed at causing delay, which include frivolous applications and requests." [Citation omitted.]

[10]    The Supreme Court then went on to describe illegitimate defence delay, at paras. 32-34. Defence action may not be legitimate in the context of a s. 11(b) application if "it is designed to delay or if it exhibits marked inefficiency or marked indifference toward delay." The defence is not allowed to "engage in illegitimate conduct and then have it count towards the Jordan ceiling."

[11]    The respondent admitted to Toronto police that his express purpose in fleeing was to avoid capture and prosecution. The terms of his bail required he remain within the jurisdiction.

[12]    The delay from the time the charges were laid until the time the respondent was returned to Canada was illegitimate defence delay. It was caused directly by the respondent, whose actions were not taken to respond to the charges, but were intended to frustrate them.

[13]    This case is different from others in which delay in pursuit of extradition proceedings has been attributed to the Crown, such as *R. v. MacIntosh,* 2011

Page:  5

NSCA 111, 281 C.C.C. (3d) 291 aff'd, 2013 SCC 23, [2013] 2 S.C.R. 200. In *MacIntosh,* the accused was lawfully living in another jurisdiction when the charges were laid.

[14]   There is no suggestion that the time following the respondent's return to Canada in 2015, until the anticipated end of the trial, was unreasonable under the *Jordan, Cody* or *Morin* analysis.

[15]   Given that the time remaining after deducting defence delay from total delay does not exceed the presumptive 30 month ceiling, there is no need to go further and consider whether exceptional circumstances amounting to discrete events or particular complexity require further examination. Nor is it necessary to consider whether the transitional exceptional circumstances analysis should apply: *R. v. Coulter*, 2016 ONCA 704, 133 O.R. (3d) 433; *R. v. Mallozzi*, 2017 ONCA 644, 390 C.R.R. (2d) 57.

[16]   Accordingly the appeal is allowed, the stay is set aside and the matter is returned to the Superior Court of Ontario for trial. Given this conclusion, it is not necessary to address the other arguments advanced on appeal.

"C.W. Hourigan J.A."
"G. Pardu J.A."
I.V.B. Nordheimer J.A."

2018 ONCA 594 (CanLII)

# WARNING

The court hearing this matter directs that the following notice be attached to the file:

A non-publication and non-broadcast order in this proceeding has been issued under subsection 486.4(1) of the *Criminal Code*. This subsection and subsection 486.6(1) of the *Criminal Code,* which is concerned with the consequence of failure to comply with an order made under subsection 486.4(1), read as follows:

**486.4  Order restricting publication — sexual offences.** — (1)  Subject to subsection (2), the presiding judge or justice may make an order directing that any information that could identify the victim or a witness shall not be published in any document or broadcast or transmitted in any way, in proceedings in respect of

(*a*)  any of the following offences:

(i)  an offence under section 151, 152, 153, 153.1, 155, 159, 160, 162, 163.1, 170, 171, 171.1,172, 172.1, 172.2, 173, 210, 211, 212, 213, 271, 272, 273, 279.01, 279.011, 279.02, 279.03, 280, 281, 286.1, 286.2, 286.3, 346 or 347, or

(ii)  any offence under this Act, as it read at any time before the day on which this subparagraph comes into force, if the conduct alleged involves a violation of the complainant's sexual integrity and that conduct would be an offence referred to in subparagraph (i) if it occurred on or after that day; or

(*b*)  two or more offences being dealt with in the same proceeding, at least one of which is an offence referred to in paragraph *(a)*.

(2)  **MANDATORY ORDER ON APPLICATION** — In proceedings in respect of the offences referred to in paragraph (1)(*a*) or (*b*), the presiding judge or justice shall

(*a*)  at the first reasonable opportunity, inform any witness under the age of eighteen years and the complainant of the right to make an application for the order; and

(*b*)  on application made by the complainant, the prosecutor or any such witness, make the order.

. . .

**486.6  OFFENCE** — (1)  Every person who fails to comply with an order made under subsection 486.4(1), (2) or (3) or 486.5(1) or (2) is guilty of an offence punishable on summary conviction.

2018 ONCJ 162 (CanLII)

CITATION: R. v. Magiri, 2017 ONSC 2818
COURT FILE NO.: CR-16-50000743
DATE: 20170512

**ONTARIO**

**SUPERIOR COURT OF JUSTICE**

| | | |
|---|---|---|
| BETWEEN: | ) | |
| | ) | |
| HER MAJESTY THE QUEEN | ) | |
| | ) | Valerie Culp, for the Crown |
| – and – | ) | |
| | ) | |
| Anthony Magiri | ) | |
| Defendant | ) | Franklin Lyons, for the Defendant |
| | ) | |
| | ) | |
| | ) | HEARD: May 01, 2017 |

**MCWATT, J.**

[1]    Mr. Anthony Magiri applies for a stay of proceedings pursuant to sections 11(b) and 24(1) of the *Charter of Rights and Freedoms.*

[2]    The complainant in this matter reported a sexual assault to police on April 7, 2013. On January 14, 2014, a warrant for a sample of the applicant's DNA was issued. Pursuant to that warrant, the applicant provided DNA samples on January 28, 2014. Soon thereafter, Mr. Magiri left Canada. He arrived in Kenya on February 11, 2014. He returned to Canada and was arrested on January 30, 2015.

[3]    Subsequent to the applicant's departure, his DNA samples were tested, and he was charged with sexual assault. The applicant did not return to Canada for another 10 months and 3 days.

[4]    The information was sworn on March 28, 2014. The anticipated end of trial is June 2, 2017, therefore 38 months and 6 days is the present time span for this matter.

*[5]*    This motion hinges on this Court's characterization of the 10 months and 3 days between the swearing of the information and the applicant's arrest.

[6]    The applicant submits that the 38 months and 6 days is *prima facie* excessive and infringes his right to be tried within a reasonable time. The Crown's position is that the 10 month, 3 day period of delay occasioned by the applicant's leaving Canada should not be considered in the s. 11(b) analysis. The interests protected by s. 11(b) were not engaged during this time. In the alternative, the time period should be characterized as a "discrete event"

2017 ONSC 2818 (CanLII)

Page: 2

exceptional circumstance, and should be deducted from the delay in bringing this matter to trial. Under either of these approaches, the resulting period of delay is 28 months, 3 days and the applicant is not able to show of these that this presumptively reasonable delay is, in fact, unreasonable. Meaningful and sustained steps to proceed to trial were not taken. The applicant has not been able to show that his case has taken markedly longer to proceed to trial than it should have.

[7]     The application is dismissed for the following reasons.

[8]     The usual approach, adopted by the Supreme Court of Canada in *R. v. Kalanj,* [1989] 1 S.C.R. 1594, is that the time period for consideration of unreasonable delay commences on the day upon which an information or indictment is sworn against an accused. Section 11(b) protects an accused person's interest in liberty, security of the person and a fair trial. Justice Moldaver explained in *R. v. Jordan,* 2016 S.C.C. 27 at para 20.

> "Liberty is engaged because a timely trial means an accused person will spend as little time as possible held in pre-trial custody or living in the community under release conditions, Security of the person is impacted because a long-delayed trial means prolonging the stress, anxiety and stigma an accused may suffer. Fair trial interests are affected because the longer a trial is delayed, the more likely it is that some accused will be prejudiced in mounting a defence…"

[9]     The interests described in *Jordan*, however, are not engaged when the accused is unaware of the criminal charges he faces. The accused is not held in pre-trial custody or forced to live under stringent bail conditions. The accused suffers no stress or anxiety and perceives no stigma. When evidence is physical and non-perishable, the passage of time does not cause prejudice to fair trial interests.

[10]    In *R. v. Millar*, 2016 BCSC 1887 at paras 25-29, 136, the accused was arrested months after charging documents were sworn. It could not be established that the appellant knew he had been charged with an offence. He did know that his property was being held pursuant to a Criminal Code warrant. Noting that this accused did "not suffer the vexations of a criminal charge" prior to arrest, the Court identified the arrest date as the appropriate starting point for its 11(b) analysis.

[11]    In selecting the arrest date as the appropriate starting point for its analysis, the Court in *Millar* distinguished the matter before it from *Kalanj*, finding that the Supreme Court in that case focused only on whether periods of delay between arrest and the swearing of the information should be considered in the s. 11(b) analysis. Justice Grey, in *Millar*, noted that the *Kalanj* case did not consider the characterization of pre-arrest delay in any meaningful way and thus did not apply to Mr. Millar's case (Ibid at paras 117-122).

[12]    The applicant's matter is analogous to Mr. Millar's.

[13]    The time period for consideration in this case begins on January 30, 2015, which is the date of the arrest. The anticipated end of trial is June 2, 2017. The "total delay" in this case is,

2017 ONSC 2818 (CanLII)

therefore, below the presumptive ceiling: 28 months and 4 days.  The onus shifts to the applicant to show that the delay is unreasonable.

[14]    The applicant cross-examined the officers involved in the investigation of Mr. Magiri on this application. He asserts that the evidence shows that they should have done more than they did to find out where he was and bring him to justice more quickly. It is not disputed that Mr. Magiri left the country and went to Kenya for the period in question. Significant efforts were made to locate him after his DNA test results implicated him in the sexual assault. A "warrant in the first" was issued. Police telephoned him on numerous occasions and paid multiple visits to his residence. At one point, an officer received information that the applicant had left the country. After Border Services officers were unable to determine where the applicant might have gone, the police asked that the applicant be flagged in the CBSA systems. That the officers did not contact Interpol, use social media or contact the applicant's family and friends to find him does not make the time period in question part of an unreasonable delay. They were more than diligent with the constant checking for the applicant after the warrant for his arrest was issued. The time period should not count against the Crown's obligations to provide Mr. Magiri with a trial within a reasonable time in these circumstances.

[15]    I also accept the Crown's alternative argument that the 10 months and 3 days between charge and arrest are deductible from the total delay as a "discrete event" and exceptional circumstance. Even if the time period for consideration commences on March 28, 2014 (the day upon which the information was sworn), the total delay in this case amounts to 38 months and 6 days. The delay spanning March 28, 2015 to January 30, 2015 (the 10 months and 3 days the applicant was absent from Canada) should be attributed to a "discrete event" exceptional circumstance, and deducted from the total delay in bringing the applicant's matter to trial.

[16]    Exceptional circumstances are those that are reasonably unforeseen or reasonably unavoidable, and which generate delay the Crown cannot reasonably remedy (*Jordan*, supra at paras 69-72). The Court in *Jordan* explained that a discrete event exceptional circumstance: "cases with an international dimension, such as cases requiring the extradition of an accused from a foreign jurisdiction." was an example of such a circumstance.

[17]    The police in this case could not have foreseen that the applicant, shortly after providing DNA samples, would leave Canada. He had been completely cooperative prior to his leaving.

[18]    Once the applicant was located and arrested, the Crown and police made concerted efforts to remedy the delay in commencing proceedings. Pre-trials and a preliminary hearing were swiftly scheduled and the applicant's Superior Court trial was prioritized over in-custody matters. The Crown made significant efforts to expedite the pre-trial motions process.

[19]    When the period of 10 months and 3 delays is deducted from the total or net delay of 38 months and 6 days, a delay of 28 months and 4 days remains. The onus then shifts to the applicant to show that the delay is unreasonable.

[20]    As the remaining delay falls below the presumptive ceiling, the applicant must rebut the presumption of reasonable delay.

2017 ONSC 2818 (CanLII)

Page: 4

[21]     The applicant has not rebutted the presumption of reasonable delay in this case. Defence counsel must show cooperation with the Crown attempts to set the earliest possible dates and to conduct pre-trial applications reasonably and expeditiously (*Jordan* at para 85).

[22]     Conduct of an accused which causes delay significantly undermines an accused's claim that meaningful and sustained steps to proceed to trial have been taken. An example of an accused's conduct giving rise to "defence delay" is "foot-dragging" in securing Legal Aid funding and retaining counsel (*R. v. Isaacs*, 2016 ONSC 6214 at para 90, citing *R. v. Boateng*, 2015 ONCA 857).

[23]     In this case, the applicant's Legal Aid certificate was cancelled after he failed to respond to a request on August 5, 2016 for financial disclosure. Mr. Magiri did not address this request until February, 2017. Only when a "with-or-without counsel" trial date was set did the matter proceed. Allowing a Legal Aid certificate to lapse is evidence that the applicant was content with the pace of the litigation.

[24]     In addition, defence counsel expressed his intention to file a s. 11(b) motion on December 22, 2016. April 7, 2017 was the day upon which application materials were to be filed, but none were filed on that date. Defence counsel failed to provide motion materials on April 11 and, again, on April 13.

[25]     Ultimately, defence counsel filed a complete Constitutional challenge on the Crown on April 20, 2017, and a complete s. 11(b) application on April 21, 2017.

[26]     The application is dismissed.

_____

McWatt, J.

**Released:** May 12, 2017

2017 ONSC 2818 (CanLII)

**CITATION:** R. v. Magiri,  2017 ONSC 2818
**COURT FILE NO.:** CR-16-50000743
**DATE:** 20170512

# ONTARIO

# SUPERIOR COURT OF JUSTICE

HER MAJESTY THE QUEEN

– **and** –

R. v. Magiri

---
## CHARTER RULING
---

McWatt, J.

**Released:** May 12, 2017

2017 ONSC 2818 (CanLII)

# ONTARIO  COURT  OF  JUSTICE

**CITATION:** *R. v. H.S.*, 2018 ONCJ 162
**DATE**: February 20, 2018

**B E T W E E N :**

## HER  MAJESTY  THE  QUEEN

— AND —

## H.S.

Before Justice M. Speyer
Heard on December 14 and 15, 2017, and January 24, 2018
Reasons for Judgment released on February 20, 2018

Alexandra Penny  ............................................................................................ **for the Crown**
Daniel Lerner  ...................................................................................................... **for H.S.**

**M. SPEYER J.:**

**Introduction:**

**[1]**       The Applicant, H.S., moved to the Republic of Nicaragua on September 22, 2016. On October 16, 2013, his former common law spouse reported to the Toronto police that she had been sexually assaulted and threatened by him. Following an investigation, the police charged the Applicant with sexual assault, unlawful confinement and uttering death threats. The offences are alleged to have occurred in April of 2013. The Information was sworn on October 17, 2013 and a warrant for his arrest was issued on the same day. The Applicant was arrested on these charges when he returned to Canada on April 5, 2017.

**[2]**       The Crown is proceeding by indictment and Mr. H.S. has elected to have a trial in the Ontario Court of Justice. The trial is scheduled for March 5 and 6, 2018. The total period of delay between the swearing of the Information and the anticipated end of the trial is approximately 52 months and 19 days. The Applicant seeks a stay based on the Crown's failure to bring this matter to trial within a reasonable time, contrary to section 11(b) of the *Charter of Rights and Freedoms*.

2018 ONCJ 162 (CanLII)

**The issue:**

**[3]**      The issue on this Application is how to characterize the period from October 17, 2013 to April 5, 2017 (41 months, 19 days) when Mr. H.S. was abroad. The parties agree that the remaining period of approximately 11 months does not engage any *Charter* concerns and is well below the 18 month limit prescribed by the Supreme Court of Canada in *R. v. Jordan*, 2016 SCC 27, for trials in the Ontario Court of Justice.

**Position of the Parties:**

**[4]**      The Applicant argues that the nearly 42 month delay should be attributed entirely to the Crown because the police either knew Mr. H.S. was in Nicaragua or could easily have discovered this, and yet took no steps to locate and return him to Canada to answer these charges.

**[5]**      The Crown submits that this period should be deducted from the total delay as it was caused solely by the Applicant choosing to remain abroad when he knew there was an arrest warrant for him for these charges. In the alternative, the period should characterized as an exceptional discrete event which could not be avoided and should be deducted from the overall length of time taken to complete this case. In the further alternative, the Crown argues that this is a transitional case and under the *Morin* framework, this period would have been considered as defence delay or at least, as neutral, and for which Mr. H.S. suffered no prejudice.

**[6]**      For the reasons stated below, I dismiss the Application and find that the period when the Applicant was abroad is a delay caused solely by him and is deducted from the total delay in bringing this matter to trial. The remaining net delay of 11 months is reasonable and does not violate the Applicant's s. 11(b) rights.

**The Evidence and Findings of Fact:**

**[7]**      On October 16, 2013, Toronto Police Constables Marsh and Perilli attended at H[…], Scarborough, in response to a call from the complainant, S.R.E.. When they arrived, she was visibly upset. She told them that her common-law spouse, Mr. H.S. had left their home about two weeks previously and she did not know where he was. She reported that in the past few days he had called and texted her repeatedly. Ms. S.R.E. disclosed that she had been sexually assaulted by Mr. H.S. in the past and was afraid of him as he had a key to the house and returned whenever he wanted to.

**[8]**      Ms. S.R.E. told these officers that she did not know where Mr. H.S. was currently living. She said his cell phone number was [phone number 1]. She advised that he had previously left their home in April and returned in May of 2013. She also told them that he worked as a supervisor at G[…] and that his car was parked in the driveway of their home. She did not know what he was using as transportation.

