1
2
3
4                        UNITED STATES DISTRICT COURT
5                       NORTHERN DISTRICT OF CALIFORNIA
6

7   UNITED STATES OF AMERICA,              Case No.  19-mj-70677-MAG-1   (KAW)

8                   Plaintiff,             **CORRECTED ORDER GRANTING
                                           REQUEST FOR CERTIFICATE OF
9          v.                              EXTRADITABILITY**

10  DONALD KOLLMAR,                        **NUNC PRO TUNC FEBRUARY 10, 2020**

11                  Defendant.             Re: Dkt. No. 39
12

13         On May 6, 2019, the United States filed a complaint under 18 U.S.C. § 3184, seeking to

14  provisionally arrest Defendant Donald Kollmar for extradition to Canada.  (Compl., Dkt. No. 1.)

15  Pending before the Court is the request by the United States for a certificate of extraditability of

16  Defendant, who is charged with Rape and Indecent Assault, in violation of sections 143, 144, and

17  149 of the Criminal Code of Canada.  (Gov.'s Mot., Dkt. No. 39.)

18         Having considered the parties' filings, the relevant legal authority, and the arguments made

19  at the January 30, 2020 hearing, the Court GRANTS the request for a certificate of extraditability.

20                          I.      BACKGROUND

21         A.      Factual Background

22         As described by police officer Robert Speakman, the charges against Defendant stem from

23  a 1997 report by B.B. (date of birth October 13, 1962) that Defendant sexually assaulted her on a

24  number of occasions when she was between the ages of twelve and sixteen.  (Speakman Aff. ¶ 4,

25  Dkt. No. 41 at 20-63.)  B.B. stated that in 1974, when she had just turned twelve, her family joined

26  the religious group, "Students of Light."  (Speakman Aff. ¶ 5.)  In the winter of 1974, when B.B.

27  lived in Sudbury with her parents, B.B. met Defendant, who was the "right hand assistant" of the

28  group's leader, John Hanas.  (Speakman Aff. ¶¶ 5-7.)  B.B. understood Defendant to be in his mid-

United States District Court
Northern District of California

twenties.  (Speakman Aff. ¶ 6.)

Defendant began to show a "strong interest" in B.B. when she was twelve.  (Speakman Aff. ¶ 8.)  Defendant would make monthly trips to Sudbury, during which he spent time alone with B.B. on several occasions.  (*Id.*)  During these sessions, Defendant would tell B.B. about how unique and important he was, of the special and significant work he was to do, his spiritual powers and psychic abilities, and his direct relationship with God.  (*Id.*)  Defendant would tell B.B. that she was very special, and that she could only become a good and spiritual person if Defendant taught her.  (*Id.*)

Defendant told B.B. that he had a "very pure and unique love" for her.  (Speakman Aff. ¶ 9.)  Defendant also told B.B. that he had intended to wait until she was sixteen years old before approaching her, but that he could not wait any longer.  (*Id.*)

Over time, Defendant became increasingly more volatile, oppressive, and abusive towards B.B., controlling every aspect of her life.  (Speakman Aff. ¶ 12.)  Defendant would tell B.B. when to wake up and go to bed, and would oftentimes allow her only one to three hours a night.  (Speakman Aff. ¶ 13.)  She described instances where she began to fall asleep, and Defendant would slap her in the face and tell her not to be lazy.  (*Id.*)  Defendant would also control when B.B. went to the bathroom, brushed her teeth and showered, combed her hair, and looked in a mirror.  (Speakman Aff. ¶ 14.)  B.B. described feeling "paralyzed by fear" in Defendant's presence, and stated that her time with him "was lived in severe anxiety and terror, never knowing what would trigger his rage."  (Speakman Aff. ¶¶ 15, 17.)  Although Defendant only physically slapped her on three occasions, he would verbally assault her and raise his hand in a motion threatening to hit her.  (Speakman Aff. ¶ 15.)  He also told her that she "angered him so much he could barely restrain himself from hitting [her] but would never do so because he would have to explain any marks to [her] parents."  (*Id.*)  On several occasions, Defendant grabbed and twisted B.B.'s wrist.  (Speakman Aff. ¶ 16.)  Defendant would also tell B.B. that her will or desire "was not valid," and that if she did not love him, "it was the evil parts with[in her] going against God's plan and will."  (Speakman Aff. ¶ 18.)

Starting from when B.B. was thirteen, Defendant touched her in a sexual manner.

2

(Speakman Aff. ¶ 20.)  In one instance, B.B. attended a weekend retreat with Defendant in Buffalo, New York.  (Speakman Aff. ¶ 21.)  Defendant told B.B. that he was going to give her a "therapeutic massage," and instructed her to remove her clothing and lay on a table.  (Speakman Aff. ¶ 22.)  Defendant then massaged B.B.'s entire body for "at least two hours," spending a large portion of that time massaging her breasts.  (*Id.*)

B.B. also described incidents in Sudbury.  (Speakman Aff. ¶ 24.)  At that time, Defendant travelled in a van that he had converted into a "mini home."  (Speakman Aff. ¶ 25.)  Defendant would tell B.B. to lie down in the van, after which he would lie down next to her and fondle her breasts over her clothes.  (*Id.*)