**[9]**      PC Perilli and Marsh took Ms. S.R.E. to 42 Division where, with the assistance

2018 ONCJ 162 (CanLII)

of a Spanish interpreter, she gave a videotaped statement to Detective Constable Emms, the officer in charge of this case. Ms. S.R.E. provided the following information relevant to this application:

- She and Mr. H.S. have been in a common law relationship for 20 years.
- She immigrated to Canada from El Salvador in 1992.
- She and Mr. H.S. met in Canada.
- Mr. H.S. is a Canadian citizen.
- She and Mr. H.S. have two children, a thirteen year old girl who lives with her at H[…] and a 20 year old son who is in the Canadian army and does not live at home.
- Problems in their relationship began about 6 years ago. Mr. H.S. frequently left their home without telling her where he was. He was abusive when he returned home and sexually assaulted her in April of 2013.
- She disclosed the physical abuse to Mr. H.S.'s sister but not the sexual assault. His sister advised her to call the police.
- Mr. H.S. left their home in April and returned in May 2013.
- On September 21, 2013, he left home again and she has not seen him since then. She does not know where he is.
- She spoke with Mr. H.S. by telephone the previous Sunday and he told her he wanted half the house as he needed money to start living his life.
- She is afraid of Mr. H.S. because she does not know where he is or when he will return home. He has threatened to kill her if he returns home and finds her with someone else.

[10]      In his affidavit, DC Emms testified that at no time did Ms. S.R.E. ever mention Nicaragua or suggest that Mr. H.S. might be in Nicaragua. She did not give him any names of Mr. H.S.'s extended family members or indicate that they may know where he might be.

[11]      Following the interview with Ms. S.R.E., DC Emms contacted G[…] who advised him that Mr. H.S. had terminated his employment with them about a week before. He did not ask them if they had a forwarding address for Mr. H.S.. He tried the cell number provided by Ms. S.R.E., but the number was disconnected.

[12]      In cross examination, DC Emms testified that he did not think to ask the complainant if Mr. H.S. was a native of Canada or of some other country. He also did not ask her for the contact information of Mr. H.S.'s sister or of their son and did not inquire if Mr. H.S. had other children or extended family in the Canada. He admitted that once he learned that Mr. H.S. was out of the country, he did not follow up with Ms. S.R.E. to make these inquiries. He denied speaking to Mr. H.S. at all in October 2013.

[13]      After Ms. S.R.E. completed her statement, PC Perilli and Marsh drove her to H[…] and waited with her while the locks on the doors were changed. At approximately

2018 ONCJ 162 (CanLII)

— 5 —

2:36 in the afternoon, Mr. H.S. telephoned Ms. S.R.E.. After a brief conversation with her, she passed the phone to PC Perilli. PC Perilli testified that he gave Mr. H.S. the name and phone number of DC Emms at 42 Division Criminal Investigation Bureau and told him to report there. Mr. H.S. said he would do so in an hour and a half, but then said that he was out of the country. PC Perilli testified Mr. H.S. did not provide any further information about where he was, and nor did he ask him. PC Marsh testified that after the call, PC Perilli tried unsuccessfully to identify the number Mr. H.S. had telephoned from by dialing "*69".

[14]     DC Cracknell was on duty at the Family Violence Unit of 42 Division on October 16, 2013. Prior to DC Emms completing his shift that day, he briefed DC Cracknell on the investigation and asked her to complete the paperwork for a warrant in the first instance for the arrest of Mr. H.S..

[15]     DC Cracknell testified that approximately 2:58 p.m. that day, Mr. H.S. telephoned the Unit and spoke to her about these charges. Mr. H.S. told her he was in the United States and had been there for the past three weeks. When she asked him about quitting his job, he told her that he was on a leave of absence. DC Cracknell asked Mr. H.S. when he was returning to Canada and he told her he may return in a month or not at all, as he had to figure his life out. She advised Mr. H.S. that charges were pending and that a warrant would be issued for his arrest, to which Mr. H.S. responded, "so be it".

[16]     Following that conversation, DC Cracknell made several telephone calls to inquire what steps could be taken to arrest Mr. H.S.. First, she called Citizenship and Immigration Canada and was advised that Mr. H.S. was a "landed immigrant". She next telephoned Canada Border Services at Pearson International Airport and was advised that Mr. H.S. had a Canadian passport. She asked them if they could flag his passport in case he was still in the country and tried to leave, but was advised that they only track entry into Canada, not departures.

[17]     DC Cracknell then called the Intelligence Unit of the Toronto Police Service because they deal with Interpol and extraditions from foreign countries. She was advised that unless she knew exactly where Mr. H.S. was, they could not start an extradition process.

[18]     DC Cracknell testified she completed the paperwork for the arrest warrant, which was obtained on October 17, 2013. She updated the Criminal Information Processing System to reflect a Canada-wide warrant for Mr. H.S.'s arrest, so that no matter where in Canada he returned, he could be arrested for these charges. She had no further dealings with this case after that.

[19]     Mr. H.S. provided an affidavit and was cross examined in relation to this application. He is a Nicaraguan national, became a landed immigrant in 1996 and a Canadian citizen in 1999. He has dual citizenship with Canada and Nicaragua. He and the complainant were in a common-law relationship for about 20 years. He has two children with the complainant and three older children from a prior relationship, one of whom resided

2018 ONCJ 162 (CanLII)

— 6 —

with Ms. S.R.E.. His mother and three sisters reside in the greater Toronto area.

[20]     Mr. H.S. left Canada on September 22, 2013 to move to Nicaragua. According to Mr. H.S., one of his sisters drove him to Buffalo, New York and he flew from there to Nicaragua. He testified he flew on his Canadian passport which was issued on March 15, 2013. This passport bears an entry stamp from Nicaragua dated September 23, 2013, but no stamp from US Homeland Security to indicate he was in the United States at any time in September of 2013.

[21]     Mr. H.S. obtained a Nicaraguan passport on October 28, 2013. He remained in Nicaragua and lived at his mother's house in Managua until his return to Canada on April 5, 2016.

[22]     Mr. H.S. confirmed that when he was in Canada, his cell number was [phone number 1], but he stopped using this number when he moved to Nicaragua. He set up an internet VoIP number, [phone number 2], and used this number to contact his family in Canada, including his 13 year old daughter who lived with Ms. S.R.E..

[23]     Mr. H.S. testified that all of his family members, including the complainant, knew he had moved to Nicaragua. However, he admitted in cross examination that he did not give Ms. S.R.E. his VoIP phone number or tell her that he had moved to Nicaragua. He testified he believed she knew this because she kept in touch with at least one of his sisters. He testified that the complainant would also know he was living in his mother's house in Managua, because they had visited there together on a family trip in 2010.

[24]     Mr. H.S. testified that he learned of these charges when he called his daughter on October 16, 2013, the day of her birthday. He had used his VoIP number to make the call. After a brief conversation with his daughter and the complainant, a person who identified himself as a police officer told him that Ms. S.R.E. had reported that he had sexually assaulted her. He was told to call a detective at 42 Division to discuss the situation further.

[25]     According to Mr. H.S., he telephoned 42 Division the next day, on October 17, 2013, and spoke with DC Emms, a male detective. He denied speaking to DC Cracknell who is a female detective. Mr. H.S. testified that during this conversation, he told DC Emms that he had moved to Nicaragua and disclosed his VoIP number. He denied telling DC Emms that he was in the United States, only that he had travelled through there to fly to Nicaragua. He testified that DC Emms did not use the word "warrant", but told him he would be charged with these offences and that the police wanted to arrest him. He testified that DC Emms told him to contact the police about these charges whenever he returned to Canada, either "this year or in ten years".

[26]     Over the next three and a half years, Mr. H.S.'s relationship with his two youngest children deteriorated. He focused on his life in Nicaragua. He decided to return to Canada to try to reconnect with his children and to address these charges. He was arrested at Pearson International Airport on his return to Canada on April 5, 2017.

— 7 —

**[27]**     I reject Mr. H.S.'s testimony regarding the supposed telephone conversation with DC Emms on October 17, 2013. Mr. H.S. denied speaking to a female officer, testifying he spoke only with DC Emms, a male detective. DC Emms strongly denied this and has no notes of such a conversation. He testified that as the officer in charge of the case, Mr. H.S.'s location was of great concern to him for the safety of the complainant. I am satisfied that if Mr. H.S. had spoken to DC Emms and told him his location, DC Emms would have made a note of it and remembered it. I am satisfied that no such conversation took place. I also reject Mr. H.S.'s testimony that he told any police officer that he was in Nicaragua or that he disclosed his VoIP telephone number.

**[28]**     I prefer and accept the evidence of DC Cracknell regarding her telephone conversation with Mr. H.S. on October 16, 2013. I found her to be a credible and reliable witness. She was tasked with obtaining a warrant in the first instance for Mr. H.S.'s arrest. His location was a key to this task and she made contemporaneous notes during and after their telephone conversation. In these circumstances, it is highly unlikely that she would be mistaken about what Mr. H.S. said regarding his whereabouts or his contact information. I accept her evidence that Mr. H.S. told her he had been in the United States for the past three weeks.

**[29]**     I also accept DC Cracknell's evidence that Mr. H.S. was ambiguous about when or whether he would return to Canada. Based upon what he told her, it was reasonable for her to think that he might return to Canada at some point. This conclusion is supported by Mr. H.S.'s own evidence under cross examination that when he left Canada, he did not in fact know how long he would be away. Although he swore in his affidavit that in the summer of 2013 he had discussed with his family his intentions to relocate to Nicaragua, he admitted under cross examination that he never told them that he was moving there permanently. He told them the date of his departure but did not share the details of what he would be doing there. He testified that he hoped to "organize something", but was evasive about what exactly he was organizing or how he was employed in Nicaragua. He also admitted that he did not quit his job with G[…] prior to leaving Canada and waited several weeks after his arrival in Nicaragua before terminating his employment.

**[30]**     I did not find Mr. H.S. to be a trustworthy or reliable witness. He made several assertions in his affidavit which, upon cross examination, did not stand up to scrutiny. Significantly, he swore that the complainant knew he was in Nicaragua. However, on cross examination, he admitted that prior to September 2013, he frequently left home without advising Ms. S.R.E. of where he was staying; he left Canada on September 22, 2013 without telling Ms. S.R.E. where he was going; he never told her he was moving to Nicaragua; he never gave her his VoIP telephone number; he never gave her his address in Nicaragua; and he would only call his son and daughter when he was certain that they were away from H[…] as he did not want to speak to the complainant.

**[31]**     Mr. H.S. also swore in his affidavit that he received updates from Ms. S.R.E. regarding their family court proceedings. However, on cross examination he testified that the documents were delivered to him by an aunt and were in an envelope with only his name and no address on it. This suggests that Ms. S.R.E. did not in fact know where he

2018 ONCJ 162 (CanLII)

— 8 —

was.

[32]     I do not accept Mr. H.S.'s assertion that his family members told Ms. S.R.E. of his location in Nicaragua.  There is no evidence about this from his family members or Ms. S.R.E.. One of his sisters may have been in contact with the complainant, but there is no admissible evidence of what they discussed.

[33]     Mr. H.S. also testified that his family members knew where he was and would have told the police if they contacted them. Again, there is no admissible evidence from his family members about what they would or would not have said to the police. On the other hand, Mr. H.S. testified that his family did not believe the accusations against him and thought that the complainant had ruined his life. In that context, it is difficult for me to accept Mr. H.S.'s assumptions that his family would have cooperated with the police to disclose his whereabouts.

[34]     I do not accept Mr. H.S.'s evidence that he did not know there was an arrest warrant for him in relation to these charges until he was arrested at Pearson International Airport. In his affidavit he swore that he learned from DC Emms in October 2013 that he would be charged with these offences and that the police wanted to arrest him. I have already found as a fact that this conversation occurred on October 16, 2013 with DC Cracknell. I accept DC Cracknell's evidence that Mr. H.S. was aware of the charges and understood that he would be arrested upon his return to Canada. Whether or not she used the word "warrant" is irrelevant. I reject Mr. H.S.'s evidence that he was told only to "report" to police upon his return.

[35]     I accept the Crown's submission that between October 2013 and April 5, 2017, Mr. H.S. actively avoided being found by Canadian authorities. I base my conclusion on the following evidence:

[36]     First, he misled DC Cracknell regarding his whereabouts in their conversation of October 16, 2013, claiming to be in the United States, when he was in Nicaragua.

[37]     Second, he never told his common-law spouse, the mother of his children, where he was living. He testified that after he became aware of these charges, he never spoke to Ms. S.R.E. and took no steps to notify her of his location. Even if I accept his evidence that he was told by PC Perilli to stay away from the complainant, this does not explain why he would not have taken steps to at notify her of his location. The fact that he did not, suggests that he did not want her to know.

[38]     Third, it is evident from his expired and current Canadian passports that prior to September 2013, Mr. H.S. was a frequent traveler to the United States and Central America. Yet these passports also establish that he never left Nicaragua between September 23, 2013 and April 5, 2017. Mr. H.S. was evasive when questioned about why he did not return to Canada, even for a short time to visit his family, which he claimed to have been close to. His lack of travel is also inconsistent with his testimony that he had plans to establish an import/export business between Canada and Nicaragua.

2018 ONCJ 162 (CanLII)

**[39]**     Four, Mr. H.S.'s explanation of why he obtained a Nicaraguan passport on October 28, 2013 is similarly unsatisfactory and not worthy of belief. He testified that he obtained the passport to avoid paying a monthly visitor's fee.  Yet he admitted that as a citizen of Nicaragua, all he needed was his citizenship card, which he obtained prior to applying for his Nicaraguan passport.

**[40]**     On all of the evidence, I am satisfied that the Applicant knew there was an outstanding warrant for his arrest on these charges. He did not tell the police or the complainant where he was residing to avoid detection. He did not travel outside of Nicaragua to avoid being arrested. He chose to return to Canada on April 5, 2016 to face these charges knowing he would be arrested.

**Applicable legal principles and analysis:**

**[41]**     Section 11(b) of the Canadian Charter of Rights and Freedoms guarantees the right of accused persons "to be tried within a reasonable time". The Supreme Court of Canada in *R. v. Jordan, supra*, para. 105, set out a new framework for determining whether delay in a case is reasonable.

> 105     The new framework for s. 11(b) can be summarized as follows:
>
> - There is a ceiling beyond which delay becomes presumptively unreasonable. The presumptive ceiling is 18 months for cases tried in the provincial court, and 30 months for cases in the superior court (or cases tried in the provincial court after a preliminary inquiry). Defence delay does not count towards the presumptive ceiling.
>
> - Once the presumptive ceiling is exceeded, the burden shifts to the Crown to rebut the presumption of unreasonableness on the basis of exceptional circumstances. Exceptional circumstances lie outside the Crown's control in that (1) they are reasonably unforeseen or reasonably unavoidable, and (2) they cannot reasonably be remedied. If the exceptional circumstance relates to a discrete event, the delay reasonably attributable to that event is subtracted. If the exceptional circumstance arises from the case's complexity, the delay is reasonable.
>
> - Below the presumptive ceiling, in clear cases, the defence may show that the delay is unreasonable. To do so, the defence must establish two things: (1) it took meaningful steps that demonstrate a sustained effort to expedite the proceedings; and (2) the case took markedly longer than it reasonably should have.
>
> - For cases currently in the system, the framework must be applied flexibly and contextually, with due sensitivity to the parties' reliance on the previous state of the law.

**[42]**     The first step in this framework entails calculating the total delay from the charge to the actual or anticipated end of trial: *Jordan*, para. 60. In this case, an information was sworn against Mr. H.S. on October 17, 2013. The anticipated end of the taking of evidence at trial is March 6, 2018, making the total delay approximately 52.5 months.

**[43]**     After the total delay is calculated, delay attributable to the defence must be subtracted (*Jordan*, para. 60). Defence delay is divided into two components: delay waived by the defence; and delay that is caused solely by the conduct of the defence (*Jordan*, paras. 61 and 63). The result, or net delay, must then be compared to the applicable pre-

— 10 —

sumptive ceiling. Net delay that exceeds the ceiling is presumptively unreasonable. The Crown may rebut this presumption by showing that the delay is reasonable because of the presence of exceptional circumstances (*Jordan,* para. 68).

[44]     The Supreme Court of Canada in *R. v. Cody,* [2017] SCJ No. 31, explained what is meant by defence delay.