B.B. further described incidents in Toronto, where she would occupy a room in the Student of Light's house.  (Speakman Aff. ¶ 27.)  Defendant would have B.B. lie down beside him, and he would fondle her breasts and genitals, pull her nightie off and lie on top of her, kiss her, and rub his groin against her.  (Speakman Aff. ¶ 27.)  B.B. described herself as feeling "so tormented" by what she was feeling that she would be stiff.  (Speakman Aff. ¶ 28.)  This would often anger Defendant, who would demand that B.B. be more affectionate with him and remind her of the "honor" it was to be with him.  (*Id.*)  Once, Defendant called B.B. selfish and told her that to make up for it, he would teach her how to massage him.  (Speakman Aff. ¶ 29.)  He told her that the only way to do this was for both people to be naked.  (*Id.*)  Defendant made B.B. practice each technique repeatedly, which included massaging around his genitals.  (*Id.*)  Afterwards, he lay on top of B.B., fondled her breasts and genitals, and put his fingers in her vagina.  (*Id.*)

During Mother's Day weekend in 1977, when B.B. was fourteen, Defendant penetrated her vagina with his penis.  (Speakman Aff. ¶ 31.)  B.B. stated that Defendant only partially penetrated, and told her that he did so because he wanted her to remain a virgin until he married her.  (*Id.*)  After this incident, Defendant would masturbate B.B., and would become enraged if she did not have an orgasm.  (Speakman Aff. ¶ 33.)  He also had B.B. masturbate him.  (*Id.*)

B.B. stated that 99% of the time, Defendant would verbally humiliate and demoralize her before sexually abusing her, calling her "stupid," "incompetent," "a piece of shit," "worthless," "nothing," "fat and ugly," "cruel and uncaring toward him," "judgmental," and "a terrible person"

who should be "ashamed" of herself.  (Speakman Aff. ¶ 34.)  He would also tell her that the "only reason [she] had any goodness or light in [her] was because of him," and that she "must submit [her] will to him."  (*Id.*)

B.B.'s relationship with Defendant ended when in June 1979, B.B. lost consciousness and was taken to the hospital, suffering from severe stomach pain.  (Speakman Aff. ¶¶ 35-36.)  At the hospital, B.B. told her mother what she fearful of, and that she did not want to be with Defendant. (Speakman Aff. ¶ 36.)  Defendant became "enraged" when B.B.'s parents did not allow her to travel with him or marry him, and tried to coerce other people to follow him, forgoing a relationship with Hanas.  (Speakman Aff. ¶ 37.)  Defendant later returned to New York, and B.B. had no further contact with him.  (*Id.*)

**B.    Procedural Background**

On February 25, 1997, B.B. provided an audio-video recorded statement to the police. (Speakman Aff. ¶ 4.)  B.B. also provided a written statement, which she had written in advance. (*Id.*)  B.B. did not know the proper spelling of Defendant's last name, his date of birth, his address, or his vehicle information, and a warrant for "Donald KOLMAR 45 Years" was issued on November 17, 1997.  (Speakman Aff. ¶ 39, Exh. A.)

In July 2017, the Toronto Police Service was conducting an audit on old arrest warrants when an internet search revealed a possible website hit for the accused from the 1997 warrant. (Speakman Aff. ¶ 40.)  The website including a photo of "Don Kollmar," and had a similar spiritual aspect as B.B.'s description of the Students of Light.  (*Id.*)  Officer Speakman contacted B.B., who advised that she was willing to testify.  (*Id.*)

On November 28, 2018, Officer Speakman swore an information that charged Defendant with indecent assault on a female, rape, and sexual intercourse with a female between 14 and 16 years of age.  (Speakman Aff. ¶ 41, Exh. B.)  On December 24, 2018, a warrant for arrest was issued.  (Speakman Aff. ¶ 42, Exh. C.)

On May 3, 2019, Defendant was arrested in this district.[1]  (Dkt. No. 6.)  Subsequently, a

---

[1] On May 17, 2019, Defendant was granted release on a secured bond.  (Dkt. No. 28; *see also* Dkt. No. 30 (June 6, 2019 conditions of release).)

United States District Court
Northern District of California

decision was made to amend the wording of the charges and remove the charge of sexual intercourse with a female between 14 and 16 years of age. (Speakman Aff. ¶ 43; *see also* Rivers Aff. ¶ 10, Dkt. No. 41 at 4-18.) Additionally, the rape charge was no longer based only on § 143(b)(iii), which concerns sexual intercourse with consent if consent was "obtained by false and fraudulent representations as to the nature and quality of the act." (Rivers Aff. ¶¶ 20, 23.) Instead, Canada intends to rely primarily on § 143(a), which concerns sexual intercourse without consent. (Rivers Aff. ¶ 23.) On June 5, 2019, a new information was sworn out, charging Defendant with indecent assault and rape. (Speakman Aff. ¶ 43.) On June 7, 2019, a warrant was issued for Defendant's arrest on the updated charges of indecent assault and rape. (*Id.*) The rape charge is based on the Mother's Day 1977 event. (Rivers Aff. ¶ 51.)