> 28     In broad terms, the second component is concerned with defence conduct and is intended to prevent the defence from benefitting from "its own delay-causing action or inaction" (*Jordan*, at para. 113). It applies to any situation where the defence conduct has "solely or directly" caused the delay (*Jordan*, at para. 66).
>
> 29     However, not all delay caused by defence conduct should be deducted under this component. In setting the presumptive ceilings, this Court recognized that an accused person's right to make full answer and defence requires that the defence be permitted time to prepare and present its case. To this end, the presumptive ceilings of 30 months and 18 months have "already accounted for [the] procedural requirements" of an accused person's case (*Jordan*, at para. 65; see also paras. 53 and 83). For this reason, "defence actions legitimately taken to respond to the charges fall outside the ambit of defence delay" and should not be deducted (*Jordan*, at para. 65).
>
> 30     The only deductible defence delay under this component is, therefore, that which: (1) is solely or directly caused by the accused person; and (2) flows from defence action that is illegitimate insomuch as it is not taken to respond to the charges. As we said in *Jordan*, the most straight-forward example is "[d]eliberate and calculated defence tactics aimed at causing delay, which include frivolous applications and requests" (*Jordan*, at para. 63). Similarly, where the court and Crown are ready to proceed, but the defence is not, the resulting delay should also be deducted (*Jordan*, at para. 64). These examples were, however, just that – examples. They were not stated in *Jordan*, nor should they be taken now, as exhaustively defining deductible defence delay. Again, as was made clear in *Jordan*, it remains "open to trial judges to find that other defence actions or conduct have caused delay" warranting a deduction (para. 64).
>
> 33     As well, inaction may amount to defence conduct that is not legitimate (*Jordan*, at paras. 113 and 121). Illegitimacy may extend to omissions as well as acts (see, for example in another context, *R. v. Dixon*, [1998] 1 S.C.R. 244, at para. 37). Accused persons must bear in mind that a corollary of the s. 11(b) right "to be tried within a reasonable time" is the responsibility to avoid causing unreasonable delay.

[45]     The Crown concedes that once the Applicant was arrested, he did not waive any period of delay. However, Crown counsel argues that the nearly 42 month period when the Applicant was in Nicaragua is defence delay that must be deducted from the total delay, bringing the net delay to only 11 months, well below the presumptive period allowed in the framework.

[46]     Counsel for the Applicant argues that this period is not attributable to the defence as it is the state's responsibility to bring an accused to trial. There is no obligation on an accused to assist the state to bring him or herself to trial. He submits that this peri-

— 11 —

od must count towards the presumptive ceiling set by the Supreme Court of Canada.

**[47]**      In support of this argument, the Applicant relies on *R. v. MacIntosh*, 2011 NSCA 111, affirmed by the Supreme Court of Canada at 2013 SCC 23. In that case, the accused lawfully moved to India prior to being charged with sexual assault. He became aware of the charges after he moved and told police he had no intention of returning to Canada. The Nova Scotia Court of Appeal held that in the context of a right to trial within a reasonable period of time, there was no duty on an accused to bring him or herself to trial. It held that the motions judge erred in wrongly placing an onus on the accused to turn himself in to the authorities. There were lengthy periods where the authorities, despite knowing exactly where the accused was located, did nothing to pursue Mr. MacIntosh. In the circumstances, it found that the state did not make a diligent effort to bring the accused to trial and stayed the charges against him.

**[48]**      *R. v. MacIntosh* is distinguishable from the facts of this case. An important consideration in that case was that the police knew exactly where the accused was, but did not act diligently to extradite him to Canada to face trial on the charges. The court recognized this as a critical factor. It cited with approval the decision of the Ontario Court of Appeal in *R. v. White,* [1997] OJ No. 961, which held that where an accused knows that charges are outstanding, yet refuses to return to Canada, or notify the authorities of his whereabouts, the resulting delay is attributable to the defence, unless the authorities knew the accused's whereabouts and deliberately delayed apprehending him or otherwise failed to bring the accused to trial.

**[49]**      Similarly, in *R. v. Burke*, [2017] ONSC 5675, Justice Thoburn held that the delay elapsing from the time the accused left the country until the police in Canada were able to extradite him to face charges was defence delay. However, once the police knew where the accused was and extradition became an available option, the calculation shifted and any delay after that was counted as Crown or state delay.

**[50]**      *R. v. White, supra*, was also cited with approval by the British Columbia Court of Appeal in *R. v. Singleton*, 2014 BCCA 232. In that case, the court affirmed that there is no obligation on an accused to bring him or herself to trial. However, it held that in determining whether there has been a breach of the accused's right to trial within a reasonable time, the inquiry should focus on the state's conduct in determining whether, in the circumstances, it acted reasonably in locating and bringing the accused to trial. This must be considered contextually, taking into consideration the investigative avenues available to the authorities at the relevant time (see too, *R. v. Arsenault*, 2013 ONSC 5675; *R. v. Burke, supra*).

**[51]**      In *R. v. Singleton*, the police had information that the accused was in the Nocona, Texas, however, his sister and local authorities told them that he had left and they did not know where he was. The police took no further action to locate the accused for the next 4 years. The British Columbia Court of Appeal held that the police action in the circumstances was reasonable, observing that the United States is a large country and "without any idea of where to look is akin to trying to find a needle in a haystack": (*Sin-*

— 12 —

*gleton*, para. 99).

[52]     In the case at bar, the police did not know of Mr. H.S.'s location. They had no information that he was in Nicaragua. Indeed, the Applicant misled the police about his whereabouts. There is no evidence that the complainant knew he was in Nicaragua. To the contrary, all of the evidence points to her not knowing his location. Even if the police should have known the Applicant was in Nicaragua because he was born there, there is no evidence that they could have discovered his exact location in that country.

[53]     The court in *Singleton* held that the Crown does not bear the burden of establishing that hypothetical steps police may have taken would have failed to locate the accused.  It concluded that this would result in an impossible burden being placed on the Crown. "The Crown would first have to prove what the police might reasonably have done at any particular time to attempt to locate an accused and then prove that doing those things would not have made a difference" (paragraph 100).

> … in a case where an accused who was located in a foreign country pleads, in effect, "the police could have found me sooner", I consider it appropriate to place the burden of establishing that fact on the accused. The police should not be faulted for failing to pursue a possible avenue of inquiry unless it is shown that doing so would have provided useful information (*Singleton,* paragraph 101).

[54]     The Applicant argues that even if the police did not know where he was, they did absolutely nothing to try to locate him and were simply content to wait for him to return to Canada. In support of this argument, the Applicant points to the evidence of DC Emms wherein he admitted that after the arrest warrant was issued, he considered the case to be inactive. DC Emms conceded that it would not have been difficult to follow up with the complainant over the years to inquire if she had received any new information of Mr. H.S.'s whereabouts. He also admitted that it would not have been difficult to inquire if he had family in the area who might know where he was.

[55]     This argument is based on speculation that these potential avenues of inquiry would have borne fruit. As stated previously, there is no evidence that the complainant knew of the accused's location and there is no evidence that other family members would have cooperated with the police and disclosed his location. The Applicant has failed to establish that these inquiries would have provided useful information.

[56]     I am satisfied that in the circumstances of this case, the police acted with due diligence to apprehend Mr. H.S.. PC Cracknell's reasonably inquired of Canada Border Services and the Toronto Police Intelligence Unit what steps could be taken. She was advised that without knowing Mr. H.S.'s exact location, extradition was not possible. The police obtained a Canada-wide arrest warrant and updated CPIC to ensure that no matter where, how or when Mr. H.S. entered Canada, he could be arrested.

[57]     In the *Jordan* and *Cody* decisions, the Supreme Court of Canada recognized that the right to a trial within a reasonable time requires an analysis of both state and defence conduct in determining the reasonableness of the delay. The court confirmed that an

2018 ONCJ 162 (CanLII)

— 13 —

accused person must not be permitted to benefit from his or her own delay-causing action or inaction. As stated by Justice Moldaver in *Jordan* at paragraph 21:

> Accused persons may seek to avoid responsibility for their crimes by embracing delay, in the hope that the case against them will fall apart or they will obtain a stay of proceedings. This operates to the detriment of the public and of the system of justice as a whole. Section 11(b) was not intended to be a sword to frustrate the ends of justice (*Morin*, at pp. 801-2).

**Conclusion:**

**[58]**　In the circumstances of this case, I find that the period of nearly 42 months when the Applicant was in Nicaragua is delay caused solely by him and must be deducted from the total delay. This period of delay is solely and directly caused by Mr. H.S. choosing to remain abroad, knowing he was wanted for these charges in Canada. The delay was not caused by any legitimate defence conduct taken to respond to the charges. To the contrary, Mr. H.S. was prepared to live his life in Nicaragua and delay dealing with these charges until he was ready to return to Canada.

**[59]**　The Applicant in this case cannot complain that the state did not do enough to bring him to trial. He was content to remain in Nicaragua, knowing that there were charges outstanding in Canada. The police did not cause any of this period of delay and acted with due diligence to bring the accused to trial.

**[60]**　When the nearly 42 months is deducted from the total delay, the net delay is approximately 11 months, well below the *Jordan* ceiling for trials in the Ontario court of Justice. It is not necessary for the purpose of this Application to determine whether the delay incurred while Mr. H.S. was abroad is an exceptional discrete event that was not reasonably foreseen or avoidable. The Applicant does not argue that the net delay of 11 months is unreasonable.

**[61]**　On all of the evidence, the Applicant has failed to show that his right to be tried within a reasonable time was breached. The application is dismissed.

Released:　　February 20, 2018
Signed: "Justice M. Speyer"

# COURT OF APPEAL FOR BRITISH COLUMBIA

Citation:  *R. v. Singleton,*
           2014 BCCA 232

2014 BCCA 232 (CanLII)

Date: 20140617
Docket:  CA039793

Between:

## Regina

Respondent

And

## Marvin Kenneth Singleton

Appellant

Before:     The Honourable  Madam Justice Kirkpatrick
            The Honourable  Mr. Justice Frankel
            The Honourable  Mr. Justice Goepel

On appeal from:  An order of the Supreme Court of British Columbia, dated
December 24, 2010 (*R. v. Singleton*, 2010 BCSC 1855, Nelson Docket 15635-7).

| | |
|---|---|
| Counsel for the Appellant: | K.R. Beatch and R.P. Thirkell |
| Counsel for the Respondent: | E.A. Campbell |
| Place and Date of Hearing: | Vancouver, British Columbia<br>January 17, 2014 |
| Place and Date of Judgment: | Vancouver, British Columbia<br>June 17, 2014 |

**Written Reasons by:**
The Honourable  Mr. Justice Frankel

**Concurred in by:**
The Honourable  Madam Justice Kirkpatrick
The Honourable  Mr. Justice Goepel

*Summary:*

*S. appealed his conviction solely on the basis that the trial judge erred in not granting his application for a stay based on a breach of his right to be tried within a reasonable time (Charter, s. 11(b)).  S., an American citizen, had returned to the United States before the charges were laid.  The investigating officer had information connecting S. to a city in Texas.  The police in Texas advised the officer that S. had moved and that his sister had no idea where he had gone.  As a result, the officer turned his attention to another file.  After moving around, S. obtained employment in Kansas, working under his own name.  After four years, the officer retuned to S.'s file and, through Internet searches, was able to locate S.'s daughter, who provided a post office box address for her father in Kansas.  Further inquiries by the officer resulted in S. being located in Kansas and extradited to Canada.  On appeal, S. contended that the four years should be attributed to "actions by the Crown".  Held: Appeal dismissed.*

*While the state has an obligation to act with reasonable diligence to bring an accused who is outside of Canada to trial within a reasonable time, whether that obligation has been met is to be determined contextually, considering the investigative avenues available to the police force or investigating agency involved.  Here, after the charges were laid, the officer unsuccessfully pursued the only lead he had as to S.'s whereabouts.  S. failed to establish there were other avenues of investigation open to the officer that would have provided information resulting in his being located sooner.*

**Reasons for Judgment of the Honourable Mr. Justice Frankel:**

<u>Introduction</u>

[1]      This appeal is about the right of an accused to be tried within a reasonable time.  More particularly, it concerns the extent to which Canadian authorities must go to locate an accused who is in another country.

[2]      Marvin Kenneth Singleton was convicted of defrauding an estate of which he was the executor.  The fraud was committed from 1988 until the end of 1990.  However, Mr. Singleton was not charged until late December 1997, by which time he had moved back to the United States of America, the country of his birth.  From October 1998 until October 2002, the police made no effort to locate him.  When he was located in late October 2002, extradition proceedings were commenced.  Those proceedings resulted in Mr. Singleton being returned to Canada in September 2006.

2014 BCCA 232 (CanLII)

2014 BCCA 232 (CanLII)

[3]      Mr. Singleton's trial commenced before Madam Justice Arnold-Bailey of the Supreme Court of British Columbia in October 2009.  Prior to the start of the trial Mr. Singleton gave notice that he intended to seek a judicial stay of proceedings based on delay.  Mr. Singleton and the Crown proposed that the entire case, including defence witnesses, be heard on a *voir dire*, following which the trial judge would render a verdict on the charges and rule on whether to grant a stay.  The judge agreed to proceed in this manner.

[4]      Following final submissions, the trial judge rendered two judgments.  In the first, she found Mr. Singleton guilty on one count of theft and one count of fraud.  In the second, she dismissed his application for a stay.  Only the second judgment is in issue on this appeal.  In particular, Mr. Singleton submits the judge erred in not holding the Crown responsible for the four-year period during which the police made no effort to locate him.

[5]      For the reasons that follow, I would dismiss this appeal.

**Factual Background:  Chronology**

[6]      What follows is not intended as an exhaustive review of the history of this matter.  Such a review can be found in the two judgments rendered by the trial judge.

[7]      Mr. Singleton was born in Kansas in 1933.  He holds several post-graduate degrees, including one in law.  His academic career brought him to Nelson, British Columbia, where he taught at Notre Dame University from 1971 until it closed in 1977.

[8]      Mr. Singleton was admitted to the British Columbia bar in September 1978, and opened a practice in Nelson.  In November 1987, he drafted and attended the execution of the will of John Alexander George. He also managed the affairs of his elderly neighbor, Haroldine Copp. Mr. George died on March 30, 1988, and Mr. Singleton obtained probate as executor of his estate.   Ms. Copp died on February 6, 1991, and Mr. Singleton exercised power of attorney over her estate.

2014 BCCA 232 (CanLII)

[9]     The George Estate was valued at approximately $1 million.  Shortly after obtaining probate, Mr. Singleton distributed approximately $263,000 from the estate. On June 30, 1988, he incorporated 433 Winchester Management Corporation ("Winchester").   Between 1988 and 1990 he directed approximately $417,500.00 from the estate to the purchase of a piece of property in Winchester's name and the development of that property.  Mr. Singleton billed the estate approximately $185,000.00 in fees and disbursements, which was paid out of the estate.

[10]    Mr. Singleton directed funds from the Copp Estate to Silvertip 1000 Enterprises Ltd. ("Silvertip"), another company he controlled.  Those funds were used to purchase equipment to support the project on the Winchester property.

[11]    By 1990, both the Law Society of British Columbia and the beneficiaries of the George and Copp Estates had become concerned about Mr. Singleton's conduct. He voluntarily withdrew from the practice of law on October 23, 1990, just before the Law Society was to conduct a competency review of his practice.

[12]    On June 10, 1992, counsel for the Copp Estate, Donald W. Skogstad, filed a complaint with the Nelson City Police alleging theft and fraud by Mr. Singleton relating to that estate.  On August 7, 1992, the Law Society's Discipline Committee ordered an audit of Mr. Singleton's practice in response to calls from both Mr. Skogstad and Philip M. Goody, counsel for the beneficiaries of the George Estate.

[13]    A spot audit was conducted on Mr. Singleton's practice as part of the Law Society's investigation.  The results of that audit were reported in March 1993, in what became known as the Hersh Report.  Around this time, Mr. Singleton had the files from his former law practice moved into storage.

[14]    In the spring of 1993, Mr. Singleton was charged with failing to file personal income tax returns for several years and with failing to file a statement of net worth. He was also charged as an officer and director of Winchester and Silvertip with respect to their failure to file corporate income tax returns for several years.

2014 BCCA 232 (CanLII)

[15]     On May 31, 1993, a court order was issued removing Mr. Singleton as trustee of the George Estate.  Mr. Singleton appealed that order, but that appeal was later dismissed as abandoned.

[16]     On July 26, 1993, the Law Society forwarded a copy of the Hersh Report to the Royal Canadian Mounted Police ("RCMP"), with a recommendation that a criminal investigation be undertaken with respect to Mr. Singleton's handling of the George Estate.  That same day, Mr. Singleton appeared in Provincial Court on the income tax charges and a trial date of December 6, 1993 was set.

[17]     In August 1993, following the death of his mother, Mr. Singleton left Nelson and moved to Texas.

[18]     On September 14, 1993, Corporal Martin Misner opened a file to investigate allegations of fraud and theft relating to the George and Copp Estates.  Corporal Misner was the sole member of the RCMP's Nelson Commercial Crime Section.

[19]     Mr. Singleton did not appear in Provincial Court on December 6, 1993.  As a result, the trial on the income tax charges was rescheduled for August 16, 1994.

[20]     Mr. Singleton came back to Nelson in late December 1993, but returned to Texas in early January 1994.