On July 10, 2019, the United States filed the instant motion for a certificate of extraditability. On July 26, 2019, Defendant filed the instant motion for discovery, seeking the statements by B.B. and B.B.'s father. (Dkt. No. 44.) On September 9, 2019, the Court granted in part and denied in part Defendant's motion for discovery. (Discovery Ord., Dkt. No. 48.) The Court permitted discovery as to B.B.'s statements, but only "for the limited purpose of determining whether the Speakman Affidavit correctly characterizes the B.B. statements." (*Id.* at 6.) The Court specifically warned that it "will **not** consider attacks on B.B.'s credibility if such attacks are based on contradictory evidence." (*Id.*)

On December 10, 2019, Defendant filed his opposition to the United States' motion for a certificate of extraditability. On January 7, 2020, the United States filed its reply. (Gov.'s Reply, Dkt. No. 74.)

## II.    LEGAL STANDARD

In deciding whether to grant a request for a certificate of extraditability, the Court considers whether:

1. the extradition judge has jurisdiction to conduct proceedings;

2. the extradition court has jurisdiction over the fugitive;

3. the extradition treaty was in full force and effect;

4. the crime fell within the terms of the treaty; and

5. there was competent legal evidence to support a finding of extraditability.

*Zanazanian v. United States*, 729 F.2d 624, 626 (9th Cir. 1984).

### III.   DISCUSSION

#### A.   Jurisdiction to Conduct Proceedings

The Court finds, and Defendant does not dispute, that it has jurisdiction to conduct these proceedings. "[D]istrict court judges are expressly authorized to conduct extradition hearings under 18 U.S.C. § 3184[,] and the district court in this district specifically permits magistrate judges to conduct such proceedings under Criminal Local Rule 7-1(b)(13)." *In re Trinidad*, 754 F. Supp. 2d 1075, 1079 (N.D. Cal. 2010).

#### B.   Jurisdiction over Defendant

The Court finds, and Defendant again does not dispute, that it has jurisdiction over Defendant because Defendant was arrested in this jurisdiction on May 3, 2019. *See* 18 U.S.C. § 3184 ("[A judge] may, upon complaint made under oath, charging any person found within his jurisdiction, . . . issue [its] warrant for the apprehension of the person so charged."); *In re Trinidad*, 754 F. Supp. 2d at 1079 ("the court has jurisdiction over [the defendant] because he is present before the Court").

#### C.   Extradition Treaty in Full Force and Effect

The Court finds, and Defendant does not dispute, that there is an extradition treaty between Canada and the United States. Here, Katherine C. Fennell, an Attorney-Advisor in the Office of the Legal Advisor, Department of State, has provided a declaration attesting that the treaty is "in full force and effect between the United States and Canada . . . ." (Fennell Decl. ¶ 2, Dkt. No. 41 at 64-66.)

#### D.   Dual Criminality

Per Article 2 of the extradition treaty, "[e]xtradition shall be granted for conduct which constitutes an offense punishable by the laws of both Contracting Parties by imprisonment or other form of detention for a term exceeding one year or any greater punishment." This dual criminality requirement "require[s] that an accused be extradited only if the alleged criminal conduct is

considered criminal under the laws of both the surrendering and requesting nations." *Clarey v. Gregg*, 138 F.3d 764, 765 (9th Cir. 1998). "The primary focus of dual criminality has always been on the conduct charged; the elements of the analogous offenses need not be identical." *Id.* at 766. In other words, "when the laws of both the requesting and the requested party appear to be directed to the same basic evil, the statutes are substantially analogous, and can form the basis of dual criminality." *Id.* (internal quotations and modifications omitted); *see also Collins v. Loisel*, 259 U.S. 309, 312 (1922) ("the law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive . . . . It is enough if the particular act charged is criminal in both jurisdictions.").

Here, Defendant is charged with rape. Per § 143 of the Criminal Code of Canada:

> A male person commits rape when he has sexual intercourse with a female person who is not his wife,
>
> (a) without her consent, or
>
> (b) with her consent if the consent
>
>> (i) is extorted by threats or fear of bodily harm,
>>
>> (ii) is obtained by personating her husband, or
>>
>> (iii) is obtained by false and fraudulent representations as to the nature and quality of the act.

Per § 144, rape is punishable by "imprisonment for life . . . ."

Defendant is also charged with indecent assault in violation of § 149 of the Criminal Code of Canada, which requires that the prosecution "establish (1) touching; (2) the absence of consent; and (3) the assault was 'indecent.'" (Rivers Aff. ¶ 38.) "Indecent" has been described as "a non-consensual touching that has an indecent element to it[,] in this instance, sexual element to it." (Rivers Aff. ¶ 40 (internal quotation omitted).) Indecent assault is punishable by five years imprisonment. (Rivers Aff. ¶ 44.)