[21]     On February 8, 1994, Jack Miller, the new administrator of the George Estate, commenced an action against Mr. Singleton.  A judgment was eventually obtained against Mr. Singleton for approximately $530,000.00 plus interest and a further $100,000.00 in punitive damages.  That judgment was assigned to the Law Society.  Ultimately, the Law Society's Special Compensation Fund repaid the beneficiaries of the George Estate approximately $560,000.00.

[22]     In May 1994, Mr. Singleton found work and spent the next few months traveling through Arizona, Texas, North Dakota, and South Dakota.  In South Dakota he obtained a driver's licence using another person's post office box as his address.  He visited his sister in Colorado, where he would receive some mail.  He also used a

post office box in Cheyenne Wells, Colorado.  He retained a lawyer in Colorado to stay in touch with legal matters in Nelson.

[23]     After leaving Colorado, Mr. Singleton travelled to Texas, where he visited his brother.  At this point, he was living in his van, which he parked on the bank of the Red River in Nocona, Texas.

[24]     Mr. Singleton did not appear for trial on the tax charges on August 16, 1994. He was convicted *in absentia* on some of the charges and fines totaling $14,000.00 were imposed (along with terms of imprisonment in default).  As the fines were not paid, warrants of committal were issued on August 2, 1995.  (Those warrants remained outstanding until Mr. Singleton was extradited to Canada in 2006.)

[25]     Corporal Misner began to actively investigate the complaints against Mr. Singleton on November 14, 1994.  He was assisted by Corporal Douglas Haddow of the Nelson City Police General Investigation Section.

[26]     On November 15, 1994, Corporal Misner and Corporal Haddow met with Mr. Goody, who provided them with a post office box mailing address for Mr. Singleton's father in Nocona.  Mr. Goody told the officers Mr. Singleton had grown a beard, his father was living in a nursing home, and that he may be using his father's social security number.  He also told them that he had used a process server to serve Mr. Singleton with documents relating to a lawsuit commenced by the George Estate.  He said he had an affidavit from the process server to the effect that when she attended at Mr. Singleton's father's residence she was told that Mr. Singleton left the area in May 1994.

[27]     On November 17, 1994, Corporal Haddow contacted Sheriff Brancher of the Nocona Police Department.  He provided Sheriff Brancher with Mr. Singleton's date of birth and asked him if he could locate Mr. Singleton.  On December 1, 1994, Sheriff Brancher's wife advised Corporal Haddow that Mr. Singleton:  (a) was living in a van with South Dakota licence plates on the bank of a river between Texas and Oklahoma; (b) had shaved his beard and cut and dyed his hair brown; (c) had a

2014 BCCA 232 (CanLII)

Texas driver's licence; and (d) had a sister living nearby and a father who was in a nursing home.

[28]    Mr. Singleton moved to Wichita, Kansas in early 1995.  He began receiving American social security benefits in February 1995.

[29]    On April 12, 1995, Corporal Misner and Corporal Haddow executed search warrants on several financial institutions in Nelson.  They then undertook a review and analysis of the seized documents.

[30]    On June 14, 1995, Sheriff Brancher advised Corporal Haddow that Mr. Singleton had left the Nocona area and his current whereabouts were unknown. Sheriff Brancher said he would let Corporal Haddow know if Mr. Singleton "resurfaced".

[31]    On August 17, 1995, Corporal Misner forwarded a report to Crown counsel seeking approval of charges against Mr. Singleton relating to the George Estate.

[32]    In October 1996, eight boxes of documents from Mr. Singleton's law practice were discovered in a building in which he had rented space.  That triggered the appointment of Thomas H. Thompson, a lawyer, as custodian of Mr. Singleton's practice.  Mr. Thompson took possession of those documents.

[33]    In early 1997, Mr. Singleton started working part-time under his own name at the Rose Hill Campus of Butler Community College, near Wichita, Kansas.

[34]    In mid-December 1997, the Crown approved charges of theft and fraud against Mr. Singleton relating to the George Estate.  On December 30, 1997, Corporal Misner swore an information setting out those charges.  A "Canada-wide" warrant for Mr. Singleton's arrest was obtained and placed on the police computer system.

[35]    In January 1998, Corporal Misner was transferred to another detachment and Sergeant Luc Quenneville  replaced him as the sole member of the Nelson Commercial Crime Section.  They did not have an opportunity to discuss the file

2014 BCCA 232 (CanLII)

relating to Mr. Singleton until March 1998.  Following that, Sergeant Quenneville gave that file priority.  His investigation included the execution of several search warrants, including one which eventually gave him access to documents and records from Mr. Singleton's former law practice.

[36]     On May 5, 1998, Sergeant Quenneville forwarded a report to Crown counsel regarding possible charges against Mr. Singleton relating to the Copp Estate.

[37]     By the summer of 1998, Mr. Singleton was aware of the George Estate charges and, in that connection, was in communication with Barnim C. Kluge, a lawyer in British Columbia.  In a letter to Mr. Kluge dated July 10, 1998, Mr. Singleton wrote:

> 5)       I need to know if possible the imminence of process and type so as to plan my moves.  I have given notice at lodgings and will in about 8 days give notice at Comm. Coll. & become greatly more obscure.

[38]     Mr. Kluge provided Mr. Singleton with copies of the George Estate charges, the arrest warrant, and the version of the *Extradition Act* then in force.  Mr. Kluge expressed doubt that Mr. Singleton's extradition would be sought.

[39]     On August 5, 1998, Sergeant Quenneville swore an information charging Mr. Singleton with theft and fraud relating to the Copp Estate.  A second "Canada-wide" warrant for his arrest was obtained and placed on the police computer system.

[40]     Sergeant Quenneville contacted the Nocona Police Department.  On August 20, 1998, he was advised that Mr. Singleton was receiving mail at a post office box there.  He did not ask the Nocona police to make further enquires as he did not want Mr. Singleton to be aware that Canadian police were looking for him.

[41]     On October 19, 1998, Sergeant Quenneville spoke with Chief Studebaker of the Nocona Police Department.  Chief Studebaker told him Mr. Singleton had left the area two years earlier and that his mail was being delivered to his father at a nursing home in Texas.  Chief Studebaker said Mr. Singleton lived in a van when he was in the Nocona area.

[42]     On December 8, 1998, Chief Studebaker advised Sergeant Quenneville that Mr. Singleton's sister said Mr. Singleton just packed up and left one day.  She did not know where he had gone and believed he was living in a van or station wagon. After receiving that information Sergeant Quenneville gave Mr. Singleton's file low priority and turned his attention to a $30 million fraud investigation in Cranbrook.  He devoted his energies to that investigation for the next four years.

[43]     On December 14, 1999, Mr. Singleton, who was then living in Wichita, Kansas, obtained a Kansas driver's licence using Box 27, Peck, Kansas, as his address.

[44]     Sergeant Quenneville returned to Mr. Singleton's file in October 2002, after he had submitted a report on the Cranbrook investigation to Crown counsel.  He asked a dispatcher at the Nelson Detachment to run checks on available databases to see if Mr. Singleton had a driver's licence in either the United States or Mexico. Those checks were negative.

[45]     Sergeant Quenneville then conducted an Internet search for "Marvin Singleton" but did not find anything that would assist the investigation. Remembering that there was a note on the file that Mr. Singleton had a daughter with a unique first name, Sergeant Quenneville conducted an Internet search for "Solveig Singleton".  He discovered that she was practicing law in Washington, D.C. He sent Ms. Singleton an email asking whether she was related to Mr. Singleton. She replied that she was.  (Sergeant Quenneville testified that the RCMP computer system available to him in 1998 did not permit Internet searches.  He was not asked when such searches could be conducted on that system.)

[46]     Sergeant Quenneville telephoned Ms. Singleton on October 17, 2002.  She told him that about a year and a half prior she had received a letter from her father with a return address of Box 27, Peck, Kansas.  Prior to this, Sergeant Quenneville was not aware of any connection between Mr. Singleton and Peck.

2014 BCCA 232 (CanLII)

2014 BCCA 232 (CanLII)

[47]    Sergeant Quenneville  had a computer check done of Kansas driver's licences.  That check found Mr. Singleton's licence.

[48]    On October 21, 2002, Sergeant Quenneville  sent an email to Corporal Daniel Paradis, a member of the RCMP stationed in the Washington, D.C. as a liaison officer with the Canadian Embassy.  Sergeant Quenneville  asked Corporal Paradis to request that the police in Peck make discrete inquiries to try to locate Mr. Singleton.  Corporal Paradis requested additional information which Sergeant Quenneville  sent via fax.  For some reason, that fax was never brought to Corporal Paradis's attention.

[49]    Having received no response from Corporal Paradis, Sergeant Quenneville sent him another email on April 29, 2003.  That email prompted Corporal Paradis to telephone the sheriff's office in Sumner County, in which Peck is located.  By May 23, 2003, Corporal Paradis had received information from Deputy Sherriff Keith Bristor to the effect that Mr. Singleton:  (a) had opened Box 27 in Peck; (b) lived in Wichita; (c) had a social security record; and (d) was teaching at a community college in Butler County.  Deputy Sheriff Bristor also provided Corporal Paradis with a copy of Mr. Singleton's driver's licence photograph.  Corporal Paradis passed this information on to Sergeant Quenneville.   By July 2003, Kansas detectives had determined Mr. Singleton's residential address in North Wichita.  They also determined he was employed on a part-time basis at the Rose Hill Campus of Butler County Community College.

[50]    In October 2003, Sergeant Quenneville  began drafting an affidavit to support a request for Mr. Singleton's extradition.  As numerous  revisions were required— some by the Department of Justice in Ottawa—Sergeant Quenneville  did not swear the final version of that affidavit until June 10, 2004.

[51]    The Canadian Government  formally requested Mr. Singleton's extradition on July 9, 2004.  He was arrested on August 30, 2004, and brought before the United States District Court for the District of Kansas.  Mr. Singleton unsuccessfully  fought extradition for two years; for the most part acting on his own behalf.  On

2014 BCCA 232 (CanLII)

September 2, 2006, he was extradited to Canada.  On September 8, 2006, a judge of the Provincial Court of British Columbia released Mr. Singleton on bail.  At this time, the charges relating to the George and Copp Estates were set out in separate informations.

[52]    Mr. Singleton retained Kenneth M. Wyllie as his counsel.  Mr. Wyllie appeared a number of times on Mr. Singleton's behalf in the Provincial Court.  On July 3, 2007, Mr. Wyllie advised the Court that he had been "removed as counsel" and that Mr. Singleton would be acting on his own behalf.  Thereafter, Mr. Singleton brought a number of motions in the Provincial Court.  As well, he filed an interlocutory appeal from a motion that had been dismissed.  He later abandoned that appeal.

[53]    On February 12, 2008, Mr. Singleton elected to be tried by a Provincial Court judge.  By this time, the charges relating to the George and Copp Estates had been combined in one information.  On March 31, 2008, the trial was set to commence on September 29, 2008, to run for four weeks.

[54]    On September 3, 2008, Mr. Singleton brought an application for disclosure before a judge of the Provincial Court.  At the same time, Kenyon J. McGee, a lawyer, appeared to advise the court that Mr. Singleton had recently been granted legal aid funding.  Mr. McGee indicated he was prepared to act for Mr. Singleton only if the trial was adjourned.  The judge dismissed Mr. Singleton's application for disclosure from the bench.  Two days later, the judge dismissed the adjournment application:  2008 BCPC 287.

[55]    Following the refusal of the adjournment application, Mr. Singleton re-elected to be tried by a judge sitting without a jury, thereby converting the scheduled trial into a preliminary inquiry.  At the conclusion of the preliminary inquiry, Mr. Singleton was committed for trial in the Supreme Court.  Although it is not entirely clear from the material filed on this appeal, it appears that Mr. Singleton was represented at the preliminary inquiry by counsel other than Mr. McGee.

[56]    On November 7, 2008, Mr. Singleton and Mr. McGee appeared before a judge of the Supreme Court.  As Mr. McGee indicated there were issues related to legal aid for Mr. Singleton that needed to be resolved, the matter was adjourned.  On January 16, 2009, a judge set the trial to commence on October 26, 2009, to run for six weeks.

[57]    The Crown stayed the charges relating to the Copp Estate and the trial proceeded on a two-count indictment containing theft and fraud charges relating to the George Estate.  Mr. McGee and Jo-Anna L. Cowen acted for Mr. Singleton throughout the trial.  On March 25, 2010, after 50 days of hearings, the trial judge reserved her decision on both the merits and Mr. Singleton's application for a stay.

[58]    On December 3, 2010, the trial judge convicted Mr. Singleton of theft and fraud relating to the George Estate:  2010 BCSC 1734.  At that hearing, Mr. Singleton and the Crown agreed the judge could release her reasons on the stay application through the registry.  On December 24, 2010, the judge released her reasons dismissing that application:  2010 BCSC 1855.

### Mr. Singleton's Mental Condition and the Admissibility of His Statements

[59]    During the Crown's case a *voir dire* was held to determine whether various oral and written statements made by Mr. Singleton could be admitted as evidence; in effect, a *voir dire* within a *voir dire*.  Those statements included things Mr. Singleton said in Provincial Court while acting on his own behalf, affidavits he swore in support of his applications, and material he filed in the extradition proceedings in the United States.  Mr. Singleton admitted the voluntariness of all the statements.  His objections to admissibility were based, in part, on his declining mental capacity.

[60]    Mr. Singleton did not testify on the *voir dire*, but called several witnesses, including Dr. Richard E.L. Magee, an expert in geriatric psychiatry.  Dr. Magee first saw Mr. Singleton in September 2008.  The Crown did not call any expert evidence on the *voir dire*.

[61]     The trial judge accepted Dr. Magee's evidence that Mr. Singleton had Alzheimer's-type dementia.  In excluding some of the statements because of Mr. Singleton's medical condition, the judge stated:

> [62]     In the present case I have concluded that permitting the Crown to use the materials generated by Mr. Singleton as enumerated above for incriminating purposes from the most recent period of time, i.e., from September 2006 to September 2008 when he was self-represented and suffering from advancing dementia likely of the Alzheimer's type, may well render the trial unfair.  The proposed evidence is likely influenced by Mr. Singleton's advancing dementia.  Its potential to mislead is likely to outweigh whatever minimal probative value it may ultimately possess.
>
> [63]     Therefore, as I have found that Mr. Singleton was operating in a state of increasing dementia in 2007 and 2008, I find that to allow these items into evidence would render the trial unfair within the meaning of s. 11 (d) of the *Charter*.  I find that this is one of those rare cases where it is appropriate to engage the common law power as identified in [*R. v. Harrer*, [1995] 3 S.C.R. 562] to preclude the incriminatory use of this evidence in order to prevent an unfair trial.  As a result I decline to permit the Crown to use any of the materials emanating from the accused from the years 2006 and 2008 in this trial for an incriminatory purpose.

[62]     The statements ruled admissible were then marked as exhibits, following which the Crown closed its case.

## Defence Evidence

[63]     Mr. Singleton was one of several defence witnesses.  He testified for approximately ten days, a little more than half of which was in-chief or re-examination.  By agreement, Dr. Magee's testimony on the statement *voir dire* was admitted as defence evidence on the trial, both with respect to the merits and the stay application.

## Crown Rebuttal Evidence

[64]     The Crown called Dr. Jeannette E. Smith, an expert in forensic psychiatry, to testify with respect to Mr. Singleton's mental condition.  Dr. Smith had examined Mr. Singleton and listened to the recordings of his testimony.  The "Opinion" section of her written report includes the following:

1.      … In my opinion the dementia is currently manifesting in impairment of recent memory and concentration but long-term memory appears to be intact. Nevertheless the deficits are beyond what would be considered normal aging.

…

4.      Mr. Singleton is clearly aware of the charges that he is facing and knows the roles of the various legal professionals in court. He appears to retain a good understanding of the nature, purpose and potential outcome of the legal proceedings and in my opinion would easily meet the criteria for Fitness to Stand Trial. Furthermore he is very aware of the adversarial process and the limits of confidentiality.

5.      Mr. Singleton speaks eloquently about his case and is clearly an intelligent man whose days are still filled with intellectual pursuits, although I note the decline in his writing described by his caregiver. Obviously I cannot judge the accuracy of his recollections concerning his behaviour at the time of the alleged offences, <u>but as he pointed out to me he has been rehearsing his case in great depth for the past fifteen years, if not longer and therefore the information remains at the forefront of his mind and well within the limits of his memory.</u>

[Emphasis added.]

## Trial Judge's Ruling on Delay

[65]     Mr. Singleton sought a stay on the basis of a breach of his right guaranteed by s. 11(b) of the *Canadian Charter of Rights and Freedoms*, Part I of the *Constitution Act, 1982*, being Schedule B to the *Canada Act 1982* (U.K.), 1982, c. 11, which provides that "[a]ny person charged with an offence has the right … to be tried within a reasonable time". The minimum remedy for a breach of s. 11(b) is a judicial stay of proceedings: *R. v. Rahey*, [1987] 1 S.C.R. 588 at 615.

[66]     Mr. Singleton submitted that the post-charge delay period in issue ran from when charges were first laid (December 30, 1997) until the conclusion of the evidentiary phase of the trial (February 4, 2010), a period of approximately 146 months. He did not include the ten days taken up with submissions on both the merits and the stay application or the time required by the trial judge to prepare her reasons.