The United States argues that dual criminality is satisfied because Defendant can be charged with 18 U.S.C. §§ 2243 (sexual abuse) and 2244 (abusive sexual contact), as well as California Penal Code §§ 261 (rape), 261.5 (unlawful sexual intercourse), and 288(a) and (c) (bigamy, incest, and crimes against nature). The federal statutes and California Penal Code §§

7

261.5 and 288(a) each concern statutory rape, while California Penal Code § 261 concerns sexual intercourse "[w]here it is accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another."[2]

The parties dispute whether the statutory rape provisions satisfy dual criminality, as Canada does not charge Defendant with statutory rape. The Court need not decide this matter, as Defendant does not dispute that California Penal Code § 261 would satisfy the dual criminality requirement. (*See* Def.'s Opp'n at 30.)[3]

Instead, Defendant argues that the Court should not look to state law in determining dual criminality, on the grounds that the extradition treaty is limited to federal statutes only. (Def.'s Opp'n at 28, 30.) Defendant cites to no authority in support, and in fact conceded, in his papers and at the hearing, that controlling law requires that the Court consider state law. (*Id.* at 28.) Indeed, in interpreting Article 2's dual criminality requirement, the Ninth Circuit explained that the courts are to "look to proscription by similar criminal provisions of federal law or, if none, the law of the place where the fugitive is found or, if none, the law of the preponderance of the states." *Cucuzzella v. Keliikoa*, 638 F.2d 105, 107 (9th Cir. 1981); *see also Wright v. Henkel*, 190 U.S. 40, 58-59 (1903) (rejecting the argument that an extradition treaty's language, "made criminal by the laws of both countries," was limited to federal statutes).

Defendant also contends that California Penal Code § 261 does not apply in this case because the statute does not prohibit "rape or sexual contact obtained by false statements. . . ." (Def.'s Opp'n at 29.) Canada, however, does not bring claims for rape or indecent assault by false pretenses; rather, as discussed further below, Canada contends that "[a]s a result of [Defendant]'s abusive and controlling behaviour and his position of authority over the complainant, any consent ostensibly given was not freely provided so as to constitute valid consent." (Rivers Aff. ¶ 23.) Defendant acknowledged this at the hearing, so it is unclear why the argument was made in his

---

[2] A violation of § California Penal Code § 261 is punishable by eleven years imprisonment if the victim is fourteen years old.

[3] At the hearing, Defendant argued that California Penal Code § 243.3 would not be a sufficient analog to indecent assault because it is a misdemeanor. The United States, however, does not rely on § 243.3 for dual criminality.

United States District Court
Northern District of California

1  brief.

2  Such conduct would satisfy a rape charge under California Penal Code § 261, which

3  includes sexual intercourse against a person's will, by means of duress.  Duress, in turn, is defined

4  as "[a] direct or implied threat of force, violence, danger, or retribution sufficient to coerce a

5  reasonable person of ordinary susceptibilities to  perform an act which otherwise would not have

6  been performed, or acquiesce in an act to which one otherwise would not have submitted."  Cal.

7  Penal Code § 261(b).  Factors to consider include a victim's age and her relationship to the

8  defendant.  As applied here, B.B., who was fourteen years old at the time, states that she was

9  subject to a pattern of physical violence, threats of physical violence, and controlling behavior by

10  a person of authority over her.  Thus, Defendant's argument that California Penal Code § 261 does

11  not prohibit rape "by false statements" is beside the point.[4]

12  Accordingly, the Court finds that the dual criminality requirement is satisfied because

13  Defendant is charged with §§ 143, 144, and 149 of the Criminal Code of Canada, and could be

14  charged in California with a violation of California Penal Code § 261.  Further, these charges are

15  punishable by more than one year imprisonment.

16  **E.    Probable Cause**

17  Next, the Court must "determine whether there is evidence sufficient to sustain the charge

18  under the provisions of the proper treaty or convention, or, in other words, whether there is

19  probable cause."  *Santos v. Thomas*, 830 F.3d 987, 991 (9th Cir. 2016) (internal quotations

20

21  [4] Defendant also argues in a footnote that the Court should "evaluate the alleged conduct at the
time of the alleged conduct" to determine if that conduct was a violation of the law in the 1970s.

22  The Court rejects this argument.  First, "[a]rguments raised only in footnotes . . . are generally
deemed waived."  *Estate of Saunders v. C.I.R.*, 745 F.3d 953, 962 n.8 (9th Cir. 2014); *see also*

23  *City of Emeryville v. Robinson*, 621 F.3d 1251, 1262 n.10 (9th Cir. 2010).  Second, Defendant's
citation to *United States v. Wathne* is unpersuasive, as this case applied India's interpretation of an

24  extradition treaty, rather than United States or Canadian law.  No. CR 05-0594 VRW, 2008 WL
4344112, at *12 (N.D. Cal. Sept. 22, 2008).  Notably, other courts have found that the courts "look

25  to the law in place at the time the extradition request, not the law in effect when [the defendant]
allegedly committed the offenses."  *Nezirovic v. Holt*, 779 F.3d 233, 127 (4th Cir. 2015); *United*

26  *States ex rel. Oppenheim v. Hecht*, 16 F.2d 955, 956-57 (2d Cir. 1927).  Finally, even if the Court
was to "evaluate the alleged conduct at the time of the alleged conduct," Defendant provides no

27  analysis to guide that evaluation, let alone demonstrate that such an evaluation would require a
finding of no dual criminality.  Indeed, it appears §§ 143, 144, and 149 were in force between

28  1970 and 1983, and Defendant does not suggest that California Penal Code § 261 was not in effect
at that time.  (*See* Rivers Aff. ¶¶ 19, 36.)

1   omitted).  Importantly, "[f]oreign states requesting extradition are not required to litigate their

2   criminal cases in American courts."  *Id.*; *see also Charlton v. Kelly*, 229 U.S. 447, 461 (1913)

3   ("The proceeding is not a trial.").  Instead, the Court "need only 'determine whether there is

4   competent evidence to justify holding the accused to await trial, not whether the evidence is

5   sufficient to justify a conviction."  *Bozilov v. Seifert*, 983 F.2d 140, 143 (9th Cir. 1992) (quoting

6   *Collins v. Loisei*, 259 U.S. 309, 316 (1922)).