[67]    In determining whether Mr. Singleton's right to be tried within a reasonable time had been infringed, the trial judge applied the framework set out in *R. v. Morin*, [1992] 1 S.C.R. 771 at 787-788, wherein Mr. Justice Sopinka stated:

> The general approach to a determination as to whether the right has been denied is not by the application of a mathematical or administrative formula but rather by a judicial determination balancing the interests which the section is designed to protect against factors which either inevitably lead to delay or are otherwise the cause of delay. As I noted in [R. v. Smith, [1989] 2 S.C.R. 1120], "[i]t is axiomatic that some delay is inevitable. The question is, at what point does the delay become unreasonable?" (p. 1131). While the Court has at times indicated otherwise, it is now accepted that the factors to be considered in analyzing how long is too long may be listed as follows:
>
> 1.   the length of the delay;
>
> 2.   waiver of time periods;
>
> 3.   the reasons for the delay, including
>
>> (a)   inherent time requirements of the case,
>>
>> (b)   actions of the accused,
>>
>> (c)   actions of the Crown,
>>
>> (d)   limits on institutional resources, and
>>
>> (e)   other reasons for delay; and
>
> 4.   prejudice to the accused.

[68]    In discussing the time that passed from when charges were first laid until the RCMP located Mr. Singleton in the United States, the trial judge said this:

> [106]    In my view, the evidence is clear that Mr. Singleton could have been located earlier by the RCMP or their contacts via Cpl. Paradis in Washington, D.C. if they had known generally where to look. If the police had contacted Mr. Singleton's daughter earlier, and if she possessed and was prepared to provide the information about her father's mailing address at the Peck, Kansas postal box, their search would have had a focus. Perhaps they might have found him on the Internet. However, these are just possibilities.
>
> [107]    On the other hand, there is every indication that Mr. Singleton was living under his own name, receiving social security, and openly working at Butler College. It would not have taken much time or creativity for the police to consider that Mr. Singleton might have returned to teaching in a post-secondary institution in the United States, employment he had pursued for much of his adult life, save for his time as a lawyer.
>
> [108]    However, what is also clear is that Mr. Singleton had no intention of returning to Nelson to face the charges outstanding against him until the timing suited him and he was ready to do so. Had he thought extradition was being pursued I accept based on his letter to Mr. Kluge that he would have

2014 BCCA 232 (CanLII)

2014 BCCA 232 (CanLII)

taken steps to make himself "greatly more obscure." He would have done his best to avoid extradition. Given his evidence, including the portion I have emphasized above, it seems he was at best ambivalent about being tried in a reasonable time.

[69]     The trial judge held that the period from when Mr. Singleton became aware of the George Estate charges until he was arrested in the United States fell into the category of "actions of the accused":

> [145]   In my opinion, it is entirely proper on the law and the facts to attribute to Mr. Singleton the responsibility for the eight-year delay (from August 1998 to August 2006) when he chose to remain in the United States as opposed to returning to Canada to face the criminal charges he knew to be outstanding, and for which he knew there were warrants out for his arrest. I find his answers on cross-examination very telling in this regard. They make clear that Mr. Singleton decided that it did not suit his plans to return to Canada to face the charges, and once he understood there to be little likelihood of extradition proceedings being launched he carried on with his life in Wichita, [Kansas].
>
> …
>
> [150]   Keeping in mind my prior comments about the generally positive effect on the proper administration of justice for charges to be laid promptly and trials to be held in a timely way, the circumstances in the present case are unique. When one considers the actions of Mr. Singleton, it is clear that he was the primary cause of delay, not the police or the Crown. Had there not been evidence that he knew of the George Estate charges as of August 1998, some six or seven months after they had been laid, this matter would have taken on a different complexion. While the police clearly stopped looking for Mr. Singleton from the fall of 1998 to the fall of 2002, they did not have information as to his likely whereabouts at that time. They could have assigned the case a higher priority, looked harder to find Mr. Singleton, and moved faster on the extradition request, but to delve into those matters is for the Court to take on a supervisory role of police investigations and priorities which is not permitted. Once Mr. Singleton was returned to Canada in September 2006 it cannot be said that any of the ensuing delay is attributable to the Crown.

[70]     With respect to the delay following Mr. Singleton's arrest until the end of the evidentiary phase of the trial, the trial judge allocated that time as follows:

> (a)      inherent time requirements of the case:  one year and nine months;
>
> (b)      institutional delay:  two weeks;
>
> (c)      waiver by the accused:  one year and three months following the preliminary inquiry; and

(d)    actions of the accused:  two years fighting extradition and eight months using various delaying tactics in the Provincial Court (e.g., lodging a compliant about the conduct of a judge, refusing to elect, filing an interlocutory appeal).

## Trial Judge's Findings With Respect to Mr. Singleton's Mental Condition

[71]    In her reasons for judgment declining to enter a stay for delay, the trial judge also rejected Mr. Singleton's application for a stay based on an assertion that his mental condition at the time for trial was such that the trial proceedings violated his *Charter* rights to security of the person (s. 7), and to make full answer and defence (s. 11(d)).  In doing so, the judge had regard not only to the testimony of Dr. Magee and Dr. Smith, but to her own observations of Mr. Singleton.  In part, she stated:

> [25]    A careful review of the transcript of Mr. Singleton's testimony at trial will dispel any notion that Mr. Singleton was not mentally sound enough to participate in this trial to the extent that it rendered the trial unfair.
>
> [26]    However, a number of examples are useful to portray the tenor of his testimony.  I have selected these portions to show aspects of his mental condition, not for their relevance to the offences charged.  I must also say that Mr. Singleton, like many of the other witnesses, could not recall many things from the distant past.  Like other witnesses, his memory was often refreshed by a document. However, I am firmly of the view that Mr. Singleton could remember very well generally what went on as it related to the activities giving rise to the offences charged.
>
> …
>
> [35]    It is my view that Mr. Singleton was, at the time of the trial, clearly an elderly man who was somewhat physically frail and hard of hearing, and a man whose very considerable intellectual abilities were being affected by his gradual deterioration due to a dementia/Alzheimer's type of illness; however, he was still very able to participate in his trial to the extent necessary to mount a detailed and comprehensive defence with the assistance of able counsel.

[72]    Later, in finding that Mr. Singleton had not been prejudiced by pre-charge delay, the trial judge said this:

> [85]    Dr. Magee places the likely time of onset of Mr. Singleton's dementia/Alzheimer's as two to five years prior to September 2008.  He may have been free of that affliction as early as 2003 and as late as 2006. However, nothing turns on this, as I find that his mental deterioration did not compromise his right to a fair trial.

2014 BCCA 232 (CanLII)

## Ground of Appeal

[73]     In his factum, Mr. Singleton states the following ground of appeal:

> The trial judge erred by failing to find that Mr. Singleton's right to a trial
> without delay as guaranteed by s. 11(b) of the *Canadian Charter of Rights
> and Freedoms* was breached.

[74]     As developed in his factum and in oral argument, Mr. Singleton's appeal
focuses on the four years from October 1998 until October 2002; i.e., the period
during which Sergeant Quenneville made no effort to locate him.  Mr. Singleton's
position is that the trial judge erred by allocating that period to "actions by the
accused".  He contends it should have been allocated to "actions of the Crown".

## Analysis

### Standard of Review

[75]     The decision by a trial judge whether to impose a judicial stay for
unreasonable delay involves a question of law subject to the correctness standard of
review:  *R. v. Conway*, [1989] 1 S.C.R. 1659 at 1676.  The approach to be taken on
an appeal such as this was stated by Madam Justice Ryan in *R. v. Horner*, 2012
BCCA 7, 283 C.C.C. (3d) 453:

> [68]     The legal framework applicable to an analysis under s. 11(b) of the
> *Charter* was set out by the Supreme Court of Canada in *R. v. Morin*, [1992] 1
> S.C.R. 771 ("*Morin*").  The question whether delay has been unreasonable is
> assessed by looking at the length of the delay, less any periods that have
> been waived by the defence, and then by taking into account the reasons for
> the delay, the prejudice to the accused, and the interests that s. 11(b) is
> designed to protect:  *R. v. Godin*, [2009] 2 S.C.R. 3 at para. 18.
>
> [69]     The ultimate question is whether the overall delay is unreasonable,
> considering the causes of the delay, the prejudice, and the interests at stake:
> *R. v. Qureshi* (2004), 190 C.C.C. (3d) 453 (Ont. C.A.) at para. 24.
>
> [70]     With respect to a judge's analysis of the *Morin* factors, including his or
> her characterization and allocation of various periods of time, the standard of
> appellate review is correctness.  However, I agree with the Ontario Court of
> Appeal that a judge's underlying findings of fact are reviewed on a standard
> of palpable and overriding error:  *R. v. Khan*, 2011 ONCA 173 at para. 18,
> leave to appeal ref'd [2011] S.C.C.A. No. 195 (QL); *R. v. Schertzer*, 2009
> ONCA 742 at para. 71, leave to appeal ref'd [2010] S.C.C.A. No. 3 (QL).

See also:  *R. v. Thomson*, 2006 BCCA 392 at paras. 83-84, 211 C.C.C. (3d) 465
(*sub nom. R. v. Guilbride*).

**Is the Crown Responsible for the Four-Year Delay?**

[76]     Mr. Singleton's argument rests principally on *R. v. MacIntosh*, 2011 NSCA
111, 281 C.C.C. (3d) 291, aff'd 2013 SCC 23, [2013] 2 S.C.R. 200, decided after the
ruling he is appealing.  In *MacIntosh*, the Court of Appeal of Nova Scotia, in reasons
written by Mr. Justice Beveridge, allowed a conviction appeal and entered a stay for
delay.  A further appeal by the Crown to the Supreme Court of Canada was
dismissed from the bench.  In brief oral reasons for judgment pronounced by Chief
Justice McLachlin, that Court agreed with the reasons of the Court of Appeal.

[77]     Mr. Singleton contends there is no principled basis on which to distinguish his
case from either the facts or the result in *MacIntosh*.  I do not agree.  However, as I
will explain, in light of *MacIntosh*, I agree with Mr. Singleton that the trial judge erred
when she held that once he became aware of the charges it was his responsibility to
return to Canada to face them.  Nevertheless, I have concluded that the judge was
correct in not allocating the four-year delay to the Crown.

[78]     I will deal first with the error made by the trial judge.  It is apparent from
paras. 108 and 145 of the judge's reasons (reproduced in paras. 68 and 69 above),
that she allocated the four-year delay to Mr. Singleton because he did not voluntarily
return to Canada to face the charges.  That it was not Mr. Singleton's responsibility
to bring himself to trial is reflected in paras. 47-50 of *MacIntosh*.  In particular, in
para. 47, Beveridge J.A. stated succinctly that "[i]t is the responsibility of the state to
bring any accused to trial."  The question that remains is what that responsibility
entails when an accused is outside of Canada and his or her whereabouts are
unknown.

[79]     I turn now to the facts in *MacIntosh*.  Mr. MacIntosh was charged in
December 1995, with sexual offences alleged to have occurred in the 1970s.  A
warrant for his arrest was issued in February 1996.  Before the investigation leading

2014 BCCA 232 (CanLII)

to those charges began, Mr. MacIntosh moved to India for work-related reasons. Before the charges were laid, the police knew where Mr. McIntosh was living and how to get in touch with him.  After the charges were laid, a police officer telephoned Mr. MacIntosh, who stated that he had no intention of returning to Canada.  In late 1997, a member of the Canadian High Commission in New Delhi delivered a letter to Mr. MacIntosh advising him that his Canadian passport would be revoked due to the outstanding charges.  Mr. MacIntosh retained counsel in Canada who succeeded in having his name removed from the Canadian Passport Control List.  Both before and after his name was removed from that list, Mr. MacIntosh travelled to and from Canada.  In May 1998, the Crown provided disclosure to Mr. MacIntosh's counsel. Counsel was advised that Mr. MacIntosh's extradition would be sought.

[80]    The material in support of an extradition request was completed in July 2003. For reasons that are unexplained, Canada did not request Mr. MacIntosh's extradition until July 2006.  He was arrested on April 5, 2007.  Following judicial proceedings in India, on May 26, 2007, the Indian government agreed to surrender Mr. MacIntosh.   He made his first appearance in Provincial Court on June 8, 2007. On May 1, 2009, following a preliminary inquiry, Mr. MacIntosh was committed for trial on 36 charges.

[81]    After an indictment was filed in the Nova Scotia Supreme Court, Mr. MacIntosh applied to have the proceedings stayed on the basis of both pre-charge and post-charge delay.  That application was dismissed: 2010 NSSC 105, 289 N.S.R. (2d) 224.  By consent, some of the counts were severed.  The first trial proceeded and a judge convicted Mr. MacIntosh on 13 of 26 counts:  2010 NSSC 300, 292 N.S.R. (2d) 355.  As already mentioned, those convictions were set aside on appeal and a stay entered.

[82]    In my view, the facts in *MacIntosh* are significantly different from those in the case at bar and I am, accordingly, unable to accept the general proposition of law Mr. Singleton seeks to extract from the reasons of the Court of Appeal.  As Lord Halsbury L.C. observed in *Quinn v. Leatham*, [1901] A.C. 495 at 506 (H.L.):

> [E]very judgment must be read as applicable to the particular facts proved, or
> assumed to be proved, since the generality of the expressions which may be
> found there are not intended to be expositions of the whole law, but governed
> and qualified by the particular facts of the case in which such expressions are
> to be found. ... [A] case is only an authority for what it actually decides.

[83]   Critical to the decision in *MacIntosh* was the fact that before charges were
laid the police knew Mr. MacIntosh's whereabouts in India.   Notwithstanding that
knowledge, more than 10 1/2 years passed from when charges were laid until his
extradition was requested.   As Beveridge J.A. stated in para. 69:

> The police had information from the very beginning detailing exactly where
> [Mr. MacIntosh] was located.

and in para. 70:

> It simply cannot be said that the state made a diligent effort to bring
> [Mr. MacIntosh] to trial.   There were lengthy periods where the authorities,
> despite knowing exactly where the appellant was located, did nothing to
> pursue him.

[84]   Two other appellate decisions have considered unreasonable delay in the
context of an accused who is outside of Canada:   *R. v. White* (1997), 114 C.C.C.
(3d) 225 (Ont. C.A.), leave ref'd [1997] 3 S.C.R. xv*;* and *R. v. Terk*, 2011 QCCA 390.

[85]   In *White*, investigators with Revenue Canada (now the Canada Revenue
Agency) searched Mr. White's business premises in May 1986.   In November 1986,
Mr. White moved from Toronto to Boston, Massachusetts.   On March 12, 1987, he
was charged with income tax evasion, which is not an extraditable offence.   In May
1987, he became aware of the income tax charges and that a warrant had been
issued for his arrest.   He also became aware of the fact that Revenue Canada was
considering charging him with fraud, which is an extraditable offence.   By July 1987,
Mr. White had moved to California.

[86]   When the tax evasion charges were laid, Revenue Canada was aware
Mr. White was out of the country.   Shortly thereafter, it asked the RCMP for
assistance in locating him.   In turn, the RCMP sought the assistance of the United
States Immigration and Naturalization Service and the Federal Bureau of

Investigation ("FBI").  In the summer of 1988, the FBI informally advised the RCMP that Mr. White might be living in California.  The RCMP asked for a formal response which did not come until March 29, 1989, when the FBI provided Mr. White's address.  Fraud and forgery charges were laid on October 6, 1989.  Mr. White's extradition was then requested and he was arrested on November 2, 1989.  He was returned to Canada on December 15, 1991, on the fraud charges only and released on bail.  Mr. White's trial began on September 7, 1993, at which time he unsuccessfully sought a stay based on delay.  Following a three-month trial he was convicted.

[87]    In appealing his conviction, Mr. White submitted that the trial judge erred in not granting a stay.  In rejecting that argument, the Court held that the period from March 12, 1987 (when the tax evasion charges were laid) until October 6, 1989 (when the fraud and forgery charge were laid) should be attributed to him.  In so doing, Mr. Justice Laskin and Madam Justice Charron stated, in part (at 239-240):

> Moreover, we do not think that the trial judge erred by calling White "a fugitive from Canadian justice."  Because White had not been charged with any offence when he left Canada for Massachusetts he was not a fugitive from Canadian justice in the narrow sense of one who leaves the jurisdiction where the crime was allegedly committed in order to avoid prosecution.  But he was a fugitive from Canadian justice in the broader sense of one who has committed a crime in one jurisdiction, has afterwards left that jurisdiction and when sought to be prosecuted is found in another jurisdiction:  see *Hogan v. O'Neill* 255 U.S. 52 (1921); *U.S. v. Deleon* 710 F. 2d 1218 (7th Cir. 1983).
>
> Because White knew charges were outstanding against him yet refused to return to Canada, tell the Crown where he was or even contact the Crown through a third party, the delay must be attributable to him unless the Crown knew his whereabouts and deliberately delayed apprehending him or did not diligently bring him to trial:  see *U.S. v. Deleon*.  The evidence before the trial judge reasonably supported his findings that the Crown had taken reasonable steps to find White and that the Crown did not know where White lived until late March 1989.
>
> [Emphasis added.]