7        In arguing that the United States cannot establish probable cause, Defendant's primary

8   argument appears to be that B.B. "is reporting false memories," and that her "account does not

9   represent the true memory of historic fact, but instead is a invented memory developed by John

10   Hanas."  (Def.'s Opp'n at 26, 27.)  In support, Defendant attempts to contradict B.B.'s account by

11   pointing to her delay in reporting, her use of a previously written statement, the "improbability"

12   that a man could abuse a young woman for years "with no person catching on," and alleged

13   inconsistencies in her report.  (*Id.* at 31-36.)

14        Defendant's attempts to contradict B.B.'s account, however, are not proper in extradition

15   proceedings.  When the Court permitted Defendant to obtain discovery of B.B.'s statement, the

16   Court warned Defendant that it "will **not** consider attacks on B.B.'s credibility if such attacks are

17   based on contradictory evidence.  (Discovery Ord. at 6.)  This is because although evidence that

18   "explains matters referred to by the witnesses for the government" may be admitted, "evidence in

19   defense that merely contradicts the testimony for the prosecution may be excluded."  *Santos*, 830

20   F.3d at 992 (internal quotations omitted).  Contradictory evidence, in turn, "is that which merely

21   controverts the existence of probable cause, or raises a defense."  *Id.* (internal quotation omitted).

22   Thus, "[a]n accused in an extradition hearing has no right to contradict the demanding country's

23   proof or to pose questions of credibility as in an ordinary trial . . . ."  *Eain v. Wilkes*, 641 F.2d 504,

24   511 (7th Cir. 1981), *cited with approval by Santos*, 830 F.3d at 992.  "In practice, this means that

25   an individual contesting extradition may not, for example, present alibi evidence, facts

26   contradicting the government's proof, or evidence of defenses like insanity, as this tends to call

27   into question the credibility of the government's offer of proof."  *Santos*, 830 F.3d at 993.  He also

28   "may not impeach government witnesses or produce witnesses whose testimony contradicts

United States District Court
Northern District of California

10

1   evidence already offered by the government." *Id.* Even evidence that a major witness that the

2   government relies on had admitted to lying during the investigation is not admissible, as there is

3   simply "no right to attack the credibility of witnesses." *Bovio v. United States*, 989 F.2d 255, 259

4   (7th Cir. 1993), *cited with approval by Santos*, 830 F.3d at 1002.

5        Here, Defendant's assertions go solely to challenging B.B.'s credibility, none of which is

6   persuasive.  To the extent Defendant seeks to introduce evidence that contradicts B.B.'s

7   credibility, such as his repeated citations to the declarations of "a great host of respected

8   community members," this evidence is not permissible because they have no bearing on probable

9   cause, except to contradict B.B.'s statement or description of Defendant's character.  (*See* Def.'s

10  Opp'n at 19-20, 33-34.)  Therefore, the Court will not consider such declarations.  *See Santos*, 830

11  F.3d at 993 ("[the accused] **may not** . . . produce witnesses whose testimony contradicts evidence

12  already offered by the government") (emphasis added).

13       Defendant's other arguments also do not obliterate probable cause.  For example,

14  Defendant repeatedly questions B.B.'s delay in reporting.  (Def.'s Opp'n at 31.)  The fact that a

15  rape victim delays reporting does not suggest a credibility problem; delay in reporting is common

16  in such cases.  *See People v. McAlpin*, 53 Cal. 3d 1289, 1300 (1991) ("common stress reactions of

17  rape victims . . . may include a failure to report, or a delay in reporting, the sexual assault").

18  Further, Defendant suggests that Canada's withholding of the statement of B.B.'s father requires

19  that the Court "infer that her father's account would refute and negate parts of [B.B.]'s narrative."

20  (Def.'s Opp'n at 33.)  This, however, ignores the fact that this Court ruled that discovery of this

21  statement was not warranted because it did not go to probable cause.  (Discovery Ord. at 7.)

22       As to Defendant's identified "contradictions" within B.B.'s statement, these alleged

23  contradictions are not persuasive. Discrediting a victim's testimony in order to "negate or

24  completely obliterate the requesting country's showing of probable cause" "is a very difficult

25  standard to meet," one Defendant falls far short of.  *In re Extradition of Berrocal*, Case No. 17-

26  22197-Civ-TORRES, 2017 WL 3776953, at *21, 22 (S.D. Fla. Aug. 31, 2017).  For example,

27  Defendant points to errors in B.B.'s written statement as to particular ages or dates.  (Def.'s Opp'n

28  at 13-14.)  After reviewing B.B.'s written and oral statement, however, the Court does not find

United States District Court
Northern District of California

11

these errors to affect B.B.'s credibility; while B.B. may be off by one year in her written statement, her oral statement is consistent with what the correct dates would be based on her age. (*See* Dkt. No. 55 at 13-144 ("B.B. Tr."); 146-57 ("B.B. St.").)  For example, while B.B.'s written statement states that the Buffalo event occurred in March 1975, when B.B. was thirteen, B.B. explained in her interview that it occurred during the March school break when she was thirteen. (B.B. St. at 2; B.B. Tr. at 12.)  The detectives also went over the stated years, and B.B. acknowledged that she might have gotten the year wrong, before emphasizing that she was "thirteen when that happened for sure."  (B.B. Tr. at 81-83.)