[88]    In *Terk*, in late 1994, a police officer advised Mr. Terk he was under investigation for fraud.  In March 1995, Mr. Terk, an Israeli citizen, moved to Israel.  In November 1995, a fraud charge was laid and a summons was issued.  In January 1996, an arrest warrant was issued.  A short time later, the police obtained

Mr. Terk's address in Israel.  Canada requested his extradition, but Israel refused that request because it will not extradite its own citizens.

[89]     In September 2003, Mr. Terk returned to Canada to live in Montreal; he passed though Canadian customs and immigration without incident, notwithstanding the outstanding warrant for his arrest.  Later, he moved to Toronto.  He was arrested on the warrant on October 10, 2004, after being stopped for speeding.  That is when he learned he had been charged with fraud.  The following day, Mr. Terk appeared in court in Montreal and was granted bail.  Since the police investigation file had been destroyed, it had to be reconstructed.  That took nearly a year.  In March 2007, Mr. Terk was committed for trial following a preliminary inquiry.  After that, the matter was set for a one-week trial to begin on May 4, 2009.

[90]     Mr. Terk brought an application for a stay based on delay which was successful.  On an appeal by the Crown, that stay was set aside and the case remitted for trial.  In doing so, Mr. Justice Chamberland stated (unofficial translation):

> [41]     In my opinion, the respondent is solely responsible for the delay incurred between November 1995 (date of the summons) and September 2003 (date of his return to Canada).  If, as the trial judge noted, nothing prohibited him from leaving Canada and moving to Israel for almost eight years, these nevertheless remain actions he "voluntarily undertook" three months after having met a police officer regarding a fraud of which he was suspected.
>
> [42]     The criticism of the authorities for having been negligent because they resorted to extradition proceedings instead of trying to contact the respondent, directly or through his mother, to inform him about the charges he faced, does not hold.
>
> [43]     I do not see how, even taking all facets of the matter into consideration, we could demand that the authorities take steps other than extradition to inform an accused he is the subject of an arrest warrant when he has left Canada to live in a foreign country.  Imposing such an obligation would certainly not be without consequences; we could even imagine cases where the accused, informed by telephone, letter or otherwise, about charges against him in Canada, would take advantage of this to move or change his identity, thereby rendering any future extradition proceedings much less effective.

[91]     In both *MacIntosh* and *White*, reference is made to *United States v. Deleo*n, 710 F. 2d 1218 (7th Cir., 1983), in which it was held that the right to a speedy trial

2014 BCCA 232 (CanLII)

guaranteed by the Sixth Amendment to the Constitution of the United States had not been infringed.  In that case, an arrest warrant on a federal drug charge was issued in Illinois on July 24, 1978.  When the warrant was issued Mr. Deleon was in custody in Texas; he was released a week later.  After that, he crossed the border between the United States and Mexico on numerous occasions.  In October 1980, he moved into his parents' home in Texas.  In an effort to locate Mr. Deleon, the Drug Enforcement Administration ("DEA"):  (a) made inquiries at his last known address; (b) routinely conducted surveillance at locations he was known to frequent; (c) conducted checks with the Immigration and Naturalization Service, the FBI, and the Chicago police; and (d) placed stop orders in several government computer systems.  Mr. Deleon was eventually arrested on February 1, 1982.  He was living with his parents at that time.

[92]    In discussing the reasons for the delay, Justice Hoffman stated (at 1221) that the government has a "'constitutional duty to make a diligent good faith effort' to locate and apprehend a defendant and to bring that defendant to trial".  In holding Mr. Deleon's right had not been infringed, he noted that:  (a) federal officials had never been advised by Texas officials of his whereabouts;  (b) absent "some type of reasonable lead", it would place too great a burden on the government to require it to monitor border crossings; and (c) it would be unreasonable to expect investigators to have waited at his parents' home in case he came there.  In concluding on this point, Hoffman J. stated (at 1222):

> With respect to the [the reason for the delay], we note that since Deleon did not allege that the Government was in fact aware of his location or that the Government deliberately delayed in apprehending him, and based on the ten DEA investigative reports which indicate the Government received no reasonable information concerning Deleon's location, we conclude that any delay which occurred was not the result of failure by the Government to make a diligent good faith effort to find Deleon.  Rather, it was the result of Deleon's fugitive status. [Footnotes omitted.]

[93]    In *MacIntosh*, reference is also made to the decision of the United States Supreme Court in *Doggett v. U.S.*, 505 U.S. 647 (1992).  On February 22, 1980, Mr. Doggett was charged with federal drug offences.  He left the United States for Columbia on March 14, 1980.  The DEA placed his name into several government

2014 BCCA 232 (CanLII)

computer systems but in September 1980, that entry expired on the system that screens persons entering the United States.  In September 1981, the DEA learned Mr. Doggett had been arrested in Panama and asked that he be "expelled" to the United States.  However, in July 1982, Panama released him and he went to Columbia.  Although Panamanian officials advised the American Department of State of Mr. Doggett's departure for Columbia, that information was not passed on to the DEA.

[94]     Mr. Doggett returned to the United States on September 25, 1982, and settled in Virginia.  It was not until 1985 that the DEA, somewhat fortuitously, learned that he had left Panama for Columbia.  However, no efforts were made to locate him, either abroad or in the United States.  After returning to the United States, Mr. Doggett, living under his own name, married, earned a college degree, and was gainfully employed.  As a result of a credit check run by the U.S. Marshals Service on several thousand outstanding warrants in September 1988, he was located and arrested.

[95]     Although the trial court found the delay was attributable to the government's negligence, it held that Mr. Doggett's right to a speedy trial had not been violated because he had failed to demonstrate actual prejudice.  That ruling was affirmed on appeal.  On further appeal, the majority of the Supreme Court of the United States held that a violation had been established.  In rejecting the government's argument that it had not been negligent, Justice Souter stated (at 652-653):

> The Government gives us nothing to gainsay the findings that have come up to us, and we see nothing fatal to them in the record.  For six years, the Government's investigators made no serious effort to test their progressively more questionable assumption that Doggett was living abroad, and, had they done so, they could have found him within minutes.  While the Government's lethargy may have reflected no more than Doggett's relative unimportance in the world of drug trafficking, it was still findable negligence, and the finding stands.
>
> [Emphasis added.]

[96]     The principle I extract from the abovementioned decisions is that while the state has an obligation to act with reasonable diligence to bring an accused who is

2014 BCCA 232 (CanLII)

outside of Canada to trial within a reasonable time, whether that obligation has been met is to be determined contextually, considering the investigative avenues available to the police force or investigating agency involved.  When an accused is in a foreign country from which he or she can be extradited and his or her whereabouts are known, Canadian prosecution officials are obligated to pursue extradition in a reasonable and timely manner.  If they fail to do so then, as in *MacIntosh*, the ensuing delay will be attributed to the Crown.  That, however, is not this case.  What must be determined here is whether, having regard to the totality of the circumstances, a reasonably diligent effort was made to locate Mr. Singleton after charges were laid.

[97]     Mr. Singleton contends that Sergeant Quenneville did not do enough to find him.  In effect, he says he was there to be found, and would have been found had the police tried harder.  He further says the onus is on the Crown to establish that even had the police tried harder, they would not have found him sooner.  I do not agree.

[98]     By August 1998, Mr. Singleton was facing charges with respect to both the George and Copp Estates.  Nocona, Texas was the only "lead" Sergeant Quenneville had with respect to Mr. Singleton's possible whereabouts.  On making inquiries of the Nocona police he learned that Mr. Singleton had left and that not even his sister knew where he had gone.  He also learned that Mr. Singleton lived in his vehicle.  In light of this, Sergeant Quenneville turned his attention to a major fraud file that occupied his attention for the next four years.

[99]     In my view, on the record of this case, it cannot be said that the police failed to act with reasonable diligence.  Attempting to locate someone in a country as vast as the United States without any idea of where to look is akin to trying to find the proverbial needle in a haystack.  Although the police could have located Mr. Singleton earlier had they known where to look, they did not know where to look until Sergeant Quenneville spoke with Ms. Singleton.  There is nothing in the

evidence to suggest that Mr. Singleton could have been located before Sergeant Quenneville learned of his possible connection to Peck, Kansas.

[100]   Further, I do not accept that it falls to Crown to establish that had the police taken other steps to locate Mr. Singleton, those steps would have failed. In effect, Mr. Singleton's argument would result in an impossible burden being placed on the Crown. The Crown would first have to prove what the police might reasonably have done at any particular time to attempt to locate an accused and then prove that doing those things would not have made a difference.

[101]   I appreciate that in *R. v. Smith*, [1989] 2 S.C.R. 1120 at 1132-1133, Mr. Justice Sopinka stated that although the ultimate or legal burden of proof is on the accused who raised s. 11(b) of the *Charter*, it is seldom necessary to evaluate the reasonableness of any delay on the basis of the burden of proof. As well, he indicated there will be circumstances where an evidentiary or secondary burden will be placed on the Crown, for example, to explain why the Crown requested an adjournment. However, in a case where an accused who was located in a foreign country pleads, in effect, "the police could have found me sooner", I consider it appropriate to place the burden of establishing that fact on the accused. The police should not be faulted for failing to pursue a possible avenue of inquiry unless it is shown that doing so would have provided useful information.

[102]   It will be recalled that in *Doggett*, one of the reasons the DEA was found to have been negligent was that the evidence established Mr. Doggett could have been found much earlier by means of a credit check. There is no similar evidence in the case at bar. For example, there is no evidence that had American authorities been contacted earlier they would have been able to locate Mr. Singleton. Similarly, there is no evidence as to when the information that led Sergeant Quenneville to Ms. Singleton became accessible on the Internet. It is pure speculation to suggest that the police could have done things that would have resulted in Mr. Singleton being arrested and brought to trial sooner.

[103]  I am, accordingly, albeit for different reasons, in agreement with the trial judge's conclusion that the four-year delay from October 1998 until October 2002 is not attributable to the Crown.

### Did the Trial Judge Err in Not Finding Prejudice?

[104]  Mr. Singleton advances a number of submissions challenging the trial judge's finding that he was not prejudiced by the delay in bringing him to trial.  All are predicated on the period from October 1998 to October 2002 being attributed to the Crown.  He submits prejudice and the risk of prejudice should have been inferred and that actual prejudice was shown because he was "less able to make full answer and defence".  As that period is not attributable to the Crown, there is no need for me to deal with those submissions.  I would, however, make the following comments.

[105]  Mr. Singleton's submissions focus on his declining mental capacity.  He says the decrease in his cognitive abilities over the years adversely affected his ability to make full answer and defence.  However, because the stay application was not determined until after the trial had been conducted, the trial judge had the opportunity to observe Mr. Singleton in the witness box for approximately ten days.  Based on those observations, she found he was able to participate in the proceedings and "mount a detailed and comprehensive defence with the assistance of able counsel":  see para. 71 above.  In light of that finding, Mr. Singleton's position on prejudice lacks merit.

[106]  In addition, in dismissing the stay application the trial judge found that Mr. Singleton's cognitive abilities began to decline between 2003 and 2006.  The onset date most favourable to him would be in 2003.  However, it is manifest that following his arrest in mid-August 2004 and for several years thereafter, Mr. Singleton had no interest in a trial, timely or otherwise.  Having regard to the trial judge's allocation of the post-arrest time periods, which are not challenged on this appeal (see para. 70 above), and assuming onset in 2003, I have difficulty accepting that someone who, but for his own actions, likely would have come to trial in late

2006, can seek to avoid being tried three years later due to a decline in cognitive abilities that did not meaningfully affect his ability to defend himself.

## Disposition

[112]   I would dismiss this appeal.

"The Honourable Mr. Justice Frankel"

I AGREE:

"The Honourable Madam Justice Kirkpatrick"

I AGREE:

"The Honourable Mr. Justice Goepel"

**CITATION:** R. v. Thind, 2018 ONSC 1337
**COURT FILE NO.:** CrimJ(P) 456/17
**DATE:** 2018 02 27

# ONTARIO

## SUPERIOR COURT OF JUSTICE

**BETWEEN:**

HER MAJESTY THE QUEEN ) Ikdeep Singh, for the Crown

**- and -**

GURIQBAL SINGH THIND ) Ravin Pillay, for the Accused

Accused

) **HEARD:** January 8, 2018

2018 ONSC 1337 (CanLII)

## <u>REASONS FOR RULING (s. 11(b) Application)</u>

### <u>COROZA J.</u>

### Introduction

[1]     Guriqbal Thind, is charged with perjury. His trial is scheduled for the week of February 26, 2018, with an anticipated completion date of March 2, 2018.

- 2 -

2018 ONSC 1337 (CanLII)

[2]      On April 30, 2012, Mr. Thind gave evidence before Justice F. Dawson, sitting with a jury. His evidence related to the trial of Manjit Singh Dhanoa and Havishal Singh Kler, who were charged with importing heroin.

[3]      Mr. Thind had been called as a witness for the accused Dhanoa, and while still providing his evidence-in-chief, the court adjourned for the lunch break. Following the break, a juror informed the court staff that he had witnessed Mr. Thind speaking with Dhanoa in the washroom outside the cafeteria. Justice Dawson held an inquiry into the issue on the same date. During that inquiry, Mr. Thind testified that he had not spoken to Dhanoa in the washroom. Eventually, Justice Dawson declared a mistrial.

[4]      The Crown alleges that Mr. Thind's denial of his conversation with Dhanoa during the inquiry held by Justice Dawson is false. Mr. Thind is charged with a single count of perjury.

[5]      The police investigated the matter after the mistrial was declared. Eventually, on March 12, 2013, an Information alleging perjury was sworn. Once the Information was placed before the justice, a warrant was issued for Mr. Thind's arrest. However, by this date, Mr. Thind had left Canada and was attending school in Australia.   Mr. Thind was unaware that he was being investigated for perjury. Mr. Thind did not know that an Information had been sworn and a warrant issued for his arrest.

- 3 -

[6]     Mr. Thind was arrested on January 8, 2016 at Pearson International Airport. The RCMP had requested that the Canada Border Services place the warrant on their system.  Mr. Thind had been "flagged" at the border.

[7]     It is not disputed that over 59 months will have passed from the date of the swearing of the Information to the completion of trial.

[8]     Mr. Thind submits that his right to be tried within a reasonable time, as guaranteed by section 11(b) of the *Canadian Charter of Rights and Freedoms*, has been breached by the passage of this time between the time the Information was sworn (March 12, 2013) and the anticipated end date for the trial (March 2, 2018). He seeks the remedy of a stay of proceedings. The Crown opposes the application.

**Position of the Parties**

[9]     Both parties agree that in deciding an application for unreasonable delay, I must follow the legal framework set out by the Supreme Court of Canada in *R. v. Jordan*, 2016 SCC 27, [2016] 1 SCR 631. It is not disputed that this court's characterization of the time period between the swearing of the Information on March 12, 2013, and Mr. Thind's arrest on January 8, 2016, is crucial to the delay analysis. The parties have divergent views on how this court should characterize the period of time.

2018 ONSC 1337 (CanLII)

- 4 -

2018 ONSC 1337 (CanLII)

[10]     Defence counsel argues that this time period should be considered in the section 11(b) calculus as part of the unreasonable delay. Defence counsel argues that it does not matter whether the swearing of the Information came to the attention of the accused, and the s.11 (b) "clock" starts ticking when the act of swearing the Information takes place (see: *R. v. Kalanj*, [1989] 1 S.C.R. 1594 at para. 15).

[11]     The Crown argues that this period of delay should not be considered in the s. 11(b) analysis. Crown counsel argues that Mr. Thind did not know that a warrant had been issued for his arrest. Therefore, Mr. Thind's s. 11(b) rights were not in jeopardy. Alternatively, the Crown argues that if this time period is considered to be part of the overall period of delay, then this delay should be characterized as an exceptional circumstance. The Crown urges me to consider the time period as a discrete event that should not count toward unreasonable delay, and the remaining delay, not accounting for this time period, does not breach Mr. Thind's s.11 (b) rights.

[12]     For the following reasons, Mr. Thind's application is dismissed.

**The Evidence**

[13]     The Crown called Cpl. Patrick Flannery, Cst. Hamill (formerly McVeigh), and Border Services Officer (BSO) Kenneth Kirkpatrick of the Canada Border

- 5 -

Services Agency (CBSA) as witnesses on this application. The defence called Mr. Thind.

[14]     Furthermore, there is an application record and a responding record that has been filed by both parties. Finally, defence counsel also filed the relevant transcripts of proceedings leading up to the trial date.

**Events leading up to the laying of the Information**

**Guriqbal Thind**

[15]     Mr. Thind testified that he enrolled and attended law school in Australia after the inquiry on April 30, 2012.