Next, Defendant challenges B.B.'s account of what happened in Buffalo, including the lack of confirmation in Defendant's passport of a trip from Toronto to Buffalo that month or the lack of evidence of commercial flights then.  (Def.'s Opp'n at 15.)  The lack of evidence does not demonstrate that B.B. was not credible, particularly with respect to the lack of a passport stamp. As the Government points out, prior to 2009, citizens of the United States and Canada could travel between the two countries without presenting a passport.  (Gov.'s Reply at 15.)  Further, the fact that Defendant had some passport stamps does not necessarily mean Defendant always travelled with a passport.[5]  Defendant also contends that he would not have flown for this trip, but even if true, this inconsistency is not so significant that it would "obliterate" probable cause.  Finally, Defendant contends that his parents did not own the property B.B. describes in March 1975; Defendant argues that his parents owned a house with one living room and that B.B. describes two living rooms.  (Def.'s Opp'n at 15-16.)  B.B., however, did not state there were two living rooms; she only states the abuse happened in a front living room.  (*See* B.B. Tr. at 68.)

Defendant also challenges B.B.'s statements about the Students of Light property in Toronto, the Keele Street property.  (Def.'s Opp'n at 17.)  Defendant contends no one saw the abuse that happened; B.B., however, stated that the sexual abuse happened when they were alone. (*Id.*; *see also* B.B. Tr. at 18; B.B. St. at 4.)  Defendant also argues that B.B. lacks credibility because the Students of Light did not own the Keele Street property until after B.B. asserts the

---

[5] This would also be contradictory evidence that is impermissible in an extradition hearing.

United States District Court
Northern District of California

1  abuse there started; the Students of Light, however, did *rent* the property at that time.  (Def.'s

2  Opp'n at 18; Gov.'s Reply at 14.)  Thus, these are not inconsistencies, let alone inconsistencies

3  that would "obliterate" probable cause.[6]

4        Finally, Defendant challenges B.B.'s description of a trip to South Carolina when B.B. was

5  fifteen, in which B.B. left Defendant around 1:00 a.m.  (B.B. St. at 9.)  B.B. ended up at a main

6  roadway, and began following the highway around 2:30 a.m.  (*Id.*)  B.B. stated that at least an

7  hour passed, but no cars came by.  (*Id.*)  Eventually, when the sun began to rise, B.B. returned to

8  Defendant.  (*Id.*)  Defendant contends this description is unbelievable, first pointing – yet again –

9  to improper declaration testimony.  (Def.'s Opp'n at 21; *see Santos*, 830 F.3d at 993.)  Defendant

10  then contends that this story is "improbable and fantastical," as it is unlikely she would be on a

11  highway for hours and not meet any persons, cars, or telephones.  (Def.'s Opp'n at 32.)  The Court

12  disagrees that this story is "fantastical," and B.B. does not appear to state that she saw no cars for

13  hours; she stated that she did not see a car for "at least an hour."  It is not clear if she saw any cars

14  after that, and even if she was stating such, this alone is not nearly sufficient to affect B.B.'s

15  credibility to the point that her entire account must be set aside.

16        Taken together, the inconsistencies cited by Defendant – many of which are not

17  inconsistencies – do not rise to the level of rendering B.B.'s statement not credible.  This is not a

18  situation where B.B. is describing incidents that are so impossible that a Court cannot believe her.

19  Rather, B.B.'s statements are generally consistent, describing a pattern of abuse over the years.

20  While there may be errors as to some dates, this does not demonstrate that B.B. is not credible;

21  such errors are human, particularly when describing traumatic events that occurred years ago.

22  Further, the Court's review of the video further affirms B.B.'s credibility; in her oral statements to

23  the officers, B.B. appears to be truthful and genuinely emotional, and while she, at times, refers to

24  her written statement, she generally does not read from it.

25        In the alternative, Defendant argues that even if the Court accepts B.B.'s statement, it does

26

27  _____

[6] Defendant also relies on numerous declarations to contend that B.B.'s description of his vehicle at the time is incorrect.  Again, this is contradictory evidence that the Court cannot consider.  *See Santos*, 830 F.3d at 993 ("an individual contesting extradition may not, for example, present . . .

28  facts contradicting the government's proof").

United States District Court
Northern District of California

not establish forcible rape.  (Def.'s Opp'n at 34-35.)  Specifically to the Mother's Day 1977

incident, Defendant contends that B.B. only stated that she was "demeaned," and that

"[c]onsenting to sex because you've been told you're 'ugly' or 'stupid' does not convert that

sexual act to forcible rape."  (*Id.* at 35; *see also id.* ("lowering another person's self-esteem does

not vitiate consent because it does not threaten violence").)

In so arguing, Defendant relies on a limited focus on the specific incident, ignoring the

*entirety* of the relationship between B.B. and Defendant, as described by B.B.  Canada does not

contend B.B. did not consent merely because of what Defendant describes as her "lowered" self-

esteem, but because she had spent years being abused and controlled by Defendant.  (Rivers Aff. ¶

23.)  B.B. described how Defendant controlled many aspects of her life, including how many

hours she slept, when she went to the bathroom, and whether she could brush her teeth.