[16]     From July 5, 2012 to August 30, 2012, he lived with his parents in Brampton. He was not aware that he was being investigated for perjury. In September 2012, Mr. Thind relocated to Australia to attend law school, and remained there until August 2015.

[17]     Mr. Thind returned to Canada on August 21, 2015. By that time, a warrant had been issued for his arrest relating to the perjury charge. However, the warrant did not appear on the CBSA system at the Pearson International Airport, because the time period for keeping the warrant on the CBSA system had expired. The warrant was placed back onto the system by November 2015. In December 2015, Mr. Thind left Canada to travel to the United States for a

2018 ONSC 1337 (CanLII)

- 6 -

2018 ONSC 1337 (CanLII)

vacation. He returned from that vacation on January 8, 2016, and upon his arrival, was arrested at the airport.

[18]     Mr. Thind acknowledged that his mother notified him when he was in Australia in early 2013 that the police were looking for him. He brushed off his mother's message. He believed that the police were looking for him, as he was wanted as a witness for the defence. The police witnesses who testified on this application acknowledge that they did not disclose the fact that Mr. Thind was under investigation for perjury to his family.

**Cpl. Patrick Flannery**

[19]     Cpl. Flannery of the RCMP was the officer in charge of investigating the perjury charge. His willsay and general reports were filed on this application. The officer adopted the contents of both documents. I will not review the documents in detail.

[20]     During his examination by both counsel, Cpl. Flannery admitted to the following:

> 1. The perjury investigation began in May of 2012. It was a straightforward investigation that involved two witnesses and a review of Mr. Thind's evidence before Justice Dawson.

- 7 -

2. Around May and June of 2012, he was advised by the trial Crown that she believed that Mr. Thind was leaving for Australia.

3. In June of 2012, he contacted Bond University in Australia to request that they confirm that Mr. Thind had registered at school. The universtiy could neither confirm nor deny that Mr. Thind was going to school in Australia.

4. The investigation was completed around June 26, 2012.

5. Although he believed Mr. Thind was in Australia, he did not seek any extradition orders because he believed that Mr. Thind had family in Canada, and he assumed that he would return to Canada on a break from school.

6. He did not believe that Mr. Thind was evading arrest.

7. From August 2012 to July 2013, he reassigned the file to Cst. Hamill.

8. When he returned back to the file in July of 2013, he noticed that the warrant for Mr. Thind's arrest was still outstanding. He believed that he was still out of Canada.

9. On January 14, 2014, he sent a request to BSO Kirkpatrick to extend a lookout for Mr. Thind with the CBSA until March 1, 2016.

2018 ONSC 1337 (CanLII)

[21]     In cross-examination, defence counsel suggested to Cpl. Flannery that BSO Kirkpatrick did not receive any lookout request from the RCMP until February 2015. Cpl. Flannery, in response, insisted that he did have this discussion with BSO Kirkpatrick in January of 2014.

[22]     Cpl. Flannery acknowledged that once the Information was sworn and a warrant had been issued, the prosecution had officially commenced. He agreed that s. 511 of the *Criminal Code* directed that a warrant be executed forthwith.

[23]     Cpl. Flannery also acknowledged that he did not do the following:

- Contact an RCMP liaison officer who covered Australia about Mr. Thind

- Attempt to proceed under the Mutual Legal Assistance Treaty to seek evidence relating to Mr. Thind's specific location;

- Contact any immigration authorities about Mr. Thind's status in Canada

- Follow up on the letter sent by Cst. Hamill in February 2013 to Bond University, which requested contact information for Mr. Thind in Australia

- Initiate an extradition request to Australia

2018 ONSC 1337 (CanLII)

2018 ONSC 1337 (CanLII)

[24]     Cpl. Flannery submitted that the fact it was a perjury charge weighed heavily against seeking extradition. He believed that this type of charge was not serious enough to use extradition relief.

[25]     Cpl. Flannery agreed that he did not tell Mr. Thind's family that he was wanted, because he was confident that Mr. Thind would eventually return to Canada.

**Cst. Hamill**

[26]     Cst. Hamill adopted her willsay report, which has been filed as part of the Respondent's record.

[27]     On February 6, 2013, she called the phone number 905-794-9027, leaving a message for Mr. Thind to call her. She had a very poor recollection how she got this number, and had no recollection of the message that she left.

[28]     On the same date, she sent an email to Bond University requesting assistance in providing contact information for Mr. Thind in Australia. On February 7, 2013 she received correspondence back from the University advising her that due to privacy laws, they could not comply with her request.

[29]     She agreed that the file was reassigned to her, and that she swore out an Information on March 12, 2013 for the purpose of obtaining an arrest warrant for Mr. Thind.

- 10 -

[30]      It is not disputed that the warrant was issued on March 12, 2013. The notes of Cst. Burris (filed on consent) disclose that he attended the A. Grenville and William Davis Courthouse on that day, and obtained a warrant that was signed and endorsed by Justice of the Peace Duggal.

**BSO Kirkpatrick**

[31]      BSO Kirkpatrick explained that the process of placing warrants on their system was to generate what is called a "lookout" on the CBSA system at Pearson Airport. Prior to November 2015, the ability to place a warrant on the system was limited. The lookout would expire after 180 days. This policy changed on November 23, 2015, and lookouts that were on the system did not expire after 180 days.

[32]      BSO Kirkpatrick testified that the lookout for Mr. Thind was generated for the period of February 4, 2015 to August 3, 2015. He denied that he was asked to place a lookout on the CBSA system prior to February 2015. The lookout expired on August 3, 2015.

[33]      A second lookout was generated on November 22, 2015. Again, because the policy had changed, that lookout did not have an expiry date. On January 8, 2016, the warrant was executed when Mr. Thind travelled through the airport upon his arrival from the United States.

2018 ONSC 1337 (CanLII)

2018 ONSC 1337 (CanLII)

**Analysis**

[34]    To decide this issue, I must follow the framework set out in *Jordan.* This framework has also been summarized by the Ontario Court of Appeal in *R. v. Coulter*, 2016 ONCA 704, 133 O.R. (3d) 433. In *Jordan*, the Supreme Court of Canada set out presumptive ceilings for cases tried in both the provincial court and for cases in the Superior Court (or cases tried in the Superior Court after a preliminary inquiry in provincial court).

[35]    The presumptive ceiling for this case, which is to be tried in the Superior Court, is 30 months.

[36]    For ease of reference, I will set out the framework created in *Jordan* in order to address the issues raised by counsel.

**The *Jordan* Framework**

[37]    A judge hearing an application for a stay of proceedings based on unreasonable delay must analyze the delay in the following manner.

Step 1 – Calculate the Total Delay

[38]    The judge is to calculate the total delay, from the date of the charge to the end or anticipated end of the trial.

- 12 -

Step 2 – Subtract Defence Delay

[39]      Defence delay is subtracted from the total delay. Defence delay is comprised of two components. The first component is delay that is a clear and unequivocal waiver of the accused's s. 11(b) rights, and the second component is delay caused solely by the conduct of the defence, including unavailability for trial when the court and the Crown are ready to proceed.

[40]      The resulting number is called the net delay.

 Step 3 – Compare Net Delay to Presumptive Ceiling

[41]      Once the net delay is calculated, the net delay must be compared to the presumptive ceiling of 30 months for cases tried in Superior Court.

 Step 4 – Net Delay Exceeds Presumptive Ceiling

[42]      If the net delay exceeds the presumptive ceiling, the delay is presumptively unreasonable. However, the Crown can establish that there is delay attributable to exceptional circumstances that should be subtracted from the net delay. These exceptional circumstances include delay caused by circumstances that were a) reasonably unforeseen or unavoidable, and b) could not be reasonably remedied by the Crown once they arose. The list of exceptional circumstances is not closed.

2018 ONSC 1337 (CanLII)

- 13 -

[43]     If the Crown has established that there are exceptional circumstances, then that delay is subtracted from the net delay, to total the "remaining delay".

Step 5 – Remaining Delay Exceeds Presumptive Ceiling

[44]     Where the remaining delay exceeds the presumptive ceiling, the Crown may only rebut the presumption of unreasonable delay by establishing that the case was particularly complex, in that the nature of the evidence or the issues required an inordinate amount of trial time or preparation time.

[45]     Where the Crown cannot establish that the case was particularly complex, the charges against the accused will be stayed.

Step 6 – Remaining Delay Below Presumptive Ceiling

[46]     Where the remaining delay is less than the presumptive ceiling, the defence may demonstrate that it was nonetheless unreasonable. The defence must establish two things: (1) they took meaningful steps that demonstrate a sustained effort to expedite the proceedings; and (2) the case took markedly longer than it reasonably should have. The granting of stays for cases that fall below the presumptive ceilings should only be done in the clearest of cases.

Step 7 – Transitional Cases where matter commenced prior to *Jordan*

[47]     Where charges were instituted pre-*Jordan*, and the total delay (minus defence delay) falls *below* the ceiling, the application of the new framework must

2018 ONSC 1337 (CanLII)

- 14 -

be applied contextually and flexibly, taking into account whether the parties justifiably relied on the pre-*Jordan* state of the law, which did not require defence initiative, and which accepted institutional delay as a justification.

**The Findings in This Case**

**Step 1 - Calculate the Total Delay**

[48]      In this case, the time between the swearing of the Information (March 12, 2013) and the anticipated completion of the trial date (March 2, 2018) is 1817 days, or 4 years, 11 months and 19 days (approximately 59.5 months).

[49]      The Crown submits that although the Information was sworn in March 2013, Mr. Thind was not in fact charged until his arrest on January 8, 2016. The Crown submits that the "11(b) clock" started ticking in this case upon the arrest date, making the total delay 785 days, or 2 years 1 month and 27 days (approximately 26 months).  I do not agree.

[50]      The Crown relies on *R. v. Millar*, 2016 BCSC 1887, [2016] B.C.J. No. 2144, at para. 122.  In *Millar*, Justice Gray held that the s. 11(b) *Charter* analysis commences when a person becomes aware of the charge against them. This occurs when they are arrested or receive a summons, because their liberty and security interests are not engaged until that time.

2018 ONSC 1337 (CanLII)

- 15 -

[51]     *Millar* was followed by my colleague Justice McWatt in *R. v. Magiri*, 2017 ONSC 2818, [2017] O.J. No.  2505. In that case, the accused was arrested 10 months after an Information was sworn. Justice McWatt accepted that the clock did not begin to tick until the date of arrest. Alternatively, she held that the police made significant and diligent efforts to locate Mr. Magiri, and that the pre-arrest period was deductible as a "discrete event".

[52]     Defence counsel relies on the Supreme Court of Canada's decision in *R. v. Kalanj*, [1989] 1 S.C.R. 1594. Defence counsel argues that *Kalanj* is binding authority that I must follow.

[53]     In *Kalanj*, the Supreme Court of Canada held that the meaning of the term "charged with an offence" in s. 11 of the *Charter* refers to the time at which an Information is sworn.  *Kalanj* has been cited over the years with approval by various courts, including the Ontario Court of Appeal.

[54]     For example, the Court of Appeal in *R. v. E. (K.*), 2013 ONCA 175, 303 O.A.C. 96 at para. 20 held:

> It is well-settled that a person is "charged with an offence" within s. 11, thus s. 11(b) of the Charter, when an information is sworn alleging an offence against him or her: *R. v. Kalanj*, [1989] 1 S.C.R. 1594, at p. 1607. Time reckoning for the purposes of claims of infringement of the right to be tried within a reasonable time commences with the laying of the information and continues until the completion of the trial.

2018 ONSC 1337 (CanLII)

- 16 -

[55]     I agree with defence counsel that I am bound by *Kalanj*, and I find that the calculation of delay for s. 11(b) purposes in this case started with the swearing of the Information on March 12, 2013.

[56]     That being said, there are notable differences between this case and *Kalanj*. In *Kalanj*, the accused were arrested and then released on the same day without any charges being laid. Over eight months later, an Information was sworn. During the time between the initial arrest and the swearing of the Information, the police had reviewed numerous intercepted communications and had interviewed witnesses who had been identified through the interceptions. The central issue before the Supreme Court of Canada was whether the pre-charge delay when the police were conducting their investigation, after the arrest of Mr. Kalanj, should be considered in the s. 11(b) calculus. The Supreme Court held that pre-charge delay was not relevant and that the clock began to tick when the information was sworn.

[57]     One of the primary differences is that in this case, Mr. Thind was in a situation opposite to that of Mr. Kalanj in that the Information was sworn, but the accused did not become aware of its existence until he was arrested several months later. Indeed, I find as a fact that Mr. Thind was unaware that he was being investigated. Even if Mr. Thind did know that he was under investigation after speaking to his mother, I do not accept that he believed he may be facing a

2018 ONSC 1337 (CanLII)

criminal charge. Although the Crown argues that he would have had some sense of an investigation after he left the courtroom on April 30, 2012, I am of the view that he only became aware of the charges when he returned to Canada on January 8, 2016.

[58]     It seems to me that once the police determined they had sufficient evidence to justify swearing an Information, a warrant for Mr. Thind's arrest could only be issued by placing that Information before the justice.  That is exactly what was done in this case, pursuant to s. 507 of the *Code*. A warrant based on an Information being placed before him was issued by Justice of the Peace Duggal. The warrant, by its terms, had to be executed forthwith. However, s .511(2) states that the warrant remains in force until it is executed, and does not have to be made returnable at any particular time (see: s.504, 507, and 511 of the *Code*).

[59]     I have considered the Crown's argument that there is no principled basis why, in this situation, the clock for Mr. Thind's s.11 (b) rights should start running until the warrant was executed. The Crown's argument highlights that Mr. Thind was not even aware that a warrant had been issued. In the meantime, he was able to continue his schooling and travel. The Crown submits that the laying of the Information had no impact on any of his rights.

2018 ONSC 1337 (CanLII)

- 18 -

[60]     However, I am in agreement with Justice Blacklock's decision of *R. v. Sundralingam*, 2017 ONCJ 400, [2017] O.J. No. 3097, where he stated at para. 30:

> I have read and re-read Kalanj and with some regret, I have come to the conclusion that if one looks at that decision as a whole it is clear that Justice MacIntyre could not help but have been alive to the fact that his comments start the 11B clock at the point the charge is laid and process issued at the latest; not when process was ultimately executed upon the accused.

[61]     In my view, Mr. Thind was charged with an offence for s. 11(b) purposes when Cst. Hamill swore out the Information on March 12, 2013, in order to obtain a warrant. I acknowledge that the decision of Justice Gray in *Millar* is very persuasive. That being said, I must adhere to the principle of *stare decisis*. Many cases have analyzed what the Supreme Court of Canada has decided in *Kalanj*. It seems to me that the bulk of authority weighs heavily in accepting *Kalanj*. Departing from it is the exception.

**Step 2 - Subtract Defence Delay**

[62]     I deduct 234 days total for defence delay. Crown counsel's chart at page 4 of his factum is, for the most part, an accurate accounting for the defence delay in this case. I have reviewed the transcripts that support the Crown's position. However, I have made some minor adjustments to the calculation of defence delay. For ease of reference I highlight the important features that outline the defence delay in this case.

2018 ONSC 1337 (CanLII)

- 19 -

**Defence Delay - September 29, 2016 to October 7, 2016 (8 days)**

[63]      On September 29, 2016, a judicial pre-trial was set in the Ontario Court of Justice. The Crown was ready to set the date for a preliminary hearing after this pre-trial, but the defence needed time to get instructions and requested an adjournment.

**Defence Delay - October 7, 2016 to October 14, 2016 (7 days)**

[64]      On October 7, 2016, the Crown was again in a position to set a preliminary hearing date. Additional disclosure was provided. The defence needed more time to get instructions and explicitly waived s. 11(b) on the record.

**Defence Delay - October 14, 2016 to March 1, 2017 (44 days)**

[65]      On October 14, 2016 a preliminary hearing date was set for March 1, 2017. I have reviewed the trial verification sheet that is provided by the trial coordinator to the parties once a date is set in the Ontario Court of Justice. The document outlines the Court's available dates to the Crown and the defence that were available when the trial date was set. Due to defence unavailability for dates that were offered by the court (where the Crown was available), the defence was responsible for 44 days of this delay.

2018 ONSC 1337 (CanLII)

- 20 -

**Defence Delay - May 26, 2017 to June 23, 2017 (28 days).**

[66]     After committal for trial, the matter was remanded to the Superior Court to set a trial date. The defence election was to be tried with a jury. On May 26, 2017 in the Superior Court assignment/intake court, the defence requested an adjournment and waived s. 11(b) for this time period.

**Defence Delay - June 23, 2017 to August 14, 2017 (38 days)**

[67]     On June 23, 2017 the matter was set for a judicial pre-trial in the Superior Court for August 14, 2017. This date was the first available date that defence counsel was available. I observe that the court was first available for the judicial pre-trial much earlier than August 14, 2017. It is not clear how early the court could have accommodated a judicial pre-trial. As such, it would be unfair to characterize the entire delay as defence delay. The Crown has assumed that a judicial pre-trial date could have been held in 2 weeks (14 days), and has characterized the first 14 days from June 23, 2017 as inherent delay, and the remaining delay to August 14, 2017 as defence delay. I agree with this approach. The defence is responsible for 38 days of delay during this time frame.