(Speakman Aff. ¶¶ 13-14.)  B.B. also described how she "felt paralyzed by fear" in Defendant's

presence, and how he had slapped her on three occasions, held up his hand in a motion threatening

to hit her, told her that he did not hit her only because he did not want to explain the marks to her

parents, and twisted her wrist.  (Speakman Aff. ¶¶ 15-17.)  In this context, where Defendant had a

relationship of authority over B.B. and controlled significant aspects of her life, B.B. felt terrified

and intimidated by Defendant, Defendant had used physical violence against B.B. and threatened

further violence, and Defendant had told B.B. that her will and desires were "not valid," there is

probable cause to believe that Defendant committed rape and indecent assault against B.B.

because his penetration of her on Mother's Day 1977 was without genuine consent.  (*See* Rivers

Aff. ¶¶ 53-58, 61.)  Such circumstances would also establish duress under California Penal Code §

261.

Finally, Defendant also suggests that he lacked adequate mens rea because Defendant did

not know that B.B. did not actually consent.  (Def.'s Opp'n at 35.)  Even if Defendant believed

that B.B. "had this special love for him as well," this does not negate that, per B.B.'s account, he

inflicted physical and emotional abuse on her, including when she disobeyed him.  (Rivers Aff. ¶

55.)  Notably, B.B. also stated that Defendant would demand that B.B. be more "affectionate with

him," and would get angry when B.B. did not orgasm, as he saw this as B.B. "willfully punishing

14

1    and denying him pleasure." (Speakman Aff. ¶¶ 28, 33.)  Such behavior does not suggest that

2    Defendant genuinely believed B.B. "loved" him.  Rather, it suggests that he was not blind to her

3    actual wants, and intended to coerce her into acting to the contrary.

4         The Court therefore concludes that there is probable cause to believe that Defendant

5    committed the offenses for which extradition is sought.

6         **F.    Statute of Limitations**

7         Finally, Defendant argues that his extradition is barred due to a lapse in time.  (Def.'s

8    Opp'n at 36.)  Article 4 of the extradition treaty provides: "Extradition shall not be granted . . .

9    [w]hen the prosecution for the offense has become barred by lapse of time according to the laws of

10   the requesting State."

11        **i.    Canada's Charter of Rights and Freedoms**

12        Defendant contends that his extradition is barred by Canada's Charter of Rights and

13   Freedoms ("Charter").  (Def.'s Opp'n at 36; *see also* Greenspan Decl., Dkt. No. 64-2.)  The

14   Charter guarantees procedural and substantive due process in criminal proceedings.  (Greenspan

15   Decl. ¶ 4.)  Defendant argues that the delay in prosecution will result in violations of such due

16   process rights because of the loss of evidence, including the death of Hanas.  (Greenspan Decl. ¶¶

17   10, 17.)

18        Defendant cites no authority that the Charter is applicable to Article 4's "lapse of time"

19   inquiry.  Notably, other courts have found that the "lapse of time" language in other treaties does

20   not apply to constitutional principles such as the speedy-trial right, but to applicable statute of

21   limitations.  *See Martinez v. United States*, 828 F.3d 451, 464 (6th Cir. 2016); *Yapp v. Reno*, 26

22   F.3d 1562, 1567 (11th Cir. 1994) ("for over a century, the term 'lapse of time' has been commonly

23   associated with a statute of limitations violation").

24        Moreover, Canada explains that the Charter does not "bar" prosecution of such offenses for

25   lapse of time, but instead provides a remedy after prosecution has been initiated, and that "[t]he

26   availability of such a remedy is highly dependent on the particular facts in each case."  (Supp.

27   Rivers Aff. ¶ 3, Dkt. No. 79.)  Significantly, in *Argentina (Republic) v. Mellino*, the Supreme

28   Court of Canada "made clear . . . that proceedings barred by 'lapse of time' are only those barred

by a limitations period." (Supp. Rivers Aff. ¶ 4.) The Supreme Court of Canada specifically found that the Charter's remedy for delay when a prosecution has been initiated did not apply to extraditions, explaining:

> This [lapse of time] provision was obviously intended to bring into operation statutes of limitations that exist in some countries prohibiting prosecution for certain crimes after a stated lapse of time . . . . Such statutes are relatively easy to apply at an extradition hearing; one simply has to compute the time in accordance with the provision of the statute. . . . [In contrast, a Charter remedy] must take into account such matters as whether the delay is unreasonable having regard to the time particular procedures ordinarily take. In extradition matters, this would surely require an inquiry into how proceedings are conducted in the foreign country and involve comparing them with ours. As well, a thorough examination of the facts surrounding the delay would have to be made, a function . . . wholly out of keeping with extradition proceedings.

(*Id.*) The Supreme Court of Canada's interpretation of the Chart is entitled to deference, particularly in this case, where Defendant cites no contrary authority. *See also Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961) ("While courts interpret treaties for themselves, the meaning given them by the departments of government particularly charged with their negotiation and enforcement is given great weight.").[7]

### ii. California Statute of Limitations

In the alternative, Defendant argues that because California's statute of limitations has expired, this is a jurisdictional bar that requires denial of extradition per Article 10(1) of the extradition treaty. (Def.'s Opp'n at 36.) Article 10(1) states:

> Extradition shall be granted only if the evidence be found sufficient, according to the laws of the place where the person sought shall be found, either to justify his committal for trial if the offense of which he is accused has been committed in its territory or to prove that he is the identical person convicted by the courts of the requesting State.