**Defence Delay - August 14, 2017 to August 22, 2017 (8 days)**

[68]     On August 14, 2017, the defence re-elected to be tried by a judge in the Superior Court without a jury. The defence also decided to bring a certiorari application to quash the committal order from the Ontario Court of Justice. A date

2018 ONSC 1337 (CanLII)

2018 ONSC 1337 (CanLII)

for the application was set for November 17, 2017. The defence was not in a position to set trial dates, and they requested a one week adjournment to canvass some issues regarding delay.

**Defence Delay - August 22, 2017 to March 2, 2018 (101 days)**

[69]     On August 22, 2017 a target trial date was set for the week of February 26, 2018 with an anticipated end date of March 2, 2018. In my view, the defence is responsible for 101 days of this time period due to defence counsel's unavailability for trial until February 2018. On August, 22, 2017, the court and the Crown had trial dates as early as October 10, 2017.  I agree with the Crown that the defence did not request for an earlier date to have the certiorari application heard in order to possibly canvass earlier trial dates. In any event, it appears that the earliest date defence counsel was available for trial was the end of February 2018. After reviewing the transcripts and the indictment, I have calculated the total delay from November 17, 2017 (the date the certiorari hearing was argued) to February 26, 2018 (the trial date eventually selected) as defence delay due to defence counsel's schedule (i.e. the defence was not available until the end of February 2018 for trial).

[70]     I observe that the defence also scheduled a s.11 (b) application hearing date for December 8, 2017 during this time period. However, the s. 11(b) application hearing had to be rescheduled to January 8, 2018 as the defence

was delayed in perfecting the s. 11(b) application and the December 8, 2017 date was lost.

**Step 3 - Compare Net Delay to Presumptive Ceiling**

[71]     The net delay in this case is 1583 days, being the total delay of 1817 days less deductions for defence delay of 234 days.

[72]     The applicable ceiling is one of 30 months and the net delay (1583 days or 52.75 months) exceeds the presumptive ceiling.

**Step 4 - Net Delay Exceeds Presumptive Ceiling**

[73]     It is obvious that the net delay is well over the 30-month ceiling and is presumptively unreasonable.  However, in an alternative to his primary argument, the Crown argues that the period between the laying of the Information and the arrest of Mr. Thind should treated as a "discrete event" within the *Jordan* framework under exceptional circumstances. The Crown does not dispute that the police were obligated to act on the warrant forthwith. However, the Crown argues that Mr. Thind was out of the country.

[74]     Defence counsel submits that the police knew where he was at all times, and far from being reasonably unforeseen or unavoidable, the police handled this file in a very careless manner. As I understand his argument, the police did

2018 ONSC 1337 (CanLII)

- 23 -

nothing to ensure that the warrant that was issued on March 12, 2013 was executed forthwith.

[75]     I acknowledge that section 511(1) (c) of the *Code* places a duty on the police to execute arrest warrants forthwith, and they must take reasonable steps in doing so.

[76]     I do not accept that the police acted negligently and set out to deliberately delay the proceedings. While it is always possible to conceive of steps that the police should have taken, the test is reasonable diligence.

[77]     On this record, I believe the police did act with reasonable diligence.

[78]     It seems to me reasonable steps were taken to execute the arrest warrant issued on March 12, 2013, but despite their diligence, Mr. Thind could not be located and arrested prior to January 8, 2016.

[79]     The Supreme Court of Canada in *Jordan* has held that exceptional circumstances need not be "rare or entirely uncommon." To rely on such circumstances, the Crown needs to show that it took reasonable steps to avoid and address the problem where it was possible to have done so. It need not prove that the steps taken were ultimately successful. Nor is the Crown required to "exhaust every conceivable option for redressing the event in question to satisfy the reasonable diligence requirement" – see *R. v. Cody,* 2017 SCC 31,

2018 ONSC 1337 (CanLII)

- 24 -

[2017] 1 S.C.R. 659, at para 54. In *Jordan*, the Court actually contemplated an example of a discrete event exceptional circumstance similar to the case at bar, stating that "cases with an international dimension, such as cases requiring the extradition of an accused from a foreign jurisdiction" could also meet the definition of an exceptional circumstance.

[80]     It is true that Cpl. Flannery deliberately did not pursue extradition. I also acknowledge that it was certainly possible to pursue other avenues. Where I respectfully disagree with defence counsel is that the failure to do so is fatal to the existence of an exceptional circumstance. The *Jordan* framework does not require that all possible avenues be pursued. The choice to pursue an extradition order is case specific, and may not be appropriate in every circumstance. What is important is whether the actions taken by the RCMP were reasonable.

[81]     Frankel J.A. made the same point in *R. v. Singleton*, 2014 BCCA 232, [2014] B.C.J No. 1213, at paras. 99 to 100:

> …it cannot be said that the police failed to act with reasonable diligence. Attempting to locate someone in a country as vast as the United States without any idea of where to look is akin to trying to find the proverbial needle in a haystack. Although the police could have located Mr. Singleton earlier had they known where to look…Further, I do not accept that it falls to Crown to establish that had the police taken other steps to locate Mr. Singleton, those steps would have failed. In effect, Mr. Singleton's argument would result in an impossible burden being placed on the Crown. The Crown would first have to prove what the police might reasonably have done at any particular time to attempt to locate an accused and then prove that doing those things would not have made a difference.

2018 ONSC 1337 (CanLII)

- 25 -

[82]     In my view, the RCMP in this case made reasonable efforts to locate Mr. Thind and swear out an Information in order to obtain a warrant. There were efforts to make contact with Mr. Thind by leaving him messages on the telephone and with his mother. The RCMP also attempted to contact Bond University, but were unable to get any assistance due to privacy laws. More importantly, the RCMP asked that Mr. Thind be flagged in the CBSA systems. Cpl. Flannery did not believe Mr. Thind was evading service, and believed he would eventually return to Canada, because his family was living here and he was in Australia for school. Such a belief was reasonable in the circumstances.

[83]     I acknowledge that the RCMP's actions were not perfect. Indeed, it appears that Mr. Thind actually came back to Canada after the Information was sworn and remained in the country undetected by the authorities. That being said, a standard of perfection is not placed upon the police. Furthermore, there were some things beyond their control, such as the expiry of the lookout on the CBSA system, and I find that the failure to arrest him when he arrived in Canada in August of 2015 was inadvertent. Again, the test is reasonable diligence.

[84]     As the Supreme Court of Canada has held in *Jordan* at para. 71, it will be for the trial judge, relying on his/her good sense and experience, to determine whether a particular event is properly determined to be exceptional. In my view,

2018 ONSC 1337 (CanLII)

- 26 -

common sense dictates that there were reasonable steps taken to attempt to execute the warrant issued for Mr. Thind's arrest. Those steps included:

1.  Phoning Mr. Thind's mother;

2.  Leaving a message for Mr. Thind;

3.  Contacting Bond University to find out if Mr. Thind was attending school in Australia;

4.  Contacting Bond University to see if they had residential information for him; and

5.  Placing a warrant on the CBSA system to generate a lookout.

[85]     In conclusion, I agree with the Crown's submissions on this point. Accordingly, I find there were exceptional circumstances which would reduce the net delay below the presumptive ceiling.

[86]     The Supreme Court in *Jordan* has held that it is obviously impossible to identify in advance all circumstances that may qualify as "exceptional" for the purposes of adjudicating a s. 11(b) application. The fact that Mr. Thind left the country and was unaware for a lengthy period of time that there was an investigation and a warrant outstanding for his arrest is a discrete exceptional circumstance that must be subtracted from the total period of delay.

2018 ONSC 1337 (CanLII)

[87]      The delay between the swearing of the Information on March 12, 2013 and the arrest date of January 8, 2016 totals 1032 days. The net delay, as stated earlier, was 1583 days after accounting for defence delay. Subtracting this exceptional circumstance delay of 1032 days from 1583 days results in the total remaining delay of 551 days (approximately 18 months). The remaining delay falls below the presumptive ceiling of 30 months.

**Step 5 - Remaining Delay Exceeds Presumptive Ceiling**

[88]      This step need not be considered as the remaining delay is not greater than the presumptive ceiling.

**Step 6 - Remaining Delay Below Presumptive Ceiling**

[89]      Again, where the net delay or remaining delay is less than the presumptive ceiling, the onus shifts to the defence to demonstrate that the delay is unreasonable. Defence counsel argues that even if the remaining delay falls below the ceiling, the Crown's approach to this prosecution shows that the delay in setting down the matter was unreasonable.

[90]      To succeed at this step of the *Jordan* analysis, the defence must establish two things: (1) they took meaningful steps that demonstrate a sustained effort to expedite the proceedings, and (2) the case took markedly longer than it reasonably should have. Absent these two factors, the s. 11(b) application must fail. These two requirements must be interpreted contextually, as discussed

- 28 -

below, given that this case was in the system prior to the release of *Jordan*: *Jordan* at para. 99.

[91]     As I will set out below, this is not one of the clearest cases. Although I agree that when Mr. Thind eventually made his first few appearances in court, the Crown's approach to the pace of litigation was not one of urgency, from my review of the record, it seems to me that both parties were content with the pace of the proceedings once Mr. Thind was arrested in January 2016.  On this basis alone, the defence has not met their onus.

## Step 7 - Transitional Cases where the matter commenced prior to *Jordan*

[92]     Again, the new framework applies to cases currently in the system (*Jordan*, para. 94) and the framework must be applied "contextually and flexibly" because this case was already in the system when *Jordan* was released. Since I have found that the remaining delay falls below the presumptive ceiling, Mr. Thind bears the onus of showing that the delay is unreasonable.

[93]     The court must also be mindful that a stay of proceedings for cases in which the delay falls below the presumptive ceiling are rare and limited to clear cases (*Jordan*, para. 48)

2018 ONSC 1337 (CanLII)

[94]     Although the onus is on Mr. Thind, I have considered a number of factors based on the parties' reliance on the state of the law prior to *Jordan*. I do so on a contextual basis: *Coulter* at para. 40 and 56.

**The Complexity of the Case**

[95]     This is not a complex case. It is a two-witness case that involves a relatively discrete issue.

**Period of Crown and Institutional Delay**

[96]     I calculate the institutional and Crown delay as amounting to 264 days. In my view, the delay is well within the *Morin* guidelines. For ease of reference I summarize the institutional and crown delay.

**Crown Delay - February 8, 2016 to July 11, 2016 (154 days)**

[97]     I calculate this delay (154 days) as running from February 8, 2016 to July 11, 2016 because the Crown should have had disclosure ready to go much sooner than they did. This is not a complex case. There was no reason why disclosure should not have been ready one month after Mr. Thind's release.

**Crown and Institutional Delay - October 14, 2016 to March 1, 2016 (61 days)**

[98]     The Ontario Court of Justice could only offer a preliminary hearing date of November 23, 2016 as the first available date to the court (40 days institutional delay). My review of the verification sheet from the Ontario Court of Justice when

2018 ONSC 1337 (CanLII)

this matter was set for a preliminary hearing shows that the Crown was not available on certain dates when the defence and the court were available (21 days).

**Institutional delay - August 22, 2017 to March 2, 2018 (49 days)**

[99]     The first earliest date available to the Superior Court for trial was October 10, 2017 (49 days institutional delay from August 22). Eventually, February 26, 2018 was selected for trial. The defence was not available until the end of February 2018. Much of the time during this period would be characterized as inherent delay under the *Morin* framework, because the defence brought a certiorari application that was not frivolous and a s. 11(b) application.

**Crown Response to the Delay**

[100]     I agree with defence counsel that the provincial and federal crown displayed a complacent attitude displayed towards this file when Mr. Thind was first arrested. For reasons that are not apparent to me, disclosure was not ready shortly after Mr. Thind's arrest, and the issue of who was taking carriage of the prosecution (i.e. federal crown or provincial crown) was not resolved.

[101]     The overall length of delay (Crown and institutional) in this case is 8.67 months, which is well within the *Morin* 14 to 18 months guideline for cases in the Superior Court that involved a preliminary hearing in provincial court.

2018 ONSC 1337 (CanLII)

**Defence Efforts to Move Case Along**

[102]    Defence initiative is new to the s. 11(b) analysis. It was not required before the release of *Jordan*. Therefore, the defence is not required to demonstrate defence initiative to expedite the matter for the period of delay preceding the release of *Jordan*. However, the defence is required to show it took initiative to expedite matters after July 8, 2016, when the *Jordan* framework came into effect (see: *R. v. Osinski*, 2017 ONCJ 396 at para. 43). The defence must demonstrate that it took meaningful and sustained steps to be tried quickly.

[103]    From my review of the transcripts, the defence did not show initiative after the release of *Jordan*. I will provide four examples.

[104]    First, on September 29, 2016 a judicial pre-trial was held in the Ontario Court of Justice. The Crown and the Court were in a position to set a preliminary hearing date. However, the defence still needed time to get instructions in order to set the date.

[105]    Second, when the case finally reached Superior Court on May 26, 2017, the matter was adjourned to June 23, 2017 for "retainer" purposes, with an explicit 11(b) waiver for this time period.

[106]    Third, on August 14, 2017, when the matter was pre-tried in this Court, the earliest date suggested by the defence to argue a certiorari application on

2018 ONSC 1337 (CanLII)

- 32 -

this matter was November 17, 2017. The defence also requested a one week adjournment to "think things over".

[107]    Fourth, on August 22, 2017, a trial was set for the week of February 26, 2017. The court had dates as early as October 10, 2017. However, the defence only had dates starting at the end of February 2018. The defence also scheduled this s. 11(b) application for December 8, 2017. This date ultimately had to be vacated because the defence missed the filing date for transcripts.

[108]    In my view the defence did not take meaningful steps to be tried quickly after the release of *Jordan*.

[109]    Defence initiative prior to the release of *Jordan* should also factor in to the s. 11(b) analysis. In *Jordan*, the Supreme Court stated that "in close cases, any defence initiative during that time [prior to *Jordan*], would assist the defence in showing that the delay markedly exceeds what was reasonably required." The court also cautioned that a trial judge "must also still consider action or inaction by the accused that may be inconsistent with a desire for a timely trial."

[110]    Although the Crown very clearly made no efforts to remedy the delay prior to the *Jordan* decision, my review of the record also discloses no sustained effort to move the case along by the defence prior to the release of *Jordan*.

2018 ONSC 1337 (CanLII)

- 33 -

**Prejudice to the Accused**

[111]     I also observe that I am permitted to look at prejudice in transitional cases, because under the pre-*Jordan* jurisprudence, prejudice was a significant factor in the s. 11(b) analysis.  Indeed, the Court of Appeal in *Coulter* considered prejudice in a transitional case at paras. 91, 103-104. I have reviewed Mr. Thind's affidavit and his evidence on the *voir dire*. His position comes down to this: "Had I known I was going to be arrested, I would not have gone to law school and incurred the costs." In my view, this is not significant enough prejudice sufficient to produce a section 11(b) violation in a transitional case, where the Crown and institutional delay falls well within appropriate guidelines.

**Conclusion on this Transitional Case**

[112]     In conclusion, while it is not a complex case and there is certainly some troubling aspects of the Crown's approach to delay once Mr. Thind was arrested, I must not lose sight of the fact that the Supreme Court of Canada in *Jordan* stressed that "a stay of proceedings below the ceiling will be even more difficult to obtain for cases currently in the system" than they will for cases brought after the inception of the *Jordan* framework. The delay in this transitional case is below the ceiling, and in my view, the delay is not long or unreasonable enough to stay the proceedings. It cannot be said that this case took longer than it should have to prosecute, let alone "markedly longer" than it reasonably should have.

2018 ONSC 1337 (CanLII)

- 34 -

**Result**

[113]     The application must fail. One must not lose sight of the fact that in order to obtain an arrest warrant, the police must swear out an Information before a justice. This is a mandatory requirement in the *Code.* I cannot accept that argument that police compliance with the *Code,* in order to obtain a warrant for an accused who is out of the country and does not know about the investigation, should turn the constitutional protection guaranteed by s. 11(b) into a sword because the police did exactly what the *Code* requires of them.

[114]     For the reasons set out above, I dismiss the application. Accordingly, the trial will proceed on February 26, 2018.

_____

Coroza J.

**Released:**  February 27, 2018

2018 ONSC 1337 (CanLII)

**CITATION:** R. v. Thind, 2018 ONSC 1337
**COURT FILE NO.:** CrimJ(P) 456/17
**DATE:** 2018 02 27

# ONTARIO
# SUPERIOR COURT OF JUSTICE

**BETWEEN:**

HER MAJESTY THE QUEEN

**- and -**

GURIQBAL SINGH THIND

---

## REASONS FOR RULING
### (s. 11(b) Application)

---

COROZA J.

**Released:**  February 27, 2018

2018 ONSC 1337 (CanLII)