---

[7] In a declaration filed on January 28, 2020, Defendant argues that *Argentina* is distinguishable because there, the foreign state was seeking extradition from Canada. (Supp. Greenspan Decl. ¶ 4, Dkt. No. 80.) The reasoning of *Argentina*, however, would still apply, namely that the Charter would require that the courts consider multiple factors in determining delay, rather than a straightforward computation of time under the statute of limitations. Further, Defendant still cites to no authority that suggests the Charter would apply to extraditions.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   In support, Defendant relies on *In re Extradition of Sylvester*, in which the district court

2   found that Article 10(1) was not satisfied because the Pennsylvania statute of limitations had run.

3   No. 4:CR 05-0490, 2006 WL 6323514, at *2 (M.D. Penn. Feb. 14, 2006).  The district court

4   reasoned that Article 10(1)'s requirement that the evidence be sufficient to bind the accused for

5   trial "according to the laws of the place where the person sought shall be found" included the

6   statute of limitations because "the statute of limitations is an element of every criminal offense in

7   Pennsylvania."  *Id.*  The district court also found that Article 10(1) required that the United States

8   establish that there was probable cause that the defendant committed the extraditable crimes under

9   Pennsylvania law, which prohibited the use of hearsay evidence.  *Id.*

The Court finds *Sylvester* unpersuasive.  Notably, *Sylvester*'s finding that Article 10(1)

11   required the application of Pennsylvania law to determine the sufficiency of evidence was rejected

12   by the Third Circuit in *Harsharger v. Regan*.  599 F.3d 290, 294 (3d Cir. 2010).  In so finding, the

13   Third Circuit found that the district court failed to rely on Supreme Court authority interpreting

14   similar treaties, all of which concluded that hearsay evidence is permitted.  *Id.*

15   Moreover, as the Government argues, Article 4 is the extradition treaty's lapse of time

16   provision, while Article 10(1) concerns the probable cause requirement.  (*See* Gov.'s Reply at 19.)

17   In *Quinn v. Robinson*, the Ninth Circuit considered a provision similar to Article 10(1), and

18   explained that "United States courts have interpreted this provision in similar treaties as requiring

19   a showing by the requesting party that there is probable cause to believe that the accused has

20   committed the charged crime."  783 F.2d 776, 783 (1986).  Further, to read Article 10(1) as also

21   encompassing state statute of limitations would also conflict with Article 4's specific lapse of time

22   provision, which limits the statute of limitations inquiry to that of the requesting country.  *See D.*

23   *Ginsberg & Sons, Inc. v Popkin*, 285 U.S. 204, 208 (1932) ("Specific terms prevail over the

24   general in the same or another statute which otherwise might be controlling.").

25   Accordingly, the Court finds that Defendant's extradition is not barred due to a lapse in

26   time under either the Charter or the California statute of limitations.

27   ///

28   ///

17

United States District Court
Northern District of California

## IV.    CONCLUSION

For the reasons stated above, the United States' request for a certificate of extraditability of Donald Kollmar is GRANTED.

## CERTIFICATE OF EXTRADITABILITY

Having heard and considered the evidence in the above-captioned matter under 18 U.S.C. § 3184 *et seq.*, the Court finds and orders as follows:

1.    This Court has subject matter jurisdiction to conduct the extradition proceedings.

2.    This Court has personal jurisdiction over Donald Kollmar.

3.    This Court is authorized to conduct an extradition hearing under Criminal Local Rule 7-1(b)(13).

4.    There exists a valid extradition treaty between Canada (the requesting state) and the United States ("Treaty"), and the Treaty is in full force and effect.

5.    Donald Kollmar has been charged in Canada with Rape and Indecent Assault, in violation of sections 143, 144, and 149 of the Criminal Code of Canada.

6.    These charges constitute extraditable offenses within the meaning of the Treaty, as well as crimes under the laws in both Canada and the United States, punishable by imprisonment or other form of detention for a term exceeding one year.

7.    Canada seeks the extradition of Donald Kollmar for trial for these offenses.

8.    As required by Article 10(1) of the Treaty, there is probable cause to believe that Donald Kollmar has committed the offenses for which extradition is sought based on the documents and information provided by Canada.  The documentary evidence in support of the extradition request was authenticated by an officer of the Department of Justice of Canada, and was certified by the principal diplomatic or consular officer of the United States in Canada.

Accordingly, the Court CERTIFIES the above findings to the Secretary of State in order that a warrant may issue for the surrender of Donald Kollmar to Canada.  The Court ORDERS that Donald Kollmar continue to be released on bail pending final disposition of this matter by the

*///*

1   Secretary of State, for the reasons stated in the May 17, 2019 order.  (Dkt. No. 28.)[8]

2        IT IS SO ORDERED.

3   Dated: January 15, 2021

4   _Kandis Westmore_
    _____
    KANDIS A. WESTMORE

5   United States Magistrate Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

---

[8] The Court has corrected the date and docket number of the appropriate order granting release on secured bond.